IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

_____
                                              )
UNITED STATES OF AMERICA and                  )
THE STATE OF WISCONSIN,                        )
                                              )
                    Plaintiffs,                )
                                              ) Civil Action No. 10-C-910
          v.                                   )
                                              )
NCR CORPORATION,                              )
APPLETON PAPERS INC.,                          )
CITY OF APPLETON,                              )
CBC COATING, INC.,                             )
GEORGIA-PACIFIC CONSUMER PRODUCTS LP,          )
KIMBERLY-CLARK CORPORATION,                    )
MENASHA CORP.,                                )
NEENAH-MENASHA SEWERAGE COMMISSION,            )
NEWPAGE WISCONSIN SYSTEMS, INC.,               )
P.H. GLATFELTER CO.,                           )
U.S. PAPER MILLS CORP., and                    )
WTM I COMPANY,                                )
                                              )
                    Defendants.                )
_____)

# COMPLAINT

The United States of America, by authority of the Attorney General of the United States,

acting at the request and on behalf of the United States Environmental Protection Agency

("EPA") and the Department of the Interior ("DOI"), and the State of Wisconsin (the "State"),

by authority of the Attorney General of Wisconsin, acting at the request of the Governor of

Wisconsin and on behalf of the Wisconsin Department of Natural Resources ("WDNR")

pursuant to Wis. Stat. § 165.25(1), through the undersigned attorneys, file this complaint and

allege as follows:

## NATURE OF THE ACTION

1.      This is a civil action brought by the United States and the State (collectively, the "Plaintiffs") against the above-named defendants (collectively, the "Defendants") pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9606 and 9607.  The Plaintiffs seek to recover unreimbursed costs incurred for response activities undertaken in response to the release and threatened release of hazardous substances from facilities at and near the Lower Fox River and Green Bay Superfund Site in northeastern Wisconsin (the "Site") as well as damages for injury to, loss of, or destruction of natural resources resulting from such releases.  The Plaintiffs also seek a declaratory judgment that the Defendants are liable for future response costs that the United States or the State may incur in connection with response actions that may be performed at the Site.  Finally, the United States seeks injunctive relief and a declaratory judgment requiring specified Defendants to comply with a Unilateral Administrative Order issued by EPA in November 2007 pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), which required certain parties to implement response actions that EPA determined are necessary to protect public health and welfare and the environment.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) and (e) of CERCLA, 42 U.S.C. §§ 9613(b) and (e), and 28 U.S.C. §§ 1331 and 1345.

3.      Venue is proper in this district pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b) and (c) because the claims arose and the threatened and actual releases of hazardous substances occurred in this district.

## BACKGROUND ON THE SITE AND THE STATUTE

4.     The Lower Fox River and Green Bay Superfund Site encompasses a nearly 40 mile stretch of the Lower Fox River and more than 1,000 square miles of Green Bay that have been contaminated by polychlorinated biphenyls ("PCBs").  Facilities owned and operated by the defendants discharged large amounts of PCBs to the River in connection with past production and re-processing of a particular type of PCB-coated "carbonless" copy paper, known as "No Carbon Required" paper or "NCR Paper."  The PCB contamination that remains at the Site is primarily in sediments – at moderate to high concentrations in portions of the River and at lower concentrations in the Bay.  PCBs do not break down readily by natural processes, and the compounds bioaccumulate in the fatty tissue of animals.  The PCBs at the Site have caused adverse health effects and reproductive effects in fish and birds, and fish and waterfowl in the area are subject to human health-based consumption advisories.  PCBs are probable human carcinogens and can cause non-cancer human health effects, such as reduced ability to fight infections, low birth weights, and learning problems.

### Response Activities By Plaintiffs

5.     Pursuant to CERCLA, EPA and States may take "response" actions in response to the release and threatened release of hazardous substances at and from facilities, including contaminated sites.   Such response actions may include "removal" actions, including site investigations, studies to plan and direct cleanup efforts, and various activities to prevent, minimize, or mitigate damage to public health, welfare, or the environment, as well as longer-term "remedial" actions consistent with permanent remedies that prevent or minimize releases of hazardous substances to protect present and future public health, welfare, and the environment.

6.     As a result of PCB contamination at the Site, EPA and WDNR have taken various

-3-

response activities in accordance with CERCLA. Those actions include, but are not limited to, the response activities described below.

7. In 1999, WDNR – with assistance and funding from EPA – prepared and issued a set of draft scientific reports on the Site in accordance with the National Contingency Plan ("NCP") promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, and codified at 40 C.F.R. Part 300. Those reports included: (i) a draft remedial investigation report on the types, levels, and locations of contaminants at the Site; (ii) a draft risk assessment report evaluating the contamination-related risks posed to people and wildlife; and (iii) a draft feasibility study report assessing possible cleanup methods.

8. In 2001, EPA and WDNR issued a Proposed Remedial Action Plan for the Site, and solicited public comment on that Plan pursuant to the Section 117 of CERCLA, 42 U.S.C. § 9617, and the NCP.

9. WDNR issued final reports on its feasibility study, risk assessment, and remedial investigation in December 2002.

10. In December 2002 and June 2003, EPA and WDNR issued two Records of Decision ("RODs") selecting cleanup remedies for different portions of the Site. The RODs also divided the Site into five geographically-defined Operable Units ("OUs"): OU 1 (Little Lake Butte des Mort); OU 2 (Appleton to Little Rapids); OU 3 (Little Rapids to De Pere); OU 4 (De Pere to Green Bay); and OU 5 (the bay of Green Bay).

11. EPA and WDNR made adjustments to the remedies for OU 1 and OUs 2-5 in two ROD Amendments issued in 2007 and 2008. In three segments of the River (OUs 1, 3, and 4), the RODs (as amended) provide for extensive sediment removal by dredging and containment of contaminated sediment under specially-engineered *in situ* caps. The RODs also provide for

-4-

other activities in those areas, as well as long-term monitoring and other measures throughout the Site.

12.     The remedial action that EPA and WDNR selected for OU 1 of the Site is being performed under an Amended Consent Decree in the case captioned *United States and the State of Wisconsin v. P.H. Glatfelter Co. and WTM I Co.*, Case No. 03-C-0949 (E.D. Wis.).

Response Costs

13.     CERCLA § 107, 42 U.S.C. § 9607, authorizes the United States and States to recover costs that they incur in response to the release and threatened release of hazardous substances, to the extent such costs are not inconsistent with the NCP.  The statute imposes liability for such costs on certain classes of potentially responsible parties ("PRPs"), including current owners and operators of a facility from which there has been a release of a hazardous substance, parties that owned or operated a facility at the time of disposal of a hazardous substance, and parties that arranged for disposal or treatment of a hazardous substance at a facility owned by another party or entity.

14.     EPA and WDNR incurred costs in connection with response actions at the Site, including the actions described above.

15.     The United States has incurred more than $16.5 million in unreimbursed response costs associated with the Site.  Those costs include, but are not limited to:  (i) costs of a remedial investigation and feasibility study for the Site; (ii) costs of other actions to monitor, assess, and evaluate the release or threatened release of hazardous substances at the Site; (iii) costs of overseeing response activities at the Site; and (iv) costs of enforcement activities relating to the Site.

16.     To date, many of the response costs incurred by the State have been reimbursed

by the United States under a set of Cooperative Agreements with EPA under CERCLA § 104(d)(1), 42 U.S.C. § 9604(d)(1). Those State costs are therefore included in the United States' unreimbursed costs.

17. The State also has incurred some additional unreimbursed response costs associated with the Site. Those costs include, but are not limited to: (i) costs of overseeing response activities at the Site; and (ii) costs of enforcement activities relating to the Site.

18. The above-referenced response costs incurred by Plaintiffs qualify as costs of "response" and "costs of removal or remedial action incurred by the United States Government or a State" under CERCLA §§ 101(25) and 107(a)(4)(A), 42 U.S.C. §§ 9601(25) and 9607(a)(4)(A).

19. The United States and the State incurred the above-referenced response costs in a manner not inconsistent with the NCP.

20. The United States and the State will continue to incur response costs associated with the Site.

21. Certain past response costs incurred by the United States and the State have been paid under partial settlements or other arrangements with the PRPs at this Site. The amount of unreimbursed costs referenced above incorporates full credit for all cost reimbursements already paid by PRPs.

22. The amounts recoverable in an action under CERCLA § 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A), include statutory prejudgment interest on the response costs. Such interest accrues from the later of: (i) the date that payment of a specified amount is demanded in writing; or (ii) the date of the expenditure concerned.

23. The United States made a written demand for payment of a specified amount of

-6-

unreimbursed response costs in a January 15, 2009 correspondence addressed to representatives of NCR Corporation; Appleton Papers Inc.; CBC Coating, Inc.; Georgia-Pacific Consumer Products LP; Menasha Corporation; P.H. Glatfelter Company; U.S. Paper Mills, Inc.; and WTM I Company.

Cleanup Requirements

24.     Pursuant to CERCLA § 106, 42 U.S.C. § 9606, when EPA determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of hazardous substances from a facility, EPA may issue such orders as may be necessary to protect public health and welfare and the environment.  CERCLA § 106 also authorizes the United States to maintain civil actions to secure such relief as may be necessary to abate such danger or threat, and provides that district courts may grant such relief as the public interest and the equities of the case may require.

25.     In November 2007, EPA issued a unilateral administrative order ("UAO") – pursuant to CERCLA § 106, 42 U.S.C. § 9606 – requiring certain parties, including several of the Defendants, to perform the remedial actions that EPA and WDNR selected for OUs 2-5 of the Site.   EPA issued that UAO to the following parties:  NCR Corporation; Appleton Papers Inc.; CBC Coating, Inc.; Georgia-Pacific Consumer Products LP; Menasha Corporation; P.H. Glatfelter Company; U.S. Paper Mills, Inc.;  and WTM I Company (collectively, the "UAO Recipients").  A copy of the UAO is attached hereto as Exhibit A.

Natural Resource Damage Assessment and Restoration Activities

26.     In addition to being liable for payment of response costs and performance of response actions, PRPs at a site are liable for damages for any injury to, destruction of, or loss of natural resources resulting from the release of hazardous substances, including the reasonable

costs of assessing such injury, under CERCLA § 107(a)(4)(C), 42 U.S.C. § 9607(a)(4)(C). Pursuant to CERCLA § 107(f), 42 U.S.C. § 9607(f), duly-designated Federal and State natural resource trustees (and Native American Tribes) are authorized to recover such natural resource damages ("NRD").

27.     Under CERCLA, the term "natural resources" includes "land, fish, wildlife, biota, air, water . . . and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States [or] any State or local government," 42 U.S.C. § 9601(16).

28.     Natural resources have been injured, and natural resources will continue to be injured, as a result of releases of hazardous substances – especially PCBs – into the environment at the Site.

29.     DOI has been designated as a natural resource trustee for federal trust resources at and near the Site pursuant to 42 U.S.C. § 9607(f)(2)(A), 40 C.F.R.§ 300.600, and Exec. Ord. No. 12,580, 52 Fed. Reg. 2923 (Jan. 23, 1987). DOI acts on behalf of the public as a trustee for natural resources, including threatened or endangered species, migratory birds, other fish and aquatic life, and their supporting ecosystems, belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States. *See*, *e.g.*, 40 C.F.R. § 300.600.

30.     WDNR has been designated as a State natural resource trustee for state trust resources at and near the Site pursuant to 42 U.S.C. § 9607(f)(2)(B) and 40 C.F.R. § 300.605. WDNR acts on behalf of the public for natural resources, including their supporting ecosystems, within the boundary of the State or belonging to, managed by, or appertaining to such State. 40 C.F.R. § 300.605.

31.     Federal trusteeship over natural resources may overlap with that of States or

Tribes or both. The NCP directs that, where there are multiple trustees, the trustees should coordinate and cooperate in carrying out their responsibilities. 40 C.F.R. § 300.615(a).

32.     NRD may include compensation for interim losses to the public attributable to natural resource injuries from the onset of the release through their repair or recovery to an uninjured state, adjusted for any mitigation of those injuries by response actions or early restoration actions, and any increase in injuries that may have occurred as a result of response actions. NRD also include the costs of actions to restore, replace, or acquire the equivalent of the injured natural resources and the reasonable costs of assessing the injury and the associated damages.

33.     As required by CERCLA § 301(c), 42 U.S.C. § 9651(c), DOI has promulgated regulations respecting the assessment of NRD and associated restoration activities. Those regulations are codified at 43 C.F.R. Part 11.

34.     As expressly provided by CERCLA § 107(c)(2), 42 U.S.C. § 9607(c)(2), any determination or assessment of damages made by a Federal or State trustee in accordance with DOI's NRD assessment regulations shall have the force and effect of a rebuttable presumption on behalf of the trustee in any judicial proceeding to recover such damages under CERCLA.

35.     DOI, WDNR, and certain Tribal Trustees – the Oneida Tribe of Indians of Wisconsin and the Menominee Indian Tribe of Wisconsin – have performed a variety of NRD assessment and restoration activities concerning the Site in accordance with DOI's NRD assessment regulations. The assessment activities have included preparation of a preassessment screen, issuance of an assessment plan, completion of an injury determination phase and injury quantification phase, development of a Restoration and Compensation Determination Plan ("RCDP"), and issuance of a Joint Restoration Plan by the Federal, State, and Tribal Trustees.

Case 1:10-cv-00910-WCG   Filed 10/14/10   Page 9 of 33   Document 1

The October 2000 RCDP – prepared on behalf of DOI and certain Co-Trustees – focused on PCB-related injuries to natural resources associated with the bay of Green Bay and its tributaries up to the first dam or obstruction and determined the resulting damages.

36.    In issuing the RCDP and other associated reports, DOI made a determination or assessment of damages for the Site in accordance with DOI's NRD assessment regulations. Pursuant to CERCLA § 107(f)(2)(C), 42 U.S.C. § 9607(f)(2)(C), that determination or assessment of damages shall have the force and effect of a rebuttable presumption on behalf of the Plaintiffs in this judicial proceeding to recover such damages.

37.    The Plaintiffs have obtained partial recoveries on their NRD claims for the Site through partial settlements with some of the Defendants and other PRPs.  This Complaint does not seek a double recovery; those partial settlements reduce Defendants' potential liability by the amounts of those partial settlements consistent with CERCLA §§ 107(f)(1) and 113(f)(2), 42 U.S. C. §§ 9607(f)(1) and 9613(f)(2).

38.     The amounts recoverable in an action for NRD under CERCLA Section 107(a)(4)(C), 42 U.S.C. § 9607(a)(4)(C), include statutory prejudgment interest on the damages.

GENERAL ALLEGATIONS AND ALLEGATIONS RELATING TO THE DEFENDANTS

General Allegations

39.    Each of the Defendants is a "person," within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

40.     Each paper production facility and each paper reprocessing facility referenced in paragraphs 45-112 below is a "facility," within the meaning of CERCLA §§ 101(9) and 107(a), 42 U.S.C. §§ 9601(9) and 9607(a).

41.    Each sewer system (including each sewer pipe) and each publicly-owned

Case 1:10-cv-00910-WCG   Filed 10/14/10   Page 10 of 33   Document 1

treatment works ("POTW") referenced in paragraphs 45-112 below is a "facility," within the meaning of CERCLA §§ 101(9) and 107(a), 42 U.S.C. §§ 9601(9) and 9607(a).

42.     Each landfill referenced in paragraphs 45-112 below is a "facility," within the meaning of CERCLA §§ 101(9) and 107(a), 42 U.S.C. §§ 9601(9) and 9607(a).

43.     The Site is a "facility," within the meaning of CERCLA §§ 101(9) and 107(a), 42 U.S.C. §§ 9601(9) and 9607(a).

44.     PCBs are "hazardous substances," within the meaning of CERCLA §§ 101(14) and 107(a), 42 U.S.C. §§ 9601(14) and 9607(a).

NCR Corporation and Appleton Papers Inc.

45.     NCR Corporation and Appleton Papers Inc. are corporate successors to a common set of corporate predecessors, including Appleton Coated Paper Company and Combined Paper Mills, Inc.  Appleton Papers Inc. also is a successor to certain relevant liabilities of NCR Corporation.  NCR Corporation and its corporate predecessors are collectively referred to herein as "NCR," and Appleton Papers Inc. and its corporate predecessors are collectively referred to herein as "API."

46.     NCR and API and have owned and/or operated two paper production facilities in the Fox River Valley:  one located on East Wisconsin Avenue in Appleton (the "Appleton Facility") and another located in Combined Locks (the "Combined Locks Facility").

47.     NCR and API produced PCB-coated NCR Paper at the Appleton Facility and the Combined Locks Facility.

48.     NCR and API reprocessed PCB-containing wastepaper at the Combined Locks Facility.

49.     During production of NCR Paper at the Appleton Facility and the Combined

-11-

Locks Facility, NCR and API generated PCB-coated NCR Paper "broke," such as paper trimmings from its manufacturing process and off-specification scrap paper.

50.     In connection with its production of NCR Paper and its reprocessing of PCB-containing wastepaper, the Combined Locks Facility discharged wastewater containing PCBs directly to the Lower Fox River while it was owned and operated by NCR and API.  NCR and API therefore owned and operated a facility at the time of disposal of hazardous substances at that facility, and there were releases of hazardous substances from that facility to the Site.

51.     In connection with its production of NCR Paper, the Appleton Facility discharged wastewater containing PCBs to the City of Appleton's sewer system and POTW while the Appleton Facility was owned and operated by NCR and API, and the City of Appleton in turn discharged the Appleton Facility's partially-treated, PCB-containing wastewater to the Lower Fox River.  NCR and API therefore:  (i) owned and operated a facility at the time of disposal of hazardous substances at that facility, and there were releases of hazardous substances from that facility to the Site; and (ii) arranged for disposal or treatment of hazardous substances that they owned or possessed, at a facility owned or operated by another party or entity, and there were releases of hazardous substances from that facility to the Site.

52.      As described more specifically below in this paragraph, NCR and API also arranged for disposal or treatment of hazardous substances that they owned or possessed, at facilities owned or operated by other parties, through the generation and disposition of PCB-coated NCR Paper broke.

i.     NCR and API established and followed detailed process specifications for the manufacture of NCR Paper.  Those specifications required the paper coater to test samples of the NCR Paper and to scrap any NCR Paper that failed to meet a set of

-12-

minimum quality requirements. Off-specification NCR Paper needed to be disposed of and could not be shipped to NCR Paper customers.

ii. The Appleton Facility's generation of broke was incidental to its production of saleable coated paper. The Appleton Facility could not use or re-use the broke in its own operations.

iii. The Appleton Facility had limited space for storing broke.

iv. NCR and API tracked their generation of NCR Paper broke and sought to minimize their broke generation. Internal memoranda and external communications by NCR and API referred to NCR Paper broke as a "waste" material. Appleton Facility employees were directed to dispose of broke through the most economical means.

v. NCR and API sold PCB-coated NCR Paper broke to other companies, and it was then reprocessed at paper mill facilities that discharged resulting PCB-contaminated wastewater to OU 1, OU 2, and OU 4 at the Site. NCR and API sold at least some of their PCB-coated NCR Paper broke through paper brokers, who then sold and delivered that NCR Paper broke to various paper mills, including some of the Fox River Valley paper mills owned by other Defendants in this case.

vi. When it was sold, NCR Paper broke was sold at a discounted price as compared to otherwise similar uncoated waste paper.

vii. The sale of broke was not a profit center for the Appleton Facility.

viii. NCR and API knew that the PCB-coated NCR Paper broke that they generated was being re-sold to recycling mills, including some of the Fox River Valley paper mills owned by other Defendants in this case.

ix. The recycling mills reprocessed the NCR Paper broke to recover the wood

fibers in the paper. The PCBs contained in the NCR Paper broke were of no use to those paper mills.

x. The mills owned by several of the Defendants used specialized deinking processes or other processes to treat the paper and remove the unwanted PCB-containing coating that came from NCR Paper. The coating would impart an undesirable odor, tint, or haze, and/or discolor the product that the mill was making. In some instances, the NCR Paper broke still needed to be blended with other deinked wastepaper in order to prevent or minimize the discoloration of the final paper product.

xi. Based in part on their own experiments and experience, NCR and API knew that re-pulping processes would rupture the capsules coated on NCR Paper broke, releasing the PCBs and the dye. NCR and API also knew that the dye would discolor the pulp and that the discoloration typically would need to be reduced by deinking or washing processes. NCR and API knew that mills that recycled NCR Paper broke – including some of the Fox River Valley paper mills owned by other Defendants in this case – actually employed such processes to remove unwanted coatings from the broke.

53. In light of the foregoing, NCR is liable to Plaintiffs in this action under: (i) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2); and (ii) CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

54. In light of the foregoing, API is liable to Plaintiffs in this action under: (i) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2); and (ii) CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

Case 1:10-cv-00910-WCG   Filed 10/14/10   Page 14 of 33   Document 1

CBC Coating, Inc.

55.     CBC Coating, Inc. (formerly known as Riverside Paper Corp) ("CBC Coating") has owned and/or operated a paper production facility on South Lawe Street in Appleton, Wisconsin (the "Riverside Facility"). The Plaintiffs are informed and believe that CBC Coating still owns and/or operates the Riverside Facility.

56.     CBC Coating reprocessed PCB-containing wastepaper at the Riverside Facility.

57.     In connection with its reprocessing of PCB-containing wastepaper, the Riverside Facility discharged wastewater containing PCBs to the City of Appleton's sewer system and POTW while the Riverside Facility was owned and operated by CBC Coating, and the City of Appleton in turn discharged the Riverside Facility's partially-treated, PCB-containing wastewater to the Lower Fox River.

58.     CBC Coating therefore:  (i) owns and operates a facility from which there have been releases of hazardous substances, and there were releases of hazardous substances from that facility to the Site; (ii) owned and operated a facility at the time of disposal of hazardous substances at that facility, and there were releases of hazardous substances from that facility to the Site; and (iii) arranged for disposal or treatment of hazardous substances that it owned or possessed, at a facility owned or operated by another party or entity, and there were releases of hazardous substances from that facility to the Site.

59.     In light of the foregoing, CBC Coating is liable to Plaintiffs in this action under: (i) CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1); (ii) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2); and (iii) CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

60.     This Complaint does not assert claims against CBC Coating for any response costs associated solely with OU 1. CBC Coating is liable for other response costs, response

actions, and natural resource damages, as alleged below.

City of Appleton

61.    The City of Appleton ("Appleton") has owned and/or operated a sewer system and a POTW that is adjacent to the Lower Fox River, to the north of East Newberry Street, in Appleton.  As alleged above, Appleton's sewer system and POTW received PCB-containing wastewater from the Appleton Facility owned by NCR and API and the Riverside Facility owned by CBC Coating, and Appleton in turn discharged partially-treated, PCB-containing wastewater from those facilities to the Lower Fox River.  Appleton still owns and/or operates the Appleton POTW and its associated sewer system.

62.    Appleton therefore:  (i) owns and operates a facility from which there have been releases of hazardous substances, and there were releases of hazardous substances from that facility to the Site; and (ii) owned and operated a facility at the time of disposal of hazardous substances at that facility, and there were releases of hazardous substances from that facility to the Site.

63.    In light of the foregoing, Appleton is liable to Plaintiffs in this action under: (i) CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1); and (ii) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2).

64.    This Complaint does not assert claims against Appleton for any response costs associated solely with OU 1.  Appleton is liable for other response costs and natural resource damages, as alleged below.

Georgia-Pacific Consumer Products LP

65.    Georgia-Pacific Consumer Products LP (formerly known as Fort James Operating Co.) and at least one of its corporate predecessors – Fort Howard Corporation – have owned

and/or operated a paper production facility on South Broadway in Green Bay, Wisconsin (the "Fort Howard Facility"). Georgia-Pacific Consumer Products LP is – among other things – a corporate successor by merger to Fort Howard Corporation, which owned and operated the Fort Howard Facility until at least 1997. Georgia-Pacific Consumer Products LP and its corporate predecessors are collectively referred to herein as "Georgia-Pacific." Georgia-Pacific still owns and operates the Fort Howard Facility.

66.    Georgia-Pacific reprocessed PCB-containing wastepaper at the Fort Howard Facility.

67.    In connection with its reprocessing of PCB-containing wastepaper, the Fort Howard Facility discharged wastewater containing PCBs directly to the Lower Fox River while it was owned and operated by Georgia-Pacific.

68.    In connection with its reprocessing of PCB-containing wastepaper, the Fort Howard Facility generated PCB-containing paper mill sludge that was disposed of at a landfill facility owned and operated by Georgia-Pacific. PCB-containing leachate from that landfill facility has been discharged to the Green Bay Metropolitan Sewerage District's sewer system and POTW while the landfill was owned and operated by Georgia-Pacific, and the Green Bay Metropolitan Sewerage District in turn discharged Georgia-Pacific's partially-treated, PCB-containing wastewater to the Lower Fox River.

69.    Georgia-Pacific therefore:  (i) owns and operates facilities from which there have been releases of hazardous substances, and there were releases of hazardous substances from those facilities to the Site; (ii) owned and operated facilities at the time of disposal of hazardous substances at those facilities, and there were releases of hazardous substances from those facilities to the Site; and (iii) arranged for disposal or treatment of hazardous substances that it

owned or possessed, at a facility owned or operated by another party or entity, and there were releases of hazardous substances from that facility to the Site.

70.     In light of the foregoing, Georgia-Pacific is liable to Plaintiffs in this action under:  (i) CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1); (ii) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2); and (iii) CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

71.     Georgia-Pacific has resolved its liability for NRD associated with the Site pursuant to a Consent Decree in *United States and the State of Wisconsin v. Fort James Operating Co.*, Case No. 02-C-0602 (E.D. Wis.), subject to specified terms and conditions set forth in that Decree.  That Consent Decree and a related administrative settlement agreement also resolved Georgia-Pacific's liability for certain response actions in an area of the Site known as Sediment Management Unit 56/57 (and its liability for certain costs associated with response actions in that area), subject to specified terms and conditions set forth in those settlements. For that reason, this Complaint does not assert claims against Georgia-Pacific for NRD or for such Sediment Management Unit 56/57 response actions or response costs.

72.     This Complaint does not assert claims against Georgia-Pacific for any response costs associated solely with OU 1, OU 2, or OU 3.  Georgia-Pacific is liable for other response costs and response actions, as alleged below.

Kimberly-Clark Corporation

73.     Kimberly-Clark Corporation ("Kimberly Clark") has owned and/or operated several paper production facilities in the Fox River Valley, including two paper mills on North Commercial Street in Neenah (the "Neenah Facility" and the "Badger-Globe Facility") and another paper mill on North Lake Street in Menasha (the "Lakeview Facility').  Kimberly-Clark no longer owns the Neenah Facility or the Lakeview Facility.  The Badger-Globe Facility has

-18-

been demolished.

74.     Kimberly-Clark reprocessed PCB-containing wastepaper and/or PCB-containing deinked pulp at the above-referenced facilities.

75.     For some period of time, Kimberly-Clark used a wastewater treatment system at the Neenah Facility to treat wastewater from both the Neenah Facility and the Badger-Globe Facility.

76.     In connection with the reprocessing of PCB-containing wastepaper and/or PCB-containing deinked pulp, the Neenah Facility and Badger-Globe Facility discharged portions of their wastewater containing PCBs:  (i) directly to the Lower Fox River while those facilities were owned and operated by Kimberly-Clark; and (ii) to the Neenah-Menasha Sewerage Commission's sewer system and POTW while the Neenah Facility and Badger-Globe Facility were owned and operated by Kimberly-Clark, and the Neenah-Menasha Sewerage Commission in turn discharged those facilities' partially-treated, PCB-containing wastewater to the Lower Fox River.

77.     In connection with its reprocessing of PCB-containing wastepaper and/or PCB-containing deinked pulp, the Lakeview Facility discharged its wastewater containing PCBs directly to the Lower Fox River while that facility was owned and operated by Kimberly-Clark.

78.     Kimberly-Clark therefore:  (i) owned and operated a facility at the time of disposal of hazardous substances at that facility, and there were releases of hazardous substances from that facility to the Site; and (ii) arranged for disposal or treatment of hazardous substances that it owned or possessed, at a facility owned or operated by another party or entity, and there were releases of hazardous substances from that facility to the Site.

79.     In light of the foregoing, Kimberly-Clark is liable to Plaintiffs in this action

under: (i) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2); and (ii) CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

Menasha Corporation

80.     Menasha Corporation and at least one of its corporate predecessors – the John Strange Paper Company – have owned and/or operated a paper production facility on Washington Street in Menasha, Wisconsin (the "John Strange Facility"). Menasha Corporation is – among other things – a corporate successor by merger to the John Strange Paper Company, which owned and operated the John Strange Facility until at least 1971. Menasha Corporation and its corporate predecessors are collectively referred to herein as "Menasha." Menasha no longer owns or operates the John Strange Facility.

81.     Menasha reprocessed PCB-containing wastepaper at the John Strange Facility.

82.     In connection with its reprocessing of PCB-containing wastepaper, the John Strange Facility discharged portions of its wastewater containing PCBs: (i) directly to the Lower Fox River while it was owned and operated by Menasha; and (ii) to the Neenah-Menasha Sewerage Commission's sewer system and POTW while the John Strange Facility was owned and operated by Menasha, and the Neenah-Menasha Sewerage Commission in turn discharged the John Strange Facility's partially-treated, PCB-containing wastewater to the Lower Fox River.

83.     Menasha therefore: (i) owned and operated a facility at the time of disposal of hazardous substances at that facility, and there were releases of hazardous substances from that facility to the Site; and (ii) arranged for disposal or treatment of hazardous substances that it owned or possessed, at a facility owned or operated by another party or entity, and there were releases of hazardous substances from that facility to the Site.

84.     In light of the foregoing, Menasha is liable to Plaintiffs in this action under:

-20-

(i) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2); and (ii) CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

### NewPage Wisconsin Systems, Inc.

85.     One or more corporate predecessors of NewPage Wisconsin Systems, Inc. – including Consolidated Papers, Inc. – owned and/or operated a paper production facility on East John Street in Appleton, Wisconsin (the "Consolidated Appleton Facility").  NewPage Wisconsin Systems, Inc. is – among other things – a corporate successor by merger to Consolidated Papers, Inc., which owned and operated the Consolidated Appleton Facility until at least the 1980s.  NewPage Wisconsin Systems, Inc. and its corporate predecessors are collectively referred to herein as "NewPage."  The Plaintiffs are informed and believe that the Consolidated Appleton Facility closed and was dismantled in the 1980s.

86.     The Consolidated Appleton Facility discharged wastewater containing PCBs directly to the Lower Fox River while the Facility was owned and operated by NewPage.

87.     NewPage therefore owned and operated a facility at the time of disposal of hazardous substances at that facility, and there were releases of hazardous substances from that facility to the Site.

88.     In light of the foregoing, NewPage is liable to Plaintiffs in this action under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2).

89.     This Complaint does not assert claims against NewPage for any response costs associated solely with OU 1.  NewPage is liable for other response costs and natural resource damages, as alleged below.

### P.H. Glatfelter Company

90.     P.H. Glatfelter Company and at least one of its corporate predecessors –

Bergstrom Paper Company – have owned and/or operated a paper production facility on West Wisconsin Avenue in Neenah, Wisconsin (the "Bergstrom Facility"). P.H. Glatfelter Company is – among other things – a corporate successor by merger to Bergstrom Paper Company, which owned and operated the Bergstrom Facility until at least 1979. P.H. Glatfelter Company and its corporate predecessors are collectively referred to herein as "Glatfelter." Glatfelter still owns and/or operates the Bergstrom Facility.

91. Glatfelter reprocessed PCB-containing wastepaper at the Bergstrom Facility.

92. In connection with its reprocessing of PCB-containing wastepaper, the Bergstrom Facility discharged wastewater containing PCBs directly to the Lower Fox River while it was owned and operated by Glatfelter.

93. In connection with its reprocessing of PCB-containing wastepaper, the Bergstrom Facility generated PCB-containing paper mill sludge that was disposed of at an adjacent landfill facility owned and operated by Glatfelter. PCB-contaminated material from that landfill facility has been released to the Lower Fox River while the landfill was owned and operated by Glatfelter.

94. Glatfelter therefore: (i) owns and operates facilities from which there have been releases of hazardous substances, and there were releases of hazardous substances from those facilities to the Site; and (ii) owned and operated facilities at the time of disposal of hazardous substances at those facilities, and there were releases of hazardous substances from those facilities to the Site.

95. In light of the foregoing, Glatfelter is liable to Plaintiffs in this action under: (i) CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1); and (ii) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2).

-22-

96. Glatfelter has resolved its liability for certain response actions and response costs associated with OU 1 of the Site pursuant to an Amended Consent Decree in *United States and the State of Wisconsin v. P.H. Glatfelter Co. and WTM I Co.*, Case No. 03-C-0949 (E.D. Wis.), subject to specified terms and conditions set forth in that Amended Consent Decree. Among other things, that Amended Consent Decree included Plaintiffs' covenants not to sue Glatfelter for certain "OU 1 Response Activities and Costs," which includes costs of response activities for OU 1 incurred after July 1, 2003. For that reason, this Complaint does not assert claims against Glatfelter for such "OU 1 Response Activities and Costs." Glatfelter nonetheless remains bound to perform certain ongoing obligations under its Amended Consent Decree with the Plaintiffs. Glatfelter also is liable for other response costs, response actions, and natural resource damages, as alleged below.

U.S. Paper Mills Corp.

97. U.S. Paper Mills Corp. (formerly known as Sonoco-U.S. Mills, Inc.) and at least one of its corporate predecessors – U.S.P.M., Inc. – have owned and/or operated a paper production facility on Fort Howard Avenue in De Pere, Wisconsin (the "De Pere Facility"). The United States is informed and believes that U.S. Paper Mills Corp. also expressly assumed relevant liabilities when it purchased the John Strange Facility from Menasha in 1983. Therefore, U.S. Paper and Menasha both are corporate successors to the liabilities of the John Strange Paper Company, and U.S. Paper is a successor to certain relevant liabilities of Menasha. U.S. Paper Mills Corp. and its corporate predecessors are collectively referred to herein as "U.S. Paper." U.S. Paper still owns and operates the De Pere Facility and the John Strange Facility.

98. U.S. Paper reprocessed PCB-containing wastepaper at the De Pere Facility.

99.     U.S. Paper reprocessed PCB-containing wastepaper at the John Strange Facility

100.     In connection with its reprocessing of PCB-containing wastepaper, the De Pere Facility at various times discharged its wastewater containing PCBs:  (i) directly to the Lower Fox River while the De Pere Facility was owned and operated by U.S. Paper; and (ii) to the City of  De Pere's sewer system and POTW while the De Pere Facility was owned and operated by U.S. Paper, and the City of De Pere in turn discharged the De Pere Facility's partially-treated, PCB-containing wastewater to the Lower Fox River.

101.     In connection with its reprocessing of PCB-containing wastepaper, the John Strange Facility discharged portions of its wastewater containing PCBs:  (i) directly to the Lower Fox River while it was owned and operated by U.S. Paper; and (ii) to the Neenah-Menasha Sewerage Commission's sewer system and POTW while the John Strange Facility was owned and operated by U.S. Paper, and the Neenah-Menasha Sewerage Commission in turn discharged the John Strange Facility's partially-treated, PCB-containing wastewater to the Lower Fox River.

102.     U.S. Paper therefore:  (i) owns and operates facilities from which there have been releases of hazardous substances, and there were releases of hazardous substances from those facilities to the Site; (ii) owned and operated a facility at the time of disposal of hazardous substances at that facility, and there were releases of hazardous substances from that facility to the Site; and (iii) arranged for disposal or treatment of hazardous substances that it owned or possessed, at a facility owned or operated by another party or entity, and there were releases of hazardous substances from that facility to the Site.

103.     In light of the foregoing, U.S. Paper is liable to Plaintiffs in this action under: (i) CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1); (ii) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2); and (iii) CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

-24-

WTM I Company

104.    WTM I Company (formerly known as Wisconsin Tissue Mills Inc. and WTM Corp.) and at least one of its corporate predecessors – including another company called Wisconsin Tissue Mills Inc. – have owned and/or operated a paper production facility on Tayco Street in Menasha, Wisconsin (the "WTM Facility").  WTM I Company is – among other things – a corporate successor by merger to a Wisconsin corporation called Wisconsin Tissue Mills Inc., which owned and operated the WTM Facility until at least 1977.  WTM and its corporate predecessors are collectively referred to herein as "WTM."  WTM no longer owns or operates the WTM Facility.

105.    WTM reprocessed PCB-containing wastepaper at the WTM Facility.

106.    In connection with its reprocessing of PCB-containing wastepaper, the WTM Facility at various times discharged its wastewater containing PCBs:  (i) to the Neenah-Menasha Sewerage Commission's sewer system and POTW while the WTM Facility was owned and operated by WTM, and the Neenah-Menasha Sewerage Commission in turn discharged the WTM Facility's partially-treated, PCB-containing wastewater to the Lower Fox River; (ii) directly to the Lower Fox River while the WTM Facility was owned and operated by WTM.

107.    WTM therefore:  (i) owned and operated a facility at the time of disposal of hazardous substances at that facility, and there were releases of hazardous substances from that facility to the Site; and (ii) arranged for disposal or treatment of hazardous substances that it owned or possessed, at a facility owned or operated by another party or entity, and there were releases of hazardous substances from that facility to the Site.

108.    In light of the foregoing, WTM is liable to Plaintiffs in this action under: (i) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2); and (ii) CERCLA § 107(a)(3), 42 U.S.C.

§ 9607(a)(3).

109.     WTM has resolved its liability for certain response actions and response costs associated with OU 1 of the Site pursuant to the above-referenced Amended Consent Decree in *United States and the State of Wisconsin v. P.H. Glatfelter Co. and WTM I Co.*, Case No. 03-C-0949 (E.D. Wis.), subject to specified terms and conditions set forth in that Amended Decree.  For that reason, this Complaint does not assert claims against WTM for "OU 1 Response Activities and Costs" as defined in that Amended Consent Decree, including any claim for costs of response activities for OU 1 incurred after July 1, 2003.  WTM nonetheless remains bound to fund and perform certain ongoing obligations under its Amended Consent Decree with the Plaintiffs.  WTM also is liable for other response costs, response actions, and natural resource damages, as alleged below.

Neenah-Menasha Sewerage Commission

110.     The Neenah-Menasha Sewerage Commission ("NMSC") has owned and/or operated a regional sewer system and a POTW that is adjacent to the Little Lake Butte des Mort segment of the Lower Fox River, at the western end of Garfield Avenue, in Menasha.  As alleged above, the NMSC's sewer system and POTW received PCB-containing wastewater from several facilities – including the WTM Facility, the John Strange Facility, and the Kimberly-Clark Neenah and Badger Gloge Facilities – and the NMSC in turn discharged partially-treated, PCB-containing wastewater from those facilities to the Lower Fox River.  The NMSC still owns and/or operates the NMSC POTW and its associated regional sewer system.

111.     The NMSC therefore:  (i) owns and operates a facility from which there have been releases of hazardous substances, and there were releases of hazardous substances from that facility to the Site; and (ii) owned and operated a facility at the time of disposal of hazardous

-26-

substances at that facility, and there were releases of hazardous substances from that facility to the Site.

112.    In light of the foregoing, the NMSC is liable to Plaintiffs in this action under: (i) CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1); and (ii) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Cost Recovery by the United States Under CERCLA Section 107, 42 U.S.C. § 9607)

113.    Paragraphs 1-112 are realleged and incorporated herein by reference.

114.    Except as specified above, each of the Defendants is jointly and severally liable to the United States for all unreimbursed response costs incurred by the United States in connection with the Site pursuant to CERCLA Section 107(a), 42 U.S.C. § 9607(a).

### SECOND CLAIM FOR RELIEF
(Declaratory Judgment for Recovery of Further Response Costs by the United States)

115.    Paragraphs 1-112 are realleged and incorporated herein by reference.

116.    Except as specified above, each of the Defendants is liable to the United States for any unreimbursed further response costs that the United States incurs in connection with PCB contamination at the Site, not inconsistent with the NCP, pursuant to CERCLA §§ 107(a) and 113(g)(2), 42 U.S.C. §§ 9607(a) and 9613(g)(2), and the Declaratory Judgment Act, 28 U.S.C. § 2201-2202.

### THIRD CLAIM FOR RELIEF
(Cost Recovery by the State Under CERCLA Section 107, 42 U.S.C. § 9607)

117.    Paragraphs 1-112 are realleged and incorporated herein by reference.

118.    Except as specified above, each of the Defendants is jointly and severally liable to the State for all unreimbursed response costs incurred by the State in connection with the Site

Case 1:10-cv-00910-WCG   Filed 10/14/10   Page 27 of 33   Document 1

pursuant to CERCLA Section 107(a), 42 U.S.C. § 9607(a).

## FOURTH CLAIM FOR RELIEF
### (Declaratory Judgment for Recovery of Further Response Costs by the State)

119.    Paragraphs 1-112 are realleged and incorporated herein by reference.

120.    Except as specified above, each of the Defendants is liable to the State for any unreimbursed further response costs that the State incurs in connection with PCB contamination at the Site, not inconsistent with the NCP, pursuant to CERCLA §§ 107(a) and 113(g)(2), 42 U.S.C. §§ 9607(a) and 9613(g)(2), and the Declaratory Judgment Act, 28 U.S.C. § 2201-2202.

## FIFTH CLAIM FOR RELIEF
### (United States' Claim for Relief Under CERCLA Section 106, 42 U.S.C. § 9606)

121.    Paragraphs 1-112 are realleged and incorporated herein by reference.

122.    As set forth in the November 2007 UAO, EPA has determined that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of actual or threatened releases of hazardous substances to the Site and into the environment at the Site, pursuant to CERCLA § 106(a), 42 U.S.C. § 9606(a).

123.    The UAO orders the UAO Recipients identified in Paragraph 25 of this Complaint to take specified actions with respect to OUs 2-5 of the Site that EPA determined may be necessary to protect public health and welfare and the environment.

124.    The United States hereby seeks a judicial determination that each UAO Recipient is required to comply with all provisions of the UAO applicable to such UAO Recipient, other than the provisions of UAO Section XIX (Reimbursement of Response Costs). The United States seeks such relief pursuant to CERCLA § 106, 42 U.S.C. § 9606, and the Declaratory Judgment Act, 28 U.S.C. § 2201-2202. The United States is seeking to have its cost recovery rights determined separately under this Complaint's First Claim for Relief and Second Claim for

-28-

Relief.

SIXTH CLAIM FOR RELIEF<br>(<u>Natural Resource Damages</u>)

125.     Paragraphs 1-112 are realleged and incorporated herein by reference.

126.     Releases of PCBs into the environment at the Site have resulted in injury to, destruction of, or loss of natural resources under Federal trusteeship and of natural resources under State trusteeship.  Federal and State trusteeships of injured natural resources at the Site overlap.

127.     Plaintiffs have incurred reasonable costs of assessing the injury, destruction, or loss of natural resources resulting from releases of hazardous substances to the Site and into the environment at the Site.

128.     Except as specified above, each of the Defendants is jointly and severally liable to the United States and the State for damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such damages and the injury, destruction, or loss resulting from releases of hazardous substances to the Site and into the environment at the Site, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, the United States of America and the State of Wisconsin, respectfully request that this Court:

1.     Enter judgment in favor of the United States and against the above-named Defendants, jointly and severally, for all response costs incurred by the United States, as well as prejudgment interest, for response actions in connection with the Site, except as specified above;

2.     Enter a declaratory judgment in favor of the United States and against the above-

-29-

named Defendants for any unreimbursed further response costs that the United States incurs in connection with the Site, not inconsistent with the NCP, except as specified above;

3.         Enter judgment in favor of the State and against the above-named Defendants, jointly and severally, for all response costs incurred by the State, as well as prejudgment interest, for response actions in connection with the Site, except as specified above;

4.         Enter a declaratory judgment in favor of the State and against the above-named Defendants for any unreimbursed further response costs that the State incurs in connection with the Site, not inconsistent with the NCP, except as specified above;

5.         Enter a judgment in favor of the United States and against each of the UAO Recipients, that each UAO Recipient is required to comply with all provisions of the UAO applicable to such UAO Recipient, other than the provisions of UAO Section XIX (Reimbursement of Response Costs);

6.         Enter a judgment in favor of the Plaintiffs and against the above-named Defendants for natural resource damages for the Site, including assessment costs, as well as prejudgment interest;

7.         Award the United States and the State their costs of this action; and

8.         Grant such other and further relief as the Court deems just and proper.

For the United States of America

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

RANDALL M. STONE, Senior Attorney
JEFFREY A. SPECTOR, Trial Attorney
IVA ZIZA, Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044
Telephone:     (202) 514-1308
Facsimile:     (202) 616-6584
E-Mail:        randall.stone@usdoj.gov

OF COUNSEL:

Richard Murawski
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 West Jackson Blvd.
Chicago, IL 60604

John Carlucci
Assistant Solicitor
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Signature Page for Complaint in *United States and the State of Wisconsin v. NCR Corp., et al.* (E.D. Wis.)

For the United States of America

JAMES L. SANTELLE
United States Attorney

SUSAN M. KNEPEL
Assistant United States Attorney
Wisconsin State Bar # 1016482
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Ave., Room 530
Milwaukee, WI 53202
Telephone: (414) 297-1700
Facsimile: (414) 297-4394
Susan.Knepel@usdoj.gov

Signature Page for Complaint in *United States and the State of Wisconsin v. NCR Corp., et al.* (E.D. Wis.)

For the State of Wisconsin

CYNTHIA HIRSCH
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Madison, WI 53702
(608) 266-3861

MATTHEW J. FRANK
Secretary
Wisconsin Department of Natural Resources
101 South Webster Street
Madison, WI 53703