LAW OFFICES
BEVERIDGE & DIAMOND, P. C.
SUITE 700
1350 I STREET, N. W.
WASHINGTON, D. C. 20005-3311

(202) 789-6000

TELECOPIER (202) 789-6190

STEVEN M. JAWETZ
DIRECT DIAL NUMBER
(202) 789-6045

MAY 6 1996

GREEN BAY OFFICE
40TH FLOOR
437 MADISON AVENUE
NEW YORK, N. Y. 10022-7380
(212) 702-5400

BEVERIDGE & DIAMOND
SUITE 400
ONE BRIDGE PLAZA
FORT LEE, N. J. 07024-7502
(201) 585-8162

BEVERIDGE & DIAMOND
SUITE 3400
ONE SANSOME STREET
SAN FRANCISCO, CA 94104-4438
(415) 397-0100

May 3, 1996

**VIA FEDEX**

Janet Smith, Field Supervisor
U.S. Fish and Wildlife Service
Green Bay Field Office
1015 Challenger Court
Green Bay, Wisconsin 54311

Re: DOI's Information Request Dated February 22, 1996

Dear Ms. Smith:

This letter responds to the information request ("Request") of the U.S. Department of the Interior ("DOI") dated February 22, 1996, and addressed to Fort Howard Corporation ("Fort Howard"). Although the Request made no express reference to any statutory authority, Fort Howard will assume that the Request was made pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and it will respond in good faith on that basis. Fort Howard reserves the right to contest the authority of DOI to issue the Request in the event of any dispute.

Pursuant to discussions with Shelly Hall at the Office of the Solicitor, DOI, the scope of some of the information requests has been slightly modified by agreement to eliminate certain voluminous and irrelevant records that might otherwise be deemed within the scope of the requests as drafted. Where the scope of a particular request has been modified, such modification is noted in the response to that particular request. All responses are limited to Fort Howard's Green Bay, Wisconsin facilities.

Due to the large volume of documents produced and the relatively short period of time allowed to provide a response, it is possible that the produced documents contain privileged material. In the event that a privileged document is inadvertently included, Fort Howard states for the record that it is not waiving the attorney-client or work-product privileges as to any document or matter.

Subject to the objections noted in or at the end of these responses, and without waiving any objections or privileges, Fort Howard submits the following responses to the enumerated requests.

FH 019016
~~FH 018237~~

BEVERIDGE & DIAMOND, P. C.

Ms. Janet Smith
May 3, 1996
Page 2

1. **Identify all persons consulted in the preparation of the answers to these information requests.**

Response

Fort Howard contacted numerous individuals in preparing its response. The following individuals provided material information or assisted in the drafting of the response:

> Steven M. Jawetz
> Margaret Lattin Bazany
> Beveridge & Diamond, P.C.
> 1350 I Street, N.W., Suite 700
> Washington, D.C. 20005
> (202) 789-6045
>
> James W. Nellen, II, Esq., Vice President and Secretary (General Counsel)
> Mark S. Reimer, Attorney
> Jacqueline K. Powell, Manager, Environmental Legal Services
> Fort Howard Corporation
> 1919 South Broadway
> P.O. Box 19130
> Green Bay, WI 54307-9130
> (414) 435-8821, ext. 2406
>
> Donald J. Schneider, Vice President (Research and Development)
> Albert H. Toma, III, Assistant to the President, Director of Environmental Affairs
> Doug McLaughlin, PhD., Environmental Research Manager
> Fort Howard Corporation
> 1919 South Broadway
> Green Bay, WI 54307-9130

We request that all future requests for information or documents relating to Fort Howard be made to Steven Jawetz or Mark Reimer at the addresses and telephone numbers noted above.

FH01 9017

NCR-FOX-0206805

BEVERIDGE & DIAMOND, P. C.

Ms. Janet Smith
May 3, 1996
Page 3

2. **Identify all documents consulted, examined, or referred to in the preparation of the answers to these requests and furnish copies of all such documents.**

Response

Copies of all non-privileged documents that are responsive to the information requests (as such requests have been interpreted) are provided and are identified in each response by number. In addition, responsive data referenced in certain privileged documents has been provided in Exhibits B-E of these responses. By providing this data, Fort Howard does not intend to waive any privileges with regard to the underlying documents which may reference such data. Documents protected by law against compulsory disclosure ("privileged documents") have not been produced, to preserve all applicable privileges.

3. **If you have reason to believe that there may be persons able to provide a more detailed or complete response to any information request or who may be able to provide additional responsive documents, identify such persons.**

Response

Fort Howard does not presently have reason to believe that there are persons within its custody or control, other than those listed in these responses, who are able to provide a more detailed or complete response or additional responsive documents.

4. **Identify the acts or omissions of any persons, other than your employees, contractors, or agents, that may have caused the release of hazardous substances, particularly polychlorinated biphenyls (PCB), and damages resulting therefrom.**

Response

Documents containing information responsive to this request are provided and identified with Numbers FH000001 through FH002268.

Many of these documents may contain data on discharges from several facilities located along the Fox River, including Fort Howard. Therefore, some of the documents provided in response to this request may also be responsive to request 13. In addition, some documents provided in response to request 6 or request 13 may also contain information responsive to this request.

9018
FH 018239

NCR-FOX-0206806

5. **Identify all persons having knowledge or information about the generation, transportation, treatment, disposal or other handling of pollutants or hazardous substances, particularly PCBs, by Fort Howard Corporation or its contractors or other agents.**

Response

Fort Howard objects to this information request as overbroad in scope, unauthorized by law to the extent it is overbroad, and unduly burdensome. Fort Howard has approximately 6800 current employees, several thousand former employees, and numerous contractors. A tremendous number of individuals inside and outside of the Company may have some knowledge that falls within the facial scope of the request. Notwithstanding the foregoing, and without any waiver of its objection, Fort Howard provides the following names of Fort Howard employees who it believes have material information about the potential release or discharge of PCBs or other hazardous substances or pollutants by Fort Howard to the Fox River or the Green Bay Metropolitan Sewerage District treatment works ("Green Bay Metro"). Additional names of lower level staff or other persons may appear in the documents provided in response to these Requests.

> James W. Nellen, II, Esq., Vice President and Secretary (General Counsel)
> Mark S. Reimer, Attorney
> Jacqueline K. Powell, Manager, Environmental Legal Services
>
> Donald J. Schneider, Vice President (Research and Development)
> Albert H. Toma, III, Assistant to the President, Director of Environmental Affairs
> Doug McLaughlin, PhD., Environmental Research Manager
>
> Kenneth J. Graves, Technical Director

6. **Furnish copies of any federal, state, municipal, or local permits ever issued to respondent to release any pollutants or hazardous substances, particularly in effluents, to the environment, particularly to surface waters or sediments. In particular, furnish copies of any: National Pollutant Discharge Elimination System ("NPDES") or Wisconsin Pollutant Discharge Elimination System ("WPDES") permits, pursuant to the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. or State law; Army Corps of Engineers Permits; or municipal, local, or waste water treatment plant industrial user permits or approvals. Include all applications, final permits, and associated correspondence and other related documents used in the development of final permits or approvals.**

9019
FH 018240

BEVERIDGE & DIAMOND, P. C.

Ms. Janet Smith
May 3, 1996
Page 5

### Response

Documents responsive to this request are provided and identified with numbers FH002269 through FH005592. In general, these documents relate to NPDES permits, WPDES permits, Army Corps of Engineers discharge and fill permits, stormwater discharge permits, and a protective RCRA Part A filing.

Permits or approvals from local waste water treatment facilities are also responsive to request 15. Such approvals have been provided in connection with that response and are not duplicated here.

We have not provided copies of any air permits or air permit applications. Only conventional air pollutants were monitored or limited under Fort Howard's air permits, and no analyses of PCBs or dioxins were performed on air emissions. Because the air permits, applications, and air monitoring data are not relevant to the Fox River matter, and are quite voluminous, they have not been provided.

7. **Indicate the relevant time period (hereinafter referred to as the relevant time period) during which paper-making processes used by Fort Howard Corporation could have resulted in PCB releases.**

### Response

As previously discussed with Shelly Hall, Fort Howard believes that the period between 1957 and September 28, 1989 should be considered "the relevant time period" for purposes of its response. The start of the period is based on the date that NCR began to manufacture carbonless copy paper that contained PCBs. Because such paper is virtually the sole source of PCBs in Fort Howard's effluent, 1957 is the earliest possible year that PCBs could have appeared in Fort Howard's effluent.

The end of the relevant time period is the effective date of the first NPDES permit issued to Fort Howard that contained a limitation for PCBs. Fort Howard has been in compliance with the PCB discharge limitations in its permit ever since that date. Therefore, any discharges of PCBs after September 28, 1989 cannot be a source of CERCLA liability in the Fox River matter. (Fort Howard reserves its rights and defenses regarding the status of any hazardous substance discharges prior to September 28, 1989.)

Fort Howard has limited the scope of its remaining responses to the relevant time period, with certain exceptions. In response to request 13, Discharge Monitoring Reports ("DMRs") have been provided through the present to show that Fort Howard has remained in compliance with its PCB limitation. Also in response to request 13, data on Fox River sediments and river

FH 018241 9020

NCR-FOX-0206808

BEVERIDGE & DIAMOND, P. C.

Ms. Janet Smith
May 3, 1996
Page 6

water have been provided regardless of the sampling date. Finally, in the response to request 15, information on effluent sent to Green Bay Metro has been provided regardless of date.

8. **Indicate the time period within the relevant time period during which carbonless copy paper was reprocessed into recycled paper products by Fort Howard Corporation.**

Response

Fort Howard has no specific information on the time period during which it recycled carbonless copy paper containing PCBs into other paper products. It is likely that carbonless copy paper containing PCBs was not recycled in significant amounts for some time after such paper was first manufactured. In addition, although PCBs were no longer used in the manufacture of carbonless copy paper after 1971, several years would have been required to move most carbonless copy paper containing PCBs out of the recycled wastepaper stream. An unknown quantity of carbonless copy paper containing PCBs may still be in document archives maintained by public or private entities; this material could still enter the recycled wastepaper stream. Fort Howard has no information on when it may have begun recycling carbonless copy paper that did not contain PCBs; to the best of Fort Howard's information and belief, it continues today periodically to recycle carbonless copy paper that does not contain PCBs.

9. **Describe in detail the materials, chemical constituents, and processes used by respondent during the relevant time period to de-ink and reprocess carbonless copy paper into recycled paper products. Describe in detail the materials, chemical constituents, and processes used by the respondent during the relevant time period which may have resulted in the release of PCBs.**

Response

Pursuant to our discussions with Shelly Hall, the first portion of this information request has been limited to a description of the materials, chemicals, and processes used in deinking and pulp processing, excluding the remainder of the paper production process as irrelevant.

The deinking of wastepaper, sometimes referred to as "secondary fiber," began at Fort Howard's Green Bay, Wisconsin facility in the late 1930s. The percentage of secondary fiber used by Fort Howard gradually increased over time so that by 1989 over 99% of the sanitary tissue grades made were from secondary fiber. The primary use of secondary fiber by Fort Howard is to provide a fiber source from wastepaper as an effective substitute for virgin fiber in the production of sanitary tissue products.

9021
FH 018242

NCR-FOX-0206809

BEVERIDGE & DIAMOND, P. C.

Ms. Janet Smith
May 3, 1996
Page 7

Fort Howard refers to its manufacturing processes which produce usable fiber from secondary fiber as "systems." The primary purpose of the equipment and process materials that comprise a system is to convert the wastepaper into individual paper fibers by removing contaminants such as fillers, starches, coating materials, inks, plastic films, and wet strength resins. Fibers are bleached to whiten the fiber and to remove colorants, or left unbleached, before entering the paper machine processes. The types of wastepaper processed and the desired end product attributes (such as brightness) influence the configuration of the system to be used.

In 1957, one system was used at the Green Bay mill. Over the course of the next 32 years, seven different systems were used at the Green Bay mill to process wastepaper. Although each system used the same general types of equipment and process materials, each system was configured and operated differently depending on the quality of the fiber produced. A general description of a system is provided below and in **Figure 1**.

Overview of a System

a.  Pulping & Deinking Stage

During the relevant time period the Pulping and Deinking Stage at Fort Howard consisted of wastepaper pulping, ink removal, washing, and rejects removal. Pulping of wastepaper occurred in pulpers, which consisted of a tub with high speed rotors or slotted rotating drums. Wastepaper was placed in a pulper where it was wetted and large contaminants were removed. Process materials added to some of the pulpers were water, detergents, solvents, caustic soda or soda ash, alum or muriatic acid, hypochlorite, and steam.

Deinking primarily occurred in the pulpers, although some occurred in the equipment downstream of the pulpers. Pulp washers and flotation equipment were used to remove the solid particles of inks and clays and solubilized materials in the pulp slurry from the pulpers. Fort Howard used pre- and post-bleaching washers (comprised of a wire covered cylinder) and belt washers (where secondary fibers were pressed between a belt and cylinder). Flotation equipment was also used to remove contaminants by aerating the pulp slurry and skimming the contaminants and air bubbles from the surface. Screening consisted of different types of screens with various basket configurations and was used to remove contaminants such as staples, bands, large pieces of plastic, balls of glue, and synthetic fibers. Screens are generally identified as coarse or fine depending upon the aperture size. The screens used by Fort Howard were either rotating or vibrating. Cleaning was accomplished in centrifuge devices which employ centrifugal force to remove stones, metal objects, and other high density contaminants. Rifflers consisted of a step-type mechanism where the pulp and water slurry cascaded to remove materials heavier than water. Thickeners were used to remove water from the fiber water slurry. Process materials used during the deinking of wastepaper were defoamers, sodium hexametaphosphate, muriatic or sulfamic acid, and sodium hydrosulfite.

9022
FH 018243

# FIGURE 1



9023
FH0118244

Case 1:10-cv-00910-WCG    Filed 01/05/11    Page 8 of 18    Document 76-4

NCR-FOX-0206811

BEVERIDGE & DIAMOND, P. C.

Ms. Janet Smith
May 3, 1996
Page 8

The detergents used in the Pulping and Deinking Stage were supplied by several different suppliers during the relevant time period. Detergents were used to emulsify dirt contaminants to permit them to be easily washed from the secondary fiber. Sodium tripolyphosphate and carboxymethylcellulose were occasionally added to enhance the detergents' actions.

Several different solvents were utilized in processing certain grades of wastepaper. The primary solvent used in the Pulping and Deinking Stage was kerosene, #1 fuel oil, stoddard solvent, or mineral spirits. Any other solvents were proprietary compounds purchased from vendors; they had names such as Solvox or Piosolv. Solvents were used to break down the bond between ink pigments and coatings and the secondary fiber. The use of solvents was strictly on an as-needed basis for treating hard-to-remove inks. Fort Howard has now virtually eliminated the use of all solvents in the pulping and deinking stage.

Alum or muriatic acid was used to break down wastepaper which contained urea formaldehyde or melamine formaldehyde based wet strength resins. These acids dissolved the bond between the wet strength resin and fiber. Hypochlorite was used to break down wastepaper that contained polyamide-epichlorohydrin based wet strength resins.

Caustic soda and small amounts of soda ash were used to raise the pH in the pulper to make it alkaline in order to aid dirt removal. The use of soda ash was eliminated in the mid-1960s at the Green Bay mill after the start-up of the chlor alkali plant. The chlor alkali plant produced the caustic soda and calcium hypochlorite used in the mill.

Defoamers were used to control foaming. Sodium hexametaphosphate was used to inhibit the formation of scale in the Pulping and Deinking Stage and muriatic or sulfamic acid was used to remove scale that may have formed. Sodium hydrosulfite was used to strip colorants and brighten certain fibers.

Rejected materials from the Pulp and Deinking Stage consisted of a water and solids slurry (referred to as "deinking mill waste") and large contaminants such as paper clips, plastics, and gravel (referred to as "screenings").

b.  Bleaching

During the relevant time period, Fort Howard produced both bleached and unbleached fiber. Unbleached fiber was sent to the paper machine process described below. Fiber to be bleached was sent to the bleaching process. Bleaching was used to strip colorants from the secondary fiber. Bleaching primarily occurred in a bleach tower. Some bleaching also occurred as the fiber slurry was mixed in tanks and washed. The bleaching agent used by Fort Howard during the relevant time period was calcium hypochlorite.

FH 019024

NCR-FOX-0206812

BEVERIDGE & DIAMOND, P. C.

Ms. Janet Smith
May 3, 1996
Page 9

Water from the Bleaching Stage was recycled to the Pulp and Deinking Stage and reused as a process material there.

    c.    Paper Machines

The secondary fiber and water slurry resulting from the Pulp and Deinking Stages and Bleaching Process was referred to as "furnish," "pulp," or "stock" during the relevant time period. Furnish was fed into the wet end of a paper machine. As the furnish passed through the paper machine, water was removed, pulp fiber was dried and formed into a sheet and wound into a large roll referred to as a "parent roll." Parent rolls were then transferred to storage and eventually sold or converted into finished products. Mechanisms incorporating rotating vacuum drums ("savealls") were used to maximize fiber recovery from the fiber and water slurry used on the paper machines. Process materials added to the fiber or the sheet at the paper machine include wet strength resin, colors, defoamers, sizing agents, and optical brighteners.

Rejected materials from the paper machines were water, fiber, and solids (the effluent was referred to as "paper machine whitewater"), and damaged or rejected portions of the sheet. The rejected portions of the sheet were repulped and reprocessed to reclaim the fiber.

## Wastepaper Received By Fort Howard That May Have Contained PCBs

The American Forest & Paper Association ("AF&PA") has identified several classifications of wastepaper. Each company that processed wastepaper further subclassified each of these general classifications to meet their own needs. These subclassifications were given different names by each deinking company and were referred to as "grades." During the relevant time period, Fort Howard processed wastepaper in the "mixed paper," "newspaper," "corrugated," "pulp substitutes," and "high grade deinking" classifications. These classifications are described in **Exhibit A**. Each system was designed, configured and operated to process different classifications and certain mixtures of the classifications. As the wastepaper and desired end product attributes changed during the relevant time period, each system may have been refined.

Within the mixed paper classification were grades referred to by Fort Howard as "file stock" and "NCR grade." "NCR" was the abbreviation used by Fort Howard to refer to "no carbon required" paper. Fort Howard does not know at this time whether all NCR grade processed during the relevant time period was in fact NCR paper produced by Appleton Papers and Mead Corp. with PCB material. File stock consisted primarily of wastepaper generated by offices, institutions, and other commercial and industrial entities and may have contained amounts of NCR grade. During the 1960's, to the best recollection of Fort Howard personnel, very little file stock was processed by Fort Howard.



FH 018246  9025

NCR-FOX-0206813

BEVERIDGE & DIAMOND, P. C.

Ms. Janet Smith
May 3, 1996
Page 10

To the best recollection of Fort Howard personnel, Fort Howard did not intentionally process NCR grade until the late 1960's, and then only in small amounts. Little NCR grade was processed for two principal reasons: (1) achieving the necessary color removal/brightness was very difficult; and (2) NCR grade contained wet strength resins which were difficult to process. During the late 1960's Fort Howard ran trial shipments of NCR grade received from Golper Company, a paper broker located in the Fox River Valley. In addition, shipments of forms containing NCR grade were processed on a limited basis directly from manufacturers of these forms. There were two companies in Green Bay producing these forms: Shade Business Forms (now believed to be known as Shade Allied Coated Products Division of Shade Allied Incorporated); and Moore Business Forms (now believed to be known as Moore Business Forms and Systems Division of Moore Corporation (Canada)). NCR papers may also have been processed by Fort Howard during the relevant time period as incidental components of other grades of wastepaper.

According to information contained in **Exhibit B** (parts of which are CBI), wastepapers within the NCR grade may have contained PCB concentrations up to 3% by weight. By the mid-1970s, as shown in **Exhibit B**, all other wastepaper classifications that Fort Howard was processing contained PCBs. As shown by analytical results obtained by Fort Howard and provided in response to request 10, all classifications and grades of wastepaper (as well as virgin fiber) contained residual quantities of PCBs, measured as Aroclor 1242, from at least the mid-1970's throughout the remainder of the relevant time period.

Starting in the 1970's, changes in the availability of wastepaper required that Fort Howard use more mixed papers, and particularly more office papers of lower grades. This change increased the likelihood that Fort Howard would inadvertently receive wastepaper that included NCR grade from old office files and similar document archives throughout the United States.

NCR paper may not have been the only source of PCBs in wastepaper. Certain dyes such as phthalocyanine greens and blues may have contained PCBs. Documents relating to this issue are provided in response to request 10.

## Other Uses of PCBs at Fort Howard During The Relevant Time Period

Electrical transformers and capacitors which contained PCB materials were located at Fort Howard's Green Bay mill during the relevant time period. During the relevant time period, Fort Howard enclosed all such transformers and capacitors with spill containment. Fort Howard does not have any information that any such use led to a release of PCBs to the environment.

In addition, it is generally believed that PCBs were used in other products such as caulks, sealants, hydraulic fluids, and numerous other materials in commerce, that Fort Howard may have

9026
F H 018247

BEVERIDGE & DIAMOND, P. C.

Ms. Janet Smith
May 3, 1996
Page 11

used during the relevant time period. Fort Howard does not have any information indicating that any such use led to a release of PCBs to the environment.

10. **Identify the suppliers of materials, the volume of materials, and the nature of materials, including but not limited to those which included or consisted of carbonless copy paper, obtained by you for the purpose of manufacturing paper products during the relevant time period.**

Response

Fort Howard has had thousands of suppliers of raw materials, including wastepaper, over the relevant time period. Pursuant to our discussions with Shelly Hall, this request has been limited to available information on suppliers of materials that Fort Howard knows contained PCBs during the relevant time period.

Documents responsive to this request are numbered FH005593 through FH005616K and FH018237 through FH018363. Miscellaneous documents that may be responsive to the scope of the original request are incidentally included in the first series. Fort Howard asserts that the series of documents numbered FH018237 through FH018363 contains Confidential Business Information ("CBI"); this series has been labeled as such and placed with other materials considered CBI.

In addition, information responsive to this request is included in **Exhibit B**, which Fort Howard asserts is CBI.

11. **Describe all plant effluents which may have contained PCBs, including physical characteristics and chemical composition.**

Response

During the relevant time period, there were two plant effluent streams from Fort Howard's Green Bay mill flowing to the Fox River that may have contained PCBs. These streams were the Mill Sewer discharge, which contained paper machine whitewater, and the Deinking Sewer discharge, which contained deinking mill waste. The former was discharged at a point near the north end of the mill and the latter was discharged from a point near the south end of the mill. These individual discharge points remained separate until the startup of the wastewater treatment plant in December 1972. After December 1972, all process wastewater discharges to the river were from a single discharge point, now identified as outfall 001, at the southern end of the property. The discharge point at the north end of the mill still exists, but is used only as a bypass line in case of equipment failure (e.g., failure of the pumps which pump wastewater to the

FH 018248 9027

NCR-FOX-0206815

treatment plant). If a bypass does occur, it is automatically recorded, samples are taken, and flow to the river is estimated. The company reports such bypasses on its DMRs.

Available chemical analyses of plant effluents indicating the presence of PCBs (and other chemical characteristics) are provided in **Exhibit C** and in the responses to requests 12, 13, and 14.

12. **Describe any plant waste effluent treatment systems used by the respondent during the relevant time period, including when operational failures occurred, and furnish copies of all data showing effectiveness of all such treatment.**

Response

From 1957 to December 1972, solids (fibers) were removed from paper machine whitewater by the paper machine savealls; the effluent was then discharged to the river through the Mill Sewer. After the startup of the Green Bay mill's wastewater treatment plant in December 1972, the Mill Sewer effluent was also treated in a clarifier 180 feet in diameter for solids removal. The clarified water was then combined with the effluent from the secondary treatment plant and discharged through outfall 001 to the river. In recent years, most or all of the clarified Mill Sewer effluent has been recycled in the mill.

From 1957 to December 1972, the Deinking Sewer effluent received primary treatment in settling ponds prior to discharge in the river. Settling was aided through the addition of calcium hydroxide (slaked lime) as a coagulating agent. At times magnesium chloride was added with the slaked lime to increase efficiency. There were five settling ponds, each approximately two acres in size. Only one pond was used at a time, in rotation, with sludge removal in spring, summer, and autumn.

In December 1972, Fort Howard started an activated sludge (secondary) treatment system for the primary settling pond effluent that included two aeration basins to remove BOD. The liquid from the activated sludge aeration basins was settled in a secondary clarifier. The effluent from the clarifier was combined with the Mill Sewer clarifier effluent and the combined flow was discharged to the river from outfall 001.

Fort Howard added three additional aeration basins and changed from surface aerators to diffusers between December 1972 and 1989. Moreover, in the early 1980's, the primary settling ponds were replaced with two 180' diameter primary clarifiers. The solids were removed in the clarifiers and the liquids were sent to the aeration basins. The solids removed in the primary clarifiers were placed in the settling ponds for further thickening before being hauled to the offsite

9028
FH 018249

BEVERIDGE & DIAMOND, P. C.

Ms. Janet Smith
May 3, 1996
Page 13

landfill operated by Fort Howard. This operation continued until 1985, when sludge presses were substituted to thicken the sludge from the primary clarifiers prior to disposal. **Figure 2** shows a schematic of the overall plant waste effluent treatment system. Other schematics are included in the documents provided with these responses. (Fort Howard does not believe this request seeks detailed construction drawings or similar documents, which would be irrelevant and unduly burdensome to produce.)

Prior to 1972, the Green Bay facility operated a trickling filter system for processing sanitary sewer waste. In 1972, Fort Howard discontinued this system and discharged sanitary sewer waste to the Green Bay Metropolitan Sewerage District for treatment.

Any significant treatment system issues since 1972 are documented in Fort Howard's DMRs and bypass reports. Fort Howard does not have any information indicating that any treatment systems experienced operational failures prior to 1972.

Documents relating to bypass events and system upsets are provided. In addition, studies and data relating to the effectiveness of the treatment system are provided. These documents are numbered FH005617 through FH06610 and FH018364 through FH018415. Fort Howard asserts that the series of documents numbered FH018364 through FH018415 contains CBI; this series has been labeled as such and placed with other materials considered CBI.

13. **Furnish copies of all data from chemical analyses of all effluents, all waste streams, all waste treatment streams, Fox River water, Fox River sediments, raw materials which may have contained PCBs, and all intermediate or finished products which may have contained PCBs. Include any chemical analyses of all conventional parameters, including biological oxygen demand, carbonaceous biological oxygen demand, dissolved oxygen, suspended solids, and total suspended solids, plus PCBs, including total PCBs, Aroclors, and all specific PCB congeners. Include all monitoring plans and reports, particularly "Discharge Monitoring Reports," pursuant to the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq., State "N.R. 105" monitoring reports, any Army Corps of Engineers monitoring reports, and any waste water treatment plant monitoring reports. Also include all monitoring plans and reports other than those required by the Federal Water Pollution Control Act.**

Response

Pursuant to discussions with Shelly Hall and consistent with Fort Howard's response to request 7, Fort Howard has limited its response to request 13 to the relevant time period except for the following categories of documents: all DMRs required pursuant to NPDES permits have

FH018250 9029

NCR-FOX-0206817

BEVERIDGE & DIAMOND, P. C.

Ms. Janet Smith
May 3, 1996
Page 14

been provided regardless of time period; interim and final reports to the Wisconsin Department of Natural Resources ("WDNR") regarding a 1990-92 study that included samples taken within the wastewater treatment plant have been provided; data on effluent sent to Green Bay Metro have been provided regardless of date; and data on Fox River water and Fox River sediment samples have been provided regardless of date.

Also pursuant to discussions with Shelly Hall, Fort Howard in general has not provided copies of raw data underlying the results reported to WDNR (e.g., chromatograms, bench sheets, computer spreadsheets), or product safety or other product testing data (other than PCB analyses). Similarly, Fort Howard has not produced data generated for manufacturing process optimization purposes, such as paper machine process control data, scale buildup studies, and the like. Fort Howard would object to this request if it were interpreted to include such data, on the ground that such data are irrelevant to the Fox River matter, are voluminous, and would be unduly burdensome to produce.

Fort Howard has provided data from chemical analyses of Fort Howard waste streams that might have been discharged or released to the Fox River or that might have contributed to such discharges or releases, including sampling data from multiple points within Fort Howard's wastewater treatment system. (Fort Howard, however, disputes the relevance of most of this data.) In general, documents relating to waste streams (and particularly solid wastes) that are sent offsite to locations that have no connection to the Fox River are not included in Fort Howard's present response. In addition, as discussed in the response to request 6, Fort Howard has not included data from chemical analyses of air emissions; such data all relates to conventional pollutants, is voluminous, and has no relevance to the Fox River matter.

Documents responsive to this request are provided and numbered FH006611 through FH017628 and FH018416 through FH019015. Fort Howard asserts that the series of documents numbered FH018416 through FH019015 contains CBI; this series has been labeled as such and placed with other materials considered CBI.

Documents responsive to other requests are also responsive to request 13. In most cases, those documents are provided only once to avoid unnecessary duplication. Accordingly, some of the studies or other documents provided in response to request 4 also contain data specific to Fort Howard. Data on "raw materials which may have contained PCBs" have been provided in connection with the response to request 10 relating to the nature of the waste paper recycled. Reports of bypass events and upsets provided in response to request 12 may contain data on effluents. Finally, data on effluent discharged to the river or to Green Bay Metro are also provided in response to requests 14 and 15.

In addition, data responsive to this request is included in **Exhibits B, C, D, and E.**

FH018251 9030

NCR-FOX-0206818

BEVERIDGE & DIAMOND, P.C.

Ms. Janet Smith
May 3, 1996
Page 15

14. **Describe all releases into the Fox River of effluents, including dates, locations, durations, and volumes of effluent released.**

Response

Fort Howard interprets this request as seeking information regarding releases from Fort Howard's own facilities or properties. Moreover, with the same exceptions noted above, the response is limited to the relevant time period.

General descriptions of various effluents are provided and numbered as FH017629 to FH017654. Where the description of an effluent includes analytical data, it is provided in response to request 13 and is not repeated here. Where the effluent results from a bypass or upset event, it is provided in response to request 12 and is not repeated here. In addition to the effluents described in response to requests 11 and 12, Fort Howard occasionally pumped clean stormwater from bermed containment areas (around former petroleum aboveground storage tanks) to the Fox River, pursuant to a permit.

15. **Describe all discharges of effluents to municipal or local waste water treatment facilities, including dates, locations, durations, and volumes of effluent discharged. Identify and describe the treatment facilities. Identify and describe any permits or approvals for such discharges.**

Response

Fort Howard sends three waste streams to Green Bay Metro. The first is the sanitary waste stream from the plant and office buildings. The second is water collected at Fort Howard's offsite paper sludge landfill. The third is a tiny amount of groundwater from an extraction well located on property recently purchased by Fort Howard adjacent to its existing plant. Documents relating to the authorization for these discharges, dates of such discharges, and volumes and descriptions of such discharges is provided and numbered FH017655 through FH018236.

Note that some of the documents provided in response to request 15 are also responsive to requests 4 or 13. These documents are only provided once to avoid unnecessary duplication.

GENERAL OBJECTIONS

Fort Howard asserts the following privileges and objections with regard to the Request and each information request therein:

1. Fort Howard objects to any requirement to produce documents or information already in the possession of a government agency or already in the public domain. Notwithstanding

FH018252 9031

NCR-FOX-0206819

BEVERIDGE & DIAMOND, P. C.

Ms. Janet Smith
May 3, 1996
Page 16

  this objection, pursuant to our discussions with Shelly Hall, Fort Howard has produced information or documents that it obtained from the State or Federal government where those materials contain information specific to Fort Howard or the Fox River and/or where they are not currently publicly available.

2. Fort Howard asserts all privileges it has in regard to the enumerated inquiries including the attorney-client privilege, work-product privilege, all privileges related to materials generated in anticipation of litigation, and any other privilege under law.

3. Fort Howard objects to instructions 3 and 10 in that they purport to require Fort Howard to contact former employees. DOI has no authority to require Fort Howard to seek documents or information in the possession, custody, or control of former employees, agents, servants, contractors, or attorneys, none of whom are within the custody or control of Fort Howard. Given the number of former employees, agents, servants, contractors, and attorneys that Fort Howard has employed over the relevant time period, moreover, this instruction is unduly burdensome. Notwithstanding its objections, Fort Howard has undertaken a diligent search for information based on the documents and individuals within its custody or control.

4. Fort Howard objects to definition 6 as unduly burdensome. Where documents have been provided in connection with a response, each and every document is not also "identified" by describing its contents; to do otherwise would require a period of many months for preparation of this response.

5. Fort Howard objects to instruction 5, on the ground that DOI has no authority to impose a continuing obligation on Fort Howard to supplement these responses. Fort Howard will, of course, comply with any lawful future requests that are within DOI's authority.

6. Fort Howard objects to instruction 10, on the ground that DOI has no authority to demand a notarized affidavit as described in that instruction. Fort Howard notes, however, that it has diligently reviewed its relevant files and has interviewed appropriate employees in connection with these responses.

7. Fort Howard objects to the Request's definition of "you" and "Respondent" because the terms are overbroad, and it is not possible for Fort Howard to answer questions on behalf of all the persons identified therein.

8. Fort Howard objects to the definitions of "identify" in definitions 4 and 6 because they are overbroad and unduly burdensome. Subject to this objection, current employees are identified by name, title, and corporate address. Fort Howard requests that all contacts with employees identified in these responses or the related documents be initiated through

FH 018253 9032

NCR-FOX-0206820

BEVERIDGE & DIAMOND, P. C.

Ms. Janet Smith
May 3, 1996
Page 17

Mark Reimer or Steven Jawetz at the addresses and telephone numbers provided in the response to request 1. In addition, relevant documents are generally "identified" by providing the document.

Please contact me if DOI would like to request any documents that have fallen outside the scope of the current requests as understood by Fort Howard.

Respectfully submitted on behalf of Fort Howard Corporation,

Steven M. Jawetz

Attachments

cc: Mark Reimer, Esq.

O:\CLN03\93\3377\LTR\3377MLB.08

9033
FH018254