**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| | | |
|---|---|---|
| APPLETON PAPERS INC. and<br>NCR CORPORATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 08-CV-00016-WCG |
| | ) | |
| GEORGE A. WHITING PAPER<br>COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF PAUL A. MONTNEY IN SUPPORT OF**
**GEORGIA-PACIFIC'S MOTION FOR SUMMARY JUDGMENT**

I, Paul A. Montney, declare as follows:

1.     This declaration is submitted in connection with the above-captioned case, currently pending in the District Court for the Eastern District of Wisconsin, on behalf of Defendants and Counterclaimants Georgia-Pacific Consumer Products LP (f/k/a Fort James Operating Company), Fort James Corporation, Fort Howard Corporation and Georgia-Pacific LLC (collectively, "Georgia-Pacific").  This declaration supports Georgia-Pacific's request, in its Motion for Summary Judgment (the "Motion"), for recovery of response costs and damages related to the cleanup of the Fox River.  I have personal and first-hand knowledge of many of the matters set forth herein, and I have obtained additional necessary information from a variety of sources, including other individuals with personal knowledge.  If called and sworn as a witness, I can and will testify competently thereto.

2.     My name is Paul A. Montney and I am Director of Field Environmental Services at Georgia-Pacific.  My primary responsibilities include management of major environmental projects, most of which involve Superfund sites.  I worked for Georgia-Pacific from 1987 to 1989 and from 1992 to the present.  Between 1989 and 1992, I worked as a consultant for Georgia-Pacific.  Throughout my time with the company I have worked on environmental and site cleanup issues.  I became involved in the Fox River cleanup when Georgia-Pacific acquired the Fort James Corporation in 2000.  Since 2000, I have worked as the Georgia-Pacific internal project manager for the Fox River project.  In my capacity as project manager, I have been responsible for setting budgets for site cleanups and ensuring that expenses are within budget and reasonable.

3.     The Lower Fox River and Green Bay Superfund Site (the "Lower Fox River Site" or "Site") includes approximately 39 miles of the Lower Fox River as well as the Bay of Green

1

Bay. The site has been divided into five geographically defined Operable Units ("OUs"): OU1 – Little Lake Butte des Morts; OU2 – Appleton to Little Rapids; OU3 – Little Rapids to De Pere; OU4 – De Pere to Green Bay; and OU5 – the Bay of Green Bay. Georgia-Pacific is located on the Lower Fox River in the downstream portion of OU4, sometimes known as "OU4B." Georgia-Pacific first received a notice letter from the United States Environmental Protection Agency ("EPA") identifying Georgia-Pacific as a potentially responsible party ("PRP") under Section 122(e) of CERCLA with respect to the Fox River on July 3, 1997.

4. Georgia-Pacific has taken an active role in the investigation, remediation, and funding of the Lower Fox River cleanup from the initial formation of the Fox River Group/Coalition in 1994 through and including the present cleanup efforts being undertaken pursuant to the November 13, 2007 Administrative Order for Remedial Action issued by the EPA. Georgia-Pacific's involvement in the investigation, design and infrastructure work required by the cleanup efforts has always been in close cooperation with, and with oversight by, the EPA and the Wisconsin Department of Natural Resources ("WDNR").

5. Georgia-Pacific has incurred and paid over $115,000,000 in response costs, damages, fees and other expenses associated with the investigation and cleanup of PCBs in the Lower Fox River. These amounts have been incurred throughout Georgia-Pacific's long history of working with other companies, the EPA, and the WDNR to address PCB contamination in the Lower Fox River. As with all of our environmental projects, each of the Fox River projects Georgia-Pacific managed was done pursuant to a budget and has been reasonable in scope. Each project involved steps that were necessary to comply with the governmental orders and agreements pursuant to which they were performed. Each project also included governmental

oversight and participation. All of these response actions have resulted in a CERCLA-quality cleanup, including provision for meaningful public participation.

6. Of the over $115,000,000 Georgia-Pacific has spent, Georgia-Pacific seeks recovery in this Motion of $83,553,054.83 in response costs and damages, broken out as follows:

a. First, this declaration describes $37,114,163.66 in "106 Order Response Costs." These are response costs that were incurred and paid by Georgia-Pacific under the November 2007 cleanup order issued by the EPA. These costs are for work performed jointly with NCR Corporation ("NCR") and/or Appleton Papers Inc. ("API") in response to the order.

b. Second, this declaration describes $5,228,900.28 in "Design Order Response Costs." These are response costs that were incurred and paid by Georgia-Pacific under the 2004 order issued by the EPA for testing and design of the Lower Fox River cleanup plan. These costs are for work performed jointly with NCR in response to the order.

c. Third, this declaration describes $8,213,962.29 in costs incurred and paid by Georgia-Pacific in completing the second phase of the SMU 56/57 dredging project.

d. Fourth, this declaration describes $215,780.98 in costs incurred and paid by Georgia-Pacific for initial investigation, assessment and monitoring costs.

e. Fifth, this declaration describes $13,126,370.62 in natural resource damage ("NRD") costs incurred and paid by Georgia-Pacific.

f. Finally, Georgia-Pacific seeks $19,653,877.00 that was incurred and paid by Georgia-Pacific as a member of the Fox River Group ("FRG"), which was formed

in 1994 to coordinate natural resource damage assessments and response efforts

by PRPs on the Fox River. NCR and API joined the FRG in 1997. Of the

$19,653,877.00 total incurred, $12,087,853.00 were in assessments and

$7,566,024.00 were in interest calculated through June 1,2010 as required under

the FRG Interim Allocation Agreement. This interest amount would be adjusted

as of the date of judgment. In support of these response costs, Georgia-Pacific

refers to the Declaration of Arthur A. Vogel, Jr.

7.    The vast majority of the response costs Georgia-Pacific seeks in this Motion were

incurred and paid under agreements with, or orders issued by, the EPA and/or the WDNR, and

are therefore presumptively consistent with the National Contingency Plan ("NCP"). The

remainder of the response costs were incurred in substantial compliance with the applicable

requirements of the NCP. Furthermore, most of Georgia-Pacific's response costs were incurred

in joint efforts between Georgia-Pacific and NCR and/or API.

8.    Because the documents supporting the response costs and damages Georgia-

Pacific has incurred and paid are voluminous and cannot conveniently be examined in court,

Georgia-Pacific has prepared summary charts and calculations pursuant to Federal Rule of

Evidence 1006, which are attached hereto as Exhibits A through E. The documents upon which

these summaries are based are available for examination by other parties or for production in

court. Georgia-Pacific will provide NCR and API with courtesy copies of these documents.

Georgia-Pacific has also previously voluntarily provided many of these documents to NCR and

API.

4

**A.    106 Order Response Costs**

9.      Georgia-Pacific has incurred and paid $37,114,163.66 in compliance with the November 2007 remedial action order issued by the EPA.  [Ex. A.]  The majority of these costs were invoiced to Georgia-Pacific by agents, representatives or subcontractors of NCR and API.

10.     In November 2007, the EPA issued an administrative order for remedial action under Section 106(a) of CERCLA (the "106 Order").  [Ex. F.]  The 106 Order named Appleton Papers Inc., CBC Coating, Inc. (formerly known as Riverside Paper Corporation), Georgia-Pacific Consumer Products LP (formerly known as Fort James Operating Company), Menasha Corporation, NCR Corporation, P.H. Glatfelter Corporation, U.S. Paper Mills Corp., and WTM I Company (formerly known as Wisconsin Tissue Mills, Inc.) as Respondents.  Georgia-Pacific was ordered to conduct remedial work in OU4 and OU5, but was specifically exempted from OU2 and OU3.  [Ex. F, at ¶¶ 46 and 47.]

11.     The 106 Order directed Respondents to implement the remedial action for Operable Units ("OUs") 2 through 5 at the Lower Fox River Superfund Site.  The remedial actions ordered by the 106 Order were based on the various Records of Decision ("RODS") that had been issued over time for the OUs by the EPA and the WDNR.  Those RODS identified sediment removal by dredging as the primary remedial approach at the Site.

12.     Upon receipt of the 106 Order, Georgia-Pacific immediately took steps to fulfill its obligations.  On December 13, 2007, Georgia-Pacific informed the EPA and the WDNR that it intended to comply with the terms and requirements of the Order.  [Ex. G.]

13.     Georgia-Pacific agreed to pay and has paid twenty-six (26) percent of all infrastructure construction costs and all work that took place in the downstream section of OU4, often referred to as OU4B.

14.     Boskalis Finances provided the presses for dewatering of the sediments dredged from the river.  The 106 Order identified sediment removal by dredging as the primary remedial approach at the Site.  Georgia-Pacific paid Boskalis its share directly, and Georgia-Pacific did not receive any reimbursement from NCR or API for any of these amounts.  NCR and API, however, were at all times aware of the amounts Georgia-Pacific paid to Boskalis and approved of those amounts.  The total amount Georgia-Pacific paid to Boskalis was $2,558,417.85.  [See Ex. A.]

15.     Foth & Van Dyke was chosen by NCR/API to provide oversight and track costs for the 106 Order dredging project.  Georgia-Pacific paid Foth & Van Dyke its share directly, and Georgia-Pacific did not receive any reimbursement from NCR or API for any of these amounts.  NCR and API, however, were at all times aware of the amounts Georgia-Pacific paid to Foth & Van Dyke and approved of those amounts.  The total amount Georgia-Pacific paid to Foth & Van Dyke was $63,108.00.  [See Ex. A.]

16.     Veolia Environmental Services provided disposal of the sediments from the 106 Order dredging project.  Georgia-Pacific paid Veolia its share directly, and Georgia-Pacific did not receive reimbursement from NCR or API for any amounts paid to Veolia.  NCR and API, however, were at all times aware of the amounts paid to Veolia and approved of those amounts.  The total amount Georgia-Pacific paid to Veolia was $83,842.69.  [See Ex. A.]  API and NCR were the only signatories on the contract with Veolia for waste disposal.

17.     EQ Industrial Services provided transportation and disposal of dredged materials and debris that were classified as "hazardous" under the federal Toxic Substances Control Act ("TSCA") and therefore required special handling by qualified transporters.  The primary remedial approach at the Site, sediment removal by dredging, requires disposal of the dredged

6

sediments, and EQ Industrial Services transported TSCA wastes to its disposal facility. Georgia-Pacific paid EQ its share directly, and Georgia-Pacific did not receive reimbursement for any amounts paid to EQ. NCR and API were at all times aware of the amounts paid to EQ and approved of those amounts. The total amount Georgia-Pacific paid to EQ was $32,491.75. [See Ex. A.]

     18.     Tetra Tech was the consultant chosen by NCR and hired to perform the dredging required by the 106 Order. Georgia-Pacific initially paid Tetra Tech directly for Georgia-Pacific's share, and Georgia-Pacific did not receive reimbursement for any amounts paid directly to Tetra Tech. NCR and API were at all times aware of the amounts paid to Tetra Tech and approved of those amounts. The total amount Georgia-Pacific paid to Tetra Tech was $3,556,323.43. [See Ex. A.]

     19.     Georgia-Pacific paid WDNR $186,195.65 for oversight costs. [See Ex. A.]

     20.     In 2008, API and NCR hired Project Controls Companies to manage the remediation. Georgia-Pacific did not sign a contract with Project Controls Companies for management of the remediation. Project Controls Companies paid vendors for services provided to fulfill the parties' obligations under the 106 Order and then billed Georgia-Pacific for its share of those costs. The total amount Georgia-Pacific paid to Project Controls Companies was $21,284,506.77. [See Ex. A.] Project Controls Companies continued to use Boskalis, Foth & Van Dyke, Tetra Tech, and Veolia.

     21.     In 2009, API and NCR formed the Lower Fox River Remediation, LLC to manage the remedial action. API and NCR selected Project Controls Companies to manage the Lower Fox River Remediation, LLC. The Lower Fox River Remediation, LLC paid vendors for services provided to fulfill the parties' obligations under the 106 Order and then billed Georgia-

Pacific for its share of those costs. The total amount Georgia-Pacific paid to the Lower Fox River Remediation, LLC was $9,349,277.52. [See Ex. A.]

22.     All of these 106 Order response costs were necessary to comply with the 106 Order. I understand that NCR/API determined that the response costs were reasonable in scope and budget. Paragraph 37 of the 106 Order states that "The actions required by this Order are necessary to protect the public health, welfare, or the environment and are consistent with the National Contingency Plan, as amended, and CERCLA." [Ex. F.]

**B.     Design Order Response Costs**

23.     Georgia-Pacific has incurred and paid $5,228,900.28 in compliance with the 2004 Design Order issued by the EPA. [See Ex. B.] Georgia-Pacific paid a total of $7,492,101.99 under the 2004 Design Order. Before the design costs were incurred, NCR and API had placed money into a trust fund as part of a standstill agreement with the EPA and the WDNR. In 2004, approximately $6,500,000 was left in this trust fund, and the EPA and the WDNR agreed that these funds could be used to pay for part of the sampling and remedial design. Georgia-Pacific agreed to pay half of anything above the remaining approximately $6,500,000 million in the trust fund. Georgia-Pacific was reimbursed $2,263,201.71 from that trust fund. Georgia-Pacific is therefore entitled to $5,228,900.28 in response costs under the 2004 Design Order. [See Ex. B.]

24.     In 2004, Georgia-Pacific, the EPA, the WDNR and NCR entered into an order issued by the EPA under CERCLA Sections 104, 106, 122(a) and 122(d)(3) providing for pre-design sampling and design planning activities at OUs 2 through 5 ("2004 Design AOC"). [Ex. H.]

25.     Under the 2004 Design AOC, Georgia-Pacific and NCR each paid for one half of the costs incurred.

8

26.    Georgia-Pacific carried out the response actions required by the 2004 Design AOC in compliance with the terms of the order.  Georgia-Pacific and NCR collected thousands of sediment samples at hundreds of locations in OUs 3 and 4 and provided analysis and interpretation of the results.

27.    Anchor Environmental Inc. provided consulting services on the project design. Anchor was paid a total of $231,445.34 by Georgia-Pacific in 2004.  [See Ex. B.]  After 2004, Anchor continued to work on the design project, but became a subcontractor of Shaw Environmental Inc.  As a result, Anchor invoiced Shaw Environmental Inc. for the services Anchor continued to provide.  Georgia-Pacific and NCR were billed only by Shaw Environmental, even though Anchor continued to perform work at the site.

28.    Shaw Environmental Inc. was one of the primary design consultants under the order.  Shaw became involved in the design process through its prior affiliation with NCR.  Shaw was paid a total of $5,269,249.27 by Georgia-Pacific from 2004 through 2008.  [See Ex. B.]

29.    Georgia-Pacific paid the EPA $622,018.78 for oversight costs.  [See Ex. B.]

30.    Georgia-Pacific paid the State of Wisconsin $1,369,388.60 for oversight costs. [See Ex. B.]

31.    All of the Design Order response costs discussed above were necessary to comply with the 2004 Design AOC and were reasonable in scope and budget.  Paragraph 12(h) of the 2004 Design AOC states that "[t]he response actions required by this Consent Order are necessary to protect the public health, welfare, or the environment and if carried out in compliance with the terms of this Consent Order, shall be deemed consistent with the NCP." [Ex. H.]

9

C.    **SMU 56/57B Response Costs**

32.    Georgia-Pacific incurred and paid $8,213,962.29 in response costs for the completion of the second phase of the dredging project at SMU 56/57 under the May 2000 Administrative Order on Consent entered into by the EPA, the WDNR, and Georgia-Pacific (the "SMU 56/57B AOC").  [See Ex. C; Ex. J.]

33.    In 1997, the WDNR initiated a demonstration project on the Fox River.  The area known as Sediment Management Units ("SMUs") 56 and 57 were selected for the demonstration sediment restoration project below DePere Dam (the "SMU 56/57A Project").  The removal of contaminated sediment from SMU 56/57 was intended to generate relevant information to assess the implementability, effectiveness, and expense of a large scale sediment dredging and disposal project in the Lower Fox River.

34.    In January of 1997, Georgia-Pacific joined an agreement between the WDNR, NCR Corporation, Appleton Papers Inc., P.H. Glatfelter Company, Riverside Paper Corporation, U.S. Paper Mills Corp., and Wisconsin Tissue Mills Inc. concerning the Fox River ("1997 WDNR Agreement").  [Ex. I.]  The objectives of the agreement were "(1) to begin certain plans, studies or activities in the Lower Fox River/Green Bay area that will improve natural resources and will serve as a basis for evaluating certain sediment management techniques; (2) to establish a one-year "time out" from litigation, including tolling of limitations periods and forbearance from litigation; (3) to establish a mechanism for collaborative natural resource damage ("NRD") assessment planning or activities in the Lower Fox River/Green Bay area; and (4) to establish a framework for negotiations, leading to settlement of the Claims."  [Ex. I.]

35.    The 1997 WDNR Agreement required the companies to "make available a total of $10 million, consisting of a combination of work by the Companies and funding of State

activities, for the Interim Phase of the resources assessment and restoration projects for the Fox River and Green Bay." Under the 1997 WDNR Agreement, a portion of those funds were to be made available for "Field-Scale Demonstration of Restoration Projects." One of these projects was "[t]he design, implementation, and monitoring of a sediment restoration project below DePere Dam that is designed to provide important information regarding large-scale sediment restoration projects in the Lower Fox River, the specific parameters of which are to be worked out by separate technical discussions of the Technical Committee. The Companies' aggregate commitment for this work shall be in an amount not less than $7.0 million." [Ex. I.]

36.     In 1999, the FRG ceased funding the SMU 56/57A Project on the grounds that it had exhausted its $7 million obligation under the 1997 WDNR Agreement. However, certain areas within SMU 56/57 were only partially dredged, resulting in the exposure of high concentrations of PCBs in certain portions of SMU 56/57.

37.     In May of 2000, the EPA, the WDNR, and Georgia-Pacific entered into an order issued by the EPA under CERCLA Section 106(a) providing for further removal actions at SMU 56/57 (the "SMU 56/57B AOC"). [Ex. J.] The Order required Georgia-Pacific to "conduct removal actions as described herein to abate an actual or threatened release of hazardous substances at or from the Site that U.S. EPA and the State believe may present an imminent and substantial endangerment to the public health, welfare or the environment." [Ex. J, at I.B.]

38.     The SMU 56/57B AOC concluded that "[t]he 1999 dredging project at SMU 56/57 has resulted in the exposure of unacceptably high concentrations of polychlorinated biphenyls ("PCBs") in certain portions of SMU 56/57." [Ex. J, at V.9.]

39.     The SMU 56/57B AOC stated that "The increased exposures of PCBs in portions of SMU 56/57 now may present an imminent and substantial endangerment to human health and

11

the environment due to: [1] increased uptake by biota exposed to PCBs; this likely increased uptake adds to the already elevated risk presented by the overall site contamination. [2] potential for further release and migration of PCBs, and more widespread distribution of high concentrations in the downstream river areas and Green Bay. This, in turn, could result in additional PCB uptake and exposures to PCBs, and further releases into Green Bay, and potentially Lake Michigan." [Ex. J, at V.10.]

40. To complete the dredging project as required by the SMU 56/57 AOC, Georgia-Pacific paid Foth & VanDyke $556,414.21 for project management. [See Ex. C.] As project managers, Foth & VanDyke insured that the right spots were being dredged, the samples were being collected properly, and provided general contractor oversight. Georgia-Pacific paid $5,332,676.33 to Sevenson Environmental, who served as the dredging contractors. [See Ex. C.] STS Consultants was paid $59,001.60 for preparatory work. [See Ex. C.] Georgia-Pacific paid Hart Crowser $163,072.43 for permitting and reporting, and Green Bay Blueprint was paid $1,020.00 for drawing up blueprints for the site. [See Ex. C.]

41. Georgia-Pacific paid Carew Concrete $4,632.30 for containment blocks at the dewatering site, DACCO Inc. of Wisconsin $5,493.04 for rental of trailers to use at the dewatering site, McKeefry & Sons $280,872.40 for construction of a pad at the landfill and certain landfill repairs, Mill Coatings $10,035.81 for surface work at the site, Griese & Ross $1,885.00 for rental of a crane used for sampling, Orde Advertising $836.00 for safety signs, Spirit Construction $1,888.56 for lighting around the site, VOS Electric $47,385.56 for power distribution on the site, and Wisconsin Public Service $36,901.85 for the cost of power at the site. [See Ex. C.]

42.     Georgia-Pacific paid $10,701.08 to Ameritech for phone service at the dewatering site, $687.23 to Cellcom for cell phones for people working on site, $2,626.08 to MCI Worldcom Communications for additional phone and computer lines, and $6,712.54 to Xerox for copier rental.  [See Ex. C.]

43.     Georgia-Pacific paid $1,367.00 to Lakeshore Technical and $1,266.57 to C.R.M. Inc. for health and safety training for employees who would be working at the Site.  [See Ex. C.] Georgia-Pacific also incurred costs for health and safety supplies to be used at the site, and the credit card charges in the amount of $6,700.61 for those supplies are listed under "Citibank." [See Ex. C.]

44.     Georgia-Pacific paid En Chem $61,101.00 for the testing of sediment samples, Seaview Diving $1,950.00 for sand cap testing, Miller Engineering $600.00 for soil testing, WF Baird & Associates $30,800.00 for bathymetric measurement of sediment removal, MTS Mulcahy $2,975.56 for technical services, and paid Makuehl Co. $2,424.00 for third party data validation.  [See Ex. C.]

45.     With additional employees dedicated full time to the project, Georgia-Pacific incurred $421,440.00 in labor costs.  [See Ex. C.]  This amount is listed under "ETMS Engineering" in the summary sheet.  [See Ex. C.]

46.     Georgia-Pacific paid the Green Bay Water Utility $27,862.10 for water to be mixed in with polymers being used to increase the settling of particles.  [See Ex. C.]

47.     By the end of 2000, Georgia-Pacific successfully completed the SMU 56/57B dredging project.

48.     Each of the invoices received by Georgia-Pacific related to the remedial action under the 56/57B Order was thoroughly reviewed and only those costs necessary under the Order

were paid. In addition to the summary sheet attached as Exhibit C, Georgia-Pacific has provided a print-out of its internal cost accounting and budgeting records, showing that the invoices described above were paid. [Ex. K.] This print-out contains information on additional invoices that Georgia-Pacific has not yet located and, for that reason, for which Georgia-Pacific does not seek recovery in this Motion.

49. In January 2001, Foth & Van Dyke, with Georgia-Pacific and Hart Crowser, Inc., prepared a report for the EPA and the WDNR titled "Final Report 2000 Sediment Management Unit 56/57 Project Lower Fox River, Green Bay, Wisconsin." [See Ex. L.] Page 29 of that report summarizes the costs incurred by Georgia-Pacific. These costs include a calculation of $1,083,900.00 for the cost of landfill disposal for the 56/57B Project. The landfill disposal costs are based on the costs of such disposal at a third-party landfill. [See Ex. C.]

50. On February 26, 2001, the EPA sent Georgia-Pacific a "Notice of Completion" of the SMU 56/57B AOC, informing Georgia-Pacific that the EPA had "received, reviewed and accepted" the January 2001 Final Report. [Ex. M.]

51. In the 2002 NRD Consent Decree, discussed in more detail in Section E below, Georgia-Pacific agreed to pay and paid $50,000.00 to the EPA Hazardous Substance Superfund to be applied toward EPA oversight costs in overseeing the SMU 56/57 Project. [See Ex. C.]

52. All of these costs were necessary to comply with the SMU 56/57 AOC and were reasonable in scope and budget. The SMU 56/57B AOC stated that: "The removal actions and costs required by this Order, if performed or incurred in accordance with this Order, shall be deemed consistent with the NCP. The removal actions required by this Order are necessary to protect the public health, welfare, or the environment." [Ex. J, at VI.8.]

14

53.     Georgia-Pacific worked in close cooperation with the WDNR and the EPA on the SMU 56/57B Project, obtaining approval from the EPA and the WDNR where necessary, including officials from the EPA and the WDNR in meetings, and communicating with the EPA and the WDNR regarding project updates.  [See, e.g., Ex. P.]

**D.     Initial Investigation, Assessment and Monitoring Costs**

54.     Throughout the Fox River cleanup, Georgia-Pacific incurred and paid $215,780.98 for the investigation, assessment, and monitoring of sites for the disposal of PCB-laden sediments.  [See Ex. D.]

55.     In 2003 and 2004 Georgia-Pacific made payments to the Town of Vinland in the amount of $20,000 for the Town's expenses in evaluating the Vinland landfill for use in implementing the remedial actions selected by the EPA and the WDNR for the Site.  [See Ex. D.]

56.     From 2000 to 2004 DeWitt Ross & Stevens provided services related to the permitting of the Vinland landfill for TSCA waste disposal.  Georgia-Pacific made payments of $98,518.37 directly to DeWitt Ross & Stevens.  After proper investigation and assessment, the Town of Vinland landfill was impracticable for the cleanup.  [See Ex. D.]

57.     Between 2006 and 2008, Evan Zeppos worked on planning and community involvement for Cell 13A of the Georgia-Pacific Landfill and also provided services related to the amendment of the Record of Decision.  Georgia-Pacific made payments of $97,262.61 directly to Evan Zeppos.  [See Ex. D.]

58.     These investigation, assessment and monitoring costs were necessary to comply with the 106 Order and were reasonable in scope and budget.

15

**E.** **Natural Resource Damages**

59. Georgia-Pacific has paid $13,126,370.62 to resolve its alleged Natural Resource Damage liabilities for the Fox River Site. [See Ex. E.]

60. In 2002 Georgia-Pacific entered into a Consent Decree with the EPA and the natural resource trustees. [See Ex. N.] the 2002 Consent Decree was judicially approved in 2004. *United States v. Fort James Operating Co.*, 313 F. Supp. 2d 902 (E.D.WI. 2004).

61. Under the 2002 Consent Decree, Georgia-Pacific made an initial payment of $6,200,000.00 into an interest-bearing Court Registry account. [See Ex. E.] Of this $6,200,000.00, $50,000.00 was to EPA for oversight at the SMU 56/57 Project and is discussed in Paragraph 52 above, and the $6,150,000.00 remainder was paid to natural resource trustees. [See Ex. E.]

62. Under the 2002 Consent Decree, Georgia-Pacific also agreed to fund $3,900,000.00 in recreational projects. Georgia-Pacific funded and completed seven recreational projects in the Green Bay area. Georgia-Pacific provided $375,018.00 in funding to Brown County, $766,000.00 to the City of De Pere, $800,000.00 to the City of Green Bay, $678,999.00 to the Village of Allouez, $500,000.06 to the Village of Ashwaubenon, $270,000.00 to the Village of Bellvue, and $497,524.35 to the Village of Howard. [See Ex. E.] The recreational fund balance of $12,475.65 was wired to the Fox River/Green Bay Natural Resource Trustee Counsel. [See Ex. E.] Georgia-Pacific in fact paid a total of $3,900,017.06 for recreational projects.

63. Under the 2002 Consent Decree, Georgia-Pacific also agreed to acquire and transfer to the State of Wisconsin about 1,060 acres of specified property in the Green Bay watershed for habitat preservation. In fulfillment of this obligation, Georgia-Pacific incurred the

16

following costs: (1) Huhuta Property, 211 acres, $639,263.00; (2) Singer Property, 14.3 acres, $37,911.00; (3) Richter Property, 52 acres, $129,051.00; (4) Bender Property, approximately 40 acres, $252,611.00; (5) the Badger Properties, approximately 700 acres, $1,231,207.32; and (6) Payne Property, approximately 53 acres, $222,665.00. Georgia-Pacific paid a total of $2,512,708.32 for these property transfers. [See Ex. E.]

64.    Georgia-Pacific incurred expenses for NRDs and NRD assessment costs in addition to those paid under the 2002 Consent Decree.

65.    Georgia-Pacific paid Allan Waelchli $600 for a site inspection of forest site purchased by Georgia-Pacific that was given to the state as part of the NRD settlement. [See Ex. E.]

66.    Georgia-Pacific paid Arthur Anderson $42,057.00 for research, preparation and presentation of a report regarding compensatory restoration values. [See Ex. E.]

67.    Georgia-Pacific paid Foth & Van Dyke $8,740.57 for technical evaluations for NRDA. [See Ex. E.]

68.    Georgia-Pacific paid Limno Tech $162,124.10 for consulting services and river flow monitoring related to NRDA. [See Ex. E.]

69.    Georgia-Pacific paid Pricewaterhouse Cooper $96,558.49 for land valuation services related to provision of land under the 2002 NRD Settlement. [See Ex. E.]

70.    Georgia-Pacific paid STS $30,552.76 on Environmental Site Assessments for land provided under the 2002 NRD Settlement. [See Ex. E.]

71.    Georgia-Pacific paid Triangle Economic Research $223,012.32 for compensatory restoration valuation of restoration projects. [See Ex. E.]

72.    These costs were reasonable in scope and budget.

**F.    Shell Property**

73.    Georgia-Pacific owns a 22-acre parcel of land located directly on the Fox River (appraised at $3,000,000).  This land was formerly used by Shell Oil Company as a bulk petroleum terminal and is known as the "Shell Property."

74.    After the EPA and the WDNR began investigating PCB contamination in the Fox River, focus centered on the Shell Property as a possible staging area for cleanup operations because the Shell Property had been successfully used for dewatering for the SMU 56/57 Project. When NCR and Georgia-Pacific began researching possible areas for dewatering of sediment, they therefore focused on the use of the Shell Property.  Because of its size and proximity to the Fox River, the Shell Property was considered ideal for this use.  In fact, the environmental contractors undertaking the remediation under the 106 Order have stated that "the former Shell property is the only practicable location to process sediment dredged from the Lower Fox River."  [Ex. O, at 35-36.]

75.    Rather than forcing the PRPs to locate and acquire alternative property for this massive project, Georgia-Pacific agreed that the PRPs could lease the Shell Property as a staging area for the overall Fox River cleanup.

76.    Georgia-Pacific is not seeking recovery for the value of the use of the Shell Property in this Motion.

**G.    Response Costs, Fees and Other Expenses not Sought in this Motion**

77.    Georgia-Pacific has incurred and paid a significant amount of additional costs and expenses related to the cleanup of the Fox River.  These include the following costs.

78.    Georgia-Pacific incurred costs related to early efforts by the FWS and the WDNR to collect information and data regarding the PCB contamination of the Fox River.

18

79.     Georgia-Pacific also incurred costs for participation in legislative efforts and community awareness activities related to issues that directly affected the Lower Fox River cleanup, such as: out-of-state disposal of highly-contaminated sediments, tax exempt financing of remedial expenses, and an amendment to the federal Water Resources Development Act to change the federally-authorized navigation channel configuration for OU 4A, an action that would have facilitated cleanup efforts.

80.     Since 1994, Georgia-Pacific has incurred legal fees in the amount of over $24,000,000.  This amount includes attorneys' fees and expenses incurred in connection with PRP investigations, FRG activities and the present litigation.

81.     Georgia-Pacific's employees have also spent significant amounts of time to develop or review plans for this remedial action, and on monitoring and oversight.

I declare under the penalty of perjury under the laws of the United States and the State of Wisconsin that the foregoing is true and correct. Executed at Hillsborough, New Jersey on April 2, 2010.

Paul A. Montney