UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 5

| | |
|---|---|
| IN THE MATTER OF: ) | Docket No. V-W-00-C-596 |
| ) | |
| Lower Fox River Sediment ) | ADMINISTRATIVE ORDER BY |
| Management Unit 56/57 ) | CONSENT PURSUANT TO |
| Removal Action ) | SECTION 106 OF THE |
| ) | COMPREHENSIVE |
| ) | ENVIRONMENTAL RESPONSE, |
| Respondents: ) | COMPENSATION, AND |
| ) | LIABILITY ACT OF 1980, |
| Fort James Corporation, and ) | as amended, 42 U.S.C. |
| Fort James Operating Company ) | §9606(a) |
| ) | |

## I.  JURISDICTION AND GENERAL PROVISIONS

A.   This Order is entered voluntarily by the United States
Environmental Protection Agency ("U.S. EPA"), the State of
Wisconsin ("State") through the Wisconsin Department of
Natural Resources ("WDNR"), the Wisconsin Department of
Justice ("WDOJ"), Fort James Corporation, and the Fort James
Operating Company (collectively "Fort James" or
"Respondent").  The Order is issued pursuant to the
authority vested in the President of the United States by
Section 106(a) of the Comprehensive Environmental Response,
Compensation, and Liability Act of 1980, as amended
("CERCLA"), 42 U.S.C. §§9606(a). This authority has been
delegated to the Administrator of the U.S. EPA by Executive
Order No. 12580, January 23, 1987, 52 Federal Register 2923,
and further delegated to the Regional Administrators by
U.S. EPA Delegation Nos. 14-14-A and 14-14-C, and to the
Director, Superfund Division, Region 5, by Regional
Delegation Nos. 14-14-A and 14-14-C.  This Agreement is also
entered into pursuant to the authority of the Attorney
General of the United States to compromise and settle claims
of the United States, which authority, in the circumstances
of this settlement, has been delegated to the Assistant
Attorney General, Environmental and Natural Resources
Division, U.S. Department of Justice ("DOJ").

B.   This Order provides for performance of removal actions in
connection with a portion of the Lower Fox River, Wisconsin,
known as Sediment Management Unit 56/57 (the "SMU 56/57

202865

NCR-FOX-302081

Site" or the "Site"). This Order requires Respondent to conduct removal actions as described herein to abate an actual or threatened release of hazardous substances at or from the Site that U.S. EPA and the State believe may present an imminent and substantial endangerment to the public health, welfare or the environment.

C. Nothing in this Order, including the Statement of Work attached hereto, is intended by the parties to be, nor shall it be construed as, an admission of facts or law, an estoppel, or a waiver of defenses by Respondent for any purpose. Participation in this Order by Respondent is not intended by the parties to be, and shall not be, an admission of any fact or opinion developed by U.S. EPA, the State, or any other person or entity in the course of the work.

## II. PARTIES BOUND

This Order is binding upon and inures to the benefit of U.S. EPA, the WDNR and WDOJ, Respondent, and Respondent's successors and assigns. Any change in ownership or corporate status of Respondent including, but not limited to, any transfer of assets or real or personal property shall not alter Respondent's responsibilities under this Order. Respondent shall ensure that its contractors, subcontractors, and representatives comply with this Order. Respondent shall be responsible for any noncompliance with this Order.

## III. DEFINITIONS

A. Unless otherwise expressly provided herein, terms used in this Order which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in the statute or its implementing regulations.

B. Whenever terms listed below are used in this Order or in the documents attached to this Order or incorporated by reference into this Order, the following definitions shall apply:

1. "Agencies" shall mean the United States Environmental Protection Agency (U.S. EPA) and the Wisconsin Department of Natural Resources (WDNR).

2. "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq.

NCR-FOX-302082

3. "Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Order, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the end of the next business day.

4. "National Contingency Plan" or "NCP" shall mean the National Contingency Plan, promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 CFR Part 300, and any amendments thereto.

5. "Paragraph" shall mean a portion of this Order identified by a capital letter and may include one or more subparagraphs.

6. "Parties" shall mean all signatories to this Order.

7. "Section" shall mean a portion of this Order identified by a Roman numeral.

8. "Site" shall mean the portion of Sediment Management Unit 56/57 ("SMU 56/57") delineated in Figure 1 of Attachment A to the Order, and all suitable areas in close proximity to the contamination necessary for implementation of the removal action, including but not limited to the portion of the Fort James property known as the former Shell property, as described in Figure 2 of Attachment A to this Order.

9. "Statement of Work" or "SOW" shall mean the statement of work for implementation of the removal action, as set forth in Attachment A to this Order. The Statement of Work is incorporated into this Order and is an enforceable part of this Order.

10. "WDOJ" shall mean the Wisconsin Department of Justice.

11. "WDNR" shall mean the Wisconsin Department of Natural Resources.

12. "Work" shall mean all activities Respondent is required to perform under this Order and all attachments hereto, and includes any Work required pursuant to modifications to this Order under Section XXVI.

IV. **STATEMENT OF PURPOSE**

NCR-FOX-302083

The mutual objectives of the U.S. EPA, WDNR, WDOJ, and Respondent in entering into this Order are to implement a removal action in accordance with the Statement of Work. The activities conducted pursuant to this Order are subject to approval by U.S. EPA and the State as provided herein, and shall be consistent with CERCLA, the NCP, and all other applicable laws.

## V. FINDINGS OF FACT

Based on available information, including the Administrative Record in this matter, U.S. EPA hereby finds that:

1. At certain times in the past, primarily in the 1950's and 1960's, certain paper companies located along the Fox River engaged in the manufacture or recycling of carbonless copy paper. Polychlorinated biphenyls (PCBs), which are hazardous substances, were used in the production of carbonless copy paper and in wastepaper that entered the paper recycling operations.

2. As a result of the paper mills' production or recycling of carbonless copy paper an estimated 700,000 pounds of PCBs were likely released to the Fox River. An estimated 60,000 pounds of these PCBs remain in the lower 39 miles of the Fox River, distributed within approximately 10,400,000 cubic yards of sediment. The balance of PCBs likely released to the Fox River are located in the sediments of Green Bay and/or Lake Michigan or were volatilized into the atmosphere. Based upon the extreme longevity and durability of PCBs, degradation of PCBs in the environment is not considered likely. An estimated 400 to 600 pounds of PCBs have been released annually into Green Bay from the lower Fox River.

3. As a result of this contamination, fish consumption advisories have been in effect on the Fox River since 1976.

4. On July 3, 1997, the United States Environmental Protection Agency sent a notice letter under Section 122(e) of CERCLA to, among others, Respondent, identifying it as a potentially responsible party (PRP) with respect to the Fox River.

5. A Remedial Investigation and Feasibility Study (RI/FS) under the technical lead of WDNR is currently underway.

282882

NCR-FOX-302084

6. Sediment Management Unit (SMU) 56/57 is located within the Lower Fox River, approximately 3 miles southwest (upstream) from that point where the Lower Fox River discharges into Green Bay. This area is adjacent to the southern edge of the City of Green Bay.

7. Respondent is the owner of property located within the City of Green Bay, Brown County, Wisconsin. The Respondent's property is located north of, and immediately adjacent to SMU 56/57.

8. A dredging project at SMU 56/57 was undertaken in 1999 pursuant to an agreement between WDNR and certain companies, including Respondent. Certain areas within SMU 56/57 were partially dredged (i.e., only a single dredging "pass" was conducted). These partially dredged areas are defined as subunits 12, 13, 14, 15, 16, 17, 23, 24, 25, 26, 27, 28, and 38. Portions of subunits 25, 26, 27, and 28 were dredged with a second dredging "pass".

9. The 1999 dredging project at SMU 56/57 has resulted in the exposure of unacceptably high concentrations of polychlorinated biphenyls ("PCBs") in certain portions of SMU 56/57. The currently exposed PCB concentrations in the areas where partial dredging occurred (i.e., where one dredging "pass" was conducted) are as high as 310 ppm. An estimated 21,500 cubic yards of contaminated sediments and 1600 pounds of PCBs remain in that portion of SMU 56/57 where dredging was left uncompleted in 1999.

10. The increased exposures of PCBs in portions of SMU 56/57 now may present an imminent and substantial endangerment to human health and the environment due to:
- increased uptake by biota exposed to PCBs; this likely increased uptake adds to the already elevated risk presented by the overall site contamination.
- potential for further release and migration of PCBs, and more widespread distribution of high concentrations in the downstream river areas and Green Bay. This, in turn, could result in additional PCB uptake and exposures to PCBs, and further

232861

NCR-FOX-302085

releases into Green Bay, and potentially Lake Michigan.

## VI. CONCLUSIONS OF LAW AND DETERMINATIONS

Based on the Findings of Fact set forth above, and the Administrative Record supporting this removal action, U.S. EPA has determined that:

1. The Site is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. §9601(9).

2. Polychlorinated Biphenyls ("PCBs") are "hazardous substances" as defined by Section 101(14) of CERCLA, 42 U.S.C. §9601(14).

3. Respondent is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. §9601(21).

4. Respondent Fort James Corporation is either the present "owner" and "operator" of a facility from which there was a release of a hazardous substance to the Lower Fox River that came to be located at the Site, or a person who arranged for disposal or transport for disposal of hazardous substances at the Site. Respondent therefore may be liable under Section 107(a) of CERCLA, 42 U.S.C. §9607(a).

5. The conditions described in the Findings of Fact above constitute an actual or threatened "release" of a hazardous substance from the facility into the "environment" as defined by Sections 101(8) and (22) of CERCLA, 42 U.S.C. §§9601(8) and (22).

6. The conditions present at the Site may present a threat to public health, welfare, or the environment based upon the factors set forth in Section 300.415(b)(2) of the National Oil and Hazardous Substances Pollution Contingency Plan, as amended ("NCP"), 40 CFR §300.415(b)(2).

7. The actual or threatened release of hazardous substances from the Site may present an imminent and substantial endangerment to the public health, welfare, or the environment within the meaning of Section 106(a) of CERCLA, 42 U.S.C. §9606(a).

8. The removal actions and costs required by this Order, if performed or incurred in accordance with this Order, shall be deemed consistent with the NCP. The removal actions required by

NCR-FOX-302086

this Order are necessary to protect the public health, welfare, or the environment.

## VII. **WORK TO BE PERFORMED**

A.    Statement of Work

Attachment A to this Order provides a Statement of Work ("SOW") for the removal action at the Site. Respondent shall perform the activities described in the SOW in accordance with the specifications and schedules contained in the SOW.

B.    Designation of Project Coordinator, On-Scene Coordinator, and On-Scene Representative

   1.    Within 10 business days after the effective date of this Order, Respondent shall designate a Project Coordinator who shall be responsible for administration of all Respondent's actions required by the Order. Respondent shall submit the designated coordinator's name, address, telephone number, and qualifications to U.S. EPA. To the greatest extent possible, the Project Coordinator shall be present on-site or readily available during site work. U.S. EPA retains the right to disapprove of any Project Coordinator named by Respondent. If U.S. EPA disapproves a selected Project Coordinator, Respondent shall retain a different Project Coordinator within 5 business days following U.S. EPA's disapproval and shall notify U.S. EPA of that person's name and qualifications within 7 business days of U.S. EPA's disapproval.

   2.    The U.S. EPA has designated Sam Borries as its On-Scene Coordinator ("OSC"). Respondent shall direct all submissions required by this Order to the OSC at Sam Borries (SE-5J), Emergency Response Branch, U.S. Environmental Protection Agency, 77 West Jackson Blvd., chicago, IL 60604-3590, by certified mail or overnight delivery. Respondent shall also send a copy of all submissions to Roger Grimes, Assistant Regional Counsel, 77 West Jackson Boulevard, C-14J, Chicago, Illinois, 60604-3590. Respondent is encouraged to make its submissions to U.S. EPA on recycled paper (which includes significant postconsumer waste paper content where possible) and using two-sided copies.

   3.    The State designates Gary Kincaid as its On-Scene Representative("OSR"). Respondent shall direct all



2326659

NCR-FOX-302087

submissions required by this Order to the OSR at Wisconsin Department of Natural Resources, 1125 North Military Avenue, P.O. Box 10448, Green Bay, WI 54304 , by certified mail or overnight delivery.

4. The Agencies and Respondent shall have the right to change their designated OSC, OSR, or Project Coordinator. The Agencies shall notify Respondent, and Respondent shall notify the Agencies, as early as possible before such a change is made, but in no case less than 24 hours before such a change. The initial notification may be made orally but it shall be promptly followed by a written notice.

C.  Health and Safety Plan

Not later than 30 days after Respondent receives this AOC executed by the EPA and WDNR, Respondent shall submit for U.S. EPA and WDNR review and comment a plan that ensures the protection of the public health and safety during performance of on-site work under this Order. This plan shall comply with applicable Occupational Safety and Health Administration ("OSHA") regulations found at 29 CFR Part 1910. Respondent shall consider all changes to the plan recommended by U.S. EPA and WDNR, and shall implement the plan during the pendency of the removal action.

## VIII.  REVIEW OF SUBMISSIONS

A.  The Agencies shall review all documents required to be submitted for review and approval pursuant to this Order. The Agencies shall respond to each submission in writing with a single integrated response. As a result of their review of a submission, the Agencies may: (a) approve the submission; (b) approve the submission with minor modifications; (c) disapprove the submission and direct Respondent to re-submit the document after incorporating the Agencies' comments; or (d) if a re-submission, disapprove the re-submission and the Agencies may assume responsibility for performing all or any part of the response action.

B.  In the event of approval or approval with minor modifications by the Agencies, Respondent shall proceed to take any action required by the submittal, as approved or modified by the Agencies.

C.   Upon receipt of a notice of disapproval, Respondent shall, within thirty (30) days or such longer time as specified by the Agencies in their notice of disapproval, correct the deficiencies and resubmit the submittal for approval. Notwithstanding the notice of disapproval, Respondent shall proceed, at the direction of the Agencies, to take any action required by any non-deficient portion of the submission.

D.   If any re-submission is not approved by the Agencies, they may determine that Respondent is in violation of this Order, unless Respondent invokes the procedures set forth in Section XVIII (Dispute Resolution) and the Agencies' determination is revised pursuant to that Section. Issues previously resolved pursuant to the procedures set forth in Section XVIII may not be re-disputed.

## IX.   QUALITY ASSURANCE AND SAMPLING

A.   All sampling and analyses performed pursuant to this Order shall conform to U.S. EPA (and if an in State laboratory is used, WDNR) direction, approval, and guidance regarding sampling, quality assurance/quality control ("QA/QC"), data validation, and chain of custody procedures. Respondent shall ensure that the laboratory used to perform the analyses participates in a QA/QC program that complies with U.S. EPA (and if an in State laboratory is used, WDNR) guidance.

B.   Upon request by the Agencies, Respondent shall have such a laboratory analyze samples submitted by the Agencies for quality assurance monitoring. Respondent shall provide to the Agencies the quality assurance/quality control procedures followed by all sampling teams and laboratories performing data collection and/or analysis. Respondent shall also ensure provision of analytical tracking information consistent with OSWER Directive No. 9240.0-2B, "Extending the Tracking of Analytical Services to PRP-Lead Superfund Sites."

C.   Upon request by the Agencies, Respondent shall allow the Agencies or their authorized representatives to take split and/or duplicate samples of any samples collected by Respondent or its contractors or agents while performing work under this Order. Respondent shall notify the Agencies not less than 3 business days in advance of any sample collection activity. The Agencies shall have the right to take any additional samples that they deem necessary.

NCR-FOX-302089

D.  At the request of Respondent, the Agencies shall provide split or duplicate samples of any samples collected by the Agencies or their contractors pursuant to this Order, except sample results generated pursuant to a criminal investigation. The Agencies shall notify Respondent not less than 3 business days in advance of any sample collection activity.

E.  Pursuant to applicable Federal laws and regulations, (Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), and 40 CFR Part 2), Respondent may assert a confidentiality claim with respect to any or all of the information requested or submitted pursuant to the terms of this Order. Such an assertion must be adequately substantiated when the assertion is made. Analytical data and other information described in Section 104(e)(7)(F) of CERCLA shall not be claimed as confidential by Respondent. Information determined to be confidential by the U.S. EPA in accordance with applicable federal laws and regulations or information determined to be confidential by the State pursuant to applicable Wisconsin laws and regulations will be afforded the full protection provided by such laws and regulations. If no confidentiality claim accompanies information when it is submitted to the U.S. EPA, or if information claimed as confidential is determined by the State not to be confidential, and an appeal of such determination is not made or is unsuccessful, the information may be made available to the public.

## X.  **REPORTING**

Respondent shall submit a monthly written progress report to the Agencies concerning actions undertaken pursuant to this Order, beginning 30 calendar days after the effective date of the Order and continuing until termination of the Order, unless otherwise directed in writing by the OSC. These reports shall describe all significant developments during the preceding period, including the work performed and any problems encountered, analytical data received during the reported period, and developments anticipated during the next reporting period, including a schedule of work to be performed, anticipated problems, and planned resolution of past or anticipated problems.

## XI.  **FINAL REPORT**

A.  Within 60 calendar days after completion of all removal actions required under this Order, Respondent shall submit for review by the Agencies a final report summarizing the

232656

NCR-FOX-302090

actions taken to comply with this Order. The final report shall conform to the requirements set forth in Section 300.165 of the NCP, 40 CFR §300.165. The final report shall also include a good faith estimate of total costs incurred in complying with the Order, a listing of quantities and types of materials removed off-site or handled on-site, a summary of the analytical results of all sampling and analyses performed, and accompanying appendices containing all relevant documentation generated during the removal action.

B.  The final report shall include the following certification signed by a person who supervised or directed the preparation of that report: "Under penalty of law, I certify that, to the best of my knowledge, after appropriate inquiries of all relevant persons involved in the preparation of this report, the information submitted is true, accurate, and complete."

## XII.  ACCESS TO PROPERTY AND INFORMATION

A.  Respondent shall provide or obtain access to the Site and off-site areas to which access is necessary to implement this Order, and shall provide access to all records and documentation related to the actions conducted pursuant to this Order. Such access shall be provided to the Agencies and their authorized representatives at all reasonable times. These individuals shall be permitted to move freely at the Site and appropriate off-site areas for the purpose of conducting actions which the Agencies reasonably determine are necessary for oversight of this Order. Respondent shall submit to the Agencies, upon request, the results of all sampling or tests and all other data generated by Respondent or its contractor(s) under this Order.

B.  Where work under this Order is to be performed in areas owned by or in possession of someone other than Respondent, Respondent shall use its best efforts to obtain all necessary access agreements within 30 calendar days after the effective date of this Order, or as otherwise specified in writing by the OSC. Respondent shall immediately notify the Agencies if, after using its best efforts, it is unable to obtain such agreements. Respondent shall describe in writing its efforts to obtain access. The Agencies may then assist Respondent in gaining access, to the extent necessary to effectuate the removal actions described herein, using such means as the Agencies deem appropriate.

NCR-FOX-302091

### XIII. RECORD RETENTION

Respondent shall preserve all documents and information in its possession or the possession of its contractors, subcontractors or representatives relating to work performed under this Order for six years following completion of the removal action required by this Order. At the end of this six year period and at least 60 days before any document or information is destroyed, Respondent shall notify the Agencies that such documents and information are available to the Agencies for inspection, and upon request, shall provide the originals or copies of such documents and information to whichever one of the Agencies they select. In addition, Respondent shall provide documents and information retained under this Section at any time before expiration of the six year period at the written request of the Agencies, subject to Section XII (Access to Property and Information). Any information that Respondent is required to provide or maintain pursuant to this Order is not subject to the Paperwork Reduction Act of 1995, 44 U.S.C. §3501 et seq.

### XIV. OFF-SITE SHIPMENTS

All hazardous substances, pollutants or contaminants removed off-site pursuant to this Order for treatment, storage or disposal shall be treated, stored, or disposed of at a facility in compliance, as determined by U.S. EPA, with the U.S. EPA Off-Site Rule, 40 CFR §300.440, 58 Fed. Reg. 49215 (Sept. 22, 1993).

### XV. COMPLIANCE WITH OTHER LAWS

A.  Respondent shall perform all actions required pursuant to this Order in accordance with all applicable local, state, and federal laws and regulations except as provided in Section 121(e) of CERCLA, 42 U.S.C. §9621(e), and 40 CFR §300.415(j). In accordance with 40 CFR §300.415(j), all on-Site actions required pursuant to this Order shall, to the extent practicable, as determined by U.S. EPA, considering the exigencies of the situation, attain applicable or relevant and appropriate requirements under federal environmental or state environmental or facility siting laws.

B.  As provided in Section 121(e) of CERCLA and Section 300.400(e) of the NCP, no federal, state or local permits shall be required for any portion of the Work conducted entirely on Site. Where any portion of the Work that is not on Site requires a federal or state permit or approval,

202854

NCR-FOX-302092

Respondent shall submit timely applications and take all other actions necessary to obtain all such permits or approvals.

C. Respondent may seek relief under the provisions of Section XIX (Force Majeure) of this Order for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit required for the Work, provided Respondent has made proper, timely and complete permit application(s) and submitted all required information in a timely manner.

## XVI. EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES

A. If any incident, or change in Site conditions, during the activities conducted pursuant to this Order causes or threatens to cause an unanticipated additional release of hazardous substances from the Site or an endangerment to the public health, welfare, or the environment, Respondent shall immediately take all appropriate action to prevent, abate or minimize such unanticipated release or the endangerment caused or threatened by the release. Respondent shall also immediately notify the OSC and OSR or, in the event of their unavailability, shall notify the Regional Duty Officer, Emergency Response Branch, Region 5 at (312) 353-2318, and the appropriate WDNR representative at 1-800-943-0003, of the incident or Site conditions. If Respondent fails to respond, the Agencies may respond to the release or endangerment and reserve the right to recover costs associated with that response.

B. Respondent shall submit a written report to the Agencies within 7 business days after each such release, setting forth the events that occurred and the measures taken or to be taken to mitigate the release or the endangerment caused or threatened by the release and to prevent the reoccurrence of such a release. Respondent shall also comply with any other notification requirements, including those in Section 103 of CERCLA, 42 U.S.C. §9603, Section 304 of the Emergency Planning and Community Right-To-Know Act, 42 U.S.C. §11004, and Wis. Stats. Sec. 292.11.

## XVII. AUTHORITY OF THE U.S. EPA ON-SCENE COORDINATOR

The OSC shall be responsible for overseeing the implementation of this Order, in consultation with the OSR. The OSC shall have the authority vested in an OSC by the NCP, including the authority to halt, conduct, or direct any work required by this Order, or to

NCR-FOX-302093

direct any other response action undertaken by U.S. EPA or Respondent at the Site. Absence of the OSC from the Site shall not be cause for stoppage of work unless specifically directed by the OSC in consultation with the OSR.

## XVIII. DISPUTE RESOLUTION

A. The parties to this Order shall attempt to resolve, expeditiously, informally, and in good faith, any disagreements concerning this Order.

B. If Respondent objects to any U.S. EPA or State action taken pursuant to this Order, Respondent shall notify the Agencies in writing of its objection(s) within 14 calendar days of such action, unless the objection(s) has (have) been informally resolved. This written notice shall include a statement of the issues in dispute, the relevant facts upon which the dispute is based, all factual data, analysis or opinion supporting Respondent's position, and all supporting documentation on which Respondent relies. The Agencies shall submit their Statement of Position, including supporting documentation, no later than 14 calendar days after receipt of Respondent's written notice of dispute. Respondent may submit a response to the Agencies' Statement of Position within 5 business days after receipt of the Statement. During the 5 business days following receipt of the Agencies' Statement of Position, the parties shall attempt to negotiate, in good faith, a resolution of their differences. The time periods for exchange of written documents may be extended by agreement of all parties.

C. An administrative record of any dispute under this Section shall be maintained by U.S. EPA and shall contain the notice of objections and accompanying materials, the Statement of Position, any other correspondence between the Agencies and Respondent regarding the dispute, and all supporting documentation. The administrative record shall be available for inspection by all parties. If the Agencies do not concur with the position of Respondent, the Division Director for the Office of Superfund, U.S. EPA Region V, in consultation with the Secretary of the WDNR, shall resolve the dispute based upon the administrative record and consistent with the terms and objectives of this Order, and shall provide written notification of such resolution to Respondent.

D. Respondent's obligations under this Order, other than the obligations affected by the dispute, shall not be tolled by

NCR-FOX-302094

submission of any objection for dispute resolution under this Section. Elements of Work and/or obligations not affected by the dispute shall be completed in accordance with the schedule contained in the Statement of Work. Following resolution of the dispute, as provided by this Section, Respondent shall fulfill the requirement that was the subject of the dispute in accordance with the agreement reached or with U.S. EPA's decision, whichever occurs.

## XIX. FORCE MAJEURE

A. Respondent agrees to perform all requirements under this Order within the time limits established under this Order, unless the performance is delayed by a _force majeure_. For purposes of this Order, a _force majeure_ is defined as any event arising from causes beyond the control of Respondent or of any entity controlled by Respondent, including but not limited to its contractors and subcontractors, that delays or prevents performance of any obligation under this Order despite Respondent's best efforts to fulfill the obligation. _Force majeure_ does not include financial inability to complete the work or increased cost of performance.

B. Respondent shall notify the Agencies orally within 2 business days after Respondent becomes aware of any event that Respondent contends constitutes a _force majeure_, and in writing within 7 calendar days after the event. Such notice shall: identify the event causing the delay or anticipated delay; estimate the anticipated length of delay, including any necessary demobilization and re-mobilization; state the measures taken or to be taken to minimize the delay; and estimate the timetable for implementation of the measures. Respondent shall take all reasonable measures to avoid and minimize the delay. Failure to comply with the notice provision of this Section shall be grounds for the Agencies to deny Respondent an extension of time for performance. Respondent shall have the burden of demonstrating by a preponderance of the evidence that the event is a _force majeure_, that the delay is warranted under the circumstances, and that best efforts were exercised to avoid and mitigate the effects of the delay.

C. If the Agencies determine a delay in performance of a requirement under this Order is or was attributable to a _force majeure_, the time period for performance of that requirement shall be extended for such time as is necessary to complete such requirement. Such an extension shall not

202851

NCR-FOX-302095

alter Respondent's obligation to perform or complete other tasks required by the Order which are not directly affected by the force majeure.

D. If either the U.S. EPA or the State, but not the other, concludes that a delay or anticipated delay has not been or will not be caused by a force majeure event, the U.S. EPA and the State will notify Respondent in writing of such disagreement, the provisions of Section XVIII (Dispute Resolution) shall be deemed to be invoked, and Respondent's time for invoking the provisions of Section XVIII will be stayed until the U.S. EPA and the State have completed the process specified in Section XVIII.

## XX. STIPULATED AND STATUTORY PENALTIES

A. Respondent shall be liable for payment into the Hazardous Substances Superfund administered by the U.S. EPA of the sums set forth below as stipulated penalties for each week or part thereof that Respondent fails to comply with a schedule in accordance with the requirements contained in this Order, including its Attachments or modifications, unless the Agencies determine that such a failure or delay is attributable to force majeure as defined in Section XIX or is otherwise approved by U.S. EPA. Such sums shall be due and payable within thirty (30) days of receipt of written notification from U.S. EPA specifically identifying the noncompliance and assessing penalties, unless Respondent invokes the procedures of Section XVIII (Dispute Resolution). These stipulated penalties shall accrue in the amount of $1500.00 for the first week or part thereof, and $2000.00 for each week or part thereof thereafter. Stipulated penalties shall begin to accrue on the day that performance is due or a violation occurs and extends through the period of correction.

B. The stipulated penalties set forth herein shall not preclude the Agencies from electing to pursue any other remedy or sanction because of Respondent's failure to comply with any of the terms of this Order, including a suit to enforce the terms of this Order. Said stipulated penalties shall not preclude the U.S. EPA from seeking statutory penalties up to the amount authorized by law if Respondent fails to comply with any requirements of this Order. Provided, however, that the United States shall not seek civil penalties pursuant to Section 122(l) of CERCLA for any violation for which a stipulated penalty is provided herein, except in the case of a willful violation of this Order.

NCR-FOX-302096

C.   Upon receipt of written demand from U.S. EPA, Respondent shall make payment to U.S. EPA within 30 days and interest shall accrue on late payments.  If Respondent fails to pay stipulated penalties when due, U.S. EPA may institute proceedings to collect the penalties, as well as interest.

D.   Even if violations are simultaneous, separate penalties shall accrue for separate violations of this Order. Penalties shall accrue regardless of whether U.S. EPA has notified Respondent of a violation or act of noncompliance. The payment of penalties shall not alter in any way Respondent's obligation to complete the performance of the work required under this Order.  Stipulated penalties shall accrue, but need not be paid, during any dispute resolution period concerning the particular penalties at issue.  If Respondent prevails upon resolution, Respondent shall pay only such penalties as the resolution requires.  In its unreviewable discretion, U.S. EPA may waive its rights to demand all or a portion of the stipulated penalties due under this Section.

## XXI.  RESERVATION OF RIGHTS

A.   Except as specifically provided in this Order, nothing herein shall limit the power and authority of the Agencies to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site.  Further, nothing herein shall prevent the Agencies from seeking legal or equitable relief to enforce the terms of this Order. Except as specifically provided in this Order, U.S. EPA also reserves the right to take any other legal or equitable action as it deems appropriate and necessary, or to require Respondent in the future to perform additional activities pursuant to CERCLA or any other applicable law.  The United States reserves, and this Order is without prejudice to, all rights against Respondent with respect to all other matters including, but not limited to:

1.   Liability for failure to meet a requirement of this Consent Order;

2.   Criminal liability;

3.   Liability arising from any future releases of hazardous substances or oil from a facility owned

Case 1:10-cv-00910-WCG   Filed 01/05/11   Page 17 of 35   Document 76-8

NCR-FOX-302097

and/or operated by Respondent to the Site, and any future arrangement for disposal or treatment of a hazardous substance, pollutant or contaminant at the Site after the effective date of this Order;

4. Liability for federal government response costs including the cost of overseeing performance of the work covered under this agreement.

5. Claims for damages to natural resources, as defined in Section 101(6) of CERCLA, 42 U.S.C. § 9601(6);

B. Respondent specifically reserves all rights and defenses that it may have, including but not limited to the right to contest any determinations, findings of fact, or conclusions of law set forth in the Order in any proceeding other than an action brought by U.S. EPA or the State to enforce this Order.

## XXII. OTHER CLAIMS

A. By issuance of this Order, the United States, the State of Wisconsin, and the Agencies assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Respondent. The United States, the State of Wisconsin, and the Agencies shall not be a party or be held out as a party to any contract entered into by Respondent or its directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out activities pursuant to this Order.

B. Except as expressly provided in Section XXIII (Covenant Not To Sue), nothing in this Order constitutes a satisfaction of or release from any claim or cause of action against Respondent or any person not a party to this Order, for any liability such person may have under CERCLA, other statutes, or the common law, including but not limited to any claims of the United States for costs, damages and interest under Sections 106(a) or 107(a) of CERCLA, 42 U.S.C. §§9606(a), 9607(a).

C. This Order does not constitute a preauthorization of funds under Section 111(a)(2) of CERCLA, 42 U.S.C. §9611(a)(2). The Respondent waives any claim to payment under Sections 106(b), 111, and 112 of CERCLA, 42 U.S.C. §§9606(b), 9611, and 9612, against the United States or the Hazardous Substance Superfund arising out of any action performed

232048

under this Order.  No action or decision by U.S. EPA pursuant to this Order shall give rise to any right to judicial review except as set forth in Section 113(h) of CERCLA, 42 U.S.C. §9613(h).

## XXIII.  COVENANT NOT TO SUE

A.   1.  In consideration of the actions that will be performed by Respondent under the terms of this Order and except as specifically provided in Section XXI, the United States covenants not to sue or to take administrative action against Respondent pursuant to Section 106 of CERCLA, Section 311 of the Federal Water Pollution Control Act, and Section 10 of the Rivers and Harbors Act with respect to the Site.

2.  In consideration of the actions that will be performed by Respondent under the terms of this Order, and except as specifically provided in Section XXI, the State covenants not to sue or take administrative action against Respondent pursuant to Sections 107(a) and 310 of CERCLA, Section 505 of the Federal Water Pollution Control Act, and state statutory and common law with respect to the Site.

3.  Except with respect to future liability, the covenants not to sue or take administrative action shall take effect upon issuance of this Order.  With respect to future liability, these covenants not to sue or take administrative action shall take effect upon the issuance of the Notice of Completion.  These covenants not to sue or take administrative action are conditioned upon the satisfactory performance by Respondent of its obligations under this Order.  These covenants not to sue or take administrative action extend only to Respondent and do not extend to any other person.

B.   These covenants not to sue or take administrative action shall not apply to a U.S. EPA claim for response action after issuance of the Notice of Completion with respect to any subunit of the Site, as delineated in the SOW, that did not achieve the Cleanup Objectives as defined in the SOW.

C.   Nothing in this Order shall affect any covenant not to sue provided to Respondent in any other agreement.

## XXIV.  CONTRIBUTION PROTECTION

232847

NCR-FOX-302099

With regard to claims for contribution against Respondent for matters addressed in this Order, the Parties hereto agree that Respondent is entitled to protection from contribution actions or claims to the extent provided by Section 113(f)(2)of CERCLA, 42 U.S.C. §§9613(f)(2), and applicable state law. The "matters addressed" in this Order are all response actions to be taken by any person other than the United States with respect to the Site. Nothing in this Order precludes Parties from asserting any claims, causes of action or demands against any persons not parties to this Order for indemnification, contribution, or cost recovery.

## XXV.   INDEMNIFICATION

Respondent agrees to indemnify, save and hold harmless the United States, the State, and their officials, agents, contractors, subcontractors, employees and representatives from any and all claims or causes of action: (A) arising from, or on account of, acts or omissions of Respondent and Respondent's officers, directors, employees, agents, contractors, subcontractors, receivers, trustees, successors or assigns, in carrying out actions pursuant to this Order; and (B) for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between (any one or more of) Respondent, and any persons for performance of work on or relating to the Site, including claims on account of construction delays. Nothing in this Order, however, requires indemnification by Respondent for any claim or cause of action against the United States or the State based on acts or omissions that occur at the direction of the United States or the State (not including oversight or approval of plans or activities of Respondent).

## XXVI.   MODIFICATIONS

Any requirements of this Order may be modified in writing by mutual agreement of the parties.  If Respondent seeks permission to deviate from any approved plan or schedule, Respondent's Project Coordinator shall submit a written request to the Agencies for approval outlining the proposed modification and its basis.

No informal advice, guidance, suggestion, or comment by the Agencies regarding reports, plans, specifications, schedules, or any other writing submitted by Respondent shall relieve Respondent of its obligations to obtain such formal approval as may be required by this Order, and to comply with all requirements of this Order unless it is formally modified.

232646

NCR-FOX-302100

## XXVII. NOTICE OF COMPLETION

The Agencies shall promptly review the Final Report submitted by Respondent and determine whether all work has been performed in accordance with this Order, except for certain continuing obligations required by this Order (e.g., record retention). Upon such determination, the Agencies will promptly provide written notice to Respondent. Such notice will not be unreasonably withheld. If the Agencies determine that any removal activities have not been completed in accordance with this Order, they will notify Respondent, provide a list of the deficiencies, and require that Respondent modify the Work Plan if appropriate to correct such deficiencies. Respondent shall implement the modified and approved Work Plan and shall submit a modified Final Report in accordance with the Agencies' notice. Failure to implement the approved modified Work Plan shall be a violation of this Order.

## XXIII. SEVERABILITY

If a court issues an order that invalidates any provision of this Order or finds that Respondent has sufficient cause not to comply with one or more provisions of this Order, Respondent shall remain bound to comply with all provisions of this Order not invalidated by the court's order.

## XXIX. EFFECTIVE DATE

This Order shall become effective five (5) days following facsimile transmission to Respondent's representative, as designated in Section VII, of the signature pages herein for the Director for the Office of Superfund, U.S. EPA, Region V, and the Secretary of the WDNR.

222045

NCR-FOX-302101

IN THE MATTER OF:
Administrative Order by Consent
SMU 56/57 Site
Fox River, Wisconsin

### SIGNATORIES

Each undersigned representative of a signatory to this
Administrative Order on Consent certifies that he or she is fully
authorized to enter into the terms and conditions of this Order
and to bind such signatory to this document.


AGREED AS STATED ABOVE:

FORT JAMES CORPORATION and
FORT JAMES OPERATING COMPANY



BY: _Kathleen M Bennett_____     DATE: _May 25, 2000_
Name:
Title:


IT IS SO ORDERED AND AGREED:



BY: _____     DATE: _5/26/00_
    William E. Muno, Director
    Superfund Division
    U.S. Environmental Protection Agency, Region 5



BY: _George Meyer_____     DATE: _5/25/2000_
    George Meyer, Secretary
    Wisconsin Department of Natural Resources

NCR-FOX-302102

23

IN THE MATTER OF:
Administrative Order by Consent
SMU 56/57 Site
Fox River, Wisconsin


BY:_____          DATE:_____
Name:
Title:
    Wisconsin Department of Justice




BY:_____          DATE: 5/25/00
    Lois J. Schiffer
    Assistant Attorney General
    Environment & Natural Resources Division
    U.S. Department of Justice

NCR-FOX-302103

23

IN THE MATTER OF:
Administrative Order by Consent
SMU 56/57 Site
Fox River, Wisconsin


BY: _____          DATE: 5/22/00
    Name:  Jerry L. Hancock
    Title: Assistant Attorney General
           Wisconsin Department of Justice




BY: _____          DATE: _____
       Lois J. Schiffer
       Assistant Attorney General
       Environment & Natural Resources Division
       U.S. Department of Justice

NCR-FOX-302104

# STATEMENT OF WORK
## Lower Fox River
### Sediment Management Unit 56/57 Removal Action

## I. INTRODUCTION

### A. Purpose

The purpose of this Statement of Work ("SOW") is to set forth the requirements for performance of a removal action involving dredging of contaminated sediment from a portion of the area known as Sediment Management Unit ("SMU") 56/57, located in the vicinity of the Fort James Corporation facility located on the west bank of the Lower Fox River, Wisconsin. The work is being conducted under Administrative Order by Consent No. _____ ("AOC"), to which this SOW is attached.

### B. Description of Removal Action

1. Respondent will use hydraulic dredging to remove contaminated sediment from certain subunits of SMU 56/57, as numbered on Figure 1 attached to this SOW, in two phases. Phase I will remove sediment from all areas in subunits 12, 13, 14, 15, 16, 17, 23, 24, 25, 26, 27, 28, and portions of subunits 18, and 29. In order to obtain stable side slopes, sediments from portions of subunits 34, 35, 35, 36, 37, 38, 39, and 40 ("Phase I Subunits") will be removed. If the project does not enter Phase II, then sediments from portions of 18 and 29 will be removed for side slope stabilization. The foregoing will be collectively referred to as "Phase I Subunits." The approximate horizontal extent of Phase I dredging is shown on Figure 1. The vertical extent of dredging will be determined by the Cleanup Objectives, as defined below, subject to the limitations contained in this Paragraph I.B.1. Phase II will remove sediment from the remaining portions of subunits 18, 36, 37, 38, and 39, and from all or part of subunits 19, 29, 30, 40, 41, 46, 47, 48, 49, 50, and 51 ("Phase II Subunits"). Respondent shall not be required to remove more than a total of 50,000 cubic yards ("CY") of in-place sediment from the Phase I and II Subunits, given the need to preserve stable side slopes, avoid leaving residual elevated PCB concentrations, and remain within the remaining capacity of the Fort James Green Bay Landfill Cell 12A ("Cell 12A") located at Respondent's Green Bay Landfill (WDNR Lic. #2332), which has been approved to receive dewatered sediments containing over 50 parts per million ("ppm") PCBs ("TSCA-level Sediments"). The Phase II Subunits will be dredged only to the extent that Respondent can meet the Cleanup Objectives, establish stable side slopes, and remain within the 50,000 CY volume limit. All dredged sediment will be dewatered and made suitable for placement in Cell 12A. Respondent will properly dispose of all TSCA-level Sediments in Cell 12A and the balance of the PCB-contaminated sediments, if any, as provided in Section II.E of this SOW.

Case 1:10-cv-00910-WCG   Filed 01/05/11   Page 25 of 35   Document 76-8

NCR-FOX-302105

2. Respondent will construct access roads, staging areas, work pads, and other infrastructure as necessary to accomplish the required sediment dredging, dewatering, stabilization, truck loading, truck washing, parking, and associated activities.

3. Respondent will provide or obtain the necessary utilities, site security, and support services to complete the project.

4. At the completion of the response activities, Respondent will restore the onshore area used for the response action to a stable and secure status as determined by Respondent, the owner of the onshore area.

## C.    Cleanup Objectives

As part of the Removal Design, discussed in Section II.A.2 of this SOW, target dredging elevations will be established for the Phase I and Phase II Subunits based on the goal of attaining a residual surficial PCB concentration (defined for purposes of this SOW as the upper four inches of sediment after dredging) of approximately 1 ppm, establishing stable side slopes at the conclusion of the dredging, and remaining within the 50,000 CY volume limitation, using existing data and estimated cross-sections of SMU 56/57. Dredging of each subunit will proceed until any of the following Cleanup Objectives is met:

Post-dredging sampling of the subunit pursuant to Section II.F of this SOW indicates that a surficial sediment concentration of 1 ppm PCBs or less has been attained; or

Post-dredging sampling of the subunit pursuant to Section II.F of this SOW indicates that a surficial sediment concentration of 10 ppm PCBs or less has been attained and Respondent will place six inches of clean sand over the entire subunit; or

Post-dredging sampling of all subunits in each Phase pursuant to Section II.F of this SOW indicates that a surficial sediment concentration of 10 ppm PCBs or less has been attained in 90% of the subunits in that Phase, the surficial sediment concentration does not exceed 25 ppm in any subunit in that Phase, the average surficial sediment concentration of all subunits in that Phase is less than or equal to 10 ppm, and Respondent will place six inches of clean sand over all subunits that have not attained a surficial sediment concentration of 1 ppm PCBs or less.

If the U.S. EPA On-Scene Coordinator ("OSC") makes a determination, in consultation with the WDNR On-Scene Representative ("OSR"), that achieving a surficial sediment

2

222640

NCR-FOX-302106

concentration of 10 ppm PCBs or less in a given subunit is impracticable or undesirable (e.g., due to the need to maintain appropriate side slopes), the Cleanup Objectives will be deemed to have been met in that subunit, as long as Respondent will place six inches of clean sand over the entire subunit. The foregoing Cleanup Objectives do not apply to the side slopes of the subunits at the perimeter of the dredged area, which shall be designed to minimize sloughing or slumping into the dredged area. All dredged side slopes will be covered with six inches of clean sand.

### D. Applicable or Relevant and Appropriate Requirements to be Considered

Permits are not required for this project pursuant to CERCLA Section 121(e)(1). The following substantive requirements will be met to the extent that they are applicable, or to the extent that they are relevant and appropriate and do not interfere with expeditious completion of the project:

The substantive requirements of the letter dated 11-03-98 from the US Army Corps of Engineers, except that Respondent may seek to modify such requirements based on the results of the Demonstration Project.[1]

The substantive requirements of WDNR dredging permit No. 3-NE-99-0341LF, except that Respondent may seek to modify such requirements based on the results of the Demonstration Project.

The water discharge limitations set forth in WPDES Permit No. WI-0049735, except that Respondent may seek to modify such requirements based on the results of the Demonstration Project.

Substantive State solid waste disposal requirements, including requirements contained in WDNR's existing approval of Cell 12A.

### E. Removal Implementation

The removal action to be implemented will consist of the following elements:

Design Activities;
Contractor Selection;
Construction Oversight;

---

[1] SMU 56/57 was the location of a demonstration dredging project in 1999 that will be referred to as the "Demonstration Project" throughout this Statement of Work. The detailed design for the Demonstration Project is a document entitled "Basis of Design Report" (Montgomery Watson 1998).

3

NCR-FOX-302107

Dredging and Processing;
TSCA and Non-TSCA Disposal; and
Confirmatory Sampling

These steps are described below and shall be completed in accordance with the schedule provided below.

## II.  WORK TO BE PERFORMED

### A.  Design Activities

#### 1.  Planning Phase

Respondent will complete the planning phase following the execution of the AOC.  The planning phase will consist of the pre-design activities described below.  The results of these activities will serve to supplement the Basis of Design Report for the previously conducted Demonstration Project.

##### a.  Compilation and Assessment of Existing Sediment Contamination Data

Relevant data developed before and after the Demonstration Project will be evaluated and summarized to identify data gaps and support the proposed methods for completing the remediation of the disturbed area and selected adjacent cells.

##### b.  Evaluation of Dredging, Processing, and Disposal Options

Based on the data assessment and an evaluation of the results of the Demonstration Project, Respondent will recommend modifications to the Basis of Design Report and relevant associated documents that will allow for the efficient completion of this removal action.

##### c.  Supplemental Sampling

Based on an initial evaluation of available relevant data, the following supplemental sampling activities may be necessary:

Supplementary Geo-technical Borings -- Additional geotechnical borings may be taken to further define the grain size, degree of consolidation and possibly other geotechnical characteristics of the sediments in the disturbed area and selected adjacent cells.

4

NCR-FOX-302108

<u>Pre-dredging Bathymetry</u> -- Sloughing and siltation in the disturbed area may have occurred over the last 6 months since Demonstration Project dredging was completed. In order to project depth and quantities accurately a new pre-dredging survey will be conducted.

5

2⸱⸱263⸱

Case 1:10-cv-00910-WCG   Filed 01/05/11   Page 29 of 35   Document 76-8

NCR-FOX-302109

2. <u>Removal Design</u>

Based on the evaluation of the Demonstration Project and the available results of the pre-design activities, certain modifications to the plan described in the Basis of Design Report may enhance the efficiency of the dredging, sediment treatment, and water treatment operations. Respondent will refine these modifications and describe them in a technical memorandum entitled "Work Plan/Design Memorandum," which will be submitted to the USEPA and WDNR for review and approval. Respondent anticipates the Work Plan/Design Memorandum will generally refer to the Basis of Design Report and will be limited to describing the modifications to that report. Target dredging elevations will be established for the Phase I and Phase II Subunits based on the goal of attaining a residual surficial PCB concentration (defined for purposes of this SOW as the upper four inches after dredging) of approximately 1 ppm, establishing stable side slopes at the conclusion of the dredging, and remaining within the 50,000 CY volume limitation, using existing data and estimated cross-sections of SMU 56/57.

**B.      Contractor Selection**

Respondent will conduct a two-step contractor selection process. The first step will be pre-qualification, including; checking references, visiting similar dredging project sites and visiting the offices of potential contractors. The second step will be solicitation of bids from qualified contractors.

**C.      Construction Oversight**

Respondent will identify an employee or third party to provide full time oversight of the dredging, dewatering, and disposal operation.

**D.      Dredging and Processing**

Respondent will excavate contaminated sediments from the subunits listed in Section I.B. of this SOW pursuant to the approved Work Plan/Design Memorandum until the Cleanup Objectives and appropriate side slopes are achieved. Dredging will first occur in the Phase I Subunits. To avoid any unnecessary interruption in the progress of the work, the OSC, OSR, and Respondent will consult after Confirmatory Sampling of 75% or more of the Phase I Subunits have been dredged. The OSC shall determine in consultation with the WDNR OSR, based on the available data, whether objectives are consistently being met in the areas dredged to-date, and whether dredging may proceed in the Phase II Subunits upon completion of Phase I. The dredging will be implemented in a manner to ensure that the volume of the dredged sediments does not exceed 50,000 CY, the volume of the dredged, dewatered and treated sediments does not exceed the remaining capacity of Cell 12A, and the side slopes on the outer perimeter of the dredged area are stable. Respondent will place six inches of clean sand

6

on all side slopes after the dredging has concluded, and will place six inches of clean sand on any subunits as needed to attain the Cleanup Objectives.

Dredged material will be dewatered using mechanical means. A combination of passive dewatering in lagoons and batch processing through agitated tanks may be employed to maximize the volume removed in the shortest time. Prior to transportation, dewatered sediment will be stabilized, if necessary, in order to pass the RCRA "paint filter test."

### E. TSCA and Non-TSCA Disposal

Dewatered and stabilized sediments will be separated in batches of 2,000 CY or less, sampled for PCBs, and tested for free liquids (RCRA paint filter test) and other relevant geotechnical characteristics as needed. Batches or piles having a PCB concentration greater than or equal to 50 ppm will be transported to and disposed of in Cell 12A of the Fort James Green Bay Landfill. Batches or piles having a PCB concentration less than 50 ppm will be transported to and disposed of in: (i) Cell 12A; (ii) a cell other than Cell 12A at Fort James Green Bay Landfill as may be agreed to by WDNR and Respondent; or (iii) some other disposal facility as may be agreed to by WDNR and Respondent.

### F. Confirmatory Sampling

Respondent shall conduct Confirmatory Sampling under this section to determine whether the Cleanup Objectives have been met. The Confirmatory Sampling shall be conducted consistent with the Sampling and Analysis Plan ("SAP") discussed in Section III.A. of this SOW. After the approximate target elevation of each subunit has been reached, Respondent will collect and analyze one sample of the surficial sediment (the top four inches) in that subunit for PCBs. If the sample result is greater than 10 ppm PCBs, Respondent either may collect and composite four or more additional samples of surficial sediment from the subunit and analyze the composited sample for PCBs to determine whether the Cleanup Objectives have been met, or may conduct additional dredging of the subunit before conducting further Confirmatory Sampling. Respondent also will conduct a post dredging bathymetric survey of the dredged area after each phase of dredging has been completed.

## III. ADDITIONAL ACTIVITIES

The following additional activities will also be conducted as part of the removal action.

### A. Sampling and Analysis Plan

Respondent will prepare and submit a Sampling and Analysis Plan that will describe the procedures and analytical techniques to be used for the following required sampling and

7

232635

Case 1:10-cv-00910-WCG   Filed 01/05/11   Page 31 of 35   Document 76-8

NCR-FOX-302111

monitoring:

Turbidity and Water Column PCB Monitoring--During dredging operations, turbidity measurements will be taken at one station upstream and one station downstream of the work. The existing upstream station at the Fort James intake will be used for the upstream measurements. Upstream turbidity measurements will be compared to downstream turbidity measurements. An in-stream water column sample will be collected and analyzed for PCBs when turbidity measured by the downstream station is significantly higher than the turbidity measured by the upstream station ("Trigger Level") and the source of the increased turbidity is demonstrated to be the dredging. The Trigger Level will be specified in the final approved Work Plan/Design Memorandum.

Dewatered Sediment Sampling--Dewatered and stabilized sediments will be separated in batches of 2,000 CY or less. Each batch will be sampled for PCBs and tested for free liquids (RCRA paint filter test) and other relevant geotechnical characteristics as needed.

Post-Dredging Confirmatory Sampling--Surficial sediments will be analyzed for PCBs as provided in Section II.F of this SOW.

Effluent Sampling--Samples of treated effluent from the project will be obtained and analyzed as directed by the OSC and OSR; provided however that, any such sampling and analysis will not be more frequent nor involve more constituents than required by the WPDES permit issued in connection with the Demonstration Project.

Post-Dredging Bathymetric Survey--A post dredging bathymetric survey will be conducted.

B.    Health and Safety Plan

Respondent will review the Health and Safety Plan prepared for the Demonstration Project and the onsite safety history during that project. Based on that evaluation and considering proposed modifications to the dredging program, a modified plan will be developed, if necessary.

C.    Quality Assurance Project Plan

Sampling and analyses will be conducted in accordance with an approved Quality Assurance Project Plan.

8

232034

NCR-FOX-302112

## IV. PROJECT SCHEDULE

The following milestones are established for the project:

Work Plan/Design Memorandum - 30 days after Respondent receives AOC executed by EPA and WDNR

Sampling and Analysis Plan - 30 days after Respondent receives AOC executed by EPA and WDNR

Health and Safety Plan - 30 days after Respondent receives AOC executed by EPA and WDNR

Quality Assurance Project Plan - 30 days after Respondent receives AOC executed by EPA and WDNR

Selection of Contractor - 45 days after Respondent receives AOC executed by EPA and WDNR

Begin Contractor Mobilization to Site - 30 days after receipt of EPA/WDNR written approval of Work Plan/Design Memorandum

Start of Dredging - 60 days after receipt of EPA/WDNR written approval of Work Plan/Design Memorandum

9

NCR-FOX-302113



FIGURE I

| SU | Target Elevation in Feet (NGVD 29) |
|----|-----|
| 12 | 565 |
| 13 | 565 |
| 14 | 565 |
| 15 | 562 |
| 16 | 562 |
| 17 | 563 |
| 18 | 563 |
| 19 | 562 |
| 20 | 565 |
| 22 | 565 |
| 24 | 564 |
| 25 | 563 |
| 27 | 564 |
| 28 | 562 |
| 29 | 563 |
| 36 | 565 |
| 38 | 565 |
| 39 | 563 |
| 40 | 565 |
| 45 | 565 |
| 46 | 565 |
| 47 | 556 |
| 48 | 565 |
| 49 | 565 |
| 50 | 556 |
| 51 | 556 |

Phase I Dredging

Phase II Dredging

Partial Dredging During Phase I

Scale in Feet
0    200    400

HARTCROWSER
J-4875-02   5/00
Figure 1

NCR-FOX-302114



Figure 2

FORMER
SHELL OIL
PROPERTY

FORT JAMES
CORPORATION
FACILITY

SEDIMENT
MANAGEMENT
UNIT 56/57

FEET

QUALITY CONTROL

Management Review
Other

Technical Review
Project Manager

5-1-98

Graphic Standards
Lead Professional

this document has been developed for a specific application and may not be used without the written approval of Montgomery Watson.

## NOTES

1. REFERENCE: RECREATIONAL CHART 14916, LAKE WINNEBAGO AND LOWER FOX RIVER, NOAA, 8th EDITION, OCTOBER 17, 1992.

north

232631

| Developed By | RHW | Drawn By | CCM |
|---|---|---|---|
| Approved By | | Date | 5-15-98 |
| Reference | | | |
| Revisions | | | |

LOCATION MAP

BASIS OF DESIGN REPORT
SEDIMENT REMOVAL
DEMONSTRATION PROJECT
SEDIMENT MANAGEMENT UNIT 56/57
FOX RIVER, GREEN BAY, WISCONSIN

| Drawing Number 1272167 01250101 | A2 |
|---|---|

MONTGOMERY WATSON

NCR-FOX-302115