EPA Region 5 Records Ctr.



290162



BEVERIDGE
& DIAMOND PC

Steven M. Jawetz
1350 I Street, N.W.
Suite 700
Washington, D.C. 20005-3311
Direct: (202) 789-6045
Fax: (202) 789-6190
sjawetz@bdlaw.com

November 29, 2007

**VIA E-MAIL AND FEDEX**

Mr. James Hahnenberg  
Remedial Project Manager  
Superfund Division, Mail Code: SR-6J  
U.S. Environmental Protection Agency, Region 5  
77 West Jackson Boulevard  
Chicago, IL 60604

Mr. Gregory Hill  
Project Coordinator  
Wisconsin Department of Natural Resources  
101 S. Webster Street  
Madison, WI 53707

Re: Administrative Order for Remedial Action, U.S. EPA Docket No. V-W-'08-C-885: Georgia-Pacific Comments and Sufficient Cause Defenses

Dear Mr. Hahnenberg:

We provide this letter on behalf of Georgia-Pacific Consumer Products LP ("GP") in response to Paragraph 99 of the Administrative Order for Remedial Action, U.S. EPA Docket No. V-W-'08-C-885, In the Matter of: Lower Fox River and Green Bay Superfund Site, WI, Operable Units 2-5 ("Order"), which was signed on November 13 and issued to the Respondents on November 14, 2007.

Paragraph 99 of the Order provides an opportunity for each Respondent to submit comments on the Order, and also purports to require each Respondent asserting "sufficient cause" defenses to the Order under Section 106(b) of CERCLA to describe those defenses. GP objects to the latter requirement, as Section 106 does not provide the U.S. Environmental Protection Agency ("EPA") with authority to require GP at this time to describe any "sufficient cause" defenses it may have to compliance with the Order. GP also reserves its rights to raise any defenses at any time they may become applicable, whether or not they are mentioned in this letter. Notwithstanding the foregoing, GP provides the comments and information below, including its understanding of certain provisions of the Order.

Although it may not assert any of these defenses to the Order now or in the future, in brief, GP believes that it has sufficient cause to assert that portions of the Order may not apply to GP or may not be legally enforceable, for at least the following reasons.

1. The Order directs GP to implement Work in areas of the Site for which GP has no liability under CERCLA.

2. The Order is invalid because it did not specify the work to be performed by each Respondent.

3. The Order arbitrarily directs one group of potentially responsible parties ("PRPs") to implement Phase 2A Work and a different and partially overlapping group of PRPs to implement Phase 2B Work, without any basis for distinguishing between the groups for the ordered tasks, and without recognizing more appropriate bases for the division of responsibilities.

4. The Order arbitrarily and capriciously orders certain Remedial Action Work to occur before the Remedial Design has been completed and otherwise out of a rational sequence, creating vague requirements and imposing substantial costs without any concomitant health or environmental benefit.

5. EPA has failed to demonstrate that certain elements of the Order will abate an imminent and substantial endangerment, particularly with respect to the portions of the Site for which GP may be liable.

6. Certain requirements of the Order are beyond EPA's authority under CERCLA Section 106.

7. Some or all of the ordered Work is inconsistent with the National Contingency Plan ("NCP"), arbitrary and capricious, or otherwise not in accordance with law.

Each of the above defenses is outlined in greater detail below.

### 1) The Order directs GP to implement Work in areas of the Site for which GP has no liability under CERCLA.

The GP Green Bay West Mill is located about 3.5 miles from the mouth of the Lower Fox River, at the approximate midpoint of OU 4. The substances discharged by the Green Bay West Mill throughout the relevant period would have been carried downstream at all times, except during periodic flow reversals caused by the Green Bay "seiche" effect. Flow reversal can occur only when the Green Bay water level change is high enough relative to the downstream flow to cause upriver movement of the water column. GP has determined through field measurements and extensive modeling that, to the limited extent discharged particles (and associated PCBs) traveled upstream of the Green Bay West Mill outfalls during a flow reversal, almost all of those particles would have settled out within a few hundred meters upstream of the relevant outfall, or would have traveled back downstream when the flow reverted to the downstream direction. Even at the farthest upstream locations where any GP particles could have traveled and settled to the sediments in the 1960s and early 1970s, the relatively light particles that could have reached that point would have been carried downstream of the Green

BEVERIDGE & DIAMOND<sub>PC</sub>

Mr. James Hahnenberg
Mr. Gregory Hill
November 29, 2007
Page 3

Bay West Mill since then by river hydrodynamics. Therefore, GP is not liable for response actions or costs relating to sediments located upstream of the southern boundary of the Green Bay West Mill property. The upstream boundary of the Green Bay West Mill, which is several hundred meters upstream of the historical outfall locations, constitutes the dividing line between "OU 4a" and "OU 4b" as used in this letter.

In Paragraph 7.g. of the Order, EPA states that it "is informed and believes that, at certain times during that period [since 1954], a corporate predecessor of Georgia-Pacific sold wastepaper containing PCBs to at least one other paper production facility that discharged its PCB-contaminated wastewater to the Lower Fox River (i.e., the U.S. Paper Mills De Pere facility)." GP does not believe that the available evidence supports this assertion, for the reasons discussed below.

We understand that U.S. Paper's outside counsel provided a February 2007 Supplemental Response to EPA stating that a person who was employed by U.S. Paper from 1948 to 1979, and who worked in the shipping department from 1952 to 1962, recalled "as a fill-in truck driver . . . picking up damaged cores and mixed bales of waste from Fort James, Green Bay, WI." We also understand that an August 1998 U.S. Paper response to a DOJ information request states that "U.S. Paper did purchase small quantities of used cores, returned cores and corrugated material from Fort James Green Bay East Mill. To the knowledge of U.S. Paper, these materials did not include PCB-containing carbonless copy paper. U.S. Paper also purchased small quantities of some baled, unbleachable rejected raw materials from Fort James Green Bay West Mill which would not, to the knowledge of U.S. Paper, have included PCB-containing carbonless copy paper." Neither of these statements indicates that the Green Bay West Mill sold wastepaper containing PCBs to the U.S. Paper Mills plant in De Pere, and GP is not aware of any other information showing that GP sold PCB-containing wastepaper to the U.S. Paper Mills De Pere facility.

GP believes that Fort Howard (the "Green Bay West Mill" to which the U.S. Paper statement referred) recycled most or all of its own scrap paper and wastepaper, so any wastepaper bales picked up at Fort Howard likely would have been incoming wastepaper rejected by Fort Howard. Rejected raw materials from the Fort Howard mill, if any, could have come from any of the thousands of suppliers of furnish to that mill, including from far outside the Fox Valley. The U.S. Paper statement clearly indicates that the subject material was not produced at the Fort James Green Bay West Mill. GP is not aware of any evidence showing that the subject material contained PCBs.

Neither the Green Bay West Mill nor the Green Bay East (Day Street) Mill were in the business of producing cores or corrugated material, so if the "used," "returned," or "damaged" cores did come from either of these mills and were not part of the rejected Fort Howard furnish discussed above, they would have been cores obtained from elsewhere and used on paper

DOJ284785

winders and rewinders. GP is not aware of any evidence showing that such cores contained PCBs.

For all of the foregoing reasons, GP is not liable for response action or response costs incurred with respect to OU 4a.

### 2) The Order is invalid because it did not specify the work to be performed by each Respondent.

Paragraph 2 of the Order states that "each Respondent is jointly and severally responsible for carrying out all activities required by this Order, except as specifically provided by this Order." The Order is invalid because it requires GP to implement applicable portions of the Statement of Work jointly and severally with several other recipients of the Order. GP has no duty to or relationship with the other PRPs beyond the terms of the Order, which does nothing to define these duties or responsibilities. Thus, EPA has failed to give GP sufficient guidance regarding the steps it must take to comply with the Order. There is no way to determine, either from the face of the Order or from the parties' relationship, what work GP is to perform or how GP is to work with the other PRPs.

In addition, the Order provides that GP is required to perform the tasks in the Phase 2A and Phase 2B Statements of Work ("SOWs"), "other than any tasks that relate solely to OU 2 and/or OU 3 at the Site." The Order makes no attempt to define what requirements do or do not fit within the latter category, leaving the Order vague regarding the requirements that apply to GP.

Courts have held that this lack of specificity renders similar orders invalid. In United States v. Stringfellow, 20 Env't Rep. Cas. (BNA) 1905 (C.D. Cal. 1984), the court addressed whether it could enforce a Section 106 Order such as the one received by GP. The court found that "[i]nsofar as plaintiffs may intend to ask the Court to compel certain actions on the part of the defendants, . . . [Section 106] orders . . . have to state with specificity the steps to be taken and the party to take them." Id. at 1910. Thus, the court held that "no role [exists] under Section 106(a) for . . . 'joint and several liability to abate.'" Id. Furthermore, the court's implicit holding in Stringfellow that EPA, like the judiciary, also lacks the authority to order numerous defendants to perform work jointly and severally without specifying the steps to be taken by each defendant, is in accord with general principles of administrative law. See, e.g., National Labor Relations Bd. v. Express Publishing Co., 312 U.S. 426, 433 (1941) ("It is obvious that the order of the Board, which, when judicially confirmed, the courts may be called on to enforce by contempt proceedings, must, like the injunction order of a court, state with reasonable specificity the acts which the respondent is to do or refrain from doing.").

BEVERIDGE & DIAMOND℠

Mr. James Hahnenberg
Mr. Gregory Hill
November 29, 2007
Page 5

Because EPA fails to specify what work is to be performed by GP, the Order is invalid and unenforceable against GP.

   3) **The Order arbitrarily directs one group of potentially responsible parties ("PRPs") to implement Phase 2A Work and a different and partially overlapping group of PRPs to implement Phase 2B Work, without providing any basis for distinguishing between the groups for the ordered tasks, and without recognizing more appropriate bases for the division of responsibilities.**

Paragraph 46 of the Order requires API, NCR, Riverside, and U.S. Paper to perform all tasks in the Phase 2A SOW (with GP ordered to perform all tasks other than those relating solely to OUs 2 or 3). Paragraph 47 of the Order requires API, P.H. Glatfelter, Menasha, NCR, Riverside, U.S. Paper and WTM I to perform all tasks in the Phase 2B SOW (with GP ordered to perform all tasks other than those relating solely to OUs 2 or 3). The Phase 2A and Phase 2B SOWs relate to the same geographic areas; only the ordered tasks differ. There is no basis for including only a subgroup of parties to address the Phase 2A tasks, given that the inclusion of the entire group with respect to the Phase 2B tasks shows that EPA believes all parties are potentially liable for those tasks.

If the Order is going to place different burdens on different subgroups of PRPs, the Order should do so based on less arbitrary and more appropriate grounds that take into consideration the equities of this matter. The Order fails, for example, to account for the fact that the PCBs in Lower Fox River sediments resulted almost entirely from the use of PCBs by API and NCR as an ingredient in the carbonless copy paper that API and NCR manufactured and sold, and that, as between the mills that subsequently recycled scrap carbonless copy paper and API/NCR, only API/NCR benefited economically from the presence of PCBs in that paper. The Order also fails to consider the leadership role that GP has consistently taken among the Respondents from the inception of this matter, e.g., by forming the Fox River Coalition of public and private entities to begin to address the contamination in the River, voluntarily finishing in 2000 the dredging of Sediment Management Units 56 and 57 that the Fox River Group undertook as a demonstration project in 1999, assisting the agencies and other PRPs in the critical search for potential sediment disposal sites, and initiating and settling early its natural resources damages liability at the site.

   4) **The Order arbitrarily and capriciously orders certain Remedial Action Work to occur before the Remedial Design has been completed and otherwise out of a rational engineering sequence, creating vague requirements and imposing substantial costs without any concomitant health or environmental benefit.**

Paragraph 43 of the Order states that EPA and WDNR have determined that it will be feasible and practicable for Respondents to commence full-scale sediment remediation for Phase 2 of the OU 2-5 remedial action at the start of the 2009 construction season. There is no factual

DOJ284787

basis for this determination, and no rationale for the commencement of Remedial Action in advance of the completion of Remedial Design. In fact, Respondents face severe practical obstacles in attempting to address this requirement (as implemented through Paragraphs 46 and 47), including the following facts: the Remedial Design will not be completed until the end of 2008; the approved Remedial Design Work Plan (June 2004) does not call for detailed plans and specifications suitable for procurement of contractors and equipment to be prepared until the 90-100% design phase; the procurement of certain sediment dewatering equipment necessary for hydraulic dredging depends upon the completion of critical portions of the Remedial Design; and the design and manufacturing of such equipment requires 12-18 months. The only way that the requirement for sediment remediation in 2009 could avoid being wholly arbitrary and capricious is for it to be interpreted to mean forms of sediment remediation other than hydraulic dredging.

Even with that interpretation, however, the requirements of the Phase 2A SOW are so vague as to be unenforceable, given that they require "taking all necessary steps" to procure "any and all equipment that will be required" for commencement of full-scale sediment remediation at the start of the 2009 construction season and continuation of such remediation throughout 2009 and subsequent years. The Remedial Design process is intended to result in plans and specifications that remove such uncertainties; by mandating action before the Remedial Design has been completed, these uncertainties render the Order arbitrary, capricious, and unenforceable. The Remedial Action will require approximately a decade to implement, and the current conditions have been steadily improving over the past three decades, as discussed further below. There is no reasonable basis for mandating out-of-sequence implementation, and no incremental protection of human health and the environmental that would warrant the incremental costs of such an approach.

### 5) EPA has failed to demonstrate that certain elements of the Order will abate an imminent and substantial endangerment, particularly with respect to the portions of the Site for which GP may be liable.

Under CERCLA Section 106, EPA must determine that there may be an "imminent and substantial endangerment to the public health or welfare or the environment" before it can issue an order "as may be necessary to protect public health and welfare and the environment." 42 U.S.C. § 9606(a). GP reserves the right to argue that no Site conditions pose an "imminent and substantial endangerment," and therefore that the Order is invalid. In any event, however, the Order requires many actions that are not necessary to abate an imminent and substantial endangerment, including a number of the requirements listed in the next section of these comments. In addition, the Order appears to require a number of actions in 2008 purely for the purpose of having sediment remediation work begin at the start of the 2009 construction season, whether or not such 2008 and 2009 activities make sense from an engineering perspective or will result in appreciable risk reduction.

BEVERIDGE & DIAMOND<sub>PC</sub>

Mr. James Hahnenberg
Mr. Gregory Hill
November 29, 2007
Page 7

Other than the possibility of minor sediment removal in connection with preparation of a staging area at the former Shell Property adjacent to the Green Bay West Mill, none of the Work required by the Order will address sediments in OU 4b for many years, indicating that there is no basis to issue the Order against GP at this time. While upstream work is taking place, natural recovery will continue to occur for several years in OU 4b. The need for sediment remediation in OU 4b, and the basis for any conclusions regarding the existence of an imminent and substantial endangerment related to historical releases from GP, should be reevaluated at the time the remediation project reaches OU 4b.

### 6) Certain requirements of the Order are beyond EPA's authority under CERCLA Section 106.

Paragraph 55 (Periodic Review) purports to require Respondents to "conduct the requisite studies, investigations, or other response actions as determined necessary by U.S. EPA in order to permit U.S. EPA to conduct the review under Section 121(c) of CERCLA." This requirement is unduly vague as to the required activities and is therefore invalid. GP reserves its rights and defenses regarding any specific requirements imposed by EPA under this Paragraph.

Paragraphs 55 through 59 refer to possible decisions that EPA may make in the future regarding the need for additional or modified response activities at the Site. These potential future EPA decisions and actions are undefined, speculative, would not necessarily be consistent with the NCP, and do not provide a sufficient basis to compel compliance at this time. GP reserves its rights and defenses regarding any such future decisions or actions.

Paragraph 67 of the Order requires Respondents to demonstrate that the proposed Project Coordinator has a quality system that complies with certain guidance. There is no reason for the Project Coordinator, which may or may not participate in any environmental sampling or analysis, to have a "quality system" or Quality Management Plan that addresses "environmental data collection and environmental technology programs." With respect to Paragraph 67 and multiple other locations in the Order and SOWs, EPA also lacks authority under CERCLA Section 106 to order compliance with guidance, which does not have the legal status of a regulation that has been subjected to the rulemaking process.

Paragraphs 70.a. and 70.b. of the Order requires Respondents to show evidence of "adequate" insurance coverage for injuries and damages to persons or property which may result from the Work. Not only is this requirement so vague as to be unenforceable, EPA lacks the authority under CERCLA Section 106 to order the acquisition of insurance.

Similarly, Paragraph 70.c. requires Respondents to provide financial assurance for the Phase 2B Work. Section 106 does not authorize EPA to require Respondents to provide the stated financial assurance. EPA does not have the authority under Section 106 to order PRPs to

DOJ284789

pay money to EPA for the Agency to undertake prospective response action; for the same reason, EPA does not have the authority to order the provision of financial assurance. Moreover, such a requirement is not necessary to protect human health or the environment, given that the Order otherwise requires the PRPs to perform the Work, and no evidence exists that financial assurance has ever been necessary to ensure the completion of remedial action at a Superfund site with several large and financially sound companies as PRPs. Specifically with respect to GP, the Order is also invalid to the extent that it orders GP to provide financial assurance for Work in areas of the River for which GP is not liable under CERCLA.

Paragraph 74 of the Order requires Respondents to submit a certification regarding the lack of destruction or disposal of records "relating to their potential liability with regard to the Site" and requires Respondents to preserve all such documents until otherwise approved by EPA. Section 106 of CERCLA does not authorize EPA to mandate such a certification or perpetual document retention, which are irrelevant to the protection of public health and the environment. Similarly, Paragraph 76 requires document preservation for decades, without any showing that such preservation is necessary to protect public health and the environment.

Paragraph 77 of the Order refers to claims of business confidentiality that GP may make regarding certain documents. GP interprets these and all other Order provisions regarding access to documents and information as allowing it to assert attorney-client privilege, the work product doctrine, and any other privilege available under law, whether or not the privilege is specifically listed in the Order. GP believes that the Federal Rules of Evidence, the common law, and the U.S. Constitution provide sufficient cause for this position.

Paragraph 80 requires Respondents to notify EPA within 48 hours of the time they first "knew or should have known that a delay might occur." This requirement is so vague as to be unenforceable, as any event "might" later cause a delay.

Paragraphs 81-83 require Respondents to reimburse EPA on demand for response costs incurred by the United States in overseeing the Order. As noted above, EPA does not have the authority under Section 106 to order PRPs to pay money to EPA. GP interprets these provisions as providing the procedures by which EPA may demand, and GP may reimburse, such oversight costs. In each case, GP reserves the right to seek appropriate documentation of EPA's oversight costs and to discuss such costs and their documentation with EPA prior to making any payment. GP further reserves its rights and defenses as to any specific written demand by EPA for payment of oversight costs and will make a determination at that time whether to pay all or any such costs, in conjunction with other Respondents who are potentially liable for such costs. GP also notes that EPA has no authority to order GP to pay oversight costs incurred in connection with response action relating to portions of the Site for which GP is not liable under CERCLA.

BEVERIDGE & DIAMOND<sub>PC</sub>

Mr. James Hahnenberg
Mr. Gregory Hill
November 29, 2007
Page 9

As previously noted, although Paragraph 99 of the Order appears to require GP to describe any "sufficient cause" defenses it may assert under CERCLA, EPA has no legal authority to impose such a requirement. Nonetheless, GP believes that the various issues set forth in this response, along with the points raised in its prior submissions to the Agency regarding the problems with the remedy selected in the OU 2-5 Record of Decision ("ROD"), would give GP the basis for a "sufficient cause" defense.

GP reserves its rights and defenses with respect to all schedules and deadlines set by the Order and SOWs, to the extent that such schedules and deadlines may not be reasonably achievable. EPA does not have the statutory authority to order compliance with schedules and deadlines that are not achievable.

### 7) Some or all of the ordered Work is inconsistent with the NCP, arbitrary and capricious, or otherwise not in accordance with law.

Portions of the work required by the Order are inconsistent with the NCP, arbitrary and capricious, and not in accordance with law, for the reasons described in the following documents:

a) Comments of the Fox River Group on the Wisconsin Department of Natural Resources' Draft Remedial Investigation, Draft Feasibility Study, Baseline Human Health and Ecological Risk Assessment, and Proposed Remedial Action Plan (submitted January 22, 2002).

b) Comments of Fort James Corporation and Georgia-Pacific Corporation on the Remedial Investigation/Feasibility Study and Proposed Remedial Action Plan for the Lower Fox River and Green Bay Site, Wisconsin (submitted January 22, 2002).

Both of the above documents are in the Administrative Record for the Site and are incorporated herein by reference, including all appendices and attachments.

Although EPA and WDNR have amended the original OU 2-5 ROD, the June 2007 Record of Decision Amendment ("ROD Amendment") still adopts sediment removal as the primary remedial approach. For the reasons set forth in the above documents and summarized below, this and other components of the ordered remedy remain inconsistent with the NCP, arbitrary and capricious, and not otherwise in accordance with law.

The ROD and its supporting Remedial Investigation and Feasibility Study ("RI/FS") made several critical errors that the ROD Amendment did not address, including but not limited to the following errors that are described in detail in the above documents:

- The ROD and RI/FS incorrectly assumed that the entire sediment bed in OU 4 was highly unstable and would lead to continued exposure of buried PCBs absent

DOJ284791

active remediation of the sediments. This assumption was based on an erroneous interpretation of bathymetric survey data and use of isolated points in the River to make a Site-wide assumption that the sediments were highly unstable. Actual data from the River and the behavior of sediments in other river systems contradict the agencies' assumptions.

- The estimate of current and future PCB transport to the Bay was highly overstated, thereby inflating the estimated benefits of sediment remediation in terms of reduced transport.

- The ROD erroneously overstated the benefits of dredging compared to natural recovery, by assuming Site-wide instantaneous implementation of dredging, ignoring the environmental impacts of the dredging process, and inaccurately predicting post-dredging PCB surface sediment concentrations.

- The Human Health Risk Assessment contained several errors that inflated the estimated risks posed by PCBs in River sediments, thereby inflating the estimated risk reduction from sediment remediation.

- When the Ecological Risk Assessment completed by the agencies used specific PCB congeners to evaluate risk, it found little or no ecological risk. But the agencies used the relatively high risk, generic PCB results from a screening-level risk assessment to set cleanup goals, contrary to the recommendations of the National Research Council for the establishment of sediment remediation goals. Had the risk management decision been based on the findings of a properly conducted risk assessment using the available site-specific data, little or no active remediation would have been warranted based on estimated ecological risk.

- The ROD and RI/FS did not quantify and compare the risk of injury and fatality associated with a large-scale remediation project in the Lower Fox River with the estimated risks prompting the ROD remedy. Even with the lesser amount of dredging in the ROD Amendment, the project remains the largest environmental dredging and disposal project in the United States, involving many tens of thousands of truck trips and an associated risk of accidents, injuries, and fatalities.

- Both the ROD and the ROD Amendment placed artificial restrictions on the use of engineered capping and sand covers as remediation technologies (both as alternatives to dredging and as a dredging residuals management tools), arbitrarily increasing the time and cost of the remedy with no concomitant health or environmental benefits.

BEVERIDGE & DIAMOND℗

GP hopes that as the Remedial Design and implementation of the remedy proceed, EPA and WDNR will continuously evaluate their technical positions and take steps to mitigate the adverse health, environmental, and cost consequences of past remedy-related decisions.

Nothing in this letter is intended or should be construed to limit the claims and defenses that GP may raise in any future proceeding by EPA or any other person, and the company specifically reserves its rights and defenses regarding any future EPA decisions or actions. GP also reserves any rights it may have under Section 106(b)(2) of CERCLA to recover amounts expended to comply with all or part of the Order. Nothing in this letter, including any decision by GP to proceed with implementation of the Order, should be considered or construed as an admission of any factual allegation or legal conclusion in the Order or any liability for any matters described in the Order or elsewhere. In Paragraphs 85-88, EPA reserves various rights and authorities. GP reserves its rights and defenses regarding any future EPA actions or decisions under these or other provisions of the Order.

Please include this letter in the record for this matter. GP reserves the right to supplement the record at appropriate times as issues arise concerning the implementation of the Order.

We look forward to continuing to work with EPA and WDNR in completing the Remedial Design and moving ahead with implementation of Remedial Action for the Site.

Sincerely,

Steven M. Jawetz

cc: Jerry Hancock, Esq.
Randall M. Stone, Esq.
Al Toma, Esq.
J. Michael Davis, Esq.