## Harmon Associates

June 2, 1989

Dixon Recyclers
328 N. 14th Street
Lebanon, PA 17042

ATT: Mr. Frank Dixon

Dear Mr. Dixon:

THIS AGREEMENT made this __22nd__ day of __June, 1989__ by
and between HARMON ASSOCIATES CORPORATION hereinafter called
"Harmon" and DIXON RECYCLERS hereinafter called "Dixon" the
said parties for the considerations hereinafter mentioned
hereby agree to the following. This Agreement when signed
supercedes and replaces the Agreement between Brandywine
Recycling and Harmon Associates dated July 11, 1988 and
terminating June 30, 1989.

1. Harmon agrees to purchase from Dixon and Dixon agrees to
   sell to Harmon wastepaper of the quality and quantity
   hereinafter specified during the period and at the
   prices and upon other terms and conditions hereinafter
   set forth.

2. This Agreement is for a two (2) year period commencing
   July 1, 1989 and ending June 30, 1991 and thereafter
   shall be automatically renewed from year to year unless
   either party shall notify the other by Certified Mail
   Return Receipt Requested at least sixty (60) days prior
   to any expiration date hereunder of his intention to
   terminate.

3. During the term of this Agreement Harmon agrees to
   purchase from Dixon and Dixon agrees to sell to Harmon
   the entire accumulation of the grades listed below
   packed at 328 North 14th Street, Lebanon, PA 17042 and
   700 South Prince Street, Lancaster, PA 17603, on a
   year-round basis regardless of market conditions. The
   estimated tonnage will escalate as follows, according to
   Dixon's forecasts for the first two years:

GPFOX00136834

APPROXIMATE TONS PER MONTH

| TIME PERIOD | SORTED OFFICE WASTEPAPER | COMPUTER PRINTOUTS | TOTAL |
|---|---|---|---|
| At inception | 280 | 20 | 300 |
| January 1990 | 560 | 40 | 600 |
| July 1990 | 740 | 60 | 800 |
| January 1991 | 920 | 80 | 1000 |

| GRADES | SPECIFICATIONS |
|---|---|
| Sorted Office Wastepaper | Clean, post-consumer, sulfite office papers with occasional trace amounts of coated copy paper, staples, paper clips, rubberbands, pressure sensitive adhesives, carbon paper, and plastics. Unbleachable papers (kraft, corrugated chipboard, newspapers and groundwood) must not exceed 2% of the total weight of each bale. Photographs, EKG's, wet strength papers, wax laminated wrappers, heat sensitive papers, glass and organic material is not allowed. |
| Computer Printouts | Grade #42 as outlined in Scrap Specifications Circular PS-88. |

4. The purchase price for the Sorted Office Waste in truckload quantities shall be based on the price as established each month by Fort Howard Corporation, which shall be used as a general guideline. In no case shall the purchase price be less than $50.00 per short ton for Sorted Office Wastepaper.

The purchase price for Computer Printouts in truckload quantities shall be based on the current market price and will be negotiated each month.

Prices and delivery terms are F.O.B. loaded on Harmon's truck at Dixon's dock.

5. Certified mill weights will govern. Trailers will be loaded to full visible capacity and Dixon will make every effort to load to 42,000 pounds per trailer load. If weights fall below the minimum amounts specified herein, Harmon may debit Dixon's account for any dead freight charged back for same by the receiving mill.

GPFOX00136835

6. All wastepaper supplied under this Agreement is to be baled free of any contamination. Paper is to be packed in large well-compressed mill size bales. All bales are to be marked for grade and a manifest itemizing the individual bales is to accompany each load. Dixon will accumulate approximately one truckload which will be picked up according to Dixon's schedule. Dixon must provide Harmon at least one full day's notice regarding Dixon's pickup schedule. Dixon's employees will load Harmon's truck.

7. Dixon warrants that the goods to be delivered pursuant to this Agreement will be merchantable and will conform to any previously approved samples or other descriptions furnished to Harmon by Dixon or specified by Harmon. If any new element is used on the paper stock, the paper stock must be sampled and tested by Harmon prior to any shipments by Dixon. If after such sampling and testing it is determined that there is an inability on the part of Harmon's main consuming mills (Fort Howard Corporation, Green Bay, Wisconsin/Muskogee, Oklahoma/Rincon, Georgia) to utilize the paper stock due to changes in the characteristics of the paper, Harmon shall not be obligated to accept any shipment of said paper containing the new element.

8. Terms of payment shall be net 30 days from date of invoice. Invoices will be prepared by Dixon and will be directed to Harmon Associates Corporation, 86 Garden Street, Westbury, NY 11590. Invoices are to be dated date of shipment.

9. Neither Harmon nor Dixon shall be liable to the other for failure to carry out this Agreement in whole or in part when such failure is due to strikes, fires, transportation equipment shortage, or other occurrences beyond its control. Harmon shall not be liable to Dixon and Dixon shall not be liable to Harmon for failure to carry out this Agreement when such failure is due to 1) orders or actions by federal, state or local governmental authorities which prevent or restrict the generation or use of the paper stock herein described and 2) shutdown of equipment at Harmon's main consuming mills (Fort Howard Corporation, Green Bay, Wisconsin/Muskogee, Oklahoma/Rincon, Georgia).

   In such occurrences affecting Harmon's obligation, shipments already en route will be accepted and paid for by Harmon. Any tonnage undelivered due to conditions described above is to be considered cancelled from this Agreement except in those instances when Dixon and Harmon mutually agree to a delayed shipping schedule at the outset of any such occurrences.

GPFOX00136836

10. This Agreement shall be governed by the Uniform Commercial Code and other applicable laws of the State of New York as effective and enforced on the date hereof. Whenever a term is defined by the Uniform Commercial Code and is used in this Agreement the definition contained in the UCC is to govern.

11. No obligations arising under this Agreement shall be assigned in whole or in part without the written consent of a duly authorized representative of the nonassigning party.

12. No waiver, alteration or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by a duly authorized representative of Harmon. In no event shall Harmon's acceptance and/or use of the goods or services delivered hereunder constitute acceptance by Harmon of any terms or conditions in addition to or different from those provided herein.

This constitutes the entire Agreement between the parties. Please signify your consent by signing below.

ACCEPTED AND AGREED:

DIXON RECYCLERS

By: _____

Title: _____V.A._____

Date: ____6/20/89_____

Witness: _Judith A. Hoyt_____

HARMON ASSOCIATES CORPORATION

By: _____

Title: _____President_____

Date: ____6-22-89_____

Witness: _Heide Thomsen_____

2587A

GPFOX00136837

Harmon Associates Corporation
86 Garden Street
Westbury, NY 11590
516 997 3400

## Harmon Associates

July 18, 1988

L & C Enterprises
120 Payne Road
Thomasville, NC  27360

ATT:  Mr. Chris Thorpe

Dear Mr. Thorpe: 

THIS AGREEMENT made this __26th__ day of __SEPTEMBER 1988__ by and
between HARMON ASSOCIATES CORPORATION hereinafter called
"Harmon" and L & C ENTERPRISES hereinafter called "L & C
Enterprises", the said parties for the considerations
hereinafter mentioned hereby agree to the following:

1. Harmon shall supply and have installed a Reconditioned
   Economy 172 Upstroke Baler, Serial #55190 and a
   Reconditioned Load King Vertical Downstroke Baler, Model
   V-6030, Serial #5465, on L & C Enterprises' premises at
   120 Payne Road, Thomasville, NC  27360 (hereinafter
   called Equipment).  Title to said Equipment shall belong
   to Harmon and L & C Enterprises agrees not to remove,
   sell, assign, encumber or otherwise dispose of said
   Equipment at any time.  The Equipment shall at all times
   remain personal property and not become a fixture to
   real property and L & C Enterprises shall not affix the
   Equipment to the realty so as not to be severable from
   same without damage to the Equipment.  In order to have
   notice of Harmon's title to said Equipment as a matter
   of record, Harmon is authorized to execute on L & C
   Enterprises' behalf and file a UCC Form 1 and renewals
   thereof with the appropriate recording offices.

2. L & C Enterprises will operate the Equipment as
   instructed by B.E. Equipment and L & C Enterprises at
   their cost and expense will maintain the same in good
   working order after its installation and shall hold
   Harmon harmless from any and all claims, costs or
   expenses of any nature whatsoever (including but not
   limited to bodily injury) arising out of or in any

Subsidiary of Fort Howard Corporation

GPFOX00137050

manner connected with the use, operation and/or maintenance thereof and L & C Enterprises shall comply with any and all municipal, state and federal regulations with respect to the use, operation and/or maintenance of said Equipment. L & C Enterprises shall carry a minimum of one million dollars ($1,000,000) in liability insurance including contractual liability and shall name Harmon Associates Corporation as an additional insured. In addition, L & C Enterprises shall acquire and maintain Workers' Compensation and bodily injury liability insurance with respect to the operation. L & C Enterprises at their own expense shall keep the Equipment insured at its full value thereof against all risks of physical loss or damage in the amount of $35,000. L & C Enterprises shall advise their insurance company to complete the attached Certificate of Insurance including the name of Harmon Associates Corporation as a additional insured. These coverages shall be placed with insurance companies qualified to do business in the state in which the Equipment may be located with losses for damage to the Equipment, if any, payable to Harmon. L & C Enterprises agrees to require that such policies shall have, at least, a thirty (30) day notice in the event of cancellation with said notice to be sent to Harmon in addition to L & C Enterprises.

3. The Equipment contains a six (6) months guarantee from B.E. Equipment, P.O. Box 139, Wentz Road, Quakertown, PA 18951 and L & C Enterprises shall look solely to them for repairs and maintenance during the guarantee period. Said guarantee covers replaced defective parts, provided the Equipment is properly operated and maintained. Harmon is at no time responsible for warranties or guaranties. Such Equipment shall remain the property of Harmon Associates but L & C Enterprises shall be responsible for servicing, maintaining and keeping it in repair after the guarantee period. L & C Enterprises shall be responsible for the proper routine operation of the Equipment at its expense and agrees to provide routine maintenance in accordance with standard recommendations of the manufacturer. Harmon shall have the right during reasonable business hours to inspect the Equipment and shall have access to L & C Enterprises' premises for this purpose upon prior notice to an authorized officer of L & C Enterprises. L & C Enterprises will, of course, pay for any baling wire.

4. Harmon agrees to purchase from L & C Enterprises and L & C Enterprises agrees to sell to Harmon its entire accumulation of wastepaper that is now generated at L & C Enterprises' plant at 120 Payne Road, Thomasville, NC 27360, of the quality and quantity specified below and at the prices and upon other terms and conditions hereinafter set forth on a year-round basis regardless of market conditions. The estimated tonnage will be approximately 200 tons per month.

GPFOX00137051

| GRADE | SPECIFICATIONS |
|-------|----------------|
| Mixed Sulfites | Printed Bleached Sulfates, White Ledgers, Colored Ledgers, and Coated Sulfites with or without trace levels of insoluble glues (I.G.S.). Grade must be free of all insoluble inks, insoluble coatings, poly, pressure sensitive adhésives, unbleachable papers (i.e. groundwood, kraft, corrugated, chipboard, beater dyed, etc.) and all other contamination. Overall mixture will contain approximately 50% coated sulfite and be equal to or better in quality to material shipped in May 1988. |

5. The purchase price shall be set twice each year, January 31 and July 31 and run for each six month period. The purchase price shall be as mutually agreed between Harmon and L & C Enterprises.

6. Certified mill weights will govern. Trailer trucks will be loaded to full visible capacity and L & C Enterprises will make every effort to load to 42,000 pounds for trailer trucks. If weights fall below the minimum amounts specified herein Harmon may debit L & C Enterprises' account for any dead freight charged back for same by the receiving mill.

7. All wastepaper supplied under this Agreement is to be baled free of any contamination. Paper is to be packed in large well-compressed mill size bales. All bales are to be marked for grade and a manifest itemizing the individual bales is to accompany each load. L & C Enterprises will accumulate approximately one truckload which will be picked up according to L & C Enterprises' schedule. L & C Enterprises must provide Harmon one full day's notice regarding L & C Enterprises' pickup schedule. L & C Enterprises' employees will load Harmon's truck.

8. L & C Enterprises warrants that the goods to be delivered pursuant to this Agreement will be merchantable and will conform to any samples or other descriptions furnished to Harmon by L & C Enterprises or specified by Harmon. If any new element is used on the paper stock, the paper stock must be sampled and tested by Harmon prior to any shipments by L & C Enterprises. If after such sampling and testing it is determined that there is an inability on the part of Harmon's main consuming mill (Fort Howard Corporation, Green Bay, Wisconsin/Muskogee, Oklahoma/Rincon, Georgia) to utilize the paper stock due to changes in the characteristics of the paper, Harmon shall not be obligated to accept any shipment of said paper containing the new element.

GPFOX00137052

9. Neither Harmon nor L & C Enterprises shall be liable to the other for failure to carry out this Agreement in whole or in part when such failure is due to strikes, fires, transportation equipment shortage, or other occurrences beyond its control. Harmon shall not be liable to L & C Enterprises and L & C Enterprises shall not be liable to Harmon for failure to carry out this Agreement when such failure is due to 1) orders or actions by federal, state or local governmental authorities which prevent or restrict the generation or use of the paper stock herein described and 2) shutdown of equipment at Harmon's main consuming mill (Fort Howard Corporation, Green Bay, Wisconsin/Muskogee, Oklahoma/Rincon, Georgia) or at L & C Enterprises' generating location for any reason other than normal maintenance.

   In such occurrences affecting Harmon's obligation, shipments already en route will be accepted and paid for by Harmon. Any tonnage undelivered due to conditions described above is to be considered cancelled from this Agreement except in those instances when L & C Enterprises and Harmon mutually agree to a delayed shipping schedule at the outset of any such occurrences.

10. Terms of payment shall be as currently handled from the beginning date of the contract until January 31, 1989. Beginning February 1, 1989, terms shall be net thirty (30) days from date of invoice. Invoices will be prepared by L & C Enterprises and will be directed to Harmon Associates Corporation, 86 Garden Street, Westbury, NY 11590. Invoices are to be dated date of shipment. Notwithstanding the foregoing, no invoices shall become payable until Harmon has received the Certificate of Insurance as required by Paragraph 2 hereof.

11. This Agreement shall be governed by the Uniform Commercial Code and other applicable laws of the state of New York as effective and enforced on the date hereof. Whenever a term is defined by the Uniform Commercial Code and is used in this Agreement the definition contained in the UCC is to govern. HARMON MAKES NO WARRANTIES, EXPRESS OR IMPLIED, CONCERNING THE EQUIPMENT AND SPECIFICALLY EXCLUDES ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

12. L & C Enterprises acknowledges that the Equipment provided by B.E. Equipment under this Agreement meets all current requirements of the ANSI/Z245.5-1982 and regulations promulgated thereunder. L & C Enterprises agrees to use, operate and maintain said Equipment in strict conformity with all applicable OSHA and ANSI standards and regulations.

GPFOX00137053

13. No obligations arising under this Agreement shall be assigned in whole or in part without the written consent of a duly authorized representative of the nonassigning party.

14. No waiver, alteration or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by a duly authorized representative of Harmon. In no event shall Harmon's acceptance and/or use of the goods or services delivered hereunder constitute acceptance by Harmon of any terms or conditions in addition to or different from those provided herein.

15. In the event the aggregate tonnage delivered by L & C Enterprises to Harmon pursuant to the term hereof falls below 150 tons per month for three (3) consecutive months, then and in such event Harmon shall have the right at Harmon's discretion to remove the aforesaid Equipment from L & C Enterprises' premises and from and after the date of such removal this Agreement shall be of no further force and effect and Harmon shall be released from any obligations to L & C Enterprises.

16. L & C Enterprises agrees to indemnify, defend, and hold harmless Harmon Associates Corporation from and against any and all liability for damages resulting from injuries to persons, death or damage to property in any way arising out of or connected to the use and operation of the Equipment, including specifically, without limiting the generality of the foregoing, any and all expenses, legal and otherwise, including attorneys' fees which may be incurred by Harmon in defending against any claim, action or suit in which such liability may be asserted.

17. If this Agreement is terminated prior to the expiration date, L & C Enterprises shall reimburse Harmon $7,000.00 for the initial delivery and installation costs. In addition, L & C Enterprises shall be responsible for the cost of shipping the Equipment back to Harmon's location.

18. Following any termination of this Agreement, with regard to the lease of the Equipment, Harmon shall be permitted to take possession of the Equipment within sixty (60) days of such termination. In the event that Harmon is denied access to the Equipment for any reason following the sixty (60) day grace period, L & C Enterprises shall pay to Harmon liquidated damages (and not a penalty) a rental fee of $500.00 per day for each piece of Equipment retained by L & C Enterprises following any termination of this Agreement. This remedy shall be in addition to any other remedies available to Harmon. Harmon shall assume all costs of removal of Equipment. The provisions of this Agreement shall remain in force for as long as the Equipment remains in the possession of L & C Enterprises.

GPFOX00137054

19. The date this Agreement becomes in force shall coincide with the installation date of the Equipment and shall extend for a five (5) year period from the installation date and thereafter shall be automatically renewed from year to year unless either party shall notify the other by Certified Mail Return Receipt Requested at least thirty (30) days prior to any expiration date hereunder of his intention to terminate.

20. Harmon shall loan L & C Enterprises the sum of $20,000.00 at the prime interest rate. Harmon shall deduct $2.50 per ton until such time as the principal and interest are paid. In the event that the Agreement is terminated prior to the expiration date, the remaining principal and interest shall be paid immediately.

21. The terms of this Agreement will be withdrawn if a signed copy is not forwarded to Harmon's office within sixty (60) days from date of this proposal.


This constitutes the entire Agreement between the parties. Please signify your acceptance by signing below.

ACCEPTED AND AGREED:

L & C ENTERPRISES

BY: _Louis R Bennard_

Title: _PRES_

Date: _7/20/88_

Witness: _Chris C George_

HARMON ASSOCIATES CORPORATION

By: _Joyce Hanley_

Title: _President_

Date: _7/27/88_

Witness: _Jacqueline F Carpe_

2689A

GPFOX00137055

Harmon Associates Corporation
86 Garden Street
Westbury, NY 11590
516 997 3400

# *Harmon Associates*

AMENDMENT TO THE AGREEMENT BETWEEN
L & C ENTERPRISES AND
HARMON ASSOCIATES CORPORATION
DATED: *5-9-89*

WHEREAS, HARMON ASSOCIATES CORPORATION (hereinafter called
"Harmon"), 86 Garden Street, Westbury, NY 11590, and L & C
ENTERPRISES (hereinafter called L & C Enterprises), 518
Pineywood Road, Thomasville, NC 27360, entered into an
agreement dated September 26, 1988.

WHEREAS, both parties have now mutually agreed to amend the
contract as follows:

Harmon shall remove the Load King Vertical Downstroke
Baler, Model V-6030, Serial #5465. However, the Economy
172 Upstroke Baler, Serial #55190 will remain on the
premises of L & C Enterprises.

All other terms and conditions of the existing Agreement
remain in effect.

ACCEPTED AND AGREED:

L & C ENTERPRISES                    HARMON ASSOCIATES CORPORATION

BY: *Chris C Thorpe*                 BY: *Joyce Harvey*

TITLE: *President*                   TITLE: *President*

DATE: *5-5-89*                       DATE: *5-9-89*

WITNESS: *Charles Ray Thorpe*        WITNESS: *Heide Thomsen*

3944B

GPFOX00137056



# HARMON ASSOCIATES CORPORATION

## BALER LOAN AND WASTEPAPER SUPPLY CONTRACT

HARMON ASSOCIATES CORPORATION, ("Harmon"), 86 Garden Street, Westbury, New York 11590 and SOFCO, Inc.) ("SOFCO"), at 702 Potential Parkway, Scotia, NY 12302 , hereby agree to the following terms and conditions:

A.  EQUIPMENT LOAN AGREEMENT

1.  INSTALLATION -- Harmon will supply and SOFCO shall install at SOFCO's cost a new Philadelphia Tramrail Baler Model #3400HD, Serial #_____ ("Equipment") located at 702 Potential Parkway, Scotia, NY _____ , (the "Premises").  Any installation costs or fees, including freight, shall be paid by SOFCO.

2.  TITLE -- It is agreed that the Equipment shall be loaned by Harmon to SOFCO, and, accordingly, the Equipment shall remain the property of Harmon.  Harmon shall be permitted to maintain identification plates on the Equipment to indicate Harmon's ownership thereof, and SOFCO agrees that it shall not remove or otherwise obscure such identification.  SOFCO promises that it will not permanently affix the Equipment to any real estate, building or like structure so as not to be severable from same without damage to equipment.

GPFOX00137111

3. <u>NOTICE OF TITLE</u> -- To provide notice of Harmon's title to the Equipment, Harmon will execute on SOFCO's behalf, the appropriate UCC forms and renewals thereof, and Harmon shall file or caused to be filed such forms with the appropriate recording offices, including those for the state of New York, county of Schenectady.

4. <u>LIENS</u> -- SOFCO shall not sell, assign, mortgage, secure, or encumber the Equipment in any fashion, or otherwise dispose of the Equipment or any interest therein. SOFCO shall not remove the Equipment from the Premises without the prior written consent of Harmon.

5. <u>COMPLIANCE WITH LAW</u> -- SOFCO acknowledges that the Equipment provided by Philadelphia Tramrail under this Agreement meets all current requirements of the ANSI/Z245.5-1982 and regulations promulgated thereunder. SOFCO agrees to use, operate and maintain said Equipment in strict conformity with all applicable ANSI and OSHA standards and regulations.

6. <u>GUARANTEE</u> -- The Equipment contains a one (1) month guarantee from Philadelphia Tramrail, 2207 E. Ontario Street, Philadelphia, PA, and SOFCO shall look solely to Philadelphia Tramrail for repairs and replacements during the guarantee period. The guarantee covers defective parts, provided the Equipment is properly operated and maintained by SOFCO. Harmon is at no time responsible for Equipment warranties and guarantees.

GPFOX00137112

7. <u>DISCLAIMER OF WARRANTIES</u> -- HARMON DISCLAIMS ANY AND ALL WARRANTIES CONCERNING THE EQUIPMENT, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. As between SOFCO and Harmon, the Equipment is loaned to SOFCO AS IS. SOFCO and Harmon hereby acknowledge that any manufacturer's or supplier's warranties with respect to the Equipment are for the benefit of both SOFCO and Harmon.

8. <u>USE</u> -- SOFCO will operate the Equipment as instructed by Philadelphia Tramrail and shall not, without Harmon's written consent, permit anyone other than its trained employees to use the Equipment. SOFCO shall not make or permit to be made any attachment, change, removal or modification to, from or in the Equipment without the prior written consent of Harmon. If SOFCO alters the Equipment or attaches any device, except as authorized in writing by Harmon, or uses any unauthorized parts or supplies in operating the Equipment, or prevents it from operating as designed, Harmon may terminate the loan of the Equipment and this Agreement immediately.

9. <u>SERVICE AND MAINTENANCE</u> -- SOFCO shall maintain, at its cost and expense, the Equipment in good operating condition and shall use all necessary precautions to prevent the loss or destruction of the Equipment by improper maintenance, use, storage or handling. SOFCO shall indemnify and hold Harmon harmless from any and all claims, costs or expenses of any nature whatsoever (including but not limited to death or bodily injury) arising out of or in any way connected with any failure by SOFCO to properly service or maintain the Equipment.

10. <u>SUPPLIES</u> -- SOFCO will pay for all supplies required to operate the Equipment, including without limitation baling wire.

GPFOX00137113

11. <u>RISK OF LOSS</u> -- All risk of loss or damage to the Equipment while in SOFCO's possession shall be borne by SOFCO, and SOFCO shall reimburse Harmon for any damage to or for the loss or destruction of the Equipment. The stipulated loss value of the Equipment, in the event of total loss, is $8,000.00.

12. <u>INSURANCE</u> -- SOFCO at its expense shall keep the Equipment insured against all risks of physical loss or damage at its full replacement value, but, in any event, in an amount not less than $8,000.00, and such policies shall name Harmon Assoc., Corp. as sole loss payee with respect to the Equipment. SOFCO shall further carry a minimum of One Million Dollars ($1,000,000) per occurrence bodily liability insurance, as well as contractual liability and worker's compensation insurance, and such policies shall name Harmon Assoc., Corp. as an additional insured. All such policies described in this paragraph shall be placed with insurance companies satisfactory to Harmon and qualified to do business in the state in which the Equipment is located. SOFCO shall obtain from its insurance company and supply to Harmon a Certificate of Insurance in form acceptable to Harmon. SOFCO agrees to require that all such policies shall contain a provision providing Harmon with not less than thirty (30) days prior notice in the event of modifications or cancellation. SOFCO may maintain the coverage required under this paragraph under a blanket policy covering the Premises, provided the terms of such blanket policy otherwise comply with this paragraph.

13. <u>ACCESS AND INSPECTION</u> -- Harmon shall have the right during reasonable business hours to inspect the Equipment, and shall have access to SOFCO's premises for this purpose or for any other reason relating to the Equipment.

GPFOX00137114

B. WASTEPAPER PURCHASE AGREEMENT

1. PURCHASE AGREEMENT — Harmon agrees to purchase from SOFCO, and SOFCO agrees to sell to Harmon, the entire accumulation of Office Mix *Fiber* and Old Corrugated Containers that is generated at SOFCO's plant at 702 Potential Parkway, Scotia, NY  12302, of the quality and quantity specified herein and at the prices and upon other terms and conditions hereinafter set forth.  The estimated tonnage for the Office Mix *Fiber* will be approximately 25 tons per month, and the estimated tonnage for the Old Corrugated Containers will be approximately 15 tons per month.

2. PURCHASE PRICE —- The purchase price for the Office Mix *Fiber* shall be based on the price as established each month by the Fort Howard Corporation, and the purchase price for the Old Corrugated Containers will be based on the current market price and will be negotiated monthly.  Delivery terms:  F.O.B. loaded on Harmon's truck at SOFCO's dock.

During such period the the Fibre Market News may report that any grade of wastepaper has nominal value or is unsaleable, Harmon shall not be required to purchase such grade from SOFCO and SOFCO at its option may dispose of same at its own cost and expense or it may have same removed by Harmon, in which case, it shall pay Harmon the then current competitive market price for disposal thereof and for freight.

3. PAYMENT TERMS —- Terms of payment shall be net thirty (30) days from the date of invoice.  Invoices will be prepared by SOFCO and will be directed to Harmon at 86 Garden Street, Westbury, NY  11590.  Invoices shall be dated the date of shipment. No invoices shall become payable until Harmon has received the Certificate of Insurance as required by Section 12 hereof.

GPFOX00137115

4. <u>SHIPMENT WEIGHTS</u> -- Certified mill weights shall govern on truck shipments. Trailer
trucks will be loaded*with a single grade* to full visible capacity and SOFCO will make every effort to
load to 40,000 pounds for trailer trucks. If weights fall below the minimum amounts
specified herein, Harmon may debit SOFCO's account for any dead freight charged back
to Harmon by the receiving mill.

5. <u>BALING AND SHIPPING</u> -- All wastepaper supplied under this Agreement is to be baled
free of any contamination. Paper is to be packed in large, well compressed mill
size bales. All bales are to be marked by SOFCO clearly indicating the applicable
wastepaper grade. A manifest itemizing the individual bales prepared by SOFCO is to
accompany each load. SOFCO will accumulate approximately one truckload, *of each grade* which will
be picked up according to SOFCO's schedule. SOFCO must provide Harmon one full
day's notice regarding SOFCO's pickup schedule. SOFCO's employees will load
Harmon's truck.

6. <u>MERCHANTABILITY WARRANTY</u> -- SOFCO warrants that the goods to be delivered pursuant
to this Agreement will be merchantable, will be of the grades specified herein, and
will conform to the samples furnished to Harmon by SOFCO.

SOFCO warrants that the *Old* Corrugated paper *containers* supplied under this Agreement shall meet
the quality standards for Grade 11 Old Corrugated Containers shown in PS-90, Paper
Stock Standards and Practices. SOFCO warrants that the Office *fiber* Mix to be delivered
pursuant to this agreement will be merchantable and will conform to the grade
description of Office *fiber* Mix provided herein as Attachment "A".

GPFOX00137116

SOFCO warrants that the good to be delivered pursuant to this Agreement will be merchantable and will conform to any samples or other descriptions furnished to Harmon by SOFCO or specified by Harmon. If any new element is used on the paper stock, the paper stock must be sampled and tested by Harmon prior to any shipments by SOFCO. If after such sampling and testing it is determined that there is an inability on the part of Harmon's main consuming mill (Fort Howard Corporation, Green Bay, Wisconsin/Muskogee, Oklahoma/Rincon, Georgia) to utilize the paper stock due to changes in the characteristics of the paper, Harmon shall not be obligated to accept any shipment of said paper containing the new element.

C. <u>OTHER PROVISIONS (APPLICABLE TO BOTH THE EQUIPMENT LOAN AND WASTEPAPER PURCHASE AGREEMENTS)</u>

1. <u>EXCUSED NONPERFORMANCE</u> -- Neither Harmon nor SOFCO shall be liable to the other for failure to carry out this Agreement in whole or in part when such failure is due to strikes, lockouts or other labor problems, fires, floods or acts of God, freight embargoes, transportation delays, any existing or future laws or acts of the Federal, State or Local governments, or any other occurrences beyond its control or shutdown of equipment at Harmon's main consuming mills (Fort Howard Corporation, Green Bay, Wisconsin/Muskogee, Oklahoma/Rincon, Georgia).

If either party is affected by such an occurrence, shipments already enroute will be accepted and paid for by Harmon. Any tonnage undelivered due to conditions described above shall not be covered by this Agreement, except in those instances when SOFCO and Harmon mutually agree to a delayed shipping schedule.

GPFOX00137117

2. <u>ASSIGNMENT</u> -- No obligations arising under this Agreement shall be assigned by either party in whole or in part without the written consent of a duly authorized representative of the other party.

3. <u>WAIVER</u> -- No waiver, alteration or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by duly authorized representatives of each party.  In no event shall Harmon's acceptance and/or use of the goods delivered hereunder constitute acceptance by Harmon of any terms or conditions in addition to or different from those provided herein.

4. <u>DEFAULT</u> -- In the event that the aggregate tonnage delivered by SOFCO to Harmon pursuant to term hereof falls below 35 tons per month for 3 consecutive calendar months, Harmon shall have the right at Harmon's sole discretion to remove the aforesaid Equipment from SOFCO's premises and from and after the date of such removal this Agreement shall be of no further force and effect and Harmon shall be released from any obligations to SOFCO.  In addition, Harmon shall have the right to immediately terminate this Agreement upon failure of the other party to perform or comply with any of the other material terms of the Agreement.

5. <u>INDEMNITY</u> -- SOFCO agrees to indemnify and hold harmless Harmon, as well as its parent company, affiliates, agents, employees, officers, directors, successors and assigns, from any and all liability on account of personal injuries, death, and/or property loss or damage, arising out of or in any manner connected with SOFCO's use, possession, ownership or in any manner connected with the performance of this Agreement, or the installation, use, operation or removal of the Equipment; and SOFCO shall, at its own expense, defend any and all claims or actions based

GPFOX00137118

thereon and pay all attorney's fees and costs and other expenses associated with such defense. SOFCO agrees that this provision shall survive any termination of this Agreement.

6. LIMITATION OF LIABILITY -- Harmon shall not be liable for any failure to keep the Equipment in proper condition or repair or for any damages (indirect, special, incidental, consequential or otherwise, including without limitation lost profits), by whatever means caused, whether arising in tort (including strict liability), contract or otherwise arising out of the use or loss of use of the Equipment, or damage to the Equipment, or the time required to repair or replace the Equipment.

7. APPLICABLE LAW -- This Agreement shall be governed by the Uniform Commercial Code and other applicable laws of the State of New York as in effect and enforced on the date hereof (excluding its choice of law provisions). Whenever a term is defined by the UCC and is used in this Agreement, the UCC definition shall govern. Any disputes shall be adjudicated exclusively in the state or federal courts of the State of New York, and the parties hereby consent to the jurisdiction of such courts for this purpose.

8. TERM -- This Agreement shall be in effect for a five (5) year period commencing _____ N/A and terminating _____ and shall be automatically renewed from year to year thereafter unless either party shall notify the other of its intention to terminate this Agreement on the next succeeding anniversary date. Such notice shall be sent by Certified Mail-Return Receipt Requested at least thirty (30) days prior to the termination date.

9. <u>RETURN OF EQUIPMENT</u> -- Following any termination of this Agreement, Harmon shall be permitted to take possession of the Equipment within thirty (30) days of such termination.  In the event that Harmon is denied access to the Equipment for any reason, following the thirty day grace period, SOFCO shall pay to Harmon as liquidated damages (and not a penalty) a rental fee of $50.00 per day for each piece of Equipment retained by SOFCO following any termination of this Agreement.  This remedy shall be in addition to any other remedies available to Harmon.  SOFCO shall assume all cost for removal of Equipment.  The provisions of this paragraph shall remain in force as long as the Equipment remains in SOFCO's possession.

10. <u>COMPLETE AGREEMENT</u> -- This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof.

<u>ACCEPTED:</u>

| SOFCO | HARMON ASSOCIATES CORPORATION |
|---|---|
| By: | By: |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

4698B

GPFOX00137120

ATTACHMENT "A"    *Fiber*
GRADE SPECIFICATIONS FOR OFFICE ~~MIX~~

Office Fiber (OF) -- Office generated wastepaper that is either source
separated or plant separated from other solid waste and packed for mill
shipment.

The pack can contain all papers listed as recyclable on the attached sheet, *(page 2)* and
the following items will be allowed if limited to the amounts listed below.

Groundwood Papers
- less than 5%

newspapers
magazines
phone books
pocket novels
chipboard
groundwood computer printouts

Non Fiberous Material
- less than 2%

plastic wrappers
plastic overlays
soda cans
synthetic fibers
parchment
binders
diskettes
microfiche

Unbleachable Papers
- less than 1% (traces only)

brown corrugated boxes
brown kraft envelopes
brown kraft folders
goldenrod envelopes
black dyed papers
red dyed papers
red rope papers
carbon paper

Treated Papers
- less than 1% (traces only)

coated copy papers
copy paper wrappers
wet strength
waxed papers

The following items are prohibited:

Raw food or cafeteria waste
Food contaminated papers
Construction debris
Restroom waste
Glass, dirt, grit, coffee grounds, tobacco
Medical waste

4698B/11

Case 1:10-cv-00910-WCG   Filed 01/05/11   Page 22 of 23   Document 76-22

GPFOX00137121



## RECYCLABLE OFFICE WASTEPAPER

All clean white, bright, colored, and coated papers are recyclable and can be included in this grade. Specific items to be included are:

ENVELOPES

with windows
with labels
colored
coated

MAIL

letters
pamphlets
brochures
advertisements
booklets
greeting cards

FOLDERS

with plastic tabs
manila
colored
coated

MISCELLANEOUS

posters & bulletins
white cartons
NCR carbonless forms
manuals with glued bindings
soft covered books with white pages
hard cover books over 1 inch thick

DATA PROCESSING

computer printouts
adding machine tapes
accounting ledgers
tabulating & time cards

CORRESPONDENCE

colored sheets
legal pads
looseleaf pages

receipts
fax & telex sheets
scratch & message pads

copy & typing paper
interoffice memos
self-adhesive notes

Paper clips, rubber bands, staples, tape, adhesive labels, plastic tabs, plastic and wire spirals do not have to be removed. Tear security sensitive papers as appropriate.

## NON-RECYCLABLE OFFICE WASTE

Low brightness paper, contaminated papers and non-paper items must be excluded from the Office Fiber grade. Specific items to be excluded are:

FOOD WASTE

contaminated plates
napkins & cups
waxed paper
candy wrappers
restroom papers

NEWS QUALITY PAPERS

phone books
magazines
newspapers
news inserts & flyers
pocket novels with gray pages
gray cartons

BROWN PAPERS

lunch bags
brown envelopes
goldenrod envelopes
brown file folders
boxes

TRASH

3 ring binders
computer binders
copy paper wrappers
hard cover books under 1 inch thick
carbon paper
wallpaper

4698B/12

GPFOX00137122