*UNITED STATES DISTRICT COURT*
*EASTERN DISTRICT OF WISCONSIN*
*GREEN BAY DIVISION*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA, et al.* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| *v.* | ) | *Case No. 1:10 - CV - 910 - WCG* |
| | ) | |
| *NCR CORPORATION, et al.* | ) | |
| | ) | |
| *Defendants* | ) | |

***DEFENDANT NEWPAGE'S REPLY***

Defendant NewPage Wisconsin Systems Inc., replies to the United States' opposition to NewPage's motion for additional time to answer the amended complaint, as follows:

Undersigned counsel's illness is the reason for NewPage's motion for additional time having been filed on December 23, 2010, rather than before December 20, 2010. Undersigned counsel acknowledges the USA's lodging a "no objection" due to counsel's "prior illness" for allowing 30 of the 60 additional days requested by NewPage.

Regrettably, the USA's response inexplicably states that "nothing has happened" since the time NewPage counsel contacted counsel for USA about additional time to answer the complaint (which, from time-keeping entries, was on November 22, 2010). First, USA's statement that "nothing has happened" can only be taken to mean that from November 22, 2010 to the present, NewPage has not actually settled with the USA, because in fact, much has happened, and happened directly with the USA in NewPage's quest to settle the USA's claims against it. Even apart from NewPage's ongoing and necessary dealings with its Insurers and an Indemnitor, referenced in NewPage's Motion at page 2 (to which the USA, of course, is not privy), NewPage in its direct dealings with the USA has made progress, albeit at times made to

feel as though pulling teeth. While there is more history to it, addressing specifically the time period called-out by the USA (November 22, 2010, to the present), the following has happened:[1]

12-1-10 ~ NewPage requested a written explanation of the USA's settlement demand. See attached Exhibit A, page 4.

12-6-10 ~ USA declined to provide written explanation of its settlement demand. Exhibit A, page 4.

12-9-10 ~ Having followed the USA's suggestion to review pleadings in another related case, NewPage renewed its request for a written explanation of the USA's $ million plus demand Exhibit A, page 3-4.

12-13-10 ~ Having received no response from the USA, NewPage again requested a written explanation from the USA of its settlement demand. Exhibit A, page 3.

12-15-10 ~ Fully two weeks after it had been requested by NewPage, the USA provided a written explanation of its settlement demand. Exhibit A, pages 1-2 and 6-9.[2]

In addition to securing in writing the USA's rationale underlying its settlement demand, undersigned counsel has consulted with expert(s) regarding the USA's methodology and the reliability of its computations. Undersigned counsel is also actively researching other comparable settlements.

Clearly, much has happened, notwithstanding the USA's inaccurate statement "nothing has happened."

Finally, there is a complete absence of any showing by USA of prejudice to it, were the Court to allow NewPage's motion. The Code of Professional Responsibility provides that a lawyer should accede to the reasonable requests of opposing counsel, which do not prejudice the

---

[1] Pursuant to Rule 11(h)(3), these factual contentions are supported by undersigned counsel's contemporaneous time entries, as well as the attached email correspondence.

[2] While the recited communications are generally not admissible evidence, they can be used to "negate a contention of undue delay" (FRE 408(b)), which is their utility here.

right of his/her client. *RTA v. Grumman*, 532 F. Supp 665, 667 (N.D. Ill 1982) (attorney who refused to stipulate to short extension of time, where no prejudice to his client would ensue, ordered to pay attorney fees of moving party).

WHEREFORE, for the foregoing reasons, the USA's opposition should be overruled, and additional time granted to February 18, 2011, so that NewPage may continue its efforts to settle the USA's claims against it without incurring additional unnecessary costs of litigation.

Respectfully submitted this 4th day of January 2011

NEWPAGE WISCONSIN SYSTEMS INC.

By: */s/ Daniel C. Murray*

Daniel C. Murray
JOHNSON & BELL, LTD.
Suite 2700
33 West Monroe Street
Chicago, IL 60603-5404
murrayd@jbltd.com
tel. 312 984 0226
fax. 312 372 9818

**Dan Murray**

**From:** Spector, Jeffrey (ENRD) [Jeffrey.Spector@usdoj.gov]
**Sent:** Wednesday, December 15, 2010 10:32 AM
**To:** Dan Murray
**Cc:** Hirsch, Cynthia R.
**Subject:** RE: Spreadsheet for Fox call
**Attachments:** Spector - Industrial Non-UAO PRPs (Final 12-17-08).pdf

Privileged and confidential settlement communication.

Dan – Below are some bullet-points to assist you in understanding the basis for our settlement proposal. As I mentioned earlier, I am willing to arrange a conference call to discuss further if you would like.

In this matter the United States and Wisconsin have alleged that New Page is jointly and severally liable for unreimbursed costs incurred by the governments for response activities undertaken in response to the release and threatened release of hazardous substances (PCBs) from NewPage's Appleton facility, as well as natural resource damages resulting from those releases. The Complaint also seeks a declaratory judgment that NewPage is jointly and severally liable for future response costs that may be incurred by the governments.

For purposes of settlement, the governments have estimated total costs and damages at $1.5 billion ($200 million in past costs + $700 million in estimated future costs + $350 million premium on future costs + $250 million natural resource damages). These costs are described in Plaintiffs' Joint Brief in Support of Motion to Enter Consent Decree With Eleven De Minimis Party Defendants at pp 18-19. NewPage is potentially liable for the entirety of this amount (less amounts received through prior settlements).

In June of this year we provided you with a spreadsheet providing the basis for our settlement demand of $1,157,253. This was discussed with you at length during conference calls in June and October.

The settlement demand was derived from our review of all available PCB sampling data relating to NewPage, collected during the relevant time-frame (1957-1977). This consisted of 11 samples collected between July 1975 and July 1977. Three of the samples showed PCB concentrations. The December 9, 1976 sample is relatively high – 7 ug/L of Aroclor 1254.

In an effort to identify an average daily PCB discharge for NewPage, we averaged together all 11 sampling results. The results averaged out to 0.68454545 ug/L which is the equivalent of 0.0382 lb/day. We then multiplied that amount by 365 days for an annual amount (13.94 lbs/year) and multiplied the annual amount by 20 years. This resulted in an assumption that NewPage had released 279 lbs / 127 kg during the relevant time period of 1957-1977.

We did not include the 50 ug/L result from the 1973 NR101 report in our calculation, as our analysis of that document made us question whether it reflected an actual sample result or simply reflected the detection limit.

While we recognize that NewPage's discharges to the Fox were likely the result of spills or leaks, rather than daily discharges as an element of the facility's standard operations, we believe the 13.94 lb/year

Exhibit A

1

figure is a reasonable estimate of the impact of such spills or leaks.

As discussed in the earlier Motion to Enter, the governments have estimated that a total of 230,000 kg of PCBs were discharged to the Fox River between 1957 and 1977.

We took the calculated New Page discharge of 127 kg and applied a 50% uncertainty premium, raising the NewPage volumetric share to 190 kg or 0.083% of the total PCBs released to the river. An uncertainty premium is necessary in matters such as this where there is no sampling at all available for 17 of the 20 years. Likewise it is reasonable to assume that PCB releases may have been greater during the earlier portions of the relevant time-period due to the lesser awareness/concern with environmental matters during the earlier period. Inclusion of a significant uncertainty premium provides the Court with comfort that we are not underestimating NewPage's share.

We then excluded $100 million in Operable Unit 1 costs from the Total Costs and Damages, due to NewPage's facility being located downstream of OU1.

We then applied NewPage's share (0.083%) to the remaining $1.4 billion in costs and damages to calculate the proposed settlement amount of $1,157,253.

While we believe this is a defensible settlement figure, it will be challenged by NCR and API and possibly other defendants. NCR and API have aggressively opposed and are currently appealing the prior de minimis settlements.

Extrapolating from NewPage's 7 ug/L sample, NCR previously calculated that NewPage had an average daily PCB discharge of 0.6586 lbs, for a total discharge of 4,676.129 lbs during the relevant time-period. NCR calculated that this was equivalent to a 0.676% share of all PCBs discharged to the Fox River and warranted a contribution of $13,523,774. A copy of NCR's analysis is attached.

API has repeatedly argued that releases of Aroclor 1254 (which they claim they did not release) should be treated separately from releases of Aroclor 1242 (the PCB found in carbonless copy paper). API alleges that Aroclor 1254 makes up as much as 20% of all PCBs released to the river. Under API's theory, 20% of all clean-up costs ($300 million) should be paid for by those entities – such as NewPage – that released 1254. There are no known "major" dischargers of Aroclor 1254, so arguably NewPage could bear a significant percentage of that amount. API's arguments are set out API/NCR's Oppositions to the Motion to Enter Consent Decree with the De Minimis Parties (Dkt. 38) and City of De Pere (Dkt. 70), as well as in their Appeal.

A settlement would be memorialized in a judicially entered consent decree consistent with those entered for settlements with the de minimis parties and De Pere (see Exhibit 1 to Dkt 12 and Ex. 1 to Dkt 16).

Generally speaking, the proposed settlement would resolve NewPage's liability for PCB releases to the Fox - NewPage would receive covenants not to sue (subject to specified reservations) from the governments and statutory contribution protection, which would prohibit other responsible parties from bringing an action against NewPage for these matters. Additionally, NewPage would retain the right to seek contribution from other potentially responsible parties (other than the governments).

I hope this provides you with the information you require to assess our settlement demand. Please call me with any further questions.

Jeffrey A. Spector
Trial Attorney

2

U.S. Department of Justice
Environmental Enforcement Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 514-4432
Fax: (202) 616-6584

---

**From:** Dan Murray [mailto:murrayd@jbltd.com]
**Sent:** Monday, December 13, 2010 3:52 AM
**To:** Spector, Jeffrey (ENRD); hirschcr@DOJ.STATE.WI.US
**Subject:** Spreadsheet for Fox call

**Jeff and Cynthia, some of the observations below are perhaps more obvious than others, though I failed to mention the most obvious of all. That is, in any settlement achieved and put to the Court for approval, some explanation of how the settlement amount was determined would seem to be required by the Court, if not the non-settling parties. If pen must be put to paper to secure the Court's approval of the settlement, why should it be too much to ask to do the same now, so that we may have a settlement at all for the Court to even consider. Dan M.**

Dan Murray, Attorney at Law




33 West Monroe Street, Suite 2700
Chicago, Illinois 60603-5404
T: (312) 372-0770 | F: (312) 372-9818
**D: (312) 984-0226**

murrayd@jbltd.com | www.johnsonandbell.com

---

**From:** Dan Murray
**Sent:** Thursday, December 09, 2010 9:52 PM
**To:** 'Spector, Jeffrey (ENRD)'; hirschcr@DOJ.STATE.WI.US
**Subject:** Spreadsheet for Fox call

Jeff and Cynthia, the government is seeking over a million dollars from NewPage, yet you don't have the time to put pen to paper to explain how the gov't arrived at its settlement demand figure? To your statement that we have "discussed" such matters over the 'phone does not ameliorate our present need to have the methodology and computation in writing. To your statement that referring us to filings in another lawsuit is sufficient to reveal "many of the underlying assumptions," that may be so, as far as it goes. But still, the methodology is lacking.

We are not asking for a "position paper," just a run through of the calculation, with each step of the computation identified as a fact, an assumption, a methodology, or whatever underpins the gov'ts' calculation.

Being in active litigation is not a good reason to refuse our request, as a computation is required anyhow by Rule 26

**(a)(1)(A)(iii). And, any expert you offer in the litigation will have to reveal his / her principles and methods, and that they have been reliably applied to the facts (FRE 702), all as disclosed in a required written report. Rule 26(a)(2)(B).**
**NewPage is interested in reaching a settlement, and renews its request for a written explanation of the gov'ts' demand. Thank you.**

***Dan Murray***

---

**From:** Spector, Jeffrey (ENRD) [mailto:Jeffrey.Spector@usdoj.gov]
**Sent:** Monday, December 06, 2010 12:37 PM
**To:** Dan Murray; hirschcr@DOJ.STATE.WI.US
**Subject:** Re: Spreadsheet for Fox call

Dan - I believe that we discussed these issues extensively during our June and October calls. Additionally, I've previously directed you to the filings on the Motion to Enter Consent Decree with De Minimis Party Defendants for a written discussion of many of the underlying assumptions. As we are currently in active litigation, we do not have the time to dedicate to a written position paper reiterating those discussions. With that said, we would be willing to conduct a conference call with your client to go through the material with him/her on the line. If that is of interest to NewPage, let me know and we can arrange a call in the near future.

Thank you,
Jeff Spector

Sent Using U.S. DOJ/ENRD BES Server

---

**From:** Dan Murray <murrayd@jbltd.com>
**To:** Spector, Jeffrey (ENRD); Hirsch, Cynthia R. <hirschcr@DOJ.STATE.WI.US>
**Sent:** Wed Dec 01 17:29:24 2010
**Subject:** Spreadsheet for Fox call

Jeff and Cynthia, going back through my correspondence with you, I could find the email below, with the attached "spreadsheet" as the only statement of what the governments' settlement demand is. My client NewPage has asked for, and I agree, an explanation in writing, which states narratively the premises, assumptions, interpolations, extrapolations, and the like, which will allow the reader to follow along the spreadsheet AND understand the methodology used to arrive at the conclusion reached, which is the dollars settlement demand. In short, we need a better, more complete statement of how the settlement demand was calculated, than we can divine from the spreadsheet alone. Thank you for you anticipated cooperation in meeting our request. Dan M.

Dan Murray, Attorney at Law




33 West Monroe Street, Suite 2700
Chicago, Illinois 60603-5404
T: (312) 372-0770 | F: (312) 372-9818
**D: (312) 984-0226**

murrayd@jbltd.com | www.johnsonandbell.com

---

**From:** Spector, Jeffrey (ENRD) [mailto:Jeffrey.Spector@usdoj.gov]

**Sent:** Friday, June 18, 2010 2:29 PM
**To:** Dan Murray
**Subject:** Spreadsheet for Fox call

Dan – for your review during today's call.

---

All contents of this e-mail and any attachment are private & confidential. If received or viewed by anyone other than the intended recipient, neither this e-mail nor any attachments, or anything derived from these, may be used or passed on for any purpose whatsoever, and all materials must be destroyed and the sender notified immediately.

5



SIDLEY AUSTIN LLP
ONE SOUTH DEARBORN
CHICAGO, IL 60603
(312) 853 7000
(312) 853 7036 FAX

evanwesterfield@sidley.com
(312) 853-7150

BEIJING
BRUSSELS
CHICAGO
DALLAS
GENEVA
HONG KONG
LONDON
LOS ANGELES
NEW YORK
SAN FRANCISCO
SHANGHAI
SINGAPORE
TOKYO
WASHINGTON, DC

FOUNDED 1866

December 17, 2008

**CONFIDENTIAL SETTLEMENT COMMUNICATION**

Via E-mail

Mr. Jeffrey Spector
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington D.C. 20044

**Re: Settlement Discussions with Industrial Non-UAO Defendants in Appleton Papers Inc. v. George Whiting Paper Co., et al.**

Dear Jeff,

I am submitting this letter on behalf of NCR Corporation, one of the Plaintiffs in *Appleton Papers Inc. v. George Whiting et al.*. We have had several discussions over the past few weeks concerning your investigation into whether to offer an early *de minimis* settlement proposal to any of the defendants in the *Whiting* case who are not respondents to the Unilateral Administrative Order and who are not municipalities ("Industrial Non-UAO Parties"). In followup from those conversations, I would like to offer three comments for your consideration.

*First*, NCR supports any reasonable expedited effort that will resolve the liability for parties that are truly *de minimis*. CERCLA recognizes that where there is sufficient evidence to conclude that a party's contribution to the contamination at a site is small in terms of volume or toxicity, it is in everyone's interest to have that party make an appropriate monetary contribution and obtain protection from further claims.

However, in this situation, NCR is very concerned about whether sufficient information is currently available on which to base any early *de minimis* settlement with the Industrial Non-UAO Parties. Wastewater monitoring records show that each of these parties discharged some quantity of PCB into the river. But there are only a handful of such records; additional information is clearly needed to determine whether the PCB discharges were limited to only the few occasions captured in the records, or whether they were more extensive in terms of duration and/or quantity. In addition, five of the eleven Industrial Non-UAO Parties have not submitted any historical documents, and the rest have submitted little or no information concerning their past use of PCBs or PCB-containing paper fiber. I understand that you may rely heavily on your consultant's analysis of the PCB contributions from these parties. However, a

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships

consultant's opinion carries weight only to the extent it is based on sufficient historical information, and there is a paucity of such information at this time. For these reasons, NCR has serious reservations that any settlement with the Industrial Non-UAO Parties can be justified on the current record and without further investigation.

*Second*, NCR believes that if the government elects to offer an early *de minimis* settlement for the Industrial Non-UAO Parties, the dollar value of that settlement should be commensurate with the magnitude of the Fox River site and what is known, to date, about these parties' PCB discharges. Estimates of the total cleanup costs and natural resource damage claims at the site will exceed $600 million and could, by some estimates, approach $800M. Even a very small share of those costs will be a very large number.

To date, you have not been willing to disclose your analysis of what share – individually or collectively – the Industrial Non-UAO Parties are responsible for. For the reasons outlined above, it is not clear to NCR that such an estimate can even be credibly made at this time. However, NCR does believe that it may be possible to put a lower bound or "floor" on that share.[1] As we discussed on the phone, this can potentially be done using the wastewater PCB detection data that exists. *See* Table 1. The PCB detection results for each facility can be averaged and multiplied by the number of operational days per year – to generate an annual PCB discharge.[2] This annual PCB discharge can then be multiplied by the number of years when discharges occurred – in this analysis, we assumed 20 years.[3] This generates a total PCB discharge, which can be compared to the total quantity of PCBs discharged to the river – in this analysis, we used the estimate from Technical Memorandum 2d.[4]

Our consultants work on this is still ongoing and additional revisions are likely. Moreover, these numbers are not and should not be considered to represent an allocation of individual shares for these parties. However, they can serve to *illustrate* the magnitude, at a minimum, of the Industrial Non-UAO Parties' collective responsibility. As Table 1 shows, even using a conservative approach that assumes that the parties' PCB discharges were never greater than those detected at the far end of the relevant time period, the appropriate contribution from these parties should be at least $15 million (taking into account the other parties not included in the illustration). Any lower number would require an explanation for why earlier PCB

[1] Note that our investigation into the discharges by these parties is continuing and that there is other work underway, some of which we discussed on the phone. Any analyses presented here are preliminary and subject to revision or supplementation, and we specifically reserve the right to do so.

[2] Note that this annual PCB discharge is certainly an *underestimate* of the PCBs actually discharged, given that the records are from the late 1970s or early 1980s.

[3] The relevant time period may in fact extend farther back in time or more recently (some PCB detections for the Industrial Non-UAO Parties occur as late as 1983).

[4] We have shared with the government in the past NCR's concerns about the methodologies and conclusions contained in Technical Memorandum 2d. NCR uses its total PCB discharge estimate here only to illustrate the analysis.

7

discharges would have been less than those actually detected later. Moreover, given that this represents approximately 1% of the total cost number you indicated you were using, this also would appear to be a fair and reasonable minimum aggregate contribution from these parties.

*Third*, if a *de minimis* settlement offer is made and funds are received, those funds should be directed into the Fox River site-specific account to be used to pay for future work at the Site. It would be contrary to EPA guidance as well as the policies underlying CERCLA to extinguish the Plaintiffs' and other parties' rights of contribution but not actually use the monies to further the cleanup effort for which they were recovered. Alternatively, any settlement should make clear that any recovery will be credited against the remaining parties' obligations with respect to the site, such as, for example, their obligations for past or future EPA oversight costs or NRD.

If you have any questions about these comments or the illustration set forth in Table 1, please do not hesitate to call. As we discussed last week, NCR is submitting these comments at this time based on the assurance that they will not be distributed further.

Sincerely,

Evan B. Westerfield

cc: John Hartje
Michael Hermes

8

## LOWER-BOUND DISCHARGE/SHARE ILLUSTRATION FOR INDUSTRIAL NON-UAO DEFENDANTS

| PRPs (1) | Avg. Daily PCB Discharge (lbs) (2) | Avg. Annual PCB Discharge (lbs) (3) | PCBs Discharged from Facility (lbs) (4) | Share of All PCBs Discharged (5) | Possible Monetary Contribution (6) |
|---|---|---|---|---|---|
| Green Bay Packaging | 0.0229 (8) | 8.1464 | 61.187 | 0.009% | $176,958 |
| NewPage | 0.6586 | 233.8064 | 4,676.129 | 0.676% | $13,523,774 |
| Neenah Foundry | 0.0133 | 4.7375 | 94.750 | 0.014% | $274,024 |
| Proctor & Gamble | 0.0088 | 3.1369 | 62.737 | 0.009% | $181,442 |
| Leicht Transfer | n/a | n/a | 57.400 (7) | 0.008% | $166,006 |

**Notes:**

(1) We did not have available comparable PCB effluent data for Wisconsin Public Service, George Whiting, or International Paper. Other named defendants – Kimberly-Clark, LaFarge, and Union Pacific – are also not included in this illustration.

(2) The documents from which these figures are drawn are attached (in some cases calculated using flow data).

(3) Assumes 355 operational days per year.

(4) Except as noted below, assumes discharges occurred at the same rate over 20 years. In some cases, discharges may have started earlier; ended earlier; or continued later (e.g., some facilities listed above have PCB detections as late as 1983). However, for illustration purposes only, a round number of 20 years was used. It should be noted that this figure is almost certainly a gross *underestimate* of the total PCBs discharged by each referenced facility, given that the records are from the late 1970s or early 1980s.

(5) Assumes PCB discharges to the river totaled 691,542 pounds, as represented in WDNR's 1999 Draft Technical Memorandum 2d. We have shared with the government in the past NCR's concerns about the methodologies and conclusions contained in draft Technical Memorandum 2d. NCR uses its total PCB discharge estimate here only to illustrate the analysis.

(6) Assumes total costs of $1 billion. This number was used because it was represented in a phone conversation that this was a number DOJ was considering using internally for this analysis. Again, this number is used for illustration purposes and may not represent an accurate estimate of the total costs that have been or will be incurred at the Site. A 100% premium, per EPA guidance, was also applied.

(7) Records indicate that "less than 50 gallons" of PCB material entered a storm sewer than ultimately discharged into the Fox River. This analysis assumes, for illustration purposes, that five of the 50 gallons (which is the equivalent of 57 pounds of PCB) actually reached the river.

(8) No adjustment for intake water was made. It should be noted that according to draft Technical Memorandum 2d, "it is reasonable to conclude that intake water was not a significant source of PCB detected in mill effluent" and that "intake water contributions are negligibly small in comparison" (p. 25).