729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**



United States District Court,
D. Rhode Island.
ASHLAND INC., Plaintiff,
v.
GAR ELECTROFORMING, The Black and Decker
Corporation, Emhart Industries, Morton International, Inc.,
Rohm & Haas Company, Acco-Bristol Division of Bab-
cock Industries, Bristol, Inc., Life Technologies Corpora-
tion [FN1], and United Technologies Corporation, Defen-
dants.

FN1. Formerly named defendant Applera Cor-
poration is now known as Life Technologies
Corporation ("LTC") and is the successor in in-
terest or by merger to the whole or a part of Per-
kin-Elmer Corporation, the original defendant in
the underlying litigation. *See* Order dated April
10, 2009, C.A. No. 08-227ML, Docket No. 117.

C.A. No. 08-227ML.
July 22, 2010.

**Background:** Non-settling potentially responsible
party (PRP) brought Comprehensive Environmental Response,
Compensation, and Liability Act (CERCLA) cost recovery
action against settling and non-settling PRPs for ground-
water remediation costs at hazardous waste disposal site.
Defendants moved for summary judgments.

**Holdings:** The District Court, Mary M. Lisi, Chief Judge,
held that:

(1) PRP was entitled to bring cost recovery action, and

(2) collateral estoppel did not bar reallocation of equitable
liability shares.

Motions denied.

West Headnotes

**[1] Environmental Law 149E ☞437**

149E Environmental Law
   149EIX Hazardous Waste or Materials
      149Ek436 Response and Cleanup; Liability
         149Ek437 k. In general. Most Cited Cases

CERCLA was enacted to respond to the serious en-
vironmental and health risks posed by industrial pollution.
Comprehensive Environmental Response, Compensation,
and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. §
9601 et seq.

**[2] Environmental Law 149E ☞437**

149E Environmental Law
   149EIX Hazardous Waste or Materials
      149Ek436 Response and Cleanup; Liability
         149Ek437 k. In general. Most Cited Cases

**Environmental Law 149E ☞445(1)**

149E Environmental Law
   149EIX Hazardous Waste or Materials
      149Ek436 Response and Cleanup; Liability
         149Ek445 Persons Responsible
            149Ek445(1) k. In general. Most Cited Cases

**Environmental Law 149E ☞447**

149E Environmental Law
   149EIX Hazardous Waste or Materials
      149Ek436 Response and Cleanup; Liability
         149Ek447 k. Contribution and indemnity; allo-
cation of liability. Most Cited Cases

CERCLA grants the President broad power to com-
mand government agencies and private parties to clean up
hazardous waste sites, and provides that everyone who is
potentially responsible for hazardous-waste contamination
may be forced to contribute to the cost of the cleanup.
Comprehensive Environmental Response, Compensation,
and Liability Act of 1980, § 101 et seq., 42 U.S.C.A. §
9601 et seq.

**[3] Environmental Law 149E ☞447**

149E Environmental Law
   149EIX Hazardous Waste or Materials
      149Ek436 Response and Cleanup; Liability
         149Ek447 k. Contribution and indemnity; allo-
cation of liability. Most Cited Cases

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

In order to encourage CERCLA settlements and provide potentially responsible parties (PRP) a measure of finality in return for their willingness to settle, responsible parties who have settled their liability are specifically protected from contribution actions. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 113(f), 42 U.S.C.A. § 9613(f).

**[4] Environmental Law 149E ⬗444**

149E Environmental Law
   149EIX Hazardous Waste or Materials
     149Ek436 Response and Cleanup; Liability
      149Ek444 k. Persons protected or authorized to undertake removal actions. Most Cited Cases

CERCLA provides potentially responsible parties (PRP) with a cause of action to recover necessary costs incurred in cleaning up a contaminated site; CERCLA cost recovery actions are not reserved for "innocent" parties. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), 42 U.S.C.A. § 9607(a).

**[5] Environmental Law 149E ⬗444**

149E Environmental Law
   149EIX Hazardous Waste or Materials
     149Ek436 Response and Cleanup; Liability
      149Ek444 k. Persons protected or authorized to undertake removal actions. Most Cited Cases

Under CERCLA's cost recovery provisions, a private party may recover without any establishment of liability to a third party, but only to the extent the private party has incurred costs in cleaning up the site. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), 42 U.S.C.A. § 9607(a).

**[6] Environmental Law 149E ⬗444**

149E Environmental Law
   149EIX Hazardous Waste or Materials
     149Ek436 Response and Cleanup; Liability
      149Ek444 k. Persons protected or authorized to undertake removal actions. Most Cited Cases

Nothing in the plain language of CERCLA's cost recovery provisions requires that cleanup performed by a potentially responsible party (PRP) must be voluntary to allow that party to bring a claim for cost recovery. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), 42 U.S.C.A. § 9607(a).

**[7] Environmental Law 149E ⬗444**

149E Environmental Law
   149EIX Hazardous Waste or Materials
     149Ek436 Response and Cleanup; Liability
      149Ek444 k. Persons protected or authorized to undertake removal actions. Most Cited Cases

Any private party, including potentially responsible parties (PRP) who may or may not be considered innocent, may pursue a CERCLA cost recovery action for expenses associated with cleaning up contaminated sites. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), 42 U.S.C.A. § 9607(a).

**[8] Environmental Law 149E ⬗447**

149E Environmental Law
   149EIX Hazardous Waste or Materials
     149Ek436 Response and Cleanup; Liability
      149Ek447 k. Contribution and indemnity; allocation of liability. Most Cited Cases

Only a potentially responsible party (PRP) subject to CERCLA enforcement actions under abatement or cost recovery provisions may bring a suit for contribution. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 106, 107(a), 113(f), 42 U.S.C.A. §§ 9606, 9607(a), 9613(f).

**[9] Environmental Law 149E ⬗444**

149E Environmental Law
   149EIX Hazardous Waste or Materials
     149Ek436 Response and Cleanup; Liability
      149Ek444 k. Persons protected or authorized to undertake removal actions. Most Cited Cases

**Federal Civil Procedure 170A ⬗2397.5**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(A) In General
      170Ak2397 On Consent
       170Ak2397.5 k. Construction and operation.
Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

Potentially responsible party (PRP) that incurred slightly less than $2 million in groundwater remediation costs at contaminated waste disposal site was entitled to bring CERCLA cost recovery action against other PRPs, including settling party that had signed partial consent decree with state and federal government pertaining to soil remediation at same site and had sued PRP and others for contribution. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107(a), 113(f), 42 U.S.C.A. §§ 9607(a), 9613(f).

**[10] Federal Civil Procedure 170A 2397.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(A) In General
            170Ak2397 On Consent
                170Ak2397.5 k. Construction and operation.
Most Cited Cases

Consent decrees entered into between state and federal governments and settling party in CERCLA cost recovery action pertaining to contaminated soil at waste disposal site did not bar non-settling potentially responsible party (PRP) that incurred groundwater cleanup costs at same site from later bringing a cost recovery action against settling party. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107(a), 113(f), 42 U.S.C.A. §§ 9607(a), 9613(f).

**[11] Federal Courts 170B 420**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk420 k. Judgments. Most Cited Cases

When a party implores a federal court to give preclusive effect to a prior federal court adjudication, federal law governs.

**[12] Judgment 228 713(1)**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k713 Scope and Extent of Estoppel in General
                228k713(1) k. In general. Most Cited Cases

Issue preclusion prohibits a party from re-litigating issues that have previously been adjudicated.

**[13] Judgment 228 634**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(A) Judgments Conclusive in General
            228k634 k. Nature and requisites of former adjudication as ground of estoppel in general. Most Cited Cases

**Judgment 228 713(1)**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k713 Scope and Extent of Estoppel in General
                228k713(1) k. In general. Most Cited Cases

To preclude the litigation of an issue based on a prior adjudication between the parties, a party must establish (1) that the issue sought to be precluded is the same as that which was involved in the prior proceeding, (2) that the point was actually litigated in the earlier proceeding, (3) that the issue was determined by a valid and binding final judgment or order, and (4) that the determination of the issue in the prior proceeding was essential to the final judgment or order.

**[14] Judgment 228 715(1)**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k715 Identity of Issues, in General
                228k715(1) k. In general. Most Cited Cases

The reach of collateral estoppel must be confined to situations where the matter raised in the second suit is identical in all respects to that decided in the first proceeding.

**[15] Judgment 228 644**

228 Judgment
    228XIV Conclusiveness of Adjudication

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

228XIV(A) Judgments Conclusive in General
228k643 Nature of Action or Other Proceeding
228k644 k. In general. Most Cited Cases

**Judgment 228 ☞713(1)**

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(C) Matters Concluded
228k713 Scope and Extent of Estoppel in General
228k713(1) k. In general. Most Cited Cases

Collateral estoppel did not bar reallocation of equitable liability shares among parties in non-settling potentially responsible party's (PRP) CERCLA cost recovery action against settling and non-settling PRPs for costs already expended on groundwater cleanup, although same parties and hazardous waste site were involved in prior contribution action for reimbursement of future soil remediation costs. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107(a), 113(f), 42 U.S.C.A. §§ 9607(a), 9613(f).

**[16] Environmental Law 149E ☞445(1)**

149E Environmental Law
149EIX Hazardous Waste or Materials
149Ek436 Response and Cleanup; Liability
149Ek445 Persons Responsible
149Ek445(1) k. In general. Most Cited Cases

In a cost recovery action, CERCLA imposes strict liability for the costs of cleanup on a party found to be an owner or operator, past operator, transporter, or arranger. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), 42 U.S.C.A. § 9607(a).

**[17] Environmental Law 149E ☞445(3)**

149E Environmental Law
149EIX Hazardous Waste or Materials
149Ek436 Response and Cleanup; Liability
149Ek445 Persons Responsible
149Ek445(3) k. Joint and several liability; divisibility. Most Cited Cases

Generally, CERCLA's cost recovery provisions impose joint and several liability on potentially responsible parties (PRP) regardless of fault, unless the harm is capable

of apportionment. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), 42 U.S.C.A. § 9607(a).

**[18] Environmental Law 149E ☞445(3)**

149E Environmental Law
149EIX Hazardous Waste or Materials
149Ek436 Response and Cleanup; Liability
149Ek445 Persons Responsible
149Ek445(3) k. Joint and several liability; divisibility. Most Cited Cases

Scope of liability in CERCLA cost recovery action is to be determined under common law principles, where a court performing a case by case evaluation of the complex factual scenarios associated with multiple-generator waste sites will assess the propriety of applying joint and several liability on an individual basis. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), 42 U.S.C.A. § 9607(a).

**[19] Environmental Law 149E ☞445(3)**

149E Environmental Law
149EIX Hazardous Waste or Materials
149Ek436 Response and Cleanup; Liability
149Ek445 Persons Responsible
149Ek445(3) k. Joint and several liability; divisibility. Most Cited Cases

In a CERCLA cost recovery action, apportionment is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), 42 U.S.C.A. § 9607(a).

**[20] Environmental Law 149E ☞445(3)**

149E Environmental Law
149EIX Hazardous Waste or Materials
149Ek436 Response and Cleanup; Liability
149Ek445 Persons Responsible
149Ek445(3) k. Joint and several liability; divisibility. Most Cited Cases

**Environmental Law 149E ☞464**

149E Environmental Law
149EIX Hazardous Waste or Materials

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

149Ek462 Evidence
149Ek464 k. Presumptions, inferences, and burden of proof. Most Cited Cases

In a CERCLA cost recovery action, the defendant bears the burden to show that the harm is divisible and that it would be inequitable to forego an allocation of costs. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 107(a), 42 U.S.C.A. § 9607(a).

**[21] Environmental Law 149E ⟿447**

149E Environmental Law
149EIX Hazardous Waste or Materials
149Ek436 Response and Cleanup; Liability
149Ek447 k. Contribution and indemnity; allocation of liability. Most Cited Cases

**Environmental Law 149E ⟿464**

149E Environmental Law
149EIX Hazardous Waste or Materials
149Ek462 Evidence
149Ek464 k. Presumptions, inferences, and burden of proof. Most Cited Cases

In a CERCLA contribution action, the plaintiff bears the burden of proving (1) that the defendant is a potentially responsible party (PRP) under CERCLA's cost recovery provisions, and (2) the defendant's equitable share of costs. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, § 113(f), 42 U.S.C.A. § 9613(f).

**[22] Environmental Law 149E ⟿445(3)**

149E Environmental Law
149EIX Hazardous Waste or Materials
149Ek436 Response and Cleanup; Liability
149Ek445 Persons Responsible
149Ek445(3) k. Joint and several liability; divisibility. Most Cited Cases

**Environmental Law 149E ⟿447**

149E Environmental Law
149EIX Hazardous Waste or Materials
149Ek436 Response and Cleanup; Liability
149Ek447 k. Contribution and indemnity; allocation of liability. Most Cited Cases

Liability allocation in the context of a CERCLA contribution claim is driven primarily by equity considerations, to reduce the burden on a defendant who has been found liable in a direct CERCLA action; by contrast, liability in a recovery action is generally joint and several, and allocation does not come into play unless the court has first made a determination that the pollution caused by the hazardous waste for which the defendants are held responsible is divisible. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 107(a), 113(f), 42 U.S.C.A. §§ 9607(a), 9613(f).

**\*529** Anthony F. Muri, Muri Associates LLC, Providence, RI, David B. Graham, W. Hunter Old, Kaufman & Canoles, P.C., Williamsburg, VA, Winthrop A. Short, Jr., Kaufman & Canoles, P.C., Newport News, VA, for Plaintiff.

Dean M. Cordiano, Joseph K. Scully, Rene A. Ortega, Day Pitney LLP James P. Ray, Robinson & Cole LLP, Hartford, CT, Gregory L. Benik, Benik & Associates P.C., Warwick, RI, Gerald J. Petros, Alexandra K. Callam, Hinckley, Allen & Snyder LLP, Marisa A. Desautel, RI Department of Environmental Management Office of Legal Services, Providence, RI, Jennifer A. Giblin, Thomas G. Allen, Pillsbury Winthrop Shaw Pittman, LLP, Russell V. Randle, Patton Boggs, L.L.P., Leslie Allen, U.S. Department of Justice, Washington, DC, Stephen P. Ryan, The Law Offices of S. Paul Ryan, East Providence, RI, for Defendants.

***OPINION AND ORDER***
MARY M. LISI, Chief Judge.
**I. Introduction**

It has been two decades since the United States first commenced an action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., to recover response costs associated with remediating a ten acre waste disposal site in Smithfield, Rhode Island, commonly known as the "Davis Site." After several years of litigation to establish liability for the environmental contamination at the Davis Site, the case was resolved, in part by settlement memorialized in consent decrees, and in part by two separate trials against and among the responsible parties. Almost a decade ago, the First Circuit Court of Appeals affirmed the trial judge's decision with respect to liability determinations and the allocations of future response costs among various parties that were deemed to have contributed to the contamination at the Davis Site.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.Supp.2d 526
(Cite as: 729 F.Supp.2d 526)

One of these parties, Ashland Inc. ("Ashland"), now seeks recovery from several of the other parties for costs Ashland claims to have incurred "voluntarily" in connection with groundwater remediation at the Davis Site. All but one of the defendants*530 [FN2] have filed motions for summary judgment regarding (1) the effect of a settlement agreement between the United States and United Technology Corp. ("UTC"), one of the parties deemed liable for cleaning up the Davis Site; and (2) the applicability of response cost allocations made in the litigation UTC brought against various other parties for contribution. For the reasons stated in this Memorandum and Order, the defendants' motions for summary judgment are DENIED.

FN2. Bristol Inc. and Acco-Bristol Division of Babcock Industries ("Bristol") submitted only a memorandum addressing the two issues.

**II. Factual Background**
The substantive facts and procedural history of the Davis Site litigation have been set forth repeatedly and in great detail in the decision by the First Circuit Court of Appeals and several opinions by this Court, see e.g. United States v. Davis, 261 F.3d 1 (1st Cir.2001); United States v. Davis, 11 F.Supp.2d 183 (D.R.I.1998); United States v. Davis, 20 F.Supp.2d 326 (D.R.I.1998); United States v. Davis, 31 F.Supp.2d 45 (D.R.I.1998). The following is a brief summary designed to put the current litigation into perspective.

The Davis Site is a ten acre chemical waste disposal site located in Smithfield, Rhode Island, that was operated by the Davis family in the 1970s. During 1976 and most of 1977, William M. Davis and his wife Eleanor accepted for disposal more than eight hundred thousand gallons of hazardous waste materials from various generators. In 1982, the site was placed on the EPA's National Priorities List of hazardous waste sites. In 1987, the EPA issued a Record of Decision ("ROD") requiring the Government to perform the following clean-up measures to mitigate the damage caused to the environment by hazardous waste disposal: (1) complete a water line to supply drinking water to residential areas with contaminated or threatened water wells; (2) clean up contaminated groundwater; and (3) excavate and clean up contaminated soils that continued to contaminate the groundwater. The Government began constructing residential water lines but took no other remedial actions.

In 1990, the United States brought an action for re-

covery of past and future response costs at the Davis Site against (1) William Davis as owner-operator and Eleanor Davis as an owner under § 107 of CERCLA, 42 U.S.C. § 9607; (2) United Sanitation Inc. and A. Capuano Brothers Inc. as transporters and arrangers; and (3) Ciba-Geigy Corp., Clairol Inc., Pfizer Inc., The Providence Journal Company, and UTC as arrangers. Initially, the trial against these parties was trifurcated into three separate phases: Phase I to determine liability of the defendants; Phase II to establish the amount for response costs incurred by the United States; and Phase III to address all remaining claims including contribution, indemnification, and allocation.

In 1991, UTC sued some of its co-defendants and 88 other companies under 42 U.S.C. § 9613(f), which permits a potentially responsible party ("PRP") in a CERCLA action to sue other PRPs for contribution. Those PRPs impleaded additional defendants, bringing a total of 138 defendants to the litigation. The United States did not bring suit against any of those additional parties directly.

In 1994, Clairol, Ciba-Geigy, Pfizer, and the Providence Journal Company entered into a partial consent decree with the United States, pursuant to which they agreed to pay $5,625 million towards the cleanup *531 of the Davis Site. UTC, which did not participate in the consent decree, proceeded to trial instead, and was found jointly and severally liable for all past and future clean-up costs. Phase II of the trial became unnecessary when UTC, while reserving its right to appeal the liability determination, stipulated that the United States' response cost incurred by the EPA and enforcement costs incurred by the Department of Justice totaled $9.1 million (prior to certain cut-off dates determined by the Court). The $5,625 million plus interest previously paid by the settling defendants was to be deducted from that amount.

In 1996, the Government asserted total response costs for site study and water line construction of $19 million and enforcement costs of $6 million. Future costs were estimated at $3 million to complete waterlines; $14 million for soil remediation; and $13 million for ground water remediation, for a total amount of $55 million. A number of defendants then joined one of five partial consent decrees, the most extensive of which was entered into by the Government, UTC, and 49 other defendants (1996 Partial Consent Decree, the "PCD"). Those 50 parties agreed to pay $13.5 million plus $440,000 in oversight costs. UTC's share of the costs was $2.8 million and UTC also agreed to perform the entire soil cleanup at the Davis Site, estimated

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

at a cost of $14 million (reduced by $5,464 million paid through other consent decrees). UTC thus assumed the risk that the cost of remediation would exceed such an amount and it was agreed that UTC and the Government were each to receive half of any future contribution recoveries. UTC's recovery, however, was to be capped at $5,364 million.

Several defendants, including Acco Bristol, Ashland, Gar, Thiokol a/k/a Morton, Black & Decker, and Perkin-Elmer, did not participate in the consent decrees and UTC sued them for contribution. Because UTC had not yet begun the remediation, the trial on UTC's claims was focused on UTC's future costs of soil remediation. After a 26-day bench trial, the Court (Torres, J.) dismissed UTC's claims against some of the defendants, including a claim against the State of New Jersey on immunity grounds. On December 15, 1998, the Court issued a declaratory judgment, holding Ashland, Acco, Gar, Morton, and Perkin-Elmer liable for their part in contaminating the Davis Site and allocated to them a share of responsibility for UTC's future clean-up costs.

In determining the equitable allocation of CERCLA response costs among the liable parties, the Court considered several "critical" factors grouped into four categories: (1) the extent to which cleanup costs are attributable for wastes for which a party is responsible; (2) the party's level of culpability; (3) the degree to which the party benefitted from disposal of the waste; and (4) the party's ability to pay its share of the cost. *United States v. Davis, 31 F.Supp.2d at 63.*

With respect to waste attributable to each party, the Court acknowledged that the waste deposited at the Davis Site had been "commingled into an essentially homogeneous 'witches' brew' " and that the "fairest, and most practical, measure of responsibility is the quantity or vo-lume of hazardous waste attributable to each party." *Id. at 64.*

To determine the individual level of culpability, the Court took into consideration each "party's responsibility for proper disposition of the waste, its awareness of the potential harm, the degree of care it exercised in order to avert the harm and its willingness to accept responsibility for remediating the harm." *Id. at 65.* The Court also decided that "all of the parties **\*532** benefitted from disposition of the hazardous waste." *Id.*

Regarding ability to pay, the Court noted that a defendant's share of liability was not simply based on a defendant's net worth. Instead, "the principal reason for considering ability to pay is to ensure that the party seeking contribution will not bear sole responsibility for any portion of the joint liability otherwise attributable to defendants from whom recovery is unlikely." *Id. at 66.* Because the evidence regarding the various defendants' financial condition was sparse, the Court concluded that "the most that can be inferred is that UTC and the generator defendants have a much greater ability to pay response costs than do the other defendants." *Id.*

Taking those four factors into consideration, the Court calculated the allocation of equitable shares of liability by basing it on the "percentage of the total volume of hazardous waste deposited at the Davis Site that [a] particular generator produced." *Id. at 67.* The liabilities were thus allocated as follows [FN3]:

FN3. No percentage of response costs was allocated to Morton because the volume of its deposited waste could not be calculated.

| Generators | |
|---|---|
| ACCO-Bristol | 0.16% |
| Ashland | 1.03% |
| Gar (Black & Decker) | 0.03% |
| Perkin-Elmer | 0.57% |
| UTC | 1.54% |
| **Transporters** | |
| Chemical Waste Removal, Inc. | 2.08% |
| Chemical Control Corp. | 18.3% |
| A. Capuano Bros., Inc. | 13.46% |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

| Operators/Owners | |
|---|---|
| William Davis | 61.87% |
| Eleanor Davis | 0.97% |
| **TOTAL** | 100% |

```
------------------------------------------------
      Generators        Equitable Share of Liability
------------------------------------------------
ACCO"Bristol             0.16%
------------------------------------------------
Ashland                  1.03%
------------------------------------------------
Gar (Black & Decker)     0.03%
------------------------------------------------
Perkin"Elmer             0.57%
------------------------------------------------
UTC                      1.54%
------------------------------------------------
      Transporters
------------------------------------------------
Chemical Waste Removal, Inc.   2.08%
------------------------------------------------
Chemical Control Corp.   18.3%
------------------------------------------------
A. Capuano Bros., Inc.   13.46%
------------------------------------------------
      Operators/Owners
------------------------------------------------
William Davis            61.87%
------------------------------------------------
Eleanor Davis            0.97%
------------------------------------------------
         TOTAL           100%
------------------------------------------------
```

The Court included the following cautionary statement:

"[T]he Court retains jurisdiction for the purpose of revising this allocation if and when additional facts are discovered that were not reasonably available to the parties at the time of trial and that clearly demonstrate a change in circumstances so significant that the allocation would be rendered manifestly inequitable. In retaining jurisdiction for this purpose, the Court strongly discourages the parties from seeking to reopen this matter without a compelling reason. A clear showing of a material change in circumstances rendering the allocation palpably inequitable will be required." *Davis, 31 F.Supp.2d at 69-70.*

Following this decision, Ashland appealed the Court's entry of partial consent decrees and Ashland, Acco-Bristol, Black & Decker a/k/a Gar, Morton, and Perkin-Elmer appealed various aspects of the declaratory judgment. Ashland was particularly concerned that non-settlors like Ashland itself would incur disproportionate liability related to performance of the groundwater remedy since Ashland was not protected under a consent decree and was barred from seeking contributions from parties that had settled earlier. Several of the defendants argued on appeal that UTC had failed to prove that their respective wastes were hazardous or took issue with evidentiary issues. UTC, in turn, appealed dismissal of several defendants, including New Jersey, in connection with the declaratory judgment

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

action. UTC also took issue with being held solely responsible for $6 million in enforcement costs. With the exception of that last issue, which it remanded for clarification, the First Circuit affirmed all **\*533** determinations and decisions by the district court. _United States v. Davis,_ 261 F.3d 1 (1st Cir.2001).

Regarding Ashland's concern about having to bear disproportionate costs for the groundwater remedy, the First Circuit acknowledged that CERCLA could impose harsh results on non-settling PRPs. _Id._ at 28 ("The result of non-settlors possibly-bearing disproportionate liability for the open-ended cost of remediation is ... consistent with [CERCLA's] paradigm, which encourages the finality of early settlement."). The Court of Appeals also pointed out that "Ashland's preoccupation with the potential of disproportionate liability 'ignores that fact that UTC, which was allocated responsibility for 1.54 percent of the liability by the trial court, will perform the source control remedy, which will amount to over one-fourth of the total costs of remediating the site.' " _Id._ at 27-28 (quoting from UTC's appellate brief).

**III. Procedural History**
On June 6, 2008, Ashland filed a four-count complaint against the defendants [FN4] pursuant to Section 107(a) of CERCLA and under Rhode Island state law: (Count I) against all defendants, pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607(a), for recovery of response costs, contribution, and equitable indemnification in connection with groundwater modeling and remediation at the Davis Site; (Count II) against all defendants except UTC, [FN5] for contributions under Rhode Island's Uniform Contribution Among Tortfeasor Act, RI. Gen. Laws § 10-6-1, _et seq._ for future costs of responding to the groundwater contamination at the Davis Site; (Count III) against all defendants, for equitable indemnification under state law on the ground that Ashland's incurred expenditures exceed its proportionate share of liability; and (Count IV) for a determination of liability for future costs. Complaint ¶¶ 48-54, 55-60, 61-64, 65-68.

FN4. The defendants in this action are limited to those generators who were found to have contributed to the contamination of the Davis Site but who did not participate in any of the consent decrees and who were previously sued by UTC for contribution.

FN5. Ashland apparently excluded UTC because UTC is protected against a contribution claim for

the costs of groundwater cleanup by a second consent decree it entered with the State of Rhode Island in 2000 (the "AETC Decree"). According to UTC, it and "other parties agreed to reimburse the State of Rhode Island for past and future response costs, enforcement costs, oversight costs, and State natural resources damages associated with the Davis Site and agreed to perform certain additional remedial work and limited groundwater monitoring at the Davis Site." UTC Answer, CMECF Page 13 of 19.

Ashland represents that it has "voluntarily" incurred slightly less than $2 Million in response costs related to groundwater remediation at the Davis Site and that it will continue to incur such costs. Complaint ¶ 2. According to Ashland, the surface cleanup by the settling defendants has not been completely effective, making the effective cleanup effort of the groundwater impossible. Id. ¶¶ 41, 42.

Ashland suggests that the November 1996 PCD requires the settling parties to perform _soil_ cleanup at the Davis site, but that it specifically excludes _groundwater_ cleanup referred to in the EPA's final Record of Decision ("ROD"), which sets forth the overall planned remedial action at the site. Id. ¶ 38. Because the PCD excludes groundwater cleanup, Ashland proposes that UTC, as the only defendant in this case who signed the PCD, is not protected thereunder from Ashland's claim for recovery. Id. ¶ 39. Ashland acknowledges, however, that UTC derives some protection from the "AETC Decree", which is more comprehensive in its protection **\*534** against state law claims related to cleanup of the Davis Site. Id. ¶ 40.

Ashland maintains that the cost it has incurred is related to "the type of work specifically excluded from the scope of work defined in the PCD signed by UTC" and that Ashland has undertaken such work "voluntarily, ... even though [it] was not subject to any Government action directly." ¶ 44. In addition to recovery of its expended response cost (less its own share of liability), Ashland seeks to have the defendants declared as "former arrangers" pursuant to Section 107(a) of CERCLA and, as such, liable for future response costs incurred by Ashland, plus "interest and costs of suit, including reasonable attorneys' fees." Complaint at 14-15.

In response to Ashland's complaint, UTC asserts, inter alia, that Ashland's claims are barred by Section 113 of CERCLA. UTC claims that it has incurred unreimbursed response costs of approximately $20 million in connection

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

with tire, drum and container removal and soil remediation at the Davis Site. UTC Answer Page 11 of 19. According to UTC, it submitted a Remedial Action Report to the EPA in 2002, in which UTC reported that UTC and the performing parties spent approximately $23,950,500 to implement the remedial activities required by the PCD and the AETC Decree. UTC Answer Page 14 of 19. UTC notes that the EPA issued a certificate of completion in 2002 "notifying UTC that it had satisfied its obligations under the [PTC]." *Id.*

UTC also raises counterclaims against Ashland for (1) past response costs incurred by UTC, pursuant to Sections 107 and 113; (2) in the event Ashland is found entitled to response cost recovery, equitable allocation of response costs as determined by *Davis,* 31 F.Supp.2d 45 (D.R.I.1998); and (3) set-off, under the equitable doctrine of recoupment. Further, UTC asserts cross-claims against the other defendants for (1) their respective share of response costs incurred by UTC; and (2) in the event Ashland is found to be entitled to response cost recovery, the defendants' share of such response costs.

On October 15, 2008, then Senior Judge Torres, who presided over the CERCLA action against UTC and also conducted the bench trial over UTC's contribution claims, held a Rule 16 conference with all the parties to this new action. On October 30, 2008, the Court issued an order pursuant to which the defendants were permitted to file summary judgment motions limited to addressing the following questions:

(1) Whether the settlement agreement between the United States and United Technologies Corp. ("UTC") in the related case of United *States v. Davis,* C.A. No. 90-484 bars an action against UTC; or

(2) Whether the liability allocations for response costs made by this Court in *United States v. Davis,* 31 F.Supp. 45 (D.R.I.1998) apply in this case. Order Limiting Motions for Summary Judgment, CV. No. 08-227ML (Doc. # 61)

On November 24, 2008, the United States was granted permission to file an amicus curiae brief in the matter. Subsequently, the case was reassigned to this Court following Senior Judge Torres's retirement. On July 27, 2009, this Court granted RIDEM's motion to file an *amicus curiae* brief and permitted the parties to file responses to RIDEM's brief, which had already been submitted on November 21, 2008. Only Ashland has filed a memoran-

dum in opposition to RIDEM's brief.

## IV. Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on **535 file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material' fact is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. United States Dept. of Justice,* 355 F.3d 6, 19 (1st Cir.2004)(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In considering a motion for summary judgment, the Court reviews all evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Cadle Co. v. Hayes,* 116 F.3d 957, 959 (1st Cir.1997). Generally, the movant must make a preliminary showing that no genuine issue of material fact remains that must be resolved at trial. After such a showing has been made, the burden shifts to the nonmovant to demonstrate, by presenting specific facts, that a trialworthy issue remains. *Cadle Co. v. Hayes,* 116 F.3d at 960. The nonmoving party " 'may not rest upon mere allegation ... but must set forth specific facts showing that there is a genuine issue for trial.' " *Braga v. Hodgson,* 605 F.3d 58, 60 (1st Cir.2010) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## V. The Parties' Positions

A review of the parties' briefs reveals that their arguments and contentions vary, based on their respective positions and interests in this case.

(A) UTC

UTC seeks dismissal of Count I (Cost Recovery) on the grounds that the prior allocation in *Davis,* together with UTC's performance, as required by the approved Davis settlements, have resulted in significant overpayment of UTC's equitable share in the remediation. UTC argues that the prior liability allocations for response costs apply also in this case because they have been thoroughly tried and affirmed on appeal. UTC maintains that it has fully discharged its liability to the United States and the State of Rhode Island. UTC also points out that, according to UTC engineer Philip W. Sheridan, Ashland has made no pay-

ment to UTC for the soil remediation work UTC performed at the Davis Site.[FN6]

> FN6. UTC acknowledges that it has collected $3,950,000 in contributions from settling parties under various federal consent decrees.

UTC also seeks dismissal of Count III (Equitable Indemnification under state law) on the ground that the claim is barred by the PCD and the AETC Decree. UTC suggests that Ashland's equitable indemnification claim is actually a disguised CERCLA contribution claim and that, pursuant to § 9613(f)(2), Ashland's claim against UTC should be dismissed. Specifically, UTC maintains that the PCD provides contribution protection for all work specified in the ROD (which includes groundwater work) and that the AETC Decree provides contribution protection that expressly covers groundwater remediation.

(B) Gar, Black & Decker, Emhart
The motion by these defendants (together, "Gar") is limited to the allocation issue; it does not address whether UTC is protected from this litigation by the PTC. Gar argues that the soil remediation response cost allocations in *Davis* apply to Ashland's **536 current complaint on the basis of collateral estoppel or, in the alternative, that if collateral estoppel does not apply, this Court has the authority and sufficient available facts to apportion the parties' liabilities in order to reach the same result.

Gar contends that (1) the Davis allocation for soil remediation applies equally to the groundwater remediation at issue now; and (2) the Court is required to address the allocation issue because of UTC's asserted counterclaim under Section 113. Specifically, Gar states that there is no distinction between the groundwater and the soil contamination; that the volume of waste has previously been established and remains unchanged; and that there are no new factual circumstances that would warrant reopening the issue. Gar also points out that Ashland knew the estimated cost of the groundwater remedy prior to the entry of the consent decrees and was aware that several potentially responsible parties were already defunct or impecunious.

Gar further suggests that this Court has the authority to apportion liability at the summary judgment stage because (1) there is no specific provision for joint and several liability among multiple defendants under CERCLA; and (2) the harm in this case is divisible and the Court has previously determined that the most reasonable basis for al-

locating liability is volume of waste attributable to each defendant.

(C) International/Rohm and Haas/Morton
Unique among these defendants, Morton was not allocated a specific percentage of equitable share of liability based on insufficient evidence that it had disposed any specific volume of waste at the Davis Site.[FN7] Because the issue of liability allocation is precluded by the determination in *Davis,* Morton argues that Ashland's claims against it should be dismissed entirely. Morton also states that it will, along with the other defendants in this action, assert counterclaims for Section 113(f) contribution that will necessitate a determination of the liability allocation, and that Ashland is already bound by the allocations under *Davis.*

> FN7. Morton, as successor to Thiokol Corporation Chemical Division ("Thiokol"), was found liable as an arranger. Because there was no evidence regarding the volume of Thiokol's waste transported to the Davis Site, Morton was not included in the cost share allocation. The First Circuit Court of Appeals noted that Morton's appeal of the liability determination stemmed from Morton's "concern that the Government will use the judgment of liability in this case to pursue a § 9607 action for the cost of the groundwater and well remediation that remains unallocated." *Davis,* 261 F.3d at 50 n. 45.

Alternatively, Morton argues that Ashland's entire claim against Morton is precluded because both Ashland and Morton were parties in *Davis,* the case resulted in a final judgment, and Ashland could have brought a Section 107(a) claim at the time of that litigation.[FN8] Finally, Morton argues that Ashland's state law claims against Morton should be dismissed because the issues underlying Ashland's claim for equitable indemnification are identical to the issues already litigated and there is no equitable reason to shift part of Ashland's liability to Morton.

> FN8. This point appears to disregard the fact hat Ashland could not have brought a Section 107 claim prior to incurring costs. It is also outside the two questions Judge Torres posed for a possible motion for summary judgment.

(D) LTC contends that its own liability allocation of .57% was fully litigated and that Ashland is now precluded from relitigating the issue, particularly because there has

been no material change in factual **537** circumstances which would warrant a modification. The estimated cost of the groundwater remediation was known at that time, as well as the inability of some of the responsible parties to pay part of the remediation costs. LTC also states that the declaratory judgment issued in *Davis* was not limited to soil remediation, but covered liability for past and future response costs at the Davis Site, which included groundwater remediation. LTC concedes that Ashland may bring a Section 107 claim under *Atlantic Research,* but predicts that the defendants will promptly file Section 113 counterclaims, leading to the equitable allocation analysis already performed in *Davis.* With respect to Ashland's Section 107 claim, although CERCLA allows for joint and several liability, LTC points out that courts have recognized that joint and several liability is not appropriate when there is a reasonable basis to apportion liability.

**(D) Bristol**

As noted, in lieu of filing a motion for summary judgment, Bristol elected to submit a memorandum in response to the two questions set forth in the November 3, 2008 order. Bristol seeks (1) a finding by this Court that Ashland can maintain a Section 107 claim against UTC under *Atlantic Research,* and (2) deferment of a decision regarding the allocation "until the universe of defendants is better defined." Bristol Memorandum at 6.

**(1) Protection from Contribution**

Bristol agrees with Ashland that, under *Atlantic Research,* Ashland may file a Section 107 claim against UTC because contribution protection under Section 113 does not bar such a direct action. In fact, Bristol contends that Ashland is limited to bringing a Section 107 claim because it is barred from bringing a Section 113 claim as it has made no payments and cannot request contribution from another PRP. Bristol rejects the Government's argument advanced in its amicus brief that "Ashland's claim against UTC under Section 107 is in the nature of contribution." Government's amicus brief at 1. Bristol suggests that the Government's contention "deliberately blurs the distinction" between a cost recovery action and a contribution claim and that the Government's brief is a "stealth petition for a rehearing of the *Atlantic Research* decision." Bristol Memorandum at 5, 6.

**(2) Allocation Issue**

Bristol further suggests that the allocation issue is premature until the Court has determined the pool of PRPs. According to Bristol, Ashland anticipates adding as many as 50 new defendants which might affect any allocation

decision reached by the Court. Therefore, the Court should defer a decision regarding the allocation of liability "until the universe of defendants is better defined." Bristol Mem. at 6.

**(E) The United States Government's amicus curiae Brief**

The Government asserts that (1) Ashland's Section 107 claim is "in the nature of [a] contribution" claim and therefore barred by Section 9613(f)(2); and (2) if the Court finds a "gap" in the protection of Section 9613(f)(2), it should apply federal common law to protect settling parties such as UTC. Although it is not expressly stated in Ashland's complaint, Ashland apparently seeks to establish joint and several liability against the defendants. The Government contends that joint and several liability, however, applies only to actions brought by the Government or innocent parties, whereas PRPs are limited to equitable allocation in the nature of contribution.

The Government also suggests that Ashland's involvement in the remediation cannot **538** be considered "voluntary." Instead, the EPA approached (liable, non-settlor) Ashland in 2000 to commence groundwater work at the Davis Site. Ashland was required to submit work plans, other submittals and a final report for finished work to the EPA for approval. Generally, the EPA has approved Ashland's work and Ashland has reimbursed the EPA for response costs the EPA has incurred in overseeing the work.

In the event the Court determines that Ashland's claim is not a contribution claim, the Government suggests that the Court rely on federal common law and find that UTC is protected against a Section 107 claim as a party who settled with the EPA. Generally, common law disfavors claims by a PRP against a settling party, and governmental settlements can bar subsequent private claims based on the common-law rule that the sovereign is in privity with individual citizens invoking similar remedies and can extinguish private claims.

With respect to the allocation issue, the Government states that it did not participate in the proceedings and is in no position to opine on the matter.

**(F) RIDEM's amicus curiae Brief**

RIDEM was a party to a separate case related to the Davis landfill, *RIDEM v. Advanced Environmental Technologies, et al,*[FN9] C.A. No. 97-0138T ("AET"), which involved both CERCLA and state law claims. Pursuant to the AETC Decree entered in that case, UTC and other

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

defendants reimbursed RIDEM for more than $2 million in response costs RIDEM incurred in connection with protecting groundwater "beyond the work prescribed in the parallel consent decree" in the instant case. RIDEM asserts that the AETC Decree constitutes a settlement under CERCLA as well as under the Rhode Island Industrial Property Remediation and Reuse Act ("IPRRA"), R.I. Gen. Laws § 23-19-14, et seq., which is implemented by RIDEM.

> FN9. Ashland was an Intervenor Defendant in the AET case. Ashland initially opposed entry of the partial consent decree and filed two separate appeals related thereto. However, after the First Circuit Court of Appeals concluded that it lacked appellate jurisdiction, Ashland dropped its later appeal. This Court (Torres, J.) entered a consent decree between the participating parties on June 28, 2004.

RIDEM states that it filed an amicus curiae brief "in order to set forth its interpretation of [IPRRA] under which the AETC settlement is a part," and to be assured of the finality of settlements it has reached under state law at the Davis Site and other hazardous waste sites in Rhode Island. RIDEM Mot. 2. The AETC Decree specifically provides that the settling defendants are protected from contribution action for "Protected Matters," which included both "soil remediation" and "groundwater treatment work" at the Davis Site. FN10 Accordingly, RIDEM argues that UTC may not be held liable for claims for contribution regarding matters addressed in the AETC Decree because, under IPRRA,FN11 UTC's participation in the AETC Decree protects it from Ashland's equitable indemnity claim.

> FN10. However, such contribution protection is apparently limited to "claims by any other person (except the United States)." [Although RIDEM refers to the AETC Decree as "attached," it has not been provided to the Court.]

> FN11. IPRRA, R.I. Gen. Laws § 23-19.14-12, provides:

> > A party who is exempt from liability under §§ 23-19.14-7, 23-19.14-8 or 23-19.14-10 of this chapter shall not be liable for claims for contribution regarding matters addressed in the letter of compliance or the settlement agreement or the remedied agreement.

**\*539** (G) Ashland's Opposition

In response to the parties' motions for summary judgment, Ashland filed separate memoranda addressing arguments asserted by (1) UTC; (2) Gar, Black & Decker, Emhart and Life Technologies Corporation; and (3) Rohm/Haas and Morton. Ashland also responded to the amicus curiae briefs by the Government and RIDEM. UTC, in turn, filed a response to Bristol's memorandum.

In general, Ashland relies on the 2007 Supreme Court decision in *United States v. Atlantic Research Corp.,* 551 U.S. 128, 127 S.Ct. 2331, 168 L.Ed.2d 28 (2007), for its assertion that, although it may be precluded from filing a Section 113 contribution claim, Ashland *can* pursue a direct Section 107 recovery claim for joint and several liability. With respect to UTC, Ashland suggests that the PCD and AETC Decree only bar contributions claims, not recovery claims related to the work performed by Ashland. With respect to the other defendants, Ashland asserts that the *Davis* allocations only apply to parties subject to a Section 113 claim (in this case, Ashland) and any other party joining Ashland in the current cleanup and this litigation.

Ashland also suggests that liability for a Section 107 claim is joint and several unless the harm is divisible and points to prior findings made during the *Davis* litigation that the hazardous waste was "commingled." Regarding Morton's position that its allocated share of liability was "zero percent," Ashland points out that Morton was deemed to be an "arranger," which establishes Morton's liability in connection with Ashland's current complaint. Ashland also states that UTC's soil remediation work may have uncovered additional information that supports equitable apportionment of liability to Morton.

Regarding the allocations of remediation cost assessed in *Davis,* Ashland points out that those allocations were made in the context of UTC's contribution under Section 113 and are not appropriate for a recovery claim based on Section 107. In essence, Ashland seeks to recover from the defendants on a joint and several liability basis.

**VI. Discussion**

A. Ability of Ashland to bring a Section 107(a) claim

[1][2] CERCLA was enacted in 1980 to respond to the "serious environmental and health risks posed by industrial pollution." *United States v. Bestfoods,* 524 U.S. 51, 55, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). In addition to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

"grant[ing] the President broad power to command government agencies and private parties to clean up hazardous waste sites," *id.* at 55, 118 S.Ct. 1876, CERCLA provides that "everyone who is potentially responsible for hazardous-waste contamination may be forced to contribute to the cost of the cleanup." *Id.* at 56 n. 1, 118 S.Ct. 1876.

Originally, CERCLA "contained no express provision authorizing a private party that had incurred cleanup costs to seek contribution from other PRP's." *Key Tronic Corp. v. United States,* 511 U.S. 809, 816, 114 S.Ct. 1960, 1965, 128 L.Ed.2d 797 (1994); *United States v. Cannons Eng'g Corp.,* 899 F.2d 79, 92 (1st Cir.1990) (CERCLA, as originally enacted, "did not expressly provide for a right of contribution among parties found jointly and severally liable for response costs"). In enacting the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Congress expressly authorized parties who have been held liable for the cleanup of contaminated properties to seek contribution from other responsible parties. *Id.* Pursuant to Section 113(f)(1), "[a]ny person may seek contribution from any other person who is liable or potentially liable **\*540** under section 9607(a) of this title, during or following any civil action under section 9606 [FN12] of this title." 42 U.S.C. § 9613(f)(1)(1987).

> FN12. Section 106 of CERCLA, 42 U.S.C. § 9606, authorizes the Federal Government to compel responsible parties under CERCLA to perform remediation of contaminated areas.

[3] Likewise, in order to encourage settlements and "provide PRPS a measure of finality in return for their willingness to settle," responsible parties who have settled their liability are specifically protected from contribution actions. *United States v. Cannons Eng'g Corp.,* 899 F.2d at 92 ("Congress specifically provided that contribution actions could not be maintained against settlors"). Section 9613(f)(2) states as follows:

> A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement. 42 U.S.C. § 9613(f)(2)

Settlors are thus protected against contribution actions "regarding matters addressed in the settlement," while

Section 9613(f)(3)(B) provides them with the express right to "seek contribution from any person who is not party to a settlement referred to in paragraph (2)." 42 U.S.C. § 9613(f)(3)(B).

In addition, Section 107 has been interpreted "to impliedly authorize ... a cause of action for private parties to seek recovery of cleanup costs." *Key Tronic Corp. v. United States,* 511 U.S. at 816, 118 S.Ct. at 1965, 1966. (CERCLA statute "expressly identifies the Government as a potential plaintiff and only impliedly identifies private parties" as potential plaintiffs). Pursuant to Section 107(a), parties deemed responsible under CERCLA "are liable for ... any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). In other words, CERCLA "expressly authorizes a cause of action for contribution in § 113 and impliedly authorizes a similar and somewhat overlapping remedy in § 107." *Key Tronic* at 816, 114 S.Ct. at 1966.

The circumstances under which a party may pursue a contribution claim under Section 113(f)(1) were further defined by the Supreme Court in *Cooper Indus., Inc. v. Aviall Serv., Inc.,* 543 U.S. 157, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004). In *Aviall,* the plaintiff, Aviall Services, Inc. ("Aviall"), sought contribution for cleaning up contaminated properties that it had purchased from the defendant, Cooper Industries, Inc. ("Cooper"). Although Aviall notified the State when it discovered the contamination, neither the State nor the Federal Government had taken "judicial or administrative measures to compel cleanup." *Id.* at 164, 125 S.Ct. at 582. Aviall initially asserted a claim for cost recovery under Section 107(a) and a separate claim for contribution under Section 113(f)(1), then amended its complaint by combining the two claims into a single, joint claim, seeking contribution under Section 113(f)(1). The district court granted Cooper's motion for summary judgment after determining that contribution was unavailable to Aviall because it had not been subject to an enforcement action under Sections 106 and 107. The Fifth Circuit reversed, holding that a PRP could seek contribution even if he had not been sued under those Sections. The Supreme Court granted certiorari.

**\*541** Aviall's appeal was based on the suggestion that a Section 113(f)(1) claim for contribution was permissible, regardless of whether such an action occurred "during or following any civil action" under Sections 106 or 107. The Supreme Court disagreed, concluding that Aviall could not file a Section 113(f)(1) claim for contribution because

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

Aviall had never been subject to a civil action or administrative order under either section. *Id.* at 168, 125 S.Ct. at 584. The Court also rejected Aviall's effort to revive its Section 107(a) claim, noting that the issue had not been addressed by the district court or the Fifth Circuit Court of Appeals. *Id.* at 169, 125 S.Ct. at 585. Therefore, the Court declined to address the question of whether a private party that is itself a PRP is precluded from pursuing a Section 107(2) action against other PRPs for joint and several liability. *Id.*

[4] The question was revisited and definitively resolved in *United States v. Atlantic Research Corp.*, 551 U.S. 128, 127 S.Ct. 2331, 168 L.Ed.2d 28 (2007), on which Ashland primarily relies. *The* holding in *Atlantic Research,* that Section 107(a) provides PRPs with a cause of action to recover necessary costs incurred in cleaning up a contaminated site, made clear that Section 107(a) is no longer reserved for "innocent" parties. *See W.R. Grace & Co.-Conn. v. Zotos Intern'l, Inc.*, 559 F.3d 85, 89 (2d Cir.2009).

The plaintiff in *Atlantic Research,* Atlantic Research Corporation ("ARC"), leased property at a facility operated by the Department of Defense. *Atlantic Research* at 133, 127 S.Ct. at 2335. At the site, ARC retrofitted rocket motors for the United States and, as a result of such activities, the site was contaminated by wastewater and burned fuel. ARC cleaned up the site at its own expense and then filed an action against the United States under Sections 107(a) and 113(f) to recover some of its costs. *Id.* Following the Supreme Court's decision in *Aviall,* ARC amended its complaint and relied solely on Section 107(a) and federal common law. The United States filed a motion to dismiss on the ground that PRPs were precluded from seeking cost recovery under Section 107(a). The district court granted the Government's motion and the Eighth Circuit Court of Appeals reversed. *Id.* at 134, 127 S.Ct. at 2335.

[5] The Supreme Court affirmed, holding that Section 107(a)(4)(B) provides "any other person," including PRPs, with a cause of action to recover costs from other PRPs for cleaning up a contaminated site. *Id.* at 135, 127 S.Ct. at 2336. The Court specifically rejected the Government's position that Section 107(a)(4)(B) only applied to "innocent" private parties, e.g. "landowners whose land has been contaminated by another." *Id.* The Court noted that, because the broad definition of PRPs "sweep[s] in virtually all persons likely to incur cleanup costs," regardless of their innocence, the Government's interpretation "would

reduce the number of potential plaintiffs to almost zero, rendering § 107(a)(4)(B) a dead letter." *Id.* at 136, 127 S.Ct. at 2336. The Court also recognized that Sections 107(a) and 113(f) provide two " 'clearly distinct' " remedies. Section 107(a) "provides for aright to cost recovery in certain circumstances," whereas Section 113(f) "provides separate rights to contribution in other circumstances." *Id.* at 138, 127 S.Ct. at 2337-38 (quoting *Aviall*, 543 U.S., at 163, n. 3, 125 S.Ct. 577). With respect to Section 107(a) recovery claims, a private party may recover "without any establishment of liability to a third party," but only to the extent the private party has "incurred" costs in cleaning up the site. *Id.*

The Court recognized that Section 107(a) and 113(f) provided "somewhat **\*542** overlapping remedies," and that, for instance, "a PRP may sustain expenses pursuant to a consent decree following a suit under § 106 or § 107," but it declined to decide "whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both." *Id.* at 139, n. 6, 127 S.Ct. 2331. The Court "assume[d] without deciding that § 107 imposes joint and several liability." *Id.* at 140, n. 7, 127 S.Ct. 2331.

The Court also concluded that the settlement bar set forth in Section 113(f) only provides protection against contribution claims, not against direct claims for cost recovery. *Id.* at 140, 127 S.Ct. at 2339. Section 113(f)(2) "prohibits § 113(f) contribution claims against '[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement....' " 42 U.S.C. § 9613(f)(2). The settlement bar does not by its terms protect against cost-recovery liability under § 107(a)." *Id.* The Court recognized that allowing an action under Section 107(a) against a PRP who has settled its liability to the Government might be perceived as weakening the protection against contribution claims provided by Section 113(f)(2). *Id.* at 140, 127 S.Ct. at 2339. The Court pointed out, however, that a PRP could file a Section 113(f) counterclaim (which would necessitate equitable apportionment of costs among all liable parties, including the plaintiff) and that contribution claims were still barred. *Id.*

B. This Case

In the course of the *Davis* litigation, the United States did not bring civil or administrative claims against Ashland directly. Nor did Ashland participate in any settlement agreements or consent decrees resulting from the *Davis* case. Instead, Ashland was deemed responsible for a portion of the contamination at the Davis Site in the context of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

a suit for contribution brought by UTC, although it appears that Ashland has yet to make any payment to UTC. As such, Ashland is ineligible to bring its own suit for contribution pursuant to Section 113(f) because it is undisputed that Ashland has not been the subject of proceedings pursuant to Section 106 or 107. *See Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004)*(CERCLA action against private party is a requirement for contribution suit under Section 113).

Ashland now claims, with some factual support, that it has incurred response costs related to the groundwater cleanup. Specifically, Ashland asserts that it "voluntarily has incurred slightly less than Two Million Dollars ($2,000,000.00) in response costs related to ongoing modeling and remediation efforts for the groundwater contamination at the Davis Site." Complaint ¶ 43. According to the Declaration of Neil Handler, an EPA employee and Remedial Project Manager at the Davis Site from 1989 to 2004, "on or about July 19, 2000, the EPA sent a letter and accompanying Administrative Order by Consent for Pre-Remedial Design for the groundwater remedial action at the Site." Handler Declaration ¶ 5 (submitted by the United States as Exhibit 1 to its amicus curiae brief). After some discussion, "Ashland sent EPA a letter confirming their agreement to be a Performing Party at the Site to finance, develop, and submit to EPA a Pre-Design Work Plan for the Site." *Id.* at ¶ 6. Since then, Ashland has performed certain work and submitted each phase of work for the EPA's approval. Ashland has also reimbursed the EPA for overseeing Ashland's work. *Id.* at ¶¶ 7, 8.

[6][7] Nothing in the plain language of Section 107(a) requires that the cleanup performed by the PRP must be "voluntary" to allow the PRP to bring a claim for **\*543** cost recovery. As held by the Supreme Court in *Atlantic Research,* Section 107(a)(4)(B) expressly "authorizes cost-recovery actions by any private party, including PRPs." *Atlantic Research,* 551 U.S. at 136, 127 S.Ct. at 2336. Courts have generally described the cleanup for which PRPs typically seek cost recovery under Section 107(a) as "voluntary," *see e.g. E.I. DuPont de Nemours and Co. v. United States,* 508 F.3d 126, 135 (3d Cir.2007)("Permitting parties who voluntarily incur cleanup costs to bring suit under § 107 comports with the fundamental purposes of CERCLA."); *Kotrous v. Goss-Jewett Co. of Northern California,* 523 F.3d 924, 930 (9th Cir.2008) (following CERCLA enactment, " 'litigation arose over whether ... a private party that had incurred response costs, but that had done so voluntarily and was

not itself subject to suit, had a cause of action for cost recovery against other PRPs' under § 107"). However, it appears that such characterization merely serves to distinguish those efforts from cleanups mandated by civil actions or administrative remedies brought under Sections 106 or 107. *See Kotrous v. Goss-Jewett Co. of Northern California,* 523 F.3d at 933 ("Under *Atlantic Research,* a PRP ... that incurs costs voluntarily, without having been subject to an action under § 106 or § 107, may bring a suit for recovery for its costs under § 107"). Moreover, the Supreme Court, in *Atlantic Research,* made clear that any private party, including PRPs who may or may not be considered "innocent," may pursue a cost recovery action for "expenses associated with cleaning up contaminated sites." *Atlantic Research,* 551 U.S. at 131, 127 S.Ct. at 2333.

In other words, neither the plain language of Section 107(a)(4)(B), nor the holding of *Atlantic Research* require that the cleanup was "voluntary" in the sense that it was performed by an innocent party. *Atlantic Research* noted that a PRP who sustains "expenses pursuant to a consent decree following a suit under § 106 or § 107 ... does not incur costs voluntarily," but declined to decide whether such "compelled" costs were recoverable. Instead, the Court determined that "costs incurred voluntarily are recoverable only by way of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f)." *Atlantic Research* at 2338 n. 6. Clearly, the focus of the Supreme Court's analysis was on the type of recovery sought, not on the voluntariness of the cleanup or the "innocence" of the party bringing the action. In other words, "[i]f a party incurs **direct** costs that it is seeking to recover, it may bring a claim under § 107. If a party incurs **indirect** costs that it is suing to recover-that is, costs incurred in the context of reimbursing a party who itself directly paid response costs, then it has to bring a contribution action under § 113." *Ford Motor Co. v. Michigan Consol. Gas Co.,* 2009 WL 3190418 \*7 (E.D.Mich. Sept. 29, 2009).

[8] As established in *Aviall,* only a PRP subject to enforcement actions under Sections 106 or 107 may bring a suit for contribution under Section 113(f). Since the Government did not sue Ashland (or any of the other defendants in this case) directly, Ashland faced no liability under Sections 106 or 107 and is, therefore, precluded from bringing a contribution claim under Section 113(f). If, however, Ashland itself has "incurred" cleanup costs, as opposed to reimbursing costs paid by other parties, it may

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

bring a cost recovery action under Section 107(a). The fact that Ashland may have been prompted by the EPA to commence cleanup work at the Davis Site does not change the analysis. Although the Government asserts that the EPA sent an "Administrative Order by Consent" to Ashland, there is nothing in **\*544** the record to indicate that the EPA brought civil or administrative enforcement proceedings directly against Ashland.

The Second Circuit Court of Appeals, when addressing the question of whether a PRP "who has remediated a contaminated site pursuant to an administrative consent order has a cause of action to pursue necessary associated costs under section 107," concluded that the PRP has such a right. *W.R. Grace & Co.-Conn. v. Zotos Intern'l, Inc.*, 559 F.3d 85, 89 (2d Cir.2009). The Court in *W.R. Grace* noted that "[u]nder the plain language of [Section 107(a)(4)(B) ], the fact that a party enters into a consent order before beginning remediation is of no legal significance with respect to whether or not the party has incurred response costs as required under section 107(a)." *W.R. Grace & Co.-Conn. v. Zotos Intern'l, Inc., 559 F.3d at 92.* Following the reasoning and statutory interpretation in *Atlantic Research,* the Court concluded that "[i]n the same manner that section 107(a) is not limited solely to 'innocent' parties, see *id.,* section 107(a) does not specify that only parties who 'voluntarily' remediate a site have a cause of action." *Id.* (citing *Atlantic Research* at 2339).

[9] In the case now before this Court, Ashland seeks to recover costs for remedial work related to groundwater contamination at the Davis Site. Although Ashland's work was performed at the request of the EPA, Ashland was not compelled to perform the cleanup as a result of a direct civil or administrative action under Sections 106 or 107. Nor is Ashland attempting to obtain contribution from other parties for payments it has made under a settlement agreement or a court order.[FN13] Based on the plain language of Section 107(a)(4)(B) and the Supreme Court's holding in *Atlantic Research,* this Court concludes that Ashland may bring a Section 107(a) against the defendants to seek recovery of necessary costs it incurred in performing remedial work at the Davis Site.

FN13. As noted before, Ashland has yet to pay any reimbursement to UTC for costs UTC has incurred in performing the considerable remedial work it completed pursuant to the PCD and the AETC Decree.

[10] The PCD and the AETC decree do not change

this conclusion. Section 113(f)(3) provides that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for *contribution* regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2) (Emphasis added). Paragraph 95 of the PCD grants to UTC (and other settlors) "protection from contribution action or claims as provided by CERCLA section 113(f)(2), for matters addressed in this Consent Decree." UTC's Memorandum 7-8. The AETC Decree provides that UTC is "entitled ... to protection from contribution action or claims as provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2) ... For purposes of this Paragraph, the term "Covered Matters" is to be construed to provided contribution protection against claims by the State or any other person (except the United States)". UTC's Memorandum 10. Neither decree addresses the possibility of direct recovery claims pursuant to Section 107 against UTC or any of the other settlors. Therefore, the settlement agreements UTC has entered with the United States and the State of Rhode Island do not serve to bar Ashland's Section 107(a) recovery claim against UTC.

C. Applicability of the *Davis* Liability Allocations

Having determined that Ashland can bring a cost recovery claim pursuant to **\*545** Section 107(a), the remaining question before this Court is whether the equitable share allocations made in *Davis* apply in this case. The common thread of the parties' arguments [FN14] is the general assertion that a reallocation of equitable liability shares is precluded on collateral estoppel grounds, *i.e.,* the issue of allocation has already been addressed in *Davis. See e.g.,* UTC's Memorandum at 11 ("Ashland is bound by this Court's prior allocation and is precluded from relitigating that percentage allocation"); Gar's Memorandum at 4 ("Issue preclusion bars Ashland from relitigating the allocation of liability"); Morton's Memorandum at 6 ("Morton's CERCLA allocation has already been finally determined and is therefore barred from litigation by issue preclusion"); Life Technologies Corporation's Memorandum at 3 ("The doctrine of issue preclusion precludes Ashland from re-litigating the percentage allocation assigned to Applera in *Davis* ").

FN14. Bristol, which declined filing a motion for summary judgment, suggests that "[t]he Court should defer the allocation issue until it determines the pool of PRPs."

[11][12][13][14] "When a party implores a federal court to give preclusive effect to a prior federal court ad-

Page 18

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

judication, federal law governs." *Faigin v. Kelly,* 184 F.3d 67, 78 (1st Cir.1999). Issue preclusion "prohibits a party from re-litigating issues that have previously been adjudicated." *Enica v. Principi,* 544 F.3d 328, 336 (1st Cir.2008). The requirements for collateral estoppel or issue preclusion are well established under federal common law. To preclude the litigation of an issue based on a prior adjudication between the parties, a party must establish "(1) an identity of issues (that is, that the issue sought to be precluded is the same as that which was involved in the prior proceeding), (2) actuality of litigation (that is, that the point was actually litigated in the earlier proceeding), (3) finality of the earlier resolution (that is, that the issue was determined by a valid and binding final judgment or order), and (4) the centrality of the adjudication (that is, that the determination of the issue in the prior proceeding was essential to the final judgment or order)." *Faigin v. Kelly,* 184 F.3d at 78. With respect to identity of issues, "[i]t is common ground that the reach of collateral estoppel 'must be confined to situations where the matter raised in the second suit is *identical in all respects* to that decided in the first proceeding.' " *Id.* at 78. (Emphasis added).

[15] In the case now before the Court, it appears that the argument for collateral estoppel fails to clear the first hurdle because the *Davis* litigation was a *contribution* action for reimbursement of future soil remediation costs, whereas now Ashland seeks *recovery* of costs it expended on groundwater cleanup. Although the parties in the present case also took part in the *Davis* litigation, and their respective liabilities for depositing hazardous waste at the Davis Site is at the core in both litigations, the mechanics of the liability determination for each case are conceptually different and require a separate analysis.

[16][17] One of the significant differences between cost recovery-actions brought under Section 107(a) and contribution claims pursuant to Section 113(f) relates to liability. In a cost recovery action under Section 107(a), "CERCLA imposes strict liability for the costs of cleanup on a party found to be an owner or operator, past operator, transporter, or arranger." *United States v. Davis,* 261 F.3d 1, 28-29 (1st Cir.2001). It is well established that, generally, Section 107 imposes joint and several liability on PRPs regardless of fault, unless the harm is capable of apportionment.**546** *United States v. Davis,* 261 F.3d at 29 ("CERCLA allows for full recovery of costs from a party sued successfully under *§ 9607*"); *United States v. Chem-Dyne Corp.,* 572 F.Supp. 802 (S.D.Ohio 1983).

[18] The seminal case of *Chem-Dyne* established that,

while Section 107 does not explicitly mandate "joint and several liability," this "was not intended as a rejection of joint and several liability." *Chem-Dyne,* 572 F.Supp. at 808. Rather, "the scope of liability [is to be] determined under common law principles, where a court performing a case by case evaluation of the complex factual scenarios associated with multiple-generator waste sites will assess the propriety of applying joint and several liability on an individual basis." *Id. Chem-Dyne* has provided the basis for divisibility of harm analyses in this and other Circuits. *See e.g., O'Neil v. Picillo,* 883 F.2d 176 (1st Cir.1989) ("The rule adopted by the majority of courts, and the one we adopt, is based on the Restatement (Second) of Torts: damages should be apportioned only if the defendant can demonstrate that the harm is divisible.") *Burlington Northern and Santa Fe Ry. Co. v. United States,* ---U.S. ----, 129 S.Ct. 1870, 1881, 173 L.Ed.2d 812 (2009)(listing cases)("The *Chem-Dyne* approach has been fully embraced by the Courts of Appeals.").

[19] The First Circuit noted in *Picillo* that "[t]he practical effect of placing the burden on defendants has been that responsible parties rarely escape joint and several liability" because a determination of the amount of environmental harm may be impossible. *Picillo,* 883 F.2d at 178-79. "Nevertheless, courts have continued to impose joint and several liability on a regular basis, reasoning that where all of the contributing causes cannot fairly be traced, Congress intended for those proven at least partially culpable to bear the cost of the uncertainty." *Id.* at 179 (citing *Chem-Dyne,* 572 F.Supp. at 809-810). In sum, in a recovery action under Section 107(a), courts will typically assign joint and several liability. "Apportionment is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs." *Burlington Northern and Santa Fe Ry. Co. v. United States,* --- U.S. ----, 129 S.Ct. 1870, 1882 n. 9, 173 L.Ed.2d 812 (2009); *United States v. Hercules, Inc.,* 247 F.3d 706, 715 (8th Cir.2001) (In a Section 107(a) action "[l]iability is strict and is typically joint and several").

By contrast, a suit for contribution under Section 113(f) expressly allows the court "to allocate response costs among liable parties using such equitable factors as the court determines are appropriate." *42 U.S.C. § 9613(f)(1). Acushnet Co. v. Mohasco Corp.,* 191 F.3d 69, 78 (1st Cir.1999); *Elementis Chromium L.P. v. Coastal States,* 450 F.3d 607, 612 (5th Cir.2006)(listing cases)("[O]verwhelming majority of our sister circuits have concluded that liability is merely several under § 113(f)."). *See Restatement (Second) of Torts § 433A*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

(1976)("Damages for harm are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm.").

[20] Further, in a Section 107 recovery case, it is the defendant who bears the burden to show that the harm is divisible and that it would be inequitable to forego an allocation of costs. *Burlington Northern and Santa Fe Ry. Co. v. United States,* 129 S.Ct. at 1881, 173 L.Ed.2d 812 ("Not all harms are capable of apportionment ... and CERCLA defendants seeking to avoid joint and several liability bear the burden of proving that a reasonable basis for apportionment exists.")(citing **\*547**_Chem-Dyne Corp.,_ 572 F.Supp. 802, 810 (D.C.Ohio 1983)). See *Restatement (Second) of Torts § 433B* ("Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.") However, "[w]hen two or more causes produce a single, indivisible harm, 'courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm.' " *Burlington Northern,* 129 S.Ct. at 1881 (quoting *Restatement (Second) of Torts § 433A* Comment i, p. 440 (1963-1964).)

[21] On the other hand, in a contribution action under Section 113, the plaintiff bears the burden of proving (1) that the defendant is a PRP under Section 107(a), *United States v. Davis,* 261 F.3d at 29, and (2) the defendant's equitable share of costs. *Id.* at 42-43; *Minyard Enter., Inc. v. Southeastern Chem. & Solvent Co.,* 184 F.3d 373, 385 (4th Cir.1999) ( "[u]nder § 113(f) of CERCLA, the Plaintiff bears ... the burden of proving the defendant's equitable share of costs.").

In the original *Davis* litigation, UTC, which had previously been found jointly and severally liable for all past and future cleanup costs in a direct CERCLA action brought by the United States, asserted Section 113(f) contribution claims after it settled the Government's claims. *Davis* addressed UTC's request to allocate responsibility for future soil cleanup costs among contribution defendants, including Ashland and the other named defendants in the instant case. After a twenty-six day bench trial, the trial judge first determined that "[s]ince the hazardous waste deposited at the Davis Site has been commingled into an essentially homogenous "witches' brew", it is impossible to allocate discrete portions of the cleanup costs to

any particular type of waste or any particular party." *Davis,* 31 F.Supp.2d at 64. Because, in a contribution action, a court "enjoys broad discretion to consider and apply such equitable factors as it deems appropriate to achieve a just and fair allocation among liable parties," *id.* at 62, the trial judge then applied certain equitable factors, including cleanup costs, level of culpability, benefit resulting from disposal, and a PRP's ability to pay. The trial judge then allocated liability among UTC and the other PRPs based on the volume of hazardous waste for which each party could be held responsible.

With respect to Morton (Thiokol's successor), the trial judge determined that it was "reasonable to infer that some Thiokol waste was included in the waste transported by CCC to the Davis Site ... [u]nfortunately for UTC, there is no way to determine the amount of Thiokol waste that was transported." *Davis,* 31 F.Supp.2d at 55.

The Court did not assign a percentage of liability to Morton. Nevertheless, Morton was determined to be liable as an arranger for hazardous waste dumped at the Davis Site. *Davis,* 261 F.3d at 49.

[22] An allocation in the context of a contribution claim like Davis is driven primarily by equity considerations, to reduce the burden on a defendant who has been found liable in a direct CERCLA action. *United States v. Davis,* 261 F.3d at 47 (Section 113(f) action is intended to afford PRP an opportunity to " 'seek recoupment of that portion of his expenditures which exceeds his pro rata share of the overall liability-in other words, to seek contribution rather than complete indemnity' ") (quoting *United Tech. Corp. v. Browning-Ferris Indus., Inc.,* 33 F.3d 96, 100 (1st Cir.1994)). By contrast, liability in a recovery action as now asserted by Ashland is generally joint and several. Allocation **\*548** does not come into play unless the Court has first made a determination that the pollution caused by the hazardous waste for which the defendants are held responsible is divisible. In addition, the burden on the party seeking recovery under Section 107 or contribution under Section 113 is different. "[W]hile a defendant in a direct EPA enforcement action invoking the divisibility of harm defense bears an 'especially heavy burden,' a defendant in a contribution proceeding seeking to limit his liability has a 'less demanding burden of proof by virtue of the equitable considerations that immediately come into play.' " *Acushnet Co. v. Mohasco Corp.,* 191 F.3d at 78.

In sum, it is clear that, under *Atlantic Research,* Ash-

729 F.Supp.2d 526
**(Cite as: 729 F.Supp.2d 526)**

land may bring a Section 107(a) action against UTC and the other defendants named herein to seek recovery for costs it has expended in connection with the groundwater cleanup. Following *Atlantic Research,* UTC's protection under the PCD and the AETC Decree does not extend to avoiding direct recovery claims under Section 107(a). Likewise, Morton's 0% allocation does not preclude a claim for direct recovery for the reasons set forth herein. Because the allocations in *Davis,* which was a Section 113(f) contribution action, were based primarily on equitable considerations, they do not automatically apply in this case. Instead, liability, if proven, will be joint and several unless the defendants can establish that the hazardous waste is divisible. As *Atlantic Research* indicates, the defendants may seek to offset any recovery claims asserted against them by filing Section 113(f) contribution claims. However, a determination of the applicability of the *Davis* allocations in future Section 113(f) claims would be premature at this time and is not within the perimeters set by the November 3, 2008 order.

**Conclusion**

For the foregoing reasons, the motions for summary judgment by UTC, Gar, Black & Decker, Emhart, Morton, and Life Technologies Corporation are DENIED with respect to the two issues raised in the November 3, 2008 Order Limiting Motions for Summary Judgment.

SO ORDERED.

D.R.I.,2010.
Ashland Inc. v. GAR Electroforming
729 F.Supp.2d 526

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.