IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF WISCONSIN, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 10-C-910 |
| v. | ) ) ) | Hon. William C. Griesbach |
| NCR CORPORATION, *et al.* | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' JOINT REPLY BRIEF IN SUPPORT OF MOTION TO ENTER CONSENT DECREE WITH GEORGIA-PACIFIC CONSUMER PRODUCTS LP**

**PLAINTIFFS' JOINT REPLY BRIEF IN SUPPORT OF MOTION TO ENTER CONSENT DECREE WITH GEORGIA-PACIFIC CONSUMER PRODUCTS LP**

NCR Corporation ("NCR") and Appleton Papers Inc. ("API") have not shown that the proposed Consent Decree with Georgia-Pacific is unfair, unreasonable, or inconsistent with CERCLA. Among other things:

- They do not demonstrate that Georgia-Pacific made anything more than an *immaterial* contribution to the PCB contamination in Upper OU 4, upstream from the Consent Decree's negotiated dividing line. In fact, their expert opines that Georgia-Pacific made a 0% contribution to the contamination in that area. Dkt. 76-1 at 20.[1]

- They do not dispute that Georgia-Pacific would stipulate to liability for far more than its fair share in Lower OU 4 and OU 5, where the work may cost $331 million. Under the proposed Decree, Georgia-Pacific would agree that it is "liable to the United States under CERCLA Section 106, 42 U.S.C. § 9606, for performance of *all response actions* that the UAO requires for Lower OU 4 and OU 5." Dkt. 2-1 at 13 (emphasis added). But an expert report offered by NCR and API estimates that Georgia-Pacific contributed no more than 44% of the contamination in the final segment of the River. Dkt. 76-1 at 20.

- They do not show that Georgia-Pacific was responsible for any more than 15-20% of the total PCB discharges at the Site, as estimated by the Plaintiffs. NCR and API provide no volumetric discharge estimates of their own, but the analysis by one of their experts also suggests that Georgia-Pacific may have contributed roughly 16% of total PCB contamination that remains in the River, as discussed below. Thus, NCR and API offer no cogent reasons for disapproving Georgia-Pacific's agreement to pay $7 million toward an estimated $38-$45 million in Site-wide past and future government costs (*i.e.*, a 16-18% share). Dkt. 2-1 at 14-15.

- They do not deny that: (1) they are refusing to reimburse the government's UAO oversight costs (Dkt. 76-25); and (2) Georgia-Pacific's settlement payment would provide a critical and cost-efficient source of near-term oversight funding, as explained in our principal brief (Dkt. 77 at 26).

We now respond to the main points made in the joint opposition brief filed by NCR and API.

---

[1] And their rant that the proposed settlement wrongly relieves Georgia-Pacific of "liability for almost 36 of the 39 miles of the Lower Fox River" is just plain silly. Dkt. 91 at 6. NCR and API have articulated no reason why Georgia-Pacific – the owner of two paper mills in the City of Green Bay – should have any liability for cleanup in the 32 miles of River above the De Pere dam.

**1. The "Takings" Argument**

CERCLA § 113 creates a unique statutory right to contribution that is limited by § 113(f)(2), which bars claims against parties that resolve their liability in a judicially approved settlement with the United States or a State. *See* 42 U.S.C. § 9613.[2] The law specifies that any such settlement "reduces the potential liability of the others by the amount of the settlement." 42 U.S.C. § 9613(f)(2).[3] But in crafting § 113, "Congress explicitly created a framework that left nonsettlors at risk of bearing a disproportionate amount of liability." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 91 (1st Cir. 1990).

To our knowledge, no court has ever found that statutory contribution protection afforded by a judicially-approved CERCLA settlement amounts to "private property . . . taken for public use, without just compensation" under the Fifth Amendment. U.S. Const. amend. V. NCR and API cite one case rejecting that notion, *United States v. BP Amoco Oil PLC*, 277 F.3d 1012 (8th Cir. 2002), but other courts have reached the same conclusion. *See Cannons Eng'g*, 899 F.2d at 92 n.6; *United States v. Atlas-Lederer Co.*, 494 F. Supp. 2d 629, 640 (S.D. Ohio. 2005).

Parties like NCR and API "must first establish an independent property right before they can argue that the [government] has taken that right without just compensation." *Parella v. Ret. Bd. of the R.I. Emp. Ret. Sys.,* 173 F.3d 46, 58 (1st Cir.1999); *accord Peick v. Pension Ben.*

---

[2] *See also Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL 3931036, at *2 (E.D. Wis. Nov. 18, 2009) ("contribution under § 113 is not necessarily identical to a common law contribution claim"); *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2010 WL 1186333, at *1 (E.D. Wis. Mar. 19, 2010) ("the consent decree bars recovery against all of the *de minimis* Defendants").

[3] Thus, Georgia-Pacific's $7 million payment would reduce NCR's and API's liability for the government's past costs (most of which are for Site-wide studies and remedy development efforts) and future oversight costs (for government oversight of ongoing UAO work in OU s 2-5). The Consent Decree would not provide Georgia-Pacific contribution protection for Lower OU 4 (Dkt. 2-1 at 23-24), so the company's liability for that area vis-à-vis NCR, API, and other PRPs would remain an issue in the *Whiting* Case.

2

*Guar. Corp.*, 724 F. 2d 1247, 1275 (7th Cir. 1983). But as Judge Posner has noted, "'property' as used in [the takings] clause is defined much more narrowly than in the due process clauses" and "it does not extend to . . . statutory entitlements." *Pittman v. Chicago Board of Educ.*, 64 F.3d 1098, 1104 (7th Cir. 1995). The interest claimed by NCR and API – their conditional right to seek contribution from Georgia-Pacific under CERCLA – is nothing more than a "statutory entitlement" created and limited by § 113. Because Congress provided the right to contribution under CERCLA, Congress also could place limits on that right without implicating the Fifth Amendment.[4] That is confirmed by all of the cases that have considered the question. *See BP Amoco*, 277 F.3d at 1017 (contribution under § 113(f) "is subject to and limited by" § 113(f)(2)); *Cannons Eng'g Corp.*, 899 F.2d at 92 n.6 (same); *Atlas-Lederer*, 494 F. Supp. 2d at 640 (same). Entry of this Decree would not amount to a taking of property.

---

[4] The "saving clause" in CERCLA § 308, 42 U.S.C. § 9657, does not alter that conclusion. Such clauses do not create substantive rights; they merely reserve possible arguments about whether such rights exist independently. *See BP Amoco*, 277 F.3d at 1017 n.5 ("Because [the non-settler] did not have a vested property interest to be 'taken,' 42 U.S.C. § 9657 was not implicated by the district court's decision" approving a settlement); *see also Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 166-167 (2004) (holding that another saving clause in CERCLA "does not itself establish a cause of action"); *City of Milwaukee v. Illinois*, 451 U.S. 304, 329 n.22 (1981) (ruling that a saving clause in the Clean Water Act "does not reflect any considered judgment about what other remedies were previously available or continue to be available."). CERCLA § 308 merely provides that *if* a non-settler could demonstrate a particular administrative settlement effected a taking without just compensation, then contribution protection provided by the settlement would be invalid and the non-settler would not be entitled to seek to compensation from the United States (*e.g.*, by bringing a Court of Federal Claims action under the Tucker Act, 28 U.S.C. § 1491). 42 U.S.C. § 9657.

3

## 2. Georgia-Pacific's PCB Contribution in Upper OU 4

NCR and API offer nothing that negates the reasons for believing that only "a *very small amount* of [Georgia-Pacific's] contamination" may be located in Upper OU 4, as detailed in Plaintiffs' principal brief. Dkt. 77 at 15-24, 28. The Connolly Report that NCR and API have relied upon here and in the *Whiting* Case quantifies Georgia-Pacific's relative contribution in that general area at *0%* (versus a 100% contribution from upstream sources). Dkt. 76-1 at 20, 66.[5] Another consultant hired by NCR and API says that his hydrodynamic model would allow him to estimate Georgia-Pacific's contribution to the contamination in Upper OU 4 relative to other sources (Dkt. 92-9 at 2-3), but his affidavit and a subsequent declaration actually offer no such estimate (Dkt. 92-8; Dkt. 92-9). In contrast, Georgia-Pacific's hydrodynamic modeling consultant quantified the company's seiche-related upstream contribution in absolute terms, showing that less than 0.01% of the solids discharged from the Green Bay West Mill could have been deposited in Upper OU 4 (because more than 99.9% would have settled in Lower OU 4). Dkt. 76-13. As previously noted (Dkt. 76 at 1-2), the government negotiators credited Georgia-Pacific's analysis only after consulting with an expert on hydrodynamics and sedimentation from the U.S. Army Corps of Engineers' Research and Development Center, Coastal and Hydraulics Laboratory in Vicksburg, Mississippi.[6] In sum, the available information confirms the Plaintiffs' settlement judgment that Georgia-Pacific made no more than an immaterial contribution to the PCB contamination in Upper OU 4.

---

[5] We simply do not understand how NCR and API can insist in their brief that "GP's liability in this area is in the tens of millions of dollar" (Dkt. 91 at 22), especially when they estimate the total costs in the disputed portion of Upper OU 4 at $83 million (Dkt. 92-12 at 4).

[6] It is quite clear that the Court need not resolve the highly technical disagreements that have prompted a back-and-forth between the hydrodynamic consulting firm hired by Georgia-Pacific and the opposing consultant hired by NCR and API. Settlements help avoid such fights.

### 3. Georgia-Pacific's Fair Share of the Past and Future Government Costs

The total costs and damages at this Site may approach $1.5 billion, but the Plaintiffs only used a volumetric discharge estimate to allocate Georgia-Pacific a share of a relatively small portion of the total costs – *i.e.*, a share of the Plaintiffs' own Site-wide past response costs and costs of overseeing all remaining UAO work, which are collectively estimated at $38-$45 million. Georgia-Pacific would pay $7 million toward those costs. NCR and API complain about that mightily. Despite their protests, there is no great mystery concerning the 15-20% volumetric share estimate that Plaintiffs used here, as shown below.

In the 1980s and 1990s, the United States and the State undertook major efforts to identify the nature and extent of PCB contamination in the Lower Fox River and Green Bay and the likely sources of that contamination. That included collecting an enormous amount of information from industrial and municipal dischargers – much of it through formal information requests under CERCLA Section 104(e), 42 U.S.C. § 9604(e) – including facility-specific historic records on facility operations, production rates, raw material usage, product characteristics, spill incidents, wastewater treatment systems, treatment efficiencies, wastewater volumes and characteristics, and PCB testing. Most of the information was catalogued and

---

We do, however, see fundamental problems with the work done by the consultant engaged by NCR and API. Georgia-Pacific's consulting firm – LTI LimnoTech – modeled seiche-related flow reversal effects for 1970. Dkt. 76-13. The consultant hired by NCR and API then tried to compare seiche-related effects in 1970 and 2003/2004, which led him to conclude that the "significant (top 30%) seiche height for 2003/2004 is approximately 3 times larger that of [sic] 1970" such as "a seiche event of over 0.8 m height in November 2003." Dkt. 92-9 at 3-4. But he seems to have used incorrect water elevation data for 1970. A graph that he prepared implies that data obtained from NOAA shows that water levels near the mouth of the River never changed by more than 0.7 meters in 1970, because the levels were: (1) never lower than 176.3 meters above sea level; and (2) never higher than 177.0 meters above sea level. *Id.* at 7. The actual source data on NOAA's website shows otherwise. For example, on February 2, 1970, a seiche caused the water level to rise by 0.985 meters within a few hours (from only 175.981 meters to 176.966 meters above sea level). Dkt 100-1 at 1. And the water level rose well above 177.0 meters on multiple occasions in 1970. *Id.* at 2-4.

5

archived at a public "reading room" maintained by the U.S. Fish and Wildlife Service's Green Bay Field Office. The index of documents in that reading room is 858 pages long. Dkt. 100 at 3.[7] In periodic newsletters and other communications, EPA and WDNR publicize the fact that their Site investigation studies, cleanup planning studies, and other materials concerning the Site are available for public review at: (1) local public libraries in Appleton, Green Bay, Sturgeon Bay, Oneida, and Oshkosh; (2) WDNR offices in Green Bay and Madison; (3) an EPA Record Center in Chicago; and (4) special Fox River/Green Bay websites maintained by the agencies. Dkt. 100-14 at 7.[8] As part of its initial disclosures in the *Whiting* Case, NCR sent the United States and other litigants external hard drives containing electronic images of hundreds of thousands of pages of documents from those document repositories.

Using the huge collection of technical information contained in the document repositories, the United States and the State developed traditional "mass balance" analyses estimating the total PCB discharges from particular facilities. That scientific method has been explained as follows:

> A "mass balance" is a technique based on the scientific principle that matter can never be destroyed. To apply a mass balance, one accounts for all mass or material entering, leaving, and remaining in a defined area. Typically, the accounting of a material is expressed in a mathematical equation. When all material is accounted for, the equation "balances."

*United States v. Hoechst Celanese Corp.*, 964 F. Supp. 967, 974 n.6 (D.S.C. 1996), *rev'd on other grounds*, 128 F.3d 216 (4th Cir. 1997). Thus, for a facility like Georgia-Pacific's Green Bay West Mill, those analyses first estimated the PCB mass that entered the Mill's production process (using information such as the types and amounts of wastepaper recycled at various

---

[7]  The reading room index is posted in four parts on the U.S. Fish and Wildlife Service's website at http://www.fws.gov/midwest/FoxRiverNRDA/.

[8]  EPA's website is at http://www.epa.gov/region5/sites/foxriver/. WDNR's website is at http://dnr.wi.gov/org/water/wm/foxriver/.

times) and then estimated the fractions of that PCB mass that would have left the mill in its finished paper products, in solids removed by its wastewater treatment systems, and in the mill's treated wastewater that was discharged to the River (using available information on the mill's production processes, waste treatment processes and removal efficiencies, partitioning studies, and any PCB sampling data on the mill's paper products, wastewater treatment sludge, and effluent). Similar analyses were performed for other facilities and the results were compared to estimate facilities' relative contributions to the total PCB discharges.

A number of the PRPs hired engineering firms to perform similar analyses using the available technical information. For example, an engineering consultant to NCR and API – RMT, Inc. – began its own PCB mass balance analysis by 1997. Dkt. 100-2 at 7-11. By late 1999, RMT had concluded that that the API/NCR "share of PCB discharges range[d] between 9 percent and 17 percent" under one set of assumptions. Dkt. 100-3 at 4. Under an alternate scenario analyzed by RMT, "API/NCR's share would be above 50 percent." *Id.*[9]

The United States and the State prepared and circulated several technical documents describing their mass balance analyses, including a 1999 WDNR report entitled "Technical Memorandum 2d: Compilation and Estimation of Historical Discharges of Total Suspended Solids and Polychlorinated Biphenyls from Lower Fox River Point Sources" (Dkt. 76-24) and a 2000 preliminary report that Amendola Engineering, Inc. prepared for the U.S. Department of Justice entitled "Preliminary Estimates of PCB Discharges to the Fox River: 1954 to 1985" (Dkt. 90-1). The 1999 WDNR report estimated Georgia-Pacific's volumetric PCB discharge

---

[9]  Although RMT made those estimates in 1999, they only came to light recently in a public filing by API in an insurance coverage lawsuit. Dkt. 100 at 1-2. The 1999 document does not disclose the corresponding volumetric shares that RMT computed for Georgia-Pacific.

share at 22.51% (Dkt 76-24 at 122) and Georgia-Pacific's share was pegged at between 29.1% and 39.6% in the 2000 Preliminary Estimates (Dkt. 90-1 at 13).

The United States solicited PRPs' comments on the 2000 Preliminary Estimates and, in doing so, emphasized that those estimates were "preliminary and may change based on comments we receive or other additional information." Dkt. 90-1 at 1-2. NCR and API were among those who commented and submitted additional information.[10] In their comments and in other communications, NCR and API were particularly critical of the governments' hypothesis that recycling mills without "deinking" capacity would have recycled little or no PCB-containing NCR Paper broke and PCB-containing trim from NCR Paper converters. Dkt. 100-4 at 6; Dkt. 100-7 at 2. NCR and API also offered more general critiques of the governments' assessment of PCB discharges from recycling of PCB-containing mixed waste paper and converter trim. Dkt. 100-4 at 8.[11] In light of both those criticisms, NCR and API contended that the governments' mass balance analyses substantially underestimated the relative PCB contribution from recycling mills without deinking capacity, especially two paperboard mills in Menasha and De Pere owned by Menasha Corp. and U.S. Paper Mills, Inc. Dkt. 100-4 at 8; Dkt. 100-7. The 1999 WDNR report and the 2000 Preliminary Estimates had ascribed each of those facilities very small volumetric discharge shares (with each facility assigned no more than a 0.03% share in the Preliminary Estimates). Dkt. 76-24 at 122; Dkt. 90-1 at 12.

---

[10]   Other comments were submitted by Georgia-Pacific, P.H. Glatfelter Co., WTM I Co., Riverside Paper Corp. (now known as CBC Coating, Inc.), and Consolidated Papers, Inc. (a corporate predecessor of NewPage Wisconsin Systems, Inc.).

[11]   The submissions by NCR and API also provided additional information on PCB discharges from their own facilities, including a 2000 RMT report on PCB discharges from their paper coating facility to the City of Appleton's sewer system (which estimated that "between 58,000 and 127,000 lbs of PCB-containing emulsion were lost to the sewer at the Appleton facility" each year between 1954 and 1971 (Dkt. 100-5 at 5)) and another 2000 RMT report on treatment efficiencies at that City's wastewater treatment plant (which estimated solids removal rates ranging from 57% to 84% at different times (Dkt. 100-6 at 4)).

8

In its comments on the 2000 Preliminary Estimates, Georgia-Pacific echoed the API/NCR assertion that that the governments' mass balance analyses understated PCB discharges from non-deinking mills. Georgia-Pacific also provided additional information suggesting that the Preliminary Estimates overstated pulp production rates and understated wastewater treatment system efficiency at the Green Bay West Mill. Dkt. 100-8; Dkt. 100-9.[12]

Several adjustments were made to United States' mass balance analysis after the 2000 Preliminary Estimates. Although the Preliminary Estimates presented four scenarios with wide-ranging values for the total amount of PCBs assessed in the mass balance, the analysis was refined to use a total mass of approximately 230,000 kilograms of PCBs, as referenced in several prior court filings.[13] The volumetric share estimates for a number of non-deinking mills was increased (as advocated by API/NCR and Georgia-Pacific) based on initial indications and later admissions that some of those mills actually recycled NCR Paper broke. The share estimates for several non-deinking mills also increased because their projected PCB intake from mixed waste paper and converter trim was increased, as urged by NCR and API. Because those adjustments increased the volumetric discharge estimates for several non-deinking mills, the adjustments reduced the relative shares of Georgia-Pacific and other deinking mill owners. The additional information that Georgia-Pacific supplied on pulp productions rates and treatment efficiency at the Green Bay West Mill yielded a further reduction in the volumetric share estimate for Georgia-Pacific, to within the 15-20% range referenced in Judge Adelman's 2004 decision in *United States v. Fort James Operating Co.*, 313 F. Supp. 2d 902, 909 (E.D. Wis. 2004). New

---

[12] Georgia-Pacific submitted some of its comments and information in mid-2001 (Dkt. 100-9), after the start of the negotiations that yielded the governments' natural resource damages settlement with the company (Dkt. 90-8).

[13] *See, e.g.*, E.D. Wis. Case No. 09-C-692, Dkt. 20-2 at 2 ("In calculating the Settling Defendants' volumetric shares, the Plaintiffs assumed that at least 230,000 kg of PCBs were discharged to the River.").

information and internal re-evaluations have prompted a number of revisions to the United States' mass balance analyses since 2004, but there has been little change in the estimate of Georgia-Pacific's volumetric discharge share. Based on all the available data and information, the Plaintiffs currently estimate that Georgia-Pacific discharged approximately 38,000 kilograms of PCBs, which is roughly 16% of the more than 230,000 kilograms of PCBs discharged to the River from the production and recycling of NCR Paper. The Plaintiffs used that volumetric share estimate when they negotiated Georgia-Pacific's $7 million payment toward the $38-$45 million in past and future government costs (*i.e.*, a 16-18% share of those costs).[14]

Although they commissioned and performed their own mass balance analysis years ago, NCR and API offer nothing to contradict the Plaintiffs' volumetric share estimate for Georgia-Pacific. In fact, as discussed in our principal brief and as shown below, the Plaintiffs' volumetric estimate for Georgia-Pacific is perfectly consistent with the conclusions reached in the Connolly Report that NCR and API have cited and submitted.

The Connolly Report employs a different scientific method to attempt to quantify the relative PCB contributions by Georgia-Pacific and other dischargers in two portions of OU 4 that the Report calls "OU 4A" (upstream from Georgia-Pacific's Green Bay West Mill) and "OU 4B" (downstream from that Mill). The results of that analysis are shown in the following table.

---

[14] Because refinements to the government mass balance analyses have continued, there has never been a "final" report on that technical assessment. If the Court concludes that it cannot approve this Consent Decree based on the existing record, the United States may be able to provide some added information on its mass balance analysis in a filing under seal or in a supplemental declaration.

10

|  | PCB Contribution from Upstream Sources | PCB Contribution from U.S. Paper | PCB Contribution from Georgia-Pacific |
|---|---|---|---|
| OU 4A | 38% | 62% | 0% |
| OU 4B | 22% | 34% | 44% |

*See* Dkt. 76-1 at 20, 65-66. The Connolly Report also notes that OU 4 is "estimated to contain more than 85% of the PCB deposits that require remediation" at the Site. Dkt. 76-1 at 19. That matches the results of studies that WDNR made of the residual mass of PCBs in different segments of the River before the remediation began, as summarized below.

|  | Approximate Residual PCB Mass in Different River Segments (in kilograms) | Corresponding Percent of Total River Contamination in Different Segments |
|---|---|---|
| OU 1 | 1540.00 | 5% |
| OU 2 | 94.18 | Less than 1% |
| OU 3 | 984.51 | 3% |
| OU 4A | 15,681.69 | 54% |
| OU 4B | 10,937.92 | 37% |
| Totals | 29,238.32 | 100% |

*See* Dkt. 100-10 at 9, 12.[15] Because Georgia-Pacific only made a material contribution to the PCB contamination in OU 4B (as concluded by the Connolly Report), Georgia-Pacific's relative contribution to the PCB contamination in the *entire River* can be computed using the information on OU 4B in the two tables shown above, as follows:

    Georgia-Pacific's PCB contribution in OU 4B              =        44%
    Percent of total River contamination in OU 4B            =        36%
                                                                      ---------------------------
    Georgia Pacific's PCB contribution for the entire River  =        **16%**
                                                                      (*i.e.*, 44% x 37% = 16.28%)

---

[15]    The relevant WDNR report estimated the residual PCB mass in particular "sediment management units" in the portion of the River from De Pere to Green Bay (*i.e.*, OU 4). The River segment that the Connolly Report calls OU 4A includes sediment management units 20 through 55 and OU 4B includes sediment management units 56 through 115. Dkt. 76-1 at 37-38; Dkt. 100-10 at 2.

Thus, although the Connolly Report and the United States' mass balance analysis use different scientific methods, they both support a 15-20% volumetric share for Georgia-Pacific.

Finally, NCR and API essentially ignore the fact that other equitable considerations support the share of the past and future government costs that Georgia-Pacific is paying. Although we believe Georgia-Pacific is paying its full volumetric share here, NCR and API bear partial responsibility for the PCBs discharged by Georgia-Pacific, as generators of the PCB-containing NCR Paper broke that was being recycled. Georgia-Pacific also deserves equitable credit for its history of cooperation with the government, as summarized in our principal brief. And Georgia-Pacific's $7 million settlement payment would help defray costs of ongoing government oversight efforts that NCR and API have refused to pay. Dkt. 76-25.[16]

### 4. The Demand for Discovery and an Evidentiary Hearing

NCR and API have shown that they intend to delay and oppose any settlements. They are appealing the Court's entry of two Consent Decrees with twelve *de minimis* contributors to the contamination. They are opposing this settlement with Georgia-Pacific. They will undoubtedly oppose another pending settlement with Brown County, the City of Green Bay, and certain Settling Federal Agencies. They always say: "not enough . . . ." The Court should not

---

[16] NCR and API understate their own culpability as compared to Georgia-Pacific. One lengthy report that NCR and API have submitted to show Georgia-Pacific's "egregious" behavior does not even seem to mention Georgia-Pacific's facilities. Dkt. 91 at 19 n.7; Dkt. 94-1, 94-2, 94-3. On the other hand, "confidential" internal memoranda show that that the API/NCR facilities were discharging PCBs and other hazardous substances through at least the late 1970s, years after the production of PCB-containing NCR Paper ceased. Dkt. 100-11 at 5-6; Dkt. 100-2. Although the API/NCR Combined Locks Mill produced less paper than the Georgia-Pacific Green Bay West Mill, the Combined Locks Mill had a much higher suspended solids loss rate, so the two mills discharged comparable amounts of suspended solids in the 1960s. Dkt. 93-9; Dkt. 100-12. The API/NCR Combined Locks Mill was subject to some of the same State-issued compliance orders as the Green Bay West Mill (Dkt. 93-8 at 40, 46), but the State also instituted separate enforcement actions targeting repeated wastewater discharge permit violations at the Combined Locks Mill in the 1970s (Dkt. 100-14).

12

aid their obstructionism by allowing discovery or requiring an evidentiary hearing on this settlement.

The Court has broad discretion in deciding whether to grant or deny discovery or an evidentiary hearing at this stage. *See, e.g., BP Amoco*, 277 F.3d at 1017 ("We review the district court's denial of [a non-settler's] request for an evidentiary hearing for an abuse of discretion."). But courts regularly deny such requests because requiring discovery or an evidentiary hearing would defeat one of Congress's major purposes in encouraging CERCLA settlements: the avoidance of time and delay associated with litigation. *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1085 (1st Cir. 1994) ("requests for evidentiary hearings are, for the most part, routinely denied – and rightly so – at the consent decree stage in environmental cases"). *Accord Cannons Eng'g*, 899 F.2d at 94 ("In general, we believe that evidentiary hearings are not required under CERCLA when a court is merely deciding whether monetary settlements comprise fair and reasonable vehicles for disposition of Superfund claims"); *BP Amoco*, 277 F.3d at 101 (same); *United States v. Union Elec. Co.*, 132 F.3d 422, 430 (8th Cir. 1997) (same); *Arizona v. Motorola, Inc.*, 139 F.R.D. 141, 147-49 (D. Ariz. 1991) (denying discovery and an evidentiary hearing); *United States v. Laskin*, No. C84-2035Y, 1989 WL 140230, at *5 (N.D. Ohio Feb. 27, 1989) (same).

An objector must demonstrate "a particularized need" for discovery or an evidentiary hearing on a CERCLA settlement, *Charles George Trucking*, 34 F.3d at 1086, but NCR and API have made no such showing. They cannot make that showing because the Plaintiffs have proceeded with extreme transparency here. A vast amount of information collected and generated by the government has been in the public domain for years, and the key documents have been duplicated and scrutinized by NCR, API, and others. As explained above, the

Plaintiffs have had an active exchange of views with NCR, API, and other PRPs on parties' relative contributions to the PCB contamination. The Plaintiffs' filings in this case have described and documented the main settlement considerations and the justifications for the agreement that was reached. That has afforded NCR and API "a meaningful and sufficient opportunity to present arguments and submit evidence in opposition to the government's motion to enter the consent decree," as required by the case law. *BP Amoco*, 277 F.3d at 1017. The Court should therefore deny their request for discovery and an evidentiary hearing and enter the Consent Decree without further delay.

## Conclusion

For the reasons set forth above and in the Plaintiffs' principal brief, the Court should approve and enter the proposed Consent Decree with Georgia-Pacific Consumer Products LP.

Plaintiffs' Joint Reply Brief in Support of Motion to Enter Consent Decree with Georgia-Pacific Consumer Products LP in *United States and the State of Wisconsin v. NCR Corp. et al.*, Civil Action No. 10-C-910 (E.D. Wis.)

Respectfully submitted,

For the United States of America

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

Dated: February 17, 2011    s/ *Randall M. Stone*
RANDALL M. STONE, Senior Attorney
JEFFREY A. SPECTOR, Trial Attorney
IVA ZIZA, Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
Telephone:    202-514-1308
Facsimile:    202-616-6584
E-Mail:       randall.stone@usdoj.gov


GREGORY J. HAANSTAD
Attorney for the United States, Acting
Under Authority Conferred by 28 U.S.C. § 515

SUSAN M. KNEPEL
Assistant United States Attorney
Office of the United States Attorney
517 E. Wisconsin Avenue, Room 530
Milwaukee, WI  53202


For the State of Wisconsin

Dated: February 17, 2011    s/ *Cynthia R. Hirsch*
CYNTHIA R. HIRSCH
LORRAINE C. STOLTZFUS
Assistant Attorneys General
Wisconsin Department of Justice
17 West Main Street
P.O. Box 7857
Madison, Wisconsin  53707-7857

CERTIFICATE OF SERVICE

      The undersigned hereby certifies that, on this day, the foregoing brief was filed electronically with the Clerk of the Court using the Court's Electronic Court Filing System, which sent notification of such filing to the following counsel:

**Mary Rose Alexander**
Latham & Watkins LLP
mary.rose.alexander@lw.com

**Thomas Armstrong**
von Briesen & Roper SC
tarmstro@vonbriesen.com

**Paul Bargren**
Foley & Lardner LLP
pbargren@foley.com

**Linda E. Benfield**
Foley & Lardner LLP
lbenfield@foley.com

**Dennis P. Birke**
DeWitt Ross & Stevens SC
db@dewittross.com

**Steven P. Bogart**
Reinhart Boerner Van Deuren SC
sbogart@reinhartlaw.com

**Michael P. Carlton**
von Briesen & Roper SC
mcarlton@vonbriesen.com

**Evan R. Chesler**
Cravath Swaine & Moore LLP
echesler@cravath.com

**Marc E. Davies**
Greenberg Traurig LLP
daviesm@gtlaw.com

**Brandon J. Evans**
Hermes Law Ltd.
bje@hermeslawltd.com

**Sandra C. Goldstein**
Cravath Swaine & Moore LLP
sgoldstein@cravath.com

**Thomas R. Gottshall**
Haynsworth Sinkler Boyd PA
lgantt@hsblawfirm.com

**Eric W. Ha**
Sidley Austin LLP
eha@sidley.com

**Scott W. Hansen**
Reinhart Boerner Van Deuren SC
shansen@reinhartlaw.com

**William H. Harbeck**
Quarles & Brady LLP
william.harbeck@quarles.com

**Michael L. Hermes**
Hermes Law Ltd.
mlh@hermeslawltd.com

**Cynthia R. Hirsch**
Wisconsin Department of Justice
hirschcr@doj.state.wi.us

**Caleb J. Holmes**
Greenberg Traurig LLP
holmesc@gtlaw.com

**Philip C. Hunsucker**
Hunsucker Goodstein & Nelson PC
phunsucker@hgnlaw.com

**Paul G. Kent**
Stafford Rosenbaum LLP
pkent@staffordlaw.com

**Susan E. Lovern**
von Briesen & Roper SC
slovern@vonbriesen.com

**Kevin J. Lyons**
Davis & Kuelthau SC
klyons@dkattorneys.com

**Karl S. Lytz**
Latham & Watkins LLP
karl.lytz@lw.com

**David G. Mandelbaum**
Greenberg Traurig LLP
mandelbaumd@gtlaw.com

**Tara M. Mathison**
Davis & Kuelthau SC
tmathison@dkattorneys.com

**Stephen F. McKinney**
Haynsworth Sinkler Boyd PA
smckinney@hsblawfirm.com

**Heidi D. Melzer**
Hermes Law Ltd.
hdm@hermeslawltd.com

**Elizabeth K. Miles**
Davis & Kuelthau SC
emiles@dkattorneys.com

**Sabrina Mizrachi**
Greenberg Traurig LLP
mizrachis@gtlaw.com

**Monique M. Mooney**
Greenberg Traurig LLP
mooneym@gtlaw.com

**William J. Mulligan**
Davis & Kuelthau SC
wmulligan@dkattorneys.com

**Daniel C. Murray**
Johnson & Bell Ltd.
murrayd@jbltd.com

**Kelly J. Noyes**
von Briesen & Roper SC
knoyes@vonbriesen.com

**Nancy K. Peterson**
Quarles & Brady LLP
nancy.peterson@quarles.com

**Thomas M. Phillips**
Reinhart Boerner Van Deuren SC
tphillip@reinhartlaw.com

**Joan Radovich**
Sidley Austin LLP
jradovich@sidley.com

**Ronald R. Ragatz**
DeWitt Ross & Stevens SC
rrr@dewittross.com

**Alexandra Reeve Givens**
Cravath Swaine & Moore LLP
agivens@cravath.com

**Kathleen L. Roach**
Sidley Austin LLP
kroach@sidley.com

**Megan A. Senatori**
DeWitt Ross & Stevens SC
ms@dewittross.com

**Sarah A. Slack**
Foley & Lardner LLP
sslack@foley.com

**Margaret R. Sobota**
Sidley Austin LLP
msobota@sidley.com

**James P. Walsh**
Appleton City Attorney
jim.walsh@appleton.org

**Ted Waskowski**
Stafford Rosenbaum LLP
twaskowski@staffordlaw.com

**Evan B. Westerfield**
Sidley Austin LLP
evanwesterfield@sidley.com

**Richard C. Yde**
Stafford Rosenbaum LLP
ryde@staffordlaw.com

**Patrick J. Ferguson**
Latham & Watkins LLP
patrick.ferguson@lw.com

**Linda R. Larson**
Marten Law
llarson@martenlaw.com

**Bradley M. Marten**
Marten Law
bmarten@martenlaw.com

**Meline G. MacCurdy**
Marten Law
mmaccurdy@martenlaw.com

With additional copies by U.S. Mail to:

J. Michael Davis
Principal Counsel – Environmental
Law Department
Georgia-Pacific LLC
133 Peachtree Street, NE
Atlanta, GA  30303

General Counsel
Georgia-Pacific LLC
133 Peachtree Street, NE
Atlanta, GA  30303

John N. Hanson
Beveridge & Diamond, P.C.
1350 I Street, NW – Suite 700
Washington, DC   20005

Dated:         February 17, 2011          s/ *Randall M. Stone*