IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and <br> THE STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> NCR CORPORATION, et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Civil Action No. 10-CV-00910-WCG |

**DEFENDANT GEORGIA-PACIFIC CONSUMER PRODUCTS LP'S REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREE**

## I.  INTRODUCTION

Defendant Georgia-Pacific Consumer Products LP ("GP") has endeavored for the past fifteen years to responsibly resolve its potential liability for historic PCB discharges from its Green Bay paper recycling plant ("Plant") into the Lower Fox River ("LFR"). During that time, GP has: (1) contributed to the assessment of LFR natural resource damages ("NRD") through Fox River Group contributions and activities; (2) resolved its NRD liabilities to the United States, the State of Wisconsin and relevant Indian Tribes (the only party to have done so); (3) completed a significant sediment hot spot removal action in the vicinity of the Plant; (4) allowed for the disposal of dredged LFR sediments in its private landfill; (5) shared with NCR Corporation and Appleton Papers Inc. ("NCR/API") in the remedial design costs for Operable Units ("OU") 2 - 5; (6) provided its river front property ("Shell Property") to be used for the construction and operation of the large sediment treatment facility that supports on-going dredging activities in the LFR, and; (7) contributed $37 MM towards dredging activities

1

conducted pursuant to the 2007 CERCLA Section 106 Unilateral Administrative Order ("UAO"). *See* Dkt. #76-7 [Declaration of Paul A. Montney in Support of Plaintiffs' Joint Motion to Enter Consent Decree with Georgia-Pacific Consumer Products LP]. Through May 2010, GP spent $115 MM on these efforts, $83 MM of which it is seeking to recover from NCR/API in *Appleton Papers Inc. v. George A. Whiting Paper Co.*, Case No. 08-CV-00016-WCG ("*Whiting*").

If approved by the Court, the proposed consent decree ("CD") with the United States and the State of Wisconsin (the "Governments") would finally resolve all of GP's remaining response cost liability to the Governments, making GP the only PRP on the LFR to have done so. Under the CD, GP has made (yet another) significant contribution ($7 MM) towards the Governments' past and future response costs. But far more significantly – through its admission of liability and commitment not to challenge the Governments' remedy for Lower OU 4 and 5 – GP is providing assurance to the Governments that the selected remedial actions for Lower OU 4 and 5 will be implemented. In other words, if NCR/API fail to perform, GP may have to initially fund the effort in this part of the LFR and subsequently recover its disproportionately-incurred response costs from other PRPs through CERCLA Section 113 claims, without having received any protection from the Governments against contribution claims by other PRPs for Lower OU 4 and 5 costs.[1] In return, GP receives protection against response cost and contribution claims in Upper OU 4, an area upstream of the Plant and beyond the influence of historic Plant discharges.

GP hopes that the Court's decisions here and in *Whiting* will place responsibility for LFR remedial actions where it belongs – on NCR/API, the entities primarily responsible for the

---

[1] As repeatedly noted during the *Whiting* litigation, there is nothing inconsistent with GP on the one hand acknowledging its liability to the Governments for remediation of the LFR, while on the other hand seeking to recover all past and future costs of such compliance from NCR and API pursuant to CERCLA's contribution scheme.

contamination. NCR has confirmed that it has the financial wherewithal to pay for both the remedial actions and the *Whiting* Defendants' contribution claims,[2] and the Court has already denied NCR/API contribution from GP and the other *Whiting* Defendants because of NCR/API's primary culpability for the PCB problem in the LFR. *Appleton Papers Inc*., 2009 U.S. Dist. LEXIS 117112 (E.D. Wisc., Dec. 16, 2009) (Decision and Order Dismissing Plaintiffs' Claim for Contribution). As the Court found in *Whiting*: "Ultimately, it is the Plaintiffs' own production of the CCP that is the *sine qua non* not just of the environmental damage, but of the entire cleanup effort and its attendant costs." *Id*. at *84.

Given the discovery, motion practice and rulings that have occurred in *Whiting* and the Governments' prior selection of remedies for the Site, it is now apparent that the fairest and most efficient resolution of both the Governments' demand for LFR remedial actions and the pending response costs / contribution claims would be for the Court to: (a) find NCR/API liable for implementing the Governments' selected remedies for OU 2 - 5; (b) subject them to significant penalties should they fail to perform the work; (c) grant the *Whiting* Defendants' pending contribution claims for their past costs, and; (d) grant the Governments' past response cost claims against NCR/API. This combination of additional rulings would incentivize NCR/API to promptly complete the required remedial actions.

Insofar as the present motion is concerned, GP joins the Governments' request for approval of the CD. GP replies separately to NCR/API's Joint Opposition to the Consent

---

[2] Assuming that NCR and API would have to pay over $1 billion in Fox River liabilities, NCR plainly stated in its February 2010 Annual Report on Form 10-K that "[i]t is the opinion of the Company that the effect of the Fox River matter will have a moderate, but manageable, impact on our liquidity and capital resources…." Declaration of Patrick Ferguson in Support of Defendant Georgia-Pacific Consumer Products LP's Reply in Support of Plaintiffs' Motion to Enter Consent Decree ("Ferguson Decl."), Ex. 1 [NCR 10-K (Feb. 26, 2010)].

Decree, Dkt. #91, for the purpose of bringing into this case the arguments and evidence already presented in *Whiting* that rebut NCR/API's again-repeated claims that GP's Production Period (1954-1971) discharges of total suspended solids ("TSS") and its Post-Production Period (1972 and later) discharges of PCBs make GP more liable for LFR response costs than the Governments contend in the CD. *See* Dkt. #91 at 4-9. These claims are without merit and were previously decided in *Whiting*. GP also points out a fundamental flaw in NCR/API's expert opinion (by Dr. Jones) that GP's expert (LTI) inappropriately used 1970 water level data to estimate the potential scope of upstream sediment impacts of releases from the Green Bay West mill. As explained below and in the attached Declaration of John R. Wolfe, Dr. Jones' wrongful criticism of LTI's analysis is based on Dr. Jones' own misunderstanding of the data on which LTI relied.

**II.     ARGUMENT**

    **A.     GP Has Endeavored in Good Faith to Resolve Its Potential Fox River Response Cost Liabilities, Including Through Compliance with the CERCLA 106 Order**

As detailed above and in the Declaration of Paul Montney, Dkt. #76-7, GP has expended considerable time, effort and money to address PCB problems in the LFR. Specifically with regard to the 2007 UAO, GP tried for several years to work cooperatively with NCR/API to implement the UAO's requirements, including through technical discussions and exchanges with the NCR/API remedial team, efforts to negotiate contracts with consulting and dredging companies, and attempts to reach a funding agreement with NCR/API for UAO remedial actions. Even though these efforts failed in part, GP has continued to allow its Shell Property to be used for the remedy's sediment treatment facility and funded a significant percentage of the remedial work undertaken pursuant to the UAO from 2007 until the end of 2009.

4

After this Court's December 16, 2009 Decision and Order denying NCR/API's contribution claims, GP understandably ceased funding the NCR/API dredging efforts (but still continues to allow NCR/API to use its Shell Property for management of the dredge spoils).[3] Instead, GP filed its own contribution claim against NCR for GP's past costs, *and more importantly*, entered into negotiations with the Governments to resolve GP's liability to them (including under the UAO). NCR/API's claim that GP is a recalcitrant party whose conduct is frustrating settlement is completely belied by the fact that GP, alone among all of the PRPs, has now completely settled all of its response costs and NRD liabilities with the US, the State and the Tribes.

### B. NCR/API's Allegations Regarding GP's Production Period Discharge of TSS and Post Production Period PCB Releases Are Irrelevant and Immaterial

#### 1. GP's Production Period Releases of TSS Were Irrelevant

NCR/API again contend, as they did repeatedly in *Whiting*, that intentional discharges of TSS by GP and other Defendants there make the paper recyclers primarily responsible for the LFR problems requiring remediation today. Dkt. #91 at 5-8, 14, fn. 7. The Court considered and rejected these arguments in *Whiting*, finding instead that:

> But this case is about a very specific toxin - - PCBs, primarily in the form of Aroclor 1242 - - and it is the presence of that toxin that has given rise to the massively expensive cleanup action that has itself given rise to this case. This is, at its core, a case about money - - who should pay for that cleanup. Although several of the Defendants may have polluted the river in other ways, that pollution simply did not result in an EPA-ordered cleanup. Accordingly, any arguments based on the existence of *other* kinds of pollution do not speak to the equities of whether any of the Defendants should pay for the cleanup of PCBs in the Lower Fox River.

---

[3] NCR/API and their contractors have refused to enter into a lease for the use of the Shell property and are not paying any rent.

*Appleton Papers Inc.*, 2009 U.S. Dist. LEXIS 117112, at *55. Moreover, it is clear that when the Production Period TSS discharges occurred, GP had no knowledge that PCBs might be present in its discharges (because NCR/API intentionally concealed that information), nor did it have any understanding of the environmental risks associated with PCB releases to the environment. *Id.* at *50-53.

In addition to being wholly irrelevant, Plaintiffs' allegations about GP's TSS discharges are also false.[4] For example, and contrary to NCR/API's assertions, GP was well ahead of the curve in treating wastewater for TSS. In the 1940s, GP voluntarily installed a primary settling basin system that by 1948 removed over 92 percent of solids from GP's effluent. Ferguson Decl. Ex. 2 [GPFOX00016521] at 537; *Id.*, Ex. 3 [GPFOX00015238] at 240. GP continued to improve its wastewater treatment system for solids removal and maintained exceptional removal efficiency through and beyond 1971. Furthermore, GP never ignored Governmental orders regarding TSS. Dkt. #91 at 14, fn 7. GP conducted the required study on time and submitted the required plan to the Wisconsin Committee on Water Pollution. Ferguson Decl., Ex. 4 [NCR-FOX-0159435]. By December 31, 1972, Fort Howard was the only mill on the LFR to comply with WDNR's new effluent limits for TSS and the like. *Id.*, Ex. 5 [NCR-FOX-0000216].

### 2. GP's Post Production Period PCB Discharges Were Immaterial

NCR/API again suggest that GP's post-1971 discharges were not *de minimis* and that GP should bear great responsibility because of them. Dkt. #91 at 14, fn 7. But as the Court found

---

[4] *See e.g.,* No. 2:08-cv-00016, Dkt. #1040 [Reply Memorandum of Law in Support of Georgia-Pacific LLC's and Certain Defendants' Motion For Summary Judgment on Equitable Factors], 7 - 8; Dkt. #1041 [Certain Defendants' Responses to Plaintiffs' Statement of Additional Facts Opposing Georgia-Pacific LLC's and Certain Defendants' Motion For Summary Judgment on Equitable Factors].

in *Whiting*, the Post Production Period PCB discharges were *de minimis*, and were regarded by regulatory agencies as posing negligible risks:

> …by all accounts most of the damage had been done by the time NCR stopped using Aroclor in its carbonless paper [in 1971]…. it is undeniable that all accounts confirm that the vast majority of the PCB releases - - whether 98 percent or some other figure - - occurred during the production period.
>
> … I further note that any recycling of post-consumer waste paper during the 1970's occurred within a regulatory scheme that allowed such use (even if it did not specifically "encourage" it, as some of the Defendants suggest).

*Appleton Papers Inc.*, 2009 U.S. Dist. LEXIS 117112 at *72, 75.

After the Production Period, GP continued to upgrade its wastewater treatment system and conducted numerous experiments to minimize PCB releases, then already in the low parts per billion range. In the 1980s, GP worked closely with WDNR to investigate methods of reducing PCB discharges to non-detect levels. When GP found a successful method, it promptly implemented the system and achieved that result. *See* Ferguson Decl., Ex. 6 [D. Ford July, 2009 *Whiting* Expert Report]. Contrary to NCR/API's claim (and in contrast to NCR/API's own actions), GP did not attempt to conceal its own PCB issues. Instead, it attempted to address them by improvements to its wastewater system and through lobbying to allow the continued recycling of post-consumer carbonless paper and to establish reasonable PCB discharge standards. *See Id.*, Ex. 6 [D. Ford July, 2009 *Whiting* Expert Report]; Ex. 7 [C. Klass July, 2009 *Whiting* Expert Report]. As the Court found in *Whiting*, the Governments agreed that recycling should be allowed to continue because the impacts were negligible, and this would not have happened if GP had, as NCR/API allege, concealed "its PCB problem." Dkt. #91 at 14, fn. 7.

7

Case 1:10-cv-00910-WCG   Filed 02/17/11   Page 7 of 9   Document 103

### C. The Dividing Line Between Upper and Lower OU 4 Is Reasonable

As the Governments reported in their motion, Dkt. # 77, considerable attention was given during their negotiations with GP to establishing a fair dividing line between Upper and Lower OU 4. GP's consultant, LTI, submitted a report concerning the likely extent of upstream migration from the Plant due to seiche events (times when flow in OU 4 can be temporarily reversed due to changes in the relative heights of the LFR and the bay of Green Bay water levels). The U.S. Army Corps of Engineers reviewed LTI's report and agreed that it presented a reasonable interpretation of how far upstream of the Plant PCBs may have migrated and settled to the sediment bed during seiche events. Dkt. #77 at 15 - 18.

Based on a Declaration by their expert, Dr. Jones, NCR/API contend that LTI improperly relied upon a 1970 data set that understated the extent of the seiche effect. As explained in the attached Declaration from LTI's John Wolfe, however, it is Dr. Jones who got it wrong, because he completely misunderstood (or mischaracterized) the 1970 hourly water level data on which LTI had relied. In the attached Declaration, Dr. Wolfe displays the data used by LTI and shows that the seiche heights in 1970 were just as high as, if not higher than, those in 2003/2004, the period of comparison used by Dr. Jones. LTI has reviewed its prior analysis in light of Dr. Jones' purported criticisms and has reconfirmed the correctness of LTI's initial determinations. As noted, LTI's original assessment had been reviewed and generally accepted by the U.S. Army Corps of Engineers, and the Governments added an additional margin of safety (from the Governments' perspective) when they established their final line dividing Upper OU 4 from Lower OU 4 for purposes of the CD. That line is reasonable, and NCR/API's criticism of it is not.

### III. CONCLUSION

The CD was negotiated at arm's length. It represents a fair and reasonable resolution of GP's liability for response costs in OU 4. For the reasons set forth more fully in the Governments' motion papers, the CD warrants approval by this Court, and GP respectfully asks that it do so.

Dated: February 17, 2011	Respectfully submitted,

By	*/s/ Karl S. Lytz*
	Karl S. Lytz

Karl S. Lytz
CA Bar No. 110895
Patrick J. Ferguson
CA Bar No. 252778
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Fax: (415) 395-8095
Karl.Lytz@lw.com
Patrick.Ferguson@lw.com

Mary Rose Alexander
IL Bar No. 6205313
CA Bar No. 143899
LATHAM & WATKINS LLP
233 S. Wacker Drive, Suite 5800
Chicago, IL 60606
Telephone: (312) 872-7700
Facsimile: (312) 993-9767
Mary.Rose.Alexander@lw.com

SF\816675.3