UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA and
STATE OF WISCONSIN,

        Plaintiffs,

v.                                                           Case No. 10-C-910

NCR CORP., et al.,

        Defendants.

**ORDER APPROVING CONSENT DECREE**

In this action, the United States and State of Wisconsin (the "governments") seek approval of a settlement they have reached with Defendant Georgia-Pacific Corp. ("GP") and entry of a consent decree relating to GP's liability for PCB contamination of the Fox River. Following publication in the Federal Register and receipt of comments, and after briefing of the issue in this Court, I am satisfied that the proposed settlement is reasonable.

**I. Analysis**

As all sides agree, review of proposed settlements is deferential, but not a rubber stamp. "In the first place, it is the policy of the law to encourage settlements. That policy has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement." *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). Moreover, "[t]hat so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree, itself deserves weight in the ensuing balance." *Id.*

The starting point for the settlement is the fact that GP has already paid some $83 million for response costs and damages at the Fox River Site. The proposed settlement requires GP to stipulate that it is liable for performance of all required work downstream from an artificial dividing line that was negotiated by GP and the governments. The site from which GP's predecessor companies polluted the river is known as the Green Bay West Mill, or the former Fort Howard facility. The negotiated line was drawn roughly 1,050 feet southwest, or upstream, of that facility. The reason for this is that, although almost all of the PCB contamination flowed *down*stream from GP's plant (to the northeast and into Green Bay), at some times currents exist in the river that pull water *up*stream. Because of this phenomenon, known as seiche, contaminated sediment can be deposited in the river bed upstream of the discharge site. GP has retained a consulting firm that opines that this effect resulted in less than 0.1% of contaminated sediment settling upstream of the Green Bay West Mill. This small amount could be expected to have settled in an area roughly 400 feet upstream of that facility, according to the consulting firm. The United States consulted its own expert from the Army Corps of Engineers in assessing GP's consultant's report. Although the United States believed the essence of the report was sound, it believed that an additional buffer would be reasonable to account for any uncertainties (as well as the fact that the firm was being paid by GP). Accordingly, the parties negotiated a line that was 1,050 feet upstream of the polluting facility. This, they believe, more than adequately accounts for the fact that some small amount of PCBs flowed upstream from GP's facility.

In addition, by stipulating to liability for sections of the river downstream of the negotiated line, GP is (according to the governments) "accepting liability for more than half of the total expected cost of the work in all of OU4 and OU5," for a total of $331 million. (Dkt. 77 at 22.) This

2

is despite the fact that GP was not the cause of half of the PCB pollution in those sections of the river. Although volume discharge estimates must be taken with a grain of salt (given the inherent uncertainty in the process and the length of time that has passed), various estimates pin between 15% and 44% of the PCB pollution on GP. NCR's and AP's own expert estimated that GP contributed 44% of the PCBs in a section of the river known as OU4B but none or very little in OU4A. (Dkt. # 92, Ex. 5, ¶ 12). Other projections by government entities produced estimates between 22.5% and 29-40%. Thus, even taking the numbers supplied by Defendants NCR and AP, the settling parties argue that GP is taking on a share of liability in excess of its actual discharge. They further note that the equities of the case (as discussed in the related *Whiting* action, No. 08-C-16), demonstrate that GP's actual culpability for the PCB problem is quite low in relation to that of NCR and AP.

In addition to accepting liability for OU5 and the lower portion of OU4 (downstream of the negotiated line), the settlement also requires GP to pay $7 million into a Wisconsin DNR account to help fund continued oversight of the project. The governments have estimated that there are $17 million in unreimbursed past costs, plus $28 million in future oversight costs, for a total of $45 million. The $7 million payment from GP represents 16% of that total. For all these reasons, the settling parties argue that the proposed settlement is fair and reasonable.

The chief opponents to the settlement are Defendants NCR Corp. and Appleton Papers, Inc. I have concluded in the related *Whiting* action that these parties bear overwhelming equitable responsibility for the PCB problem in the Fox River, and these parties have also opposed the government's other efforts at settlement. I will address their arguments below.

3

**1. Proportionality to the Harm**

The chief complaint brought by NCR and AP is that the proposed settlement minimizes GP's contribution to the PCB problem. Although the governments now estimate GP's contribution to the PCB problem at 15-20% (a figure also used in a 2004 settlement that Judge Adelman approved), NCR and AP argue that such a figure is much lower than previous estimates and has no technical data to support it.

NCR and AP essentially suggest that the 15-20% figure has come out of left field, but that is only true if we rely on the figures that NCR and AP have cherry-picked from the record. First, the fact that the 15-20% figure was "the most recent estimate" as far back as 2004 undermines the suggestion of NCR and AP that this is some kind of "sweetheart deal" engineered for GP's benefit. *United States v. Fort James Operating Co.,* 313 F. Supp. 2d 902, 908-909 (E. D. Wis. 2004). Moreover, as the governments note, a 1999 WDNR study found GP's share to be 22.51%, and a 2000 report pegged GP's responsibility at between 22 and 40%. (Dkt. 76-24 at 122; Dkt. 90-1 at 13.) Thus, there is plenty of support in this Site's long history to back a figure at least in the low-twenties. If the "actual" figure is, say, 22.5%, then it is certainly reasonable for the government to allow GP to enter into a settlement based on a slightly smaller amount. Although NCR and AP do not seem to appreciate the distinction between a settlement negotiation and liability established at trial, the result reached here represents a *quid pro quo* commonly allowed in order to encourage finality and save the expense and effort of further inquiry.

That said, the governments explain that more recent calculations, including those that supported the 15-20% figure in the 2004 settlement approved by Judge Adelman, have lowered the range further, to the point that their current estimate is that GP contributed some 38,000 kg of PCBs

4

out of a total of more than 230,000 kg, or 16 percent. NCR and AP vigorously protest that they have not seen any data to back that figure up, but in fact the 16 percent figure is perfectly consistent with AP and NCR's own expert. Their expert concluded that GP was liable for 44% of the PCBs in OU4B and 0% liable for OU4A. These two subsections of the Site account for the overwhelming majority (the government says 91%) of all the residual PCB mass at the entire Site: Section OU4A (the section in which GP was not liable at all) contains 54% of the Site's sediment while OU4B (for which GP is 44% liable) contains 37%. Based on these figures, GP's share may be estimated by multiplying 44% (GP's estimated share of OU4B) by 37% (OU4B's share of the total sediment), which produces a figure of 16.3%. In plain English, that means GP contributed slightly less than half of the PCBs to a section of the Site that constitutes slightly more than one-third of the total contamination.[1]

The figure proposed by the government, a party with expertise and operating at arm's length, is a reasonable one. The demand by NCR and AP for more discovery would be more persuasive if the figure had indeed come from left field or stood in sharp contrast to liability estimates. But because the number is supported by other estimates in the record, and is consistent with the objectors' own expert, I conclude that more discovery is not required. The purpose of these proceedings is not to ascertain a perfect answer, it is to determine whether a proposed settlement

---

[1] In a sur-reply brief, AP and NCR protest that the government has mischaracterized their expert's report. That is not true. The expert report concluded that upstream sources contributed 38% of the PCBs to OU4A, while OU4A sources contributed the other 62%. (Dkt. # 76, Ex. 1 at 20.) That means that the entirety of OU4A pollution arrived from sources other than GP. Although it is true that the expert noted the seiche effect and some evidence that PCBs may have flowed upstream, there is no suggestion in his report that these amounts would materially alter his conclusion. In other words, none of the cautionary, preliminary language in the report would cause one to conclude that the seiche issue was anything more than a small detail that might have accounted for a percent or two.

5

is a reasonable effort to obviate the need for finding a perfect answer. By their very nature, settlements cut off further inquiry partly because the expense and effort such an inquiry might require would outweigh any benefit achieved. Here, I conclude that the number the governments now propose is consistent with multiple sources in the record and is therefore reasonable. And to the extent it might slightly underestimate GP's liability, that is a reasonable *quid pro quo* for obtaining settlement.

**2. Upper OU4**

NCR and AP also object to the settlement on the grounds that it relieves GP of liability for any portion of the Upper OU4 expenses (the area upstream of the dividing line). NCR and AP note that it is undisputed that, due to the seiche, *some* portion of GP's PCB releases traveled upstream. Thus, in their view it does not make sense to let GP off the hook for that portion of the river.

As noted above, however, the amount of PCB contamination that flowed upstream from the GP mill is minuscule. The governments credit GP's consultant, who concluded that 99.9% of its PCBs remained in lower OU4 rather than flowing upstream. Even if that figure were off, however, there is no serious reason to attribute environmental damage in upper OU4 to GP given the minute amounts involved. As noted above, GP is paying its fair share (or more than it) for lower OU4. And, as the governments point out, this is not an academic exercise in attributing blame – it is a proceeding to approve a *settlement.* By their nature, settlements involve judicious and reasoned compromises. NCR's and AP's expert, Dr. Jones, has questioned the government's figures (Roach Decl., Ex. 7), but his analysis does not undermine the central fact that, although the seiche may be an interesting phenomenon, in this case it is little more than a footnote. Even the aerial photographs provided by NCR and AP do not show upstream discharges going all the way to the Highway 172

6

bridge (the dividing line NCR and AP propose) – they appear instead to show upstream discharges limited to within the negotiated line's 1,050-foot buffer. To hold up a settlement based on unknown but clearly minor amounts of PCBs that may have flowed backwards would undermine the very purpose of settlement.

**3. Other Objections**

NCR and AP also suggest that accepting the proposed settlement would create an "orphan share" of liability that would ultimately be borne by the public. They also contend that entry of the consent decree would reward GP for its past history of ignoring administrative orders and failure to fund various cleanup efforts.

On this latter point, the fact is that very few PRPs have a relationship with the Site that can be described as altruistic. Given the complexities of this case and the relative culpability of numerous other parties, it is not surprising that some companies have not voluntarily participated in cleanup efforts. That said, there is nothing to suggest that GP has been intransigent or obstructive to the cleanup process. In engaging in settlement talks, the governments make judgments roughly analogous to those a prosecutor makes when he considers a criminal defendant's cooperation. In such matters, the governments have tremendous leeway to identify possible settlement candidates and negotiate with them. The premise of AP's and NCR's objection is that the past actions of some parties should bar them from settlement altogether (or at least require some enhanced penalty), but they have not cited any authority for such principles. Absent some unusual circumstance, a court will not second-guess a settlement based on the past conduct of a settling party. The question is whether the settlement is reasonable *today*, and thus proceedings like this one are not an invitation to engage in extended investigations of what happened in the past.

7

As for the possibility of an orphan share, I am satisfied that the reasons cited by the governments suffice to make that possibility an unlikely one. The premise of AP and NCR, of course, is that GP would have agreed to pay more here if only the governments had driven a harder bargain. That is merely speculation, however. I must assume that the settlement proposed here represents the best deal the governments were able to obtain. The governments are the representatives of the taxpayers, who would bear an orphan share, and this reasonable settlement is a well-judged effort to obtain payment from one of the PRPs.

**4. Taking**

Finally, NCR and AP object that entry of the consent decree would eliminate their ability to obtain contribution from GP for their cleanup expenses. This, they assert, would be an unconstitutional taking because their contribution claims are vested property interests.

This argument is really an objection to CERCLA itself more than anything else. The "claim" AP and NCR have is one that was created by CERCLA, and in a nutshell CERCLA says PRPs may bring contribution claims against other PRPs *so long as* that PRP has not settled with the government. Section 113(f)(1) creates the right to contribution, but § 113(f)(2) restricts that right by providing that "A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2). Reading CERCLA as creating a "vested" property right in a contribution claim would allow PRPs to foreclose the government's ability to settle with other PRPs by making the viability of such settlements contingent on when one of the PRPs filed its contribution lawsuit. That is, in NCR's and AP's view, once it decided to file a lawsuit for contribution, no more settlements could occur. Allowing

PRPs to drive the bus in cleanup actions is surely a novel principle, and one which finds no support in the case law. In short, if anything is "vested" about NCR's and AP's contribution claim, it is merely that it has a right to such a claim *subject to* § 113(f)(2)'s provision eliminating such claims if the PRP has settled with the government. In *United States v. BP Amoco Oil PLC,* the PRP filed a contribution action in 1997 and the consent decree was lodged in 1999. 277 F.3d 1012 (8th Cir. 2002). The district court rejected the PRP's argument that entry of the consent decree (which would bar the preexisting contribution claim) constituted a taking, and the Eight Circuit affirmed. The PRP "never had a vested property interest to be taken" because the contribution right is "subject to and limited by § 9613(f)(2)." *Id.* at 1017. The same holds true here.

**5. Motion to Compel**

As noted above, AP and NCR have filed a motion to compel production of documents and to supplement the administrative record. I have explained above why I do not believe further discovery is required. To summarize: the objection raised by NCR and AP would, if accepted, undermine the entire purpose of settlement. As the governments recognize, in a case like this a quest for some sort of scientific perfection would be so costly and time-consuming (and even quixotic) that the expenses and time incurred would outweigh any benefit achieved by any more accurate figures. And, of course, such figures would be vigorously contested on all sides, with equally impressive experts, just as they are now. In the *Whiting* case, I concluded that further inquiry was not required, or even advisable, because *any* of the figures that further discovery might plausibly support would have produced the same result in equity. More discovery would have been wasteful. The same is true here. There is no reason to believe that further inquiry into the exact amounts of discharge would materially change the result.

9

**II. Conclusion**

For the reasons given above, the proposed settlement is substantively and procedurally reasonable and is consistent with the purposes of CERCLA. The motion to approve the consent decree is hereby **GRANTED**. The motion to file a sur-reply is **GRANTED**. The motion for leave to file a reply is **GRANTED**. The motion to compel is **DENIED**.

**SO ORDERED** this ___4th___ day of April, 2011.

_s/ William C. Griesbach_
William C. Griesbach
United States District Judge
