# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA and
STATE OF WISCONSIN,

        Plaintiffs,

    v.                                 Case No. 10-C-910

NCR CORP., et al.,

        Defendants.

---

## DECISION AND ORDER

---

The United States has moved for a preliminary injunction to require Defendants NCR Corporation and Appleton Papers Inc. ("AP") to comply with a recent EPA directive that they complete sediment remediation in the Fox River at a rate substantially similar to remediation accomplished in past years. The motion is a reaction to submissions made to the government in which the Defendants have articulated their reasons for undertaking substantially less work this year. For the reasons given below, the motion will be denied.

**I. Background**

NCR and Appleton Papers have been performing river remediation activities in the Fox River for several years. At issue presently is work performed pursuant to a unilateral administrative order (UAO) issued by the EPA in 2007. The UAO requires the dredging and disposal of some 3.5 million cubic yards of contaminated sediment, as well as the creation and installation of caps and the use of sand to cover PCB-laden riverbed sediment in some areas. In 2009, NCR and AP created an LLC to perform the work. The LLC entered into a long-term contract with a company called

Tetra Tech to perform most of the remediation required under the UAO. In 2009 the company dredged roughly 550,000 cubic yards of material, and in 2010 it dredged about 743,000 cubic yards. The 2010 figure exceeded expectations substantially, and many involved in the process were generally pleased by the pace of the project.

By early 2011, however, AP and NCR began indicating that they wanted to scale back the project. This development likely arose because of several unfavorable rulings they had received from this Court, which had dimmed their hopes of recouping the costs they were expending in the cleanup effort. The EPA did not approve the AP/NCR plan for 2011, which called for dredging of some 250,000 cubic yards, but instead issued a modified work plan requiring the accomplishment of several specific benchmarks in different operating units, including the dredging of between 605,000 and 810,000 cubic yards in certain areas of OU4 and other specified areas. In the EPA's view, continuing the project at full bore is required in order to remove the most contaminated sediment and restore the river to its natural state. It points to the success of Little Lake Butte des Morts, where dredging recently concluded, and notes that a typical walleye caught there is now considered safe for human consumption.

## II. Analysis

To justify a preliminary injunction, a plaintiff must show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm without the injunction, that the harm it would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and that the injunction is in the public interest. These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted. *Judge v. Quinn,* 612 F.3d 537, 546 (7th Cir. 2010).

2

**A. Likelihood of Success on the Merits**

The government argues it is highly likely to succeed on the merits of its UAO enforcement claim: NCR and AP are unquestionably liable for the contamination in OU2-OU5, and the cleanup remedy selected by the EPA and imposed by the UAO is amply supported.

**1. Divisibility Defense**

AP and NCR raise a number of arguments suggesting that the government has a low likelihood of success on the merits. Their chief focus is their divisibility defense. As discussed in other decisions in this and related actions, AP and NCR believe the harm caused to the Fox River is divisible in a number of ways. If they can show that they are responsible only for discrete portions of the river, measurable volumes of PCB pollution, or specific kinds of PCBs, then they believe they are not subject to the standard joint and several liability under CERCLA but are liable only for that portion of the harm that the court apportions to them. They believe their proper share of apportioned liability is low (or in AP's case, nonexistent). As such, if they are found liable only for a small, divisible, portion of the harm, then they should not be made to comply with the EPA's modified work plan.

The Seventh Circuit has described divisibility as "the exception . . . not the rule," *United States v. Capital Tax Corp.,* 545 F.3d 525, 535 (7th Cir. 2008), and divisibility is "a rare scenario." *Metropolitan Water Reclamation Dist. of Greater Chicago v. North American Galvanizing & Coatings, Inc.,* 473 F.3d 824, 827 (7th Cir. 2007). The divisibility defense was given new life, however, by the Supreme Court's 2009 decision in *Burlington Northern and Santa Fe Railway Co. v. United States,* 129 S.Ct. 1870 (2009). In that case, which bears some extended discussion, Burlington Northern's predecessor railroad owned about an acre of land that it leased to B&B, a

3

chemical business. B&B also operated its own adjacent site, which was 3.8 acres. Over many years, three different harmful chemicals leaked into the groundwater, resulting in remediation efforts and significant cleanup expenses. In an action brought by the government, the district court accepted the railroad's divisibility argument and found that the railroad was only liable for 9 percent of the harm at the site. The Supreme Court described the district court's analysis as follows:

> The District Court calculated the Railroads' liability based on three figures. First, the court noted that the Railroad parcel constituted only 19% of the surface area of the Arvin site. Second, the court observed that the Railroads had leased their parcel to B & B for 13 years, which was only 45% of the time B & B operated the Arvin facility. Finally, the court found that the volume of hazardous-substance-releasing activities on the B & B property was at least 10 times greater than the releases that occurred on the Railroad parcel, and it concluded that only spills of two chemicals, Nemagon and dinoseb (not D-D), substantially contributed to the contamination that had originated on the Railroad parcel and that those two chemicals had contributed to two-thirds of the overall site contamination requiring remediation. The court then multiplied .19 by .45 by .66 (two-thirds) and rounded up to determine that the Railroads were responsible for approximately 6% of the remediation costs. "Allowing for calculation errors up to 50%," the court concluded that the Railroads could be held responsible for 9% of the total CERCLA response cost for the Arvin site.

*Id.* at 1882.

To paraphrase, the district court found a small share of liability because Burlington Northern had only owned a small portion of the site; it had owned it for less than half of the time period during which the chemicals were spilled; and the railroad property only had spills of two of the three chemicals found at the site.

In upholding the district court's analysis, the Supreme Court seemed moved by the fact that the site was not an area with uniform levels of pollution. Instead, the land was sloped towards a sump and a pond, and those areas, which were *not* on railroad property, contained the bulk of the pollution. "[T]he primary pollution at the Arvin facility was contained in an unlined sump and an

4

unlined pond in the southeastern portion of the facility most distant from the Railroads' parcel and that the spills of hazardous chemicals that occurred on the Railroad parcel contributed to no more than 10% of the total site contamination . . . some of which did not require remediation. With those background facts in mind, we are persuaded that it was reasonable for the court to use the size of the leased parcel and the duration of the lease as the starting point for its analysis." *Id.* at 1883.

The Supreme Court also upheld (albeit tepidly) the district court's conclusion that because one of the three chemicals on-site was not spilled on railroad property, the railroad should only be liable for two-thirds of the harm (in combination with the other multipliers the district court used). Even so, the Court recognized that the district court's underlying assumption might have been flawed. Specifically, the lower court had concluded that because two out of three chemicals had been spilled on railroad property, the railroad should be assessed a liability calculator of 66% (two-thirds). (Or, looked at another way, it received a one-third liability "discount.") But there had not been any evidence that the actual *harm* was so easy to calculate. Suppose there had been 50 spills of Chemical A, 40 spills of B, and 10 spills of C at the site. If Chemical C was the one that had not been spilled on railroad property, it would not make sense to reduce the railroad's liability by one-third when Chemical C only accounted for 10 percent of the total spills. Similarly, the different chemicals could have had different environmental impacts: a spill of one could be ten times more dangerous than another.

The Supreme Court got past these issues because the district court had added a 50% uncertainty factor to its analysis. Thus, it ultimately increased the railroad's liability to 9% (from 6%), and this factor cancelled out any error it may have made in the analysis described above. As such, the Supreme Court found the error harmless because the overall result (9% liability) was

5

sound and could be reached without application of the district court's dubious one-third "discount."

NCR and AP argue that the comparison to *Burlington Northern* is strong. They concede at the outset that because discovery on divisibility issues has not yet occurred (which to them is a reason for denying the motion for preliminary relief) we do not yet have a clear picture of the relative amounts of pollution caused by the different parties. Even so, based on preliminary evidence, it is clear that we have a number of PRPs who deposited distinct and potentially ascertainable amounts of PCBs into the Fox River. Thus, the divisibility argument may be addressed even though fully-developed figures are not before me.

**a. Divisibility Based on Volume of PCB Discharges**

Courts have recognized that § 433A of the Restatement of Torts is the starting point for a divisibility analysis, and NCR and AP argue that the examples found therein match the circumstances we have here. To illustrate their point, I cite three similar examples found in the Restatement.

> 3. Five dogs owned by A and B enter C's farm and kill ten of C's sheep. There is evidence that three of the dogs are owned by A and two by B, and that all of the dogs are of the same general size and ferocity. On the basis of this evidence, A may be held liable for the death of six of the sheep, and B liable for the death of four.
>
> 4. Through the negligence of A, B, and C, water escapes from irrigation ditches on their land, and floods a part of D's farm. There is evidence that 50 per cent of the water came from A's ditch, 30 per cent from B's and 20 per cent from C's. On the basis of this evidence, A may be held liable for 50 per cent of the damages to C's farm, B liable for 30 per cent, and C liable for 20 per cent.
>
> 5. Oil is negligently discharged from two factories, owned by A and B, onto the surface of a stream. As a result C, a lower riparian owner, is deprived of the use of the water for his own industrial purposes. There is evidence that 70 per cent of the oil has come from A's factory, and 30 per cent from B's. On the basis of this evidence, A may be held liable for 70 per cent of C's damages, and B liable for 30 per cent.

6

Rest. (2d) Torts, § 433A cmt. d.

Although the Defendants' analogy to these illustrations has some ostensible attraction, the analogy does not bear closer scrutiny. One principal distinction is that in the examples above, the damaged party was a private party who suffered private damages: dead sheep, a flooded farm, and loss of water use. A related distinction is that the private party's damages increased in direct proportion to the defendant's tortious activities. For example, the more hungry dogs A and B allowed loose, the more dead cattle and the more financial loss suffered by the cattle owner. And as A, B and C released more water, the farmer's land became more flooded, increasing his loss. In short, the damages in the examples increased in direct proportion to the number of dogs or amount of water released. Because of this proportional relationship between the defendants' activities and the damage sustained, it makes sense to divide liability along the same lines.

Instead of a dispute between private individuals suing about damages, this is an enforcement action brought by the government to require the Defendants to pay for the cleanup of the river. This cleanup, and its attendant costs, have little in common with the scenarios described above. In particular, the cost of the cleanup bears little relation to the relative volume of PCBs released into the River. For example, suppose that dredging one square foot of sediment from the river bed costs one dollar. It will cost roughly that same dollar whether the PCB levels are 20 parts per million or 200 parts per million. The sediment has to be sucked off the river bottom by a specially equipped barge and disposed of properly.[1] Transportation of the dredged material adds to the cost, and that cost is based on distance and volume rather than PCB concentration. Although the volumes of

_____

[1] There are admittedly some differences in disposal costs when PCB concentrations exceed 50 parts per million, but overall the cost of cleanup is not largely dependent on relative PCB contamination.

PCBs discharged obviously have some correlation with the extent of the costs, the relationship between volume and cost of cleanup is a loose one. As such, apportioning liability based on volumes would not be advisable.

It is worth taking a detour to explore the premise of the government's argument. Implicit in my analysis so far is that the "harm" at issue here is the *cost* required to clean up the river. After all, this is not a case about the environment or pollution in the abstract, but about who should *pay* for cleaning up the Site. These cleanup costs – not the pollution itself – are what is subject to apportionment, and if these costs do not have a strong causal link with pollution volume, then there would seem to be little reason to apportion them on that basis. There is some precedent for this approach. *See Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.,* 746 F.Supp.2d 692, 738 (D.S.C. 2010) ("A method [of apportionment] that does not take . . . the cost of the remediation into account does not reasonably account for the harm at the Site."); *Chem-Nuclear Systems, Inc. v. Bush,* 292 F.3d 254, 260 (D.C. Cir. 2002) (finding that, to show divisibility, party must prove "the amount of the harm that it caused" was less than $7,660,315 worth of cleanup costs).

The divisibility cases before and after *Burlington Northern* do not generally focus on the harm's relationship to cleanup costs, however. Instead, they treat the divisibility issue as though the "harm" to be divided is the actual, physical pollution at issue: the plume of oil, the contaminated river, or the land itself. That is, many cases treat the divisibility question as a matter of whether the pollution in question can actually be divided, rather than whether the *cost* of cleaning up the pollution is separable based on geography or volume. This could be because in a typical divisibility case it is simply assumed that more pollution equals more cleanup cost, and that is surely a reasonable assumption in most cases, particularly when the pollution involves a discrete piece of

8

land or geographically distinct areas. But it could also be because CERCLA cases rely on divisibility considerations imported from the Restatement of Torts and the private injury paradigm, which do not translate perfectly to the CERCLA context. In short, cleaning up a polluted site is different than compensating a cattleman for his poisoned cows. As noted above, in a CERCLA enforcement action the plaintiff (the United States) is not seeking to be compensated for the value of the property it lost, it is seeking either to be compensated for its own cleanup efforts or (as here) to require others to undertake such efforts. Ultimately, the divisibility question is a causation question, and when the case is about cleanup we should be concerned with assessing to what extent the parties' behavior caused the cleanup expenses rather than which parties caused the pollution itself. Although in many cases the two questions have identical answers, here the cleanup expenses are not reasonably correlated with the volumes of pollution each party contributed. Thus, I agree with the United States that the "harm" at issue in this action is the cleanup cost, and I conclude that these costs are not reasonably divisible on the basis of volume.

But even if I were to view the "harm" here as the pollution itself, rather than the costs of cleaning it up, I would still conclude that the Site is not divisible based on volume. I reach this conclusion because, as with the cleanup costs, the extent and nature of the environmental harm in the River is not easily correlated with volumes of PCBs discharged by the various parties. Instead, numerous factors independent of the volume of pollution have affected the Site. First, I note that vast quantities of PCBs have flowed downstream and into Green Bay and Lake Michigan. We do not know exactly how much, of course, but the EPA has estimated the figure at 160,000 pounds:

> It is estimated that some 160,000 pounds of PCBs have already left the Fox River and entered Green Bay and Lake Michigan. On average, 300 to 500 additional pounds are flushed from the Lower Fox sediment each year. Floods would flush

9

additional thousands of pounds into Green Bay. Once PCBs are released into the bay and Lake Michigan, they are extremely difficult, if not impossible, to recover. In addition, countless amounts of PCBs have been released into the air as well.

(*See* http://www.dnr.state.wi.us/org/water/wm/foxriver/sites/depositn.html, last visited July 5, 2011.)

Whatever the exact figures are, it is undeniable that what's left in the River bottom *now* (the problem to be addressed by the cleanup) is not necessarily representative of the pollution that was released into the River decades ago during the period that carbonless copy paper was produced. The harm, in other words, is not a stable, stationary site but a dynamic one. The sediment that is currently at the bottom of the River is in many ways just a snapshot of the pollution that has persisted, often by the mere happenstance of river depth, currents, etc. Moreover, geography and the flow of the river over 50 years have created a variety of different areas requiring remediation. Some of these areas may be capped, while others must be dredged. The depth of the sites and their location largely control these decisions. These independent factors preclude an apportionment analysis that is based primarily on the volumes of PCBs that the parties discharged.

This conclusion is borne out by analogy to other examples from the Restatement. Illustrations 14 and 15 use the same river example described above, but impose joint and several liability because the damages were not dependent on the relative volumes of the oil discharged. Instead, independent factors played a role in causing the harm:

14. A Company and B Company each negligently discharge oil into a stream. The oil floats on the surface and is ignited by a spark from an unknown source. The fire spreads to C's barn, and burns it down. C may recover a judgment for the full amount of his damages against A Company, or B Company, or both of them.

15. The same facts as Illustration 14, except that C's cattle drink the water of the stream, are poisoned by the oil and die. The same result.

10

Rest. (2d) Torts, § 433A, cmt. 1, illus. 14, 15.

The key point in these examples is that the occurrence of the harm – the burned barn, the dead cattle – is *not* dependent on the volumes of oil polluted into the river. (Or at least it is not well-correlated with volume.) For example, if B had discharged only *half* the oil into the stream, presumably the barn would still have burned and the cattle would still have poisoned. And even if A polluted 90% of the oil and B polluted only 10%, it is possible that, due to the vagaries of dispersal of oil on a river, it was B's oil that actually ignited and caused the damage. The occurrence of independent events means we cannot reasonably conclude that either A or B actually caused the harm, and so joint and several liability is appropriate.

The overarching point is that divisibility allows a party to be liable only "for the portion of the total harm that he has himself <u>caused</u>." *Burlington Northern,* 129 S. Ct. at 1881 (emphasis added). Here, even if it could be determined that NCR and AP contributed, say, 25% of the PCBs into the river, there would not be a reasonable basis to further conclude that they only caused 25% of the harm. This is because the harm is the cost of remediation itself, and this is only loosely based on the actual PCB contributions of NCR, AP and the numerous other parties. And even if the harm is the actual pollution in the riverbed, independent factors and the passage of time have precluded our ability to conclude that any specific party caused given portions of harm. For these reasons, I conclude that NCR and AP have a low likelihood of success in meeting their burden to show that the harm is divisible on the basis of the companies' volume of PCB discharges.

**b. Divisibility Based on Geography**

NCR (but not AP) also argues that there is a basis for dividing OU4, which is the largest area of the river and the most expensive to remediate, on the basis of geography. Its expert, Dr. John

Connolly, argues that when a particular area of the river is found to have much higher concentrations of PCBs in it, compared to the area immediately upriver of that location, that signifies the presence of a new, independent source of contamination. The contribution of the new source can be measured by measuring the increased contamination. Dr. Connolly opined, based on core samples and Aroclor comparisons between different sites, that in OU4, upriver sources contributed 38% of the total PCBs in OU4A and 22% of the total PCBs in OU4B. The rest of the contamination in OU4 came from sources local to OU4 itself. Thus, he believes the contamination is divisible on the basis of geography. (Dkt. # 142 at ¶¶ 8-11.)

Even accepting Connolly's calculations, however, the divisibility argument suffers from the same problem identified above. Specifically, NCR has done nothing to link the cost of cleaning up OU4 to the specific amounts and locations of the PCB pollution. Even if it were true that upriver sources only contributed 38% of the total PCBs in the area known as OU4A, for example, that does not translate into the conclusion that such sources should only be liable for 38% of the cost of cleaning up that part of the river. As noted above, the cost of remediating a given section of the river is not directly dependent on the level of contamination, as many of the costs are fixed (dredging, transportation), and others are based on other independent factors. It might be another story if NCR could identify sections of the river into which its PCB discharges simply never flowed at all (for example, OU1, but that is not at issue here). In such a case, geographical divisibility could make sense because it is simple enough to measure the costs of cleaning up area A versus area B. "Typically, this will involve showing that the 'site consists of non-contiguous areas of soil contamination.'" *United States v. Capital Tax Corp.,* 545 F.3d 525, 535 (7th Cir. 2008) (quoting Hercules, 247 F.3d at 717-18 (quotations omitted)). But here, NCR's own expert concedes that

substantial quantities of its PCB discharges made their way into OU4. Thus, there are likely numerous sections of OU4 that would need to be cleaned up even if the other polluters had never existed. Other areas need to be capped or dredged (at different costs) based on how deep and how contaminated the sediment is. In sum, the geography argument is really just a twist on the volumetric argument. As such, I conclude that NCR would have little likelihood of success showing that areas of the river into which its PCBs flowed are separable on the basis of geography.

## 2. The Remedy

NCR and AP also argue that the United States has a low likelihood of showing that the remedy selected by the EPA is not arbitrary and capricious. In particular, they argue that dredging – as opposed to capping and sand covering – is a more expensive and potentially environmentally harmful remedy. In addition, they also argue that the EPA should have used a ROD amendment to account for cost increases between 2007 and the present rather than the more recent "Explanation of Significant Differences" ("ESD").

I address the procedural objection first, keeping in mind that the EPA is afforded substantial deference in construing its own regulations. Here, the regulations provide for two alternatives when a remedy requires significant changes:

> (2) After the adoption of the ROD, if the remedial action or enforcement action taken, or the settlement or consent decree entered into, differs significantly from the remedy selected in the ROD with respect to scope, performance, or cost, the lead agency shall consult with the support agency, as appropriate, and shall either:

> (i) Publish an explanation of significant differences when the differences in the remedial or enforcement action, settlement, or consent decree significantly change but do not fundamentally alter the remedy selected in the ROD with respect to scope, performance, or cost. To issue an explanation of significant differences, the lead agency shall:

(A) Make the explanation of significant differences and supporting information available to the public in the administrative record established under §300.815 and the information repository; and

(B) Publish a notice that briefly summarizes the explanation of significant differences, including the reasons for such differences, in a major local newspaper of general circulation; or

(ii) Propose an amendment to the ROD if the differences in the remedial or enforcement action, settlement, or consent decree fundamentally alter the basic features of the selected remedy with respect to scope, performance, or cost.

40 C.F.R. § 300.435.

To summarize: under subsection (i), the agency may issue an explanation of significant differences if the differences "do not fundamentally alter the remedy selected in the ROD with respect to scope, performance, or cost." But under subsection (ii), an amendment to the ROD is required if the differences *do* "fundamentally alter the basic features of the selected remedy." (An amendment to the ROD requires a number of additional procedural steps, including a further round of public comment.)

Here, the government states that the changes, which resulted from additional data derived from subsequent design work, resulted in a 62% increase in the remedy cost estimate. In the outside world, a 62% increase in cost projections is exceptionally large, but that is not necessarily true here. In its ESD, the EPA explained its decision to use an ESD rather than a ROD amendment. (Dkt. # 147, Ex. 1 at 15.) Specifically, it explained that cost estimates have an expected accuracy range of -30% to +50% – in other words, a large built-in uncertainty factor. Because the +62% increase was close to the actual expected range, the additional 12% above the uncertainty factor was relatively minor. As such, although it was undeniably a significant difference in cost, the EPA did not believe it fundamentally altered the remedy because it was close to the expected range. Given the deference

14

owed to such determinations, I conclude that the government has a strong likelihood of succeeding in showing that it followed proper procedures in making the proposed changes.

As for the "merits" of the remedy, I reach the same conclusion. The capping-versus-dredging debate has been waged for a long time, and the EPA has explained at length why it has chosen to require dredging in some areas and allow the less expensive capping in others. Dredging has the obvious benefit of getting the PCBs out of the River entirely, whereas capping may be more appropriate when, for example, the PCBs are buried beneath clean sediment. NCR and AP's preferences for the less expensive option are clear, but these are merely preferences. They do not come close to showing that the EPA's decisions on these matters are arbitrary or capricious.

**B. Irreparable Harm**

NCR and AP also argue that the government has not shown that it or the public will suffer irreparable harm if the preliminary injunction is not issued. First, they argue that they are essentially being penalized for having performed ahead-of-schedule in previous years. In particular, last year (2010) was a record year for dredging, which means the cleanup project will not fall behind original projections if the preliminary injunction is denied. Moreover, they have agreed to spend some $50 million on cleanup costs this year and the cleanup effort is currently active (albeit not at the pace preferred by the government). The bottom line, they argue, is that even at the government's proposed pace, there will still be PCBs in the river at the end of 2011. As such, the government cannot say that the public will be harmed by any reduction in the pace of the cleanup.

It is true that the PCB problem will not be solved this year, regardless of the pace of cleanup. But it should go without saying that any significant reduction in pace in one year will forestall the full remediation of the problem in the future. Under the government's proposal, substantially more

dredging will be undertaken this year, which means the public will benefit from the full cleanup sooner. Depriving the public of that benefit is certainly irreparable harm. After all, we are not talking about picayune disputes at the margins of the cleanup effort but a fundamental difference involving hundreds of thousands of cubic yards and up to $44 million dollars. In addition, reduction in PCB levels, even if not a complete reduction, result in a safer river. People continue to eat fish from the Fox River despite warnings to the contrary, and the public health will thus be improved by entry of an injunction. Provided that the remedy proposed meets with the regulatory requirements addressed above, an injunction requiring an increased pace in river cleanup is clearly directed to avoiding the irreparable harm caused by continued exposure to PCBs.

**C. The Relief Sought**

**1. Liability of Appleton Papers Inc.**

Although the liability of NCR has not been contested, Appleton Papers argues that its own liability under CERCLA has not been established and that the government will have difficulty showing that it is liable as a successor in interest. Understanding its argument requires a brief corporate history. The PCBs at issue here were released into the Fox River by a plant in Appleton, owned by Appleton Coated Paper Company ("ACPC"), and at Combined Locks, a facility then owned by Combined Papers Mills, Inc. These two companies were merged into a company called Appleton Papers, Inc. (with a comma, a different entity than the Defendant of the same name), and that company was then merged into NCR in 1973.

In 1978 a company called Lentheric, Inc. bought the Appleton and Combined Locks plants from NCR. Lentheric then changed its name to Appleton Papers Inc., which is the Defendant here. Although the purchase of those plants was an asset purchase rather than a corporate stock purchase,

16

the buyer (i.e., the present Defendant) did agree to assume several of the plants' liabilities from the seller. As part of the asset purchase agreement, the future Appleton Papers Inc. agreed that it would "assume, pay, perform, defend and discharge, if and when due, to the extent not paid, performed, defended or discharged prior to the Closing Date," all of the following:

> all of Seller's obligations and liabilities of any kind, character or description relating to the period subsequent to the Closing Date, which are not known to Seller on the Closing Date, with respect to the compliance of the assets, properties, products or operations of APD [NCR's Appleton Papers Division] with all governmental laws, ordinances, regulations, rules, and standards; ...

> all of Seller's liabilities ... whether accrued, absolute, contingent, or otherwise ... whether asserted or not and whether arising from transactions, events or conditions occurring prior to or after the Closing Date, with respect to compliance of the Property ... with all applicable federal, state and local and other governmental environmental and pollution control laws, ordinances, regulations, rules and standards.

(Dkt. # 139, Ex. 3 at 17-21.)

As suggested above, when a company buys assets, rather than stock, it is not generally assuming the liabilities of the seller. In some cases, however, an asset-buying company may be held liable under CERCLA as a successor. *United States v. General Battery Corp., Inc.,* 423 F.3d 294, 305 (3d Cir. 2005); *United States v. Mexico Feed and Seed Co., Inc.,* 980 F.2d 478, 487 (8th Cir. 1992). The successor liability doctrine reflects courts' belief that, in enacting CERCLA, Congress did not want to "leave a loophole that would enable corporations to die 'paper deaths, only to rise phoenix-like from the ashes, transformed, but free of their former liabilities.'" *North Shore Gas Co. v. Salomon Inc.,* 152 F.3d 642, 649 (7th Cir. 1998) (quoting *Mexico Feed & Seed Co.,* 980 F.2d at 487). In other words, successor liability prevents polluters from being able to shift away their liabilities by agreement.

17

Here, the government argues that the terms of the 1978 asset purchase agreement demonstrate that Appleton Papers Inc. has assumed CERCLA liability as a successor to the activities of ACPC and Combined Paper Mills. It is true that the terms of the clauses quoted above generally cover liability arising out of the violation of environmental regulations and government investigations and the like. (The exact scope of these clauses is not before me.) But successor liability is an equitable doctrine designed to prevent injustice or fraud, not to create a wholly new suable entity with duplicate liability to the government. Here it is crucial that NCR, the seller of the assets, remains in existence and is undeniably liable to the United States under CERCLA. It is already funding substantial portions of the cleanup. The 1978 asset sale was not an attempt to shirk environmental liability, and no corporation died a "paper death." As such, none of the equitable considerations that would otherwise support imposition of successor liability are in play here. Because NCR was liable and remains so, there is no liability for Appleton Papers to "succeed" to. There cannot be a "successor" without a succession.

This conclusion flows not only from common law of successor liability but from CERCLA itself. Section 107(e) of CERCLA provides: "No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from ... any person who may be liable ... under this section, to any other person the liability imposed under this section." 42 U.S.C. § 9607(e)(1). In other words, agreements between private parties do not affect those parties' underlying CERCLA liability with respect to the government. This means that the 1978 asset agreement could not transfer liability *per se*, it merely transferred the financial risk of that liability, as with an insurance policy. If a tortfeasor has insurance, that does not give the injured party a second defendant to name. The insurer is not liable for the tort itself, it is liable as a result of its

indemnity agreement with the insured. And in fact the next sentence in § 107(e) of CERCLA provides that "Nothing in this subsection [107(e)] shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section." 42 U.S.C. § 9607(e). Thus, CERCLA allows parties to distribute the financial impact of liability by contract, they cannot contract away CERCLA liability itself. *Harley-Davidson, Inc. v. Minstar, Inc.,* 41 F.3d 341, 342-343 (7th Cir. 1994) ("we agree with every other appellate court that has been called on to interpret it that it does not outlaw indemnification agreements, but merely precludes efforts to divest a responsible party of his liability.") As the Seventh Circuit explained: "The first sentence speaks of 'transfer[ring] ... liability,' that is, of shifting liability from one person to another. Indemnification does not do that. The indemnified party remains fully liable to whomever he has wronged; he just has someone to share the expense with. The second sentence clearly permits sharing, just as the first forbids shifting." *Id.*

The above provisions of CERCLA mean that even if NCR had wanted to divest itself of CERCLA liability, its effort would have been void. Instead, at most the asset purchase agreement merely made Appleton Papers liable as an indemnitor to NCR rather than a substitute or successor to liability *vis-a-vis* the government. "Indemnification does not, as we have already explained, 'transfer' liability from the person indemnified. The latter remains fully liable to the victims of his wrongdoing. If a person buys automobile liability insurance and later is sued for damages arising out of an automobile accident, he cannot defend by saying, 'I have insurance, so am not liable to you; go sue the insurance company.'" *Harley-Davidson,* 41 F.3d at 343. The government has cited several cases involving successor liability arising out of asset purchase agreements, but these are all cases between private companies litigating the scope of such agreements. (Just as Appleton

19

Papers and NCR litigated and arbitrated the scope of their own agreement.) Notably, none of these cases involves an action by the United States seeking to hold a non-polluter liable as a successor under CERCLA itself merely by virtue of such an agreement. In sum, when the seller of assets is still in existence and its liability to the government is still "live," an assumption of liability agreement like the one at issue here does not create liability on the buyer's part, it merely creates a duty to indemnify the seller. "If the predecessor is still a functioning corporation which can compensate Plaintiffs, there is no equitable reason for holding Clark liable. The rationale behind successor liability in CERCLA, to distribute costs and to allocate the burden of the cleanup to others than the taxpayers are irrelevant if the predecessor can provide a remedy." *Ninth Ave. Remedial Group v. Allis-Chalmers Corp.,* 195 B.R. 716, 728 (N.D. Ind. 1996).

The United States also argues that a 1998 settlement agreement between NCR and Appleton Papers creates successor liability. But again, private agreements between companies cannot create or shift liability to the government under CERCLA. They merely distribute the risk of paying for that liability, and that is what the parties' settlement agreement did. It established a shared responsibility for payments, and subsequent arbitration adjusted those amounts further. Moreover, the agreement explicitly disclaimed any suggestion that either party was admitting to any liability whatsoever. All these agreements demonstrate is that Appleton Papers and NCR will share in the costs resulting from the Fox River cleanup. They do not establish that Appleton Papers is a successor to the liability that underlies this action.

In sum, private agreements such as the ones entered into by Appleton Papers and NCR can constitute evidence that one entity succeeded another. But here, they do not establish successorship because the original liability under CERCLA has remained with the seller. The United States has

not established any reason based on equity or CERCLA itself to allow it to sue an additional entity merely because of indemnity and settlement agreements. Accordingly, I find that it will have little success in attempting to demonstrate that Appleton Papers Inc. is liable as a successor under CERCLA.[2]

## 2. Appleton Papers Inc. as a Necessary Party

The United States argues that even if I conclude Appleton Papers Inc. is likely not liable under CERCLA, it should still be subject to the injunction because it is "joined at the hip" with NCR by virtue of the agreements described above. In addition, it has a controlling interest in the LLC that NCR and Appleton Papers have formed to undertake the cleanup. Thus, if an injunction bound NCR but not Appleton Papers, it would be ineffective because NCR does not control the LLC that is actually running the cleanup work.

I am not aware of any authority for issuing an injunction to a party when that party is not liable under the law that is the basis for the injunction motion. The United States cites Rule 19, but that is simply a rule governing the joinder of necessary parties to a lawsuit. Appleton Papers has never denied that it is a proper party to this lawsuit; it has asserted that, having been sued properly, it is not liable. Accordingly, Rule 19 does not provide authority for an injunction against Appleton Papers.

The government also cites Rule 65(d)(2)(C), which states that an injunction may bind the parties as well as "other persons who are in active concert or participation with" them. Fed. R. Civ.

---

[2]The United States also throws in a suggestion that Appleton Papers may have itself polluted PCBs into the river following its creation in 1978. Thus, it would have primary liability under CERCLA. This argument has not been sufficiently supported, and I cannot conclude it has much likelihood of establishing liability.

21

P. 65(d)(2)(C). That rule "is a codification of the common-law rule allowing a non-party to be held in contempt for violating the terms of an injunction when a non-party is legally identified with the defendant or when the non-party aids or abets a violation of an injunction." *Illinois v. U.S. Dep't of Health & Human Servs.*, 772 F.2d 329, 332 (7th Cir. 1985). "Consistent with this purpose, we have explained that a person is in 'active concert or participation' with an enjoined party, and thus bound by the injunction, if 'he aids or abets an enjoined party in violating [the] injunction,' or if he is in privity with an enjoined party." *Blockowicz v. Williams,* 630 F.3d 563, 567 (7th Cir. 2010) (citations omitted). Here, the government has not suggested that Appleton Papers will be aiding and abetting any injunction violations. But by arguing that Appleton Papers is joined at the hip with NCR, it suggests that it is "in privity" with NCR and thus subject to any injunction this Court might issue.

First, I note that the rule does not explicitly apply because it deals with "other persons" (non-parties), and here Appleton Papers is a party. The rule, and the cases applying considerations of "non-party privity" thus do not apply. *See, e.g., National Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v. National Spiritual Assembly of Baha'is of U.S., Inc.,* 628 F.3d 837, 850 (7th Cir. 2010). The ultimate question is: on what basis would Appleton Papers be bound by an injunction? It is not CERCLA itself, as discussed above. Instead, its liability here is to NCR – not to the government – by virtue of the asset purchase and settlement agreements described above. The government, of course, was not a party to these agreements and cannot enforce their terms through the injunction it is proposing. Accordingly, I cannot discern any basis upon which I could enjoin Appleton Papers Inc. to comply with the EPA's unilateral administrative order and recent directive that it complete sediment remediation in 2011 pursuant to that order when

22

the underlying liability of Appleton Papers Inc. is so questionable.

### 3. The Proposed Injunction

Above I concluded that the United States has established, at least in the abstract, a sound basis supporting preliminary injunctive relief against NCR but not against Appleton Papers Inc. This creates a number of practical problems, as all sides appear to concede. The principal problem is that Appleton Papers Inc. controls the LLC that is directing the cleanup. Normally, a court would not find itself hamstrung by the private agreements entered into by defendants subject to its injunctive power. But the circumstances here create an exception. The LLC the Defendants have created has all the contracts with the environmental contractor, a company called Tetra Tech, which in turn controls one or more subcontracts. These entities are currently in place and are performing the cleanup. Given the complexity of the cleanup action and the equipment involved, not to mention the paperwork, it is undisputed that the LLC is the only instrument that could accomplish the government's directive *this season*. Because Appleton Papers – not NCR – controls that instrument, however, an injunction directed solely at NCR would essentially be meaningless. NCR simply does not have the power to achieve what the government wants. Accordingly, the injunction sought by the United States will be denied. If NCR and Appleton Papers are truly "joined at the hip" (to use the government's phrase), then an injunction against only one entity will be pointless.[3]

### D. Conclusion

---

[3]This is not to say that private agreements can preclude injunctive relief. It is only the particular circumstances of this case that make the specific relief sought by the government unavailable. The findings set forth above support injunctive relief of some kind against NCR, which would then apparently be entitled to indemnification from AP. The government may seek appropriate relief to compel NCR to undertake or continue the clean-up, but it has not done so in its current motion. For example, NCR may be able to contract directly with Tetra Tech in the event the LLC discontinues its efforts. This or other possible avenues of relief are not currently before the Court.

23

I conclude that the Plaintiffs have set forth a *prima facie* basis for preliminary relief against NCR, but not against Appleton Papers Inc., an entity I find unlikely to be deemed liable under CERCLA. I am unable to discern any basis for asserting preliminary equitable power over an entity whose liability under the statute sued upon is highly questionable. Because that entity controls the only means that apparently could implement the preliminary relief sought by the government, the motion for preliminary relief must be denied. Although I cannot find a legal basis for ordering the relief the government seeks, it is hoped that both Defendants will find it in their interest to comply with the proposed injunction to the extent feasible. Ultimately, it is doubtful that Appleton Papers Inc. will be able to have it both ways. It cannot continue to control the means of cleanup and yet remain outside the injunctive power of this Court. The fact that it does control the cleanup is only a practical bar to the injunctive relief sought here; the parties' private arrangement cannot pose a long-term bar to the government's enforcement powers.

The motion for a preliminary injunction is **DENIED**. The motion for registration of judgment is **GRANTED**. The motion to file a sur-reply is **GRANTED**.

**SO ORDERED** this 5th day of July, 2011.

 /s William C. Griesbach
William C. Griesbach
United States District Judge

24