IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

UNITED STATES OF AMERICA and
THE STATE OF WISCONSIN,

       Plaintiffs,

  v.

NCR CORPORATION, *et al*.,

       Defendants.

No. 10-CV-910-WCG

**DEFENDANT APPLETON PAPERS INC.'S PROPOSED FINDINGS
OF FACT IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Appleton Papers Inc. ("API"), by its counsel, submits the following Proposed Findings of Fact in support of its Motion for Summary Judgment.

**A.    Parties, Jurisdiction, and Venue.**

1.    API is a Delaware corporation with its principal place of business in Appleton, Wisconsin. Dkt. 65 (Counterclaim of API), p. 43, ¶ 16.

2.    The United States of America and State of Wisconsin commenced this civil action pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9606 and 9607. Dkt. 30 (First Amended Complaint), ¶ 1.

3.    This Court has jurisdiction over the subject matter of this action pursuant to Sections 113(b) and (e) of CERCLA, 42 U.S.C. §§ 913(b) and (e), and 28 U.S.C. §§ 1331 and 1345. Dkt. 30, ¶ 2; Dkt. 65 (Answer of API), ¶ 2.

4.    Venue is proper in this district pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 913(b), and 28 U.S.C. §§ 1391(b) and (c) because the claims arose and the

threatened and actual releases of hazardous substances occurred in this district. Dkt. 30, ¶ 3; Dkt. 65, ¶ 3.

### B. The Government's Allegations As To API's Alleged Liability.

5. For more than 15 years, the United States has alleged that API is liable under CERCLA for PCB contamination in the Lower Fox River and Green Bay. Dkt. 139-10.

6. In its First Amended Complaint, the Government claimed that API is liable under CERCLA. Dkt. 30, ¶¶ 45-52, 54. Specifically, the Government claimed that API "is a successor to certain relevant liabilities of NCR Corporation." Dkt. 30, ¶ 45. API denied each such allegation. Dkt. 65, pp. 13-17, ¶¶ 45-54 and p. 34, ¶¶ 1-6.

7. The Government made this same allegation of successor liability against API in the 106 Order it issued to API and others in November 2007:

> Appleton Papers Inc. **("API") is a party that is liable** for payment of response costs and performance of response activities at the Site **because API is: (1) a successor** to one or more corporate predecessors that, at the time of disposal of hazardous substances, owned and/or operated a facility at which such hazardous substances were disposed of, and from which there has been a release of hazardous substances to the Site; and (2) **a successor** to one or more corporate predecessors that by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances at a facility owned or operated by another party or entity and from which there has been a release of hazardous substances to the site.

Dkt. 30-1 (106 Order), ¶ 7.a.vi; ¶ 7.a.ii[1]

8. The United States based its successor liability claim on a 1978 asset purchase agreement with NCR:

---

[1] Many of the documents upon which API relies in support of this Motion for Summary Judgment has been previously filed in this action. To avoid duplicate filings, API is citing to the document number assigned to the document when previously filed.

> In 1978, Appleton Papers Inc. [API] . . . and . . . B.A.T. Industries, p.l.c. ("BAT") – acquired the assets of the Appleton Papers Division from NCR, and Appleton Papers Inc. and BAT assumed certain liabilities in connection with the asset purchase.

*Id.*, ¶ 7.a.vi.

9. In the 106 Order, the United States asserted no other basis for its CERCLA liability allegation. Dkt. 30-1.

### C. API Did Not Acquire Assets From NCR Until Seven Years After The Use Of PCB's Had Ceased In 1971.

10. Use of PCBs in making NCR brand carbonless copy paper ("CCP") ceased in 1971. Dkt. 30-1, ¶ 7.a.iv.

11. During the time that PCBs were used in CCP, Appleton Coated Paper Company ("ACPC") owned and operated a paper coating facility in Appleton, Wisconsin, at which CCP was manufactured. Dkt. 30-1, ¶ 7.a.iii-iv.

12. From 1954 to 1969, Combined Papers Mills, Inc. owned and operated a paper mill in Combined Locks, Wisconsin. Dkt. 30-1, ¶ 7.a.iii, v.

13. In September 1969, the National Cash Register Company acquired Combined Paper Mills, Inc., which became its wholly-owned subsidiary. Dkt. 30-1, ¶ 7.a.v.; *see also* Declaration of Ronald R. Ragatz in Support Of Its Motion For Summary Judgment ("Ragatz Dec."), ¶ 2, Ex. 1.

14. On or about September 30, 1970, the National Cash Register Company acquired ACPC, making it a wholly-owned subsidiary. *Id.*; *see also* Ragatz Dec. ¶ 3, Ex. 2.[2]

---

[2] This declaration is being filed today, along with API's Motion for Summary Judgment.

15. In 1971, ACPC and Combined Papers Mills, Inc. were merged into Appleton Papers, Inc. (with a comma – a different corporation than API). Dkt. 30-1, ¶ 7.a.v; *see also* Dkt. 139-1.

16. In 1973, the merged entity, Appleton Papers, Inc., was then merged into NCR Corporation, at which time it became the Appleton Papers Division of NCR. Dkt. 139-2; see also Dkt. 30-1, ¶ 7.a.v.

17. On June 30, 1978, a company named Lentheric, Inc., a subsidiary of B.A.T Industries, p.l.c. ("BAT"), acquired certain assets of the Appleton Papers Division of NCR, including the Appleton and Combined Locks facilities, in an asset purchase transaction. Dkt. 139-3 The terms of the purchase and sale were set forth in an asset purchase agreement. *Id*. ("1978 Agreement").

18. Lentheric, Inc. then changed its name to Appleton Papers Inc. (no comma), the Defendant in this enforcement action. Dkt. 172, p. 16.

19. It is undisputed that API did not first start doing business until July 1978 after it purchased the assets of the Appleton Papers Division from NCR.

**D.     The 1978 Agreement.**

20. The 1978 Agreement does not make any reference to Fox River contamination or liabilities, CERCLA liabilities or PCBs. Dkt. 139-3.

21. On March 29, 2011, the United States (but not the State of Wisconsin) filed a Motion For A Preliminary Injunction. Dkt. 122.

22. In its brief in support of the Motion, the United States devoted a single paragraph to the issue of NCR and API's alleged liability under CERCLA stating, in part: "There is no question that NCR and API are liable under CERCLA for the contamination

in OUs 2-5." Dkt. 126, p. 23. The United States, however, offered no facts or argument to show that API (as opposed to NCR) was liable under CERCLA. *Id*.

23. In its Reply Brief in Support of its Motion for Preliminary Injunction, the United States cited to three provisions in the 1978 Agreement as the basis for its argument that API had assumed Fox River liabilities. Dkt. 150, pp. 8-9 of 35.

24. In Paragraph 1.4.9 of the 1978 Agreement, the first provision cited by the United States, API agreed to assume certain liabilities of the Seller (NCR):

> all of Seller's liabilities (other than liabilities with respect to claims asserted by or on behalf of private parties), whether accrued, absolute, contingent or otherwise, and whether or not reflected or reserved against on the Financial Statements or the Closing Date Balance Sheet or 1977 Balance Sheet or on the books of account or other records of APD, whether asserted or not and whether arising from transactions, events or conditions occurring prior to or after the Closing Date, **with respect to compliance of the Property or the products or operations of APD with all applicable federal, state and local and other governmental environmental and pollution control laws, ordinances, regulations, rules and standards**.

Dkt. 139-3, p. 21 of 48, ¶ 1.4.9 (emphasis added).[3]

25. The Appleton Papers Division was formed in 1973 (Dkt. 143, p. 5, Dkt. 30-1, ¶ 7.a.v), and operated until the sale of assets to API in June 1978.

26. In connection with its Motion for Preliminary Injunction, the United States offered no evidence that the Fox River PCB contamination for which the Government seeks to hold API responsible resulted from the failure of the property of the APD, or the products or operations of APD, to comply with all applicable federal, state and local and other governmental environmental and pollution control laws, ordinances, regulations, rules and standards as of June 30, 1978. Dkt. 150, pp. 8-9 of 35.

---

[3] The abbreviation "APD" in the above quote refers to the Appleton Papers Division of NCR. *Id*, p. 8 of 48. The term "Property" refers to the assets that were being purchased. *Id*., p. 9-11 of 48.

27. In Paragraph 1.4.3 of the 1978 Agreement, the second provision cited by the United States, API assumed:

> all of Seller's obligations and liabilities . . . **with respect to the compliance of the assets, properties, products or operations of APD with all governmental laws**, ordinances, regulations, rules and standards."

Dkt. 139-3, p. 19 of 48, ¶ 1.4.3 (emphasis added).

28. In connection with its Motion for Preliminary Injunction, the United States offered no evidence that the Fox River liabilities for which the Government seeks to hold API responsible arise from the failure of the assets, properties, products, or operations of the Appleton Papers Division to comply with governmental laws, ordinance, regulation, rules or standards as of June 30, 1978. Dkt. 150, pp. 8-9 of 35.

29. In Paragraph 1.4.5 of the 1978 Agreement, the third provision cited by the United States, API assumed:

> **all of Seller's obligations and liabilities** of any kind, character or description relating to the period subsequent to the Closing Date **which arise out of or in respect of any** threatened suit, patent infringement suit, patent or trademark interference or opposition, action, claim, investigation by any governmental body, or legal, administrative or arbitration **proceeding set forth on Schedules A or M,** in each case whether such obligation or liability is accrued, absolute, contingent or otherwise and whether or not such obligation or liability is reflected or reserved against on the Financial Statements or the Closing Date Balance Sheet;

Dkt. 139-3, p. 20 of 48, ¶ 1.4.5 (emphasis added).

30. Neither Schedule A nor Schedule M to the 1978 Agreement disclose any pending or threatened suit, claim, action, investigation or proceeding relating to PCBs or the Lower Fox River or Green Bay. Ragatz Dec., ¶ 4, Ex. 3; ¶ 5, Ex. 4.

31. The Government has offered no evidence that the "violation" referred to in ¶ 1.4.5 of the 1978 Agreement had anything to do with Fox River liabilities.

32. NCR continued to exist after the 1978 asset transaction, remains in existence today, and is a Defendant in this action. Dkt. 30, ¶¶ 45, 53.

33. The United States concedes that NCR is viable. Dkt. 126 (Brief In Support of the United States' Motion For A Preliminary Injunction), p. 15, n.7.

### E. In The Mid-1990s, NCR And API/BAT Were Involved In Litigation Over Whether API/BAT Had Assumed Fox River Liabilities In The 1978 Agreement.

34. In its Preliminary Injunction Reply Brief, the United States claimed for the first time that API expressly assumed NCR's CERCLA liability in a 1998 settlement and 2005 arbitration. Dkt. 150, pp. 10-12.

35. In 1994, the State of Wisconsin first notified NCR (but not API) that it considered NCR to be a potentially responsible party ("PRP") for PCB contamination in the Lower Fox River ("LFR"). Dkt. 139-6.

36. NCR tendered that PRP letter to API and BAT, claiming that if NCR had any such liability, API and BAT had assumed such liability in the 1978 Agreement. Id.

37. API and BAT denied that they had assumed any such liabilities. Dkt. 139-7.

38. In June 1995, NCR sued API and BAT in the United States District Court for the Southern District of New York. Dkt. 139-8.

39. In that lawsuit, the two sides each sought indemnity from the other for any Fox River liabilities and for other liabilities. Id.; Dkt. 139-9.

40. Again, API and BAT denied NCR's claim that it had assumed such liabilities. Dkt. 139-9.

41. In February 1996, the Fish and Wildlife Service ("FWS") first named API and NCR as PRPs under CERCLA for natural resource damages arising from PCB contamination in the LFR. Dkt. 139-10.

42. In July 1997, the Environmental Protection Agency ("EPA") also issued a PRP letter to both API and NCR, asserting that each was liable under CERCLA for remediation of PCB contamination in the Fox River. Dkt. 139-11.

43. In 1996, in the then-pending litigation, NCR and API/BAT cross-moved for summary judgment on the issue of the assumption of any Fox River liabilities and other liabilities. Dkt. 139-12.

44. In 1997, the district court, however, denied both side's motions. *Id*.

45. In 1998, the two sides participated in mediation that eventually resulted in a settlement. Dkt. 124-1 ("Confidential Settlement Agreement Between NCR Corporation and B.A.T. Industries P.L.C. and Appleton Papers Inc." (the "1998 Settlement Agreement")).

46. In the 1998 Settlement Agreement, the parties specified that the settlement did not constitute an admission of liability:

> 7. **NO ADMISSION OF LIABILITY**: By entering into this Settlement Agreement, and the exhibits hereto, **the parties are not admitting to any** unlawful conduct or **liability on their part.** The parties further acknowledge and agree that this Settlement Agreement shall not be admissible as evidence in any federal, state, local, tribal, or administrative agency proceeding, except in a proceeding to enforce same.

Dkt. 124-1, pp. 18-19 (emphasis added); *see also id.* at p. 3 (twice) ("WHEREAS, without admitting any fact, fault, or liability…); p. 14 ("Without admitting any fact, responsibility, fault, or liability, the parties agree to combine and allocate as between themselves, beginning February 16, 1998 …").

47. In the 1998 Settlement Agreement, the parties agreed that if any costs were ever imposed upon either of them arising from the Fox River PCB contamination or other sites as defined in the 1998 Agreement, those costs would be split with API/BAT together bearing 55% and NCR bearing 45% of the first $75 million. Dkt. 124-1, p. 14.

48. The 1998 Settlement Agreement established parameters for a "compulsory, binding arbitration to allocate as between them . . . costs in excess of $75 million." *Id.* The parties agreed in a contemporaneous Subsequent Allocation Arbitration Agreement that neither side would be allocated more than 75% or less than 25% of the amounts to be expended beyond $75 million, but that "[w]ithin that range, the arbitrators may select any allocation that they deem appropriate." Dkt. 139-13 (Subsequent Allocation Arbitration Agreement between NCR, API and BAT), p. 19. Under this charge, the arbitrators were not required to base their allocation upon the terms of the 1978 Agreement.

### F. In 2005, NCR And API/BAT Participated In A Private Arbitration.

49. The arbitration hearing contemplated in the 1998 Settlement Agreement was held in October and November 2005. Dkt. 124-2, p. 6 ("Arbitration Award"). The only parties to the arbitration were NCR and API/BAT. Dkt. 124-2, p. 6.

50. The arbitrators were charged to "select any allocation that they deem[ed] appropriate" within the 75% and 25% parameters mentioned above. Dkt. 124-1, p. 19.

51. The panel made the following division of costs above $75 million as between NCR and API/BAT for Fox River Liabilities and any liabilities at other sites as defined in the 1998 Agreement:

Pursuant to this agreement of the parties, the Arbitrators deem appropriate the following allocation:

> API/BAT: Sixty (60) percent
>
> NCR: Forty (40) percent.

Dkt. 124-2, p. 7.

52. The arbitration award represented the panel's "collective judgment on the appropriate allocation under the terms of the Allocation Agreement." Dkt. 124-2, p. 8.

### G. There Is No Evidence That API's Own Operations Beginning June 30, 1978 Resulted In Any Discharge Of PCBs Into The Lower Fox River Or Green Bay.

53. In it Reply Brief in support of its Motion for Preliminary Injunction, the United States claimed for the first time there were documented PCB leaks and spills at the Combined Locks facility as late as the 1980's and 1990's. Dkt. 150, p. 6; citing to Dkt. 147-3; Dkt. 147-4; Dkt. 147-5. The United States also claimed that PCBs were detected in effluent discharged from the Combined Locks Facility in the 1980s. Dkt. 150, p. 6.

54. Dkt. 147-3 is a memorandum from 1988 or 1989 that discusses the need to replace a particular electrical transformer containing PCBs at substation "H" at the Combined Locks Facility. The memo includes the statement: "Recently, this transformer had leakage in its bushings which was corrected." Dkt. 147-3 at 1 of 5.

55. Dkt. 147-3 does not indicate what substance was leaked from the electrical transformer or whether this substance escaped from the transformer (as opposed to being contained within the transformer).

- 10 -

56. There is no evidence in Dkt. 147-3 that PCBs were released from the Combined Locks facility to the Lower Fox River or Green Bay after June 30, 1978, when API owned and operated the facility.

57. Dkt. 147-4 is a letter from 1993 indicating that PCBs were detected on the concrete floor beneath the transformer at substation "J" at the Combined Locks facility. There is a handwritten note on Dkt. 147-4 that indicates that "[t]he leak was stopped & there is no evidence of any further leaking." *Id.* at 1 of 3.

58. There is no evidence in Dkt. 147-4 that PCBs were discharged from the Combined Locks facility to the Lower Fox River or Green Bay after June 30, 1978.

59. Dkt 147-5 appears to be a laboratory analytical report from 1989, showing the results of analysis of a sample collected from the effluent at the Combined Locks facility. Dkt. 147-5 does not identify substance or substances the sample was analyzed. The words "PCBs" or 'polychlorinated biphenyl" do not appear on the document.

60. There is no evidence in Dkt. 147-5 that PCBs were discharged from the Combined Locks facility to the Lower Fox River or Green Bay after June 30, 1978.

61. The Government has offered no evidence of PCB discharges to the Lower Fox River or Green Bay from the Combined Locks Facility after June 30, 1978.

62. In sampling events that analyzed both the influent into and the effluent from the Combined Locks facility after June 30, 1978, whenever PCBs were detected in the effluent leaving the facility, they were no higher than the pre-existing level of PCBs in the river water drawn into the plant. Dkt. 139-18; Dkt. 139-19 (PCB test results); *see also* Testimony of James Beatty. Dkt. 139-20, pp. 5-6.

63. There is no evidence in the record of PCB discharges from the Appleton Facility to the Lower Fox River or Green Bay after June 30, 1978, when API owned and operated that facility.

64. After reviewing the United States' submissions and arguments, the Court issued its Decision and Order denying the United States' Motion for Preliminary Injunction. (Dkt. 172)

65. The Court concluded that it was unlikely that the United States could show that API is liable under CERCLA. *Id*., p. 24 ("I conclude that the Plaintiffs have set forth a prima facie basis for preliminary relief against NCR, but not against Appleton Papers Inc., an entity that I find unlikely to be deemed liable under CERCLA.").

66. On at least seven occasions since the United States identified API as a potentially responsible party for PCB contamination of the Lower Fox River and Green Bay in 1996, the United States has issued information requests to API pursuant to Section 104(e) of CERCLA, 42 U.S.C. § 9104(e). Ragatz Dec., ¶ 6.

Dated this 28th day of July, 2011.

                        APPLETON PAPERS INC.

                        By    /s/ Ronald R. Ragatz
                            One of Its Attorneys

Counsel for Appleton Papers Inc.:

| | |
|---|---|
| Michael L. Hermes (#1019623) | Ronald R. Ragatz (#1017501) |
| Heidi D. Melzer (#1076125) | Dennis P. Birke (#1018345) |
| Brandon J. Evans (#1063940) | Megan A. Senatori (#1037314) |
| Ericka L. Krumrie (#1066383) | DeWitt Ross & Stevens S.C. |
| Hermes Law, Ltd. | Two East Mifflin Street |
| 333 Main Street, Suite 601 | Madison, WI 53703 |
| Green Bay, WI 54301 | (608) 255-8891 |
| (920) 436-9870 | |