IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

UNITED STATES OF AMERICA and
THE STATE OF WISCONSIN,

        Plaintiffs,

   v.

NCR CORPORATION, *et al.*,

        Defendants.

No. 10-CV-910-WCG

**MEMORANDUM OF DEFENDANT APPLETON PAPERS INC.
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Appleton Papers Inc. ("API"), by its undersigned attorneys, respectfully submits this Memorandum in Support of its Motion for Summary Judgment.

### INTRODUCTION

In its July 5, 2011 Decision and Order, the Court concluded that the United States "will have little success attempting to demonstrate that Appleton Papers Inc. is liable as a successor under CERCLA." Dkt. 172, p. 21. The Court later repeated that API is "unlikely to be deemed liable under CERCLA." *Id.,* p. 24. The Court reasoned that: (a) NCR Corporation ("NCR"), which sold assets to API in 1978, could not divest itself of its CERCLA liability; (b) NCR remains a viable company; and (c) there is no basis for imposing CERCLA liability on an asset purchaser where the seller remains liable and viable. *Id.*, p. 18. Any private financial arrangement between API and NCR is in the nature of an indemnity, which does not impose successor liability on API or make API liable under CERCLA. *Id.*, pp. 18-21. That analysis, made under the "likelihood of success" prong of the requirements for a preliminary injunction, should now be confirmed by granting summary judgment and dismissing with prejudice claims that the

United States and State of Wisconsin (collectively, the "Government") have asserted against API.

The Court's conclusion that successor liability does not apply here because NCR remains viable made it unnecessary for the Court to determine in its July 5 Decision whether API in fact assumed the Fox River liabilities in the 1978 transaction, and the same is true here. However, should the Court wish to consider an independent basis for granting summary judgment, API demonstrates below that it did not assume NCR's Fox River liabilities in that transaction. That is an additional reason why the Government's CERCLA claims against API are groundless.

Finally, the Court's July 5 Decision also addressed a new claim that the United States made in its reply to API's memorandum opposing the motion for a preliminary injunction. The Court wrote that the "United States also throws in a suggestion that Appleton Papers may have itself polluted PCBs into the river following its creation in 1978." *Id.,* p. 21, n.2. The Court rejected the claim, stating: "This argument has not been sufficiently supported and I cannot conclude it has much likelihood of establishing liability." *Id*. Indeed, despite fifteen years of investigation and access to hundreds of thousands of pages of documents, the United States has no credible support for its "suggestion" that API itself discharged PCBs into the river.

Accordingly, it is time to finally bring closure to the Government's baseless claims that API is liable under CERCLA. API respectfully requests that the Court enter summary judgment and dismiss the Government's claims against API with prejudice.

- 2 -

Case 1:10-cv-00910-WCG   Filed 07/28/11   Page 2 of 20   Document 197

**STATEMENT OF FACTS**

A.  **The Government's Allegations As To API's Alleged Liability.**

For 15 years, the United States has claimed that API is liable under CERCLA for PCB contamination in the Lower Fox River and Green Bay. Proposed Finding of Fact ("PFOF") ¶ 5.[1] In the Section 106 Order it issued to API and others in November 2007, the United States stated that API was liable under CERCLA because it is the successor to corporations that had such liability:

> Appleton Papers Inc. **("API") is a party that is liable** for payment of response costs and performance of response activities at the Site **because API is: (1) a successor** to one or more corporate predecessors that, at the time of disposal of hazardous substances, owned and/or operated a facility at which such hazardous substances were disposed of, and from which there has been a release of hazardous substances to the Site; and (2) **a successor** to one or more corporate predecessors that by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances at a facility owned or operated by another party or entity and from which there has been a release of hazardous substances to the site.

PFOF ¶ 7 (emphasis added). The United States based its successor liability claim on a 1978 asset purchase agreement with NCR:

> In 1978, Appleton Papers Inc. [API] . . . and . . . B.A.T. Industries, p.l.c. ("BAT") – acquired the assets of the Appleton Papers Division from NCR, and Appleton Papers Inc. and BAT assumed certain liabilities in connection with the asset purchase.

PFOF ¶ 8. In the 106 Order, the United States asserted no other basis for its CERCLA liability allegation. PFOF ¶ 9.

In its First Amended Complaint, the Government alleged that API "is a successor to certain relevant liabilities of NCR Corporation." PFOF ¶ 6. API denied that allegation. *Id.*

---

[1] API's Proposed Findings of Fact in Support of its Motion for Summary Judgment are being filed with this Memorandum.

### B.  API Did Not Acquire Assets From NCR Until Seven Years After The Use Of PCB's Had Ceased In 1971.

It is undisputed that the use of PCBs in making NCR brand carbonless copy paper ("CCP") ceased in 1971.  PFOF ¶ 10.  During the time that PCBs were used in CCP, Appleton Coated Paper Company ("ACPC") owned and operated a paper coating facility in Appleton, Wisconsin, at which CCP was manufactured.  PFOF ¶ 11.  From 1954 to 1969, Combined Papers Mills, Inc. owned and operated a paper mill in Combined Locks, Wisconsin.  PFOF ¶ 12.

In 1969, NCR acquired the stock of Combined Paper Mills, Inc., which became its wholly-owned subsidiary.  PFOF ¶ 13.  In 1970, NCR acquired the stock of ACPC, making it a wholly-owned subsidiary.  PFOF ¶ 14.  In 1971, ACPC and Combined Paper Mills, Inc. were merged into Appleton Papers, Inc. (with a comma – a different corporation than API).  PFOF ¶ 15.  The merged entity, Appleton Papers, Inc., was then merged into NCR Corporation in 1973, at which time it became the "Appleton Papers Division" of NCR.  PFOF ¶ 16.

On June 30, 1978, NCR sold the assets of its Appleton Papers Division, including the Appleton and Combined Locks plants, to Lentheric, Inc., a subsidiary of B.A.T Industries, p.l.c. ("BAT").  PFOF ¶ 17.  The terms of the purchase and sale were set forth in an asset purchase agreement ("1978 Agreement").  *Id*.  Lentheric, Inc. then changed its name to "Appleton Papers Inc." (no comma), the Defendant in this action. PFOF ¶ 18.  API first began doing business in July 1978 after it purchased the assets of the Appleton Papers Division.  PFOF 19.  The 1978 Agreement between NCR and API and BAT does not make any reference to Fox River liabilities, CERCLA liabilities or PCBs.  PFOF ¶ 20.

It is undisputed that NCR continued to exist after the 1978 asset transaction, remains in existence today, and is a Defendant in this action. PFOF ¶ 32.

## C. The United States' Claims Regarding API's Alleged Liability In Its Motion for Preliminary Injunction.

On March 29, 2011, the United States (but not the State of Wisconsin) filed a Motion For A Preliminary Injunction. PFOF ¶ 21. In its brief in support of the Motion, the United States devoted a single paragraph to the issue of NCR and API's alleged liability under CERCLA stating, in part: "There is no question that NCR and API are liable under CERCLA for the contamination in OUs 2-5." PFOF ¶ 22. The United States, however, offered no facts or argument to show that API (as opposed to NCR) was liable under CERCLA. *Id.* It was not until the United States filed its reply brief ("Preliminary Injunction Reply Brief") that it offered any facts or argument to support its contention that API is liable under CERCLA. PFOF ¶ 23. The United States raised three purported bases for that claim.

### 1. Alleged Successor Liability Based Upon The 1978 Agreement.

The United States cited three provisions in the 1978 Agreement as the basis for its claim that API had assumed, and therefore was a successor to, NCR's Fox River liability. PFOF ¶ 23. These provisions are set forth and discussed below. The United States provided nothing but argument to support its allegation that NCR's Fox River liability fell within the express terms of these provisions. PFOF ¶¶ 24-31.

### 2. Alleged Successor Liability Based Upon The 1998 Agreement.

In its Preliminary Injunction Reply Brief, the United States claimed for the first time that API expressly assumed NCR's CERCLA liability in a 1998 settlement and 2005 arbitration. PFOF ¶ 34. By way of background, the State of Wisconsin first identified

NCR (but not API) as a potentially responsible party ("PRP") for remediation of the PCB contamination in the Fox River in 1995. PFOF ¶ 35. Thereafter, NCR sued API and BAT, claiming that they must indemnify NCR against any Fox River liability pursuant to the terms of the 1978 Agreement. PFOF ¶ 38. In 1998, NCR, API and BAT mediated and settled the case, entering into a "Confidential Settlement Agreement Between NCR Corporation and B.A.T Industries P.L.C. and Appleton Papers Inc." (the "1998 Settlement Agreement"). PFOF ¶ 45. The 1998 Settlement Agreement provided that it was not an admission of liability:

> 7. **NO ADMISSION OF LIABILITY**: By entering into this Settlement Agreement, and the exhibits hereto, **the parties are not admitting to any** unlawful conduct or **liability on their part.** The parties further acknowledge and agree that this Settlement Agreement shall not be admissible as evidence in any federal, state, local, tribal, or administrative agency proceeding, except in a proceeding to enforce same.

PFOF ¶ 46.

In the 1998 Settlement Agreement, the parties agreed that if any costs were ever imposed upon any of them arising from the Fox River PCB contamination or other sites as defined in the 1998 Settlement Agreement, those costs would be split with API/BAT together bearing 55% and NCR bearing 45% of the first $75 million. PFOF ¶ 47. The 1998 Settlement Agreement established parameters for a "compulsory, binding arbitration to allocate as between them . . . costs in excess of $75 million." *Id.* The parties agreed in a contemporaneous Subsequent Allocation Arbitration Agreement that neither side would be allocated more than 75% or less than 25% of the amounts to be expended beyond $75 million, but that: "within that range, the arbitrators may select any allocation that they deem appropriate." PFOF ¶ 48. Under this charge, the arbitrators were not required to base their allocation upon the terms of the 1978 Agreement. *Id.*

- 6 -

Consistent with the terms of the 1998 Settlement Agreement, NCR, API and BAT participated in an arbitration in October and November 2005. PFOF ¶ 49. The arbitrators were not asked to determine, and did not determine, whether NCR's Fox River liability fell within the terms of the assumption provisions in the 1978 Agreement. Rather, the parties' arbitration agreement authorized the arbitrators, within the bounds noted above, to "select any allocation that they deem appropriate." PFOF ¶ 50. Consistent with this charge, the arbitrators made the following division of costs above $75 million:

> Pursuant to this agreement of the parties, the Arbitrators deem appropriate the following allocation:
>
> API/BAT: Sixty (60) percent
>
> NCR: Forty (40) percent.

PFOF ¶ 51. The arbitration award represented the panel's "collective judgment on the appropriate allocation under the terms of the Allocation Agreement." PFOF ¶ 52. The parties have abided by that private settlement arrangement.[2]

### 3. Alleged Direct Liability.

In its Preliminary Injunction Reply Brief, the United States also alleged that API is liable under CERCLA because there may have been discharges of PCBs from API's facilities when they were owned and operated by API. PFOF ¶ 53. The United States offered no evidence of PCB discharges from the Appleton facility when API owned and operated that facility. PFOF ¶ 63. Instead, the United States submitted documents

---

[2] Any disputes that may arise as to the rights and obligations of NCR, API and/or BAT are subject to the dispute resolution provisions of the 1998 Settlement Agreement, as explained in API's July 25, 2011 Response of Defendant Appleton Papers Inc. To Defendant NCR Corporation's Filing Regarding The United States' Motion for Entry of Revised Proposed Terms of an Injunction. Dkt. 192.

regarding a leak from a transformer at the Combined Locks plant that was captured by a containment pad (PFOF ¶¶ 54-57) and certain unidentified analytical results of a water sample. PFOF ¶¶ 59-60. These documents provide no evidence of a PCB discharge to the river during the time API owned the Combined Locks plant. PFOF ¶ 63. Moreover, API submitted undisputed evidence that discharges from the Combined Locks plant during the time API owned it did not add PCBs to the river. PFOF ¶ 62.

**D.  The Court's Decision And Order Denying The Preliminary Injunction.**

After reviewing the United States' submissions and arguments, the Court issued its Decision and Order (Dkt. 172) denying the United States' Motion for Preliminary Injunction. PFOF ¶ 64. The Court concluded that it was unlikely that the United States could show that API is liable under CERCLA. *Id*., p. 24 ("I conclude that the Plaintiffs have set forth a prima facie basis for preliminary relief against NCR, but not against Appleton Papers Inc., an entity that I find unlikely to be deemed liable under CERCLA."). PFOF ¶ 65. The Court reiterated its ruling in its July 28, 2011 Order Denying Renewed Motion For Preliminary Injunction. Dkt. 193. The Court's Decision and Order is discussed in detail below.

## LAW AND ARGUMENT

**I.  API IS ENTITLED TO SUMMARY JUDGMENT BASED UPON THE REASONING IN THE JULY 5, 2011 DECISION AND ORDER.**

In its July 5, 2011 Decision and Order, the Court concluded that it is unlikely that the United States can prove that API has successor liability under CERCLA because its alleged predecessor, NCR, retained the CERCLA liability and remains a viable company. The Court ruled that there is no basis for the imposition of successor liability in such circumstances.

- 8 -

The Court briefly summarized the pertinent corporate history:

> The PCBs at issue here were released into the Fox River by a plant in Appleton, owned by Appleton Coated Paper Company ("ACPC"), and at Combined Locks, a facility then owned by Combined Papers Mills, Inc. These two companies were merged into a company called Appleton Papers, Inc. (with a comma, a different entity than the Defendant of the same name), and that company was then merged into NCR in 1973.
>
> In 1978 a company called Lentheric, Inc. bought the Appleton and Combined Locks plants from NCR. Lentheric then changed its name to Appleton Papers Inc., which is the Defendant here.

Dkt. 172, p. 16.

When a company buys assets, it generally does not succeed to the liabilities of the seller. *Id.*, p. 17. The United States argued that NCR's Fox River liability fell within the scope of certain assumption provisions in the 1978 Agreement. *Id.*, pp. 17-18. However, the Court did not need to reach this issue, ruling that "the exact scope of these clauses is not before me." *Id.,* p. 18.

Rather, the Court ruled that "none of the equitable considerations that would otherwise support the imposition of successor liability are in play here" because NCR remains liable:

> Because NCR was liable and remains so, there is no liability for Appleton Papers to "succeed" to. There cannot be a "successor" without a succession.

*Id.*

The Court explained that a party like NCR cannot divest itself of CERCLA liability through a private agreement. CERCLA § 107(e), 42 U.S.C. § 9607(3)(1). That conclusion is confirmed by the Seventh Circuit's decision in *Harley-Davidson, Inc. v. Minstar, Inc.,* 41 F.3d 341, 342-43 (7th Cir. 1994), which held that § 107(e) "precludes efforts to divest a responsible party of his liability" by "shifting liability from one person to another." Dkt, 172, p. 19. Accordingly, "the 1978 Asset Agreement could not transfer

liability *per se*, it merely transferred the financial risk of that liability, as with an insurance policy." Dkt. 172, p. 18.

This Court then reviewed and summarized the extensive case law holding that where an asset seller remains liable and viable, there is no basis for imposing successor liability on the buyer:

> In sum, when the seller of assets is still in existence and its liability to the government is still "live," an assumption of liability agreement like the one at issue here does not create liability on the buyer's part, it merely creates a duty to indemnify the seller. "If the predecessor is still a functioning corporation which can compensate Plaintiffs, there is no equitable reason for holding Clark liable. The rationale behind successor liability in CERCLA, to distribute costs and to allocate the burden of the cleanup to others than the taxpayers are irrelevant if the predecessor can provide a remedy." *Ninth Ave. Remedial Group v. Allis-Chalmers Corp.,* 195 B.R. 716, 728 (N.D. Ind. 1996).

Dkt. 172, p. 20.[3] The United States concedes that NCR is still a functioning corporation that is capable of providing the relief it seeks. PFOF ¶ 33. Thus, "at most the asset purchase agreement merely made Appleton Papers liable as an indemnitor to NCR rather than a substitute or successor to liability *vis-a-vis* the Government." Dkt. 172, p. 19. Private agreements between API and NCR "do not establish successorship because the original liability under CERCLA has remained with the seller." *Id.,* p. 20.

This Court's analysis is supported by Judge Stadtmueller's decision in *A-C Reorganization Trust v. E.I. DuPont de Nemours & Co.*, No. 94-C-574, 1997 WL 381962

---

[3] This Court's ruling is consistent with other reported decisions. *See, e.g., Durham Mfg. Co. v. Merriam Mfg. Co.,* 294 F. Supp. 2d 251, 273-74 (D. Conn. 2003) (refusing to impose CERCLA successor liability where the seller continued to exist as a viable entity); *United States v. Mexico Feed & Seed Company, Inc.,* 980 F.2d 478, 490 (8th Cir. 1992) (refusing to impose CERCLA successor liability where the asset seller continued to be a viable entity because "the very concern animating the doctrine of corporate successor liability – that the corporate veil thwart plaintiffs in actions against corporations which have sold their assets and distributed the proceeds – is not present.").

(E.D. Wis. 1997).[4] In that case, Reichhold Chemicals, Inc. ("Reichhold") had entered into Acquisition and Assumption Agreements with Tenneco Chemicals in which Reichhold stated that it "assumes and agrees to pay, perform, and discharge, all debts, obligations, contracts and liabilities" of Tenneco Chemicals. *Id.* \*5. The Court ruled that that provision "is best viewed as an indemnification" because "Reichhold could not assume the CERCLA liability itself." *Id.* \*6. The Court held that the contractual assumption provision did not impose CERCLA successor liability on Reichhold:

> **Although the law of corporate succession contemplates that corporate parties may allocate liabilities in an asset sale, CERCLA § 107(e)(1) nullifies any attempted transfer of CERCLA liability**. 42 U.S.C. § 9607(e)(1); *Harley-Davidson, Inc. v. Minstar, Inc.,* 41 F.3d 341, 342 (7th Cir. 1994). While the decision in *Harley-Davidson* theoretically leaves open the possibility that pre-CERCLA transfers of liability could be effective, the Seventh Circuit's discussion and the statute's language both indicate that Congress meant to foreclose all transfers of liability. *Id.* at 343-44. Furthermore, **the court's research revealed no cases holding that CERCLA liability may be transferred by agreement of the parties. Thus, the statute eliminates the exception for express or implied assumption of liabilities in an asset sale.**

*Id.* at \*7 (emphasis added). The court further held that, due to § 107(e)(1), there can be no CERCLA liability where the sole basis for alleged CERCLA liability is a contractual assumption of liability:

> **If there is no transfer of liability in a mere asset sale (and there [is] neither an argument nor a basis in the record for applying any of the other exceptions to the general rule), then Reichhold cannot have acquired liability even if it agreed to do so**. Under the Agreements, Reichhold agreed to assume the obligations and liabilities of Tenneco Chemicals with respect to the Newport Division. Amended Fourth Party Complaint Ex. C at 11. However, CERCLA nullifies this portion of the agreement with respect to CERCLA liability, because Reichhold could not assume Tenneco Chemicals' CERCLA liability. **As there is no indication or allegations that Reichhold is a PRP, there is no basis for successor liability, and the court finds no authority in CERCLA for a possible statutory indemnification [i.e., contribution] action**.

---

[4] A copy of such decision is attached as Exhibit 5 to the Declaration of Ronald R. Ragatz in Support of Appleton Papers Inc.'s Motion for Summary Judgment.

> Count II of the amended fourth-party complaint must be dismissed for failure to state a claim upon which relief may be granted.

*Id.* at *8 (footnotes omitted; emphasis added). The court granted Reichhold's FRCP 12(b)(6) motion to dismiss, holding there was no possible § 113 contribution claim against Reichhold. The *A-C* decision was expressly grounded on the Seventh Circuit's decision in *Harley-Davidson.*

In its Preliminary Injunction Reply Brief, The United States cited a Third Circuit case in support of an argument that express assumption language creates direct CERCLA liability. *Caldwell Trucking PRP v. Rexon Technology Corp.*, 421 F.3d 234 (3rd Cir. 2005). However, in *Caldwell* the original holder of the liability, Rexon, was no longer viable or capable of providing any relief:

> As noted earlier, the suit before us was filed on April 6, 1995. Rexon was served with process in April and May 1995 and its **certificate of dissolution was not filed until June 30, 1995.** Pullman points out that **Rexon's facilities in Wayne and Fairfield had ceased operations in September, 1994,** the bank had attached the remaining assets, and **by June 30, 1995 Rexon had liquidated.**

*Id.* at 245. Less than three months after the action was filed "Rexon was tottering on the edge of its grave." *Id.* While Rexon could still be sued, it had no ability to provide meaningful relief. Thus, the situation in *Caldwell*, where the original holder of the liability was an empty shell that had been liquidated and dissolved, bears no resemblance to this case, where the Government took pains to tell the Court that NCR is viable and capable of providing relief. Dkt, 126, p. 13, n.7.[5]

---

[5] *Caldwell* also is distinguishable on other grounds. It involved a sale of stock (rather than assets) in which the seller (not the buyer), Pullman, was alleged to be responsible for the liability of the subsidiary, Rexon. The language at issue was a provision in the stock purchase agreement captioned "[Pullman] Retention of Certain Liabilities" in which Pullman agreed to pay Rexon's "Superfund liabilities." *Caldwell*, 421 F.3d at 242.

The United States also cited a second case in support of its argument, *In Re Safety-Kleen Corp.,* 380 B.R. 716 (D. Del. 2008), which is also readily distinguishable. In that case, a bankrupt debtor, Safety Kleen, had sold certain assets to Clean Harbors and the bankruptcy court entered a "Sale Order" approving the sale. Clean Harbors agreed to assume Safety Kleen's obligations under two settlement agreements involving the Kramer Landfill Superfund Site. *Id.* at 731-35. When Clean Harbors tried to renege on the deal, and Safety Kleen's creditors brought an adversary proceeding against Clean Harbors. The bankruptcy court held that the Kramer Landfill settlement obligations were covered by the Sale Order and Acquisition Agreement and that "the Sale Order expressly conferred third-party beneficiary rights on interested parties, including the creditors of Safety Kleen." *Id.*, p. 740. *Safety Kleen* is not at all similar to the facts here where there has been no bankruptcy, no court-ordered sale approved by creditors, no conferral of third-party beneficiary rights on those creditors, no finding of an express assumption, and no need to even consider the equitable principles against imposing CERCLA liability where the asset seller is viable.

The cases cited by the United States are inapposite. The Court correctly ruled in its July 5 Decision and Order that there is no basis to apply the equitable doctrine of successor liability where, like here, the asset seller is viable. API is, therefore, entitled to summary judgment dismissing the Government's claims against it.

## II. THE GOVERNMENT CANNOT PROVE THAT NCR'S FOX RIVER LIABILITY WAS WITHIN THE SCOPE OF THE 1978 AGREEMENT.

Having determined that successor liability was inapplicable because NCR remained viable, the Court did not address the factual predicate upon which the Government's successor liability theory is based, namely, that API assumed NCR's Fox

- 13 -

Case 1:10-cv-00910-WCG   Filed 07/28/11   Page 13 of 20   Document 197

River liabilities in the 1978 Agreement. In fact, however, the United States was unable to explain how NCR's Fox River liability would fall within the scope of the 1978 Agreement. The provision upon which the United States principally relied in claiming that API has successor liability states that API assumed the following:

> . . . all of Seller's liabilities (other than liabilities with respect to claims asserted by or on behalf of private parties), whether accrued, absolute, contingent or otherwise, and whether or not reflected or reserved against on the Financial Statements or the Closing Date Balance Sheet or 1977 Balance Sheet or on the books of account or other records of APD, whether asserted or not and whether arising from transactions, events or conditions occurring prior to or after the Closing Date, **with respect to compliance of the Property or the products or operations, of APD with all applicable federal, state and local and other governmental environmental and pollution control laws, ordinances, regulations, rules and standards.**

PFOF ¶ 24 (emphasis added). The abbreviation "APD" in the above quote refers to the Appleton Papers Division of NCR. *Id.*, n.3. The Appleton Papers Division was formed in 1973 and operated until the sale of assets to API in June 1978. PFOF ¶ 25. Thus, the Appleton Papers Division operated for only about five years, 1973-78, all of which were after the use of PCBs in making carbonless copy paper had ceased. The term "Property" refers to the assets that were being purchased. PFOF ¶ 24, n.3.

Accordingly, any assumption under ¶ 1.4.9 of the 1978 Agreement was limited to liabilities arising from the failure of the Property or the products or operations of the Appleton Papers Division to comply with applicable governmental environmental and pollution control laws. The Fox River PCB liability did not result from the failure of the assets acquired in 1978, or the products or operations of the Appleton Papers Division to comply with applicable governmental environmental and pollution control laws. The United States has not even suggested otherwise. It has never identified any environmental law with which the Property or products or operations of the Appleton

- 14 -

Papers Division failed to comply during the period when APD existed, 1973-78. PFOF ¶ 26.

A second provision which the United States cited provides that API assumed: "all of Seller's obligations and liabilities . . . **with respect to the compliance of the assets, properties, products or operations of APD with all governmental laws**, ordinances, regulations, rules and standards." PFOF ¶ 27 (emphasis added). Like ¶ 1.4.9, ¶ 1.4.3 requires a failure of the assets, properties, products or operations of the Appleton Papers Division to comply with governmental laws. The United States offered no facts to suggest that the assets, properties, products, or operations of the Appleton Papers Division were in non-compliance with any law – much less that NCR's Fox River liabilities arose from such non-compliance. PFOF ¶ 28. CERCLA did not exist at the time and CERCLA's later enactment did not establish that any of Appleton Papers Division's operations failed to comply with any laws. CERCLA later created liability for activities that were in compliance with applicable laws, but that is not an obligation assumed under the 1978 Agreement. NCR had no obligation or liability with respect to *compliance* of the Appleton Paper Division's assets, properties, products, or operations with governmental laws in 1978.

The third provision cited by the Government is as follows:

> . . . **all of Seller's obligations and liabilities** of any kind, character or description relating to the period subsequent to the Closing Date **which arise out of or in respect of any** threatened suit, patent infringement suit, patent or trademark interference or opposition, action, claim, investigation by any governmental body, or legal, administrative or arbitration **proceeding set forth on Schedules A or M,** in each case whether such obligation or liability is accrued, absolute, contingent or otherwise and whether or not such obligation or liability is reflected or reserved against on the Financial Statements or the Closing Date Balance Sheet;

PFOF ¶ 29 (emphasis added).

The United States quoted an excerpt from Schedule A that says that "facilities of Appleton Papers Division located in Pennsylvania and Wisconsin may be operating in violation of applicable federal, state, local and other governmental environmental and pollution control laws." Dkt. 150, p. 7. This language could not have related to CERCLA; CERCLA was not enacted until 1980. Neither Schedule A nor Schedule M to the 1978 Agreement disclose any pending or threatened suit, claim, action, investigation or proceeding relating to PCBs or the Lower Fox River or Green Bay. PFOF ¶ 30. Nor did the United States offer any evidence that the violation that "may be" occurring in 1978 had anything to do with the later-determined Fox River PCB liabilities. PFOF ¶ 31.

The Government has the burden of proving API's liability. *United States v. Hercules, Inc.,* 247 F.3d 706, 715 (8th Cir. 2001). The United States put forth argument in connection with its preliminary injunction motion in an effort to show a reasonable likelihood of success on the merits. The argument does not hold up factually as explained above, and was rejected by this Court. The Government has not demonstrated, and cannot demonstrate, that NCR's Fox River liability – whatever that liability is ultimately adjudicated to be – falls within the scope of any assumption provision in the 1978 Agreement.[6] The inability of the United States to make even a *prima facie* showing in that regard is a second and independent basis for granting summary judgment dismissing the Government's claims against API. The sole obligation of API regarding the Fox River contamination is as a partial indemnitor (jointly and severally with BAT) to

---

[6] A ruling by this Court that API did not assume NCR's Fox River liabilities will not affect API's indemnification obligations to NCR. Those obligations arise under the 1998 Settlement Agreement, in which the parties released claims relating to the Fox River based upon the 1978 Agreement. Dkt. 124-1, at 16-18.

- 16 -

NCR pursuant to the 1998 Settlement Agreement, which does not impose CERCLA liability on API or make API liable to the Government at all.

### III. THERE IS NO BASIS FOR IMPOSING DIRECT CERCLA LIABILITY ON API.

As the Court noted in the July 5 Decision and Order, the United States threw in a suggestion that API itself may have discharged PCBs into the river.

> The United States also throws in a suggestion that Appleton Papers may have itself polluted PCBs into the river following its creation in 1978. Thus, it would have primary liability under CERCLA. This argument has not been sufficiently supported, and I cannot conclude it has much likelihood of establishing liability.

Dkt, 172, p. 21, n.2.[7]

The United States cited three documents to support its allegation that PCBs were discharged by the Combined Locks facility after June 30, 1978: PFOF ¶ 53; Dkt 147-3; Dkt 147-4; and Dkt 147-5. *See* Dkt. 150, p. 6 of 35. The first two are a memorandum and letter about a leak from a transformer that was detected and stopped with a minor level of PCBs detected on the concrete floor beneath the transformer. Dkt. 147-3, 147-4. PFOF ¶¶ 54-58. There is no evidence of any release to the environment, much less any discharge to the Lower Fox River. *Id*.

The final document, Dkt. 147-5, purports to be a laboratory analytical report from 1989, showing the results of analysis of a sample collected from the Combined Locks facility's effluent. PFOF ¶¶ 59-60. The document does not identify the substances for which the sample was analyzed; the words "PCBs" or 'polychlorinated biphenyl" do not appear on the document. *Id*.

---

[7] The Court confirmed this in its July 28, 2011 Order Denying Renewed Motion For Preliminary Injunction, Dkt. 193, where the Court stated: "Appleton Papers did not pollute itself, but signed an agreement stating it would indemnify NCR for certain environmental liability," thus recognizing that API's obligation is in the nature of an indemnity arising from the 1998 Settlement Agreement.

Even if one assumes, however, that the test result relates to PCBs, the results are meaningless because the document does not show the level of PCBs that came *into* the Combined Locks facility as *influent* from the Fox River that the plant used as process water. In sampling events analyzing both the influent into *and* the effluent from the Combined Locks facility during API's period of ownership, whenever PCBs were detected in the effluent leaving the facility, they were no higher than the pre-existing level of PCBs in the river water drawn into the plant. PFOF ¶¶ 62-63. Thus, the evidence before the Court shows that the Combined Locks facility was not contributing PCBs to the River. This is supported by testimony from a Combined Locks plant employee:

> A   Basically the findings were that we would remove PCBs from the water. It was going back – the effluent that we were discharging had less in it than the water that we were taking in.
>
> Q   Okay. Can you explain that for the jury a little bit? What kind of water were you taking into the mill?
>
> A   We were taking the raw river water, and we were processing that in our water treatment system, and that was used in the papermaking and pulp making operations, and what we discharged from the paper machines, that went through our primary and secondary waste treatment systems, and someplace along the line PCBs were removed.
>
> Q   So in essence the mill was cleaning up the river?
>
> A   That's correct.

PFOF ¶ 62 (Dkt. 139-20, pp. 5-6).

The United States has no credible evidence in support of a last-minute allegation of direct discharges thrown in after 15 years of silence on such a theory. Such a theory was never mentioned in the Section 106 Order. It has no basis in fact, as the Court has already recognized. Rather, the evidence establishes that the Combined Locks facility did not contribute to PCB contamination in the Lower Fox River.

- 18 -

## CONCLUSION

The Government has had fifteen years to investigate (including the ability to issue mandatory information requests) and build its case against API.[8] However, when the United States was forced to put its cards on the table to support its preliminary injunction motion, the United States' inability to prove a case against API was finally exposed to the Court.

NCR remains liable and viable. That fact alone precludes successor liability. Even if the Court were, despite NCR's viability, interested in expending judicial resources to explore the meaning of the agreements in issue, they do not establish an assumption of NCR's liability. And there is no basis to conclude that API has direct CERCLA liability.

Accordingly, API respectfully requests that the Court enter summary judgment in its favor and against the United States and the State of Wisconsin as to all claims in the First Amended Complaint and dismiss all such claims with prejudice.

---

[8] In its effort to build its case against API, the United States has served information requests pursuant to CERCLA § 104(e) upon API on at least seven occasions, pursuant to which API has produced thousands of pages of documents. PFOF ¶ 66.

Dated this 28th day of July, 2011.

APPLETON PAPERS INC.


By  /s/ Ronald R. Ragatz
   One of Its Attorneys

Counsel for Appleton Papers Inc.:

| | |
|---|---|
| Michael L. Hermes (#1019623) | Ronald R. Ragatz (#1017501) |
| Heidi D. Melzer (#1076125) | Dennis P. Birke (#1018345) |
| Brandon J. Evans (#1063940) | Megan A. Senatori (#1037314) |
| Ericka L. Krumrie (#1066383) | DeWitt Ross & Stevens S.C. |
| Hermes Law, Ltd. | Two East Mifflin Street |
| 333 Main Street, Suite 601 | Madison, WI 53703 |
| Green Bay, WI 54301 | (608) 255-8891 |
| (920) 436-9870 | |