

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 77-1408 |
| v. | ) | |
| | ) | |
| NCR CORPORATION, APPLETON | ) | |
| PAPERS, INC., and APPLETON | ) | |
| PAPERS INC. | ) | |
| | ) | |
| Defendants. | ) | |

## DECREE

WHEREAS, defendant NCR Corporation, a Maryland corporation qualified to do business in Pennsylvania, was doing business in the Western District of Pennsylvania at a paper manufacturing facility ("facility") in Roaring Spring, Pennsylvania until June 30, 1978; and

WHEREAS, defendant Appleton Papers, Inc., a Delaware corporation qualified to do business in Pennsylvania, was operating the facility until June 30, 1978; and

WHEREAS, on June 30, 1978, Lentheric, Inc., a wholly owned subsidiary of B.A.T. Industries, Ltd., purchased the Appleton Papers Division of defendant NCR Corporation, which purchase included the facility, and changed its name to Appleton Papers Inc.; and

WHEREAS, defendant Appleton Papers Inc., formerly Lentheric, Inc., is a corporation which has been operating the facility since June 30, 1978; and

Case 1:10-cv-00910-WCG   Filed 08/26/11   Page 1 of 22   Document 203-2

WHEREAS, defendants have discharged pollutants, as that term is defined in section 502(b) of the Clean Water Act, as amended ("the Act"), 33 U.S.C. § 1362(b), from the facility into Halter Creek, a navigable water of the United States; and

WHEREAS, on February 28, 1974, the United States Environmental Protection Agency, Region III ("EPA") issued National Pollutant Discharge Elimination System ("NPDES") Permit No. PA 0008265 to defendant Appleton Papers, Inc., pursuant to section 402 of the Act, 33 U.S.C. § 1342, for discharges of certain pollutants into Halter Creek; and

WHEREAS, under section 301(a) of the Act, 33 U.S.C. § 1311(a), the discharge of pollutants is unlawful except, inter alia, as in compliance with an NPDES permit; and

WHEREAS, on December 14, 1977, plaintiff commenced this action to enjoin defendants NCR Corporation and Appleton Papers, Inc., from violating certain terms of its NPDES permit and to recover a civil penalty; and

WHEREAS, NPDES Permit No. PA 0008265 expired on June 30, 1977, and a new NPDES Permit No. PA 0008265 was issued to defendant Appleton Papers Inc. on August 9, 1977, effective July 1, 1977; and

WHEREAS, the complaint in this action was amended to join additional party defendant Appleton Papers Inc., formerly Lentheric, Inc., pursuant to a stipulation and order of this Court filed December 5, 1978; and

WHEREAS, the parties agree that settlement of this matter is in the public interest and that entry of this Decree without further litigation is the most appropriate means of resolving this matter;

NOW, THEREFORE, upon consent of the parties by their attorneys and authorized officials, it is hereby ORDERED, ADJUDGED AND DECREED:

1.  This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1345 and section 309 of the Act, 33 U.S.C. § 1319.

2.  The complaint filed herein states a claim upon which relief may be granted against defendants under section 309 of the Act, 33 U.S.C. § 1319.

3.  The provisions of this Decree shall apply to the defendants, and to each of the defendants' officers, servants, employees, successors and assigns, and to all persons, firms and corporations acting under, through or for them.

4.  From the date of entry of this Decree to December 27, 1982, defendant Appleton Papers Inc., formerly Lentheric, Inc., ("Appleton"), shall not discharge pollutants from its facility into Halter Creek in excess of the following interim effluent limitations:

| Effluent Characteristic | Interim Limitations | | | |
|---|---|---|---|---|
| | kg/day (lbs/day) | | Other Units (specify) | |
| | Avg. Monthly* | Max. Daily** | Avg. Monthly | Max. Daily |
| Flow/Day | | | 4.84 MGD (million gallons per day) | |
| BOD$_5$ (biochemical oxygen demand- 5 day count) | 917 (2018) | 1835 (4036) | | |
| TSS (total suspended solids) | 2569 (5651) | 3670 (8073) | | |
| Phenols | | | | 0.2 mg/l |
| Aluminum (dissolved) | | | | 0.5 mg/l |
| Ammonia (as Nitrogen) | | | | 1.5 mg/l |
| Color | | | 500 Pt-co units (platinum-colbalt units) | 750 Pt-co units |

5.  Appleton shall make internal process changes and upgrade the facility's wastewater treatment system as set forth in the Preliminary Design Report for Secondary Wastewater Treatment Plant Alterations, dated December, 1978, prepared by Edward C. Jordan Co., Inc., of Portland, Maine, including, but not limited to the following:

*"Average Monthly Discharge" is the total mass or concentration of all daily discharges sampled and/or measured during a calendar month on which daily discharges are sampled and measured, divided by the number of daily discharges sampled and/or measured during such month.

**"Maximum Daily Discharge" is the total mass of a pollutant discharged during the calendar day, or the average concentration or other measurement of the pollutant specified during the calendar day or any 24-hour period that reasonably represents the calendar day for the purpose of sampling.

a.  Full implementation of the internal mill modifications as outlined by the Sandwell International Inc. in Report No. G4058/1, except for the separate broke washing line;

b.  Modification of the conveyor system to convey reburned lime from the kiln;

c.  A new integrated level control system for the scrubber and lime kiln dust box which couples fresh water make-up with mud and density control;

d.  A modified dregs washing system, including a vacuum filter, sized to assure adequate dry handling and disposal of solids;

e.  An additional primary clarifier with a minimum diameter of 80 feet, preceeded by a primary clarifier splitter box to evenly divide the flow between the two primary clarifiers;

f.  Replacement of the existing primary clarifier mechanism;

g.  Addition of an adequate number of primary sludge pumps with building;

h.  Addition of additional static aerators to the existing aeration tank;

i.  Addition of an anhydrous ammonia feed system
and a new blower with a minimum capacity of 2,400
standard cubic feet per minute to the aeration basin;

j.  Construction of a new sludge re-aeration tank
with a minimum of 162 aerators;

k.  Construction of a new secondary clarifier with
a minimum diameter of 80 feet, preceded by a new flow
splitter box to divide the flow among the three
clarifiers;

l.  Replacement of weirs in existing secondary
clarifiers with V-notch weirs; and

m.  Addition of return sludge pumps.

6.  The requirements of paragraph "5" herein shall be
accomplished in accordance with the following schedule:

| | | |
|---|---|---|
| Submit final design report | – | March 12, 1980 |
| Submit progress report | – | July 30, 1980 |
| Award first construction contract | – | February 27, 1981 |
| Submit construction progress report | – | October 27, 1981 |
| Complete construction | – | June 27, 1982 |
| Complete testing and necessary repairs to achieve final effluent limitations | – | December 27, 1982 |

7.    Appleton shall construct an aerated pipeline to carry all of the wastewater from the facility to the Frankstown Branch of the Juniata River ("Frankstown Branch").  The pipeline shall have sufficient aeration capacity to maintain a dissolved oxygen concentration in the wastewater of 5.0 mg/l.  The pipeline shall be constructed in accordance with the following schedule:

| | | |
|---|---|---|
| Retain consultant | – | March 12, 1980 |
| Submit progress report | – | July 30, 1980 |
| Award first construction contract | – | February 27, 1981 |
| Submit construction progress report | – | October 27, 1981 |
| Complete construction | – | June 27, 1982 |
| Complete testing and necessary repairs of pipeline | – | December 27, 1982 |

8.    From December 27, 1982 to July 1, 1984, Appleton shall not discharge pollutants from its facility into the Frankstown Branch in excess of the following interim effluent limitations:

| Effluent Characteristic | kg/day (lbs/day) | | Other Units (specify) | |
|---|---|---|---|---|
| | Avg. Monthly | Max. Daily | Avg. Monthly | Max. Daily |
| $BOD_5$ | 459 (1009) | 917 (2018) | | |

9.    On and after December 27, 1982, Appleton shall not discharge pollutants from its facility into the Frankstown Branch in excess of the following final effluent limitations:

| Effluent Characteristic | Final Limitations | | | |
|---|---|---|---|---|
| | kg/day (lbs/day) | | Other Units (specify) | |
| | Avg. Monthly | Max. Daily | Avg. Monthly | Max. Daily |
| Flow/Day | | | 4.84 MGD | |
| TSS | 2569(5651) | 3670(8073) | | |
| Phenols | | | | 0.1 mg/l |
| Aluminum (dissolved) | | | | 0.2 mg/l |
| (total) | | | | 1.0 mg/l |
| Ammonia (as Nitrogen) | | | | 0.2 mg/l |
| Color | | | 180 Pt-Co units | 300 Pt-Co units |
| Temperature | | | 110°F | |

10. On and after July 1, 1984, Appleton shall not discharge pollutants from its facility into the Frankstown Branch in excess of the following final effluent limitations:

| Effluent Characteristic | Final Limitations | | | |
|---|---|---|---|---|
| | kg/day (lbs/day) | | Other Units (specify) | |
| | Avg. Monthly | Max. Daily | Daily Avg. | Max. Daily |
| BOD$_5$ | 239(525) | 477(1050) | | |

11. On and after December 27, 1982, Appleton shall maintain the temperature of its discharge at such level as is necessary to insure that the temperature of the Frankstown Branch measured at the Township Route 373 bridge at Kladder Station shall not rise due to Appleton's discharge when "ambient temperature" as herein defined is 87°F

or above, nor rise more than a 5°F rise above ambient
temperature until the stream temperature measured at the
Township Route 373 bridge reaches 87°F, not to be changed by
more than 2°F during any one-hour period. "Ambient
temperature" is defined as the temperature of the water body
upstream or outside the influence of a heated waste
discharge or waste discharge complex. The ambient
temperature sampling point should be unaffected by any
sources of waste heat.

12. No later than December 27, 1982, Appleton shall
commence a comprehensive program to determine what ad-
ditional measures, if any, will be needed to achieve the
final effluent limitations on $BOD_5$ set forth in paragraph
"10" herein. This program shall include an examination of
process and production changes, possible modifications to
the treatment system and the installation of additional
controls. Progress of the program shall be reported
quarterly to EPA.

13. Appleton may conduct and submit to the Pennsylvania
Department of Environmental Resources ("DER") a water quali-
ty modelling study concerning the relationship between the
dissolved oxygen in the Frankstown Branch and the final
effluent limitations on $BOD_5$ set forth in paragraph "10"
herein. If Appleton's effective NPDES permit is modified to
reduce the final effluent limitations on $BOD_5$ contained
therein to the interim effluent limitations on $BOD_5$ set
forth in paragraph "8" herein, or lower, Appleton need not

comply with the requirements of paragraph "12" herein.
Appleton's obligation to comply with the requirements of
paragraph "12" herein shall continue until the modification
referred to in this paragraph is effective.  If DER modifies
the final limitations on $BOD_5$ set forth in Appleton's
effective NPDES permit and paragraph "10" herein in ac-
cordance with all of the provisions of 40 C.F.R. § 122.31,
and EPA approves the modification, the parties agree that
the modified effluent limitations in $BOD_5$ shall become the
enforceable final effluent limitations on $BOD_5$ set forth
in paragraph "10" herein.

   14.   (a)   In the event that Appleton is unable to meet
the final effluent limitations on color set forth in par-
agraph "9" herein by December 1, 1982, Appleton may petition
EPA in writing to extend the time for meeting said final
effluent limitations.  Such petition shall be submitted on
or before July 1, 1982 and shall document all treatment
methods presently available and all research and development
activities conducted by Appleton or otherwise known to it
which relate to potential color-reduction treatment systems
or processes.  Said petition shall also set forth the
reasons why the final effluent limitations for color speci-
fied in paragraph "9" herein are unattainable and shall
propose a specific period of extension not to exceed one
year, along with alternate interim average monthly and
maximum daily color limitations which shall be derived by
computing the average of the average monthly and maximum

daily effluent discharges of color reported by Appleton
during the three month period immediately preceding the date
of the petition.  In no event, however, shall the alternate
interim effluent limitations for color exceed 300 platinum-
cobalt units as an average monthly or 500 platinum-cobalt
units as a maximum daily.  The petition shall be signed by
the Mill Manager or other corporate official with authority
to act on behalf of the corporation and shall be notarized.
If Appleton fully complies with the requirements of this
subparagraph, EPA shall extend the time for meeting the
final effluent limitations for color specified in paragraph
"9" herein.

(b)  Appleton may request any number of extensions
pursuant to paragraph "14(a)" herein, but in no event shall
the date for compliance with paragraph "9" herein be ex-
tended by EPA beyond July 1, 1984; provided, however, that
in any petition subsequent to the initial petition,
Appleton, in addition to all requirements of "14(a)" herein,
shall include a full explanation of the further progress or
lack of progress of the research and development activities
described in Appleton's previous petition(s) and provided
further, that the proposed new alternate interim effluent
limitations for color shall not be less stringent than those
imposed as a result of the immediately preceding petition(s).

15.  Appleton may request DER to modify the final effluent limitations on color set forth in Appleton's effective NPDES permit and paragraph "9" herein on the ground that DER has modified the water quality standards for color on which the final effluent limitations were based and EPA has approved DER's modification of the water quality standards.  If DER modifies the final effluent limitations on color set forth in Appleton's effective NPDES permit and paragraph "9" herein in accordance with all of the provisions of 40 C.F.R. § 122.31, and EPA approves the calculation of modified effluent limitations on color based on the modified water quality standards, the parties agree that the modified effluent limitations on color shall become the enforceable final effluent limitations on color set forth in paragraph "9" herein.

16.  The parties understand that DER has agreed to propose a modification of Appleton's current NPDES permit which will authorize the discharge of pollutants from the facility into the Frankstown Branch, and which will contain the final effluent limitations and the condition set forth in paragraphs "9", "10" and "11" herein.  EPA currently believes that it can approve this proposed modification to Appleton's NPDES permit to the extent that it is not inconsistent with the terms of this Decree.  However, the parties recognize and agree that EPA's approval is expressly made subject to EPA's procedures for granting such modification, including giving notice of the proposed modification

and receiving public comment thereon. Moreover, EPA expressly reserves the right, _inter alia_, 1) pursuant to section 402(d) of the Act, to object to any permit or permit modification which is not consistent with applicable guidelines, regulations or the Act; and 2) to enforce the final effluent limitations contained in any NPDES permit or modification to such permit which has been or will be issued to Appleton, even if such final limitations are inconsistent with the terms of this Decree.

17. The proposed NPDES permit modification shall contain a "reopener clause" pursuant to 40 C.F.R. §§ 122.12(c) and 124.15(b)(1), requiring Appleton to achieve any effluent limitations approved under Section 301(b)(2)(C) and (D), 304(b)(2) and 307(a)(2) of the Act (effluent limitations on toxic pollutants), if any such effluent limitations are more stringent than any effluent limitation in the permit or control a pollutant not limited in the permit. The parties also understand that EPA intends to promulgate effluent guidelines for the pulp and paper industry reflecting best available technology economically achievable (BAT) and best conventional pollutant control technology (BCT), pursuant to section 301(b)(2)(A), (C), (D), (E) and (F) of the Act, and to incorporate any effluent limitation reflecting BAT or BCT into Appleton's effective NPDES permit by modification or by reissuance after expiration. Appleton agrees that it will not contest the final effluent limitations and the condition set forth in

paragraphs "9", "10" and "11" herein in any local, State or Federal administrative or judicial forum. Nothing contained in this Decree shall be construed to prevent or limit Appleton's right to contest any effluent limitation inconsistent with the terms of this Decree or promulgated by EPA pursuant to sections 301(b)(2)(A), (C), (D), (E) and (F), 304(b)(2) and 307(a)(2) of the Act and incorporated into the NPDES permit by modification or by reissuance.

18. No provision of this Decree shall prevent or limit DER's right to revise Appleton's NPDES Permit to account for changes in applicable State law or policy, nor to limit or prevent Appleton's right to contest any such revisions.

19. Appleton shall comply with all monitoring, reporting and management requirements and responsibilities set forth in its effective NPDES permit.

20. No later than 14 calendar days following a date specified in the schedules of compliance set forth in paragraphs "6" and "7" herein (other than dates for progress reports), Appleton shall submit a report to EPA stating whether or not compliance with the action required by the appropriate schedule of compliance has been achieved by the specified date, and if compliance has not been achieved, the report shall include:

a. a complete description of any factors which explain the failure to achieve compliance with the required action, including all necessary documentation;

b.  a description of the steps taken or proposed to be taken to comply with the required action;

c.  the date by which the required action will be achieved;

d.  a description of any future required action(s) which may be affected by the present failure;

e.  the date by which any affected future required action(s) will be achieved; and

f.  the steps that could be taken to prevent violations of future required actions.

21.  If Appleton fails to comply with any action, except submission of progress reports, required by a schedule of compliance set forth in paragraphs "6" and "7" herein by a specified date, Appleton shall pay a stipulated penalty for each failure of compliance in the amount of $100 per day for the first ten days of noncompliance, $500 per day for the following ten days of noncompliance, and $1,000 per day thereafter.

22.  If Appleton fails to comply with any interim effluent limitation set forth in paragraph "4" herein, Appleton shall pay a stipulated penalty of $5,000 for each violation of an average monthly effluent limitation and $250 for each violation of a maximum daily effluent limitation.

23. (a) If Appleton fails to comply with any interim or final effluent limitation or the condition set forth in paragraphs "8", "9" "10" or "11" herein, Appleton shall pay a stipulated penalty of $10,000 for each violation of an average monthly effluent limitation and $750 for each violation of a maximum daily effluent limitation.

(b) Appleton may be excused from any penalty incurred pursuant to this paragraph which relates to the violation of a technology based effluent limitation if it establishes that the violation was due to an upset condition as defined in 40 C.F.R. § 122.14(1) and demonstrates that the conditions necessary for the demonstration of an upset condition as set forth in 40 C.F.R. § 122.14(1)(3) have been met. This subparagraph shall not apply to water quality based effluent limitations, unless the aforesaid regulations are amended so as to apply to water quality based effluent limitations.

24. If Appleton fails to submit to EPA any report required by paragraph "20" or any progress report required by paragraphs "6" and "7" herein by the dates specified in those paragraphs, Appleton shall pay a stipulated penalty for each such failure in the amount of $50 per day for the first ten days of violation, $100 per day for the following ten days of violation, and $500 per day thereafter.

25. Stipulated penalties under paragraphs "21" through "24" herein shall be paid to the Treasury of the United States within 30 days after EPA has made demand for payment of the penalties. Appleton shall provide EPA with sufficient evidence of the payment of these stipulated penalties within a reasonable time. Payment of any stipulated penalties shall not relieve Appleton of the obligations imposed by this Decree or limit plaintiff's right to enforce its terms.

26. Any liability for stipulated penalties under paragraph "21" herein will be relieved if Appleton completes construction of the equipment required by paragraphs "5" and "7" herein on or before December 27, 1982.

27. Within 30 days from the entry of this Decree, Appleton shall pay a civil penalty in the amount of $150,000, by check made payable to the Treasury of the United States, and shall provide EPA with sufficient evidence of this payment within a reasonable time.

28. (a)  If any event occurs which causes or may cause delays in the achievement of actions required by this Decree, Appleton shall notify EPA in writing within 20 days of the delay or anticipated delay, as appropriate, describing in detail the anticipated length of the delay, the precise cause or causes of the delay, the measures taken

and to be taken by Appleton to prevent or minimize the delay, and the timetable by which those measures will be implemented. Appleton shall adopt all reasonable measures to avoid or minimize any such delays. Failure by defendant to specifically comply with the requirements of this paragraph shall render the paragraph void and of no effect as to the particular incident involved.

(b) If the parties expressly agree that the delay or anticipated delay in compliance with this Decree has been or will be caused by circumstances entirely beyond the reasonable control of Appleton, the time for performance hereunder may be extended for a period no longer than the delay resulting from such circumstances. In such event, the parties shall stipulate to such extension of time and so inform the Court. In the event the parties cannot agree, then any party may submit the matter to this Court for resolution.

(c) The burden of proving that any delay is caused by circumstances entirely beyond the reasonable control of Appleton shall rest with Appleton. Increased costs or expenses associated with the implementation of actions called for by this Decree shall not, in any event, be a basis for changes in this Decree or extensions of time. Delay in achievement of one interim step shall not necessarily justify or excuse delay in achievement of subsequent steps.

29. This Court shall retain jurisdiction of this case for the purpose of enabling any party to apply to the Court at any time for such relief as may be appropriate to interpret, enforce, modify or terminate this Decree.

30. This Decree shall be in full settlement and satisfaction of the action filed herein and all claims and penalties related thereto. Its entry serves to bar plaintiff from bringing any further civil action against Appleton under the Clean Water Act arising out of any alleged violations known by EPA as of the date of entry of this Decree to have occurred at the facility prior to the date of entry of this Decree, and shall release defendants, their officers, servants, employees, and agents from any and all civil liability arising therefrom during said period.

31. This Decree is not, and shall not be construed to be, an NPDES permit under the Act, nor shall it in any way relieve Appleton of any obligation imposed by the Act or under the permit issued to Appleton and in full force under the Act, or any obligation to comply with any other local, State or Federal law or regulation. So long as Appleton fully and completely complies with each requirement of this Decree by the dates specified herein, plaintiff agrees not to bring any civil action against Appleton for alleged violations of 1) the final effluent limitations in Appleton's current NPDES permit, occurring subsequent to the date of entry of this Decree and prior to issuance of the

proposed permit modification referenced in paragraph "16" herein; 2) in Appleton's modified NPDES permit, to the extent that the final effluent limitations in this Decree and in Appleton's NPDES permit are consistent, occurring subsequent to the date of entry of this Decree and prior to its expiration; and 3) the effluent limitations in Appleton's modified NPDES permit, to the extent that the final effluent limitations in this Decree and in Appleton's modified NPDES permit are inconsistent, occurring subsequent to the date of entry of this Decree and prior to the date said permit effluent limitations become final, after appeal, if any, by Appleton pursuant to paragraph "17" herein. Nothing contained herein shall be construed to prevent or limit plaintiff's right to commence a civil action to enforce any other violations of the Clean Water Act and the regulations promulgated thereto, including, but not limited to, violations of toxic, BCT or BAT based effluent limitations which may be incorporated into Appleton's effective NPDES permit. Nothing contained herein shall be construed to prevent or limit plaintiff's right to commence a criminal action to enforce any violation of the Clean Water Act and the regulations promulgated thereto.

32. Unless otherwise terminated by this Court, this Decree shall terminate on October 1, 1984.


UNITED STATES OF AMERICA,
                    Plaintiff

By: _____
    JAMES W. MOORMAN
    Assistant Attorney General
    Land and Natural Resources
        Division
    Department of Justice


By: _____
    ROBERT J. CINDRICH
    United States Attorney
    Pittsburgh, PA


By: _____
    CRAIG R. McKAY
    Assistant United States
    Attorney
    Pittsburgh, PA


By: _____
    KENNETH REICH
    Attorney, Department of
        Justice
    Washington, D.C.


NCR CORPORATION,
                    Defendant

By: _____
    Vice President


APPLETON PAPERS, INC.

By: _____
    Vice President


APPLETON PAPERS INC.

By: _____
    THOMAS W. BUSCH
    Executive Vice President


Reed Smith Shaw & McClay
747 Union Trust Building
Pittsburgh, PA  15230

By: _____
    BLAIR S. McMILLIN


_____
ROBERT W. THOMSON

By: _R. Sarah Compton_
R. SARAH COMPTON
Director, Enforcement Division
Environmental Protection Agency
Region III
Philadelphia, PA


By: _Robert B. Koegel_
ROBERT B. KOEGEL
Attorney, Environmental Protection
Agency, Region III
Philadelphia, PA


Judgment entered in accordance with the foregoing Decree
this 3rd day of June , 1980.

_Louis Rosenberg_
United States District Judge