IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

UNITED STATES, et al.,

                Plaintiffs,

        v.                                Case No. 10-C-910

NCR Corporation et al.,

                Defendants.

## CERTAIN DEFENDANTS'[1] RESPONSE TO MOTION FOR SUMMARY JUDGMENT OF DEFENDANT APPLETON PAPERS INC.

## INTRODUCTION

Defendant Appleton Papers Inc. ("API") argues in its motion for summary judgment that an asset buyer cannot assume CERCLA liability as part of the price it pays for those assets, even if the polluting seller remains liable to the government as well. Dkt. 197, p. 1. API is wrong. Section 107(e) of CERCLA precludes a polluter from extinguishing its own liability but does not preclude an asset buyer from agreeing to become liable in addition to the original polluter. Successor liability, particularly a buyer's *agreement* to assume environmental liabilities in an asset purchase, is firmly rooted in the common law, and the

---

[1] "Certain Defendants" are U.S. Paper Mills Corp., Georgia Pacific Consumer Products LP, Fort James Corporation, Georgia Pacific LLC, Neenah-Menasha Sewerage Commission, Menasha Corporation, City of Appleton, WTMI Company, CBC Coating, Inc., and P.H. Glatfelter Company.

Supreme Court has directed that traditional common law doctrines should apply to CERCLA.[2]

Once past API's mistaken argument that CERCLA shields it from the risks it agreed to assume, its ancillary arguments fail as well. API's liability is not contingent on NCR's financial condition. And API's tired argument that it unambiguously did not assume CERCLA liability, which lacks merit in any case, was litigated to finality and rejected in a 2005 arbitration proceeding. Collateral estoppel precludes relitigating that argument. For these and the other reasons discussed below, API's motion for summary judgment should be denied.

## ARGUMENT

API is collaterally estopped from denying CERCLA liability because it litigated that issue to a final arbitration award that was confirmed as a judgment by the U.S. District Court for the Southern District of New York. And even if the Court could ignore that final judgment, the government is right that API assumed liability for the Fox River PCB pollution and, therefore, is liable under CERCLA.

**I.      API Cannot Re-litigate Its Liability For The Environmental Costs And Damage To The Fox River Because It Arbitrated That Issue To Finality And Lost.**

In 2005, API and NCR arbitrated their respective liability for the "Claims, Damages, or Group Defense Costs" associated with the cleanup of the Fox River

---

[2] The Court noted that CERCLA does not rewrite the common law of corporate liability. *U.S. v. Bestfoods*, 524 U.S. 51, 63 (1998), citing *U.S. v. Texas*, 507 U.S. 529, 534 (1993) ("[T]he failure of the statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application

(footnote continued)

Site in excess of $75 million. API argued to the panel of arbitrators that it had

assumed no CERCLA liability at all concerning the Fox River Site, and the

arbitrators rejected that argument. API cannot re-litigate that issue.

### A. A Final Judgment Confirming An Arbitration Award Precludes The Parties From Re-litigating Issues Decided By The Arbitrators.

The Seventh Circuit directs courts to apply collateral estoppel when:

> (1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was fully represented in the prior action.

*Chicago Truck Drivers, Helpers & Warehouse Union Pension Fund v. Century

Motor Freight, Inc.*, 125 F.3d 526, 530 (7th Cir. 1997). "An arbitration award

counts as a final judgment for collateral estoppel purposes" once it has been

judicially confirmed. *Manion v. Nagin*, 394 F.3d 1062, 1066-67 (8th Cir. 2005).

*See also* Restatement (Second) of Judgments § 84, cmt. b (1982) ("Assuming

that the arbitration procedure has the elements of validity and has become final, it

should be accorded preclusive effect . . .").

*Tremont LLC. v. Halliburton Energy Services, Inc.*, 696 F. Supp. 2d 741,

825 (S.D. Tex. 2010), applied collateral estoppel under circumstances similar to

this case. *Tremont* also involved an asset sale—National Industries' petroleum

business—and assumption of the associated liabilities. The buyer assumed those

---

of the rule that '[i]n order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law.'").

liabilities and promised to indemnify the seller if it failed to pay them. Years later, state and federal environmental protection agencies ordered remediation of contamination associated with the old petroleum business, and the seller and buyer agreed to arbitrate their respective liability for the remediation. The arbitrators decided liability, and their decision was confirmed and entered as a final judgment in federal court, but the loser sued in federal court anyway, ignoring the final award. The court applied the same test used by the Seventh Circuit and held that the parties' liability to pay for the remediation had been fully litigated in the arbitration and could not be re-litigated in a subsequent federal action.

In finding that the procedures of the arbitration were sufficient to preclude relitigation, the court noted that the parties to the arbitration had engaged in significant discovery and the arbitrators had reviewed a record that included documentary evidence as well as witness testimony. *Tremont*, 696 F. Supp. 2d at 825. The same can be said for the 2005 arbitration between NCR and API/BAT.

### B. Collateral Estoppel Applies To API's Final Arbitration Award.

NCR and API/BAT arbitrated in 2005 under the "Subsequent Allocation Arbitration Agreement" expressly to resolve the parties' liability for "Claims, Damages, or Group Defense Costs" related to the Fox River Site and other sites, including their respective CERCLA liabilities. Dkt. 139-13. The 2005 arbitration resolved the very issue API now raises—whether API assumed CERCLA liability

4

for the Fox River.[3]  During the arbitration, the arbitrators studied the 1978

Purchase Agreement and "numerous documents... the videotaped and transcribed

deposition testimony of various witnesses, and lengthy briefs" as well as draft

versions of the 1978 Agreement, contemporaneous correspondence, and

memoranda "in order to attempt to demonstrate where the minds of the contracting

parties met." Dkt. 144-2, pp. 2-3.[4]  The panel issued an arbitration award that

assigned liability for costs of the Fox River Site in excess of $75 million – 60% to

API and its former corporate parent, B.A.T. Industries, and 40% to NCR.  Dkt.

144-2, p. 3.

   In the arbitration, API argued, as it does to this Court, that it assumed no

CERCLA liability whatsoever for the Fox River Site.  The arbitration panel flatly

rejected API's argument.  Instead, the panel considered the extensive factual

record concerning the intent of the parties and issued a final, binding decision

allocating 60% of the liability to API.  Dkt. 144-2, p. 3.

   The 2005 arbitration and the federal court judgment that confirmed it

collaterally estop API from re-litigating its CERCLA liability.  API expressly

---

[3] The arbitration was the final step to settle API and NCR's lawsuit over that very issue.  In 1995, NCR
(then known as AT&T Global Information Solutions Company) sued API and BAT Industries in the
Southern District of New York to resolve who is liable under the 1978 Purchase Agreement for remediating
the Fox River PCB pollution.  They settled that lawsuit in 1998 by agreeing to split the first $75 million of
liability for all environmental claims "including without limitation any cause of action under CERCLA,"
55% to API and 45% to NCR, and to arbitrate their liability beyond $75 million for those claims.  Dkt. 124-
1, p.6.   API agreed that "[t]he decision of the arbitrators shall be final, binding and conclusive." Dkt. 139-
13, p. 21 at ¶ 9.

[4] A copy of the Arbitration Award is attached as Exhibit 1 to the 56(d) Declaration of Steven P. Bogart
("Bogart 56(d) Decl.") for the Court's convenience.

agreed that claims under CERCLA would be addressed in the arbitration. API's CERCLA liability for the Fox River was central to the arbitration; it was fully litigated and necessarily decided; and it was essential to the final judgment. API was fully represented as a party to the arbitration by competent counsel—the arbitrators described the proceedings as "very fine presentations of counsel in their papers and argument before the Panel." Dkt. 144-2, p. 4. The 2005 arbitration satisfied each of the Seventh Circuit's four criteria for applying collateral estoppel to bar API from re-litigating its CERCLA liability. As in *Tremont*, API may not re-litigate whether it assumed these liabilities under the 1978 agreement.

API may argue that it would be improper to apply collateral offensively in this case. If so, API is wrong. Collateral estoppel can be used offensively to prevent a defendant from relitigating issues it has already litigated to final judgment, absent special circumstances. *Crowder v. Lash*, 687 F.2d 996, 1010 (7th Cir. 1982)(reversing district court's refusal to allow plaintiff to use collateral estoppel against defendants); *Ross-Berger Cos. v. Equitable Life Assur. Soc. of the U.S.*, 872 F.2d 1331, 1338 (7th Cir. 1989). None of the special circumstances that sometimes preclude use of offensive collateral estoppel apply here. API had every incentive to vigorously contest its CERCLA liability in the 1995 federal case and in the 2005 arbitration against NCR, who, as the other party to the 1978 Purchase Agreement, was in the best position to challenge API's claims. Through those prior proceedings, API had full access to discovery and due process. Neither the governments nor Certain Defendants could have participated in those earlier

6

proceedings. And applying collateral estoppel would assure consistency with the final judgment confirming the arbitration award.

### C. API's Attempts To Avoid The Preclusive Effect of Its Arbitration and Final Judgment Fail.

API argues that the arbitrators did not really interpret the 1978 Purchase Agreement; they just picked percentages. Dkt. 197, p. 2, 16. API is wrong. As the United States explains in its response brief, API's assumption of liabilities left *both* NCR and API liable for NCR's share of CERCLA liability, NCR as the polluting predecessor and API because it agreed to assume that liability when it bought the polluting assets. After agreeing that each of them would bear 25% of that liability beyond $75 million, NCR and API asked the arbitrators to allocate between them the remaining 50% of CERCLA liability that they had not resolved by agreement before the arbitration. Each party argued that it had no CERCLA liability and that the other party was fully liable, instead. The arbitrators allocated 70% of that remaining 50% to API (35% plus API's previously agreed 25% equaling 60%) and 30% of it to NCR, which they could not have done without finding that NCR remained liable as the polluting predecessor and that API had agreed to assume those same liabilities as part of the consideration it paid to purchase the assets that NCR used to create the pollution. This is why it is wrong for API to argue that the arbitrators' allocation of liability shows they did not decide API's liability under the 1978 Purchase Agreement. They could not have made such an allocation without first deciding that both NCR and API were liable

7

under CERCLA – NCR as the predecessor and API as the successor that agreed to assume those CERCLA liabilities.

API also mischaracterizes the 2005 arbitration by suggesting that it just construed the 1978 contract's indemnity clause, not the assumption of liability clause. Again, API is wrong. The indemnity clause only applies to the liabilities that API agreed to assume. That is why the parties' evidence and arguments, and the arbitrators' deliberations, focused on the assumption of liability language. API argued that the assumption of liability terms did not include the Fox River liabilities. The arbitrators disagreed and, looking at all the extrinsic evidence, allocated a majority of the Fox River CERCLA liability to API based on their interpretation of the 1978 Purchase Agreement. A federal court confirmed that decision and entered final judgment.

API cannot re-litigate whether it agreed to assume NCR's CERCLA liabilities in 1978. API's motion for summary judgment should be denied and, instead, the Court should grant summary judgment finding that API is collaterally estopped from arguing again that it did not assume this CERCLA liability as part of the price it agreed to pay for the polluting assets.

## II.   API'S ARGUMENTS SEEKING TO AVOID CERCLA LIABILITY HAVE NO MERIT.

API argues that its 1978 agreement to assume these liabilities should not be enforced because either (a) CERCLA section 107(e)(1) shields it from assuming CERCLA liability or (b) it cannot be held to its bargain as long as NCR remains

8

viable. As a third backup, API argues (again) that the 1978 Purchase Agreement does not extend to remediating PCB contamination in the Lower Fox River. All three arguments are wrong.

### A.    CERCLA section 107(e)(1) Does Not Shield API.

API correctly argues that section 107(e)(1) does not allow polluters to escape liability by *transferring* it to others, but it errs by arguing the same language shields those who agree to assume that liability without excusing the polluter.

The Supreme Court has directed that traditional common law principles should be applied in CERCLA cases. *See U.S. v. Bestfoods*, 524 U.S. 51 (1998). The Court in *Bestfoods* stressed that CERCLA gave "no indication that 'the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute.'" *Id.* at 63 (citing *Burks v. Lasker*, 441 U.S. 471 (1979)). While *Bestfoods* involved the common law defining the liability of parent corporations, the Court's broad pronouncement that corporate common law principles do apply to CERCLA has been applied by the circuit courts to the common law governing successor liability as well. *See New York v. National Services Industries, Inc.*, 352 F.3d 682, 685 (2nd Cir. 2003) ("[W]e take from *Bestfoods* the principle that when determining whether liability under CERCLA passes from one corporation to another, we must apply common law rules and not create CERCLA-specific rules."); *see also U.S. v. Davis*, 261 F.3d 1 (1st Cir.

2001). Among the most basic of these common law principles is the rule that a buyer who *agrees* to assume its seller's liability becomes liable for them.

Several courts have applied the common law governing assumed liabilities to include liability under CERCLA section 107. Section 107(e)(1) is no impediment because a buyer who assumes CERCLA liability as part of the purchase price does not extinguish the seller's liability to the government. Rather, the buyer becomes liable under CERCLA in addition to the polluter. *See, e.g., U.S. v. Iron Mountain Mines, Inc*., 987 F. Supp 1233 (E.D. Cal. 1997) (United States allowed to recover directly from a corporation that had agreed to assume "all liabilities" of the original polluter); *U.S. Bank National Association v. U.S. EPA*, 563 F.3d 199 (6th Cir. 2009) (holding that a corporation that had assumed a polluter's CERCLA liability could be sued directly by United States); *see also U.S. v. Chrysler Corp. and Knotts, Inc*. No. Civ. 88-341-CMW, 1990 WL 1227160 (D.Del. Aug. 28, 1990) (where a corporation assumed a polluter's liabilities, United States could sue both companies under CERCLA).

The Sixth Circuit recently enforced the contractual assumption of CERCLA liabilities in a case similar to this case—where a buyer acquired the assets and liabilities of a division of a larger seller. In *U.S. Bank*, 563 F.3d 199, the United States had entered into a settlement agreement with EaglePicher, Incorporated ("EP Inc.") for costs incurred and to be incurred to remediate pollution at an EP Inc. plant. Another company, EaglePicher Technologies ("EP Tech"), later acquired the EP Inc. division that included the polluted plant, and the government

sued the new owner under CERCLA because it had contractually assumed liability. The court found that EP Tech had expressly assumed all of EP Inc.'s environmental liabilities when it agreed to "assume all of the liabilities and obligations of the [a]ssignor," and affirmed the judgment in favor of the United States. *Id*. at 206.

In *U.S. v. Lang*, 864 F. Supp. 610, 612-614 (E.D. Tex. 1994), the court rejected the very argument API now makes, reasoning that while section 107(e)(1) of CERCLA prohibits a responsible party from extinguishing its own CERCLA liability through a private agreement, the statute does not bar a party that assumes liabilities from becoming liable under CERCLA in addition to the original polluter. Atlantic Richfield Company ("ARCO") had transferred assets to ARCO Chemical Company ("ACC") that included its Oxirane chemical plant. As part of the purchase, ACC agreed to accept all liabilities associated with that plant. The United States then sued ACC to recover under CERCLA based on ACC's agreement to assume the Oxirane plant's liabilities. Like API here, ACC argued that even if it had wanted to assume liability for Oxirane, CERCLA "foiled any attempt to shift liability from ARCO to ACC." *Id*. at 612. The court stated that sec. 107(e)(1) "is not a shield which prevents [ARCO Chemical Company] from attaining the status of a successor corporation." *Id*. at 614. Rejecting the argument API now makes, the court stated, "[w]hile § 107(e)(1) ensures that [one

party] cannot dodge its potential liability, it does nothing to prevent subsequent

owners . . . from being added to the chain of cleanup accountability." *Id*. at 612.[5]

　　We found no reported cases that refused to enforce CERCLA against a

party that had agreed by contract to assume those liabilities.  The one unreported

case we could find was the one case cited by API, *A-C Reorganization Trust v.

E.I. Dupont de Nemours & Co*., No. 94-C-574, 1997 WL 381962 (E.D. Wis.

1997).  But the Court in *A-C Reorganization Trust* did not have the benefit of the

Supreme Court's later instruction in *Bestfoods* that traditional common law rules of

corporate liability apply to CERCLA when it held that "the statute eliminates the

exception for express or implied assumption of liabilities in asset sales."[6]

　　The *A-C Reorganization Trust* Court, like API here, also mistakenly relied

on the Seventh Circuit's decision in *Harley-Davidson, Inc. v. Minstar, Inc*., 41

F.3d 341 (7th Cir. 1994).  *Harley-Davidson* involved an asset purchaser that

agreed to indemnify the seller against certain liabilities, *not* to assume those

liabilities.  *Id*. at 342.  The Court analogized indemnity agreements to insurance

contracts and rejected the argument that section 107(e)(1) forbids indemnity

---

[5] Consistent with *Lang*, circuits that have addressed this issue emphasize that the objective of §107(e)(1) is to bar polluters from extinguishing their liability.  *See Horsehead Industries, Inc. v. Paramount Communications*, Inc. 258 F.3d 132, 135 (3rd Cir. 2001) ("CERCLA recognizes the parties' right contractually to indemnify each other, although Sec. 107(e)(1) does not permit the transfer of statutory liability *vis-a-vis* the Government"); *see also Niecko v. Emro Marketing Co*. 973 F.2d 1296, 1300 (6th Cir. 1992) (interpreting Sec. 107(e): "Where the claimant is the government, liability may not be transferred").  None of these decisions read CERCLA as prohibiting the traditional common-law *assumption* of liability, only the transfer, or *divestment*, of liability.

[6] *A-C Reorganization Trust, 1997 WL 381962,* at *7.

agreements.  The case did not consider or discuss agreements to assume CERCLA liability.

Four years after *Harley-Davidson* and the year after *A-C Reorganization Trust*, the Seventh Circuit addressed CERCLA successor liability more directly in *North Shore Gas Co. v. Salomon, Inc*., 152 F.3d 642, 649 (7th Cir. 1998), overruled on other grounds, *Envision Healthcare Inc. v. PreferredOne Insurance Co*., 604 F.3d 983 (7th Cir. 2010).  The court agreed with the reasoning of other circuits that "successor liability is so well-established in corporate doctrine that... Congress would have to *explicitly* exclude successor corporations if it intended to place them beyond CERCLA's reach," and further clarified that "this statutory construction comports with the purposes of CERCLA."  *North Shore Gas,* 152 F.3d at 649.  *North Shore*  confirms that section 107(e)(1) only operates to prevent a responsible party from escaping its own liability, but does not otherwise interfere with the common-law doctrine of successor liability.  The court concluded,

> CERCLA is a remedial measure which is aimed only at correcting environmentally dangerous conditions . . . .  And holding the successor corporation liable for the cost of cleanup is not necessarily unfair, since the successor and its shareholders likely will have derived some benefit from the predecessor's use of the pollutant and the savings that resulted . . . .  We therefore reach the same result as other circuits . . . that Congress intended the equitable doctrine of successor liability to apply under CERCLA.

*Id.* at 650.  North Shore imposed CERCLA liability under the more difficult circumstances of a buyer that had *not agreed* to assume those liabilities.  The case for imposing CERCLA liability on a buyer that *agrees* to assume environmental liabilities as part of the purchase is even stronger.

13

The legislative history of CERCLA supports this interpretation of section 107(e)(1) as well. The drafters of the statute were foremost concerned with the efforts of responsible parties to divest themselves of liability. During debate on the amended language of the section, Senator Howard Cannon (D-Utah) stated:

> It is my understanding that this section is designed to eliminate situations where the owner or operator of a facility uses its economic power to force the transfer of its liability to other persons, as a cost of doing business, *thus escaping its liability under the act all together.*

126 Cong. Rec. 30,984 (1980) [emphasis added]. Senator Randolph, a sponsor of the bill replied: "That is correct." *Id*.

Section 107(e)(1) of CERCLA assures that polluters pay. They cannot avoid responsibility by transferring their liability to others. But a buyer that agrees to assume liability arising from the assets it bought does not extinguish the polluter's liability to the government; the buyer becomes liable in addition to the polluter. *Besfoods* makes it clear that this bedrock common law principle of enforcing agreements to assume liability applies to CERCLA. API assumed those liabilities, so it is liable under CERCLA along with NCR.

### 1. NCR's Continued Viability Is Irrelevant To Enforcing API's 1978 Contract.

API conflates two unrelated ways a buyer can become liable for its seller's liabilities to make a legal argument that is incorrect. It is always true that a buyer who *agrees* to assume its seller's liabilities becomes liable for them. The contract is enforced regardless what happens to the seller. *See Lang*, 864 F. Supp. at 612; *U.S. Bank*, 563 F.3d at 206; *Chrysler Corp.,* 1990 WL 127160. Only when the

buyer *does not agree* to assume its seller's liabilities, is it inequitable to impose those liabilities on the buyer as long as the seller can answer for them. Those are the circumstances in which the fate of the seller is critical to deciding whether to burden the buyer with the seller's liabilities. *Ninth Ave. Remedial Group v. Allis-Chalmers Corp*., 195 B.R. 716, 724-728 (N.D. Ind. 1996). API is liable because it *agreed* to be liable. Courts enforce agreements like that without regard to the seller's financial condition. The government's right to sue API for the liabilities API agreed to assume does not depend on NCR's financial condition.

API supported its conflated argument by citing a case in which the buyer *did not agree* to assume its seller's liabilities – the situation in which the seller's financial condition does matter. *Ninth Ave. Remedial Group*, 195 B.R. 716. The court made it clear that the case involved holding the buyer liable for its seller's liabilities only on the basis that the buyer was a "mere continuation" of the seller, not because the buyer agreed to be liable: "Applying the traditional successorship doctrine to the case at hand, the only successorship exception that appears relevant . . . before the Court is the third exception for mere continuity of business enterprise." *Id*. at 724. Thus, when the court in *Ninth Ave. Remedial Group* reached its conclusion that there was no equitable reason to hold a buyer liable if the seller can provide a remedy, it was applying the business continuity principle to a buyer that had not agreed to assume its seller's liabilities, which is irrelevant to a party like API that *agreed* to assume those liabilities.

It is the absence of an agreement to assume liability that makes the viability of the seller relevant. "As a general rule, *in the absence of an express or implied assumption of debts or obligations*, the successor will not be held liable if the predecessor is still a viable, ongoing entity." 15 *Fletcher Cyclopedia of the Law of Corporations*, Sec. 7123.10 (2008) (emphasis added). The distinction between those who do agree and those who do not agree to assume liabilities makes sense. In the "business continuation" cases, liability is assigned to a new entity based purely on equity, not contract. The common law balances the equities and concludes it is fairer for the buyer who continues the business of a defunct or insolvent seller to bear the loss rather than imposing it on an innocent victim of the defunct seller, who otherwise would have no recourse. But these equitable considerations play no role when the buyer agrees by contract to assume the seller's liabilities; there is nothing unfair about enforcing that contract—whether or not the seller is solvent.

The principle that a buyer who agrees to assume liabilities becomes liable for them regardless of the seller's financial condition applies to CERCLA cases. As the court noted in *Lang*, 864 F. Supp. at 612, CERCLA allows an additional party to be "added to the chain of cleanup accountability" by assuming liabilities. Atlantic Richfield Company, the seller in *Lang*, continued to exist and was so viable that in 1999, BP Amoco agreed to acquire it for $268 billion in stock. *See* http://www.fundinguniverse.com/company-histories/Atlantic-Richfield-Company-History.html. Similarly, in *Chrysler Corp.*, 1990 WL 127160, at *1, the

16

court permitted the United States to pursue enforcement against both the polluting seller and the buyer that agreed to become liable. The court emphasized that "Knotts, Inc. is liable to the United States under section 107(a)(4) . . . because Knotts, Inc. expressly agreed to assume liability" and "[t]he consent decree between the United States and Harvey and Harvey, Inc. did not release Knotts, Inc. from any potential CERCLA liability . . . ." *Id.* at *7. Though not mentioned in *U.S. Bank*, the seller in that case (EPI Inc.) remained viable after selling its polluted plant to EP Tech, which, nevertheless, became liable under CERLCA because it agreed to assume that liability. *See* Press Release, EaglePicher Corp., EaglePicher Corporation to Sell EaglePicher Technologies, LLC to OM Group (Dec. 23, 2009), *available at*

http://www.epcorp.com/images/stories/X091223_EPC_OMG_Release-FINAL.pdf.

      CERCLA's policy of making polluters pay and minimizing the cleanup costs paid by taxpayers is promoted when courts enforce a buyer's agreement to assume liability for cleanup costs. Holding API liable under CERCLA does not extinguish NCR's CERCLA liability, but does add API to the "chain of accountability," consistent with the remedial purposes of CERCLA.[7]

---

[7] The government's response relies on NCR's SEC filings to concede that NCR is financially viable, if that matters. Holding API to its 1978 Purchase Agreement should not depend on NCR's financial condition. But a decision that API did not assume these CERCLA liabilities under the 1978 Purchase Agreement would raise a real question about NCR's SEC statements because those statements depend on NCR's ability to rely on a series of indemnification agreements that include Arjo-Wiggins Appleton's ("AWA") (API's former parent) indemnity agreement. If the language in that AWA indemnity agreement parallels the (footnote continued)

## 2. API Did Assume All Environmental Liability Arising From The Facilities And Operations It Purchased In 1978.

API's final argument – rejected by the two prior tribunals to consider it – is that the 1978 Purchase Agreement cannot be read to assume liability for future PCB remediation in the Fox River. API should be estopped from relitigating this issue. But in case the Court decides to consider it, we address it next.

There are four exceptions to the general rule that an asset buyer does not acquire its seller's liabilities:  1) the purchaser expressly or impliedly agrees to assume those liabilities; 2) the transaction is a *de facto* merger or consolidation; 3) the purchaser is a "mere continuation" of the seller; or 4) the transaction is an effort to fraudulently escape liability. *North Shore Gas,* 152 F.3d at 651. New York law recognizes the same general rule and exceptions, and the 1978 Asset Purchase Agreement calls for New York law to apply (Dkt. 139-4, p. 44 at ¶ 10.11). *See Schumacher v. Richards Shear Co.*, 451 N.E.2d 195 (N.Y. 1983).

API succeeded to the liability of NCR's Appleton Papers Division by agreeing to assume all environmental liability arising from the Appleton Papers Division facilities or operations. API agreed in the 1978 Purchase Agreement to assume liabilities as follows:

---

assumption of liability language in the 1978 Purchase Agreement (which would be logical), interpreting that language to exclude CERCLA liability for the Fox River could materially alter the financial resources available to NCR for the remediation, a question that has not been tested through discovery in this action or in the parallel *Whiting* action. Bogart 56(d) Decl., ¶ 7. This is why we maintain that NCR's financial ability to complete the remediation is disputed, if the Court should decide it is material, and another reason why API's summary judgment motion cannot be granted.

1.4 Assumption of Contractual Obligations and
Liabilities.  Purchaser [API] agrees that it shall
assume, pay, perform, defend and discharge, if and
when due, to the extent not paid, performed, defended
or discharged prior to the Closing Date, all of the
following:

. . .

1.4.3 all of Seller's obligations and liabilities of
any kind, character or description relating to the period
subsequent to the Closing Date, which are not known
to Seller on the Closing Date, with respect to the
compliance of the assets, properties, products or
operations of APD with all governmental laws,
ordinances, regulations, rules and standards;

. . .

1.4.5 all of Seller's obligations and liabilities of
any kind, character or description relating to the period
subsequent to the Closing Date which arise out of or in
respect of any threatened suit, patent infringement suit,
patent or trademark interference or opposition, action,
claim, investigation by any governmental body, or
legal, administrative or arbitration proceeding set forth
on Schedules A or M, in each case whether such
obligation or liability is accrued, absolute, contingent
or otherwise and whether or not such obligation or
liability is reflected or reserved against on the
Financial Statements or the Closing Date Balance
Sheet;

. . .

1.4.9 all of Seller's liabilities (other than
liabilities with respect to claims asserted by or on
behalf of private parties), whether accrued, absolute,
contingent or otherwise, and whether or not reflected
or reserved against on the Financial Statements or the
Closing Date Balance Sheet or 1977 Balance Sheet or
on the books of account or other records of APD,
whether asserted or not and whether arising from
transactions, events or conditions occurring prior to or

> after the Closing Date, <u>with respect to compliance of
> the Property or the products or operations of APD with
> all applicable federal, state and local and other
> governmental environmental and pollution control
> laws, ordinances, regulations, rules and standards.</u>

Dkt. 139-3, pp. 17, 19, 20 and 21 (emphasis added). Schedule A discloses

environmental matters as among those matters for which API assumed liability

through Section 1.4.5 of the 1978 Purchase Agreement, stating:

> Seller has reason to believe that the facilities of
> Appleton Papers Division ["APD"] located in
> Pennsylvania and Wisconsin may be operating in
> violation of applicable federal, state, local or other
> governmental, environmental and pollution control
> laws, ordinances, regulations, rules and standards.
>
> APD receives and has received notices from time to
> time from various federal, state, local, and other
> governmental authorities claiming violation of
> environmental and pollution control laws, ordinances,
> regulations, rules and standards (collectively "laws").
> These claims may result, and have resulted, in fines
> and corrective action.

Dkt. 195-3, p. 4.

The liabilities API agreed to assume included all liabilities relating to

environmental laws and regulations and any remedial actions that might arise from

them. Despite the breadth of the quoted language, API argues that it couldn't have

included CERCLA because the statute did not exist then. The Seventh Circuit

disagrees with API. The language of the assumption agreement determines the

scope of future liabilities that are included, not the date on which a future statute is

enacted.

The Seventh Circuit has found that CERCLA liability can be assumed, even if CERCLA did not exist at the time the contract was executed. *North Shore Gas*, 152 F.3d at 651-52 (citing *Kerr-McGee Chem. Corp. v. Leftton Iron & Metal Co*., 14 F.3d 321, 327 (7th Cir. 1994)). Although the Court in *North Shore Gas* found that the contract in that case did not assume CERCLA liability, its conclusion hinged on contract language that limited the assumed liabilities to those "accrued to or existing on the date of transfer." *North Shore Gas,* 152 F.3d at 652. The Court contrasted that language with the assumption of liability language in *GNB Battery Technologies, Inc. v. Gould, Inc*., 65 F. 3d 615, 623 (7th Cir. 1995), where the Court found that a buyer that assumed all claims "whether accrued, absolute, contingent or otherwise"—the same phrase used in API's assumption of liabilities in the 1978 Purchase Agreement—assumed CERCLA liabilities because to hold otherwise would have "eviscerated" many terms in the agreement. *North Shore Gas*, 152 F.3d at 652 n. 5. The 1978 Purchase Agreement broadly encompasses future liability for environmental and other claims that arise after the closing and has no language limiting the type or nature of API's assumed environmental liabilities. API agreed to assume liabilities arising long after the closing date regardless whether they were known or unknown at that time. The plain language of the 1978 Purchase Agreement shows that future CERCLA liability is among the risks that API agreed to assume concerning the Fox River Site.

API next attempts to avoid its liability by arguing that it could not have assumed liability for PCBs because it only agreed to assume liabilities of the

Appleton Papers Division ("APD") of NCR, which did not exist until after the PCBs were no longer used for NCR paper. But NCR merged with Appleton Coated Papers Company and Combined Locks (the companies that used PCBs to make NCR paper) to create its APD and all of the liabilities associated with the business of those companies became the liabilities of NCR. *See* 15 *Fletcher, supra,* § 7121. In Section 1.4 of the 1978 Purchase Agreement API assumed all known and unknown future liabilities emanating from the use of the assets of the APD, not just the existing liabilities of that division. So API cannot escape liability using its strained reading of the 1978 Purchase Agreement.

API's argument that the language of the 1978 Purchase Agreement unambiguously precludes the assumption of CERCLA liabilities has been rejected by the two tribunals asked to rule on this very issue. First, the U.S. District Court for the Southern District of New York rejected API's arguments in 1995 when it denied API's summary judgment motion against NCR. *See AT&T Global v. Appleton Papers Inc. and BAT Industries Limited*, Case. No. 95 Civ. 4620, decision denying cross motions from summary judgment dated January 9, 1997 (Filed in Case No. 08-CV-00016, Dkt. 993-3, p. 2, by API counsel as Ex. 3 to Declaration of Ronald Ragatz, Dkt. 993) (Bogart 56(d) Decl. Ex. 2). Then again in 2005, a panel of arbitrators rejected API's argument that its 1978 contract cannot be construed to encompass these environmental liabilities. Dkt. 139-9, p. 12; Dkt. 144-2, p. 3. This Court should also reject API's arguments.

There is also evidence that API impliedly assumed the Fox River CERCLA liabilities despite the lack of any discovery about that subject yet. In assessing whether a party has impliedly assumed the liabilities of its predecessor following an asset purchase, courts look to the conduct and representations of the assuming party in determining whether there was an intention to assume the predecessor's obligations. *See City of Richmond v. Madison Mgmt. Group*, Inc., 918 F.2d 438 (4th Cir. 1990). API's conduct post-1978, including its agreement to pay 55% of the first $75 million of Fox River liabilities and at least 25% of the rest, and its creation and control of the remediation LLC,[8] suggests that API understood it had assumed CERCLA liabilities for the Fox River site. Even API's conduct in *Whiting* –claiming to be a party liable under CERCLA and invoking section 113 to demand contribution from everyone it could sue – bespeaks an understanding of its own CERCLA liability.

## III. IN ANY EVENT, THE COURT SHOULD DENY API'S MOTION FOR SUMMARY JUDGMENT.

Summary judgment is not appropriate where factual questions can be answered through discovery that would aid the court in deciding the question of successor liability. *Ninth Ave. Remedial Group v. Allis-Chalmers Corp*., 195 B.R. 716, 729 (N.D. Ind. 1996). It would be premature to grant API's motion for summary judgment without allowing any discovery into the scope of the liabilities API assumed unless the relevant agreements are unambiguous. While we believe

---

[8] The Lower Fox River Remediation LLC ("LLC").

API unambiguously did assume environmental liability for the ongoing CERCLA remediation, there is no merit to API's claim that it unambiguously did not do so. API's motion cannot be granted in its favor because there has been no discovery. Bogart 56(d) Decl. ¶¶ 2-8.

Nor has there been relevant discovery in the related case of *Appleton Papers, et al. v. George A. Whiting Paper Co.,* No. 08-CV-00016 (E.D. Wis., filed Jan. 7, 2008) ("*Whiting*"). API blocked all efforts to discover its knowledge or intent in entering into the 1978 Purchase Agreement, and the Court agreed that discovery was beyond the scope of Phase I. (*Whiting*, Dkt. 537). (Bogart 56(d) Decl. ¶ 3).

Documents submitted by API in this matter show that there are numerous documents that have not been produced by API in this action or the *Whiting* case that would be relevant to the issue of API's assumption of CERCLA liability for the Fox River:

- API's brief supporting its motion for summary judgment references a 1998 Settlement Agreement with NCR that resolved their lawsuit in the Southern District of New York over API's assumption of liability of the Fox River and other environmental sites through the 1998 Purchase Agreement. (Dkt. 197, 5-6). API submitted the 1998 Settlement Agreement in opposition to the government's preliminary injunction motion (Dkt. 124-1). That 1998 Settlement Agreement confirms it resolved an action concerning API's responsibility for the

Fox River Site and other environmental claims by allocating liability for the first $75 million in costs related to the Fox River. Discovery conducted in that New York lawsuit is relevant to API's assumption of liability because it likely bears on the liabilities the parties understood API had assumed.

- There is also a cache of documents assembled and produced between NCR and API in the arbitration proceeding that was part of the settlement. The 1998 Settlement Agreement references a second agreement, the Subsequent Allocation Arbitration Agreement ("Arbitration Agreement"), of the same date. The Arbitration Agreement (Dkt. 139-13) provides for discovery and an arbitration hearing to determine liability above the $75 million allocated by the 1998 Settlement Agreement. That discovery expressly included "evidence relating to the meaning of the Purchase Agreement, including but not limited to communications between the parties, what was known to the parties, and what was disclosed by the parties when the Purchase Agreement was negotiated, the drafting history, the negotiations, and the circumstances surrounding the execution of the purchase agreement and other related documents." (Dkt. 139-13 at 13 of 24).

- The Arbitration Award (Dkt. 144-2) (copy attached to Bogart Declaration as Ex. 2 for the Court's convenience) provides an extensive list of documents and evidence submitted to the panel:

  The parties submitted numerous documents as joint exhibits, the videotaped and transcribed deposition testimony of various witnesses, and lengthy briefs.

  * * *

  The parties developed a factual record containing draft versions of the 1978 Agreement, contemporaneous correspondence, memoranda, and subsequent witness recollection at depositions in order to attempt to demonstrate where the 'minds' of the contracting parties 'met.'

The above documents and videotaped depositions go to the very factual issues which API now asks this Court to decide on summary judgment. (Bogart Decl., ¶¶ 4 and 5).

Additional discovery by the parties is also appropriate concerning API's communications internally and with its own indemnitors and insurers regarding the liabilities it assumed. (Bogart 56(d) Decl., ¶ 6). To them, API likely emphasized its probable liability, and none of that evidence has seen the light of day. Therefore, the Court should deny API's motion.

## IV. DENYING API'S MOTION WOULD NOT PREVENT THE COURT FROM ORDERING DREDGING TO RESUME.

API has tried to present the Court with a Sophie's Choice: dismiss us and then you can order dredging to resume; if you don't dismiss us, you can't. But the Court has better options. First, for the reasons discussed in this brief, API is liable

under CERCLA, so the Court can order both NCR and API to resume dredging.

Second, the remediation LLC is in privity and in active concert and participation

with NCR (and API), so it can be sanctioned under Federal Rules of Civil

Procedure ("Rule") 65(d)(2)C if it enables NCR to ignore the Court's injunction.

Rule 65(d)(2)C authorizes courts to sanction nonparties who enable parties

with whom they are "legally identified" to evade an injunction. *Nat'l Spiritual

Assembly of Baha'is of U.S. under the Hereditary Guardianship Inc. v. Nat'l

Spiritual Assembly of Baha'is of the U.S. of America Inc.*, 628 F.3d 837, 840 (7th

Cir. 2010). When nonparties are so closely identified in interest that it is

reasonable to conclude their rights and interests were represented and adjudicated

in the injunction proceeding, the court may sanction them as well. *Id.* at 849.

*In Lake Shore Asset Management Ltd. v. Commodity Futures Trading

Commission*, 511 F.3d 762 (7th Cir. 2007), the court held that although it was

improper to issue an injunction directly against affiliates of Lakeshore who were

not parties in the action, Rule 65(d)(2)C did apply to those affiliates in privity and

acting in concert with Lakeshore. The court vacated the injunction directed at the

nonparty corporate affiliates but stated that the affiliates would be subject to relief

under Rule 65(d)(2)C and would therefore "act at their own peril if they disregard

the commands of the injunction . . . ." *Id.* at 767.[9]

---

[9] In its decision in Government's preliminary injunction motion, the court cited *Blockowicz v. Williams*, 630 F.3d 563, 567 (7th Cir. 2010) for the proposition that an injunction binds a non-party if he aids and abets an enjoined party in violating any injunction *or* if he is in privity with the enjoined party. Although the court in *Blockowicz* found it could not enforce an injunction against a website host for refusing to remove
(footnote continued)

Case 1:10-cv-00910-WCG   Filed 08/29/11   Page 27 of 30   Document 206

In *Lindland v. U.S. Wrestling Association Inc.*, 227 F.3d 1000 (7th Cir. 2000), the Seventh Circuit Court enforced an injunction against a nonparty that enabled an enjoined party to frustrate the injunction. Lindland sued to force the U.S. Wrestling Association to comply with an arbitration ruling that he was entitled to wrestle in the Olympics. The court ordered USA Wrestling to nominate Lindland to the U.S. Olympic Committee, so the U.S. Olympic Committee could then nominate Lindland to the International Olympic Committee. USA Wrestling instead nominated a wrestler named Sieracki. The U.S. Olympic Committee decided to accept that nomination despite its knowledge of the court order. The court found that the U.S. Olympic Committee was bound by the injunction against the U.S. Wrestling Associates because it was in active concert and participation with USA Wrestling and, therefore, was required to submit Lindland as the U.S. athlete at his weight class to the International Olympic Committee. In so doing, the court rejected the U.S. Olympic Committee's contention that it was an independent organization entitled to make the final decision. The court found:

> "[T]he active concert or participation" clause *supposes* legal distinctiveness; if USA Wrestling and the USOC were the *same* party, the order would be binding directly. The "active concert or participation" clause is designed to prevent what may well have happened here: the addressee of an injunction, eager to avoid its obligations, persuades a friendly third party to take steps that frustrate the injunction's effectiveness."

---

defamatory statements posted by the party enjoined to remove all such defamatory statements, the court specifically noted that the privity argument had not been made and was not before it.

*Id.* 1006 (emphasis added).

Here, the remediation LLC is not a party to this action, but it is in contractual privity and active concert and participation with NCR (and API). API conceded that the LLC is the instrument by which API and NCR have funded and performed remediation of the Fox River under the Unilateral Administrative Order. *See* Dkt. 143 at p. 14 ("API and NCR, through the LLC, continued their combined efforts to fund and perform the remediation . . . ."). As such, the LLC is in privity and is so aligned in interest and in concert with NCR and API that it is reasonable to conclude that the LLC's rights and interests were adequately adjudicated as part of the preliminary injunction proceeding in which its members, NCR and API, were parties. As with the nonparties in *Lake Shore* and *Lindland*, if this Court orders either NCR or API to resume dredging, the LLC cannot enable either party to frustrate this Court's order without falling within the reach of Rule 65(d)(2)C. It is no answer for NCR (or API) to argue, "but I don't control the LLC," for that is the exact argument the Seventh Circuit rejected in *Lindland.*

## CONCLUSION

As part of the price it paid for a valuable business in 1978, API agreed to add itself to the chain of accountability by assuming environmental liability for the Fox River Site arising after the purchase, whether or not that liability was known at the time, making it liable under CERCLA. Nothing in either the statute or reported case law nullifies the common law principle that requires such agreements to be enforced. Every tribunal that has explored the meaning of API's

broad contractual assumption of liabilities has rejected API's argument that it precludes CERCLA liability for the Fox River site. Whether this Court chooses to apply collateral estoppel or further explore the assumption provision, either API assumed this liability or whether it did so remains a genuine issue of material fact about which there has been no discovery. Either summary judgment should be entered against API holding that it is liable under CERCLA or API's summary judgment motion should be denied.

Dated this 29th day of August, 2011.

s/Steven P. Bogart
Scott W. Hansen
WI State Bar ID No. 1017206
shansen@reinhartlaw.com
Steven P. Bogart
WI State Bar ID No. 1005758
sbogart@reinhartlaw.com
Attorneys for U.S. Paper Mills
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
Telephone: 414-298-1000
Facsimile: 414-298-8097

Of Counsel:

Thomas R. Gottshall
tgottshall@hsblawfirm.com
Stephen F. McKinney
smckinney@hsblawfirm.com
Haynsworth Sinkler Boyd P.A.
1201 Main Street, 22nd Floor
Columbia, SC 29201-3232
Telephone: 803-540-7856
Facsimile: 803-765-1243

REINHART\7735010