IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

UNITED STATES OF AMERICA and
THE STATE OF WISCONSIN,

    Plaintiffs,

v.

NCR CORPORATION, *et al.*,

    Defendants.

No. 10-CV-910-WCG

## DEFENDANT APPLETON PAPERS INC.'S RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED FACTS

Defendant Appleton Papers Inc. ("API"), pursuant to Civil L.R. 56(b)(3)(B), provides the following response to Plaintiffs' Statement of Additional Undisputed Facts (Dkt. 204).

**PSAF 67.** NCR and two of its corporate predecessors – Appleton Coated Paper Company ("ACPC") and Combined Paper Mills, Inc. ("CPM") – owned and operated two paper production facilities in the Fox River Valley: one located on East Wisconsin Avenue in Appleton (the "Appleton Coating Facility") and another located in Combined Locks (the "Combined Locks Mill"). Dkt. 30-1 at 7-9; Dkt. 65 at 13.

**API's Response:** Undisputed, but Plaintiffs' wording is imprecise. See API's Proposed Findings of Fact ("PFOF") Nos. 11-14 (Dkt. 196 at 3).

**PSAF 68.** ACPC produced PCB-containing NCR Paper® at the Appleton Coating Facility between approximately 1954 and April 1971. Dkt. 64 at 14; Dkt 136-2 at 13.

**API's Response:** Undisputed.

**PSAF 69.** CPM produced PCB-containing NCR Paper® at the Combined Locks Facility between approximately 1969 and April 1971. Dkt. 64 at 14.

**API's Response:** Undisputed.

**PSAF 70.** CPM deinked and reprocessed certain types of wastepaper at the Combined Locks Mill, including used telephone books. Dkt. 100-2 at 10; Dkt. 136-2 at 12.

**API's Response:** It is undisputed that from approximately 1954 to approximately 1966, CPM deinked and reprocessed used telephone books and card tabs.

**PSAF 71.** Until at least the mid-1970s, the paper in used telephone books would have contained PCBs. Dkt. 76-5 at 4, 6, 8.

**API's Response:** Disputed and unsupported. The cited documents indicate only that certain telephone books received by Fort Howard in 1975 and 1976 contained low levels of PCBs. Plaintiffs have offered no evidence indicating (1) that *all* telephone books contained PCBs until the mid-1970s, or (2) that *any* telephone books processed by CPM between 1954 and 1966 (when CPM discontinued deinking telephone books) contained PCBs.

**PSAF 72.** The Appleton Coating Facility discharged wastewater containing PCBs to the City of Appleton's sewer system and publicly owned treatment works ("POTW") while the Appleton Coating Facility was owned and operated by ACPC, and the City of Appleton in turn discharged the Appleton Coating Facility's partially-treated, PCB-containing wastewater to the Lower Fox River. Dkt. 64 at 15; Dkt. 100-2 at 9; Dkt. 100-5; Dkt. 100-6; Dkt. 124-6; Dkt. 136-29; Dkt. 136-30; Dkt. 136-49.

**API's Response:** It is undisputed that (1) from approximately 1954 to April 1971, the Appleton Coated Facility produced certain quantities of NCR Paper® by coating base paper with an emulsion containing Aroclor 1242; (2) during that time, the Appleton Coated Facility discharged wastewater, which at times contained residues of substances containing Aroclor 1242, into the sanitary sewage collection system and wastewater treatment plant operated by the City of Appleton; and (3) the wastewater treatment plant operated by the City of Appleton discharged to the Lower Fox River.

**PSAF 73.** The Appleton Coating Facility also discharged wastewater containing PCBs to the City of Appleton's sewer system and POTW while the Appleton Coating Facility was owned and operated by NCR. Dkt. 100-11 at 5.

**API's Response:** Disputed in part. NCR did not own or operate the Appleton Coated Facility until 1973 (*i.e.*, after use of PCBs in NCR Paper® had been discontinued). See API's PFOF Nos. 14-16 (Dkt. 196 at 3-4). While NCR acquired the stock of ACPC in September 1970, ACPC (and later Appleton Papers, Inc.) owned and operated the Appleton Coated Facility until January 1, 1973, when Appleton Papers, Inc. was merged into NCR. The document cited by Plaintiffs in support of PSAF 73 (Dkt. 100-11) states that at three sampling events between January 1976 and June 1976, Aroclor 1242 was detected in the effluent of the Appleton Coated Facility at a "very low level." The document states:

> PCB analyses of the common effluent from the Appleton Plant were initiated in January 1976. From the results, summarized on Table 1, the following conclusions can be made:
>
> (1) The input water used in the plant is essentially free of PCB's.
>
> (2) The comment effluent contains a detectable, but very low level, of Aroclor 1242. This amount is considerably less than the levels for PCB

discharges that are being proposed, by the Wisconsin DNR, for 1977 in 1983.

Dkt. 100-11 at 4 of 28. "Table 1" indicates that PCBs were detected at levels ranging from 0.9 parts per billion and 1.7 parts per billion. *Id*. at 5 of 28. The document cited in support of PSAF 73 shows only that very low levels of PCBs were detected in the effluent leaving the Appleton Coated facility. The document provides no evidence that any amount of PCBs attributable to the Appleton Coated Facility were detectable in the water discharged into the Low Fox River after passing through the City of Appleton wastewater treatment plant.

In addition, the factual assertions in PSAF 73 are not material to API's pending motion for summary judgment. Plaintiffs' brief in opposition to API's motion for summary judgment makes no assertion that API has direct liability under CERCLA. Instead, Plaintiffs oppose summary judgment solely on the ground that API has successor liability.

**PSAF 74.** The Combined Locks Mill discharged wastewater containing PCBs to the Lower Fox River while the Combined Locks Mill was owned and operated by CPM. Dkt. 64 at 15; Dkt. 100-2 at 9.

**API's Response:** Disputed, unsupported and not material to API's pending motion for summary judgment. It is undisputed that (1) from approximately 1969 to April 1971, the Combined Locks Mill produced certain quantities of NCR Paper® by coating base paper with an emulsion containing Aroclor 1242; and (ii) during that time, the Combined Locks Mill discharged wastewater, which at times contained residues of substances containing Aroclor 1242, into a clarifier which ultimately discharged to the Lower Fox River. Neither of the documents that Plaintiffs cite in support of PSAF 74

- 4 -

provide evidence that PCBs were detected in the effluent of the Combined Locks Mill discharged into the Lower Fox River while the facility was owned and operated by CPM.

**PSAF 75.** The Combined Locks Mill also discharged wastewater containing PCBs to the Lower Fox River while the Combined Locks Mill was owned and operated by NCR. Dkt. 124-7.

**API's Response:** Disputed, unsupported and not material to API's pending motion for summary judgment. PSAF 75 is based upon inadmissible evidence. The author of the document upon which Plaintiffs rely is unidentified and unknown. The document contains various numbers for various facilities, but neither the document nor Plaintiffs explain the origin of the numbers or what they signify. There are pages referencing 1975, 1976 and 1977. One column on each page is labeled "Surface Waters", but neither the document nor Plaintiffs explain what is meant by "Surface Water". Therefore, it is not clear whether the document is referencing Surface Water in the general vicinity of the referenced facility or at a point at which the facility discharges wastewater.

The three pages include an entry for "NCR Appleton Paper Div – Combined Locks." The document appears to show the following detections of PCBs in the "Surface Water" at the Combined Locks facility:

| | |
|---|---|
| 1975 | 0.002 mg/l |
| 1976 | 0.001 mg/l |
| 1977 | "18E-5" |

Neither the document nor Plaintiffs explain what "18E-5" means. Further, the documents do not purport to take into account PCBs in the influent to the plant from the Lower Fox River.

**PSAF 76.** The Appleton Coating Facility generated PCB-containing broke during the production of PCB-containing NCR Paper® by ACPC. Dkt. 64 at 14, 16; Dkt. 65 at 15.

**API's Response:** Undisputed, but not material to API's motion for summary judgment.

**PSAF 77.** The Combined Locks Mill generated PCB-containing broke during the production of PCB-containing NCR Paper® by CPM. Dkt. 64 at 14, 16.

**API's Response:** Undisputed, but not material to API's motion for summary judgment.

**PSAF 78.** PCB-containing NCR Paper® broke that was generated by ACPC and CPM was sold to paper brokers or dealers. Dkt. 64 at 16-17; Dkt. 124-6 at 5.

**API's Response:** Undisputed, but not material to API's motion for summary judgment.

**PSAF 79.** Several of the recycling mills in the Fox River Valley used specialized processes or other processes to treat the paper and remove unwanted coatings that came from PCB-containing NCR Paper® broke. The coatings from the PCB-containing NCR Paper® broke could impart an undesirable odor, tint, haze, and/or discolor the product that the recycling mill was making. In some instances, PCB-containing NCR Paper® broke would need to be blended with other deinked wastepaper in order to prevent or minimize the discoloration of the final paper product. Dkt. 65 at 16.

**API's Response:** Undisputed, but not material to API's motion for summary judgment.

**PSAF 80.** NCR is a corporate successor by merger to both ACPC and CPM. Dkt. 64 at 13.

**API's Response:** PSAF 80 states a conclusion of law. Insofar as PSAF 80 is deemed to assert a proposed finding of fact, it is undisputed.

**PSAF 81.** In connection with the purchase of NCR's Appleton Papers Division assets, API (which was then known as Lentheric, Inc.) executed both an Agreement of Purchase and Sale of Assets (the "Purchase Agreement") and a related Assumption Agreement. A true and correct copy of the Assumption Agreement is reproduced at Dkt. 203-3.

**API's Response:** Undisputed.

**PSAF 82.** Under Section 1.4 of the Purchase Agreement and the Assumption Agreement, API assumed potential direct liability to third parties asserting covered claims. For example, Schedules A and M identified certain known liabilities to third parties that API was agreeing to assume, including responsibility for disputes over identified contracts with NCR and its predecessors, employment discrimination claims that had been brought against NCR and at least one of its predecessors, potential maternity disability claims dating back to 1972, and a previously-filed civil enforcement action by the United States alleging Clean Water Act violations by NCR and one of its predecessors at an Appleton Papers Division facility in Pennsylvania. Dkt. 139-3 at 17, 19, 20; Dkt. 195-3; Dkt. 195-4 at 19-26; Dkt. 203-3.

**API's Response:** The terms of the Assumption Agreement and Section 1.4 of the Purchase Agreement speak for themselves. Insofar as PSAF 82 characterizes the legal effect of the Purchase Agreement, it is a conclusion of law.

**PSAF 83.** The 1998 Settlement Agreement between API and NCR memorialized the companies' "joint and common legal interests with respect to the Fox River sites," their agreement "to continue to cooperate, coordinate, and assist one another in the defense of the Sovereigns' and third-party claims related to the Fox River sites" and "to implement a coordinated and joint defense effort among themselves," and their commitment "to work together as closely as possible as if the parties are one entity" in the defense of such claims. Dkt.124-1 at 20-21.

**API's Response:** The terms of the 1998 Settlement Agreement speak for themselves. Insofar as PSAF 83 purports to quote certain provisions in the Settlement Agreement, it is undisputed, but the quoted provisions must be read with all other provisions of the agreement in order to ascertain the purpose and effect of the agreement and the parties' right and obligations thereunder.

**PSAF 84.** The Records of Decision and EPA's Unilateral Administrative Order ("UAO") for the Site cover requirements for long-term maintenance of underwater sediment caps that are being installed at the Site, as well as other maintenance and long-term monitoring activities. Dkt. 30-1 at 24; Dkt. 136-43 at 23.

**API's Response:** Undisputed.

**PSAF 85.** The Amended Record of Decision for Operable Units 2-5 estimates the cost of long-term monitoring and maintenance activities for 100 years. Dkt. 136-43 at 27-28.

**API's Response:** Undisputed.

**PSAF 86.** The total cleanup costs and damages for the Site have been estimated at up to $1.5 billion. Dkt. 93-5 at 6; Dkt. 93-6 at 6; Dkt. 124-3 at 5; Dkt. 124-4 at 24-25.

**API's Response:** It is undisputed that the Government has estimated that, under certain scenarios, the total cleanup costs and damages could reach $1.5 billion.

**PSAF 87.** With API's 45 shares and its own 15 shares, Arjo Wiggins Appleton (Bermuda) Limited votes 60 of the 100 Class A shares in the Lower Fox River Remediation LLC (the "LLC"). NCR votes the remaining 40 shares. Dkt. 137 at 3; Dkt. 141 at 5-7.

**API's Response:** PSAF 87 purports to summarize certain provisions of the Amended and Restated Operating Agreement ("Operating Agreement") of the Lower Fox River Remediation LLC ("the LLC"), which Operating Agreement speaks for itself. PSAF 87's summary of certain provisions of the Operating Agreement is undisputed for purposes of this motion.

**PSAF 88.** In February 2011, the LLC submitted a work plan for the 2011 Remedial Action in OU 2-5 (the "February 2011 Draft Work Plan"). On March 4, 2011, EPA notified the LLC's contractor, Tetra Tech, that the Draft Work Plan had been approved with modifications and directed the LLC to submit a revised 2011 Work Plan by March 25, 2011. Dkt. 141 at 6.

**API's Response:** Undisputed, but not material to API's pending motion for summary judgment.

**PSAF 89.** On March 24, 2011, API informed NCR that it intended to exercise its controlling vote in the LLC to cause the LLC to reject many of EPA's modifications to

the February 2011 Draft Work Plan. NCR objected in writing. On March 25, 2011, API sent NCR notice of an LLC Action by Consent, in which API exercised its controlling vote pursuant to the LLC Agreement. NCR objected in writing to the Action by Consent and requested that its objection be filed with the records of meetings of the LLC. NCR did not play a further role in drafting or submitting the revised work plan that the LLC ultimately submitted on March 28, 2011 (the "March 2011 Revised Work Plan"). Dkt. 141 at 7.

**API's Response:** Undisputed, but not material to API's pending motion for summary judgment.

**PSAF 90.** The March 2011 Revised Work Plan did not incorporate EPA's modifications to the February 2011 Draft Work Plan. Dkt. 125 at 24; Dkt. 125-17; Dkt. 125-18.

**API's Response:** Undisputed, but not material to API's pending motion for summary judgment.

**PSAF 91.** EPA classified the March 2011 Revised Work Plan as "deficient and noncompliant with the UAO." Dkt. 125 at 24.

**API's Response:** It is undisputed that EPA objected to certain aspects of the March 2011 Revised Work Plan, but EPA either approved or raised no objection to many other aspects of the March 2011 Revised Work Plan. In any event, PSAF 91 is not material to API's pending motion for summary judgment.

**PSAF 92.** The LLC's March 2011 Revised Work Plan was designed to accommodate a self-imposed $50 million cost cap and a self-imposed 250,000 cubic yard dredging limit for 2011. Dkt. 125-18; Dkt. 190 at 2.

**API's Response:** Disputed and unsupported. Neither document cited explains for what purpose the LLC's March 2011 Revised Work Plan was designed. The Plaintiffs quoted the purpose for which the LLC designed its March 2011 Revised Work Plan in Dkt. 126 at 1, where it partially quoted Dkt. 125-17 at 1, as follows:

> The LLC is proposing the [dredging] volumes it is because its Members have sufficient cause for non-compliance with the 106 Order. First, the government's own deeply flawed volumetric analysis . . . assigns ACPC and Combined Locks a volumetric share of no greater than 30%, and the LLC has already removed more than 30% of the contaminated sediments; second, a comprehensive analysis of PRP discharges shows that ACPC and Combined Locks, together, could not have been responsible for more than 8 - 14% of the PCBs in the river; and third, the ongoing remedy is not cost effective, in violation of CERCLA . . . . For these and other reasons, the LLC's Members have sufficient cause no longer to comply with the 106 Order or, in particular, the Agencies' desire for greater dredging volumes and increased pace.

In any event, PSAF 92 is not material to API's pending motion for summary judgment.

**PSAF 93.** On July 12, 2011, the LLC issued a press release announcing that dredging at the Site would be concluding for the 2011 season because the LLC's contractors were nearing completion of the planned 250,000 cubic yards of dredging for 2011. Dkt. 178 at 5.

**API's Response:** The LLC's press release dated July 12, 2011 (Dkt. 178 at 5) speaks for itself. Insofar as PSAF 93 purports to summarize the press release, PSAF 93 is undisputed, but not material to API's pending motion for summary judgment.

**PSAF 94.** On August 12, 2011, EPA sent NCR, API, and the LLC a formal written directive under the UAO that requires replacement of the LLC's Project Coordinator and contractors with a newly-designated Project Coordinator and contractors that will be directly accountable to NCR. EPA also directed that "Full-scale dredging must resume immediately and continue throughout the 2011 construction season, as

required by the UAO, either with the assistance of the LLC and its contractors or through alternate arrangements made by NCR." Dkt. 203-4.

**API's Response:** EPA's letter of August 12, 2011 speaks for itself. Insofar as PSAF 94 purports to summarize the August 12 letter, PSAF 94 is incomplete. It is undisputed that the quoted sentence is accurately quoted, but the sentence is not material to API's pending motion for summary judgment.

**PSAF 95.** Despite EPA's August 12, 2011 directive, full-scale dredging has not resumed at the Site. The LLC concluded its 2011 dredging and processing season in mid-August and an estimated total of only 239,414 cubic yards of sediment was dredged in 2011. Dkt. 203-5.

**API's Response:** Undisputed, but not material to API's pending motion for summary judgment.

**PSAF 96.** The Seventh Amended Complaint that API and NCR filed in *Appleton Papers Inc. v. George A. Whiting Papers Co., Inc.,* No. 08-CV-00016 (E.D. Wis.) (the "Whiting Case"), described the two companies as "leaders among the responsible parties" at the Site. Dkt. 92-1 at 2.

**API's Response:** Undisputed, but not material to API's pending motion for summary judgment.

**PSAF 97.** In "Plaintiffs Appleton Papers Inc. and NCR Corporation's Brief in Support of Motion to Modify the Court's September 23, 2008 Case Management Decision and Scheduling Order" in the Whiting Case, API and NCR were both described as "successors" of Appleton Coated Paper Company ("ACPC") and ACPC was identified as "their predecessor." Dkt. 124-8 at 12-13.

**API's Response:** PSAF 97 is undisputed insofar as it quotes from the referenced brief. Insofar as it purports to suggest that API previously conceded that it was the successor to ACPC or CPM, the allegation is disputed and contrary to an express ruling of this Court:

> Appleton Papers is correct that there was no basis to conclude that it had "conceded" its liability in this action. Although there are a number of arguments suggesting that it is, or will be, liable, these arguments had not yet been addressed squarely.

"Order Granting Reconsideration and Regarding Numerous Motions Filed in 2009," entered July 5, 2011, Dkt. 1139 at 1.

The Court's ruling is supported by numerous filings in *Whiting* and the related cases. For example, several Defendants in the *Whiting* action filed counterclaims alleging that the Plaintiffs in *Whiting*, including API, are liable under CERCLA. API consistently denied those allegations in its Answers. *See, e.g.,* Dkt. 351, ¶¶ 8, 15; Dkt. 348, ¶¶ 6, 13; Dkt. 338, ¶¶ 9-14; Dkt. 337, ¶ 14; Dkt. 334, ¶¶ 29, 34; Dkt. 318, ¶ 7; Dkt. 317, ¶ 7; Dkt. 319, ¶ 7; Dkt. 316, ¶ 3.[1] API specifically denied allegations that it is liable as a successor:

> 22. Plaintiff and Counter-defendant API is a successor to all relevant liabilities of ACPC and Appleton Papers arising out of the ownership and operation of the Appleton Facility and the Combined Locks Facility.
>
> **ANSWER:** API and NCR deny the allegations in Paragraph 22.

Dkt. 348, ¶ 22 (emphasis original); *see also,* Dkt. 351, ¶ 23.

In the spring of 2010, when Defendants in the *Whiting* case filed motions for summary judgment on their counterclaims, they submitted proposed findings of fact

---

[1] All docket entry references in API's response to PSAF 97 are to the *Whiting* case unless otherwise noted.

asserting that API is liable under CERCLA and that it is a successor to ACPC, Combined Paper Mills, Inc., and/or NCR by virtue of the 1978 Purchase and Sale Agreement ("1978 Agreement"). API expressly disputed each such proposed finding of fact:

> 27. In 1978, API assumed the liabilities of NCR's Appleton Papers Division.
>
> **RESPONSE: Disputed…**
>
> 28. At the time of the 1978 assumption of liability by API, it was well aware of PCB contamination arising out of the former operations of ACPC and Combined Locks.
>
> **RESPONSE: Disputed…**
>
> 29. By operation of law, by contract or both, NCR and API both are legally liable under CERCLA for the release of hazardous substances by ACPC or Combined Locks to the Lower Fox River.
>
> **RESPONSE: Disputed...**

Dkt. 1004, ¶¶ 27-29 (Resp. to Menasha Corp.'s Stmt. of Undisputed Facts) (citations omitted) (emphasis added); *see also,* Dkt. 987, ¶¶ 19-20 (also denying API assumed CERCLA liability in the 1978 Agreement). In each such instance, after specifying that the assertion was "disputed," API also specifically stated that Defendants' allegations regarding API's liability were inaccurate, unsupported by the record evidence cited, and vigorously disputed by API. *Id.*

In a reply brief, certain Defendants tried to rely on the outcome of an agreed arbitration between NCR, API, and BAT to support a successor liability claim. Dkt. 1042, pp. 9-10 of 20 (Menasha Corp.'s Reply on S.J. Decl. Relief). However, at oral argument, counsel for API reiterated that API disputes any liability, including successor liability, and directly addressed Defendants' argument about the arbitration:

> The third point that I'd like to make today is that Menasha goes out of its way in its brief to have joint and several liability against both NCR and API for 100 percent of future costs. It's an element they have to establish in order to get

- 14 -

> future costs; however, the general rule as cited in our brief is that there is no joint and several liability. And thus, the Defendants have to prove that both API and NCR are jointly and severally liable for the CERCLA liabilities of the discharges to the river, those being Appleton Coated Paper and Combined Paper Mills. Those are the persons who discharged PCBs, and those are the persons who have liability.
>
> Defendants, on this record, haven't met this burden. **They've set forth no case law on the topic. They merely state that API contractually assumed the liabilities associated with the assets of the Appleton Papers NCR Division. It did not. Merely purchasing the assets does not lead to successor liability. In fact, the** *North Shore Gas* **case from the Seventh Circuit says exactly that.**
>
> **Menasha attempts, through the 2005 arbitration agreement, to cast its web to catch both API and NCR, but a close examination of the 2005 arbitration agreement does not establish who was the successor to either ACPC or Combined Paper Mills. It just says that as between API and NCR, 60 percent of the damage gets paid by API, and 40 percent gets paid by NCR. But it does not establish conclusively who bears the successor liability and who is the responsible party under CERCLA.**
>
> **So on this record, the Defendants have not established to you who bears the CERCLA liability, either NCR or API. And I would submit to you it would be virtually impossible to say it's API, a company who did not come into existence until June 30, 1978, and who, if it did not assume the CERCLA liabilities under the 1978 purchase agreement, could not be a liable party and cannot then have a judgment against it for future costs.**

Dkt. 1074, pp. 86-88 (S.J. Motions Transcript of 9/1/10) (emphasis added).

Finally, in the appeal of the Court's approval of the Government's settlement with the so-called *de minimis* defendants, API filed a motion after the Seventh Circuit rendered its decision seeking to correct certain language in the decision. (7th Circuit, Case No. 10-2480, Dkt. 38-1) In that motion, API asserted that "whether Appellants are liable under CERCLA and, if so, the share of the PCBs in the Lower Fox River for which they are responsible (i.e., how "much") are disputed issues of law and fact that remain pending before the district court . . ." *Id*. at 3. API further asserted that "[w]hether Appleton in fact is a successor is a disputed and unresolved issue in both of the pending related actions." *Id*. API's motion was unopposed and the Seventh Circuit granted the requested relief.

- 15 -

Dated this 15th day of September, 2011.

Respectfully Submitted,

APPLETON PAPERS INC.


By  /s/ Ronald R. Ragatz

One of Its Attorneys

Counsel for Appleton Papers Inc.:

| | |
|---|---|
| Michael L. Hermes (#1019623) | Ronald R. Ragatz (#1017501) |
| Heidi D. Melzer (#1076125) | Dennis P. Birke (#1018345) |
| Brandon J. Evans (#1063940) | Megan A. Senatori (#1037314) |
| Ericka L. Krumrie (#1066383) | DeWitt Ross & Stevens S.C. |
| Hermes Law, Ltd. | Two East Mifflin Street |
| 333 Main Street, Suite 601 | Madison, WI 53703 |
| Green Bay, WI 54301 | (608) 255-8891 |
| (920) 436-9870 | Fax: (608) 252-9243 |
| Fax: (920)436-9871 | |