UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                      Case No. 10-C-910

NCR CORP. and APPLETON PAPERS INC.,

    Defendant.

# DECISION AND ORDER

On July 5, 2011, this Court denied the government's motion for a preliminary injunction against Defendants NCR and Appleton Papers Inc. In doing so, I found that although the government had set forth grounds for relief against NCR, it had not done so against Appleton Papers because it was unlikely that Appleton Papers had successor liability under CERCLA. Appleton Papers ("API") has now moved for summary judgment on the issue of liability. For the reasons given below, I will deny the motion.

**I. Successor Liability when the Seller Survives the Transaction**

The issue of successor liability has already received significant treatment in this Court's denial of preliminary relief to the government. In sum, I have concluded that although API may have agreed to indemnify NCR as a part of its purchase of some of NCR's assets (more on this below), that agreement did not constitute a "successorship" to liability because (among other reasons) NCR continued to remain in business. Without an actual "succession," I concluded there could be no successor liability. In addition, I noted that CERCLA § 107(e)(1) precluded parties'

efforts to shift liability to other entities. That statutory bar on the transfer of liability supported my conclusion that there was no succession here. Finally, I found that the equitable purposes of the successor liability doctrine were directed toward preventing the kind of fraud or injustice that would result if a liable entity were allowed to shirk its liability through a liability-shifting transaction. Because that did not occur here (given that NCR continued to remain liable), I found the successorship doctrine inapplicable. Having already effectively ruled in favor of API, I will focus my attention on the government's arguments that my preliminary conclusion was incorrect.

To recall, in the common law there are four established ways in which a purchaser of assets can be deemed a successor: "(1) Where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligation." *Moriarty v. Svec,* 164 F.3d 323, 327, 164 F.3d 323 7th Cir. 1998) (quoting *Vernon v. Schuster,* 688 N.E.2d 1172, 1175 (Ill. 1997). Here, we are dealing only with the first of these, the express agreement of assumption. The principal focus of the government's present effort is its argument that NCR's continued existence as a viable company is irrelevant to the successorship analysis. It concedes that the seller's continued existence might preclude some ways of establishing successor liability, such as in the application of the "mere continuation" doctrine or a *de facto* merger. For example, if Company A sold some assets to Company B, it would be difficult to conclude that the transaction was actually a consolidation or merger of the two businesses if Company A remained a viable going concern. In that case, we would not view Company B as a successor.

But the government claims that the seller's continued existence is *not* relevant when successor liability is premised on an explicit agreement of liability assumption. If the buyer has

signed an agreement explicitly stating that it is assuming the liabilities of the seller, then the concerns about continuity, fraud and *de facto* merger go by the wayside because the parties have saved us the trouble by negotiating successor liability as a matter of contract, a contract to which the public is a third-party beneficiary.

This argument faces at least two hurdles. First, as has been noted already, "the purpose of corporate successor liability is to prevent corporations from evading their liabilities through changes of ownership." *United States v. Mexico Feed & Seed Co.,* 980 F.2d 478, 487 (8th Cir.1992). Here, because NCR remains viable, there has been no effort to "evade" liability. No one has disputed that NCR is a solvent corporation that has the ability to pay any judgment here, and neither has anyone suggested that the purpose of the asset sale to API was to shirk liability. Thus, the case, on its face, does not cry out for application of the successorship doctrine.

A second, and possibly related, problem is that there is almost no precedent for finding successor liability when the seller has remained a viable entity. For example, in *United States v. Iron Mountain Mines, Inc.,* which the United States cites, the court found successor liability based on two assumption agreements. 987 F. Supp.2d 1233 (E. D. Cal. 1997). But there, the predecessor companies had been dissolved. In fact, the court concluded that the requirements for a *de facto* merger were likely met, although it did not reach that issue given the existence of the express assumption agreement. *Id.* at 1242 n.19. Except for an unpublished case decided more than two decades ago, it does not appear that successor liability has been found under the circumstances we have here. *See United States v. Chrysler Corp.,* 1990 WL 127160, *4-7 (D. Del. 1990) (finding assumption of liability through agreement even though selling company remained in-tact).

Despite these hurdles, I am satisfied that API may be deemed a successor to the liability of NCR even though NCR itself remains liable to the government. First, all of the CERCLA cases

addressing successor liability recognize that a company may become liable as a successor by expressly agreeing to become liable. *Moriarty v. Svec,* 164 F.3d at 327. These cases do not condition liability-by-agreement on the non-existence of the selling corporation. Perhaps the problem is that assumption of CERCLA liability through an agreement is not actually a "succession," because in common parlance a succession implies that the successor has assumed liability *in lieu* of the transferor. Instead of talking about succession, it might be clearer to state that a party may assume direct CERCLA liability by agreement even though it may not "succeed" to it in the traditional understanding of the term. In any event, CERCLA case law is clear that parties may assume liability through agreement (though they may not transfer it away), and none of the cases requires that an assumption is only valid if the seller ceases to exist. Accordingly, the fact that NCR continues to be liable should not be an obstacle to finding API liable.

A second consideration motivating my denial of preliminary relief was the fact that CERCLA explicitly prevents parties from shifting liability to other entities. 42 U.S.C. § 9607(e)(1). "Although the law of corporate succession contemplates that corporate parties may allocate liabilities in an asset sale, CERCLA § 107(e)(1) nullifies any attempted transfer of CERCLA liability." *A.C. Reorganization v. Dupont,* 1997 WL 381962, *7 (E.D. Wis. 1997). If CERCLA invalidates such attempts to transfer, API argued, then how could the direct liability of NCR be assumed by API (even if that were the parties' intent)? Section 107(e)(1)'s prohibition on liability transfer appeared to bolster my conclusion that API was not a successor.

The government now persuasively argues that although § 107(e)(1) would preclude a party from *eliminating* liability through a liability transfer agreement, it does not preclude parties from *creating* additional liability, in effect, on the part of the buyer or anyone else. The court in *A.C. Reorganization* cited *Harley–Davidson, Inc. v. Minstar, Inc.* for the principle that CERCLA

precludes efforts to divest liability. 41 F.3d 341, 342 (7th Cir. 1994). But that is not the same as saying that CERCLA prohibits a non-liable party from entering an agreement to take on direct liability *in addition to* that of the already-liable party: the only condition CERCLA imposes is that the directly liable party must remain liable. It might be argued that such an agreement would have no purpose: if the seller cannot escape direct liability, then what is the point of "transferring" liability to the buyer if the seller still remains on the hook for that liability? It is true that the primary value in such an arrangement might manifest itself in the indemnification provision that makes the buyer compensate the seller for any liability, rather than the assumption of direct liability itself. But by making the buyer *itself* directly liable, the seller has obtained something of value: an additional defendant to help share the burden of defense. Where there was one defendant there are now two. Although this might not be the overarching purpose of such an arrangement, neither is it a trifle.[1] The point is that not only is an assumption agreement allowed by CERCLA (subject to the conditions noted above), such an agreement also makes commercial sense. Thus, CERCLA's bar on the transfer of liability does not preclude a finding that API could be liable in addition to NCR.

With those considerations favoring the imposition of successor liability, the only remaining problem is that the purpose underlying the successor liability doctrine does not appear to apply here. To recall, the cases tell us that the successor liability doctrine is intended to prevent corporations from dying "paper deaths" only to reemerge having eliminated their environmental liability. *United States v. Mexico Feed and Seed Co., Inc.,* 980 F.2d 478, 487 (8th Cir. 1992). Obviously such a concern is absent here. But just as the continued existence of the seller does not matter in an

---

[1] And of course indemnification agreements are not self-executing. Having an indemnitor on the line for *direct* liability saves the indemnitee the trouble of collecting on his indemnification agreement.

assumption-by-agreement case, the concerns underlying the successor liability doctrine fall by the wayside as well. As noted above, the problem may be one of nomenclature: the "succession" doctrine applies when a buyer has actually succeeded (exclusively) to the liabilities of the seller, who has either been dissolved or merged in some fashion. In these circumstances, courts rightly view the doctrine as a means of preventing the injustice that would occur if a liable entity were allowed to simply paper away that liability through private agreements. But when a buyer expressly agrees to assume the environmental liabilities of the seller, we need not worry about such concerns because shirking environmental liability—something CERCLA prohibits— was never the intent of the agreement in the first place. In a case like this, it is not so much that a "doctrine" of successor liability is being applied as it is simply a matter of enforcing an explicit contract that created additional liability. Viewed in that light, the fact that the concerns underlying the succession doctrine are absent in an assumption-by-agreement case is not all that surprising.

In sum, I do not believe the hurdles identified above suffice to preclude enforcement of an explicit agreement to assume CERCLA liability. Nothing in federal common law requires that the seller cease to exist before another entity may assume its CERCLA liability. And the concerns underlying the other "successor" liability doctrines, such as *de facto* merger or mere continuation, are not relevant when two companies have explicitly agreed that the buyer will become liable along with the seller. Finally, nothing within CERCLA itself invalidates an attempt to create additional CERCLA liability, so long as the agreement does not purport to *transfer* that liability. Thus, the next question is whether the agreement signed by NCR and API actually does operate to create direct liability on the part of API.

**II. The 1978 Agreement**

In 1978 NCR sold its Appleton Papers Division to API's predecessor, a company called

Lentheric, Inc., hereinafter referred to simply as API. As part of the asset purchase agreement memorializing that transaction, API agreed to assume several liabilities and to indemnify NCR as follows:

> Purchaser agrees that it shall assume, pay, perform, defend and discharge, if and when due, to the extent not paid, performed, defended or discharged prior to the Closing Date, all of the following:
>
> . . .
>
> 1.4.4 all of Seller's obligations and liabilities of any kind, character or description relating to the period subsequent to the Closing Date which arise out of or in respect of any state of facts, matter, event or disclosure set forth on an attachment to the agreement that was designated as Schedule A; and
>
> 1.4.5 all of Seller's obligations and liabilities of any kind, character or description relating to the period subsequent to the Closing Date which arise out of or in respect of any . . . action, claim, investigation by a government body, or legal . . . proceeding set forth on Schedules A and M, and
>
> . . .
>
> 1.4.9 all of Seller's liabilities . . . whether accrued, absolute, contingent, or otherwise . . . whether asserted or not and whether arising from transactions, events or conditions occurring prior to or after the Closing Date, with respect to compliance of the Property . . . with all applicable federal, state and local and other governmental environmental and pollution control laws, ordinances, regulations, rules and standards

(Dkt. 139, Ex. 3 at 19-21.)

Two of these assumption of liability clauses refer to Schedule A of the asset purchase agreement. As relevant here, Schedule A contains the following clause:

> Seller has reason to believe that the facilities of Appleton Papers Division located in Pennsylvania and Wisconsin may be operating; in violation of applicable federal, state, local and other governmental environmental and pollution control laws, ordinances, regulations, rules and standards.
> APD receives and has received notices from time to time from various federal, state, local and other governmental authorities claiming violation of environmental and pollution control laws, ordinances, regulations, rules and standards (collectively "laws"). These claims may result, and have resulted in fines

and corrective action.

(Dkt. # 195, Ex. 3 at 4.)

The United States argues that each of these clauses shows that API's predecessor explicitly assumed liability for the cost of environmental cleanup at issue in this action. The question is whether the language in the asset purchase agreement is broad enough to encompass the liability at issue here even though neither CERCLA nor the extent of the PCB problem had been in the minds of the parties at the time the contract was signed.

"A party may indemnify another party for liability arising out of a law not in existence at the time of contracting." *Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 327 (7th Cir. 1994). But when that happens the parties cannot be said to have a meeting of the minds as to the specific liability at issue. Instead, if the parties have expressed a meeting of the minds, their agreement goes to the division of liability when some unforseen liability emerges; in other words, the parties may contract to shift the risk of the unknown. In *Kerr-McGee,* for example, the court found a pre-CERCLA agreement broad enough to encompass CERCLA liability when the indemnitor had agreed to pay for "the maintenance of any action, claim or order concerning pollution or nuisance." 14 F.3d 321, 327 (7th Cir. 1994). Given the breadth of this language ("any action . . . concerning pollution") the court had no trouble concluding that the indemnitor had indeed agreed to pay for the CERCLA liability in question even though such liability was not specifically envisioned by the parties when the contract was signed.

Similarly, in *Olin Corp. v. Consolidated Aluminum Corp.,* the Second Circuit noted that indemnification agreements are interpreted strictly under New York law (which applies here at the agreement of the parties). Even so, and despite the fact that CERCLA had not been enacted at the time of the agreement in question, the court found in the parties' agreement an intent to indemnify

for CERCLA liability:

> The Purchase Agreement requires Conalco to indemnify Olin against "all liabilities, obligations and indebtedness of Olin related to [its aluminum business] ... as they exist on the Closing Date or arise thereafter." (emphasis added). In the Assumption Agreement executed at the closing, Conalco agreed to "indemnify Olin against, all liabilities ( absolute or contingent ), obligations and indebtedness of Olin related to [the aluminum business] ... as they exist on the Effective Time or arise thereafter with respect to actions or failures to act occurring prior to the Effective Time."

5 F.3d 10, 15 (2d Cir. 1993).

Both of these cases reflect the scenario in which although the parties did not—*could* not—know about CERCLA liability, they made a business decision to shift the risk of the unknown (both "known unknowns" and "unknown unknowns," of which CERCLA was likely the latter) from party A to party B.

Although two of the assumption clauses in this case are similar, § 1.4.4 appears to be broader than § 1.4.5 because it includes "any state of facts" or "matters," whereas the latter section merely applies to governmental investigations or claims. Either way, the question is whether the CERCLA liability at issue here arises out of any "matters," etc., or governmental actions disclosed in Schedule A. (Schedule M is not relevant here.) As noted earlier, the relevant portion of Schedule A reads as follows:

> Seller has reason to believe that the facilities of Appleton Papers Division located in Pennsylvania and Wisconsin may be operating; in violation of applicable federal, state, local and other governmental environmental and pollution control laws, ordinances, regulations, rules and standards.
> APD receives and has received notices from time to time from various federal, state, local and other governmental authorities claiming violation of environmental and pollution control laws, ordinances, regulations, rules and standards (collectively "laws"). These claims may result, and have resulted in fines and corrective action.

(Dkt. # 195, Ex. 3 at 4.)

The second paragraph just quoted indicates not only that APD had received notices from

governmental authorities in the past, but that it continued to do so at the time of the asset purchase. These notices not only *had* resulted in fines and corrective action but "*may* result" in fines and corrective action in the future. That is a "matter" disclosed in Schedule A. When API received notices from the EPA that it was a PRP for the Fox River PCB problem, that was a notice from a federal authority claiming violation of environmental laws. Although the PCB problem was not the subject of any notices APD had received as of 1978, the clause is broad enough to indicate that the division *generally* received such notices and would continue to do so in the future. Such notices "may result" (as they did here) in corrective action. By disclosing the division's proclivity for receiving corrective notices from the government, the seller was alerting the buyer that this was an issue for which it was accepting responsibility, both for problems already disclosed and for those that had not yet arisen. It would therefore not be difficult to conclude that liability for the PCB problem arose out of a matter disclosed on Schedule A.

Although I may be able to reach that conclusion from the asset purchase agreement alone, the parties recognize that the purchase agreement may no longer be read in a vacuum. In 1995 NCR sued API in the Southern District of New York to resolve liability for the PCB cleanup. The parties ultimately reached a two-part settlement of that issue. First, they agreed to split the first $75 million of any liability between them. Second, they agreed to submit the question to binding arbitration with respect to any amounts in excess of $75 million.

The arbitration panel concluded that API was liable for 60% and NCR 40% of any expenses in excess of $75 million. The panel found that the contractual language "is not sufficiently clear and unambiguous with respect to the issue of responsibility for the environmental costs at issue to permit an award based solely on the contract language." (Dkt. # 208, Ex. 1 at 4.) Based on testimony and documents produced to the panel, however, the panel decided to impose a larger

share of liability upon API.

Although the panel did not make its decision solely on the basis of the contract, the parties had agreed that the arbitrators would settle the question of liability for cleanup expenses once and for all. By agreeing to have the matter resolved by arbitration, the arbitration, in effect, altered the terms of the original purchase agreement. The entirety of the agreement is thus the product of the arbitration, which imposed liability upon API. In fact, given the agreed structure and mission of the arbitration, which guaranteed that API would be found liable for *some* part of the expenses, API had essentially already conceded liability just by virtue of entering into the arbitration.

API protests that in entering into the settlement agreement that led to arbitration, API and NCR had explicitly agreed that neither party was admitting liability of any kind. (Dkt. # 124, Ex. 1.) Although that may be true, that was simply an agreement between those private parties that neither of them were conceding liability. That does not mean, however, that one of the signatories could not assume the liability that another party was actually found to have, regardless of the lack of any concessions or admissions. If NCR were ultimately found to be liable under CERCLA, as it has been, API could have agreed to assume that liability. In other words, the fact that neither one was conceding it was liable in 1978 has no impact on whether or not one party assumed the liability that the other actually was later *found* to have (irrespective of any concessions). For these reasons, I am satisfied that the purchase agreement, as interpreted and applied by the arbitration panel, could impose liability upon API. Accordingly, API's motion for summary judgment will be denied.

**III. Conclusion**

For the reasons given above, I conclude that the government is correct that the continued existence and liability of NCR does not preclude a finding that API assumed CERCLA liability. Moreover, I further conclude that the terms of the 1978 assumption agreement, as applied in the

parties' arbitration, are broad enough that they could encompass that liability. Accordingly, API's motion for summary judgment is **DENIED**.

**SO ORDERED** this 19th day of December, 2011.

                                                              /s William C. Griesbach
                                                              William C. Griesbach
                                                              United States District Judge