IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---

UNITED STATES OF AMERICA and
THE STATE OF WISCONSIN,

Plaintiffs,

v.

NCR CORPORATION, *et al*.,

Defendants.

No. 10-CV-910-WCG

---

**MEMORANDUM OF DEFENDANT APPLETON PAPERS INC.
IN SUPPORT OF MOTION TO RECONSIDER THE COURT'S
DECISION AND ORDER OF DECEMBER 19, 2011**

---

Defendant Appleton Papers Inc. ("API"), by its undersigned counsel, submits this Memorandum in support of its Motion to Reconsider the Court's Decision and Order of December 19, 2011.

## INTRODUCTION

Respectfully, API believes the Court's Decision and Order of December 19, 2011 (Dkt. 279) ("Decision") is incorrect and should be reconsidered and withdrawn for three reasons.

First, the Court has misapplied the doctrine of successor liability. The Court's conclusion that API can be held liable to the Government as a matter of contract because API allegedly assumed environmental liabilities in the 1978 Agreement ignores the Agreement's express disclaimer that third parties have no right to enforce the terms of the Agreement – the very thing the Government is saying it should be allowed to do here. That disclaimer is valid, enforceable, and bars third party claims arising from the 1978 Agreement – at least so long as NCR is available to respond to the claim. The

Court's Decision also conflicts with Seventh Circuit precedent holding that the imposition of successor liability is a matter of equity appropriate only where justified by the facts of the case. Here, as the Court itself has already recognized, equity need not intervene to create successor liability since NCR is both viable and before the Court and API is funding 60% of the cleanup costs on the basis of its indemnity arrangement with NCR.

Second, the Court's ruling that API could have assumed liability for Fox River response costs on the basis of language in Schedule A to the 1978 Agreement conflicts with controlling law that requires that a contractual assumption of CERCLA liability be clear and unequivocal. Respectfully, the Court's "proclivity" theory is untenable based upon the plain text of the 1978 Agreement and the express ruling of the 2005 arbitration panel.

Third, the Court's ruling that API could have assumed liability for Fox River claims as a result of the 1998 Settlement Agreement and/or the 2005 arbitration decision is equally indefensible. The Court's ruling ignores that the purpose of the 1998 Agreement was to settle litigation over whether there had been an assumption of Fox River liabilities. By their settlement, NCR and API/BAT intended to avoid further litigation over of the assumption issue and to instead *share* – via cross indemnification rights – any Fox River *costs* – not liability – that either incurred in proportions that were ultimately fixed by the arbitration. This is exactly what the 1998 Agreement says:

> Without admitting any fact, responsibility, fault, or liability, the parties agree to combine and allocate as between themselves … all Damages … allocated or assessed to, imposed upon, or incurred by NCR or API/BAT, either singly or collectively, relating to the Fox River sites…"

Dkt. 124-1, p. 14 of 27. The Court's ruling is contrary to the unequivocal language of the Agreement and the circumstances surrounding the Agreement.

Accordingly, API respectfully requests reconsideration.

## ARGUMENT

### I. THE COURT'S SUCCESSOR LIABILITY ANALYSIS IS FATALLY FLAWED.

#### A. The Court Erred In Concluding There Could Be An Express Assumption In Light Of The Express Disclaimer Of Third Party Rights In The 1978 Agreement.

In the December Decision, the Court accepted the Government's argument that where an asset buyer has "signed an agreement explicitly stating that it is assuming the liabilities of the seller," the buyer has direct liability "as a matter of contract, a contract to which the public is a third party beneficiary." Dkt. 279, pp. 2-3. The Court explained that where a party has expressly agreed to assume liability, "it is not so much that a 'doctrine' of successor liability is being applied as it is simply a matter of enforcing an explicit contract that created additional liability." *Id.*, p. 6. The Court stated that the equitable concerns underlying the successor liability doctrine "are not relevant when two companies have explicitly agreed that the buyer will become liable along with the seller" (*id.*), and went on to conclude that API could be liable to the Government by virtue of an express agreement.

That conclusion is wrong because there is a fundamental error in the Court's analysis. The 1978 Agreement expressly rejects the creation of any rights in third parties:

> Nothing in this Agreement, express or implied, is intended to confer upon any other person not a party to this Agreement any rights and remedies hereunder.

Dkt. 139-4, § 10.10, p. 44 of 49.

Under controlling New York law,[1] such a "negating clause" precludes the Government (or anyone else) from claiming third party rights. "Under New York law, the effectiveness of a negating clause to preclude third-party beneficiary status is well established." *India.Com, Inc. v. Dalal*, 412 F.3d 315, 321 (2nd Cir. 2005). Indeed, such a provision is "decisive" and "controlling":

> [T]he best evidence of whether contracting parties intended their contract to benefit third parties remains the language of the contract itself. . . . Where a provision exists in an agreement expressly negating an intent to permit enforcement by third parties, as exists in the agreement at bar, that provision is decisive.

*Nepco Forged Prods., Inc., v. Consolidated Edison Co. of N.Y.*, 470 N.Y.S.2d 680, 681 (App.Div.1984). *See also Edward B. Fitzpatrick, Jr. Constr. Corp. v. Suffolk County*, 525 N.Y.S.2d 863, 866 (App. Div. 1988) (dismissing third-party beneficiary claim because "[w]here a provision in the contract expressly negates enforcement by third-parties, that provision is controlling.").

In *India.Com, Inc.*, the Second Circuit reversed the district court for failing to give effect to a negating clause:

> The Negating Clause, entitled "No Third Party Beneficiaries," clearly provided that no "Schedule" was "intended to create any right, claim or remedy in favor of any person or entity other than the parties hereto." . . . **In other words, since the parties' intention to benefit the third-party must be apparent from the contract, the text of the SPA specifically foreclosed the theory of recovery on which Dalal and the District Court relied**.

412 F.3d at 321 (emphasis added). Such clauses also negate the Government's attempt to claim third party standing to enforce an alleged assumption of liability. *See LR Dev. Co. v. Comm'r*, T.C. Memo. 2010-203, 2010 WL 3604164 at *33 (T.C. 2010) (although taxpayer had expressly assumed another party's tax liabilities in excess of $10 million,

[1] New York law governs interpretation of the 1978 Agreement. Dkt. 139-4, § 10.11, p. 44 of 49.

disclaimer of third party rights in the assumption agreement "prohibits [the IRS] from enforcing as a third-party beneficiary petitioner's assumption under the assumption agreement of Castanet's obligation . . . to be responsible for BCA's tax liability.").

The Court's acceptance of the Government's assertion that "the public is a third-party beneficiary" of the 1978 Agreement (Dkt. 279, p. 3), overlooks both the express terms of the Agreement that negate any such third party standing and controlling black letter law that requires the Court to give effect to the parties' agreement. For this reason alone, reconsideration is warranted.

### B. The Court's Imposition Of Successor Liability Disregards Seventh Circuit Precedent.

The Seventh Circuit has held that successor liability under CERCLA is an equitable doctrine, not an "inflexible command," and that its imposition is not required "unless justified by the facts of each case." *N. Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 650 (7th Cir. 1998), *overruled on other grounds*, *Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983 (7th Cir. 2010) (citation omitted).

Consistent with this precedent, the Court in its July 5, 2011 Decision correctly recognized that "successor liability is an equitable doctrine designed to prevent injustice or fraud, not to create a wholly new suable entity with duplicate liability to the Government." Dkt. 172, p. 18. The Court also correctly determined in July that there is no basis in equity for imposing successor liability here because it is "crucial" that the asset seller, NCR, remains liable and viable and, thus, "none of the equitable considerations that would otherwise support imposition of successor liability are in play here." *Id*. In the December Decision, the Court again acknowledged that "there is almost

no precedent for finding successor liability when the seller has remained a viable entity." Dkt. 279, p. 3.

Nevertheless, in the December Decision, the Court ignored the equitable underpinnings of CERCLA successor liability and, instead, treated API's supposed assumption of liability by contract as dispositive. The Court's contract analysis is incorrect for the reasons explained above in Part I.A and for the additional reasons discussed in Parts II and III below. Further, to the extent that the Court's decision is based on the equitable doctrine of successorship via express assumption, it is contrary to the law in the Seventh Circuit. As API previously argued, so long as NCR remains available to respond to the Government's claim, the Court has no reason in equity to transfer NCR's CERCLA liability to API. The need to resort to equity is even more attenuated here where to date API has fully performed its indemnity obligations to NCR. Therefore, this case lacks the "justification" that, under the Seventh Circuit's decision in *North Shore*, is the essential prerequisite for application of CERCLA successor liability.

Further, the Court's statement that "by making the buyer *itself* directly liable, the seller has obtained something of value: an additional defendant to help share the burden of defense" (Dkt. 279, p. 5 (italics original)) is logically flawed. A "buyer" of assets may be making itself "directly liable" for a liability where there is an express assumption of that liability, but *only to the seller*. The buyer does not become an "additional defendant" in a CERCLA action, any more than an insurer would become a defendant in a CERCLA action because it has agreed to become "directly liable" to the insured when the duty to indemnify is triggered.[2] Under the equitable doctrine of successorship, no third party is

[2] *See Port Allen Marine Servs., Inc. v. Chotin*, 765 F. Supp. 887 (M.D. La. 1991), where the court stated:

entitled to the benefit of the asset seller's bargain, where, like here, the asset seller is viable. API is entitled to summary judgment as a result.

## II. THE COURT ERRED IN ITS ANALYSIS OF THE 1978 AGREEMENT.

Reconsideration is also warranted because the Court misconstrued the 1978 Agreement and misapplied the law when it ruled that API could have assumed liability for Fox River cleanup costs based on language in § 1.4.5 and Schedule A of the 1978 Agreement.

As the Court recognized, in order to find an asset buyer under a pre-CERCLA agreement responsible for the seller's CERCLA liability, the agreement must be clear and unequivocal and it must make the buyer responsible for all environmental liabilities, without limitation. *See Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 15 (2nd Cir. 1993) (an agreement must be "strictly construed; a court cannot find a duty to indemnify absent manifestation of a 'clear and unmistakable intent' to indemnify."; 15 William Meade Fletcher, *Fletcher Cyclopedia Corporations* § 7114, p. 180 (rev. 2008 ed.) (An agreement to assume liabilities "must be clear and unambiguous in order for it to amount to an assumption."); *Beazer E., Inc. v. Mead Corp.*, 34 F.3d 206, 211 (3rd Cir. 1994) (in order to cover CERCLA liability, the provision must either specifically include CERCLA or be "general enough to include any and all environmental liability."); *Am. Nat'l Bank & Trust Co. of Chicago v. Harcros Chems., Inc.*, No. 95-C-3750, 1997 WL 281295, *16 (N.D. Ill. May 20, 1997) ("If there is limiting language, the clause

---

> [T]he plaintiffs contend that insurers should be treated as successor owners of responsible corporations, merger partners, or parent corporations of responsible subsidiaries, which have been found by various courts to be liable under 9607(a) of CERCLA because each assumed a contractual obligation of the responsible party. [The insurers] have not assumed the contractual obligations of Chotin under the facts of this case. The insurers are only liable for certain coverages as set forth in the policies.

*Id.* at 888.

does not cover CERCLA."). The Court's conclusion that Schedule A to the 1978 Agreement could be read, consistent with these standards, to encompass the Government's Fox River claim cannot withstand scrutiny.

The 1978 Agreement expressly provides that API will be responsible only for the liabilities described in certain enumerated sections, including § 1.4. Dkt. 139-3, § 1.4.9, p. 22 of 48 ("Purchaser shall not assume, and shall not be liable for, any liability or obligation of Seller, which is not provided for in this Section 1.4 and in Sections 1.2.1.2 and 1.2.2.3.") Within § 1.4, there are provisions that carefully describe and limit the environmental liabilities that are included. *See, e.g., id.*, §§ 1.4.3, 1.4.9, pp. 19 and 21 of 48. The Court has not concluded that those provisions may have been triggered.

There are also provisions in § 1.4 (*e.g.*, *id.*, §§ 1.4.4 and 1.4.5, pp. 19-20 of 48) tied to specific matters identified in Schedules A and M. The Court focused on § 1.4.5 and the following two paragraphs of Schedule A:

> Seller has reason to believe that the facilities of Appleton Papers Division located in Pennsylvania and Wisconsin may be operating; [sic] **in violation of applicable** federal, state, local and other governmental **environmental and pollution control laws**, ordinances, regulations, rules and standards.
>
> APD receives and has received notices from time to time from various federal, state, local and other governmental authorities claiming **violation of environmental and pollution control laws**, ordinances, regulations, rules and standards (collectively "laws"). These claims may result, and have resulted in fines and corrective action.

Dkt. 279, p. 9, *citing* Dkt. 195-3, p. 4 of 6 (emphasis added). The above provisions reference violations (or alleged violations) of environmental laws that were known at the time. The Court correctly acknowledged that "the PCB problem was not the subject of any notices API had received as of 1978." *Id.*, p. 10.

However, the Court interpreted those provisions as potentially extending API's liability beyond the alleged violations referenced in Schedule A to also cover APD's supposed "proclivity" for receiving notices of violations that may require corrective action to address the violations. *Id.* Under the Court's reading of Schedule A, the PRP letter that API received from the Government almost 20 years after the 1978 transaction – involving a problem nowhere mentioned in the 1978 Agreement and a form of liability that did not exist as of 1978 – triggered Schedule A.

Respectfully, that interpretation is unsupportable. First, the language upon which the Court relies does not come close to satisfying the "clear and unmistakable" standard. If the parties had wanted a provision covering liabilities arising from a "proclivity" to receive notices of violations of environmental laws (including notices decades later alleging violations of law unrelated to those identified in Schedule A), they could have simply said so in the body of § 1.4. The fact they did not is dispositive. In § 1.4.7, the parties carefully specified that API was assuming liability for a lawsuit then pending in Pennsylvania over alleged environmental law violations at the APD facility in that state:

> all of Seller's liabilities, whether actual or contingent, whether existing on the Closing Date or arising in the future, with respect to any fines, penalties and costs, and with respect to any remedial action required, resulting from Civil Action No. 77-1408 in the District Court of the Western District of Pennsylvania commenced by the Environmental Protection Agency on December 14, 1977 and any other action into which such action is transformed or consolidated except that Purchaser shall not be liable for any of Seller's attorneys' fees incurred in connection therewith prior to the Closing Date;

Dkt. 139-3, pp. 20-21 of 48. Why would the parties address that particular issue in the body of the agreement and yet bury a broad assumption of environmental liabilities – one that was broad enough to plainly cover the matter addressed in § 1.4.7 – in the penumbra of Schedule A? Under *Olin Corp.*, upon which the Court purported to rely (Dkt. 279,

pp. 8-9), the Court was bound to strictly construe the Agreement and find an agreement to assume only on the basis of a "clear and unmistakable intent." 5 F.3d at 15. Respectfully, the Court's reading of Schedule A patently violates these standards.

Second, the Court's attempt to read an assumption of liability into Schedule A conflicts with the arbitrators' decision in 2005. After reviewing a full and complete record covering the drafting of the 1978 Agreement (including contemporaneous drafting material and correspondence, deposition testimony, multiple comprehensive briefs from the parties, and extensive oral argument), the panel concluded:

> Having considered all of the language of the 1978 Agreement, the Panel concludes that the language is not sufficiently clear and unambiguous with respect to the issue of responsibility for the environmental costs at issue to permit an award based solely on the contract language.

Dkt. 124-2, p. 8. Respectfully, the Court cannot say that the 1978 Agreement clearly and unmistakably renders API liable for the Fox River claim when the arbitrators – "having considered all of the language of the 1978 Agreement" – reached the opposite conclusion in a binding decision. The Court's Decision ignores this point, despite the fact that the arbitration award was reduced to a federal court judgment that deserves deference under principles of comity or full faith and credit, especially where, as here, the record supporting the judgment is so vastly superior to the one the Government – a stranger to the 1978 Agreement – presented to the Court.

Finally, the language in Schedule A upon which the Court relies speaks only about "notices . . . claiming violation of environmental and pollution control laws . . ." Dkt. 195-3, p. 4 of 6. The PRP letter that API received nearly 20 years after the 1978 transaction did not fall within the scope of Schedule A because it was not a notice of *violation*, or a notice to correct a *violation*, of an environmental law.

In neither the PRP letter that API received in 1997 nor in any other Government notice has the Government asserted that the PCB contamination in the Lower Fox River constitutes or arises from a violation of law. Instead, the Government simply asserts that API is "liable" under CERCLA § 107(a). Dkt. 30, ¶ 54, p. 14 of 36.[3] However, that liability does not arise from a "violation" of § 107(a) or any other provision in CERCLA. Section 107(a) imposes strict liability for response costs and natural resource damages on certain persons and entities based *only* on their *status*:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, **shall be liable for**—

42 U.S.C. § 9607(a) (emphasis added). *See, e.g., Fireman's Fund Ins. Co. v. City of Lodi, Cal.*, 296 F. Supp. 2d 1197, 1204 (E.D. Cal. 2003) ("CERCLA section 107(a) imposes strict, joint and several liability on parties falling within one of the four categories . . ."). Courts in CERCLA cases have uniformly rejected as irrelevant defenses based upon compliance with (*i.e.*, non-violation of) environmental laws:

---

[3] In its First Amended Complaint, the Government alleges:

> In light of the foregoing, API is liable to Plaintiffs in this action under: (i) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2); and (ii) CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

Dkt. 30, ¶ 54, p. 14 of 36.

> **Predictably, the courts have also consistently rejected defendants' arguments that they cannot be held strictly liable under CERCLA because** they were not at fault, they lacked guilty knowledge, or **they were in compliance with environmental laws at the time of disposal.** CERCLA imposes strict liability without regard to these fault-based concerns.

1 James T. O'Reilly, *Superfund and Brownfields Cleanup* § 11.3 at 543 (2011-12 ed.) (emphasis added).[4]

Accordingly, when API received a PRP letter advising that it may be liable under CERCLA § 107(a), it was not receiving a "notice of violation" of an environmental law. It is undisputed that the use of PCBs in the manufacture of carbonless copy paper was legal at the time. The Government has never alleged that the PCB contamination arises from a violation of law. Dkt. 139-11 (PRP Letter from EPA). Thus, the premise underlying the Court's analysis of the 1978 Agreement was wrong – the Government's claim here does not arise from a violation of law.

## III. THE COURT ERRED IN CONCLUDING THAT SUCCESSOR LIABILITY MIGHT BE BASED UPON THE 1998 SETTLEMENT AGREEMENT AND/OR SUBSEQUENT ARBITRATION.

That leaves only the issue of whether API could have acquired CERCLA liability through the 1998 Settlement Agreement and subsequent arbitration in 2005. In July, the Court observed that "the [1998] agreement explicitly disclaimed any suggestion that either party was admitting any liability whatsoever." Dkt. 172, p. 20. The Court concluded the Agreement did not render API liable on a successor theory:

---

[4] *See, e.g., O'Neil v. Picillo*, 682 F. Supp. 706, 720-21 & 720 n.2 (D. R.I. 1988), *aff'd*, 883 F.2d 176 (1st Cir. 1989) (CERCLA liability may be imposed without regard to the lawfulness of a party's actions, such as when a defendant "took every precaution" by sending its waste to a licensed landfill with express directions that the disposal not be done in violation of any law); *United States v. Marisol, Inc.*, 725 F. Supp. 833, 839-40 (M.D. Penn. 1989) (dismissing defenses that defendants "complied with all statutory, regulatory and common law requirements regarding waste disposal."). *United States v. Dickerson*, 640 F. Supp. 448, 451 (D. Md. 1986) (dismissing as irrelevant defenses alleging that defendants "complied with all laws and regulations concerning waste disposition, and otherwise conducted [their] operations reasonably and lawfully.").

> All these agreements demonstrate is that Appleton Papers and NCR will share in the costs resulting from the Fox River cleanup. They do not establish that Appleton Papers is a successor to the liability that underlies this action.

*Id*.

In the December Decision, however, the Court reached the opposite conclusion, stating that the express disclaimer of liability clause "does not mean . . . that one of the signatories could not assume the liability that another party was actually found to have, regardless of the lack of any concessions or admissions." Dkt. 279, p. 11. This conclusion ignores both the language and purpose of the 1998 Agreement.

First, the 1998 Settlement Agreement does not contain any language that could create successor liability through an express assumption. The Agreement's recitals specify that its purpose was for the parties – NCR, API and BAT ("API/BAT") – to "allocate **as between themselves**" the matters being disputed in the litigation then pending in the Southern District of New York. Dkt. 124-1, p. 4 (emphasis added).[5] Thus, the settlement was to *avoid* litigating whether there had been an assumption of liability in the 1978 Agreement. The parties agreed to a cost sharing arrangement "as between themselves" based first on an "Initial Allocation" and then "Subsequent Allocation" following an arbitration process. *Id*., p. 14. Nowhere in the 1998 Agreement does any party agree to "assume" the other's liability or any liability to third parties. Indeed, the word "assume" does not appear anywhere in the document. Consistent with the omission of third party rights, the Agreement is denominated on its face as a

[5] If the Court's analysis is taken at face value, then BAT, also a signatory to the 1998 Settlement Agreement, would also be a proper PRP. The Government, however, has never named BAT a PRP. The logical reason is that, as a matter of law, a settlement agreement cannot create successor liability.

"Confidential Settlement Agreement," thus indicating that third parties would not even know about the Agreement, much less derive rights under it. Dkt. 124-1, p. 1.

Second, it is wrong as a matter of law to impose successor liability based upon a private compromise settlement of disputed litigation which contains no admission of liability and no assumption of liability. In *United States v. Sunoco, Inc.*, 637 F. Supp. 2d 282 (E.D. Penn. 2009), the United States attempted to impose successor liability on an asset purchaser based upon a settlement agreement that arose out of a dispute between two companies, AR and Sunoco, regarding their respective responsibility for contaminated assets that had been sold under two purchase and sale agreements. There, like here, the settlement agreement contained no assumption of liability language. The court rejected the United States' argument, holding that:

> **[T]he complete absence of language in the settlement agreement regarding any assumption of liabilities or successor liability in favor of a promise to defend and hold harmless is dispositive**. Whether or not the settlement agreement requires Sunoco to fund AR's defense and/or indemnify AR as a result of this litigation is a separate question from whether or not Sunoco is AR's legal successor. The settlement agreement does not establish successor liability.

*Id*. at 289 (emphasis added; citations omitted). Likewise here, the absence of language in the 1998 Agreement regarding any assumption of liabilities or successor liability is dispositive: API did not agree to assume NCR's CERCLA liability in the 1998 Settlement Agreement. The Court correctly analyzed the 1998 Agreement in its July decision, where it concluded that the Agreement simply "established a shared responsibility for payments." Dkt. 172, p. 20. That is a far cry from an assumption of liability.

The Court's interpretation of the 1998 Agreement in its December Decision has far-reaching implications. Parties will rightly hesitate to settle disputed claims if courts

ignore express provisions in settlement agreement disclaiming liability and infer an agreement to assume a disputed liability, despite the absence of any express agreement to do so, based solely upon the mere agreement to settle. The Court's Decision upsets established corporate law throughout America and has already created tremors among corporate lawyers.[6] Reconsideration is clearly warranted.

**CONCLUSION**

API is not shirking its 60% indemnity. But it has no CERCLA liability. API did not exist when Appleton Coated Paper Company was in business. The only way API can have "CERCLA" liability to the United States or the *Whiting* Defendants, as opposed to "indemnity" liability to NCR, is if it is to step into NCR's shoes as a successor to a non-viable NCR, or if it assumed NCR's CERCLA liability in a contract that, unlike the one here, expressly gives third parties the right to pursue API for those liabilities. Neither condition is met. The Court has confused an indemnity to NCR, which does not create CERCLA liability and does not benefit any third party, with a new federal common law principle that an express assumption in an asset purchase agreement creates direct CERCLA liability to any third party despite the express disclaimer of third party rights in the Agreement and irrespective of the financial viability of the asset seller. That is not the law, and the Court's ruling upsets established corporate law. There is no reason for the Court to create bad precedent where no equitable or legal principle obliges the Court even to consider the issue of successor liability.

---

[6] *See* "Draftsmen Beware: CERCLA Can Impose Liability on Buyers under Asset Purchase Agreements, Says Wisconsin Federal Court" (Jan. 4, 2012) http://www.taftlaw.com/news/publications/detail/892-draftsmen-beware-cercla-can-impose-liabilty-on-buyers-under-asset-purchase-agreements-says-wisconsin-federal-court (last visited January 10, 2012) (attached); Robert S. Sanoff, "Rethinking Successor Liability under CERCLA (Dec. 28, 2011) http://www.lawandenvironment.com/articles/cercla/ (last visited January 10, 2012) (attached).

Accordingly, API respectfully requests that the Court reconsider and withdraw its December Decision and grant API's motion for summary judgment. If the Court does not agree to reconsider its Decision, then the parties need guidance as to the further evidence and/or proceedings that the Court believes would be required to resolve this issue, which impacts not only this litigation but also the *Whiting* litigation.

Dated this 10th day of January, 2012.

Respectfully submitted,

APPLETON PAPERS INC.

By: /s/ Ronald R. Ragatz
One of Its Attorneys

Counsel for Appleton Papers Inc.:


Michael L. Hermes (#1019623)
Heidi D. Melzer (#1076125)
Brandon J. Evans (#1063940)
Ericka L. Krumrie (#1066383)
Hermes Law, Ltd.
333 Main Street, Suite 601
Green Bay, WI 54301
(920) 436-9870
Fax: (920)436-9871

Ronald R. Ragatz (#1017501)
Dennis P. Birke (#1018345)
Megan A. Senatori (#1037314)
DeWitt Ross & Stevens S.C.
Two East Mifflin Street
Madison, WI 53703
(608) 255-8891
Fax: (608) 252-9243

Gregory A. Krauss
Gregory A. Krauss PLLC
1629 K St. NW
Suite 300
Washington, DC 20006
(202) 355-6430