**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| | | |
|---|---|---|
| APPLETON PAPERS INC. and<br>NCR CORPORATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 08-CV-00016-WCG |
| | ) | |
| GEORGE A. WHITING PAPER COMPANY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**[PROPOSED] JOINT INITIAL PRETRIAL REPORT**

## A. SUMMARY OF THE FACTS, CLAIMS, AND DEFENSES

### 1. Facts

In the mid-1950s, NCR Corporation developed a paper system called NCR Paper brand carbonless copy paper ("CCP"). In its most basic form, CCP consisted of two, layered sheets – a "coated back" or "CB" sheet layered on top of a "coated front" or "CF" sheet. The back of the CB sheet was coated with an emulsion containing microcapsules of colorless ink, oils and a transfer solvent. When pressure was applied to the top of the CB sheet, these microcapsules would rupture, and the colorless ink would release and react with the clay/resin coating on the front of the CF sheet to create an identical image. From 1954 through April 1971 (*i.e.*, the "Production Period"), Aroclor 1242, a type of PCB, was the solvent used in the microcapsules.

In about 1954, Appleton Coated Paper Company ("ACPC") began producing CCP at its coating facility in Appleton, Wisconsin, and continued to manufacture CCP throughout the Production Period. Prior to 1954, ACPC had been in the paper coating business for decades. The process of manufacturing coated paper, including CCP, created "broke." The term "broke" is a paper industry term that refers to paper that does not meet product specifications, paper that is damaged in the manufacturing process, and the paper trim and cuttings produced during paper making, coating and converting operations. Because ACPC did not itself make paper, ACPC could not use broke, including CCP broke. Therefore, ACPC sold bales of broke, including CCP broke, to brokers and dealers. The parties dispute whether ACPC ever sold broke directly to paper recyclers. Some paper recyclers along the Fox River purchased broke, including CCP broke, and used it to make paper. The recycling of CCP broke resulted in the discharge of PCBs into the Fox River.

In its decision dated February 28, 2011, this Court held that Plaintiffs NCR and Appleton Papers Inc. ("API") are liable under CERCLA and owe full contribution to each Defendant for

the recoverable costs each Defendant had incurred or may in the future incur in connection with OU2-5 of the Lower Fox River Site. Dkt. No. 1080. In a decision dated July 5, 2011, the Court granted API's motion for reconsideration and ruled that API's liability under CERCLA had not been established. Dkt. No. 1139. As a result, whether API is liable under CERCLA, and owes contribution to Defendants, remains unresolved.[1] In a decision dated September 30, 2011, the Court granted a motion for clarification filed by certain Defendants concerning Natural Resource Damages. Dkt. No. 1191. In its February 2011 decision, the Court also denied Defendants' motion for summary judgment on the issue of whether Plaintiffs are liable as "arrangers" for the disposal of hazardous substances. As a consequence, the Court denied summary judgment on Defendants' contribution claims relating to costs in OU1, upstream of ACPC's facility.

Certain Defendants[2] received various payments from their insurers. In its February 2011 decision, the Court held that Defendants may be required to offset their contribution claims "to the extent any of the funds [the Defendant] seeks have been covered by insurance." Dkt. No. 1080, at 25. Plaintiffs contend that amounts Defendants seek in contribution should also be reduced to the extent of certain other funds received, because certain Defendants would otherwise receive at least a double recovery. Defendants contend that the Court's ruling on potential offsets was limited to insurance recoveries, and the scheduling order does not identify "other" recoveries as an issue for trial.

On April 12, 2011, the Court issued a scheduling order, setting this matter for trial on the following issues: (a) Plaintiffs' status as an "arranger" under CERCLA § 107(a)(3); (b) the amount of Defendants' insurance recoveries related to the Fox River and the amount by which

[1] API's liability under CERCLA will not be addressed at the February 2012 trial.

[2] Per stipulation of the parties, the insurance offset issue need not be tried as to Neenah-Menasha Sewerage Commission.

any of the costs sought by Defendants are or should be offset by Defendants' insurance recoveries; and (c) the recoverability of certain costs claimed by Defendants. Dkt. No. 1115.

2. **Claims**

The claims at issue in this trial are the counterclaims for contribution asserted by Defendants CBC Coating, Inc. ("CBC"), Georgia-Pacific Consumer Products LP (f/k/a Fort James Operating Company), Fort James Corporation, and Georgia-Pacific LLC (collectively, "GP"), Menasha Corporation ("Menasha"), Neenah-Menasha Sewerage Commission ("NMSC"),[3] P.H. Glatfelter Company ("Glatfelter"), U.S. Paper Mills Corporation ("U.S. Paper Mills"), and WTM Company ("WTM"). Dkt. Nos. 261 (NMSC); 283 (U.S. Paper Mills); 293 (Menasha); 298 (Glatfelter); 300 (WTM); 310 (GP); and 1081 (CBC). Defendants seek the following amounts[4] from Plaintiffs: CBC: $1,166,032; GP: $92,986,942.96; Glatfelter: $59,298,439.18; NMSC: $37,041.53[5]; U.S. Paper Mills: $12,784,359.53[6]; WTM: $54,077,463.

3. **Defenses**

In order to be entitled to contribution under CERCLA § 113, Defendants have the burden to prove that Plaintiffs are liable under CERCLA. Plaintiffs contend that neither ACPC nor NCR arranged for the disposal of hazardous substances within the meaning of CERCLA § 107(a)(3) as a result of ACPC's sale of CCP broke.

---

[3] The Court granted NMSC's motion for summary judgment on its counterclaim. *See* Dkt. No. 1080, at 31-34.

[4] According to Defendants, these amounts reflect interest calculated through August 31, 2011, on certain costs related to the FRG. Defendants reserve the right to amend these amounts to reflect current interest calculations. Plaintiffs reserve the right to dispute any and all aspects of these costs, including the interest.

[5] *See* notes 2-3 above.

[6] US Paper's discovery says that, to date, all of U.S. Paper's costs related to the Lower Fox River "have all been reimbursed by insurance recoveries." Plaintiffs, therefore, object to US Paper's inclusion of this amount.

Plaintiffs contend that Defendants' claimed damages should be offset by Defendants' insurance and other recoveries.

Further, Plaintiffs contend that Defendants' claimed damages should be reduced to the extent that they seek costs that are not supported at trial or recoverable under CERCLA § 113.

**B. STATEMENT OF THE ISSUES**

1. Whether Appleton Coated Paper Company ("ACPC") arranged for the disposal of a hazardous substance within the meaning of § 107(a)(3) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(3) ("§ 107(a)(3)"), based on its sale of carbonless copy paper ("CCP") broke during the period of about 1954 through April 1971.

2. Defendants seek to try whether Plaintiff NCR is also liable as an "arranger" under § 107(a)(3) based on its own acts during the period of about 1954 through April 1971. Plaintiffs object to this issue being tried because the relevant allegations are unpleaded and untimely.

3. Whether Plaintiffs are entitled to any offsets against amounts Plaintiffs may owe Defendants in contribution because of Defendants' insurance or other recoveries. Plaintiffs contend that amounts Defendants seek in contribution should also be reduced to the extent of certain other funds received. As stated above, Defendants object to the issue of NCR's entitlement to an offset for "other" recoveries being tried in this proceeding.

4. Whether certain costs allegedly incurred by Defendants qualify as response costs or natural resource damage payments recoverable under CERCLA §113.

## C. STIPULATED FACTS

### I. Arranger Issues

In the interests of judicial economy, and to facilitate an efficient use of the Court's and the parties' time in advance of and during the trial, Plaintiffs and Defendants, through their respective counsel, hereby stipulate to the following facts:

1. In the mid-1950s, NCR Corporation developed a paper system called NCR Paper brand carbonless copy paper ("CCP").

2. CCP consisted in its simplest form of two overlain sheets, each with a special coating.

3. The top sheet of CCP, called "Coated Back" or "CB," was coated on its backside with a thin layer of emulsion containing microscopic capsules. The capsules contained colorless ink, oils and a transfer solvent.

4. The bottom sheet of CCP, called "Coated Front" or "CF", was coated on its front side with a special coating and contained no solvent. When CCP was first introduced in the 1950s, the CF coating was made with a special clay. Beginning in about 1967, the CF coating was made with phenolic resin.

5. Business forms with three or more pages had a middle sheet, called "Coated Front/Back" or "CFB." The front side of this sheet was coated with the CF coating and the backside was coated with the CB emulsion.

6. When pressure was applied to the top of the CB sheet, these microcapsules would rupture, and the colorless ink would release and react with the clay/resin coating on the front of the CF sheet to create an identical image.

7. The period of about 1954 through April 1971 is referred to as the "Production Period," *i.e.*, the time frame during which PCBs were used in the production of CCP.[7]

8. From at least 1954 through April 1971, Aroclor 1242 was the solvent used in the microcapsules.

9. In approximately April 1971, NCR ceased using PCBs in CCP emulsion.

10. ACPC was founded in 1907 and operated from a single manufacturing facility in Appleton, Wisconsin. The facility was located approximately one half mile from the Lower Fox River.

11. ACPC has been in the paper coating business before, during and after the Production Period. ACPC was not a paper mill and did not have the facilities or equipment needed to manufacture or repulp paper. Instead, ACPC purchased its "base stock" (*i.e.*, the paper to which it applied coatings) from third-party paper suppliers.

12. ACPC manufactured and sold a variety of other specialty coated papers throughout the 1950s and 1960s.

13. Prior to September 1970, ACPC was independently owned and operated.

14. The term "broke" is a paper industry term that refers to paper that does not meet product specification, paper that is damaged in the manufacturing process and the paper trim and cuttings produced during paper making, coating and converting operations. The term "broke" is not unique to ACPC or ACPC's process used to produce CCP.

15. ACPC's coating operations resulted in broke before, during and after the Production Period.

16. Broke was not unique to the manufacture of CCP.

---

[7] Unless otherwise indicated, all Stipulated Facts on Arranger Issues relate to the Production Period.

17. At ACPC both CCP and non-CCP coating operations resulted in broke.

18. Because ACPC did not make paper, ACPC could not reuse its broke, including CCP broke.

19. ACPC did not manufacture the base paper that it used in its coating operations.

20. ACPC was not a base paper maker.

21. NCR was not a base paper maker.

22. ACPC collected, sorted and baled broke, including CCP broke, according to various characteristics.

23. ACPC sold bales of broke, including CCP broke, to brokers and dealers.

24. ACPC interacted directly with brokers.

25. By volume, the primary component of CCP broke was paper fiber.

26. Some paper recyclers along the Fox River purchased broke, including CCP broke, and used the fiber to make paper.

27. During the Production Period, Bergstrom Paper Company purchased and recycled some CCP broke, some of which contained PCBs, from brokers.

28. During the Production Period, Fort Howard Paper Company purchased and recycled some CCP broke, some of which contained PCBs, from brokers.

29. During the Production Period, Wisconsin Tissue Mills purchased and recycled some CCP broke, some of which contained PCBs, from brokers.

30. During the Production Period, U.S. Paper's DePere Mill purchased and recycled some CCP broke, some of which contained PCBs, from brokers.

31. Recycling mills that purchased broke used broke, including CCP broke, to make paper products because using broke was generally more economical than using virgin pulp.

32. Paper recyclers that purchased broke repulped broke, including CCP broke, as part of the paper making process.

33. Not all recycling mills de-inked CCP broke as part of the recycling process.

34. There was a market for broke, including CCP broke.

35. There were published prices for different grades of broke.

36. CCP broke prices fluctuated.

37. Paper recyclers paid for CCP broke.

38. Sales of CCP broke generated revenue for ACPC.

39. NCR never owned broke produced by ACPC.

40. NCR never possessed broke produced by ACPC.

41. Recycling mills that purchased broke were not waste disposal companies.

42. Recycling mills that purchased broke did not consider the paper fibers in the broke they purchased to be waste.

43. Prior to joining ACPC in 1964, Ronald Jezerc worked for eight years at the West Virginia Pulp and Paper Company located in Luke, Maryland.

44. Dale Schumaker started at ACPC as an assistant solvent manager in 1965, became the assistant plant manager in about 1966, became the plant manager in the early 1970s, and retired as CEO in 1996.

45. Floyd Strelow started at ACPC as a purchasing agent in 1958 and later became purchasing manager.

46. Some ACPC employees were members of the Technical Association of the Pulp and Paper Industry ("TAPPI").

47. In 1970, in connection with NCR's purchase of ACPC, the United States Department of Justice ("USDOJ"), Antitrust Division, corresponded with NCR.

**II. Fox River Group Costs**

The FRG Defendants[8] and Plaintiffs, through their respective counsel, hereby stipulate to the following facts:

48. The following parties, or their predecessors, were members of the Fox River Group (hereinafter, "FRG") as it was reorganized in January 1997: CBC Coating Inc., Georgia-Pacific Consumer Products LP (f/k/a Fort James Operating Company), Fort James Corporation, and Georgia-Pacific LLC (collectively, "GP"), P.H. Glatfelter Company, U.S. Paper Mills Corp., WTM Company, Appleton Papers Inc., and NCR Corporation.

49. On January 31, 1997, the FRG members entered into several agreements among each other and the State through the Wisconsin Department of Natural Resources ("WDNR") and the Wisconsin Department of Justice ("WDOJ"). One such agreement was the Agreement Between the State of Wisconsin and Certain Companies Concerning the Fox River (the "January 31, 1997 State Agreement"). Another was the Supplemental Agreement Between the State of Wisconsin and Certain Companies Concerning the Fox River (the "January 31, 1997 Supplemental State Agreement").

50. A true and correct copy of the January 31, 1997 State Agreement, entered into by the FRG companies and the State of Wisconsin through the WDNR and the WDOJ, has been produced at FRGCOSTS0000001-19.

[8] CBC, GP, Glatfelter, U.S. Paper Mills and WTM.



Case 2:08-cv-00016-WCG Filed 01/30/12 Page 10 of 39 Document 1300

Case 1:10-cv-00910-WCG Filed 02/03/12 Page 10 of 39 Document 301-4

51. A true and correct copy of the January 31, 1997 Supplemental State Agreement, entered into by and among the FRG companies and the State, has been produced at FRGCOSTS0000020-34.

52. The FRG members entered into an agreement among themselves under which they would fund the first $12 million of shared costs associated with undertaking the activities in connection with the 1997 State Agreement (the "1997 Funding and Interim Implementation Agreement").

53. A true and correct copy of the 1997 Funding and Interim Implementation Agreement, entered into as of January 31, 1997, by and among the FRG companies, has been produced at FRGCOSTS000039-50.

54. Funding for the activities performed by FRG's contractors was obtained through periodic assessments.

55. The FRG members entered into an agreement establishing a custodial account (the "FRG Custodial Account") with a bank (the "Bank"), into which members deposited funds.

56. A true and correct copy of the Custodial Account Agreement, entered into as of July 1, 1997, by and among the FRG companies, has been produced at FRGCOSTS000051-76.

57. Glatfelter contributed $8,568,930 to the FRG Custodial Account.

58. WTM contributed $4,394,004 to the FRG Custodial Account.

59. CBC contributed $665,225 to the FRG Custodial Account.

60. GP contributed $10,089,008 to the FRG Custodial Account.

61. NCR and API contributed a total of $13,833,948 to the FRG Custodial Account.

62. U.S. Paper Mills contributed $268,172 to the FRG Custodial Account.

63. Disbursements from the Custodial Account were governed by a protocol established by the FRG members in the July 1, 1997 FRG Custodial Account Agreement.

64. The disbursement protocol required, among other things, that each and every invoice submitted for payment from the Custodial Account be reviewed and approved in advance by certain representatives of the FRG member companies. One of those representatives was the Chair of the Technical Committee. Another was referred to as the "Members' Designee."

65. A form designed to document authorization on behalf of the FRG companies was set forth in the FRG Agreements ("Invoice Approval Form"). Upon receipt of this duly-executed form, the Bank was authorized to disburse funds to pay corresponding invoices.

66. Disbursements from the Custodial Account could not be made by the Bank without written authorization from duly-designated representatives of the FRG member companies as reflected on executed Invoice Approval Forms.

67. The FRG Custodial Account funds were used to pay for various activities, some of which were required by the 1997 State Agreements ("Agreement Work"), and some of which were not required by the 1997 State Agreements ("Non-Agreement Work").

68. GP received $1,995,845, from the FRG in compensation for the use of landfill cell 12A to dispose of sediments from the 56/57A project. This compensation was in the form of a credit against GP's assessment obligations to the FRG.

69. The disbursements and credits given to vendors by the FRG total $40,072,526 ($38,076,681 + $1,995,845).

70. A true and correct copy of the 1999 FRG Agreement on Interim Allocation has been produced at FRGCOSTS000077-84.

71. A unilateral administrative order for remedial action under section 106 of CERCLA was issued to various FRG Companies on November 13, 2007.

72. Between 1998 and 1999, the FRG paid Deloitte & Touche LLP a total of $184,894.12.

73. Between 1997 and 1998, the FRG paid Entrix a total of $296,190.45.

74. Between 1997 and 2000, the FRG paid Exponent (also known as PTI Environmental Services) a total of $4,135,211.50.

75. Between 1997 and 1999, the FRG paid Fleishman Hillard a total of $923,301.45.

76. Between 1999 and 2001, the FRG paid Giesy Ecotoxicology, Inc. a total of $107,563.62.

77. Between 1999 and 2001, the FRG paid PriceWaterhouseCoopers a total of $595,396.88.

78. Between 1997 and 2002, the FRG paid Triangle Economic Research a total of $2,647,321.04.

## III. Defendant U.S. Paper's Costs

U.S. Paper Mills and Plaintiffs, through their respective counsel, hereby stipulate to the following facts:

79. On January 9, 2006, the U.S. EPA and WDNR demanded that NCR and U.S. Paper undertake removal and upland disposal of PCB-containing sediment in the Phase I project area of the Lower Fox River. Dkt. No. 967 ¶ 4.

80. NCR and U.S. Paper entered into a consent decree with the United States and State of Wisconsin in United States of America and the State of Wisconsin v. NCR Corporation and

Sonoco-U.S. Mills, Inc. (f/k/a U.S. Paper Mills Corp.), Case No. 06-C-484 (E.D. Wis.) (the "Phase I Consent Decree").

81. Judge Adelman approved the Phase I Consent Decree on November 3, 2006. Dkt. No. 967 ¶ 8.

82. The Phase I Consent Decree provides that the "activities conducted pursuant to this Consent Decree, if approved by EPA, shall be considered to be consistent with the NCP [National Contingency Plan]." Dkt. No. 967 ¶ 6.

83. The response activities required by the Phase I Consent Decree were overseen and approved by the WDNR and U.S. EPA and the response costs included payments to Sevenson Environmental Services, Inc. (for on-site dredging, de-watering, transport and sediment disposal), to Shaw Environmental Infrastructure, Inc. (for technical and engineering oversight), to Foth Infrastructure and Environmental, LLC (for technical and engineering oversight), to Anchor Environmental, LLC (for strategic planning), to WDNR (for government oversight), and to the U.S. EPA (for government oversight). Dkt. No. 967 ¶ 13.

84. NCR and U.S. Paper's obligations "to finance and perform the Phase I work and to pay amounts owed" under the Phase I Consent Decree are joint and several. Dkt. No. 967 ¶ 9.

85. U.S. Paper and NCR agreed to fund on a 50/50 basis the costs incurred in performing the work required by the Phase I Consent Decree. Dkt. No. 967 ¶ 10.

86. The response costs required by the Phase I Consent Decree totaled approximately $25,000,000. Dkt. No. 967 ¶ 11.

87. U.S. Paper paid $12,502,355.83 to satisfy its obligations under the Phase I Consent Decree. Dkt. No. 967 ¶ 12.

88. The Phase I Consent Decree contemplates reallocation of the costs spent to perform the work required by that Consent Decree. Dkt. No. 967 ¶ 7.

89. To date, all of U.S. Paper's costs related to the Lower Fox River "have all been reimbursed by insurance recoveries." U.S. Paper Mills Corp.'s Responses to Plaintiff NCR Corporation's Interrogatories and Requests for Production, dated May 9, 2011.

**IV. Defendant NMSC's Insurance Status**

NMSC and Plaintiffs, through their respective counsel, hereby stipulate to the following facts:

90. In a Decision and Order entered on March 1, 2011, the District Court for the Eastern District of Wisconsin granted summary judgment in favor of NMSC on its claim for past costs in the amount of $37,041.53. (Dkt. No. 1080, at 31-34.) In an Order entered on July 5, 2011, the Court granted API's Motion for Reconsideration that API had conceded liability. (Dkt. No. 1139, at 1.) In light of the Court's rulings, the insurance offset issue need not be tried as to NMSC at the trial commencing on February 21, 2012. Plaintiffs each expressly reserve all rights regarding the Court's ruling in favor of NMSC.

**V. Defendant GP's Costs**

GP and Plaintiffs, through their respective counsel, hereby stipulate to the following facts:

91. In November 2007, the EPA issued an administrative order for remedial action under Section 106(a) of CERCLA ("the 106 Order") naming Appleton Papers Inc., CBC Coating, Inc. (formerly known as Riverside Paper Corporation), Georgia-Pacific Consumer Products LP (formerly known as Fort James Operating Company), Menasha Corporation, NCR Corporation, P.H. Glatfelter Corporation, U.S. Paper Mills Corp., and WTM I Company (formerly known as Wisconsin Tissue Mills, Inc.) as Respondents. [Dkt. #903 and Dkt. #906]

Georgia-Pacific was ordered to conduct remedial work in OU4 and OU5, but was specifically exempted from OU2 and OU3.

92. The 106 Order directed Respondents to implement the remedial action for Operable Units ("OUs") 2 through 5 at the Lower Fox River Superfund Site. The remedial actions ordered by the 106 Order were based on the various Records of Decision ("RODS") that had been issued over time for the OUs by the EPA and the WDNR. Those RODS identified sediment removal by dredging as the primary remedial approach at the Site.

93. Paragraph 37 of the 106 Order states that "[t]he actions required by this Order are necessary to protect the public health, welfare, or the environment and are consistent with the National Contingency Plan, as amended, and CERCLA."

94. GP has spent $37,114,162.83 on work necessary to comply with the 106 Order. This work was performed jointly with Plaintiffs and was consistent with the National Contingency Plan.

95. In October of 2010, GP entered into a consent decree with the United States Environmental Protection Agency and Wisconsin Department of Natural Resources under which GP paid "$7 million toward the government's unreimbursed past costs and the government's expected future costs of overseeing the ongoing cleanup work that is being performed under the UAO." United States Notice of Lodging of Consent Decree with Georgia-Pacific Consumer Products LP, Case 1:10-cv-00910-WCG, October 14, 2010 (Dkt. #2) ("106 Consent Decree").

96. GP paid $7,000,000 pursuant to the 106 Consent Decree.

97. In 2004, Georgia-Pacific, the EPA, the WDNR and NCR entered into an order issued by the EPA under CERCLA Sections 104, 106, 122(a) and 122(d)(3) providing for pre-

design sampling and design planning activities at OUs 2 through 5 ("2004 Design AOC"). [Dkt. #900-7].

98. Paragraph 12(h) of the 2004 Design AOC states that "[t]he response actions required by this Consent Order are necessary to protect the public health, welfare, or the environment and if carried out in compliance with the terms of this Consent Order, shall be deemed consistent with the NCP." [Dkt. #900-7].

99. GP incurred and paid $5,228,900.28 in costs in compliance with the Design Order.

100. The $5,228,900.28 in costs GP incurred and paid were necessary to comply with the Design Order and were consistent with the National Contingency Plan.

101. In May of 2000, the EPA, the WDNR, and Georgia-Pacific entered into an order issued by the EPA under CERCLA Section 106(a) providing for further removal actions at SMU 56/57 (the "SMU 56/57B AOC"). [GPRC00000338-362].

102. The SMU 56/57B AOC required Georgia-Pacific to "conduct removal actions as described herein to abate an actual or threatened release of hazardous substances at or from the Site that U.S. EPA and the State believe may present an imminent and substantial endangerment to the public health, welfare or the environment." [GPRC00000338-362, at I.B.]

103. The SMU 56/57B AOC stated: "The removal actions and costs required by this Order, if performed or incurred in accordance with this Order, shall be deemed consistent with the NCP. The removal actions required by this Order are necessary to protect the public health, welfare, or the environment." [GPRC00000338-362, at VI.8.]

104. GP placed $469,000 into an escrow account for closure and long-term maintenance of Cell 12A. [FRGCOSTS001148-1152].

105. DeWitt Ross & Stevens submitted an invoice to GP dated 3/23/2003. [GPINS00000152-157]. GP paid this invoice on 4/25/2003. [GPRC00028814-28815].

106. DeWitt Ross & Stevens submitted an invoice to GP dated 4/17/2003. [GPINS00000158-162]. GP paid this invoice on 5/23/2003. [GPRC00028816-28817].

107. DeWitt Ross & Stevens submitted an invoice to GP dated 5/20/2003. [GPINS00000163-166]. GP paid this invoice on 6/24/2003. [GPRC00028818-28819].

108. DeWitt Ross & Stevens submitted an invoice to GP dated 6/19/2003. [GPINS00000167-169]. GP paid this invoice on 7/25/2003. [GPRC00028820].

109. DeWitt Ross & Stevens submitted an invoice to GP dated 7/15/2003. [GPINS00000170-172]. GP paid this invoice on 8/22/2003. [GPRC00028821-28822].

110. DeWitt Ross & Stevens submitted an invoice to GP dated 8/14/2003. [GPINS00000173-176]. GP paid this invoice on 9/19/2003. [GPRC00028823-28824].

111. DeWitt Ross & Stevens submitted an invoice to GP dated 9/17/2003. [GPINS00000177-180]. GP paid this invoice on 10/24/2003. [GPRC00028825-28826].

112. DeWitt Ross & Stevens submitted an invoice to GP dated 10/16/2003. [GPINS00000181-184]. GP paid this invoice on11/21/2003. [GPRC00028827-28828].

113. DeWitt Ross & Stevens submitted an invoice to GP dated 11/23/2003. [GPINS00000185-187]. GP paid this invoice on 12/30/2003. [GPRC00028829-28830].

114. DeWitt Ross & Stevens submitted an invoice to GP dated 12/4/2003. [GPRC00001305]. GP paid this invoice on 1/9/2004. [GPRC00028436; GPRC00028701].

115. DeWitt Ross & Stevens submitted an invoice to GP dated 1/26/2004. [GPRC00001312]. GP paid this invoice on 3/3/2004. [GPRC00028437; GPRC00028702-28703].

116. DeWitt Ross & Stevens submitted an invoice to GP dated 2/20/2004. [GPRC00001313]. GP paid this invoice on 3/29/2004. [GPRC00028438; GPRC00028704].

117. DeWitt Ross & Stevens submitted an invoice to GP dated 3/19/2004. [GPRC00001311]. GP paid this invoice on 4/26/2004. [GPRC00028439].

118. DeWitt Ross & Stevens submitted an invoice to GP dated 4/22/2004. [GPRC00001314]. GP paid this invoice on 6/1/2004. [GPRC00028440].

119. DeWitt Ross & Stevens submitted an invoice to GP dated 5/17/2004. [GPRC00001306]. GP paid this invoice on 6/23/2004. [GPRC00028441].

120. DeWitt Ross & Stevens submitted an invoice to GP dated 6/18/2004. [GPRC00001315]. GP paid this invoice on 7/26/2004. [GPRC00028442].

121. DeWitt Ross & Stevens submitted an invoice to GP dated 7/21/2004. [GPRC00001302]. GP paid this invoice on 8/24/2004. [GPRC00028443].

122. DeWitt Ross & Stevens submitted an invoice to GP dated 8/19/2004. [GPRC00001304]. GP paid this invoice on 9/24/2004. [GPRC00028444; GPRC00028705].

123. DeWitt Ross & Stevens submitted an invoice to GP dated 9/20/2004. [GPRC00001316]. GP paid this invoice on 10/26/2004. [GPRC00028445].

124. DeWitt Ross & Stevens submitted an invoice to GP dated 10/25/2004. [GPRC00001303]. GP paid this invoice on 11/30/2004. [GPRC00028446].

125. DeWitt Ross & Stevens submitted an invoice to GP dated 11/19/2004. [GPRC00001309]. GP paid this invoice on 12/28/2004. [GPRC00028447].

126. DeWitt Ross & Stevens submitted an invoice to GP dated 12/2/2004. [GPRC00001310]. GP paid this invoice on 1/7/2005. [GPRC00028448].

127. DeWitt Ross & Stevens submitted an invoice to GP dated 1/19/2005. [GPRC00001308]. GP paid this invoice on 2/23/2005. [GPRC00028449].

128. DeWitt Ross & Stevens submitted an invoice to GP dated 2/24/2005. [GPRC00001307]. GP paid this invoice on 4/1/2005. [GPRC00028450; GPRC00028706].

129. The Town of Vinland submitted an invoice to GP dated 8/25/2003. [GPRC00001613-1614]. GP paid this invoice on 10/1/2003. [GPRC00028475].

130. DeWitt Ross & Stevens requested that GP pay the Town of Vinland $7,001.14 in a letter dated December 22, 2003. [GPRC00001615-1616]. GP paid this amount to the Town of Vinland on 1/26/2004. [GPRC00028476].

131. GP paid Evan Zeppos $97,262.61 for work related to the Fox River Cleanup.

132. In 2002 Georgia-Pacific entered into a Consent Decree with the EPA and the natural resource trustees ("2002 NRD Consent Decree"). [GPRC00000705-764] The 2002 Consent Decree was judicially approved in 2004. *United States v. Fort James Operating Co.*, 313 F. Supp. 2d 902 (E.D.WI. 2004).

133. GP paid $6,150,000 to the natural resource trustees at the Fox River on 7/22/2002 [GPRC00028690]. These costs were incurred by GP to compensate for natural resource damages at the Fox River.

134. Under the 2002 Consent Decree, Georgia-Pacific also agreed to fund $3,900,000 in recreational projects. These costs were incurred by GP to compensate for natural resource damages at the Fox River.

135. Under the 2002 NRD Consent Decree, Georgia-Pacific also agreed to acquire and transfer to the State of Wisconsin that real property described in Appendix A, Sec. I, in the Green Bay watershed for habitat preservation.

136. Allen Waelchi submitted an invoice to GP dated 1/18/2002. [GPRC00001694]. GP paid this invoice on 3/7/2002. [GPRC00028516].

137. Allen Waelchi submitted an invoice to GP dated 1/31/2003. [GPRC00001695]. GP paid this invoice on 3/12/2002. [GPRC00028517].

138. Foth & Van Dyke submitted an invoice to GP dated 6/27/1997. [GPRC00001768]. GP paid this invoice on 9/25/1997. [GPRC00028689].

139. Foth & Van Dyke submitted an invoice to GP dated 6/27/1997. [GPRC00001769]. GP paid this invoice on 7/30/1997. [GPRC00028688].

140. STS Consulting submitted an invoice to GP dated 1/29/2001. [GPRC00001804]. GP paid this invoice on 3/28/2001. [GPRC00028544-28546].

141. STS Consulting submitted an invoice to GP dated 4/2/2001. [GPRC00001805]. GP paid this invoice on 5/8/2001. [GPRC00028547-28549].

142. STS Consulting submitted an invoice to GP dated 9/14/2001. [GPRC00001806]. GP paid this invoice on 10/12/2001. [GPRC00028746].

143. STS Consulting submitted an invoice to GP dated 11/16/2001. [GPRC00001807]. GP paid this invoice on 12/27/2001. [GPRC00028550].

## VI. Defendant Glatfelter's Costs

Glatfelter and Plaintiffs, through their respective counsel, hereby stipulate to the following facts:

144. On October 1, 2003, the parties lodged a proposed Consent Decree for Remedial Design and Remedial Action at Operable Unit 1 of the Lower Fox River and Green Bay Site in *United States v. P.H. Glatfelter Company,* Case No. 2:03-cv-949 (E.D. Wis.) (GWCOSTS0016246-16426).

145. On April 12, 2004, Judge Adelman entered that consent decree. (GWCOSTS0016428-16433).

146. On March 28, 2007, the United States filed notice of an Agreed Supplement to Consent Decree in No. 2:03-cv-949, which notice the United States corrected on May 7 and again on September 13, 2007. (GWCOSTS0016435-16445).

147. On June 20, 2008, the United States lodged in No. 2:03-cv-949 a proposed Amended Consent Decree for Remedial Design and Remedial Action at Operable Unit 1 of the Lower Fox River and Green Bay Site. (GWCOSTS0016460-16658).

148. On August 13, 2008, Judge Adelman entered the amended consent decree for OU1 in *United States v. P.H. Glatfelter Company*, Case No. 2:03-cv-949 (E.D. Wis.). (GWCOSTS0016657-16658).

149. Glatfelter paid, in total, $520,000 directly to the United States and $5,000 to the State of Wisconsin as an initial payment under the OU1 consent decree. Paragraph 52 of the OU1 Consent Decree states:

> a. Initial Payments to the United States. Within 30 days after the Date of Lodging, the Settling Defendants shall pay a total of $1,040,000 directly to the United States, with each Settling Defendant being responsible for paying one-half of that total amount ($520,000 each). The $1,040,000 paid to the United States

under this Subparagraph shall be applied as follows: (i) $740,000 shall be directed to the Fox River Site Special Account within the EPA Hazardous Substance Superfund, as the EPA Past Cost Payments, and shall be retained and used to conduct or finance response actions at or in connection with the Site, or transferred by EPA to the EPA Hazardous Substance Superfund; and (ii) $300,000 shall be directed to the DOI NRDAR Fund, as the DOI Past Cost Payments.

b. State Past Cost Payments. Within 30 days after the Date of Lodging, the Settling Defendants shall pay a total of $10,000 directly to the State, as the State Past Cost Payments, with each Settling Defendant being responsible for paying one-half of that total amount ($5,000 each).

c. The payment requirements of this Paragraph are several obligations only, not joint obligations.

Paragraph 53 of the OU1 Consent Decree states:

53. Subsequent Payments and Disbursements for Natural Resource Restoration. As provided by this Paragraph and by Appendix C, a total of $3,000,000 shall be paid and disbursed as the NRD Commitment.

a. By no later than January 31, 2004, the Settling Defendants shall pay a total of $500,000 of the NRD Commitment directly to a Site-specific sub-account within the DOI NRDAR Fund, with each Settling Defendant being responsible for paying one-half of that total amount ($250,000 each), to finance Trustee-sponsored natural resource damage restoration efforts under Paragraph 49. The payment requirements of this Subparagraph are several obligations only, not joint obligations.

b. The remaining $2,500,000 of the NRD Commitment shall be disbursed from the Escrow Account in accordance with the schedule and requirements of Appendix C: (i) for payment or reimbursement of Allowable Restoration Work Costs incurred for Approved Restoration Work to be performed by the Settling Defendants under Paragraph 48; and/or (ii) for payment to a Site-specific sub-account within the DOI NRDAR Fund, to finance Trustee-sponsored natural resource damage restoration efforts under Paragraph 49. (GWCOSTS0016301).

150. In addition to the direct payments to the United States and the State of Wisconsin, Glatfelter deposited a total of $41,750,000 into the OU1 Escrow Account pursuant to the OU1 consent decree.

151. Interest income, dividend income and investment earnings have accrued on Glatfelter's payments into the OU1 Escrow Account.

152. Pursuant to the OU1 Consent Decree, Glatfelter has paid $150,000 directly to the United States to reimburse the Department of Interior for costs DOI claims to have been natural resource damage assessment costs. (GLTFOX00028683).

153. Pursuant to the OU1 Consent Decree, Glatfelter has paid $250,000 directly to the United States to be used for specific activities as set forth in Paragraph 49 of the OU1 Consent Decree. (GLTFOX00028685).

154. Pursuant to the OU1 Consent Decree, Glatfelter has paid $1,250,000 into the OU1 Escrow Account for NRD Commitment costs.

155. On February 2, 2009, the United States Environmental Protection Agency ("EPA") sent a letter to Glatfelter, in which it demanded reimbursement of oversight costs, totaling $31,880.13, in connection with the remedial action in OU2-5. This letter was sent to each of the respondents to the UAO, excluding WTM I. (Declaration of David G. Mandelbaum (April 2, 2010) ("DGM Declaration"), Ex. 62; Missimer Affidavit, ¶ 8).

156. On February 13, 2009 at Glatfelter's direction, counsel for Glatfelter sent a letter to EPA, in which counsel stated Glatfelter would satisfy the demand of $31,880.13 in full. Glatfelter subsequently paid $31,880.13 to EPA by wire transfer. (DGM Declaration, Ex. 63; Missimer Affidavit, Ex. A).

## VII. Defendant WTM's Costs

WTM and Plaintiffs, through their respective counsel, hereby stipulate to the following facts:

157. On April 12, 2004, Judge Adelman entered a consent decree for OU1 in *United States v. P.H. Glatfelter Company*, Case No. 2:03-cv-949 (E.D. Wis.). (Declaration of Rachel A. Schneider, Dkt. 889 (April 2, 2010)); Consent Decree for Remedial Design and Remedial Action at Operable Unit 1 of the Lower Fox River and Green Bay Site, Ex. A to Schneider Decl., Dkt. 889-1; and Decision and Order entering the Consent Decree, Ex. B to Schneider Decl., Dkt. 889-2.)

158. On August 13, 2008, Judge Adelman entered an amended consent decree for OU1 in *United States v. P.H. Glatfelter Company*, Case No. 2:03-cv-949 (E.D. Wis.). (Amended Consent Decree for Remedial Design and Remedial Action at Operable Unit 1 of the Lower Fox River and Green Bay Site, Ex. E to Schneider Decl., Dkt. 889-5–8; Order Entering Amended Consent Decree, Ex. F to Schneider Decl., Dkt. 889-9.)

159. WTM performed the OU1 Remedial Design and paid a total of $1,820,013 for Remedial Design work in OU1 which was not reimbursed from the OU1 Escrow Account. (Declaration of J.P. Causey Jr. Esq., Dkt. 884, ¶¶ 8, 11, Ex. 2.)

160. WTM performed the OU1 Remedial Design pursuant to a 2003 Administrative Order on Consent, U.S. EPA Region 5 CERCLA Docket No. V-W-'03-C-745 (App. F to Dkt. 889-1; App. F to Dkt. 889-5–8), which order was subsequently incorporated by reference into the OU1 Consent Decree and OU1 Amended Consent Decree, and with the 2008 ROD Amendment. (See ¶ 12.a. of Dkt. 889-5–8.)

161. WTM paid, in total, $520,000 directly to the United States and $5,000 to the State of Wisconsin as initial payments under Paragraph 52 of the OU1 Consent Decree (Paragraph 52 is restated in Stipulation number 149 above).

162. Pursuant to Paragraph 53 of the OU1 Consent Decree (restated in Stipulation number 149 above), WTM paid $250,000 directly to the United States to be used for specific activities as set forth in Paragraph 49 of the OU1 Consent Decree.

163. In addition to the direct payments to the United States and the State of Wisconsin, WTM deposited a total of $41,750,000 into the OU1 Escrow account pursuant to the OU1 Consent Decree.

164. Of the $41,750,000 deposited by WTM into the OU1 Escrow Account, $1,250,000 was to be disbursed as provided in Paragraph 53(b) of the OU1 Consent Decree (restated in Stipulation number 149 above) for NRD Commitment Costs.

165. Interest income, dividend income and investment earnings have accrued on WTM's payments into the OU1 Escrow Account.

## D. NAMES AND ADDRESSES OF ALL WITNESSES[9]

### A. Witnesses Expected to Testify Live At Trial[10]

***Witnesses Plaintiffs Intend to Call Live***

1. Abraham, Professor Kenneth S. (expert witness), 580 Massie Road, Charlottesville, VA 22903

2. Bergstrom, Dedric (Wally), 382 Lake Rd., Menasha, WI

3. Breeden, Ph.D., Charles H. (expert witness), W344N7149 Timber Ridge Drive, Oconomowoc, Wisconsin 53066

4. Heitpas, Robert, 401 W. Winrowe Dr., Appleton, WI 54913

5. Jezerc, Ronald, 700 E. McArthur St., Appleton, WI, 54911

6. Karch, Paul J., Godfrey & Kahn, 1 East Main Street, Suite 500, Madison, WI 53701

7. Moore, William (expert witness), 8935 Ridgemont Drive, Atlanta, GA 30350

8. Rock, Robert J. (expert witness), 2000 Town Center, Suite 2400, Southfield, MI 48075

9. Schlickman, Andy, Sidley Austin LLP, One South Dearborn, Chicago, IL 60603

10. Schultz, John J. (expert witness), 9270 Bayberry Bend, #104, Fort Myers, FL 33908

11. Shifrin, PhD, Neil S. (expert witness), 275 Wyman Street, Suite 250, Waltham, MA 02451

12. Strelow, Floyd, 225 Cambridge Ct., Hardy, VA 24101

13. Vogel Jr., Arthur (Tony), 411 East Wisconsin Ave., Milwaukee, WI 53202

14. Zelikson, Jeff (expert witness), Gnarus Advisors LLC, 530 Lytton Avenue, 2nd Floor, Palo Alto, CA 94301

---

[9] All parties reserve the right to call any witness needed for rebuttal, as allowed by the Court.

[10] All parties reserve the right to call live any witness listed herein by any other party as a live witness.

***Witnesses Defendants Intend to Call Live***[11]

1. Bodmer, Jerome, 1401 East Frances Street, Appleton, 54911
2. Causey Jr., J.P., 818 Main Street, West Point, VA 23181
3. Christensen, Donald, 60 River Drive, Appleton, Wisconsin 54915
4. Dolan, Robert (expert witness), Stephen M. Ross School of Business, University of Michigan, 701 Tappan Street, Ann Arbor, Michigan, 48109
5. Elder, David, 96 South George Street, York, PA 17401
6. Goetz, William, 306 West Michigan Street, Appleton, WI 54911
7. Heitmann, Dr. John (expert witness), 4513 Pitt Street, Raleigh, North Carolina 27609
8. Heinritz, Fred, 1105 East Eldorado Street, Appleton, WI 54911
9. Holzknecht, George, 2331 South Meadowview Lane Appleton, WI 54915[12]
10. Jury, Michael, 135 South 84th Street, Suite 325, Milwaukee, WI 53214
11. Kittrell, Dr. James R. (expert witness), 665 Amherst Road, Sunderland, MA 01375
12. Klass, Charles (expert witness), 10216 Regal Drive- Suite 202, Largo, FL 33774
13. Metivier, Thomas, N2856 Sleepy Creek Drive, Kaukauna, Wisconsin 54130
14. Mishkin, Ross I. (expert witness), 321 North Clark Street, Suite 1200, Chicago, Illinois 60654
15. Montney, Paul, 97 Woodmont Dr, Randolph, NJ 07869
16. O'Keefe, Jay, 96 South George Street, York, PA 17401
17. Richards, Stanley K., 133 Peachtree St., Atlanta , GA 30303-1847
18. Schad, Jim, 10 South Wacker Dr., Chicago, IL 60606

---

[11] Plaintiffs object to any effort by Defendants to introduce trial testimony from David Elder, Michael Jury, Jay O'Keefe or Kenneth Smith because these witnesses have never been disclosed in this litigation.

[12] CBC reserves the right to request that the Court hear Mr. Holzknecht's testimony by deposition designation. Plaintiffs reserve the right to object.

19. Schneider, Rachel, 2758 North Hackett Avenue, Milwaukee, WI 53211

20. Smith, Kenneth M., 411 East Wisconsin Avenue, Milwaukee, WI 53211

21. Travers, Mark (expert witness), 333 West Wacker Drive, Suite 2700, Chicago, IL 60606

22. Vishneski III, John, 10 South Wacker Dr., Chicago, IL 60606

23. Wand, Richard W., 6602 North 40th Street, Paradise Valley, AZ 85253

24. Zoch, Robert M. (expert witness), 2100 County Road 326, Lincoln, TX 78948

## E. DESIGNATIONS OF DEPOSITION TESTIMONY[13]/[14]

***Witnesses Defendants Intend to Designate***

1. Charles, Walter
2. Gough, John
3. Kelly, Martin
4. New, William **(by live deposition video)**
5. Pagel, David
6. Patterson, James
7. Suess, Bob

***Witnesses Plaintiffs Intend to Designate***

1. Geigel, Roy
2. Missimer, Carroll
3. Safar, Joseph
4. Schneider, Donald

---

[13] All parties reserve the right to play live at trial designated video deposition testimony of any witness listed herein by other any party, either as a live or designation witness.

[14] All parties reserve the right to designate the testimony of any witness listed herein by other any party, either as a live or designation witness.

5. Schumaker, Dale **(by live deposition video)**

6. West, John

7. Zaepfel, Patrick

**F. BACKGROUND OF ALL EXPERT WITNESSES LISTED**

1. Abraham, Professor Kenneth S. – Prof. Abraham is the David and Mary Harrison Distinguished Professor of Law at the University of Virginia School of Law, where he has been a law professor since 1984. He has taught courses on Insurance Law and Torts for over thirty years, devoting extensive attention to coverage of environmental liability under liability insurance policies, including allocation of coverage responsibility to primary, umbrella and excess insurance policies. He earned his J.D. from Yale Law School (1971) and A.B. from Indiana University (1967). He has written four books on insurance law, one book on tort law, and over fifty articles on insurance law, tort law, and environmental liability. Prof. Abraham has deep familiarity with the insurance industry through his decades of experience as counsel or consultant to policyholders and insurers in insurance coverage litigation and settlement negotiations, including multi-insurer environmental liability matters.

2. Breeden, Ph.D., Charles H. – Dr. Breeden is a Professor of Economics at Marquette University. He has been on the faculty at Marquette since 1979, and has taught courses on a variety of economic disciplines at both the graduate and undergraduate levels, including principles of economics, applied business economics, law and economics, and managerial economics. Since 1980, Dr. Breeden has also worked as a consultant on a variety of economic issues, with a particular emphasis on economic valuation and damages. Dr. Breeden holds a Bachelors Degree in Business Administration from the University of Florida, and a Ph.D. in Economics from the Virginia Polytechnic Institute and State University. Prior to pursuing his Ph.D., Dr. Breeden was licensed in Florida as a Certified Professional Accountant, and worked for three years as an accountant with the firm of Ernst & Ernst in Orlando Florida. Dr. Breeden's expertise on assessing economic value is based on his education, and over 30 years of experience as a professor, economic consultant, accountant, and researcher.

3. Dolan, Robert – Dr. Dolan is currently the Stephen M. Ross Professor of Business Administration at the Ross School of Business at the University of Michigan. From 2001 to June 30, 2011, he served as Dean of the Ross School. Prior to serving as Dean, Dolan held faculty appointments at the Graduate School of Business of the University of Chicago (1976-1980) and the Harvard Business School (1980-2001). He holds a Bachelors of Arts degree from Boston College in Mathematics, which was granted magna cum laude, a Master of Science degree in Business Administration and a Ph.D., both from the Graduate School of

Management at the University of Rochester. His primary research area has been marketing, with a particular focus on pricing and new product development issues. His experience and knowledge of business systems was developed through his education and 35 years as a business professor, researcher and consultant with leading companies.

4. Heitmann, Jr., John A. – Dr. Heitmann is Professor in the Department of Wood and Paper Science at North Carolina State University, where he has taught since 1987. He has also taught courses at the Technical Association of the Pulp and Paper Industry's ("TAPPI") continuing education program and directly to individual company groups, including courses on papermaking, coating, printing, recycling, stock preparation (refining, cleaning, blending, and control), and deinking. He attended North Carolina State University from 1962 to 1966 and received a B.S. Degree in Pulp and Paper Technology. He attended graduate school at the Institute of Paper Chemistry ("IPC") in Appleton, WI, from 1966 to 1972, earning an M.S. Degree in Paper Chemistry in 1968 and a Ph.D. in 1972. He also worked at the following paper mills during the time he earned his degrees: Union Camp Corp. (1963, 1966), Champion Papers (1965), and Allis-Chalmers (1967). He worked for Owens-Illinois, Inc., from 1972 to 1979, as a Process Engineer, a Mill Analyst, an Industrial Engineer, and a Pulp Mill Superintendent. He worked at the Interstate Paper Corporation from 1979 to 1985 as a Mill Manager and a Technical Assistant to Mill Manager. He served as a consultant to Southern Management Services from 1986 to 1987. He currently holds three patents detailing processes or products in the paper industry, one of which deals with deinking and another of which relates to recycling of hardwood-containing waste papers.

5. Kittrell, James R. – Since 1980, Dr. Kittrell has been President of KSE, Inc. ("KSE"), a technology company located in Amherst, Massachusetts, that provides consulting and litigation services to the environmental, petroleum and chemical industries and also develops new technology for license to these industries. He received a B.S. Degree in chemical engineering from Oklahoma State University in 1962, and an M.S. and a Ph.D. in chemical engineering from the University of Wisconsin in 1963 and 1966, respectively. He conducted post-doctoral studies in chemical engineering at the University of Wisconsin in 1966. He has published approximately 100 technical articles and he is listed as an inventor on about 50 patents in the chemical, environmental, and petroleum fields. He was a Professor of Chemical Engineering at the University of Massachusetts, Amherst for ten years. He has over 30 years experience in the processing industries, with an emphasis on environmental and chemicals processing. For Arthur D. Little, Inc., he served as a Consultant in petroleum refining, management, petroleum products, and petroleum economics. He lectured and taught courses in Petroleum Refining and Economics to representatives of international petroleum companies and countries at the A.D. Little Management Institute. He worked as an Operating Assistant at the Standard Oil Company of California. He worked as a Senior Research Engineer and Research Engineer at the Chevron Research Company. He served as a Research Engineer at both DuPont Experimental Station

and Exxon Research Laboratories. While at Kerr McGee Oil Refinery, he worked as a Process Engineer. He has provided expert services to the U.S. Department of Justice in a CERCLA case related to the historical equipment used for processing of petroleum between the 1920s and 1970s.

6. Klass, Charles – Through his company Klass Associates Inc., Mr. Klass serves as a consultant for many companies worldwide and assists them on various issues in pulp and paper manufacturing, coating, engineering, technology and product development. He graduated from Western Michigan University in 1962 with a bachelor's degree in mathematics, pulp and paper technology, and chemistry. He graduated in 1968 from Pace University with a Master's of Business Administration. His over 50 years of experience in the pulp and paper industry began with engineering and operating supervision positions with paper companies. He worked in technical and operating positions at two recycling mills that deinked waste paper – Hamilton Paper Co., Plainwell, MI and Oxford Miami Paper Co., West Carrollton, OH. In the early 1960s, he worked at Oxford Miami Paper Company where he performed testing of pH, suspended solids and BOD of paper mill wastewater effluent. In 1963 and 1964, he worked at the West Virginia Pulp and Paper Company (later, Westvaco Corporation) in Luke, Maryland where he was responsible for Paper Machine coaters, including maintenance of broke and saveall systems. From 1968 to 1986, he worked in technical and sales/marketing positions with suppliers of equipment and materials used in pulp and paper manufacture. Since 1986, at Klass Associates Inc., he has worked as a paper industry consultant. He has consulted on projects involving recycling mills that pulp and deink wastepaper to produce printing and writing papers and deinked market pulp. He has consulted with paper and paperboard recycling mills using recycled fiber. His experience includes consulting for a company qualifying a new solvent for carbonless paper with the United States Environmental Protection Agency.

7. Mishkin, Ross I. – Mr. Mishkin is a Managing Director in the Insurance Claims Consulting group at The Claro Group, LLC. He earned a BS in Finance from the University of Illinois at Urbana-Champaign in 1992 and an MBA from the University of Chicago in 2000. During his career he has been a Senior Manager at Arthur Andersen LLP and a Principal at LECG, LLC. For most of his career, he has focused on financial consulting services, specializing in complex insurance claims relating to asbestos, pollution, and human health issues. He has been retained on many environmental insurance claim matters. His role typically includes expenditure analysis, risk estimation, insurance policy allocation calculation, and coverage settlement evaluation. He has participated in over 100 settlements between policyholders and their commercial insurers. The vast majority of the settlements he has been involved in relate to environmental matters or other long tail tort exposures. The settlements typically were policy buybacks or included a broad scope of release in exchange for a settlement payment. He has performed these services as both a testifying expert witness and a consulting expert. Although every matter has its own specific set of facts and

circumstances, the analysis he performs relies upon standard methodologies and concepts typically utilized in these types of analyses.

8. Moore, William – Since 1995, Mr. Moore has been president of Moore & Associates, an international consulting firm engaged in providing a range of market research and strategic services to the paper recycling industry. At Moore & Associates, Mr. Moore has worked with over 250 clients on more than 450 projects around the world. Mr. Moore's expertise includes all aspects of the worldwide supply and demand of recovered fiber, as well as historical practices and customs in solid waste disposal and paper recycling. Mr. Moore received a Bachelor of Chemical Engineering degree from the Stevens Institute of Technology in 1973. From 1973 to 1986, Mr. Moore worked at the Rohm and Haas Company in Philadelphia, Pennsylvania, where his experiences included serving as the company's Corporate Environmental Specialist. In this position, Mr. Moore was responsible for managing all solid and hazardous waste, groundwater, and Superfund issues at Rohm and Haas manufacturing sites located in the United States and around the world. From 1986 to 1992, Mr. Moore was employed by the solid waste management company, Waste Management, Inc. Mr. Moore served as the Director of Recycling and was responsible for the startup of the company's "Recycle America" program, the largest introduction of recycling services in the United States. Mr. Moore was also the founder and vice president of Paper Recycling International ("PRI"), a joint venture between Waste Management and Stone Container. PRI was a recovered fiber sales and brokerage operation, buying and selling recovered fiber for Waste Management, Stone Container and other third party companies. Mr. Moore is the author of over 50 published articles on paper recycling, and has made numerous presentations throughout the world on paper recycling.

9. Rock, Robert J. – Mr. Rock is a Managing Director at AlixPartners, LLP. He received a Bachelor's degree in Business Administration and a Master of Business Administration from the University of Michigan School of Business and has been a Certified Public Accountant since 1978. Prior to joining AlixPartners, Mr. Rock was with Price Waterhouse for 18 years, the last seven years of which were as a Partner. Mr. Rock's practice areas include investigative/forensic accounting, business consulting and litigation consulting in commercial matters. Mr. Rock's litigation consulting experience includes numerous financial advisory and accounting-related matters, including financial analyses related to contract and other disputes, post-acquisition disputes, auditor standard of care matters, disputes regarding alleged fraudulent activity, solvency analyses, and analyses of damages. During the past 23 years, he has provided expert analyses, including review and calculation of damages, in the following areas, among others: breach of commercial contract, fraudulent conveyances, fraud and embezzlement, patent and trademark infringement, environmental disputes and accountant negligence or malpractice. He has been involved in numerous environmental-related matters in both audit and expert engagements. Additionally, Mr. Rock has been engaged by the U. S. Department of Justice as a litigation consultant or expert witness on

several matters and has been appointed as a receiver, arbitrator, special master or custodian by federal judges in seven different matters.

10. Schultz, John J. – Mr. Schultz has over forty years of experience in the paper industry and extensive experience in buying and selling pre-consumer paper stock. In 1960, he began working for Great Lakes Paper Fibres in Buffalo, New York, as a paper stock purchaser for the Continental Can mill. In 1962, he was transferred to Elkhart, Indiana to work as a mill buyer. From 1970 to 1974, he worked for Alton Boxboard in Evansville Indiana, where he was the manager responsible for purchasing, sorting and baling various grades of paper stock for resale. From 1974 to 1982, he was the national sales manager for Alton Boxboard, where he was involved in managing the purchase and sale of all paper stock for all of Alton Boxboard's recycling facilities. After Alton Boxboard was purchased by Smurfit Corporation in 1982, Mr. Schultz worked for Smurfit Recycling until 2002. There, he served as the national sales manager (1982-90); national converting sales manager (1990-99), and market consultant for the paper reclamation division (1999-02). Since 2002, Mr. Schultz has been retired, but engages in consulting work in the paper industry.

11. Shifrin, Ph.D, Neil S. – Dr. Shifrin is an environmental engineering consultant for Gnarus Advisors LLC. He has a B.S. in Chemical Engineering from the University of Pennsylvania and a PhD in Environmental Engineering from MIT. He has been an environmental engineering consultant for 40 years and has founded two environmental consulting firms, which he also managed. Dr. Shifrin has consulted on essentially all topics of environmental concern—groundwater, soils, surface waters, sediments, air quality studies, data analysis, remedies, wastewater treatment technologies, regulations, and historical waste practices. He also has experience with both PCBs and paper recycling mills, and more specifically with PCBs in papermaking wastewaters.

12. Travers, Mark – Mr. Travers is a Principal at ENVIRON International Corporation and currently serves on ENVIRON's Board of Directors and as ENVIRON's Global Practice Leader for Site Solutions. He received a Bachelor of Science degree in Geology from Illinois State University in 1978. In 1986, he received a Master of Science degree in Engineering Geology from Purdue University. He is a registered Professional Geologist in Pennsylvania and North Carolina and a Certified Professional Geologist in Indiana. He has more than 30 years of experience in applied science and engineering including the performance and management of large multifaceted projects including projects that involve investigation, remediation, natural resources damages ("NRD"), and related activities. He has served in the role of testifying expert and consulting expert, and various technical roles for cases involving NCP consistency, natural resources damages, site investigation, and remediation. From 1997 through 2003, he served as a project manager on the Lower Fox River and Green Bay Site for the Fox River Group.

13. Zelikson, Jeffery – Mr. Zelikson is the Director of Gnarus Advisors LLC. He received a Bachelor of Science degree in mechanical engineering from the City University of New York and is a registered professional engineer in New York and New Jersey. Mr. Zelikson joined the U.S. Environmental Protection Agency in 1971 and served the agency for 25 years. During that time, Mr. Zelikson held a number of senior executive positions, including Director of the Hazardous Waste Management Division for U.S. EPA's Western Regional Office from 1987 to 1995. His responsibilities included direction of the hazardous waste regulatory and Superfund programs for U.S. EPA's Western Regional Office and oversight of similar programs for California, Arizona, Nevada and Hawaii. In these positions, Mr. Zelikson oversaw the investigation and cleanup of more than 125 Superfund sites on the National Priorities List and was responsible for assuring that compliance with the NCP was achieved at the sites under his direction. Following his service with U.S. EPA, Mr. Zelikson has had more than 15 years of experience as an environmental consultant and expert with a variety of leading consulting firms, including LECG, Putnam, Hayes & Bartlett, Inc. and now, Gnarus Advisors LLC. He has been retained as an expert in over 75 cases since leaving U.S. EPA and his expert analysis and testimony has focused on cleanup actions' consistency with the NCP and on matters related to the necessity, appropriateness and reasonableness of remediation costs and other related issues.

14. Zoch, Robert M. – Mr. Zoch is a chemical engineer and a registered professional engineer in the State of Texas. Since 1997, he has provided consulting services primarily related to contaminated site investigation, remediation and impact assessment in his capacity as principal for Zoch Consultants, LLC. He received a Bachelor of Science degree in Chemical Engineering from the University of Houston in 1968. He also attended graduate school at University of Houston through 1971, extending his education in the fields of chemistry, civil engineering and chemical engineering. Since that time, he has received continuing education through courses in groundwater protection, wastewater treatment and hazardous waste management, and has taught courses in estimating, measuring and controlling workplace exposures to environmental hazards. As an undergraduate, he worked for Marathon Manufacturing Company's pharmaceutical chemicals plant. Upon graduation in 1968 he became senior plant engineer, and in 1970 he became plant manager. He also served as a member of the environmental committee of Marathon Manufacturing Co., and in 1972 became Marathon's corporate Director of Environmental Control. In that role, he coordinated the environmental responsibilities of over 30 production facilities across the United States. In 1974, he formed an independent environmental consulting company, providing engineering and regulatory support services to a broad range of industrial clients seeking to comply with the then emerging environmental regulations concerning air and water pollution control and industrial waste management, including under RCRA and CERCLA. His role in these projects has included expert witness testimony in litigation, technical support in liability assessments, and equitable allocation of response costs. In 1990, he sold his consulting business to a German corporation, and headed the purchasing company's U.S. environmental research and development division, coordinating

international technology commercialization. In 1997, he started Zoch Consultants, LLC. Since the early 1970s, he has performed and/or directed hundreds of project assignments involving industrial waste management, including compliance and response actions required under RCRA and CERCLA, their respective amendments and reauthorizations and similar state statutes and regulations.

Dated: January 30, 2011

Respectfully submitted,

/s/ Darin P. McAtee
CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
David R. Marriott
Darin P. McAtee
Worldwide Plaza, 825 Eighth Avenue
New York, New York 10019
Phone: (212) 474-1000
Fax: (212) 474-3700
dmcatee@cravath.com

SIDLEY AUSTIN LLP
Evan B. Westerfield
One South Dearborn Street
Chicago, Illinois 60603
Phone: (312) 853-7000
Fax: (312) 853-7036

MARTEN LAW PLLC
Linda R. Larson
Bradley M. Marten
1191 Second Avenue
Suite 2200
Seattle, Washington 98101
Phone: (206) 292-2600
Fax: (206) 292-2601

**Attorneys for Plaintiff NCR Corporation**

s/Ronald R. Ragatz
DEWITT ROSS & STEVENS S.C.
Ronald R. Ragatz
Dennis P. Birke
Megan A. Senatori
Two East Mifflin Street
Madison, WI 53703
Phone: (608) 255-8891
Fax: (608) 252-9243

HERMES LAW, LTD.
Michael L. Hermes
Heidi D. Melzer
Brandon J. Evans
Ericka L. Krumrie
333 Main Street, Suite 601
Green Bay, WI 54301
Phone: (920) 436-9870
Fax: (920) 436-9871

**Attorneys for Plaintiff Appleton Papers Inc.**

/s/ Mary Rose Alexander
Mary Rose Alexander
Margrethe K. Kearney
Latham & Watkins LLP
233 S. Wacker Dr. Ste. 5800
Chicago, IL 60606
Telephone: (312) 872-7700
Facsimile: (312) 993-9767
Mary.Rose.Alexander@lw.com
Karl S. Lytz
Patrick J. Ferguson
Latham & Watkins LLP
505 Montgomery St., Ste. 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Fax: (415) 395-8095
Karl.Lytz@lw.com
**Attorneys for Defendant Georgia-Pacific LLC**

s/ David G. Mandelbaum
David G. Mandelbaum
Francis A. Citera
Marc E. Davies
Monique M. Mooney
Caleb J. Holmes
Adam B. Silverman
GREENBERG TRAURIG, LLP
Two Commerce Square, Suite 2700
2001 Market Street
Philadelphia, PA 19103
215.988.7800
mandelbaumd@gtlaw.com

**Attorneys for Defendant P.H. Glatfelter Company**

s/ Nancy K. Peterson
Nancy K. Peterson (Wis. Bar No. 1000197)
William H. Harbeck (Wis. Bar No. 1007004)
Peter C. Karegeannes (Wis. Bar No. 1015025)
Quarles & Brady LLP
411 E. Wisconsin Avenue
Milwaukee, WI 53202
Telephone: (414) 277-5000
william.harbeck@quarles.com

**Attorneys for Defendant WTM Company**

s/ Susan E. Lovern
Susan E. Lovern (#1025632)
Michael P. Carlton (#1016037)
Thomas Armstrong (#1016529)
Kelly J. Noyes (#1064809)
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 700
Milwaukee, WI 53202
Telephone: (414) 276-1122
Fax: (414) 276-6281
slovern@vonbriesen.com
mcarlton@vonbriesen.com
tarmstro@vonbriesen.com
knoyes@vonbriesen.com

**Attorneys for Defendant CBC Coating, Inc.**

s/ Scott W. Hansen
Scott W. Hansen
Steven P. Bogart
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
P.O. Box. 2965
Milwaukee, WI 53202
Telephone: 414-298-1000
Fax: 414-298-8097
sbogart@reinhartlaw.com
shansen@reinhartlaw.com

Thomas R. Gottshall
Stephen F. McKinney
Haynsworth Sinkler Boyd PA
1201 Main Street, Suite 2200
P.O. Box 11889
Columbia, SC 29211-1889
Telephone: 803-779-3080
Fax: 803-765-1243
tgottshall@hsblawfirm.com
smckinney@hsblawfirm.com

**Attorneys for Defendant U.S. Paper Mills**

s/William J. Mulligan
William J. Mulligan (WI Bar No. 1008465)
Kevin J. Lyons (WI Bar No. 1013826)
Elizabeth K. Miles (WI Bar No. 1064284)
Davis & Kuelthau, s.c.
111 E. Kilbourn Avenue, Suite 1400
Milwaukee, WI 53202
Telephone: (414) 276-0200
Fax: (414) 276-9369
Email:
wmulligan@dkattorneys.com
klyons@dkattorneys.com
emiles@dkattorneys.com

**Attorneys for Defendant Neenah-Menasha Sewerage Commission**

s/ David A. Rabbino
David A. Rabbino
Philip C. Hunsucker
Hunsucker Goodstein & Nelson PC
3717 Mt. Diablo Blvd., Suite 200
Lafayette, CA 94549
Telephone: (925) 284-0840
Fax: (925) 284-0870
phunsucker@hgnlaw.com

**Attorneys for Defendant Menasha Corp.**

s/ Paul G. Kent__________

Paul G. Kent (#1002924)
Richard C. Yde (#1013600)
Ted Waskowski (#1003254)
Stafford Rosenbaum LLP
222 W. Washington Avenue, Suite 900
P.O. Box 1784
Madison, WI 53701-1784
Telephone: (608) 256-0226
Email: pkent@staffordlaw.com

James P. Walsh (#1009328)
Appleton City Attorney's Office
100 North Appleton Street
Appleton, WI 54911-4702
Telephone: (920) 832-6423
Email: jim.walsh@appleton.org

**Attorneys for Defendant City of Appleton**