APPLETON PAPERS, INC.

Comments Pursuant to Public Notice No. 2720289
of the Army Corps of Engineers

December 10, 1971

by

| | |
|---|---|
| BUSINESSMEN FOR THE PUBLIC INTEREST: | Alexander Polikoff<br>David Dinsmore Comey |
| LAKE MICHIGAN FEDERATION: | Lee Botts |
| WISCONSIN RESOURCE CONSERVATION COUNCIL: | Vance Van Laanen<br>Dan Gaffney |
| WISCONSIN ECOLOGICAL SOCIETY: | John Wilson |
| BROWN COUNTY CHAPTER, IZAAK WALTON LEAGUE OF AMERICA: | William Thomasma |

For further correspondence: Alexander Polikoff
David Dinsmore Comey
Businessmen for the Public Interest
109 N. Dearborn, Suite 1001
Chicago, Illinois 60602
Tel: (312) 641-5570

552156

TABLE OF CONTENTS


| | Page No. |
|---|---|
| INTRODUCTION | 3 |
| I. ENVIRONMENTAL CONSIDERATIONS | |
| A. The Condition of Lake Michigan | 3 |
| B. The Condition of Green Bay | 5 |
| C. The Condition of the Fox River | 5 |
| II. RELEVANT LEGAL BACKGROUND | |
| A. Applicable Requirements of the National Environmental Policy Act | 7 |
| B. The Best Available Technology Standard | 7 |
| III. ANALYSIS OF THE APPLICATION | |
| A. General Description | 9 |
| B. Present Discharge | 9 |
| 1. Outfall 001 | 9 |
| 2. Outfall 002 | 10 |
| 3. Outfall 003 | 10 |
| 4. Outfall 004 | 10 |
| 5. Outfall 005 | 11 |
| 6. Outfall 006 | 11 |
| 7. Outfall 007 | 11 |
| 8. Outfall 008 | 12 |
| 9. Summary | 12 |
| C. Past Discharge | 13 |
| IV. ABATEMENT TECHNOLOGY | 13 |
| V. APPLETON'S LEGAL STATUS | 14 |
| CONCLUSION | 15 |
| TABLE 1 | 16 |
| TABLE 2a | 17 |
| TABLE 2b | 18 |
| TABLE 3a | 19 |
| TABLE 3b | 20 |
| TABLE 4 | 21 |
| TABLE 5a | 22 |
| TABLE 5b | 23 |
| TABLE 6a | 24 |
| TABLE 6b | 25 |
| TABLE 7 | 26 |
| TABLE 8a | 27 |
| TABLE 8b | 28 |
| TABLE 9 | 29 |
| TABLE 10 | 29 |
| BIBLIOGRAPHY | 30 |


552157

# TABLE OF CONTENTS


| | Page No. |
|---|---|
| INTRODUCTION | 3 |
| I. ENVIRONMENTAL CONSIDERATIONS | |
| A. The Condition of Lake Michigan | 3 |
| B. The Condition of Green Bay | 5 |
| C. The Condition of the Fox River | 5 |
| II. RELEVANT LEGAL BACKGROUND | |
| A. Applicable Requirements of the National Environmental Policy Act | 7 |
| B. The Best Available Technology Standard | 7 |
| III. ANALYSIS OF THE APPLICATION | |
| A. General Description | 9 |
| B. Present Discharge | 9 |
| 1. Outfall 001 | 9 |
| 2. Outfall 002 | 10 |
| 3. Outfall 003 | 10 |
| 4. Outfall 004 | 10 |
| 5. Outfall 005 | 11 |
| 6. Outfall 006 | 11 |
| 7. Outfall 007 | 11 |
| 8. Outfall 008 | 12 |
| 9. Summary | 12 |
| C. Past Discharge | 13 |
| IV. ABATEMENT TECHNOLOGY | 13 |
| V. APPLETON'S LEGAL STATUS | 14 |
| CONCLUSION | 15 |
| TABLE 1 | 16 |
| TABLE 2a | 17 |
| TABLE 2b | 18 |
| TABLE 3a | 19 |
| TABLE 3b | 20 |
| TABLE 4 | 21 |
| TABLE 5a | 22 |
| TABLE 5b | 23 |
| TABLE 6a | 24 |
| TABLE 6b | 25 |
| TABLE 7 | 26 |
| TABLE 8a | 27 |
| TABLE 8b | 28 |
| TABLE 9 | 29 |
| TABLE 10 | 29 |
| BIBLIOGRAPHY | 30 |


552158

APPLETON PAPERS, INC.

Comments Pursuant to Public Notice
No. 2720289 of the Army Corps of Engineers

## INTRODUCTION

These comments are respectfully submitted to the District Engineer, U.S. Army Corps of Engineers, Chicago District, pursuant to Public Notice No. 2720289. They are submitted without any waiver of the position heretofore taken by some of the signatories in Businessmen for the Public Interest, Inc. et al. v. Stanley R. Resor, et al., No. 71 C 894, in the District Court for the Northern District of Illinois, Eastern Division, now on appeal, to the effect that the regulation pursuant to which Notice No. 2720289 was issued (the "Regulation", 33 C.F.R. 209.131) is invalid as applied to discharges to Lake Michigan and tributary waters.

## I. ENVIRONMENTAL CONSIDERATIONS

These comments and the application of Appleton Papers, Inc. ("Appleton") must be considered in relation to the condition of the waters affected by Appleton's discharges, namely, Lake Michigan, Green Bay and the Lower Fox River.

### A. The Condition of Lake Michigan

Lake Michigan is the world's sixth largest body of fresh water. It is a natural resource of transcendent value. Millions of persons depend upon, use and enjoy Lake Michigan for health, recreational, aesthetic and other purposes. The degradation of the waters of Lake Michigan would destroy such interests and benefits and would have an incalculably destructive effect on the well-being of all persons in the Lake Michigan Basin.

Lake Michigan is essentially a cul-de-sac with substantially no flow-through or flushing action. Pollutants and nutrients discharged into Lake Michigan tend to remain and accumulate within the Lake instead of being flushed out of it. In this respect Lake Michigan is analogous to a huge wash basin with no drain.

If pollutants and nutrients discharged into bodies of water which possess flushing characteristics are stringently limited, it maybe possible to improve and reverse degraded water quality conditions. Such improvement and reversal may not be possible with respect to Lake Michigan. Because of the absence of any significant flow-through or flushing action in Lake Michigan, degradation of the waters of Lake Michigan may be substantially irreversible.

Six years ago at the opening session of the first Federal-State Enforcement Conference dealing with Lake Michigan, the fear was expressed that pollution of the Lake might be irreversible. (20, p.112.)*

Three years ago, at another session of the enforcement conference, then Secretary of Interior Udall said, "Delay means death to Lake Michigan." (21, p.104.)

One year ago, scientists E. F. Stoermer and J. J. Yang of the Great Lakes Research Division of the University of Michigan, working under a grant from the Federal Water Pollution Control Administration, published an exhaustive study of plankton diatom assembleges in Lake Michigan. They said that all of the plankton diatoms associated with "extreme water quality degradation in the Great

*References in parentheses are to the documents listed in the bibliography contained at the end of these Comments. The underlined first number of each reference designates the document bearing that number in the bibliography.

552159

Case 1:10-cv-00910-WCG Filed 02/03/12 Page 4 of 33 Document 301-5

NCR-FOX-0220112

Lakes system" were then present in Lake Michigan. They concluded that the Lake was probably at the "break point" between moderate and transient algal nuisance and "drastic and most likely irreversible changes in the entire ecosystem." (22, pp.209-210.)

In a more recent study, Drs. Stoermer and Yang have concluded that "it is not unreasonable to assume that Lake Michigan is undergoing, or has undergone, a really pivotal change in its ecosystem, and projections based on the system in its previous condition are apt to be grossly conservative." (23, p.62.)

In an affidavit filed in the Resor case, referred to above, Dr. Stoermer says:

> "Discharging polluted water into Lake Michigan, even at levels that meet current water quality criteria, still will be permitting the accumulation of nutrients and pollutants in the lake, where evaporation and other natural processes will slowly raise their level of concentration in the lake."

The past accumulations of pollutants and nutrients in Lake Michigan have clearly brought the Lake's waters to an unacceptable level of impairment. Lake Michigan may now in fact be at the "break point" of drastic and irreversible change in the entire Lake ecosystem.

Under these circumstances, the continued discharge of additional pollutants and nutrients into Lake Michigan and tributary waters may threaten the imminent and irreversible degradation of the Lake. Only cessation of the discharge of all pollutants and nutrients to the Lake and its tributary waters, for example by the installation of waste recycling systems, can insure that everything that can be done is being done to preserve Lake Michigan from such irreversible degradation.

In the affidavit referred to above Dr. Stoermer says:

> "If the lake is to be preserved in a condition useful to man, it is my opinion that the actions that are most reasonable and prudent under the circumstances are the total diversion of discharges of nutrients and other chemicals away from Lake Michigan by incorporating recycling technology wherever possible at the earliest date feasible."

These views of the condition of Lake Michigan are shared by others. Indeed, the Administrator of the Environmental Protection Agency (EPA) has already taken, with respect to thermal discharges to Lake Michigan, an essentially similar position to that of Dr. Stoermer. The Administrator, Mr. Ruckelshaus, has said:

> "Nutrient levels in certain areas of Lake Michigan are now approaching critical levels ... The Great Lakes are an irreplaceable national asset. One of these lakes, Lake Erie, has already suffered serious harm. The quality of Lake Michigan waters, though still high, has begun a steady and measurable decline, with associated damage to its biological systems. Although several other sources of ecological damages to the lake exist, thermal discharges are increasingly important and may well accelerate the harm caused by other pollutants. It is my conviction that if there are feasible methods to avoid this serious risk of harm posed by thermal discharges, these methods must be adopted ... For

552160

> far too long precautions against environmental damage have awaited a full understanding of the threat. The march of progress has aggravated environmental damage while proposed safeguards were under consideration or studies were being performed.
>
> In the case of Lake Michigan, we cannot afford further delay." (24.)

These views of course apply to industrial as well as thermal pollution. (Indeed, the harm which flows from industrial pollution is better documented than that flowing from thermal pollution.) In the case of industrial pollution, too, "We cannot afford further delay."

B. The Condition of Green Bay

It has been no secret, and it is no recent development, that the waters of Green Bay, particularly the southern portion of the Bay, are seriously degraded. (4, p.i.) Beaches were closed 25 years ago. In a document published by the FWPCA in 1968, two photographs appear, one showing "a popular swimming area" in Green Bay in 1910, and the second of the same area today. (3, p.26.) Fisheries are virtually non-existent, low dissolved oxygen levels impair wildlife support, and undesirable growth has even impaired the use of the waters for municipal supply. (4, p.i.) Indeed, the City of Green Bay obtains its water from Lake Michigan rather than from the adjacent waters of Green Bay. (4, p.i.)

There is no doubt, of course, that these conditions have been caused by pollution. (23, p.61.) Moreover, it is clear that Green Bay, particularly in its lower reaches, is continuing to deteriorate.

> "Marked changes in the bottom fauna of Lower and Middle Green Bay between 1952 and 1969 ... suggest that the deterioration of the Bay environment ... is continuing." (6, p.131.)

This study concluded that "lower and middle Green Bay are ecologically similar to highly polluted areas of Western Lake Erie but they are more degraded than open lake areas of Erie were in 1961." (6, p.132.)

The study concluded, "The future of the Green Bay bottom fauna is not difficult to predict if pollution of the Bay, via the Fox River, continues." (6, p.132.)

Moreover, if the dissolved oxygen levels in Green Bay continue to decline and the bottom becomes anaerobic, the ferromanganese nodules in the bottom sediments of the Bay will present an additional danger. These nodules contain arsenic which will remain in the nodules as long as the water is aerobic. But under anaerobic conditions the arsenic may be released. As a recent study warned, "If Green Bay continues to be polluted, there is a distinct possibility that these nodules will go into solution and release this arsenic into the lake ... If all the nodules believed to be in Green Bay dissolve because of the water becoming anaerobic and more acidic, the resulting concentration of arsenic, which is highly toxic to mammals and also carcinogenic, will be approximately 90 mg/l." (9, p.100.) Such a concentration "would be several times the maximum permissible level for drinking water." (9, p.97.)

Thus, to allow the discharge of pollutants into Green Bay to lower the dissolved oxygen levels to the point at which the arsenic, presently held in nodules on the floor of the Bay, would be released, would be tantamount to lighting the fuse on an ecological timebomb.

C. The Condition of the Fox River

The lower Fox River is so "grossly polluted" that detailed discussion of its condition is unnecessary. (4, p.6-1.) At times, the Fox has little or no

552161

dissolved oxygen for stretches exceeding 20 miles. (4, p.6-3.) In fact, in the stretch of the river just below Combined Locks no "clean water" or intolerant forms of life were discovered for 18 miles downstream. (12, p.16.) As for tolerant types of life, "a total of 24 bottom samples collected along this portion of the stream revealed tolerant and pollutional organisms at a minimum or entirely absent from the bio-habitat." (12, p.16.) In other words, the Fox River is so grossly polluted below Combined Locks that not only are normal pollution-intolerant organisms unable to survive there, but even pollution-tolerant organisms cannot survive!

The Fox is the major contributor to the pollution of the waters of Green Bay. (4, p.6-3.) It contributes to Green Bay the bulk of the phosphates, ammonia, phenols and organic contaminants found in its waters. (4, p.6-1.) Indeed, the Fox is the major tributary of the 20 rivers that feed into Lake Michigan. (3, p.4.) It is therefore no surprise that the most degraded area of Green Bay is the southern tip adjacent to the mouth of the Fox River. (4, p.6-1.)

It is common knowledge, of course, that papermill woodwastes and ooze constitute the major source of the Fox's pollution. (4, p.6-6.)

552162

## II. RELEVANT LEGAL BACKGROUND

Appleton's application and these comments must also be considered against the background of the applicable legal considerations.

### A. Applicable Requirements of the National Environmental Policy Act

As the Regulation itself states (¶(c)(2)), the National Environmental Policy Act of 1969 requires that to the fullest extent possible the policies, regulations and laws of the United States shall be interpreted and administered in accordance with the policies set forth in the National Environmental Policy Act. Among those policies is the coordination of Federal programs to attain the widest range of beneficial uses of the environment "without degradation," and to "enhance" the quality of renewable resources. 42 U.S.C.A. §4331(b)(3) and (6). Accordingly, the Regulation must be interpreted and administered in such a fashion as to avoid degradation and enhance the quality of the environment, in this case, of the lower Fox River, Green Bay and Lake Michigan.

### B. The Best Available Technology Standard

The Regulation provides (¶(d)(5)) that the decision as to whether or on what conditions a permit is to be issued will be based, among other things, upon "applicable water quality standards and related water quality considerations, including environmental values reflected in water quality standards." However, the Corps of Engineers has taken the position that this language does not restrict the District Engineer to consideration of water quality standards, but that a standard of "best technology" may be employed. Thus, a memorandum filed in the Resor case on behalf of both the Corps and EPA states:

> "[W]here 'best available treatment' is necessary to protect or enhance the quality of Lake Michigan or any other navigable body of water, or its tributary, the permit program may require it." (32, p.12.)

The same memorandum also states,

> "Although the regulations do not provide for a 'best technology standard', there is nothing in the regulations prohibiting the imposition of this standard on a case by case basis." (32, pp.12-13.)

This position of the Corps is extremely significant. It constitutes a recognition that, because of the cul-de-sac nature of Lake Michigan, water quality standards which permit continued discharges of pollutants into Lake Michigan may not halt the rapid movement of Lake Michigan toward irreversible degradation. Since such standards may be inadequate to protect Lake Michigan from irreversible degradation, the granting of a permit for Lake Michigan or tributaries based on mere compliance with water quality standards could well violate the no-degradation standards of the National Environmental Policy Act.

Officials of the Environmental Protection Agency have themselves condemned water quality standards as inadequate, even apart from the special case of Lake Michigan.

In a letter to the New York Times of April 7, 1971, William Ruckelshaus, Administrator of the Environmental Protection Agency said, "It is our strong conviction that most water quality standards require improvement ..." A statement by the Regional Administrator, Francis Mayo, presented to the Illinois Pollution Control Board on August 19, 1970, is much more specific. Mr. Mayo says, among other things:

> "Standards were written by the states followed by a Department of Interior review and approval without perhaps the proper attention to detail and without expert guidance." (p.1.)

552163

> "Often the specific criteria that are contained in the standards for a particular designated use may permit lower water quality than the existing quality ..." (pp.1-2.)

> "It was in response to this apparent failing in the standards that the Department of Interior insisted upon the non-degradation clause. However, to our knowledge, in no areas has the baseline for non-degradation - the existing quality of a water - been formally defined. This lack of a baseline makes the non-degradation concept difficult and perhaps impossible to enforce ... Lake Michigan is a good example of such a situation. If existing water quality of Lake Michigan is compared with the specific water quality criteria in SWB-7 [Illinois Water Quality criteria], it is evident that further pollution of the lake will be allowed through the established law if non-degradation cannot be enforced." (p.2.)

Mr. Mayo then gave some "examples concerning Lake Michigan ... to illustrate a fear that established standards do not adequately protect this State's waters." (p.5.) The examples included:

> "Illinois standards ... presently allow 165 mg/l of dissolved solids as an annual average, with a single daily value of not more than 200 mg/l. The present average dissolved solids concentration in the lake is about 155 mg/l ... Illinois standards allow the annual average dissolved solids concentration to increase to 186 mg/l by the year 2000." (p.2.)

> "Similarly, increasing concentration criteria are used for chlorides and sulfates." (p.2.)

> "The criteria for phosphorus and nitrogen, common plant nutrients and prime factors in the eutrophication process, similarly allow levels in Lake Michigan higher than those which presently exist." (p.3.)

> "There should be no oil in the lake; yet the standard reads 'substantially free of visible floating oil.'" (p.3.)

> "Further examples can be made: cyanides are not to exceed 0.025 mg/l. The present level is about 0.01 mg/l ..." (p.3.)

Wisconsin water quality standards are more lax than those of Illinois in each of the particulars discussed by Mr. Mayo.

552164

## III. ANALYSIS OF THE APPLICATION

For the most part the following analysis of Appleton's application is based upon information contained in the application. As indicated in various places below, some of this information is insufficient or incomplete (for example, some of it is based upon obviously inadequate sampling techniques). It also appears, for reasons suggested below in subsection C, that some of the data submitted to the Corps of Engineers in the application is considerably different than data submitted in 1971 and previous years to the State of Wisconsin.

### A. General Description

Appleton's Combined Locks Mill is situated on the south shore of the Fox River in Combined Locks, Wisconsin. It originally produced ground-wood pulp using a waterwheel at the dam, but shifted into production of de-inked pulp when the company began specializing in the recycling and production of telephone directory paper. (14, p.152.) When the inks used in directories were changed from brownish-black to more permanent and darker black inks, the economic infeasibility of treating waste water from the de-inking process led to cessation of the de-inking operation and substitution of a chemi-mechanical pulping process. (15.) By this process aspen wood chips are mechanically refined after initial treatment with a chemical solution. The operation began in 1968, and now produces 225 tons of pulp per day for use in the mill's papermaking plant. (2, Discharge 008, §II, p.1.) Pulp supplies are augmented by 30 tons per day of secondary fiber recovered from data cards. (2, Discharge 002, §II, p.1.) This latter secondary fiber figure has declined from the 1970 estimate of 70 tons per day. (14, p.153.)

The mill also purchases about 80 tons per day of pulp and uses about 15 tons per day of broke, bringing the total input for the papermaking operation to about 350 tons per day. (14, p.153.) This is used to produce, on five paper machines, about 350 tons per day of paper of which 60 tons per day is coated NCR paper, the remainder being principally telephone directory paper, plus bond and book grade papers. (2, §II, and 14, pp.153-154.)

Appleton's entire mill has an intake of 9.98 MGD, and total effluent of 8.34 MGD, of which about 6 MGD represents process water and most of the balance is cooling water. (2, §I, p.2.)

The application offers no explanation for what happens to the 1.64 MGD taken in but not discharged.

Appleton Paper expects to combine all discharges into a single outfall by December 1972. (2, §II, p.2.)

### B. Present Discharge

#### 1. Outfall 001

This outfall discharges 0.12 MGD, the effluent from production of filtered water for use in paper manufacture. No continuous monitoring system exists for this outfall. Temperature and pH are "not generally run" on this waste stream. The flows are estimated. (2, Discharge 001, §II, pp.1-2.)

Table 1 summarizes the major contents of the discharge from 001. Since presently the river water is filtered on microfloc beds with no chemical coagulation, the only appreciable net increases from intake to discharge are in total solids, total suspended solids, color, turbidity and total organic carbon. Presumably this reflects the filtration process, whereby filtered solids are removed by backwashing, and returned to the river in discharge 001. (2, Discharge 001, §II, p.1.)

The information on Outfall 001 in the Corps of Engineers permit application is based on grab samples "not [taken] on a regular basis. Data was sufficient,

552165

however, to figure average and peak loadings." (2, Discharge 001, §II, p.2.) No explanation was given as to what the basis for calculating these loadings was. The applicant states further that values for minimum and maximum concentrations in Part B-1 of the application, and for maximum concentrations and pounds per day in Part B-2, "... were impossible to obtain in the time period allowed." No mention is made of whether or when the missing data will be forthcoming. Moreover, all data reported on daily average concentrations in Part B-2 were based on analysis of one average grab sample. "... The test results obtained are assumed to represent daily average concentrations." (2, Discharge 001, §II.) Appleton employed the same sampling techniques for each of the remaining seven outfalls, with minor departures which will be noted below. This is a totally inadequate basis for determining the content of discharges, and certainly is not sufficient information on which a decision with respect to a Refuse Act permit can be made.

2. Outfall 002

Outfall 002 discharges waste from the hydropulping area, recycled tabulating card pulping and cleaning, drainage from broke and paper machine chest transfer pumps serving three paper machines, air compressor water, and boiler blowdown water.

On an average day it discharges 1.1 MGD. No continuous monitoring system exists for this outfall. Flow figures were estimated by the Nalco engineering firm; temperature has been recorded only irregularly. (2, Discharge 002, §I, p.2.)

Tables 2a and 2b summarize the contents of the discharge from 002. Among the parameters that show the most marked net increase in value are BOD, COD, total solids, total dissolved solids, total suspended solids, and total organic carbon. The average and maximum daily BOD concentrations are 376 mg/l and 565 mg/l respectively. By comparison, the proposed Illinois effluent criterion for BOD discharge into Lake Michigan basin waters is 4 mg/l. (31, p.6.)

Other parameters displaying marked net increase include sulfate, sulfide, aluminum, and oil and grease.

As mentioned in the discussion of discharge outfall 001 above, the values for nearly all parameters were based on a single grab sample. For outfall 002, the only exceptions to this generalization about sample frequency were total suspended solids (sampled daily), BOD (sampled weekly), and COD and pH (both sampled monthly). These are decidely inferior frequencies for sampling, and yield little data about actual ranges of effluent concentrations. (2, Discharge 002, §II, pp. 2, 4.)

3. Outfall 003

The processes associated with discharge outfall 003 begin with the intake of 0.6 MGD treated water for use in paper manufacture. They end with the No. 6 paper machine sewer, which carries waste from the No. 6 paper machine saveall pit, machine stock chests, silo, white water pit, press shower, couch and press pit. These effluents are collected in trenches, then pumped through a pipeline which on an average day discharges into the river 0.6 MGD. Again, no continuous monitoring system exists for this outfall. (2, Discharge 003, §L, p.2.)

The contents of Outfall 003's discharge are summarized in Tables 3a and 3b. Substantial net increases in average values include aluminum and titanium. Aluminum rises from 909 ppb at intake to 15,000 ppb at discharge, and titanium's average concentration increases from 260 ppb at intake to 7,180 ppb when discharged into the river. As is the case with all Table B data throughout Appleton's application, no maximum concentrations for the reported parameters are given.

4. Outfall 004

The processes and flow associated with Outfall 004 are almost identical

552166

to those reported for Outfall 001, and therefore this outfall will not be discussed separately. The contents are summarized in Table 4.

5. Outfall 005

Outfall 005 carries 2.3 MGD from the production of 350 tons of paper per day. This includes wastes from the number 1, 3 and 5 process areas, encompassing seal water from vacuum pumps, overflow from Broughton boxes, savealls, wire pit and the centrifugal cleaner from the paper machine screening system. No continuous monitoring system exists for this outfall. (2, Discharge 005, §I, p.2.)

Tables 5a and 5b summarize the contents of the discharge from Outfall 005. Most parameters show dramatic increase in average concentration. The maximum and average daily total suspended solid concentrations added by this outfall are 2,052 mg/l and 1,140 mg/l respectively. By comparison, the proposed Illinois effluent criterion for discharge of total suspended solids to Lake Michigan basin waters is 20 mg/l. (31, pp. 6, 9.) The maximum and average BOD concentrations added by this outfall are 365 mg/l and 205 mg/l respectively (the proposed Illinois effluent criterion allows only 4 mg/l; 31, p.6). The average daily BOD added by this outfall is equivalent, in terms of its biochemical oxygen demand on the Fox River, to the untreated sewage of 22,785 people. On an average day, this outfall also adds 18,280 pounds of COD, and 27,219 pounds of total solids. Nearly a ton of aluminum and titanium are added to the river by this outfall, as average concentrations for aluminum increase from 909 mg/l to 71,000 mg/l and those for titanium increase from 260 mg/l to 34,130 mg/l. This outfall also adds 1,649 lbs/day of sulfate and 619 lbs/day of oil and grease on an average day. No estimates were reported for maximum concentrations or pounds per day of these parameters, as required by the permit form.

6. Outfall 006

Outfall 006 principally carries wastes from the mixing and application of paper coating material used in the mill's daily production of 60 tons of coated or NCR paper. This outfall also carries the regeneration and backwash water from the zeolite softener. The various waste streams flow by gravity to the main trunkline going to the river. (2, Discharge 006, §I, p.1.) This sewer discharges 0.44 MGD of effluent. No continuous monitoring system exists for Outfall 006, and temperatures are not recorded regularly. (2, Discharge 006, §II, p.2.) The contents of Outfall 006's discharge are summarized in Tables 6a and 6b.

Among parameters reported, turbidity demonstrates the most remarkable rise in registered value, from 9 Jackson units at the intake to 442 Jackson units at discharge. Sulfate, aluminum, magnesium, and titanium concentrations at discharge all represent appreciable rises in concentration from the concentration of the intake water. (2, Discharge 006, §II, pp. 1B-7B.)

7. Outfall 007

This outfall discharges waste water only five months of each summer. During that time an average 2.4 MGD are involved in the process, which provides a vacuum supply to a deculator for removal of air from paper machine furnish on the No. 6 paper machine. This water is recycled through anthrafilt filters during the seven colder months of the year. During the summer, the average daily discharge is at a temperature of 126°F! (2, Discharge 007, §II, p.2.)

Table 7 summarizes the concentrations and quantities of selected parameters of this outfall. For those data listed in Table 7, the daily average concentrations are identical to their concentrations in untreated intake water. But when one examines the figures for maximum pounds discharged by Outfall 007 on a given day, here the total solids added amount to over 15 tons! The application offers no explanation of this seeming anomaly or where this material comes from. (2, Discharge 007, §II, p.4.)

552167

8. Outfall 008

Outfall 008 discharges 1.25 MGD of wastewater to the Fox River. This discharge contains the effluent from the mills chemi-mechanical pulping operation, bu which 225 tons per day of aspen wood are processed into pulp. On the average day, water discharged from Outfall 008 has a temperature of 110°F. in the winter and 116°F. in the summer! No continuous monitoring system exists for this outfall. Temperature is checked "occasionally." (2, Discharge 008, SII, pp. 1, 2.)

Tables 8a and 8b summarize the contents of the wastewater discharged from Outfall 008, which may be the last, but clearly is not the least, of Appleton's outfall.

The majority of parameters reported for the mill as a whole show their heaviest average concentrations or greatest value-rise at this outfall. This outfall adds to the Fox River maximum and average BOD quantities that are the equivalent, in terms of their biochemical oxygen demand, of an unsewered population of 138,844 and 58,541 people respectively. The maximum daily concentration of BOD added by this single outfall is 2,665 mg/l, rather higher than the proposed Illinois effluent criterion of 4 mg/l.

In addition, this outfall adds an average of 34,715 pounds per day of chemical oxygen demanding substances to the river, as well as total solids of 29,148 pounds per day. Included in the latter figure is an average of 11,790 pounds of total suspended solids. At its maximum, the total suspended solids quantity reaches 30,775 pounds per day, at an added concentration of 2,952 mg/l, substantially higher than the 20 mg/l that Illinois proposes to allow. (31, pp. 6, 9.) The total organic carbon added from this outfall on an average day is 7,344 pounds.

Needless to say, the discharge is quite opaque, even compared with the normal murky Fox River water. Color climbs from 40 platinum cobalt units at intake to 900 at discharge. Turbidity climbs from 9 Jackson units at intake to 408 at discharge.

To top this all off, the discharge from 008 is well heated, averaging 110°F. in the winter and 116°F. in the summer, which ensures that the dissolved oxygen levels in the river will decrease even further than the low levels caused by the chemical pollutants discharged by this outfall.

9. Summary

Table 9 sets forth a few selected totals, based on Appleton's figures in its application, of maximum and average quantities of pollutants added from the eight Appleton outfalls into the Fox River. The maximum BOD figure from the eight outfalls is equivalent, in terms of biochemical oxygen demand on the river, to the untreated sewage from 226,333 people. The average BOD figure is similarly equivalent to the untreated sewage of a population of 102,277. The average daily discharge of oil and grease is at a level found in the discharges of large oil refineries.

Besides adding tons and tons of pollutants every day to the Fox River, the Combined Locks mill also heats them up. The facility adds waste heat to the river in amounts up to 123,500,000 BTU/hr, which is equivalent to a 32,100 kilowatt fossil-fueled power plant (larger than four of the plants presently on the shore of Lake Michigan). Of this heated discharge, 3,650,000 gallons per day is at an average temperature of 120°F., far in excess of what any local fish or other fauna can survive.

There is one final insidious pollutant not reported by Appleton but undoubtedly present in its discharges: PCBs (polychlorinated biphenyls). PCBs are a constiuent of NCR paper, and have reportedly caused problems when such paper is recycled into drinking cups, etc. High levels of PCBs are being reported in the flesh of Lake Michigan fish, some well over the permissible levels set by the Food and Drug Administration. Although the permit application form does not require Appleton to analyze its discharge for PCBs, they are undoubtedly there, and may be present in quantities sufficient to have measurable effects on aquatic biota in Green Bay and Lake Michigan as a whole.

552168

C. Past Discharge

Table 10 summarizes Appleton's total mill effluent discharge from all sources at the Combined Locks location from 1952 to 1971. Unfortunately only two of the 26 major pollutants which Appleton presently adds to its discharge have been measured in the past. Unsampled pollutants include total solids, COD, total organic carbon, phenols, ammonia, and oil and grease. (1, §II, B, and 2, §II.)

Analysis of Appleton's past discharges for which information is available indicates moderate declines in levels of BOD and suspended solids between 1965 and 1968, followed by enormous, consistent increases in BOD, total solids, and suspended solids over the last three years.

Curiously, a comparison of the figures reported in a survey conducted by the Wisconsin Department of Natural Resources from February 22-27, 1971, with the figures reported to the Corps of Engineers on the permit application, shows a great disparity. The total flow in the figures given the Corps is 3,163,000 gallons higher than in the figures measured by the DNR, the BOD figure is 3,912 pounds higher, and the total suspended solids figure is 16,399 pounds higher.

Since the 1970 figures reported by Appleton to the DNR are close to the figures the DNR recorded in its 1971 survey, it would appear that the actual present discharge lies in the 5.1 MGD flow range, with BOD at about 16,200 lbs/day and total suspended solids at 27,982 lbs/day, rather than in the range Appleton shows in its Refuse Act permit application.

Another reason to believe that Appleton's application figures are unrealistically high is that the normal total waste load for a paper mill using processes similar to those at Combined Locks, prior to any treatment at all, should not exceed approximately 18,000 lbs/day of BOD or 33,500 lbs/day of total suspended solids. (33, Appendix A, Table A-4.) It seems almost technologically impossible for Appleton to be producing the wastes it reports on the permit application.

Why might Appleton report higher figures on its application than it discharges in fact? For two reasons: One is that a permit may run for five years, and Appleton may want to expand present operations at the mill. The excess figures in the application would provide a substantial cushion for expansion without having to renegotiate the permit with the Corps of Engineers. The second reason may be that Appleton expects to be ordered to reduce its total discharge by some given percentage of BOD, suspended solids, etc. If the percentage reduction is based on non-existent high discharges, such a reduction order would be much easier to comply with (in fact, may require no abatement at all) than an order based on actual discharges.

## IV. ABATEMENT TECHNOLOGY

Existing technology in the paper industry today very readily achieves substantially complete removal of pollutants, including BOD, COD and suspended solids. (33, pp.41-42.) These Comments make it plain that prompt utilization of such technology by Appleton should be required.

In this connection, the December 16, 1969 order of the Wisconsin Department of Natural Resources respecting Appleton's effluent should be noted, although for the reasons given in the succeeding section that order is essentially irrelevant. The order gave Appleton two options, the first of which was to allow the mill to cooperate with the municipality in developing a joint treatment facility, for which "a maximum effort to achieve the highest reductions that are technically feasible will be required." (34) The second option was to allow the company to construct its own facilities, provided that total daily BOD discharges after treatment not exceed 6,300 pounds and total daily suspended solids discharges not exceed 11,300 pounds. (34) Inexplicably, such a "maximum effort" was not called for under the second option.

552169

Appleton decided to comply with the second option rather than the first, and is presently constructing facilities for chemical coagulation and sedimentation that it (incorrectly) claims will be the equivalent of secondary treatment. (2, Discharge 001, §II.) This will involve separation of 28,000 gallons per day of spent liquor from the chemi-mechanical pulping process which is very high in organic matter and would hinder the flocculation and settling of the other mill wastes if not separated. Plans for handling this spent liquor are not specified, even though the DNR order is now two years old.

Appleton claims that its proposed abatement procedures will meet the DNR's requirements for BOD and suspended solids. If true, this would represent only 61 percent BOD removal and 60 percent suspended solids removal, based on the DNR's 1971 survey figures (25). This can hardly be called the equivalent of secondary treatment, which very readily achieves 90% BOD removal and solids removal of up to 98 percent. (33, 41-42.) Appleton's proposed abatement practices actually amount only to an up-grading of in-plant procedures and the addition of primary treatment. This is far from being the best available technology, and does not even correspond to what is becoming the norm for the paper industry as a whole. (33, p.50.)

## V. APPLETON'S LEGAL STATUS

Appleton is clearly in serious violation of the Refuse Act and has been for many years. Failure to have taken Refuse Act action against Appleton in the past is, of course, no bar to such action now. As to this the Regulation states:

> "The fact that official objection may not have been raised with respect to past or continuing discharges or deposits does not constitute authority to discharge or deposit or to continue to discharge or deposit in the absence of an appropriate permit." (¶(d)(4).)

Similarly, the filing of the permit application is no bar to Refuse Act action.

> "Similarly, the mere filing of an application requesting permission for the discharge or deposit in the navigable waters or tributaries thereof will not preclude legal action in appropriate cases for Refuse Act violations." (Ibid.)

Whether Appleton is likewise in violation of Wisconsin water quality standards or other Wisconsin law is irrelevant.* As noted above, water quality standards are generally recognized as inadequate, and particularly so concerning Lake Michigan. The Regional Administrator of EPA has severely criticized the Illinois standards as inadequate to protect the quality of Lake Michigan waters, and Wisconsin standards are more lax than those of Illinois.

Moreover, as also noted above, both the Corps and EPA have taken the position that where the best available treatment is necessary to protect or enhance the quality of Lake Michigan, water quality standards may be disregarded and the

*Nonetheless it may be noted that according to the application the only order of the State of Wisconsin to which Appleton is presently subject authorizes daily BOD discharges up to 6,300 lbs., authorizes daily discharges of suspended matter up to 11,600 lbs., and fails to place any specific limitation on COD or other parameters. (34) Moreover, no attempt is made in the papers submitted with the application to justify these features of the order in relation to the condition of the lower Fox River, Green Bay or Lake Michigan. Given the badly degraded condition of those waters, the provisions of the Wisconsin order make clear the utter pointlessness of any discussion of Appleton's legal status under Wisconsin law and water quality standards.

552170

permit program may require implementation of the best available treatment. There can be no doubt that the condition of Lake Michigan, Green Bay and the lower Fox River justify and require the prompt application of this policy.

CONCLUSION

Five years ago the Secretary of the Interior said, "Delay means death to Lake Michigan." This year, the public was still being told (this time by EPA Administrator Ruckelshaus), "We cannot afford further delay."

But delay is all the public is getting.

A year ago, with appropriate fanfare, the birth of the Refuse Act Permit Program was announced by the White House. During that year (and for five years before that, and for decades before that) Appleton continued to spew its filth into the choking Fox River, which continued to pour its contaminants into degraded Green Bay, whose murky mass of dead water crept inexorably toward the Lake proper. (Meanwhile, of course, deadly discharges from the other defilers of Lake Michigan have continued, unaffected by the Permit Program.)

Now the first application for a permit to discharge into Lake Michigan waters has been found to be in order. But it is not in order. It is incomplete and inaccurate. It is an affront to the people of the Lake Michigan Basin, as well as an invalid act, to have issued a public notice with respect to an application in such condition.

The notice should be withdrawn as improvidently issued, and the Appleton case should be referred immediately to the office of the United States Attorney for prompt civil injunctive action under the Refuse Act to require that the "best available treatment" be installed as soon as may be.

In the alternative (though it is a pussyfooting alternative, not responsive to the needs of Lake Michigan), Appleton should be required to correct and complete its application immediately, a public hearing on Appleton's application should be noticed promptly and the period for public comment extended until 30 days after the termination of the hearing. If this alternative is adopted it should be made clear that at the hearing Appleton will be required to bear the burden of demonstrating why it should not be required to substantially terminate its discharges of pollutants to the Fox River by the prompt installation of the best available treatment.

The Corps must now act promptly. It should within a matter of days, not weeks, refer the matter to the United States Attorney for Refuse Act action (the only proper course) or notice a public hearing. It must not sit on the Appleton application for weeks.

We cannot, we have been told by the Environmental Protection Agency, afford further delay. The grim reminder of Lake Erie, lying but a few hundred miles to the East, attests the truth of Administrator Ruckelshaus's statement.

Respectfully submitted,

December 10, 1971

BUSINESSMEN FOR THE PUBLIC INTEREST, INC.
LAKE MICHIGAN FEDERATION
WISCONSIN RESOURCE CONSERVATION COUNCIL
WISCONSIN ECOLOGICAL SOCIETY
BROWN COUNTY CHAPTER, IZAAK WALTON LEAGUE OF AMERICA

BY: Alexander Polikoff / David Dinsmore Comey / Lee Botts

Alexander Polikoff, Executive Director
David Dinsmore Comey, Director, Environmental Research
Businessmen for the Public Interest

Lee Botts, Executive Secretary
Lake Michigan Federation

552171

FACILITY: Appleton Papers, Inc. APPLICATION NO.: 2720289 OUTFALL NO.: 001

TABLE 1

| Max. Δ T (Summer °F.) | BTU/hr x 10⁵*** | Av. Δ T (Winter °F.) | BTU/hr x 10⁵ § | Aver. Flow (MGD) | x 8.34 = C.F | Max. Summer Temp (°F.) | Av. pH |
|---|---|---|---|---|---|---|---|
| 6 | 0.0005 | 4 | 0.0002 | 0.12 | 1.00 | 84 | 7.3 |

| PARAMETER | Row Number | Average Intake Concentration of Untreated Water Reported on Corps Form 4345-1 (µg/l)* mg/l (A) | Maximum Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (B) | Maximum Daily Concentration Added by This Discharge ((B) - (A)) (µg/l)* mg/l (C) | Average Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (D) | Average Daily Concentration Added by This Discharge ((D) - (A)) (µg/l)* mg/l (E) | Maximum Pounds per Day Discharged ((C) x C.F.) lbs/day (F) | Average Pounds per Day Discharged ((E) x C.F.) lbs/day (G) | Adequacy and Reliability of Discharge Sampling, Monitoring, Frequency and Analysis (see Note **) (H) | Population Equivalent of Maximum Daily BOD Discharge ((F) x 5.88) No. of people (I) | Population Equivalent of Average Daily BOD Discharge ((G) x 5.88) No. of people (J) | SPECIAL NOTES AND REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BOD | (1) | 35 | 75 | 40 | 40 | 5 | 40 | 5 | Poor | 235 | 29 | |
| COD | (2) | 120 | 310 | 190 | 160 | 40 | 190 | 40 | Poor | | | |
| TS | (3) | 332 | 4280 | 3948 | 1890 | 1558 | 3948 | 1558 | Poor | | | |
| TDS | (4) | 284 | 280 | -4 | 205 | -79 | -4 | -79 | Poor | | | |
| TSS | (5) | 48 | 4000 | 3952 | 1550 | 1502 | 3952 | 1502 | Poor | | | |
| TOC | (6) | 45 | | | 170 | 125 | | 125 | Poor | | | |
| Color | (7) | 40 | 150 | 110 | 80 | 40 | | | Poor | | | (Platinum-cobalt units) |
| Turbidity | (8) | 9 | | | 205 | 196 | | | Poor | | | (Jackson units) |
| | (9) | | | | | | | | | | | |

BOD - 5-day biochemical oxygen demand. COD - chemical oxygen demand. TS - Total solids. TDS - Total dissolved solids. TSS - total suspended solids

*Concentrations in parentheses are in micrograms per liter (parts per billion) rather than milligrams per liter (parts per million)

** "Good" indicates applicant uses continuous sampling and standard method of analysis

"Fair" indicates applicant uses daily composite sampling and standard method of analysis

"Poor" indicates applicant uses average grab samples and/or non-standard method of analysis or composites on less than daily basis

*** at maximum flow

§ at average flow

NOTE: In order to show what this outfall adds to the receiving waters, the intake water concentrations are subtracted from discharge concentrations in calculating the maximum and average concentrations (columns (C) and (E)) and the maximum and average pounds per day (columns (F) and (G)).

552172

## TABLE 2a

FACILITY: Appleton Papers, Inc. APPLICATION NO.: 2720289 OUTFALL NO.: 002

| Max. Δ T (Summer °F.) | BTU/hr x 10^6 *** |
| --- | --- |
| 13 | 0.005 |
| **Av. Δ T (Winter °F.)** | **BTU/hr x 10^6 §** |
| 6 | 0.002 |
| **Aver. Flow (MGD)** | **x 8.34 = C.F** |
| 1.1 | 9.174 |
| **Max. Summer Temp (°F.)** | 91 |
| **Av. pH** | 7.7 |

| PARAMETER | Row Number | Average Intake Concentration of Untreated Water Reported on Corps Form 4345-1 (μg/l)* mg/l (A) | Maximum Daily Concentration Reported on Corps Form 4345-1 (μg/l)* mg/l (B) | Maximum Daily Concentration Added by This Discharge ((B) - (A)) (μg/l)* mg/l (C) | Average Daily Concentration Reported on Corps Form 4345-1 (μg/l)* mg/l (D) | Average Daily Concentration Added by This Discharge ((D) - (A)) (μg/l)* mg/l (E) | Maximum Pounds per Day Discharged ((C) x C.F.) lbs/day (F) | Average Pounds per Day Discharged ((E) x C.F.) lbs/day (G) | Adequacy and Reliability of Discharge Sampling, Monitoring, Frequency and Analysis (see Note **) (H) | Population Equivalent of Maximum Daily BOD Discharge ((F) x 5.88) No. of people (I) | Population Equivalent of Average Daily BOD Discharge ((G) x 5.88) No. of people (J) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| BOD | (1) | 35 | 600 | 565 | 411 | 376 | 5183 | 3449 | Poor | 30,476 | 20,280 |
| COD | (2) | 120 | 1280 | 1160 | 1131 | 1011 | 10642 | 9275 | Poor | | |
| TS | (3) | 332 | 2090 | 1758 | 1393 | 1061 | 16128 | 9734 | Poor | | |
| TDS | (4) | 284 | 1010 | 726 | 964 | 680 | 6660 | 6238 | Poor | | |
| TSS | (5) | 48 | 1080 | 1032 | 429 | 381 | 9467 | 3495 | Poor | | |
| TOC | (6) | 45.5 | | | 167.5 | 122 | | 1119 | Poor | | |
| Sulfate | (7) | 10.0 | | | 42.0 | 32 | | 293 | Poor | | |
| Sulfide | (8) | 0.4 | --- | | 18.9 | 18.5 | | 170 | Poor | | |
| Aluminum | (9) | (909) | | | (9700) | (8791) | | 80.6 | Poor | | |

SPECIAL NOTES AND REMARKS

BOD - 5-day biochemical oxygen demand. COD - chemical oxygen demand. TS - Total solids. TDS - Total dissolved solids. TSS - total suspended solids

*Concentrations in parentheses are in micrograms per liter (parts per billion) rather than milligrams per liter (parts per million)

** "Good" indicates applicant uses continuous sampling and standard method of analysis

"Fair" indicates applicant uses daily composite sampling and standard method of analysis

"Poor" indicates applicant uses average grab samples and/or non-standard method of analysis or computes on less than daily basis

*** at maximum flow

§ at average flow

NOTE: In order to show what this outfall adds to the receiving waters, the intake water concentrations are subtracted from discharge concentrations in calculating the maximum and average concentrations (columns (C) and (E)) and the maximum and average pounds per day (columns (F) and (G)).

552173

FACILITY: Appleton Papers, Inc. APPLICATION NO.: 2720289 OUTFALL NO.: 002 (continued)

## TABLE 2b

| Max. ΔT (Summer °F.) | BTU/hr x $10^9$*** |
|---|---|
| Av. ΔT (Winter °F.) | BTU/hr x $10^9$§ |
| Aver. Flow (MGD) | x 8.34 = C.F |
| Max. Summer Temp (°F.) | |
| Av. pH | |

| PARAMETER | Row Number | Average Intake Concentration of Untreated Water Reported on Corps Form 4345-1 (µg/l)* mg/l (A) | Maximum Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (B) | Maximum Daily Concentration Added by This Discharge ((B) - (A)) (µg/l)* mg/l (C) | Average Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (D) | Average Daily Concentration Added by This Discharge ((D) - (A)) (µg/l)* mg/l (E) | Maximum Pounds per Day Discharged ((C) x C.F.) lbs/day (F) | Average Pounds per Day Discharged ((E) x C.F.) lbs/day (G) | Adequacy and Reliability of Discharge Sampling, Monitoring, Frequency and Analysis (see Note **) (H) | Population Equivalent of Maximum Daily BOD Discharge ((F) x 5.88) No. of people (I) | Population Equivalent of Average Daily BOD Discharge ((G) x 5.88) No. of people (J) | SPECIAL NOTES AND REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Iron | (1) | (583) | | | (3100) | (2517) | | 23.1 | Poor | | | |
| Titanium | (2) | (260) | | | (650) | (390) | | 3.6 | Poor | | | |
| Oil and Grease | (3) | 0 | | | 33.3 | 33.3 | | 305 | Poor | | | |
| Color | (4) | 40 | | | 60 | 20 | | | Poor | | | (Platinum cobalt units) |
| Turbidity | (5) | 9 | | | 32 | 23 | | | Poor | | | (Jackson units) |
| | (6) | | | | | | | | | | | |
| | (7) | | | | | | | | | | | |
| | (8) | | | | | | | | | | | |
| | (9) | | | | | | | | | | | |

BOD - 5-day biochemical oxygen demand. COD - chemical oxygen demand. TS - Total solids. TDS - Total dissolved solids. TSS - total suspended solids

*Concentrations in parentheses are in micrograms per liter (parts per billion) rather than milligrams per liter (parts per million)

** "Good" indicates applicant uses continuous sampling and standard method of analysis

"Fair" indicates applicant uses daily composite sampling and standard method of analysis

"Poor" indicates applicant uses average grab samples and/or non-standard method of analysis or composites on less than daily basis

*** at maximum flow

§ at average flow

NOTE: In order to show what this outfall adds to the receiving waters, the intake water concentrations are subtracted from discharge concentrations in calculating the maximum and average concentrations (columns (C) and (E)) and the maximum and average pounds per day (columns (F) and (G)).

552174

## TABLE 3a

FACILITY: Appleton Papers, Inc.  APPLICATION NO.: 2720289  OUTFALL NO.: 003

| Max. ΔT (Summer °F.) | BTU/hr x $10^9$ *** |
| --- | --- |
| 12 | 0.005 |
| **Av. ΔT (Winter °F.)** | **BTU/hr x $10^9$ §** |
| 17 | 0.006 |
| **Aver. Flow (MGD)** | **x 8.34 = C.F** |
| 0.6 | 5.00 |
| **Max. Summer Temp (°F.)** | 90 |
| **Av. pH** | 7.5 |

| PARAMETER | Row Number | Average Intake Concentration of Untreated Water Reported on Corps Form 4345-1 (µg/l)* mg/l (A) | Maximum Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (B) | Maximum Daily Concentration Added by This Discharge ((B) - (A)) (µg/l)* mg/l (C) | Average Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (D) | Average Daily Concentration Added by This Discharge ((D) - (A)) (µg/l)* mg/l (E) | Maximum Pounds per Day Discharged ((C) x C.F.) lbs/day (F) | Average Pounds per Day Discharged ((E) x C.F.) lbs/day (G) | Adequacy and Reliability of Discharge Sampling, Monitoring, Frequency and Analysis (see Note **) (H) | Population Equivalent of Maximum Daily BOD Discharge ((F) x 5.88) No. of people (I) | Population Equivalent of Average Daily BOD Discharge ((G) x 5.88) No. of people (J) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| BOD | (1) | 35 | 240 | 205 | 47 | 12 | 1025 | 60 | Poor | 6027 | 353 |
| COD | (2) | 120 | 420 | 300 | 333 | 213 | 1500 | 1065 | Poor | | |
| TS | (3) | 332 | 1336 | 1004 | 704 | 372 | 5020 | 1860 | Poor | | |
| TDS | (4) | 284 | 780 | 496 | 536 | 252 | 2480 | 1260 | Poor | | |
| TSS | (5) | 48 | 556 | 508 | 168 | 120 | 2540 | 600 | Poor | | |
| TOC | (6) | 45.5 | | | 70.5 | 25 | | 125 | Poor | | |
| Sulfate | (7) | 10.0 | | | 73.0 | 63 | | 315 | Poor | | |
| Sulfide | (8) | 0.4 | ... | | 1.0 | 0.6 | | 3 | Poor | | |
| Aluminum | (9) | (909) | | | (15000) | (14091) | | 70 | Poor | | |

SPECIAL NOTES AND REMARKS

BOD - 5-day biochemical oxygen demand. COD - chemical oxygen demand. TS - Total solids. TDS - Total dissolved solids. TSS - total suspended solids

*Concentrations in parentheses are in micrograms per liter (parts per billion) rather than milligrams per liter (parts per million)

** "Good" indicates applicant uses continuous sampling and standard method of analysis
"Fair" indicates applicant uses daily composite sampling and standard method of analysis
"Poor" indicates applicant uses average grab samples and/or non-standard method of analysis or composites on less than daily basis

*** at maximum flow
§ at average flow

NOTE: In order to show what this outfall adds to the receiving waters, the intake water concentrations are subtracted from discharge concentrations in calculating the maximum and average concentrations (columns (C) and (E)) and the maximum and average pounds per day (columns (F) and (G)).

552175

FACILITY: Appleton Papers, Inc. APPLICATION NO.: 2720289 OUTFALL NO.: 003 (continued)

## TABLE 3b[1]

| Max. ΔT (Summer °F.) | BTU/hr x 10[9]*** |
|---|---|
| Av. ΔT (Winter °F.) | BTU/hr x 10[9]§ |
| Aver. Flow (MGD) | x 3.34 = C.F. |
| Max. Summer Temp (°F.) | |

| PARAMETER | Row Number | Average Intake Concentration of Untreated Water Reported on Corps Form 4345-1 (µg/l)* mg/l (A) | Maximum Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (B) | Maximum Daily Concentration Added by This Discharge ((B) - (A)) (µg/l)* mg/l (C) | Average Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (D) | Average Daily Concentration Added by This Discharge ((D) - (A)) (µg/l)* mg/l (E) | Maximum Pounds per Day Discharged ((C) x C.F.) lbs/day (F) | Average Pounds per Day Discharged ((E) x C.F.) lbs/day (G) | Adequacy and Reliability of Discharge Sampling, Monitoring, Frequency and Analysis (see Note **) (H) | Population Equivalent of Maximum Daily BOD Discharge ((F) x 5.88) No. of people (I) | Population Equivalent of Average Daily BOD Discharge ((G) x 5.88) No. of people (J) | Av. pH / SPECIAL NOTES AND REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Iron | (1) | (583) | | | (1200) | (617) | | 3 | Poor | | | |
| Titanium | (2) | (260) | | | (7180) | (6920) | | 34.6 | Poor | | | |
| Color | (3) | 40 | | | 60 | 20 | | | Poor | | | (Platinum cobalt units) |
| Turbidity | (4) | 9 | | | 32 | 23 | | | Poor | | | (Jackson units) |
| | (5) | | | | | | | | | | | |
| | (6) | | | | | | | | | | | |
| | (7) | | | | | | | | | | | |
| | (8) | | | | | | | | | | | |
| | (9) | | | | | | | | | | | |

BOD - 5-day biochemical oxygen demand. COD - chemical oxygen demand. TS - Total solids. TDS - Total dissolved solids. TSS - total suspended solids

*Concentrations in parentheses are in micrograms per liter (parts per billion) rather than milligrams per liter (parts per million)

** "Good" indicates applicant uses continuous sampling and standard method of analysis
"Fair" indicates applicant uses daily composite sampling and standard method of analysis
"Poor" indicates applicant uses average grab samples and/or non-standard method of analysis or composites on less than daily basis

*** at maximum flow
§ at average flow

NOTE: In order to show what this outfall adds to the receiving waters, the intake water concentrations are subtracted from discharge concentrations in calculating the maximum and average concentrations (columns (C) and (E)) and the maximum and average pounds per day (columns (F) and (G)).

552176

## TABLE 4

FACILITY: Appleton Papers, Inc. APPLICATION NO.: 2720289 OUTFALL NO.: 004

| Max. ΔT (Summer °F.) | BTU/hr x [illegible] | Av. ΔT (Winter °F.) | BTU/hr x [illegible] | Aver. Flow (MGD) | x 8.34 = C.F. | Max. Summer Temp (°F.) | Av. pH |
|---|---|---|---|---|---|---|---|
| 11 | 0.001 | 4 | 0.0002 | 0.12 | 1.00 | 59 | 7.3 |

| PARAMETER | Row Number | Average Intake Concentration of Untreated Water Reported on Corps Form 4345-1 (µg/l)* mg/l (A) | Maximum Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (B) | Maximum Daily Concentration Added by This Discharge ((B) - (A)) (µg/l)* mg/l (C) | Average Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (D) | Average Daily Concentration Added by This Discharge ((D) - (A)) (µg/l)* mg/l (E) | Maximum Pounds per Day Discharged ((C) x C.F.) lbs/day (F) | Average Pounds per Day Discharged ((E) x C.F.) lbs/day (G) | Adequacy and Reliability of Discharge Sampling, Monitoring, Frequency and Analysis (see Note **) (H) | Population Equivalent of Maximum Daily BOD Discharge ((F) x 5.88) No. of people (I) | Population Equivalent of Average Daily BOD Discharge ((G) x 5.88) No. of people (J) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BOD | (1) | 35 | 60 | 25 | 55 | 20 | 25 | 20 | Poor | 147 | 118 |
| COD | (2) | 120 | 310 | 190 | 176 | 56 | 190 | 56 | Poor. | | |
| TS | (3) | 332 | 4140 | 3808 | 1880 | 1548 | 3808 | 1548 | Poor | | |
| TDS | (4) | 284 | 340 | 56 | 240 | -44 | 56 | -44 | Poor | | |
| TSS | (5) | 48 | 3800 | 3752 | 1600 | 1552 | 3752 | 1552 | Poor | | |
| TOC | (6) | 45.5 | | | 170.0 | 124.5 | | 125 | Poor | | |
| Color | (7) | 40 | 150 | 110 | 80 | 40 | | | Poor | (Platinum cobalt units) | |
| Turbidity | (8) | 9 | --- | | 205 | 196 | | | Poor | (Jackson units) | |
| | (9) | | | | | | | | | | |

SPECIAL NOTES AND REMARKS

BOD - 5-day biochemical oxygen demand. COD - chemical oxygen demand. TS - Total solids. TDS - Total dissolved solids. TSS - total suspended solids

*Concentrations in parentheses are in micrograms per liter (parts per billion) rather than milligrams per liter (parts per million)

** "Good" indicates applicant uses continuous sampling and standard method of analysis
"Fair" indicates applicant uses daily composite sampling and standard method of analysis
"Poor" indicates applicant uses average grab samples and/or non-standard method of analysis or composites on less than daily basis

*** at maximum flow
§ at average flow

NOTE: In order to show what this outfall adds to the receiving waters, the intake water concentrations are subtracted from discharge concentrations in calculating the maximum and average concentrations (columns (C) and (E)) and the maximum and average pounds per day (columns (F) and (G)).

552177

FACILITY: Appleton Papers, Inc. APPLICATION NO.: 2720289 OUTFALL NO.: 005

| Max. $\Delta$ T (Summer °F.) | BTU/hr x $10^9$*** |
|---|---|
| 20 | 0.019 |
| Av. $\Delta$ T (Winter °F.) | BTU/hr x $10^9$§ |
| 17 | 0.013 |
| Aver. Flow (MGD) x 8.34 = C.F | |
| 2.3 | 19.18 |
| Max. Summer Temp (°F.) | Av. pH |
| 98 | 7.2 |

## TABLE 5a

| PARAMETER | Row Number | Average Intake Concentration of Untreated Water Reported on Corps Form 4345-1 (µg/l)* mg/l (A) | Maximum Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (B) | Maximum Daily Concentration Added by This Discharge ((B) - (A)) (µg/l)* mg/l (C) | Average Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (D) | Average Daily Concentration Added by This Discharge ((D) - (A)) (µg/l)* mg/l (E) | Maximum Pounds per Day Discharged ((C) x C.F.) lbs/day (F) | Average Pounds per Day Discharged ((E) x C.F.) lbs/day (G) | Adequacy and Reliability of Discharge Sampling, Monitoring, Frequency and Analysis (see Note **) (H) | Population Equivalent of Maximum Daily BOD Discharge ((F) x 5.88) No. of people (I) | Population Equivalent of Average Daily BOD Discharge ((G) x 5.88) No. of people (J) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BOD | (1) | 35 | 400 | 365 | 237 | 202 | 7001 | 3875 | Poor | 41165 | 22765 |
| COD | (2) | 120 | 2800 | 2680 | 1073 | 953 | 51407 | 18280 | Poor | | |
| TS | (3) | 332 | 3000 | 2668 | 1751 | 1419 | 51177 | 27219 | Poor | | |
| TDS | (4) | 284 | 900 | 616 | 563 | 279 | 11814 | 5351 | Poor | | |
| TSS | (5) | 48 | 2100 | 2052 | 1188 | 1140 | 39357 | 21865 | Poor | | |
| TOC | (6) | 45.5 | | | 55.3 | 9.8 | | 1[illegible] | Poor | | |
| Sulfate | (7) | 10.0 | | | 96.0 | 86 | | 1649 | Poor | | |
| Sulfide | (8) | 0.4 | | | 0.8 | 0.4 | | 7.7 | Poor | | |
| Aluminum | (9) | (909) | | | (71000) | (70091) | | 1344 | Poor | | |

SPECIAL NOTES AND REMARKS

BOD - 5-day biochemical oxygen demand. COD - chemical oxygen demand. TS - Total solids. TDS - Total dissolved solids. TSS - total suspended solids

*Concentrations in parentheses are in micrograms per liter (parts per billion) rather than milligrams per liter (parts per million)

**"Good" indicates applicant uses continuous sampling and standard method of analysis

"Fair" indicates applicant uses daily composite sampling and standard method of analysis

"Poor" indicates applicant uses average grab samples and/or non-standard method of analysis or composites on less than daily basis

*** at maximum flow

§ at average flow

NOTE: In order to show what this outfall adds to the receiving waters, the intake water concentrations are subtracted from discharge concentrations in calculating the maximum and average concentrations (columns (C) and (E)) and the maximum and average pounds per day (columns (F) and (G)).

552178

TABLE 5b

FACILITY: Appleton Papers, Inc. APPLICATION NO.: 2720289 OUTFALL NO.: 005 (continued)

| Max. Δ T (Summer °F.) | BTU/hr x 10[9] *** |
|---|---|
| Av. Δ T (Winter °F.) | BTU/hr x 10[9] $ |
| Aver. Flow (MGD) | x 8.34 = C.F |
| Max. Summer Temp (°F.) | |
| Av. pH | |

| PARAMETER | Row Number | Average Intake Concentration of Untreated Water Reported on Corps Form 4345-1 (µg/l)* mg/l (A) | Maximum Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (B) | Maximum Daily Concentration Added by This Discharge ((B) - (A)) (µg/l)* mg/l (C) | Average Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (D) | Average Daily Concentration Added by This Discharge ((D) - (A)) (µg/l)* mg/l (E) | Maximum Pounds per Day Discharged ((C) x C.F.) lbs/day (F) | Average Pounds per Day Discharged ((E) x C.F.) lbs/day (G) | Adequacy and Reliability of Discharge Sampling, Monitoring, Frequency and Analysis (see Note **) (H) | Population Equivalent of Maximum Daily BOD Discharge ((F) x 5.88) No. of people (I) | Population Equivalent of Average Daily BOD Discharge ((G) x 5.88) No. of people (J) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Copper | (1) | (0) | | | (89) | (89) | | 1.7 | Poor | | |
| Iron | (2) | (583) | | | (3600) | (3017) | | 57.9 | Poor | | |
| Titanium | (3) | (260) | | | (34130) | (33870) | | 6 | Poor | | |
| Zinc | (4) | (24) | | | (140) | (116) | | 2.2 | Poor | | |
| Oil & Grease | (5) | 0 | | | 32.3 | 32.3 | | 619.5 | Poor | | |
| Color | (6) | 40 | | | 55 | 15 | | | Poor | (Platinum cobalt units) | |
| Turbidity | (7) | 9 | | | 24 | 15 | | | Poor | (Jackson units) | |
| | (8) | | -- | | | | | | | | |
| | (9) | | | | | | | | | | |

SPECIAL NOTES AND REMARKS

BOD - 5-day biochemical oxygen demand. COD - chemical oxygen demand. TS - Total solids. TDS - Total dissolved solids. TSS - total suspended solids

*Concentrations in parentheses are in micrograms per liter (parts per billion) rather than milligrams per liter (parts per million)

** "Good" indicates applicant uses continuous sampling and standard method of analysis

"Fair" indicates applicant uses daily composite sampling and standard method of analysis

*** at maximum flow

$ at average flow



NOTE: In order to show what this outfall adds to the receiving waters, the intake water concentrations are subtracted from discharge concentrations in calculating the maximum and average concentrations (columns (C) and (E)) and the maximum and average pounds per day (columns (F) and (G)).

552179

TABLE 6a

FACILITY: Appleton Papers, Inc. APPLICATION NO.: 2720289 OUTFALL NO.: 006

| Max. Δ T (Summer °F.) | BTU/hr × 10[9]*** |
|---|---|
| 7 | 0.001 |
| **Av. Δ T (Winter °F.)** | **BTU/hr × 10[§]** |
| 7 | 0.001 |
| **Aver. Flow (MGD)** | **× 8.34 = C.F** |
| 0.44 | 3.669 |
| **Max. Summer Temp (°F.)** | |
| 85 | |
| **Av. pH** | |
| 7.2 | |

| PARAMETER | Row Number | Average Intake Concentration of Untreated Water Reported on Corps Form 4345-1 (µg/l)* mg/l (A) | Maximum Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (B) | Maximum Daily Concentration Added by This Discharge ((B) - (A)) (µg/l)* mg/l (C) | Average Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (D) | Average Daily Concentration Added by This Discharge ((D) - (A)) (µg/l)* mg/l (E) | Maximum Pounds per Day Discharged ((C) × C.F.) lbs/day (F) | Average Pounds per Day Discharged ((E) × C.F.) lbs/day (G) | Adequacy and Reliability of Discharge Sampling, Monitoring, Frequency and Analysis (see Note **) (H) | Population Equivalent of Maximum Daily BOD Discharge ((F) × 5.88) No. of people (I) | Population Equivalent of Average Daily BOD Discharge ((G) × 5.88) No. of people (J) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BOD | (1) | 35 | 200 | 165 | 43 | 8 | 605 | 29 | Poor | 3557 | 171 |
| COD | (2) | 120 | 360 | 240 | 242 | 122 | 880 | 447 | Poor | | |
| TS | (3) | 332 | 1350 | 1018 | 582 | 250 | 3735 | 917 | Poor | | |
| TDS | (4) | 284 | 600 | 316 | 330 | 46 | 1159 | 169 | Poor | | |
| TSS | (5) | 48 | 750 | 702 | 252 | 204 | 2576 | 748 | Poor | | |
| Sulfate | (6) | 10 | | | 21 | 11 | | 40.4 | Poor | | |
| Aluminum | (7) | (909) | | | (10000) | (9091) | | 33.3 | Poor | | |
| Iron | (8) | (583) | | | (1000) | (417) | | 1.5 | Poor | | |
| Magnesium | (9) | 20 | | | 36 | 16 | | 59 | Poor | | |

SPECIAL NOTES AND REMARKS

BOD - 5-day biochemical oxygen demand. COD - chemical oxygen demand. TS - Total solids. TDS - Total dissolved solids. TSS - total suspended solids

*Concentrations in parentheses are in micrograms per liter (parts per billion) rather than milligrams per liter (parts per million)

** "Good" indicates applicant uses continuous sampling and standard method of analysis
"Fair" indicates applicant uses daily composite sampling and standard method of analysis
"Poor" indicates applicant uses average grab samples and/or non-standard method of analysis or composites on less than daily basis

*** at maximum flow

§ at average flow

NOTE: In order to show what this outfall adds to the receiving waters, the intake water concentrations are subtracted from discharge concentrations in calculating the maximum and average concentrations (columns (C) and (E)) and the maximum and average pounds per day (columns (F) and (G)).

352180

## TABLE 6b

FACILITY: Appleton Papers, Inc. APPLICATION NO.: 2720289 OUTFALL NO.: 006 (continued)

| Max. ΔT (Summer °F.) | BTU/hr x 10^9*** |
|---|---|
| Av. ΔT (Winter °F.) | BTU/hr x 10^9§ |
| Aver. Flow (MGD) x 8.34 • C.F | |
| Max. Summer Temp (°F.) | |
| Av. pH | |

| PARAMETER | Row Number | Average Intake Concentration of Untreated Water Reported on Corps Form 4345-1 (μg/l)* mg/l (A) | Maximum Daily Concentration Reported on Corps Form 4345-1 (μg/l)* mg/l (B) | Maximum Daily Concentration Added by This Discharge ((B) - (A)) (μg/l)* mg/l (C) | Average Daily Concentration Reported on Corps Form 4345-1 (μg/l)* mg/l (D) | Average Daily Concentration Added by This Discharge ((D) - (A)) (μg/l)* mg/l (E) | Maximum Pounds per Day Discharged ((C) x C.F.) lbs/day (F) | Average Pounds per Day Discharged ((E) x C.F.) lbs/day (G) | Adequacy and Reliability of Discharge Sampling, Monitoring, Frequency and Analysis (see Note **) (H) | Population Equivalent of Maximum Daily BOD Discharge ((F) x 5.88) No. of people (I) | Population Equivalent of Average Daily BOD Discharge ((G) x 5.88) No. of people (J) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Titanium | (1) | (260) | | | (13100) | (12840) | | 47.1 | Poor | | |
| Oil & Grease | (2) | 0 | | | 21.5 | 21.5 | | 79 | Poor | | |
| Color | (3) | 40 | | | 22 | -18 | | | Poor | | |
| Turbidity | (4) | 9 | | | 442 | 433 | | | Poor | | |
| | (5) | | | | | | | | | | |
| | (6) | | | | | | | | | | |
| | (7) | | | | | | | | | | |
| | (8) | | | | | | | | | | |
| | (9) | | | | | | | | | | |

SPECIAL NOTES AND REMARKS

(Platinum cobalt units)

(Jackson units)

BOD - 5-day biochemical oxygen demand, COD - chemical oxygen demand, TS - Total solids, TDS - Total dissolved solids, TSS - total suspended solids

*Concentrations in parentheses are in micrograms per liter (parts per billion) rather than milligrams per liter (parts per million)

** "Good" indicates applicant uses continuous sampling and standard method of analysis

*** at maximum flow

§ at average flow

NOTE: In order to show what this outfall adds to the receiving waters, the intake water concentrations are subtracted from discharge concentrations in calculating the maximum and average concentrations (columns (C) and (E)) and the maximum and average pounds per day (columns (F) and (G)).

552181

FACILITY: Appleton Papers, Inc. APPLICATION NO.: 2720239 OUTFALL NO.: 007

| Max. $\Delta$ T (Summer °F.) | BTU/hr x $10^9$*** |
|---|---|
| 54 | 0.06 |
| Av. $\Delta$ T (Winter °F.) | BTU/hr x $10^9$§ |
| -- | -- |
| Aver. Flow (MGD) | x 8.34 = C.F |
| 2.4 | 20.02 |
| Max. Summer Temp (°F.) | |
| 132 | |
| Av. pH | |
| 7.3 | |

| PARAMETER | Row Number | Average Intake Concentration of Untreated Water Reported on Corps Form 4345-1 (µg/l)* mg/l (A) | Maximum Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (B) | Maximum Daily Concentration Added by This Discharge ((B) - (A)) (µg/l)* mg/l (C) | Average Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (D) | Average Daily Concentration Added by This Discharge ((D) - (A)) (µg/l)* mg/l (E) | Maximum Pounds per Day Discharged ((C) x C.F.) lbs/day (F) | Average Pounds per Day Discharged ((E) x C.F.) lbs/day (G) | Adequacy and Reliability of Discharge Sampling, Monitoring, Frequency and Analysis (see Note **) (H) | Population Equivalent of Maximum Daily BOD Discharge ((F) x 5.88) No. of people (I) | Population Equivalent of Average Daily BOD Discharge ((G) x 5.88) No. of people (J) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BOD | (1) | 35 | 85 | 50 | 35 | 0 | 1000 | 0 | Poor | 5880 | 0 |
| COD | (2) | 120 | 250 | 130 | 120 | 0 | 2602 | 0 | Poor | | |
| TS | (3) | 332 | 1855 | 1523 | 332 | 0 | 30484 | 0 | Poor | | |
| TDS | (4) | 284 | 280 | -4 | 284 | 0 | -80 | 0 | Poor | | |
| TSS | (5) | 48 | 1575 | 1527 | 48 | 0 | 30570 | 0 | Poor. | | |
| | (6) | | | | | | | | | | |
| | (7) | | | | | | | | | | |
| | (8) | | | | | | | | | | |
| | (9) | | | | | | | | | | |

SPECIAL NOTES AND REMARKS

TABLE 7

BOD - 5-day biochemical oxygen demand. COD - chemical oxygen demand. TS - Total solids. TDS - Total dissolved solids. TSS - total suspended solids

*Concentrations in parentheses are in micrograms per liter (parts per billion) rather than milligrams per liter (parts per million)

** "Good" indicates applicant uses continuous sampling and standard method of analysis

"Fair" indicates applicant uses daily composite sampling and standard method of analysis

"Poor" indicates applicant uses average grab samples and/or non-standard method of analysis or composites on less than daily basis

*** at maximum flow

§ at average flow

NOTE: In order to show what this outfall adds to the receiving waters, the intake water concentrations are subtracted from discharge concentrations in calculating the maximum and average concentrations (columns (C) and (E)) and the maximum and average pounds per day (columns (F) and (G)).

52182

TABLE 8a

FACILITY: Appleton Papers, Inc. APPLICATION NO.: 2720239 OUTFALL NO.: 003

| Max. ΔT (Summer °F.) | BTU/hr x $10^9$*** |
|---|---|
| 44 | 0.023 |
| Av. ΔT (Winter °F.) | BTU/hr x $10^9$ § |
| 72 | 0.031 |
| Aver. Flow (MGD) | x 8.34 = C.F. |
| 1.25 | 10.43 |
| Max. Summer Temp (°F.) | 122 |
| Av. pH | 7.4 |

| PARAMETER | Row Number | Average Intake Concentration of Untreated Water Reported on Corps Form 4345-1 (µg/l)* mg/l (A) | Maximum Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (B) | Maximum Daily Concentration Added by This Discharge ((B) - (A)) (µg/l)* mg/l (C) | Average Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (D) | Average Daily Concentration Added by This Discharge ((D) - (A)) (µg/l)* mg/l (E) | Maximum Pounds per Day Discharged ((C) x C.F.) lbs/day (F) | Average Pounds per Day Discharged ((E) x C.F.) lbs/day (G) | Adequacy and Reliability of Discharge Sampling, Monitoring, Frequency and Analysis (see Note **) (H) | Population Equivalent of Maximum Daily BOD Discharge ((F) x 5.88) No. of people (I) | Population Equivalent of Average Daily BOD Discharge ((G) x 5.88) No. of people (J) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BOD | (1) | 35 | 2300 | 2265 | 990 | 955 | 23613 | 9956 | Poor | 138844 | 58541 |
| COD | (2) | 120 | 5500 | 5380 | 3450 | 3330 | 56086 | 34715 | Poor | | |
| TS | (3) | 332 | 7000 | 6668 | 3128 | 2796 | 69514 | 29148 | Poor | | |
| TDS | (4) | 284 | 4000 | 3716 | 1949 | 1665 | 38739 | 17357 | Poor | | |
| TSS | (5) | 48 | 3000 | 2952 | 1179 | 1131 | 30775 | 11790 | Poor | | |
| TOC | (6) | 45.5 | | | 750 | 704.5 | | 7344 | Poor | | |
| Sulfate | (7) | 10.0 | | | 79.5 | 69.5 | | 725 | Poor | | |
| Sulfide | (8) | 0.4 | --- | | 1.3 | 0.9 | | 9.4 | Poor | | |
| Oil & Grease | (9) | 0 | | | 26.6 | 26.6 | | 277 | Poor | | |

SPECIAL NOTES AND REMARKS

BOD - 5-day biochemical oxygen demand. COD - chemical oxygen demand. TS - Total solids. TDS - Total dissolved solids. TSS - total suspended solids

*Concentrations in parentheses are in micrograms per liter (parts per billion) rather than milligrams per liter (parts per million)

** "Good" indicates applicant uses continuous sampling and standard method of analysis

"Fair" indicates applicant uses daily composite sampling and standard method of analysis

"Poor" indicates applicant uses average grab samples and/or non-standard method of analysis or composites on less than daily basis

*** at maximum flow

§ at average flow

NOTE: In order to show what this outfall adds to the receiving waters, the intake water concentrations are subtracted from discharge concentrations in calculating the maximum and average concentrations (columns (C) and (E)) and the maximum and average pounds per day (columns (F) and (G)).

552183

FACILITY: Appleton Papers, Inc. APPLICATION NO.: 2720289 OUTFALL NO.: 008 (continued)

TABLE 8b

| Max. ΔT (Summer °F.) | BTU/hr × $10^6$*** |
|---|---|
| Av. ΔT (Winter °F.) | BTU/hr × $10^6$§ |
| Aver. Flow (MGD) | × 8.34 = C.F |
| Max. Summer Temp (°F.) | |
| Av. pH | |

| PARAMETER | Row Number | Average Intake Concentration of Untreated Water Reported on Corps Form 4345-1 (µg/l)* mg/l (A) | Maximum Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (B) | Maximum Daily Concentration Added by This Discharge ((B) - (A)) (µg/l)* mg/l (C) | Average Daily Concentration Reported on Corps Form 4345-1 (µg/l)* mg/l (D) | Average Daily Concentration Added by This Discharge ((D) - (A)) (µg/l)* mg/l (E) | Maximum Pounds per Day Discharged ((C) × C.F.) lbs/day (F) | Average Pounds per Day Discharged ((E) × C.F.) lbs/day (G) | Adequacy and Reliability of Discharge Sampling, Monitoring, Frequency and Analysis (See Note **) (H) | Population Equivalent of Maximum Daily BOD Discharge ((F) × 5.88) No. of people (I) | Population Equivalent of Average Daily BOD Discharge ((G) × 5.88) No. of people (J) | SPECIAL NOTES AND REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Phenols | (1) | (8) | | | (450) | (442) | | 4.6 | Poor | | | |
| Color | (2) | 40 | | | 900 | 860 | | | Poor | | | (Platinum cobalt units) |
| Turbidity | (3) | 9 | | | 408 | 399 | | | Poor | | | (Jackson units) |
| | (4) | | | | | | | | | | | |
| | (5) | | | | | | | | | | | |
| | (6) | | | | | | | | | | | |
| | (7) | | | | | | | | | | | |
| | (8) | | | | | | | | | | | |
| | (9) | | | | | | | | | | | |

BOD - 5-day biochemical oxygen demand. COD - chemical oxygen demand. TS - Total solids. TDS - Total dissolved solids. TSS - total suspended solids

*Concentrations in parentheses are in micrograms per liter (parts per billion) rather than milligrams per liter (parts per million)

** "Good" indicates applicant uses continuous sampling and standard method of analysis

"Fair" indicates applicant uses daily composite sampling and standard method of analysis

"Poor" indicates applicant uses average grab samples and/or non-standard method of analysis or composites on less than daily basis

*** at maximum flow

§ at average flow

NOTE: In order to show what this outfall adds to the receiving waters, the intake water concentrations are subtracted from discharge concentrations in calculating the maximum and average concentrations (columns (C) and (E)) and the maximum and average pounds per day (columns (F) and (G)).

552184

TABLE 9

Total of Outfalls 001 – 008

| Parameter | Average lbs/day | Maximum lbs/day |
|---|---|---|
| BOD | 17,394 | 38,492 |
| COD | 63,878 | 123,497 |
| TS | 71,984 | 183,814 |
| TOC | 9,026 | |
| Sulfates | 3,022 | |
| Aluminum | 1,528 | |
| Titanium | 735 | |
| Oil and Grease | 1,280 | |

(Source: Tables 1-8b)

TABL~ 10

| | Flow (GD) | BOD (lbs/day) | Total Suspended Solids (lbs/day) |
|---|---|---|---|
| 1952 | 2,800,000 | 3,180 | 25,920 |
| 1957 | 3,670,000 | 5,240 | 13,580 |
| 1962 | 3,270,000 | 8,540 | 23,600 |
| 1963 | 3,000,000 | 4,940 | 12,640 |
| 1964 | 3,150,000 | 9,880 | 16,520 |
| 1965 | 2,980,000 | 4,200 | 12,880 |
| 1966 | 3,050,000 | 5,660 | 10,600 |
| 1967 | 3,200,000 | 4,600 | 18,100 |
| 1968 | 2,396,000 | 4,620 | 18,100 |
| 1970 * | 5,070,000 | 16,180 | 27,982 |
| 1971-State of Wisconsin | 5,167,000 | 16,288 | 27,982 |
| 1971-Corps Application | 8,330,000 | 20,200 | 44,381 |

(Source: 1952-1970 data: Company reports to DNR; 1971 - State of Wisconsin: 25 )

* No 1969 report available.

552185

## BIBLIOGRAPHY


1. Appleton Papers Inc. - Comments Pursuant to Public Notice No. 2720289 of the Army Corps of Engineers. (BPI-2720289. Chicago, Illinois. Businessmen for the Public Interest, December 10, 1971.)

2. Application No. 2720289 for Permit to Discharge or Work in Navigable Waters and Their Tributaries. Filed by Appleton Papers, Inc., with U.S. Dept. of Army, Corps of Engineers, Chicago District Office, October 15, 1971.

3. Water Pollution Problems of Lake Michigan and Tributaries.. (U.S. Department of the Interior, Federal Water Pollution Control Administration, Great Lakes Region, Chicago, Illinois, January 1968.)

4. A Comprehensive Water Pollution Control Program For The Lake Michigan Basin: Green Bay Area (U.S. Department of the Interior, Federal Water Pollution Control Administration, Great Lakes Region, Chicago, Illinois, June 1966.)

5. Physical And Chemical Quality Conditions: Water Quality Investigations Lake Michigan Basin. (U.S. Department of the Interior, Federal Water Pollution Control Administration, Great Lakes Region, Chicago, Illinois, January 1968.)

6. R. P. Howmiller and A. M. Beeton, "Biological Evaluation of Environmental Quality, Green Bay, Lake Michigan", Journal Water Pollution Control Federation, Vol. 43, No. 1 (January 1971) pp. 123-133.

7. Richard F. Modlin and A. M. Beeton, "Dispersal of Fox River Water in Green Bay, Lake Michigan", Proceedings From the 13th Conference Of Great Lake Research, 1970, pp. 468-476.

8. Richard P. Howmiller and A. M. Beeton, "The Oligochaete Fauna Of Green Bay, Lake Michigan", Proceedings From The 13th Conference Of Great Lake Research, 1970, pp. 15-46.

9. David N. Edgington and Edward Callender, "Minor Element Geochemistry Of Lake Michigan Ferromanganese Nodules," Earth and Planetary Science Letters 8, (1970), pp. 97-100.

10. Report On An Investigation Of The Pollution In The Wolf River Drainage Basin Made During 1963 And Early In 1964, (Wisconsin Department of Natural Resources, August 19, 1964.)

11. Report On An Investigation Of The Pollution In The Upper Fox River Basin Made During 1966 And Early 1967. (Department of Natural Resources, Division of Resource Development, Madison, Wisconsin, November 29, 1967.)

12. Report On An Investigation Of The Pollution In The Lower Fox River And Green Bay Made During 1966 and 1967. (Department of Natural Resources, Division of Resource Development, Madison, Wisconsin, January 4, 1968.)

13. Investigation Of Alleged Pollution Of The Surface Waters In The Lower Fox River Basin Downstream From Lake Winnebago In Brown, Calumet, Outagamie And Winnebago Counties, Wisconsin And In Green Bay. (Hearing held Before the Division of Resource Development, Department of Natural Resources, Vols. 1-5, January 1968.)

14. STOP Report On Wisconsin Paper And Pulp Mills. (State of Wisconsin, Department of Justice, 1971.)

15. Letter to Mr. Freeman Holmer, Director, Wisconsin Department of Resources Development, from R. A. Vogt, Combined Paper Mills, Inc. (dated January 30, 1968).


552186

16. Letter to Mr. O. J. Muegge, State Sanitary Engineer, State Office Building, Madison, Wisconsin 53702, from Theodore F. Wisniewski, Director, Division of Water Pollution Control, Madison, Wisconsin, (dated March 5, 1965).

17. Letter to Mr. O. J. Muegge, State Sanitary Engineer, P.O. Box 309, Madison, Wisconsin 53701, from Theodore F. Wisniewski, Director, Division of Water Pollution Control (dated March 4, 1966).

18. Report On A Wastewater Survey At Combined Paper Mills, Inc., Combined Locks, Wisconsin, November 28 Through December 1, 1966, Inclusive, Submitted by Carl J. Blabaum, Public Health Engineer, Department of Resource Development, Madison, Wisconsin 53702 (dated March 6, 1967).

19. Report On A Wastewater Survey At Combined Paper Mills, Inc., Combined Locks, Wisconsin, January 15 Through 20, 1968, Inclusive, Submitted by Carl J. Blabaum, Chief, Waste Treatment Section (dated April 2, 1968), State of Wisconsin, Department of Natural Resources, Division of Resource Development.

20. Proceedings Of The Conference On The Matter Of Pollution Of The Interstate Waters Of The Grand Calumet River, Little Calumet River, Calumet River, Wolf Lake, Lake Michigan and Their Tributaries. (U.S. Department of Health, Education, And Welfare, March 2-9, 1965).

21. Proceedings Of The Conference On Pollution Of Lake Michigan And Its Tributary Basin. (U.S. Department of the Interior, Federal Water Pollution Control Administration, Chicago, Illinois, January 31, February 1-2, February 5-7, 1968, Executive Session, March 7, 8 and 12, 1968).

22. E. F. Stoermer and J. J. Yang, Plankton Diatom Assemblages In Lake Michigan. (Special Report No. 47 of the Great Lakes Research Division, The University of Michigan, Ann Arbor, Michigan 1969.)

23. Eugene F. Stoermer and Jing J. Yang, Distribution And Relative Abundance Of Dominant Plankton Diatoms In Lake Michigan. (Great Lakes Research Division, Publication No. 16, The University of Michigan, Ann Arbor, Michigan 1970.)

24. Letter from William Ruckelshaus, Administrator, U.S. Environmental Protection Agency, to Francis Mayo, Regional Administrator, Region V, U.S. Environmental Protection Agency, dated March 23, 1971.

25. Report On A Wastewater Survey At Combined Paper Mills, Inc. Combined Locks, Wisconsin, February 22 Through 27, 1971, Inclusive. Submitted by Paul P. Didier, Chief, Industrial Wastewater Section, State of Wisconsin, Department of Natural Resources (dated April 30, 1971).

26. Letter to Mr. Donald Arps, Supervisor of Environmental Control Combined Paper Mills, Inc., Combined Locks, Wisconsin, 54113, from Paul P. Didier, P.E. Chief, Industrial Wastewater Section, State of Wisconsin, Department of Natural Resources (dated May 6, 1971).

27. Engineering Study and Report, Waste Treatment Plant, Project No. 69-0421, (February, 1971), Combined Paper Mills, Inc., Locks Mill, Combined Locks, Wisconsin, (S. J. Baisch Associates, Inc., Consulting Engineers, 809 Hyland Avenue, Kaukauna, Wisconsin).

28. Letter to Mr. Paul P. Didier, P.E. Chief, Industrial Wastewater Section, Department of Natural Resources, State of Wisconsin, Box 450, Madison, Wisconsin 53701 from Reinhold A. Vogt, President, Combined Paper Mills, Inc., Combined Locks, Wisconsin 54113 (dated May 21, 1971).

29. Letter to Mr. Reinhold A. Vogt, Combined Paper Mills, Inc., Combined Locks, Wisconsin 54113 from Paul P. Didier, P.E. Chief, Industrial Wastewater Section State of Wisconsin, Department of Natural Resources (dated February 23, 1971).

552187

30. Letter to Mr. Carl J. Blabaum, Department of Natural Resources, P.O. Box 450, Madison, Wisconsin 53701 from Wayne D. Stephenson, Combined Paper Mills, Inc., Locks Mill, (dated January 15, 1971).

31. "Notice of Proposed Final Draft R70-8," Newsletter #36, Illinois Pollution Control Board, December 1971.

32. Memorandum in Support of Motion for Summary Judgment of Dismissal, filed on behalf of, among others, the officers of the Corps of Engineers in charge of the Refuse Act Permit Program and the Administrator and Regional Director of the Environmental Protection Agency, in Businessmen for the Public Interest, et al. v. Stanley R. Resor, et al., No. 71 C 894 in the United States District Court for the Northern District of Illinois, Eastern Division.

33. The Cost Of Clean Water, Volume III: Industrial Waste Profile No. 3 - Paper Mills. (U.S. Department of the Interior, Federal Water Pollution Control Administration, 1967).

34. Order No. 4B-68-11a-8A, dated December 16, 1969 from Department of Natural Resources, State of Wisconsin, to Combined Paper Mills, Inc., Combined Locks.

552188