**APPLETON PAPERS, INC.**
A subsidiary of NCR
COMBINED LOCKS, WIS. 54113 414-788-3551 TWX 910-270-1200

MILLS
APPLETON, WIS.
COMBINED LOCKS, WIS.
ROARING SPRING, PA.

April 13, 1972

Mr. Alexander Polikoff
Executive Director
Mr. David Dinsmore Comey
Director, Environmental Research
BUSINESSMEN FOR THE PUBLIC INTEREST
109 North Dearborn, Suite 1001
Chicago, Illinois 60602

Gentlemen:

Colonel Richard M. Wells, District Engineer of the Corps of Engineers has advised that we provide appropriate comments to you regarding our permit application No. 2720289.

For easy reference, response to your comments submitted to the District Engineer concerning Public Notice No. 2720289 will follow your general outline.

Introduction - page 3:

You review environmental considerations. We do not dispute that the Fox River is polluted. On page 6 you quote from page 16, reference 12 (Report on an Investigation of the Pollution in the Lower Fox River and Green Bay made during 1966 and 1967, Department of Natural Resources, Madison, Wis., Jan. 4, 1968) and state, "the Fox River is so grossly polluted below Combined Locks---", but you do not mention the biological complex of the river area <u>above</u> Combined Locks as detailed on pages 14 and 15 of that report.

Second Part of your Introduction, pages 7 & 8, entitled "Relevant Legal Background":

Under "A" you refer to the section 4331 (b)(3) and (6) of the National Environmental Policy Act and conclude that "the regulation must be interpreted and administered in such a fashion as to avoid degradation and enhance the quality of the environment . . ".

The U. S. District Court, Northern District of Illinois, Eastern Division, in "Businessmen for the Public Interest v Resor" (3ERC p. 1221) said, "The high-minded fulsomely stated environmental goals set forth as the national policy are not legislation in the traditional sense."

B. The Best Available Technology Standard. In the same case above, the U. S. District Court ruled that the Refuse Act Permit Program regulations requiring compliance with water quality standards rather than "best technology" standards do not constitute abuse of discretion. (3ERC p. 1216).

A

Mr. Polikoff
Mr. Comey
April 13, 1972

There are several inaccuracies in the first paragraph of Section A, General Description, page 9, but they have no bearing on the permit application.

The value of 9.98 MGD river water intake is correct in the 3rd paragraph of Part A, but the discharge value is not. Question 14 on page 2, Section I of Eng. Form 4345 of the permit application lists the following effluents:

| | |
|---|---|
| Cooling Water | 3.50 MGD |
| Boiler Feed Water | .07 " |
| Process Water | 5.86 " |
| Sanitary System | .01 " |
| This totals | 9.44 MGD |

The difference between 9.98 and 9.44 would be the amount of water evaporated in the paper machine drying sections and expelled in the refining equipment in the pulp mill.

Part B starting on page 9 of your comments review each discharge. Criticisms common to each outfall are:

1. No continuous monitoring of outfalls.
2. No maximum and minimum value are listed for some parameters.

Appleton Papers - Combined Locks Mill had no knowledge before mid-April 1971 of what parameters were to be reported, and thus it was impossible to provide for the type of sampling frequencies needed to get maximum and minimum values and still get the analyses completed by a commercial laboratory for all the required parameters. To achieve reliable maximum and minimum values, a full year of sampling under all seasonal conditions is necessary.

Up to the advent of the Refuse Act permit program, the mill determined total suspended solids and volatile suspended solids on manually collected samples on outfalls 002, 003, 005, 006 and 008 at 2 hour intervals continuously.

The remaining parameters were sampled and determined as shown on the permit application.

As soon as possible after learning what parameters were to be reported on, the mill did get recording flowmeters for outfalls 003, 005, 006 and 008 to continuously record flows. Total suspended solids and volatile suspended solids are determined on samples removed at 2 hour intervals. Determinations are made daily for dissolved solids, pH and temperature. BOD determinations are made three times per week.

Mr. Polikoff
Mr. Comey
April 13, 1972

Outfall 001 and 004 are the river water filter backwash outfalls, as you presumed in your comments. Since the new facilities will be accepting the solids in the backwash waters, these outfalls were previously analyzed to determine the range in flows and solids content in the study conducted by our consultants for our waste water treatment facilities. Thus, we were able to list average and peak loadings.

Outfall 002 - page 10: The only parameter values that are based on the analysis of a single sample are those not normally tested for in pulp and paper mills. These analyses had to be made on samples sent to a qualified testing laboratory. This applies to all outfalls.

Outfall 003 - page 10: Comments on Section II parameters, as well as those in Part B Eng. Form 4345, are the same for all outfalls and the reply listed above for outfall 002 applies here, too. The remarks attached to the Sept. 24, 1971 cover letter to the District Engineer on Part B forms explain the impossibility of providing minimum and maximum values for nonroutine parameters. This applied to all outfalls.

Outfall 005 - page 11: The parameter which raises the most comment here is the grease and oil loss. Similar comments are made on the grease and oil content in outfalls 002 and 006.

This parameter was discussed in my Mar. 10, 1972 letter to you. (Copy attached). I should have added that we followed up our program to minimize oil and grease losses by requesting the Fram Corporation to demonstrate their Fram Trace Oil Analysis Kit which is able to detect oil down to 5 ppm. Results indicated that any losses remaining are below the 5 ppm. level using this test procedure.

Outfall 007 - page 11: The reasoning in the second paragraph of your comments on this outfall is difficult to understand. Unfiltered water is used for cooling. No solids are added. Total solids in the water going to the condenser is the same as total solids leaving the condenser. These solids vary day-to-day. After heavy rains, total suspended solids in the river reach high levels. Similarly, solids going to and from the condenser will rise with the river water solids.

Comparing the <u>average</u> daily solids concentration of intake water with the <u>maximum</u> daily solids concentration during an entirely different period does not represent a change in discharge due to operations.

Outfall 008 - page 12: This outfall is the major contributor to BOD load. Removing the effluent from the pressifiners, evaporating and then burning the resultant concentrated liquor will drastically reduce the BOD loading and eliminate the high thermal losses in this outfall.

API 141032



APIFOX00014009

A

Mr. Polikoff
Mr. Comey
April 13, 1972

Summary - page 12: Your first paragraph should not express BOD values in terms of "untreated sewage from----people". The inference is that industrial effluent is associated with disease and intestinal bacteria present in domestic sewage. This is simply untrue.

The matter of heat in outfall water was also reviewed in my letter of March 10, 1972.

Last paragraph on page 12 of your comments: Your accusation is completely without foundation. The Combined Locks Mill has been manufacturing NCR paper since the mid 1950's.

Until the first quarter of 1970, only coated one side CF paper was produced and this coating contains no PCBS.

Production of CB paper started in the first quarter of 1970 and continued to the end of March 1971. For that period of time, the CB paper did contain PCBS. The formulation was then changed and no PCBS have been used since that time.

Therefore, at the May 1971 sampling time, no PCBS were used nor present in any outfall due to the mill's operation. We recently checked all outfalls for PCBS and results are negative.

Your page 13 review on past discharges criticizes Appleton Papers - Locks Mill saying, "Only two of the 26 major pollutants which Appleton adds to its discharge have been measured in the past."

For years the Locks Mill's effluent was sampled for those parameters required of every other pulp and paper mill in the state. Additional parameters were not required, indeed were unknown until April 1971----some not until June 1971 (Part B Eng. Form 4345) in connection with the permit application.

Paragraphs 5 and 6 - page 13: Speculation is not applicable. Appleton understands that Wisconsin Department of Natural Resources orders include a daily maximum BOD and suspended solids effluent from the mill regardless of production capacity. Planned facilities are designed to bring total effluents within the maximums set by the DNR.

Abatement Technology - page 13: The current three phase water pollution control program at the Locks Mill has, as its goal, the meeting of Wisconsin Department Natural Resources order number 4B068-11a-8A, issued Dec. 16, 1969. This order amended a previous order and included restricting total suspended solids and 5 day biological oxygen demand (BOD) in the mill's effluent to levels consistent with State water quality standards and with recommendations of the Lake Michigan Enforcement Conference pertaining to industrial waste.

A

Mr. Polikoff
Mr. Comey
April 13, 1972

The order lists two alternate routes: (1) To cooperate in joint municipal-industrial treatment facilities by Dec. 31, 1972. (2) Construction of treatment facilities, also by Dec. 31, 1972, so that effluents discharged directly to the river shall not exceed:

a) 35 lbs. of BOD per ton of production with a maximum of 6300 lbs. per day.
b) 20 lbs. of total suspended solids per ton of total production with a maximum of 11,600 lbs. per day.

The first alternative was not feasible because municipal facilities were far too small to consider joint treatment and, while regional treatment facilities were discussed 6 years ago, nothing materialized.

Before any plans to follow the second alternative could be organized, it was necessary to stabilize the operation of two innovative manufacturing processes at the mill:

1. A new pulping process was just getting into capacity production and very little was known about its effluent properties for there is only one other similar process in operation in the United States.

2. A twin wire fourdrinier paper machine, a first in the paper industry, designed to manufacture lightweight printing paper from a fiber furnish containing a high ratio of mechanical pulp began production early in 1970.

Services of a consulting firm to make a water management study were contracted for early in 1969. Studies conducted in 1969 and again in 1970 were designed to:

1. Provide maximum reuse of all waters used in the manufacturing process.

2. Provide a fully acceptable water effluent quality as required to meet the State of Wisconsin and/or Federal standards.

A consulting engineering firm was retained to review the water management study with the mill's engineers and technicians and to prepare preliminary plans and specifications for design of the treatment process.

These preliminary plans were reviewed with representatives of the Wisconsin Department of Natural Resources. Other technical and process guidance was obtained from the National Council for Air & Stream Improvement and the Institute of Paper Chemistry.

A

Mr. Polikoff
Mr. Comey
April 13, 1972

Approval of the conceptual design of the treatment program for the mill's effluent was obtained in May 1971 from the Wisconsin DNR with final approval held up until presentation of final detailed drawings to them. Final approval was received March 22, 1972.

The program for effluent control consists of:

1. A system to recycle filter backwash, vacuum pump seal, boiler house wash and compressor cooling waters through a settling tank to remove solids and reuse the water in the water system.

2. A collection of once-through cooling water for reuse.

3. Collection sewer, lift station and dual waste clarifiers.

4. A clarified liquid outfall complete with continuous flow, pH and temperature recording along with a proportional liquid sample.

5. A sludge thickening and storage system for hauling to approved landfill site.

6. Collection evaporation and burning of pulp mill liquor.

Since the program involves complete removal of the pressifiner effluent (pulping liquor) which is the largest contributor to the total BOD load, the mill's goal for total BOD discharged will be below the BOD level established as the maximum amount per day by State order. The program is designed to consistently meet present State and Federal effluent quality standards.

Since the clarifier system will be augmented by the use of chemical coagulation to remove the finest of fiber particles which are associated directly with paper mill BOD, maximum BOD reduction by physical means will be achieved. By removing the very high BOD spent pulp mill waste entirely from the system by separately evaporating and burning this material, the overall BOD reduction will be far better than values you list for Appleton on page 14.

Further, Appleton is locating the present facilities in an area with potential for additional ground area to allow installation of higher degree treatment as newer standards are established.

Appleton's legal status - page 14: The Locks Mill, as well as each and every other mill in the country whose outfalls are not connected to a municipal treatment plant, is a polluter. Therefore, the mill is subject to Refuse Act action, the same as any other mill whose outfalls enter navigable streams or its tributaries.

A

Mr. Polikoff
Mr. Comey
April 13, 1972

Conclusion - page 15: The permit application data is the best that was obtainable in the time span allowed. Actual test data were obtained from analyses made by laboratories of highest technical capabilities, experience and reputation.

Appleton's program, as outlined in the narrative in Section I of the application, includes providing facilities to correct present conditions. As stated on page 2, question 12, Eng. Form 4345, this permit application for the present operation is temporary. At best, we expected to receive a temporary permit with conditions---the conditions being to complete the installation of the new facilities.

Cordially,

Reinhold A. Vogt
Vice President

pva

Attachment

CC: J. P. Reeve
L. M. Swaim
H. S. Vanderhei
J. J. Rouman
J. A. Lewis
D. Arps
H. C. Church
L. Hibbert
C. B. Munton
Ross Plainse
E. Brick
R. Crain
R. J. Berner
R. Suess
Col. Wells