Reply to
Combined Locks, Wis. 54113
414 788 3551

OPERATIONS

# NCR APPLETON PAPERS DIVISION

January 8, 1975

A-55

Item 2

Certified Mail
Return Receipt Requested

Mr. Paul Didier
Department of Natural Resources
P. O. Box 450
Madison, Wisconsin 53701

RE: WPDES Permit No. WI-0000990

Dear Mr. Didier:

At the request of the DNR and in view of our recent violation of permit conditions concerning monthly daily average and daily maximum B.O.D. limits, NCR-Appleton Papers Division-Locks Mill hereby requests a WPDES permit modification as follows:

1.) Increase the monthly daily average $B.O.D._5$ from 18,000 lbs./day to 33,000 lbs./day.

2.) Increase the daily maximum $B.O.D._5$ limit from 36,000 lbs./day to 38,000 lbs./day.

3.) Modification to be in effect for one (1) year from date of approval.

During our December 11, 1974 meeting with you and personnel from your legal department we explained to you the mechanical and chemical difficulties we are experiencing with our Copeland Fluidized Bed Process. This process is designed to completely destroy our excess pulping liquor organic solids from our C-M pulping process. This waste liquor, while amounting to only 50,000 gpd, contains approximately 15,000 lbs. of $B.O.D._5$. The Copeland Process was purchased and designed to eliminate this $B.O.D._5$ load thus allowing the Mill to stay in compliance with the permit conditions. Start-up was scheduled for December, 1973 but because of delays in equipment and unseasonable weather conditions start-up did not occur until March 11, 1974. From March 11 to May 19 we attempted many times to operate this system effectively at various temperatures, feedrates, etc. Regardless of what was tried we could not establish good fluidization because of agglomeration problems. We found later that we could burn the liquor at lower temperatures, however, we would produce an excess amount of hydrocarbons which caused odor problems. We shutdown on May 19 and made modifications to the scrubber, orifice plate and solids handling systems to correct these new conditions. On August 3 we commenced operation and found soon that the modifications offered little solution to the problems initially encountered. On September 10, as a last resort, we operated the system utilizing a one-half sand and a one-half product bed. This arrangement eliminated the over-agglomeration problem and allowed us to operate at a higher temperature, thus reducing drastically the hydrocarbons odor. We operated this way until December 13, 1974.

This is NCR Paper® brand of carbonless paper

ATT01650

493566

The reason for our difficulty in operation seems, for a large part, a chemical one as all mechanical interferences have been thoroughly scrutinized. The Copeland engineers indicated to us about this time that high concentrations of NaCl in the product can interfere with the melting point of the almost pure $Na_2CO_3$ ash we are producing upon combustion. They informed us that a chlorides content above 0.6% in the product will cause a lower eutectics reaction which in turn will lower the effective melting point of the product produced. Appleton Papers and Copeland have spent thousands of dollars in researching this interference in the past months and have come to the assumption that chlorides interference is most likely the principle cause of our operational problems. The chloride content of our product is generally found to be in excess of 1.0% which we find is a result of using diaphram produced caustic in the digestion phase of our C-M pulping process. Diaphram caustic has replaced mercury cell caustic because of great concern over contamination of our waterways. Diaphram caustic has a high chloride content that ranges anywhere from 1.5-3.0% by weight, compared to mercury cell caustic which contains only 0.1% by weight. The high chloride content passes on through the pulping system in our liquor which is then sent to the Copeland Process for disposal. This almost complete passage of chlorides from pulping to the Copeland Process, we feel, is the prime cause for the chloride levels to reach critical concentrations.

In light of the above observations there only seems to be two alternatives that exist to remedy the problems we currently face with this phase of pollution abatement program. The first is to replace our diaphram caustic with either mercury cell or purified diaphram caustic, which are both low in chloride content, and supposedly allow us to run the plant without a eutectics problem. The second alternative would be a modification to the solids handling system. This change would allow us to slurry the encapsulated sand coming from the reactor, recapturing major portions of the sand and the residual product. The mercury cell caustic is impossible to obtain because the production is limited and secondly, all supplies are contracted well in advance. We have found, however, that purified caustic is available on a limited basis at a premium price. The availability of this type caustic for year round pulp mill use is presently being investigated, but I should say that we are less than optimistic about its availability. We are fortunate, however, to have secured five railcars of this caustic, which will allow us to run our Copeland Plant for a period of twenty days on a low chloride basis. This is presently being done in hopes that it will give us a final answer on whether high chlorides content is the entire interference with this operation.

The second alternative, another modification design by Copeland, is a wet slurry re-claimation system. The reactor product would be removed from the reactor and slurried in a dissolving tank filled with weak pulping liquor. The inorganic salts encapsulating the sand particles dissolve into the liquor, the slurry is pumped to a separator, the sand is returned to the reactor in wet form, and the remaining liquor is sent to process for evaporation and burning. Copeland believes that the bulk of the product (90%) would be taken off in dust form by means of a new cyclone located downstream from the reactor exhause exit. The other 10% would be taken from the reactor with the sand and recovered in the wet slurry system. The recovered product from the cyclone would be sent to the bucket elevator and then to a storage silo for shipment.

At present, there are no systems utilizing all of the components featured in this design. Various elements of the design are found in some MgO recovery processes, but none are on a system producing a product such as ours. The system design has been submitted for patent rights but does not come with a guarantee that it will do the job.

If we decide to install the sand-slurry system, the following timetable would be in effect. The design work on the modifications would take three to four weeks from date of purchase order. All materials could be available in six months and would be followed by at least two weeks for installation. In summary, the entire modification would take between nine months to one year.

The reason for our poor $B.O.D._5$ removal performance, both in monthly daily average and daily maximums, since October, 1974 is the result of the poor operation of the Copeland System. This necessitated occasional direct discharge of pulping liquor through our primary clarification systems increasing the amounts of $B.O.D._5$ discharged. As we had suggested during our December meeting, we shutdown the Copeland Plant on December 13 until December 23 and discharged all of our excess pulping liquor to the clarifiers. We did this to record the additional $B.O.D._5$ loading attributable from this liquor, giving us a good data base with which to base our modification requests. During this period of time we recorded a 13,341 lb./day average $B.O.D._5$ increase from the normal 18,000 lb./day $B.O.D._5$ average we are used to seeing when the liquor is left out of the system. This additional amount of $B.O.D._5$ represents the average loading of $B.O.D._5$ based on a daily average C-M pulp production of 162.4 TPD for this period.

Based on this data and on the likelihood of higher production during certain periods of time, we are asking for the modifications as stated above.

In closing, I would like to assure you that NCR-Appleton Papers Division-Locks Mill is doing everything humanly and economically possible to turn this unfortunate and embarassing situation around so that we can be in full compliance with DNR permit conditions in the shortest time possible. As you well know we have committed ourselves to a $2.6 million secondary treatment plant, which is presently under design and construction. This plant is designed to treat our monthly daily average permit limit of 18,000 lbs./day. If for this reason only, and certainly there are others, we will have to solve our present problem in a timely and effective fashion before we can proceed with high degrees of treatment such as that mentioned.

The Mill will keep you informed as to the outcome of our low chlorides pilot run and its implications on our final decision on modifications and/or compliance.

Thank you in advance for your consideration.

Very truly yours,

D. B. Arps
Manager of Environmental Control

DBA:jh

ATT01652

493568

Copies: J. Reeve - President
R. Vogt - V.P. of Environmental Affairs
W. Spearin - Mill Manager
R. McLennan - Production Manager
J. Beatty - Technical Director

ATT01653
493569