WI-0000990
for Mill File

Lake Michigan District Headquarters
Environmental Protection Section
P. O. Box 3600
Green Bay, Wisconsin 54303

3400

November 25, 1974

Mr. Reinhold A. Vogt
Appleton Papers, Incorporated
P. O. Box 348
Appleton, Wisconsin 54911

Dear Mr. Vogt:

Enclosed please find the Department's report on the results of its 24-hour survey conducted at Appleton Papers, Incorporated, Combined Locks Mill, Combined Locks, Wisconsin, on July 24 and July 25, 1974. I believe the report is self-explanatory. However, should you have any comments regarding its contents, please do not hesitate to contact either Jim Fahrbach or myself.

The Company's courtesy and cooperation during the survey was appreciated.

Very truly yours,

DEPARTMENT OF NATURAL RESOURCES
Environmental Protection Section

Allan F. Schoen
Assistant District Director

Enclosures
cc: Industrial Wastewater Section - Madison

12029

499134

Results of a

24-Hour Survey

at

Appleton Papers, Incorporated

Combined Locks Mill
Combined Locks, Wisconsin

July 24 - 25, 1974

## GENERAL INFORMATION

| | |
|---|---|
| Location: | Combined Locks, Wisconsin, on the Lower Fox River |
| Officials: | Mr. R. A. Vogt - Vice President - Environmental Control |
| | Mr. J. Beatty - Technical Director |
| Products: | NCR papers, Telephone Directory paper |
| Equipment: | 4 paper machines - plus off machine coater<br>Chemi-mechanical pulp mill |

The survey was conducted to verify existing physical mill conditions and wastewater characteristics as they relate to monitoring and reporting requirements set forth under WPDES Permit No. WI-0000990 of March 22, 1974, and Chapter NR 101, Wisconsin Administrative Code.

Inspection of the mill facilities and collection of discharges to the Lower Fox River occurred during the following period:

July 24, 10:30 A.M. to July 25, 10:30 A.M., 1974

Participants in the survey included Tim Doelger, Larry VanAlstine and Jim Fahrbach, Department of Natural Resources, Lake Michigan District. The assistance and cooperation afforded Department personnel by Don Arps during the survey was appreciated.

## PROCESS DESCRIPTION

The company manufactures NCR and Telephone Directory paper from blends of purchased pulp, chemi-mechanical manufactured pulp and secondary fiber. Roundwood is debarked dry, chipped, and fed to continuous digesters along with cooking chemicals. Following the soft cook, the chips are pressed, refined, cleaned, washed and thickened, and bleached prior to use on one of the paper machines.

12030

499135

Two pulpers are available for repulping purchased pulp and one pulper is used for reclaiming secondary fiber. Four paper machines are used in the manufacture of the various grades of paper produced. In addition an off machine coater is installed for coating various grades. Process water is obtained from the Fox River.

## WASTEWATER HANDLING

Solids captured in the treatment of Fox River intake water, along with process losses from secondary fiber reclamation, paper machine losses and coating losses are collected and flow to the lift station where, prior to being pumped to the clarifiers, rough screening occurs. Two 80-foot diameter clarifiers, operating in parallel, treat the wastes received. Provisions are available for addition of alum and polymer for enhancement of solids floc formation and settling. Solids are collected and dewatered on a vacuum filter, centrate is returned to the clarifiers, filter cake is landfilled in a company owned landfill. Composite samples for the survey showed the following:

| | INFLUENT | EFFLUENT | % REDUCTION |
|---|---|---|---|
| BOD | 370 | 235 | 36.5 % |
| SS | 1100 | 45 | 96 % |

These results indicate the system is performing satisfactorily for solids removal.

Magnetic flow meters are installed on influent lines to both clarifiers. In addition a parshall flume is installed in 009. Totalizers on all three flow measuring devices are installed in the Foxboro control panel. Effluent pH and temperature is also continuously recorded on strip charts. A Chicago pump sampling unit is installed in the mill laboratory for collecting 009 effluent samples proportional to flow. The composite sample is refrigerated as it is being collected.

Process losses from C M pulping are directed to the Copeland spent liquor incineration system. The system consists of liquor and condensate storage facilities, evaporator, scrubber and fluidized bed reactor, along with an ash handling system.

During the survey the Copeland system was not in operation and the C M pulping losses were being discharged to the river via an unpermitted outfall. The company was not measuring these losses nor analyzing for BOD and suspended solids. These losses, if discharged to the river, must be measured, sampled, BOD and suspended solids determinations made, and reported on in accordance with the discharge permit. The company has experienced considerable difficulty in operating the Copeland system primarily because of a change in the chemical composition of the cooking chemicals. This change has caused eutectic problems within the fluidized bed. Excess steam condensate is discharged through 007. This is a closed pipe with an inaccessable outlet. An inline temperature recorder and strip chart readout has been installed. Flows are not measured but arrived at through a water balance.

12031

499136

## DISCUSSION

WPDES Permit No. WI-0000990 issued to Appleton Papers, Incorporated, Combined Locks Mill, on March 22, 1974, limits the total discharge from outfalls 008 and 009 to a maximum of 36,000 pounds/day of $BOD_5$ and 21,600 pounds/day of suspended solids. Monthly average discharges are limited to 18,000 pounds/day of $BOD_5$ and 7200 pounds/day of suspended solids.

During the survey a total 18,840 pounds of $BOD_5$ and 3482 pounds of suspended solids were discharged through 009 and the unpermitted outfall carrying the C M pulping losses. No discharge occurred through 008. $BOD_5$ discharges were within daily maximum limits, but above monthly average allowables. Suspended solids discharges were well within permit limits.

The mill laboratory performs $BOD_5$ and suspended solids analysis on collected outfall samples in accordance with Standard Method Procedures. $BOD_5$ determinations are routinely set up on Monday, Wednesday and Friday. Collected outfall samples are refrigerated between collection and set up. Proposed Chapter NR 218 of the Wisconsin Administrative Code in its present form requires commencement of analysis of a sample no later than 48 hours after the collection of the initial portion of the sample. If this code becomes final in its present form, it will require the mill laboratory to increase its frequency of $BOD_5$ set up.

Table III presents data on comparative analysis between the mill lab and the State Laboratory of Hygiene on composite samples collected during the survey. Good correlation between the two labs existed for both $BOD_5$ and suspended solids analysis. I would suggest that the lab technician periodically set up unseeded blanks to check the quality of dilution water produced.

Table I summarizes Department of Natural Resources procedure employed during the survey. Table II summarizes outfall discharge characteristics found during the survey. Table IV summarizes actual discharges versus permit limits.

## CONCLUSIONS AND RECOMMENDATIONS

1. During the survey period, discharges from Appleton Papers, Incorporated, Combined Locks Mill, were within maximum daily allowable limits for $BOD_5$ and suspended solids.

2. $BOD_5$ and suspended solids analysis are being performed in accordance with Standard Method Procedures. If NR 218 is codified in its present form, Combined Locks Mill will have to increase its frequency of $BOD_5$ sample set up.

3. During the survey period, the Copeland evaporation and incineration system was down and C M pulping losses were discharged to the Fox River via an unpermitted outfall. No measurement of flow or sampling for $BOD_5$ and

suspended solids analysis was done by mill personnel. Subsequent to the survey this outfall has been sealed. However, should discharges of C M pulping liquor losses occur in the future, those discharges must be measured, sampled and analyzed for $BOD_5$, suspended solids, pH and temperature and reported on the monthly discharge monitoring report form.

Respectfully submitted,

James C. Fahrbach
James C. Fahrbach
District Engineer

JCF:ct

Approved this 28th day of November, 1974.

Allan F. Schoen
Allan F. Schoen
Assistant District Director
Environmental Protection Section

cc: Industrial Wastewater Section - Madison

12033

499138

TABLE I

SURVEY PROCEDURE

| OUTFALL NUMBER | DESCRIPTION OF OUTFALL | METHOD OF SAMPLING | METHOD OF FLOW MEASUREMENT |
|---|---|---|---|
| 007 | Cooling Water | Enclosed pipe within mill - below surface discharge - unable to measure flow or sample. | |
| 008 | Emergency | No Discharge During Survey | |
| 009 | Clarifier Effluent | 55 ml/100,000 gallons sampled every half hour | Magnetic flow meters with integration totalizers on influent line to both clarifiers |
| | C M pulping losses - cooling water - seal water | 150 ml/hour Grab | Flow estimate supplied by mill |

12034

499139

TABLE II
DISCHARGE CHARACTERISTICS

| | FLOW | TEMP | pH | $BOD_5$ | | SOLIDS | | | | | TOTAL PHOSPHORUS | TOTAL ORGANIC NITROGEN | $NH_3$ - N | $NO_3$ - N | $NO_2$ - N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | TOTAL | | SUSPENDED | | | | | | | |
| | | | | | | | Volatile | | | Volatile | | | | | |
| | (MGD) | (°C) | (su) | (mg/1) | (#/day) | (mg/1) | (mg/1) | (mg/1) | (#/day) | (mg/1) | (mg/1) | (mg/1) | (mg/1) | (mg/1) | (mg/1 |
| 7 | | 50-65 | UNABLE | | TO | SAMPLE | | | | | | | | | |
| 5 | NO | | DISCHARGE | | DURING | | SURVEY | | | | | | | | |
| ) | 7.003 | 93-102 | 7.2-816 | 235 | 13740 | 895 | 325 | 45 | 2635 | 20 | 130 | 2.66 | .27 | * | .002 |
| losses | (1) .25 | | 9.3 | 2440 | 5100 | 5825 | 3195 | 405 | 547 | 360 | 1.55 | 9.0 | .90 | * | .003 |

(1) Mill Estimate
* Interference

12035

499140

Table III

Analysis Comparisons

| Outfall Number | Sample Type | Analysis By | $BOD_5$ (mg/l) | Suspended Solids (mg/l) |
|---|---|---|---|---|
| Clarifier Influent | DNR Manual Composite | State Lab | 370 | 1110 |
| | | Mill Lab | 450 | 1113 |
| 009 | DNR Manual Composite | State Lab | 235 | 45 |
| | | Mill Lab | 214 | 62 |
| | Mill auto. Sampler | State Lab | 210 | 30 |
| | | Mill Lab | 214 | 47 |
| C M Pulping Losses, etc. to River | DNR Manual Manual Composite | State Lab | 2440 | 405 |
| | | Mill Lab | 2820 | 580 |

12036

499141

TABLE IV

PERMIT COMPARISONS

| OUTFALL NUMBER | SURVEY RESULTS BOD$_5$ (#/day) | ALLOWABLE DISCHARGE LIMITS BOD$_5$ Average (#/day) | ALLOWABLE DISCHARGE LIMITS BOD$_5$ Maximum (#/day) | SURVEY RESULTS SS (#/day) | ALLOWABLE DISCHARGE LIMITS SS Average (#/day) | ALLOWABLE DISCHARGE LIMITS SS Maximum (#/day) |
|---|---|---|---|---|---|---|
| 008 | NO DISCHARGE DURING SURVEY | | | | | |
| 009 | 13740 | | | 2635 | | |
| C M Pulping losses | 5100 | | | 847 | | |
| | 18840 | 18000 | 36,000 | 3482 | 7200 | 21600 |

12037

499142