IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF WISCONSIN, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 10-C-910 |
| v. | ) ) | Hon. William C. Griesbach |
| NCR CORPORATION, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' JOINT BRIEF IN OPPOSITION TO
DEFENDANT APPLETON PAPERS INC.'S MOTION TO RECONSIDER
THE COURT'S DECISION AND ORDER OF DECEMBER 19, 2011**

**PLAINTIFFS' JOINT BRIEF IN OPPOSITION TO
DEFENDANT APPLETON PAPERS INC.'S MOTION TO RECONSIDER
THE COURT'S DECISION AND ORDER OF DECEMBER 19, 2011**

The Court was right to deny the motion for summary judgment filed by Appleton Papers

Inc., based on the applicable law and the agreement language. API's re-argument adds nothing

that should change that outcome. The company's latest motion makes many of the same

mistakes that API made before, confusing indemnity and assumption and arguing without basis

that an agreed assumption of liabilities yields direct liability "*only to the seller.*" Dkt. 287 at 6.

The Court did not misconstrue the assumption provisions of the 1978 Agreement between

API and NCR Corporation or the effect that API's agreed assumption of liabilities had in

exposing API to direct claims by third parties.[1] If the meaning of the contractual assumption

language is ambiguous – as API seems to suggest at one point (Dkt. 287 at 10) – then the Court

must reiterate its denial of API's summary judgment motion for that reason alone. *See Curia v.*

*Nelson*, 587 F.3d 824, 832 (7th Cir. 2009) (reversing entry of summary judgment because the

contract was ambiguous); *BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 362

(7th Cir. 2009) (same).

The Court also did not err in considering API's 1998 Agreement with NCR and the

related arbitration award and judgment.[2] The 1998 Agreement reconfirmed that API and NCR

---

[1]     As noted in our prior brief, there actually are two related agreements dealing with API's original
assumption of liabilities in 1978:  (1) a June 1978 Asset Purchase Agreement (Dkt. 139-3; Dkt. 139-4);
and (2) a contemporaneous Assumption Agreement executed by API (Dkt. 203-3).  The Assumption
Agreement essentially repeats the assumption provisions in Section 1.4 of the Asset Purchase Agreement,
so we will refer to the two agreements collectively as the "1978 Agreement," although we will at times
refer to each of the two agreements separately.

[2]     Two related agreements were executed in 1998 between NCR and API and its former corporate
parent, British American Tobacco:  (1) a Confidential Settlement Agreement (Dkt. 124-1); and (2) a
Subsequent Allocation Arbitration Agreement (Dkt. 139-13).  We will refer to them collectively as the
"1998 Agreement."

1

share a joint common liability for the Lower Fox River and Green Bay Superfund Site and API

essentially gave up any argument that it assumed no liability for the Site.

Finally, the Court made no mistake in applying the legal rules governing successor

liability and the agreed assumption of liability.  Under the applicable law, the United States and

the State can pursue API directly under CERCLA for API's assumed liabilities of NCR's

Appleton Papers Division and the predecessor entities that were merged into NCR to form the

Appleton Papers Division (referred to collectively herein as the "Appleton Papers Division" or

the "APD").

**Argument**

1.       **The Assumption Provisions of the 1978 Agreement Cover This Liability.**

Although New York law makes clear that contractual indemnity and assumption

provisions operate in very different ways,[3] the same basic rules of contract construction generally

apply in determining the scope and coverage of indemnity and assumption provisions.[4]  Such

provisions should be interpreted with reference to "the language and purpose of the entire

---

[3]       *See, e.g., Bouton v. Litton Indus., Inc.*, 423 F.2d 643, 650-51 (3d Cir. 1970) (Under New York Law, "one who assumes a liability, as distinguished from one who agrees to indemnify against it, takes the obligation of the transferor unto himself, including the obligation to conduct litigation."); *Grant-Howard Assoc. v. Gen. Housewares Corp.*, 472 N.E.2d 1, 2-4 (N.Y. 1984).

[4]       *See generally GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 622-25 (7th Cir. 1995) (CERCLA case construing an assumption provision)*; Harley-Davidson, Inc. v. Minstar, Inc.*, 41 F.3d 341, 344 (7th Cir. 1994) (CERCLA case construing an indemnity provision)*.  The New York courts have not always required "clear and unmistakable" evidence of an intent to create a particular indemnity obligation, as suggested by one of the cases both sides have cited here. *See Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 15 (2d Cir. 1993).  That level of proof traditionally was required before New York courts would enforce a historically disfavored agreement to indemnify an individual for his own negligence, but the standard has been liberalized in modern cases, especially in construing agreements negotiated at arm's length between sophisticated business entities. *See Niagara Frontier Transp. Auth. v. Tri-Delta Constr. Corp.*, 487 N.Y.S.2d 428, 430 (N.Y. App. Div. 1985); *Hudmar Publ'g Co., Inc. v. Coca-Cola Co.*, No. 87 Civ. 4687, 1990 WL 254920, at *5 n.3 (S.D.N.Y. Dec. 31, 1990).  As demonstrated below, even if the heightened level of proof applied, the agreement language and circumstances here evince an unmistakable intent that API assumed broad environmental liabilities, including this liability.

2

agreement and the surrounding facts and circumstances." *Hooper Associates, Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903, 905 (N.Y. 1989). *Accord Margolin v. N.Y. Life Ins. Co.*, 297 N.E.2d 80, 82 (N.Y. 1973). Here, the intent that API would assume this liability is quite evident from the surrounding circumstances and the operative language of the 1978 Agreement.

As stated in the 1978 Agreement, NCR sold API "all of the assets, properties, and business as a going concern, of every kind and description, of Seller relating to the business and operations of APD." Dkt. 139-3 at 9-10. By selling API the entire Appleton Papers Division, NCR exited the papermaking business entirely to focus on selling computers and other business automation systems. In its 1978 Annual Report to its shareholders, NCR explained that "[t]he sale of the Appleton Papers Division will permit the company to devote all of its resources to business information processing systems and directly related products and services." Dkt. 301-1 at 3. To try to minimize its exposure to legacy liabilities for the papermaking business, NCR's sale agreement with API required API to assume nearly all liabilities associated with the APD business "to the extent not paid, performed, defended or discharged prior to the Closing Date." Dkt. 139-3 at 17-22; Dkt. 195-3; Dkt. 195-4. In other words, in buying NCR's papermaking business, API agreed to take the bad (liabilities) with the good (assets). And the liabilities that API agreed to assume included potential future liabilities stemming from a long history of environmental problems at the Wisconsin facilities, as shown below.

Before CERCLA was enacted in 1980, federal law and Wisconsin law both prohibited unauthorized discharges of industrial pollutants into the Fox River. The Appleton Papers Division regularly violated those laws.

The Refuse Act (originally enacted in 1899) specified that "[i]t shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited . . . any refuse matter of any kind or description whatever . . . into any navigable water of the

3

United States" other than as authorized by a permit issued by the Army Corps.  33 U.S.C. § 407.[5]

We have found no indication that the APD facilities in Wisconsin ever obtained Refuse Act

permits, so the discharge of suspended solids – including PCB-containing capsules used to make

NCR Paper – from those facilities to the Fox River violated that federal law.[6]  In fact, in response

to an assertion by several public interest groups in 1971 that the APD's Combined Locks Mill

was "clearly in violation of the Refuse Act and has been for many years" (Dkt. 301-5 at 15), the

APD conceded in a written reply that the mill "is a polluter" and "is subject to Refuse Act

action" (Dkt. 301-6 at 6).  Injunctive relief to dredge or otherwise remove materials discharged

in violation of the Refuse Act can be obtained under Section 10 of the River and Harbor Act of

1899, 33 U.S.C. § 403.  *See Republic Steel*, 362 U.S. at 492.

A similar Wisconsin statute (originally enacted in 1917) barred the unauthorized

deposition of "deleterious substances" into any waters of the State.  Among other things, that

statute prohibited the discharge of:

> any acids or chemicals or waste or refuse arising from the manufacture of any
> article of commerce . . . other than authorized drainage and sewage from
> municipalities and industrial or other waste discharged . . . through treatment and
> disposal facilities installed and operated in accordance with plans submitted to

---

[5]     The Refuse Act exempted materials "flowing from streets and sewers and passing therefrom in a liquid state," 33 U.S.C. § 407, but that provision did not exempt industrial discharges that contained suspended solids, whether discharged directly to navigable waters or indirectly through municipal sewers. *See, e.g., United States v. Republic Steel Corp.*, 362 U.S. 482, 484, 489-90 (1960) (direct discharge of suspended solids in industrial wastewater not exempt from the Act); *United States v. Granite State Packing Co.*, 470 F.2d 303 (1st Cir. 1972) (indirect discharge of suspended solids through a municipal sewer violated the Act); *United States v. Genoa Coop. Creamery Co.*, 336 F. Supp. 539 (W.D. Wis. 1972) (discharge of suspended solids in industrial wastewater that eventually flowed into the Mississippi River violated the Act).

[6]     The PCB-containing emulsion used to make NCR Paper was a water-based suspension that contained approximately 20% total suspended solids, including:  (1) about 16% insoluble capsules that contained a special dye and Aroclor 1242; (2) roughly 4% other suspended solids, including starch and talc.  Dkt. 301-2 at 23.  The capsules in the suspension were hardened chemically to form a protective covering that surrounded and encapsulated the Aroclor 1242 and the dye.  Dkt. 301-3 at 2-5; Dkt. 301-4 at 2.

4

> and approved by the department of natural resources under ch. 144, or in compliance with orders of that department.

Wis. Stat. § 29.29(3) (1973).[7]  The APD's Combined Locks Mill was subject to multiple water pollution control orders issued by WDNR and its predecessor agency, but the facility did not always operate "in compliance with" those orders, as required by the State law.  Among other things, the APD violated deadlines imposed under a 1969 WDNR order for installation of two different wastewater treatment systems by December 31, 1972, and December 19, 1973.[8]  Even after the belated installation of the second waste treatment system in March 1974, the APD violated the State law regularly by bypassing that system and discharging concentrated waste through an unpermitted discharge pipe rather than "through treatment and disposal facilities installed and operated" as required by the WDNR-approved plans and order.  Wis. Stat. § 29.29(3).[9]  The repeated violation of Wis. Stat. § 29.29 qualified as a public nuisance under Wisconsin common law and it could be abated by an injunction.  *See United States v. Reserve Mining Co.*, 380 F. Supp. 11, 56 n. 40 (D. Minn. 1974).

The Federal Water Pollution Control Act Amendments of 1972 (commonly called the Clean Water Act) provided that "the discharge of any pollutant by any person shall be unlawful" unless specifically authorized under that law.  33 U.S.C. § 1311(a).  For example, facilities like the APD's Combined Locks Mill that discharged directly to waters of the United States were required to obtain and comply with a Clean Water Act permit issued by EPA or an authorized State.  33 U.S.C. §§ 1311(a), 1342.  WDNR was authorized to issue and enforce permits under the Act, which were called Wisconsin Pollutant Discharge Elimination System ("WPDES")

---

[7]     In this brief, we cite and quote the version of the law that was in force between 1971 and 1975. A copy of that version of the statute, Wis. Stat. § 29.29 (1973), is reproduced at Dkt. 301-7.  The current version of the law is codified at Wis. Stat. § 29.601(a)(3).

[8]     Dkt. 301-8; Dkt. 301-9; Dkt. 301-10; Dkt. 301-11; Dkt. 301-12; Dkt. 301-13; Dkt. 301-14.

[9]     Dkt. 301-14; Dkt. 301-15 at 3-5.

5

permits.  The Clean Water Act permit program essentially replaced the Refuse Act discharge

permit program.  *See United States v. Outboard Marine Corp.*, 549 F. Supp. 1036, 1039 (N.D.

Ill. 1982).  The APD obtained a WPDES permit for the Combined Locks Mill in March 1974,

but it began violating the permit almost immediately.  In July 1975, the Wisconsin Department

of Justice sued for multiple self-reported violations of the facility's WPDES permit that occurred

between July 1974 and May 1975.  Dkt. 301-16.  The APD's WPDES permit for the Combined

Locks Mill included more stringent discharge limits that took effect in 1977; the facility violated

those legal limits repeatedly from 1977 until after the APD was sold to API in June 1978.  Dkt.

301-16 at 14-16; Dkt. 100-13 at 7-16.  Sediment remediation is an available remedy for

noncompliance with Clean Water Act requirements.  *See United States v. Alcoa, Inc.*, 98 F. Supp.

2d 1031 (N.D. Ind. 2000).

In 1976, Congress enacted the Toxic Substances Control Act ("TSCA") and the Resource

Conservation and Recovery Act ("RCRA").  TSCA targeted problems stemming from the use

and disposal of PCBs specifically, *see* 15 U.S.C. § 2605(e), and RCRA addressed the general

need for waste generators to abate hazards posed by their past waste handling and disposal

practices, *see* 42 U.S.C. §§ 6972, 6973(a).  Between 1976 and the sale of the APD to API in mid-

1978, the APD was still finding PCBs in wastewater discharged by its Appleton, Combined

Locks, and Portage facilities and APD internal memoranda identified that as a nagging

"problem."[10]  RCRA plainly authorizes cleanup injunctions for past disposal activities,

regardless of whether those activities were illegal at the time.  *See PMC, Inc. v. Sherwin-*

*Williams Co.*, 151 F.3d 610 (7th Cir. 1998); *United States v. Apex Oil Co., Inc.*, No. 05-CV-242-

DRH, 2008 WL 2945402, at *77-85 (S.D. Ill. July 28, 2008), *aff'd*, 579 F.3d 734 (7th Cir. 2009).

---

[10]     Dkt. 100-11; Dkt. 124-7; Dkt. 301-17; Dkt. 301-18; Dkt. 301-19.

Like RCRA's abatement provisions, CERCLA generally imposes strict liability and retroactive liability, so there normally is no need to prove that a defendant violated the laws in force at the time of disposal. *See United States v. Olin Corp.*, 107 F.3d 1506, 1512 (11th Cir. 1997); *United States v. Monsanto Co.*, 858 F.2d 160, 167 (4th Cir. 1988). But CERCLA liability is not completely divorced from requirements imposed by other environmental laws. For example, CERCLA liability cannot be imposed for "response costs or damages resulting from a federally permitted release," 42 U.S.C. § 9607(j), so a defendant's compliance or non-compliance with other laws can be relevant under CERCLA. CERCLA liability can surely arise from unauthorized past disposal or discharge activities. *See In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution*, 722 F. Supp. 893 (D. Mass. 1989). And the need for cleanup at PCB-contaminated sediment sites has spawned litigation under multiple environmental laws over the years, including CERCLA, RCRA, the Refuse Act and the River and Harbor Act, the Clean Water Act, and state laws.[11]

In light of the Appleton Paper Division's checkered environmental compliance record, Schedule A to NCR's 1978 Agreement with API included the following broad and general disclosures, which the Court referenced in its December 19 Decision and Order:

> Seller has reason to believe that the facilities of Appleton Papers Division located in Pennsylvania and Wisconsin may be operating; in violation of applicable federal, state, local and other governmental environmental and pollution control laws, ordinances, regulations, rules and standards.

---

[11]    *See, e.g., United States v. Outboard Marine Corp.*, 789 F.2d 497 (7th Cir. 1986) (Refuse Act, Clean Water Act, and CERCLA); *United States v. Ottati & Goss, Inc.*, 900 F.2d 429 (1st Cir. 1990) (RCRA and CERCLA); *In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*, 675 F. Supp. 22 (D. Mass. 1987) (CERCLA, RCRA, Clean Water Act, River and Harbor Act, and state statutory and common law). Obviously concerned about their potential liability for this Site under CERCLA and other laws, API and NCR demanded covenants not to sue under CERCLA, the River and Harbor Act, the Clean Water Act, and RCRA in an interim Consent Decree for this Site that was in force between 2001 and 2005. Dkt. 276-10 at 25.

APD receives and has received notices from time to time from various federal, state, local and other governmental authorities claiming violation of environmental and pollution control laws, ordinances, regulations, rules and standards (collectively "laws"). These claims may result, and have resulted in fines and corrective action.

Dkt. 195-3 at 4.

Under Sections 1.4.4 and 1.4.5 of the Asset Purchase Agreement, API expressly assumed all after-arising "obligations and liabilities" of NCR "of any kind, character or description . . . which arise out of or in respect of": (1) "any state of facts, matter, event or disclosure set forth in Schedule A" (Section 1.4.4); and (2) "any . . . action, claim, investigation by a government body, or legal . . . proceeding" referenced in Schedule A (Section 1.4.5). In each case, the liability assumption applied "whether such obligation or liability is accrued, absolute, contingent, or otherwise." Dkt. 139-3 at 19-20. The Court correctly found that Section 1.4.4 is the broader of those two assumption provisions because, when coupled with the disclosures in Schedule A, it covers "any state of facts" or "matter" that "*may* result" in future fines and corrective action requirements under environmental laws. Dkt. 279 at 10.

The assumption clauses in Sections 1.4.3 and 1.4.9 arguably are broader still, because they required API's assumption of unknown and unspecified legal "compliance" obligations that might arise in the future. Under those provisions, API assumed:

(1) "*all of Seller's obligations and liabilities* of any kind, character or description relating to the period subsequent to the Closing Date, which are not known to Seller on the Closing Date, *with respect to the compliance of the assets, properties, products or operations of APD with all governmental laws, ordinances, regulations, rules, and standards*" (Section 1.4.3); and

(2) "*all of Seller's liabilities* (other than liabilities with respect to claims asserted by or on behalf of private parties), whether accrued, absolute, contingent, or otherwise . . . whether asserted or not and whether arising from transactions, events or conditions occurring prior to or after the Closing Date, *with respect to compliance of the Property . . . with all applicable federal, state and local and other governmental environmental and pollution control laws, ordinances, regulations, rules and standards*" (Section 1.4.9).

8

Dkt. 139-3 at 19, 21 (emphasis added). The term "Property," as used in Section 1.4.9, was defined to include all of the APD's "assets, properties, and business as a going concern." Dkt. 139-3 at 9-11. Sections 1.4.3 and 1.4.9 say nothing about past or future "violations" of law, as implied by API. They cover future legal "compliance" obligations – explicitly including compliance obligations under "environmental and pollution control laws" – concerning the facilities, operations, or business of the Appleton Papers Division. Section 1.4.9 covers environmental compliance obligations that arise *after* the Closing Date based on events or conditions that occurred *prior to* the Closing Date. And that Section only covers liability to the government; it excludes "claims asserted by or on behalf of private parties." This is a governmental action to enforce compliance with an environmental and pollution control law that imposes cleanup and payment obligations for events that occurred long ago. The assumption provisions of the 1978 Agreement cover this liability. The operative language certainly encompasses "CERCLA-like" liabilities and that is sufficient. *See JFE Steel Corp. v. ICI Ams., Inc.*, 797 F. Supp. 2d 452, 463 (D. Del. 2011) (it is enough that the provisions encompass "CERCLA-like liabilities"); *Bowen Eng'g v. Estate of Reeve*, 799 F. Supp. 467, 483-86 (D.N.J. 1992) (same).[12]

The following clause in the Asset Purchase Agreement does not change that inescapable conclusion, as argued by API:

> 10.10   Parties.   Nothing in this agreement, express or implied, is intended
> to confer upon any other person not a party to this Agreement any rights and
> remedies hereunder.   No assignment of any right or benefit hereunder shall relieve

---

[12]      As noted in our prior briefs, the broad assumption language in the 1978 Agreement covers potential CERCLA liabilities, even though it was drafted before enactment of the statute. *See Bowen Eng'g*, 799 F. Supp. at 483 (1977 agreement)*; see also Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326-28 (7th Cir. 1994) (1972 agreement); *Olin Corp. v. Consol. Alum. Corp.*, 5 F.3d 10, 12-16 (2d Cir. 1993) (1973 agreement); *Joslyn Mfg. Co. v. Koppers Co., Inc.*, 40 F.3d 750, 753-60 (5th Cir. 1994) (various pre-enactment agreements).

> any obligations of the assignor hereunder without the written consent of the other parties.

Dkt. 139-4 at 43. The contemporaneous Assumption Agreement included no corresponding language. Dkt. 203-3. Unlike the contract provision involved in the main case cited by API, Section 10.10 is not entitled "No Third Party Beneficiaries." *See India.com, Inc. v. Dalal*, 412 F.3d 315, 321 (2d Cir. 2005). Section 10.10 and a related clause actually envision that some third parties may be able to assert rights and benefits under the contract, at least by an assignment. Dkt. 139-4 at 44 (Section 10.10); Dkt. 139-4 at 45 (Section 10.15) For that reason, we will refer to Section 10.10 as the "contract rights and remedies clause" in this brief, as opposed to a true "negating clause," as analyzed in the *India.com* case.

The contract rights and remedies clause – located at the very end of the Asset Purchase Agreement, among the "Miscellaneous" provisions in Section 10 – simply cannot be construed as voiding the more specific "Assumption of Contractual Obligations and Liabilities" terms in Section 1.4. API concedes that point indirectly. The company admits that in Section 1.4.7 of the Asset Purchase Agreement, "the parties carefully specified that *API was assuming liability* for a lawsuit then pending in Pennsylvania over alleged environmental law violations at the APD facility in that state," captioned *United States v. NCR Corporation and Appleton Papers, Inc.*, No. 77-1408 (W.D. Pa.). Dkt. 287 at 9 (emphasis added). *See also* Dkt. 139-3 at 20 (Section 1.4.7); Dkt. 195-4 at 20 (Agreement Schedule M). But if the general contract rights and remedies clause eliminated any and all direct exposure to third parties, as API now argues, then API never even assumed potential liability to the United States for that specifically named case.[13] All of Section 1.4 would be rendered meaningless if that were true, including Section 1.4.7

---

[13]     As previously noted, API and NCR ultimately resolved that Clean Water Act enforcement case in 1980 by entry into a Consent Decree that required API to pay a $150,000 civil penalty. Dkt. 203-1; Dkt. 203-2.

10

(with its reference to that particular government lawsuit) and Section 1.4.9 (which covered liability to the government alone under the environmental laws).  The contemporaneous Assumption Agreement also would be nullified, although it did not even contain a contract rights and remedies clause.  That cannot be so for three reasons.

First, New York follows the well-established rule that in construing a contract, "no provision of a contract should be left without force and effect."  *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956).

Second, if there is any tension between the specific assumption provisions and the general contract rights and remedies clause, "the specific provision controls."  *Id.  Accord County of Suffolk v. Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001) (courts construing contracts under New York law must give specific terms greater weight than general language).

Third, the contract rights and remedies clause does not, by its terms, preclude direct claims by third parties based on an assumption of successor liability.  Section 10.10 of the Asset Purchase Agreement limits those who may assert and enforce "rights and remedies hereunder" – *i.e.*, those who may sue *directly on the contract*.  There is an important and well-recognized distinction between:  (1) suing directly on the contract to enforce a contractual right to payment; and (2) suing under non-contract law based on an assumption of successor liability.  A true "negating clause" that precludes third-party beneficiaries may bar the first cause of action but not the second.  The defendant in another leading CERCLA case failed in making the same argument that API advances now – *i.e.*, that the United States lacks "third party standing to enforce an alleged assumption of liability" (Dkt. 287 at 4).  *See United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1233, 1239-40 & n.12 (N.D. Cal. 1997).  The court rejected that argument with the following explanation:

But the Government is not seeking to enforce the assignments. Rather, the Government is seeking response costs under CERCLA by holding Rhône-Poulenc liable as a corporate successor to Mountain Copper. The assignments are evidence that Rhône-Poulenc is a corporate successor to Mountain Copper. Thus, the Government's standing to bring this action flows from CERCLA, not the assignments.

*Id.* at 1239 n.12. *Accord Heritage Realty Mgmnt., Inc. v. Symbiot Snow Mgmt. Network, LLC*, No. 06-47, 2007 WL 2903941, at *6 (W.D. Pa. Sept. 28, 2007) ("Heritage is not, in the classic sense, 'suing on the contract' as a third-party beneficiary. Heritage . . . is simply relying on the contract to demonstrate that Symbiot expressly assumed a portion of the Heritage liability, as required to make out a claim of express assumption successor liability."). In all the "negating clause" cases cited by API, the unsuccessful claimant was trying to sue directly on the contract as a third-party beneficiary.[14] Here, the United States is not suing on the contract to enforce any contractual payment right or privilege. The contract rights and remedies clause is irrelevant to API's assumption of CERCLA liability.

**2.  The Assumption was Confirmed by the 1998 Agreement and the 2005 Arbitration Award and Judgment.**

Like the 1978 Agreement, the 1998 Agreement and the 2005 arbitration award and judgment addressed both: (1) API's and NCR's joint common liability to third-parties (because NCR retained such liability even after it was assumed by API); and (2) a reckoning process for

---

[14]       *See India.com*, 412 F.3d at 319; *Nepco Forged Prods., Inc., v. Consol. Edison Co. of N.Y., Inc.*, 470 N.Y.S.2d 680, 680-81 (N.Y. App. Div. 1984); *Edward B. Fitzpatrick, Jr. Constr. Corp. v. Suffolk County*, 525 N.Y.S.2d 863, 866 (N.Y. App. Div. 1988); *LR Dev. Co. v. Comm'r,* T.C. Memo. 2010-203, 2010 WL 3604164, at *33 (T.C. 2010). The Internal Revenue Code provision that the IRS invoked as its basis for recovery against an alleged "transferee" in the *LR Development* case, 26 U.S.C. § 6901, creates no independent cause of action, so the IRS had to rely on an argument that it could sue on the contract as a third party beneficiary. *See generally Adams v. Comm'r*, 70 T.C. 373, 389 (T.C. 1978) (26 U.S.C. § 6901 "merely affords respondent a procedural remedy and does not create or define the existence or extent of the transferee's liability." (citation omitted)).

sharing the joint costs borne by API and NCR (as a substitute for the indemnity provisions of the 1978 Agreement).[15]

The 1998 Agreement reconfirmed API's and NCR's "joint and common legal interests with respect to the Fox River sites," their agreement "to continue to cooperate, coordinate, and assist one another in the defense of the Sovereigns' and third-party claims related to the Fox River sites" and "to implement a coordinated and joint defense effort among themselves," and their commitment "to work together as closely as possible as if the parties are one entity" in the defense of such claims. Dkt. 124-1 at 20-21. It also acknowledged that API and NCR might be forced to bear costs relating to the Fox River Site "either singly or collectively" (Dkt. 124-1 at 14, 15), consistent with the established rule that a third-party claimant may pursue the seller, the purchaser, or both of them if the asset sale included an assumption of relevant liabilities. *See Grant-Howard Assoc. v. Gen. Housewares Corp.*, 472 N.E.2d 1, 3 (N.Y. 1984). And the 1998 Agreement specified that its coverage would extend not only to costs that API and NCR might be required to bear under CERCLA, but also under RCRA, TSCA, the Clean Water Act, and Wisconsin laws (including Wis. Stat. § 29.29). Dkt. 124-1 at 6-7.

The 1998 Agreement and the arbitration award and judgment then established an interim and final method to allocate their joint costs relating to the Fox River Site. Dkt. 124-1 at 14; Dkt. 144-3. API and NCR agreed to bear set shares of their joint costs up to $75 million and a minimum of at least 25% of the joint costs in excess of $75 million. Dkt. 139-13 at 20. In doing so, API essentially gave up any argument that it assumed no liability for the Fox River Site. The

---

[15]    The 1978 Asset Purchase Agreement contains not only the above-described assumption provisions in Section 1.4 but also a set of cross-indemnities in a separate Section entitled "9. Indemnification." Dkt. 139-4 at 34-36. When the agreement at issue in a CERCLA case includes clear assumption language as well as added indemnity language, "the compound nature of the provision in no way detracts from the clarity of the assumption of liabilities language." *Aluminum Corp. of Am. v. Beazer E., Inc.*, 124 F.3d 551, 566 (3d Cir. 1997).

Court was right in concluding that because that arrangement "guaranteed that API would be found liable for *some* part of the expenses, API had essentially already conceded liability just by virtue of entering into the arbitration." Dkt. 279 at 11.

The main case that API cites in its attack on the Court's logic – *United States v. Sunoco, Inc.*, 637 F. Supp. 2d 282 (E.D. Pa. 2009) – is easily distinguished. The *Sunoco* court found that there never was any agreed assumption of liability in that case; it involved indemnities alone. *Id.* at 285-89. The original sale agreement included contractual indemnities, but no assumption of liabilities, so the only issue was whether a subsequent settlement agreement between the buyer and the seller added a completely new assumption of direct liabilities to third-parties. *Id.* The court found no assumption because "the drafters of the settlement agreement carefully selected the language used and purposefully avoided the words 'assume' and 'liability'" and instead "specifically chose the language 'shall defend and hold harmless.'" *Id.* at 289. Here, API and NCR gave each other releases and covenants not to sue in their 1998 Agreement "for indemnification arising under the [1978] Purchase Agreement" (Dkt. 124-1 at 5, 16-18), but they did not purport to limit or negate the assumption provisions of the 1978 Agreement. Unlike the language at issue in *Sunoco*, the original agreement between API and NCR specified that "Purchaser agrees that it shall assume" broad categories of "Seller's obligations" and "Seller's liabilities." Dkt. 139-3 at 17-21.

### 3.    Successor Liability Applies Here.

It is *not* true that a buyer's agreed assumption of liability yields direct liability "*only to the seller*," as argued by API. Dkt. 287 at 6. As explained in the *Sunoco* case cited by API, "[a]ssumption of liability by consent means that the acquiring entity agrees to be liable to third parties." 637 F. Supp. 2d at 288. We will not re-brief that issue here because our earlier brief in opposition to API's summary judgment motion showed that a third party may sue the asset seller,

14

the asset purchaser, or both of them when the buyer has agreed to assume relevant liabilities, under both common law case law[16] and CERCLA case law.[17]

We also will not re-brief all the reasons why API is wrong in saying that it can escape its assumption of liability "so long as NCR is available to respond to the claim." Dkt. 287 at 1. Simply stated, the asset seller's continued viability is irrelevant in an assumption case.[18] That is why there are reported cases resolving disputes between viable asset sellers and asset buyers over whether the buyers assumed direct liability to third parties. *See, e.g., GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 617-19, 621-25 (7th Cir. 1995) (affirming entry of a declaratory judgment in favor of the seller holding that the buyer assumed CERCLA liabilities); *American Standard, Inc. v. OakFabco, Inc.*, 927 N.E.2d 1056, 1058 (N.Y. 2010) (affirming declaratory judgment that defendant-buyer assumed liability to tort claimants for pre-sale products made by plaintiff-seller).

---

[16]      *See, e.g., Grant-Howard Assocs.*, 472 N.E.2d at 3; *Beck v. Roper Whitney, Inc.*, 190 F. Supp. 2d 524, 533 (W.D.N.Y. 2001) (asset sellers and purchasers directly liable to third party where the purchasers assumed liabilities); *Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085, 1094-95 (5th Cir. 1991) (purchaser directly liable to tort victims based on its assumption of liabilities stemming from the prior operation of the business); *Emrich v. Kroner*, 434 N.Y.S.2d 491, 492 (N.Y. App. Div. 1980) ("Where the acquisition agreement between a manufacturer and the purchaser of its assets reveals an express or implied assumption of tort liability, a duty may be imposed on the purchaser to third parties injured by the predecessor's product." (citation omitted)).

[17]      *See, e.g., United States v. Chrysler Corp.*, Nos. 88-341, 88-534, 1990 WL 127160, at *4-7 (D. Del. Aug. 28, 1990) (seller had settled with the government, but the purchaser could still be held liable under CERCLA based on its agreed assumption of liability); *U.S. Bank Nat'l Assn. v. EPA*, 563 F.3d 199, 205-07 (6th Cir. 2009) (purchaser liable to the government in a CERCLA case based on an agreed assumption of liability); *United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1233, 1238-44 (E.D. Cal. 1997) (same); *Caldwell Trucking PRP v. Rexon Technol. Corp.*, 421 F.3d 234, 241-43 (3d Cir. 2005) (purchaser that agreed to assume the seller's environmental liabilities held directly liable to a private party CERCLA claimant); *Clean Harbors, Inc. v. Arkema, Inc. (In re Safety-Kleen Corp.)*, 380 B.R. 716, 739-40 (Bankr. D. Del. 2008) (same); *Ashley II of Charleston, L.L.C. v. PCS Nitrogen, Inc.*, No. 2:05-2782, 2007 WL 2893372, at *4-8 (D.S.C. Sept. 28, 2007) (same); *Nw. Mut. Life Ins. Co. v. Atl. Research Corp.*, 847 F. Supp. 389, 399 (E.D. Va. 1994) (same).

[18]      *See, e.g., Beck*, 190 F. Supp. 2d at 535, 540; *Chrysler*, 1990 WL 127160, at *4-7.

15

Finally, the Court can comfortably disregard API's overblown assertion that its

December 19 Decision and Order "upsets established corporate law throughout America."

Dkt. 287 at 15.  The decision rests on an unremarkable and well-accepted proposition:

"If a buyer agrees to assume the seller's liability to third parties, it is for that reason liable."

Marie T. Reilly, Making Sense of Successor Liability, 31 HOFSTRA L. REV. 745, 746 (2003).

The Court was right to deny API's motion for summary judgment.

## Conclusion

The Court should deny API's motion to reconsider the December 19, 2011, Decision and

Order for the foregoing reasons and the additional reasons set forth in detail in Plaintiffs' brief in

opposition to API's motion for summary judgment (Dkt. 205).

Plaintiffs' Joint Brief in Opposition to Defendant Appleton Papers Inc.'s Motion to Reconsider the Court's Decision and Order of December 19, 2011, in *United States and the State of Wisconsin v. NCR Corp. et al.*, Civil Action No. 10-C-910 (E.D. Wis.)

Respectfully submitted,

For the United States of America

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

Dated:   February 3, 2012

s/ *Randall M. Stone*
RANDALL M. STONE
JEFFREY A. SPECTOR
KRISTIN M. FURRIE
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
Telephone:     202-514-1308
Facsimile:     202-616-6584
E-Mail:          randall.stone@usdoj.gov


GREGORY J. HAANSTAD
Attorney for the United States, Acting
Under Authority Conferred by 28 U.S.C. § 515

SUSAN M. KNEPEL
Assistant United States Attorney
Office of the United States Attorney
517 E. Wisconsin Avenue, Room 530
Milwaukee, WI  53202



For the State of Wisconsin

Dated:   February 3, 2012

s/ *Cynthia R. Hirsch*
CYNTHIA R. HIRSCH
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
P.O. Box 7857
Madison, WI  53707-7857

17

## CERTIFICATE OF SERVICE

       The undersigned hereby certifies that, on this day, the foregoing Brief was filed electronically with the Clerk of the Court using the Court's Electronic Court Filing System, which sent notification of such filing to the following counsel:

**Mary Rose Alexander**
Latham & Watkins LLP
mary.rose.alexander@lw.com

**Thomas Armstrong**
von Briesen & Roper SC
tarmstro@vonbriesen.com

**Paul Bargren**
Foley & Lardner LLP
pbargren@foley.com

**Linda E. Benfield**
Foley & Lardner LLP
lbenfield@foley.com

**Dennis P. Birke**
DeWitt Ross & Stevens SC
db@dewittross.com

**Steven P. Bogart**
Reinhart Boerner Van Deuren SC
sbogart@reinhartlaw.com

**Michael P. Carlton**
von Briesen & Roper SC
mcarlton@vonbriesen.com

**Evan R. Chesler**
Cravath Swaine & Moore LLP
echesler@cravath.com

**Marc E. Davies**
Greenberg Traurig LLP
daviesm@gtlaw.com

**Brandon J. Evans**
Hermes Law Ltd.
bje@hermeslawltd.com

**S. Todd Farris**
Friebert Finerty & St. John SC
stf@ffsj.com

**Patrick J. Ferguson**
Latham & Watkins LLP
patrick.ferguson@lw.com

**Sandra C. Goldstein**
Cravath Swaine & Moore LLP
sgoldstein@cravath.com

**Thomas R. Gottshall**
Haynsworth Sinkler Boyd PA
lgantt@hsblawfirm.com

**Eric W. Ha**
Sidley Austin LLP
eha@sidley.com

**Scott W. Hansen**
Reinhart Boerner Van Deuren SC
shansen@reinhartlaw.com

**William H. Harbeck**
Quarles & Brady LLP
william.harbeck@quarles.com

**Michael L. Hermes**
Hermes Law Ltd.
mlh@hermeslawltd.com

**Cynthia R. Hirsch**
Wisconsin Department of Justice
hirschcr@doj.state.wi.us

**Caleb J. Holmes**
Greenberg Traurig LLP
holmesc@gtlaw.com

**Philip C. Hunsucker**
Hunsucker Goodstein & Nelson PC
phunsucker@hgnlaw.com

**Peter C. Karegeannes**
Quarles & Brady LLP
peter.karegeannes@quarles.com

**Gregory A. Krauss**
Gregory Krauss pllc
gkrauss@krausspllc.com

**Paul G. Kent**
Stafford Rosenbaum LLP
pkent@staffordlaw.com

**Ericka L. Krumrie**
Hermes Law Ltd
elk@hermeslawltd.com

**Linda R. Larson**
Marten Law PLLC
llarson@martenlaw.com

**Vanessa A. Lavely**
Cravath Swaine & Moore LLP
vlavely@cravath.com

**Susan E. Lovern**
von Briesen & Roper SC
slovern@vonbriesen.com

**Kevin J. Lyons**
Davis & Kuelthau SC
klyons@dkattorneys.com

**Karl S. Lytz**
Latham & Watkins LLP
karl.lytz@lw.com

**Meline G. MacCurdy**
Marten Law
mmaccurdy@martenlaw.com

**David G. Mandelbaum**
Greenberg Traurig LLP
mandelbaumd@gtlaw.com

**Bradley M. Marten**
Marten Law
bmarten@martenlaw.com

**Tara M. Mathison**
Davis & Kuelthau SC
tmathison@dkattorneys.com

**Darin P. McAtee**
Cravath Swaine & Moore LLP
dmcatee@cravath.com

**Stephen F. McKinney**
Haynsworth Sinkler Boyd PA
smckinney@hsblawfirm.com

**Heidi D. Melzer**
Hermes Law Ltd.
hdm@hermeslawltd.com

**Elizabeth K. Miles**
Davis & Kuelthau SC
emiles@dkattorneys.com

**Sabrina Mizrachi**
Greenberg Traurig LLP
mizrachis@gtlaw.com

**Monique M. Mooney**
Greenberg Traurig LLP
mooneym@gtlaw.com

**William J. Mulligan**
Davis & Kuelthau SC
wmulligan@dkattorneys.com

**Daniel C. Murray**
Johnson & Bell Ltd.
murrayd@jbltd.com

**Omid H. Nasab**
Cravath Swaine & Moore LLP
onasab@cravath.com

**Kelly J. Noyes**
von Briesen & Roper SC
knoyes@vonbriesen.com

**Nancy K. Peterson**
Quarles & Brady LLP
nancy.peterson@quarles.com

**Thomas M. Phillips**
Reinhart Boerner Van Deuren SC
tphillip@reinhartlaw.com

**Ian A.J. Pitz**
Michael Best & Friedrich LLP
iapitz@michaelbest.com

**David A. Rabbino**
Hunsucker Goodstein & Nelson PC
drabbino@hgnlaw.com

**Joan Radovich**
Sidley Austin LLP
jradovich@sidley.com

**Ronald R. Ragatz**
DeWitt Ross & Stevens SC
rrr@dewittross.com

**Alexandra Reeve Givens**
Cravath Swaine & Moore LLP
agivens@cravath.com

**Kathleen L. Roach**
Sidley Austin LLP
kroach@sidley.com

**Megan A. Senatori**
DeWitt Ross & Stevens SC
ms@dewittross.com

**Adam B. Silverman**
Greenberg Traurig LLP
silvermana@gtlaw.com

**Sarah A. Slack**
Foley & Lardner LLP
sslack@foley.com

**Margaret R. Sobota**
Sidley Austin LLP
msobota@sidley.com

**Anthony S. Wachewicz, III**
City of Green Bay
tonywa@ci.green-bay.wi.us

**James P. Walsh**
Appleton City Attorney
jim.walsh@appleton.org

**Ted A. Warpinski**
Friebert Finerty & St John SC
taw@ffsj.com

**Ted Waskowski**
Stafford Rosenbaum LLP
twaskowski@staffordlaw.com

**Evan B. Westerfield**
Sidley Austin LLP
evanwesterfield@sidley.com

**Richard C. Yde**
Stafford Rosenbaum LLP
ryde@staffordlaw.com

Dated:  February 3, 2012                    s/ *Randall M. Stone*