IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

UNITED STATES OF AMERICA and
THE STATE OF WISCONSIN,

Plaintiffs,

v.

NCR CORPORATION, *et al*.,

Defendants.

No. 10-CV-910-WCG

**REPLY MEMORANDUM OF DEFENDANT APPLETON PAPERS INC.
IN SUPPORT OF MOTION TO RECONSIDER THE COURT'S
DECISION AND ORDER OF DECEMBER 19, 2011**

Defendant Appleton Papers Inc. ("API"), by its undersigned counsel, submits this Reply Memorandum in support of its Motion to Reconsider the Court's Decision and Order of December 19, 2011 ("December Decision").

**INTRODUCTION**

In its December Decision, the Court concluded that if a buyer of corporate assets has agreed by contract to assume the seller's liabilities, the seller's continued existence and viability is not an impediment to holding the buyer liable to third parties for claims allegedly attributable to the seller's conduct. This is so, the Court reasoned, because subjecting the buyer to third-party liability, despite the availability and viability of the seller, "is simply a matter of enforcing an explicit contract that created additional liability." Dkt. 279 at 6. The Court denied API's motion for summary judgment because, according to the Court, the terms of the 1978 Asset Purchase Agreement "could" encompass liability for PCB contamination in the Lower Fox River. *Id.* at 11-12.

API's opening brief demonstrated that the Court's ruling overlooked the "negating clause" in the 1978 Agreement that explicitly disclaimed the creation of enforcement rights in third parties. While this fact alone warrants reconsideration and withdrawal of the December

Decision, API also demonstrated that the Court was incorrect when it ruled that the terms of the 1978 Agreement and the 1998 Settlement Agreement could support a finding that API assumed liability for PCB contamination in the Fox River.

In their briefs opposing API's motion for reconsideration, the Government and Certain Defendants attempt to minimize and dismiss the significance of the negating clause, but they cite no case where a court has not enforced a negating clause in circumstances like those present here — in stark contrast to the many cases where courts have strictly enforced such clauses.

Moreover, the Government's contention that its successor liability claim against API is based upon "non-contract law" (and that the negating clause is therefore irrelevant) is, of course, in direct conflict with the December Decision. If API's alleged liability as a successor is not grounded upon an "explicit contract," the essential predicate for this Court's analysis in the December Decision, then the *only* basis for subjecting API to liability for its alleged predecessors' actions is equity, *i.e.*, transferring NCR's liability to API as a matter of equity to avoid injustice. But, as the Court has already ruled, "none of the equitable considerations that would otherwise support imposition of successor liability are in play here" since NCR "remains in existence and is undeniably liable to the United States under CERCLA." Dkt. 172 at 18. Thus, rather than supporting the December Decision, the Government's "non-contract law" theory disclaims its foundation.

The efforts by the Government and Certain Defendants to defend the Court's construction of the 1978 Agreement and the 1998 Settlement Agreement are equally baseless. Recognizing that the record before the Court was devoid of evidence to support the Court's interpretation of the 1978 Agreement, the Government has filed 21 additional exhibits that were not previously filed in opposition to API's summary judgment motion. API's motion for reconsideration raised no new factual matters outside the existing record and the Government's flagrant attempt to

introduce new evidence in response to a motion for reconsideration is improper. The exhibits must be stricken.

However, neither these exhibits nor the new arguments can mask the fact that the December Decision stretches, bends and contorts the language of both the 1978 Agreement and the 1998 Settlement Agreement beyond their plain meaning in order to find an assumption of liability where none exists.

API respectfully requests reconsideration and withdrawal of the December Decision and entry of summary judgment in its favor on the issue of its liability under CERCLA.

## ARGUMENT

### I. THE COURT'S SUCCESSOR LIABILITY ANALYSIS IS FLAWED.

#### A. The Negating Clause Bars Third Parties, Such As The Government, From Claiming Contractual Rights Arising From the 1978 Agreement.

In its December Decision, the Court reasoned that equitable considerations (such as the continued viability of a selling corporation) do not come into play if an asset buyer contractually assumes the liability of the asset seller because subjecting the buyer to liability in that situation "is simply a matter of enforcing an explicit contract that created additional liability." Dkt. at 6. Implicit in the Court's analysis is the notion that a third-party claimant has a right as a third-party beneficiary to sue the buyer for damages arising from the seller's actions. In its December Decision, the Court accepted the Government's assertion that the third party has standing to assert such a claim because the buyer and seller "negotiate[ed] successor liability *as a matter of contract*, a contract to which the public is a third-party beneficiary." *Id*. at 3 (emphasis added).

As API's opening brief demonstrated, the fatal flaw in the Court's analysis is that § 10.10 of the 1978 Agreement includes a negating clause that expressly disclaims any third-party contractual rights. In that provision, NCR and API agreed that API's assumption of certain

enumerated liabilities[1] was solely for NCR's benefit, and that third parties (such as the Government) have no rights and remedies under the 1978 Agreement.[2]

Courts routinely, and strictly, enforce negating clauses in asset purchase agreements. In *In re Lehman Brothers Holdings Inc.*, No. 08-13555, 2011 WL 722601 (Bankr. S.D.N.Y. Feb. 22, 2011), the court, applying New York law, dismissed third-party claims asserted against the buyer of corporate assets where the asset purchase agreement included a negating clause identical in substance to the one in the 1978 Agreement. The court explained:

> Here, the only parties to the APA [asset purchase agreement] are Lehman and Barclays, and, under that agreement, Barclays was careful in agreeing to assume only specifically identified liabilities relating to employment compensation. Former employees were expressly excluded as third-party beneficiaries under the unambiguous language of the negating clause that appears in § 13.9 of the APA. This provision of the agreement conclusively establishes that former employees have no rights under the APA and effectively takes away the argument that Article IX of the APA is intended to benefit Transferred Employees.
>
> New York law is clear on this point. The inclusion of a negating clause in a contract is decisive in determining that a party lacks standing to claim third-party beneficiary status.

*Id*. at *6. Numerous other courts have reached the same conclusion.[3]

Certain Defendants cite language in *In re Safety-Kleen Corp.*, 380 B.R. 716 (Bankr. D. Del. 2008) that suggests that an assumption of liabilities *always* trumps a negating clause — an

---

[1] The Fox River liability is not one of the liabilities API assumed.

[2] The Government's assertion that § 10.10 is not a "true 'negating clause'" (Dkt. 302 at 11 of 20) is belied by the provision's plain language. *See, e.g.*, *Ward v. Glover*, 206 S.W.3d 17, 34 (Tenn. Ct. App. 2006) (construing language identical to that in § 10.10 as negating third-party beneficiary rights).

[3] *See, e.g.*, *Liberty Mut. Ins. Co. v. Household Int'l, Inc.*, 136 F. Supp. 2d 5, 8-9 (D. Mass. 2001) (citing a negating clause in the agreement whereby liabilities were assumed, the court dismissed a third party's successor liability claim even though it was undisputed that the defendant has assumed the liability); *Anderson v. BASF Corp.*, No. 00-C-6804, 2001 WL 1035211, *3 (N.D. Ill. Aug. 4, 2001) ("The court concludes that the clear import of this [negating] provision is that . . . there are no third-party beneficiaries to the Purchase Agreement."); *Duvall v. Galt Med. Corp.*, No. C-07-03714, 2007 WL 4207792, *8 (N.D. Cal. Nov. 27, 2007) ("Where, as here, the [stock purchase agreement] expressly states that there are no third-party beneficiaries, that provision has been found to defeat contractual claims by a purported third-party beneficiary."); *GlaxoSmithKline Consumer Healthcare, L.P. v. ICL Performance Prods., L.P.*, No. 07-CV-2039, 2009 WL 2151190, *5 (E.D. Mo. July 16, 2009) ("Brenntag simply cannot claim to be a third party beneficiary of the [Asset Purchase] Agreement by virtue of its clear, unambiguous terms which specifically exclude any third party claims."); *Kaesemeyer v. Angiogenix, Inc.*, 629 S.E.2d 22, 25 (Ga. Ct. App. 2006) ("Given this explicit language [in a negating clause], the intent of the parties that no others benefit from the [Asset Purchase Agreement] could scarcely have been more clearly and unambiguously expressed.")

assertion flatly contradicted by the numerous decisions cited above.[4] Moreover, Certain Defendants omit the next sentence in the decision, stating that the Bankruptcy Court's "Sale Order expressly conferred third-party beneficiary rights on interested parties, including [the claimants before the court]." *Id.* at 740. Thus, *Safety-Kleen* ultimately holds only that a bankruptcy court's order can trump a negating clause — a holding without application here.

Contrary to the Government's claims, § 10.10's negating clause is not inconsistent with, or trumped by, other provisions in the 1978 Agreement. The clause does not "void" API's agreement in § 1.4 to assume certain liabilities. Dkt. 302 at 11 of 20. Section 1.4 sets forth API's promise *to NCR* to assume and discharge certain of NCR's liabilities. Section 10.10 expresses the parties' agreement that API's promises *to NCR* in § 1.4 (and other parts of the Agreement) did not extend to, or create rights in favor of, third parties. Such an interpretation of the two provisions does not render § 1.4 "meaningless," as the Government asserts. Dkt. 302 at 11 of 20. Section 10.10 in no way affects the promises that API made to NCR in § 1.4. There is a conflict between the two provisions only if one assumes, as the Government mistakenly does, that § 1.4 creates rights in favor of third parties.[5] In fact, § 1.4 makes no reference to creating third party rights, and § 10.10 simply confirms the parties' intention not to create any such rights.

---

[4] The *Safety-Kleen* court provides no support for its bald assertion that a buyer of corporate assets becomes liable to third parties, irrespective of any negating clause. The only decision it cited, *Roesner v. Majestic Mgmt., Inc.*, 321 B.R. 128, 135-37 (Bankr. D. Del. 2005), did not address this issue and simply held that a bankruptcy trustee had standing to assert successor liability claims on behalf of the debtor's creditors. While the decision made a passing reference to the presence of a negating clause in an asset purchase agreement, the issue before the court was the scope of authority of the bankruptcy trustee. Neither the facts nor the reasoning in *Roesner* provide a foundation for the proposition attributed to it in *Safety-Kleen*.

Certain Defendants also cite *Caldwell Trucking PRP v. Rexon Technology Corp*., 421 F.3d 234 (3rd Cir. 2005), but that case is distinguishable. The court there held that the negating clause had to "yield" to the "specific direction" of the assumption clause, which provided that "[a]nything contained herein . . . to the contrary notwithstanding, [Pullman] agrees to assume . . . all liabilities . . ." *Id*. at 245. The 1978 Agreement does not use similar language.

[5] The Government quotes language in *United States v. Sunoco, Inc.*, 637 F. Supp. 2d 282, 288 (E.D. Pa. 2009) stating that "[a]ssumption of liability by consent means that the acquiring entity agrees to be liable to third parties." Dkt. 302 at 15 of 20. In support of that assertion, the *Sunoco* court cites a law review article in which the

(footnote continued on next page)

Nor is there any merit to the Government's assertion that the negating clause conflicts with API's agreement in § 1.4.7 to assume liability with respect to a certain then-pending lawsuit in Pennsylvania that the United States had filed against NCR. Dkt. 302 at 11-12 of 20. API's agreement to assume NCR's liability for that lawsuit did not *in itself* render API directly liable to the United States for the claims, as the Government appears to contend. *Id*. Instead, API's direct liability to the United States for the claim arose when, after the closing of the 1978 transaction, API appeared in the lawsuit as the defendant. API elected to appear and to, in effect, step into NCR's shoes because it determined that it was an efficient way to discharge its obligation *to NCR*, and not because (as the Government mistakenly assumes) the Agreement itself rendered API directly liable to the United States.[6]

Finally, both the Government and Certain Defendants mention that the negating clause appears in the 1978 Asset Purchase Agreement but not in the Assumption Agreement. The fact that the negating clause was not repeated in the Assumption Agreement has no significance. The Asset Purchase Agreement and the Assumption Agreement (and numerous other attachments to the Asset Purchase Agreement) are part of one integrated agreement. Section 10.13 of the 1978 Agreement provides that "this Agreement, the Schedules referred to herein and the Exhibits and Annexes hereto constitute the entire agreement between the parties with respect to the subject matter hereof." Dkt. 139-4 at 44 of 49. Section 6.2 of the Agreement required that

(footnote continued from prior page)

author actually states something quite different: "If a buyer agrees to assume the seller's liability *to third parties*, it is *for that reason* liable." Marie T. Reilly, *Making Sense of Successor Liability*, 31 Hofstra L. Rev. 745, 746 (2003) (emphasis added). Thus, the article simply states a truism: a buyer is liable to third parties if it assumes a seller's liabilities to third parties. Here, the negating clause confirms that API did not assume liability to third parties. Further, since the *Sunoco* court ultimately held that the agreement in question "does not establish successor liability," 637 F. Supp. 2d at 289, the court had no occasion to decide the issue for which the Government cites the case.

[6] The Government's assertion that "Section 10.10 and a related clause actually envision that some third parties may be able to assert rights and benefits under the contract, at least by an assignment" is mystifying. Dkt. 302 at 11 of 20, citing §§ 10.10 and 10.15. Neither § 10.10 (the negating clause) nor § 10.15 (which prohibits assignments without consent of the other party) "envision" any kind of third party claim.

"Purchaser shall deliver an assumption agreement in substantially the form of Exhibit 2 attached hereto." *Id*. at 16 of 49. The Asset Purchase Agreement and the Assumption Agreement are thus part and parcel of one integrated agreement, and the lack of a repeated negating clause in the Assumption Agreement cannot render § 10.10 mere surplusage.

Accordingly, if API's liability to the Government as a successor is "simply a matter of enforcing an explicit contract" (Dkt. 279 at 6), then API was entitled to summary judgment because the "explicit contract" before the Court negates the Government's third party claim. Therefore, the Court should reconsider and withdraw its December Decision and enter summary judgment for API.[7]

**B. The Government's Assertion That Its Claim Against API Arises From "Non-Contract Law" Disclaims The Basis For The Court's December Decision.**

In its July 2011 Decision, the Court concluded that there was no basis in equity — the usual basis for successor liability — to impose successor liability on API since NCR was both liable and available to respond to the claim. Dkt. 172 at 18. However, under the Court's analysis in the December Decision, a third-party CERCLA claimant in an alleged assumption-by-agreement case can possibly recover from an asset buyer without regard to the usual equitable factors (such as whether the asset seller was available to respond to the claim) because the claimant is suing to enforce a contract even though the claimant is not a party to the contract.

---

[7] API is not suggesting here that a buyer of corporate assets can insulate itself from true successor liability by including a negating clause in an asset purchase agreement. Where the buyer assumes the seller's liabilities subject to a negating clause, but the seller is unavailable to respond to a third party's claim (thereby leaving the claimant without a remedy), a court could impose successor liability on the buyer as a matter of equity to avoid injustice. In such a situation, the imposition of successor liability as a matter of equity may be "justified by the facts of [the] case," *N. Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 6501 (7th Cir. 1998), *overruled on other grounds, Envision Healthcare Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983 (7th Cir. 2010)., even though the third party claimant could not sue the buyer as a matter of contract. *See, e.g., United States v. Midwest Generation, LLC*, 781 F. Supp. 2d 677, 688-89 (N.D. Ill. 2011) (recognizing the equitable underpinnings of the successor liability doctrine where the Government's sole alleged basis for liability was express assumption). That, of course, is not the situation before this Court, since NCR is available to respond to the Government's claim.

Confronted with a negating clause that bars such a contract claim, the Government changes its approach again. The Government now claims that "the United States is not suing on the contract," and says instead that it really is just relying on language of the 1978 Agreement to demonstrate that API assumed the liability in question. Dkt. 302 at 12-13 of 20. According to the Government, it is "suing under *non-contract law* based on an assumption of successor liability" (Dkt. 302 at 12 of 20) (emphasis added) and that the negating clause, therefore, is "irrelevant." The Government has fallen off its own legal tightrope.

*First*, the Government's new argument, if accepted, disclaims the basis for the December Decision. That Decision, which justified the imposition of successor liability without regard to equitable considerations on the ground the Government was "enforcing an explicit contract," cannot be reconciled with the Government's new assertion that "the United States is not suing on the contract to enforce [contractual obligations]." Dkt. 302 at 13 of 20. If successor liability here does not arise from contract (as the Government now claims), then the Court must look to equity, and it has already ruled that there is no equitable reason to impose successor liability so long as NCR is liable and viable. This, without more, necessitates reconsideration and withdrawal of the Court's December Decision.

*Second*, the Government's assertion that its "non-contract law" theory is "well-recognized" is unfounded.[8] The Government cites language in *United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1233 (N.D. Cal. 1997), but, as this Court has already ruled, that case is distinguishable because there, unlike here, "the predecessor companies had been

[8] The court in *In re Lehman Brothers* rejected the same argument the Government advances here. The claimant there (like the Government here) attempted to evade a negating clause by claiming that she was not *really* suing on the contract as a third-party beneficiary. The court flatly dismissed the assertion, stating: "[Plaintiff] cannot escape from the fact that she is a third party who is seeking relief from Barclays that is dependent upon an interpretation of the [asset purchase agreement] . . ." 2011 WL 722601 *8, n.11. Here, too, the Government, a stranger to the 1978 Agreement, is seeking relief from API that is dependent upon an interpretation of that agreement.

dissolved." Dkt. 279 at 3. *Heritage Realty Management, Inc. v. Symbiot Snow Management Network, LLC*, No. 06-47, 2007 WL 2903941 (W.D. Pa. Sept. 28, 2007), also cited by the Government, actually supports API's position, as the asset seller there was no longer financially viable and so the Court concluded that the traditional equitable rules for successor liability applied. Because there was an express assumption and no viable asset seller, the court found the asset buyer liable for the debt, but limited the buyer's liability to the amount the buyer had expressly assumed ($170,000), rather the full debt. Notably, neither *Iron Mountain* nor *Heritage Realty* cite any decision supporting the language upon which the Government relies.[9]

*Finally*, even under the Government's theory, the Court would have to look to the 1978 Agreement to decide whether or not API allegedly assumed liability for the Government's claim. That requires the Court to take into account *all* terms and conditions in the Agreement, including § 10.10, in order to decide the scope and extent of any assumption, and not just the provisions the Government cherry-picks. Thus, even under the Government's theory, the negating clause is dispositive in establishing that API did not assume liability for claims asserted by third parties.

## II. THE COURT ERRED IN ITS ANALYSIS OF THE 1978 AGREEMENT.

In its December Decision, the Court ruled that the terms of the 1978 Agreement "could" encompass liabilities arising from PCB contamination in the Fox River, without deciding whether in fact the liability was assumed. Dkt. 279 at 11-12. The Court based its ruling on language in Schedule A to the 1978 Agreement indicating that NCR's Appleton Papers Division ("APD") "receives and has received notices from time to time" from government agencies

[9] Certain Defendants cite *Bouton v. Litton Industries, Inc.*, 423 F.2d 643 (3rd Cir. 1970) and *Hatco Corp. v. W.R. Grace & Co.-Conn*, 59 F.3d 400 (3rd Cir. 1995) for the proposition that "[w]hen API assumed liabilities, it stepped into the shoes of NCR with respect to the obligations and liabilities assumed." Dkt. 304 at 4. *Bouton* and *Hatco* each involved lawsuits solely between the sellers and buyers of corporate assets concerning their respective contractual obligations arising from asset purchase agreements. Since neither case involved third party claims allegedly arising from an asset purchase agreement, the court in neither case had occasion to consider, much less decide, whether a buyer of assets who assume the sellers liabilities "takes the obligation . . . unto himself" (*Bouton*, 423 F.2d at 651) *with respect to third party claimants* – the issue before this Court.

"claiming violation of environmental and pollution control laws," and that such "claims may result, and have resulted in fines and corrective action." According to the Court, the notice regarding PCB contamination that API received from the Government in 1996 (18 years after the 1978 transaction) may constitute such a notice of violation. The Court acknowledges that "the PCB problem was not the subject of any notices APD had received as of 1978." Dkt. 279 at 10.

### A. The Government Has Not Established That The Appleton Papers Division Violated Any Environmental Law Related to PCBs.

API's opening brief demonstrated that the Court's analysis overlooks the fact that Schedule A speaks only about the APD's receipt of "notices . . . claiming *violation* of environmental and pollution control laws . . . " (Dkt. 195-3 at 4 of 6 (emphasis added)), and that the Government has never alleged that the Fox River PCB claim arises from the APD's violation of CERCLA or any other law. The focus of Schedule A was upon *violations* of environmental law; the Court had nothing before it to suggest that Schedule A was intended to cover (*i.e.*, subject API to liability for) environmental laws, like CERCLA, that impose liability based upon a party's *status* (*e.g.*, an owner or operator of a facility from which hazardous substances were released), without regard to any violation of law. Dkt. 287 at 10-11. Nor was there anything before the Court suggesting any that violations of law as of 1978 had anything to do with PCBs.

The Government, obviously concerned that the Court's Decision identifies no violation of an environmental law by the APD that might trigger Schedule A, responds to API's argument by claiming that, in the years preceding the 1978 transaction, the APD's Combined Locks facility had been cited for violating certain water discharge regulations, resulting (according the Government) in the unlawful discharge of PCBs. Dkt. 302 at 4-7 of 20. The Government appears to be suggesting that these pre-1978 violations provide a predicate for the Fox River claim that the Government asserted against API in 1996.

The first problem with the Government's argument is that it is based upon documents never offered in opposition to API's summary judgment motion. All of the documents were first put into the record when the Government filed its brief in opposition to API's reconsideration motion. Since API put no new evidence into the record with its motion for reconsideration, and raised no new factual issues, the Government has no right now to supplement the record with documents that, if relevant to API's summary judgment motion, should have been filed with the Government's other evidentiary submissions in opposition to that motion. Had the Court granted API's summary judgment motion, clearly the Government would not be entitled to seek reconsideration of that decision on the basis of documents (such as those it now offers) that it possessed but failed to offer when its response to the summary judgment motion was due. *See Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("A party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.' . . . Reconsideration is not an appropriate forum for . . . arguing matters that could have been heard during the pendency of the previous motion.") (internal citations omitted). Accordingly, the Court should strike the Second Declaration of Randall M. Stone (Dkt. 301) and the exhibits thereto (Dkts. 301-1 through 301-21).

The Government's new documents and arguments do not, in any event, cure the problem. Schedule A references violations of environmental laws at the "facilities of Appleton Paper Division located in Pennsylvania and Wisconsin." Dkt. 195-3 at 4 of 6. It is undisputed that the Appleton Papers Division ("APD") first came into existence in 1973. Dkt. 204 at 5 of 33, ¶ 16. The Government has offered no evidence indicating that the APD ever received any notice of a violation of the Refuse Act between 1973 and 1978. Moreover, it is also undisputed that use of PCBs in the production of carbonless copy paper ended in 1971. *Id.* at 4 of 33, ¶ 10. Consequently, between 1973 and 1978, no APD facilities were using PCBs. Therefore, even if

the Government was correct that the APD's Combined Locks facility needed a Refuse Act permit (an allegation made by the Government for the first time 40 years after the fact), any such alleged violation by the APD would have had nothing to do with the discharge of PCBs into the Fox River since PCBs were no longer in use.

Likewise, even if the Government is correct that the APD missed by four months the December 1973 deadline for completing a new wastewater treatment system at the Combined Locks facility, and even if thereafter there were occasional unpermitted bypasses of the treatment system (Dkt. 302 at 6 of 20), the Government has no basis for contending that PCBs were discharged into the Fox River as a result of these alleged violations, since use of PCBs had been discontinued more than two years earlier. In fact, evidence in the record demonstrates that in sampling events from that time period that analyzed both the influent into and the effluent from the Combined Locks facility, whenever PCBs were detected in the effluent leaving the facility, they were never higher and generally lower than the pre-existing level of PCBs detected in the river water drawn into the plant. *See*, *e.g.*, Dkt. 139-18 at 4-5; Dkt. 139-20 at 5-6. This evidence refutes any claim that there were violations of environmental laws related to the discharge of PCBs at the APD's Combined Locks facility between 1973 and 1978.[10]

### B. The Court's Interpretation Of The 1978 Agreement Conflicts With The Decision Of The 2005 Arbitration Panel.

API's opening brief also demonstrated that the Court's conclusion that the 1978 Agreement "could" encompass the Fox River claim is contrary to the finding of the arbitration panel in 2005 that "the issue of responsibility for the environmental costs at issue" could not be decided "solely on the contract language." Dkt. 287 at 10. In other words, the

[10] The Government also *speculates* that the APD facilities *might* have been charged with violating two federal environmental statutes enacted in 1976 and certain other federal and state water pollution laws (Dkt. 302 at 6-7 of 20), but it makes no claim that any such violation was ever alleged or that the APD received notice of such a violation.

arbitration panel held that language of the 1978 Agreement could not support a conclusion that API had assumed liability for PCB contamination in the Fox River. The arbitrators' decision was reduced to a federal court judgment that deserves deference under principles of comity and full faith and credit.

The Government has not responded to this argument. Certain Defendants agree that the arbitration panel decided the "exact same issue" (Dkt. 304 at 9), but ignore the fact that this Court's reading of the 1978 Agreement conflicts with the panel's conclusion.[11] Thus, neither the Government nor Certain Defendants have offered any way to reconcile the conflict between this Court's conclusion that the assumption language in the 1978 Agreement "could" encompass the Fox River PCB liability and the arbitration panel's conclusion (after a full adjudication that included this exact issue) that the language of the Agreement could not support such a determination.

The December Decision creates the bizarre situation where the Government is being permitted to pursue an interpretation of the 1978 Agreement that NCR, a party to the 1978 Agreement, is foreclosed from making (since it is bound by the decision of the arbitration panel). It is legally inconceivable that a third party would have greater rights under the 1978 Agreement than a contracting party has.

Accordingly, the Court's decision is patently wrong when it concludes that "the purchase agreement, *as interpreted and applied by the arbitration panel*, could impose liability." Dkt. 279 at 11 (emphasis added). In fact, the arbitration panel said just the opposite. Therefore, the

[11] Certain Defendants assert the Court's December Decision is consistent with the decision of the arbitration panel, citing the fact that the panel ultimately concluded that API should bear a 60% share of the joint liability of API and NCR. Dkt. 304 at 9-10. Certain Defendants ignore the fact that, had the panel concluded API had assumed the liability for the Fox River claim, the arbitration agreement allowed the panel to assess a maximum 75% share against API. The panel did not assess such a share apparently because they concluded – contrary to this Court – that the language of the 1978 Agreement could not support a conclusion that API had assumed liability for the Fox River matter.

Court's conclusion that its December Decision simply applies the logic, reasoning and conclusions of the arbitration panel is, respectfully, inaccurate both factually and legally.

## III. THE COURT ERRED IN CONCLUDING THAT SUCCESSOR LIABILITY MIGHT BE BASED UPON THE 1998 SETTLEMENT AGREEMENT.

NCR and API/BAT entered into the 1998 Settlement Agreement to resolve their dispute over who (as between API and NCR) was liable under the terms of the 1978 Agreement for the Fox River claim. The fundamental problem with the Court's treatment of the 1998 Settlement Agreement in the December Decision is that it incorrectly concludes that by entering into the Agreement, API assumed the very liability it was disputing. That conclusion cannot be squared with the plain language of the 1998 Agreement, in particular the language in that Agreement whereby each party disclaimed any admission of liability in the same sentence in which they agreed to share costs:

> Without admitting any . . . liability, the parties agree to combine and allocate as between themselves . . . all Damages . . . allocated or assessed to, imposed upon or incurred by NCR or API/BAT . . . relating to the Fox River sites. . .

Dkt. 124-1 at 14. Whether there was an assumption of liability in the 1978 Agreement was the issue in the litigation which the parties opted to settle rather than litigate. Thus, the provisions in the 1998 Settlement Agreement stating that no "liability" was being admitted refers to any liability via such an assumption in the 1978 Agreement.

In its December Decision, the Court dismissed this mutual disclaimer, claiming that such a provision "does not mean . . . that one of the signatories could not assume the liability that another party was actually found to have." Dkt. 279 at 11. The question before the Court, however, was not whether a party "could" or "might" assume liability as an abstract possibility. The issue before the Court was the intent of the parties to the 1998 Agreement as reflected in the language of the Agreement. No variation of the words "assume" or "assumption" can be found

in the 1998 Agreement. In its July Decision, the Court looked at the language and reached a result that followed naturally from the language of the Agreement:

> [The 1998 Agreement] established a shared responsibility for payments, and subsequent arbitration adjusted those amounts further. Moreover, the agreement explicitly disclaimed any suggestion that either party was admitting to any liability whatsoever. All these agreements demonstrate is that Appleton Papers and NCR will share in the costs resulting from the Fox River cleanup. They do not establish that Appleton Papers is a successor to the liability that underlies this action.

Dkt. 172 at 20.

In its December Decision, the Court rejected its straightforward interpretation of the 1998 Agreement in favor of one inconsistent with the plain meaning of the text in the Agreement. Why would parties disputing a liability resolve that dispute by agreeing to assume the liability, especially when their dispute could be (and was) readily resolved by an agreement to simply share costs? Isn't it more likely that parties are entering into a cost sharing allocation agreement (as opposed to an agreement to assume liability) when they say just that in the same sentence disclaiming any admission of liability?

The Court discarded one reading of the 1998 Agreement that flowed naturally and logically from the language used in favor of another that does not. Respectfully, this strained result seems tailored to reach a particular outcome, rather than fairly interpreting the language of a contract.

**CONCLUSION**

The Court should ask itself why, when the courtroom is filled with PRPs who have admitted liability under CERCLA, and against whom the Government purports to be enforcing its 106 Order, the only effort the Government has spent to date in this action is a series of complicated machinations to compel API – the only party everyone agrees did not discharge any PCBs into the Lower Fox – to perform 60% of the work required to remove them. This effort

turns CERCLA's "polluter pays" policy on its head and makes a mockery of the United States' authority to enforce environmental laws.

For the foregoing reasons, Defendant Appleton Papers Inc. respectfully requests that the Court grants it motion for reconsideration, withdraw its Decision and Order of December 19, 2011, and grant API's motion for summary judgment (Dkt. 194). API also requests that the Court enter an order striking the Second Declaration of Randall M. Stone (Dkt. 301) and the exhibits thereto (Dkts. 301-1 through 301-21).

Dated this 20th day of February, 2012.

Respectfully submitted,

APPLETON PAPERS INC.

By: /s/ Ronald R. Ragatz
One of Its Attorneys

Counsel for Appleton Papers Inc.:

Michael L. Hermes (#1019623)
Heidi D. Melzer (#1076125)
Ericka L. Krumrie (#1066383)
Hermes Law, Ltd.
333 Main Street, Suite 601
Green Bay, WI 54301
(920) 436-9870
Fax: (920)436-9871

Ronald R. Ragatz (#1017501)
Dennis P. Birke (#1018345)
Megan A. Senatori (#1037314)
DeWitt Ross & Stevens S.C.
Two East Mifflin Street
Madison, WI 53703
(608) 255-8891
Fax: (608) 252-9243

Gregory A. Krauss
Gregory A. Krauss PLLC
1629 K St. NW
Suite 300
Washington, DC 20006
(202) 355-6430