IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF WISCONSIN, ) ) ) ) | |
| Plaintiffs, ) ) | Civil Action No. 10-C-910 |
| v. ) ) | Hon. William C. Griesbach |
| NCR CORPORATION, *et al.*, ) ) ) | |
| Defendants. ) ) | |

**BRIEF IN SUPPORT OF UNITED STATES' EXPEDITED MOTION FOR
A PRELIMINARY INJUNCTION TO COMPEL PERFORMANCE OF
FULL SCALE REMEDIATION WORK IN 2012**

# BRIEF IN SUPPORT OF UNITED STATES' EXPEDITED MOTION FOR A PRELIMINARY INJUNCTION TO COMPEL PERFORMANCE OF FULL SCALE REMEDIATION WORK IN 2012

Although the winter months are supposed to be the time for yearly remediation planning at the Lower Fox River and Green Bay Superfund Site, last year and again this year they have become a time for foot dragging by Appleton Papers Inc. and NCR Corporation. To keep the entire project on schedule, EPA has ordered the removal of at least 660,000 cubic yards of sediment from the Site by dredging this year, starting on April 2. That is significantly more than the companies dredged in 2011 – because they quit early last year – but it is less than they dredged in 2010. NCR proposed a plan to remove 500,000 cubic yards of sediment this year, although API apparently would not support that plan. Instead, API has threatened either to suspend dredging operations altogether in 2012 or to dredge no more than 250,000 cubic yards under certain conditions. Due to their own disagreements, NCR and API have made no definite *commitment* to perform *any* amount of dredging this year, despite prodding and encouragement by EPA and WDNR over the last several months.

The United States now moves for a preliminary injunction to require NCR and API to resume full scale sediment remediation work at the Site this year, as mandated by EPA's Unilateral Administrative Order for cleanup. More specifically, the United States seeks entry of an injunction requiring NCR and API to ensure removal of at least 660,000 cubic yards of sediment starting on April 2, as opposed to the lesser volumes proposed by NCR and API. Alternatively, the United States seeks entry of a preliminary injunction that would allow performance of the required dredging work by NCR alone, as explained below.[1]

---

[1] The motion seeks enforcement of EPA's Unilateral Administrative Order (the "UAO") under Section 106 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9606, consistent with the Fifth Claim for Relief in Plaintiffs' First Amended Complaint in this case. Dkt. 30 at 30. The State of Wisconsin supports the request for relief here, although the State has not joined the motion because it lacks authority to issue orders or sue under CERCLA Section 106.

1

The United States sought a similar preliminary injunction last spring, but the Court denied that relief due to concern that API might not qualify as a liable party under CERCLA. Dkt. 172; Dkt. 193. After much more extensive briefing on the issue, that impediment was removed in December 2011 when the Court dismissed API's main arguments against liability and concluded that API is likely to be liable under CERCLA based on its agreed assumption of relevant liabilities from NCR. As the Court stated, "API may be deemed a successor to the liability of NCR even though NCR itself remains liable to the government." Dkt. 279 at 3.

Little else has changed since last year. Tetra Tech EC, Inc. and its subcontractors still are under contract with the Lower Fox River Remediation LLC (the "LLC"), which was formed by NCR, API, and another entity that has an obligation to indemnify API.[2] API and its indemnitor hold a controlling voting interest in the LLC, so they have the ability to veto any proposal NCR might offer for performance of remediation work by the LLC's contractors. Dkt. 141 at 5-7. And API and its indemnitor have in fact vetoed NCR's proffers to have those contractors perform an increased amount of remediation work at the Site. Dkt. 141 at 7. In light of that dysfunctional arrangement, and within weeks after the Court pointed out that "NCR may be able to contract directly with Tetra Tech" (Dkt. 172 at 23 n.3), EPA issued NCR a formal directive to make substitute arrangements for performance of the remediation work at the Site this year (Dkt. 203-4). NCR has disregarded that directive. Dkt. 293-9.

---

[2] Under a prior arbitration award and federal court judgment, API and its former corporate affiliates must pay 60% of all Fox River Site costs incurred either by NCR or by API; NCR must pay the remaining 40%. Dkt. 144-2; Dkt. 144-3; Dkt. 172 at 24. That fixed cost sharing arrangement will continue to apply no matter how any dispute over API's own CERCLA liability comes out. But API itself currently is paying *nothing* toward the costs associated with this Site. Not a penny. All of API's cleanup expenditures and legal bills are being covered by a set of foreign-based entities under an indemnity arrangement that was put in place when API became an employee-owned company in 2001. The principals of those two related entities – Arjo Wiggins Appleton (Bermuda) Ltd. and Windward Prospects Ltd. (formerly known as Arjo Wiggins Appleton p.l.c.) – purport to control nearly all actions API takes concerning the Fox River Site, including the positions API takes in dealings with the government and in litigation. Dkt. 124-3 at 11-12; Dkt. 137 at 3; Dkt. 141 at 5.

Under an accord with the other LLC members, NCR took on sole responsibility for working with Tetra Tech on a proposed Remedial Action Work Plan for 2012. Unlike that *planning* work, the LLC still gives Tetra Tech its marching orders on the *performance* of any sediment remediation work at the Site. In other words, as things stand now, the contractor team will not do any dredging unless instructed to do so by *both* API and NCR, acting through the LLC. NCR's drafts of a 2012 work plan have proposed removal of 500,000 cubic yards of sediment by dredging this year; API and the LLC have neither endorsed NCR's proposed work plan nor committed to any level of work this year. API can cede control to NCR, however, either voluntarily or as ordered by this Court. As noted in a recent letter to the U.S. Department of Justice that API publicized with a press release, "API can take administrative steps within the LLC to free the remediation contractor to perform work in 2012 for any defendant in the enforcement action, on exactly the same terms and at exactly the same rates set forth in the LLC's contracts." Dkt. 313-1 at 1-2, 9.

For reasons that the Court has already outlined in prior decisions in this case, the United States has a clear entitlement to a preliminary injunction requiring full scale remediation work by NCR and API this year. Section I of this brief reviews those justifications in summary fashion. Section II explains the United States' request that API be given the option of complying with the injunction by taking administrative steps within the LLC to free the remediation contractor to perform the work for NCR. Finally, Section III explains the remediation work that EPA has ordered in 2012 because the preliminary injunction would require completion of that work.

# ARGUMENT

I.  **The United States has established a sound basis for preliminary injunctive relief against both NCR and API.**

In one of its decisions in this case last year, the Court summarized the standard for entry of a preliminary injunction as follows:

> To justify a preliminary injunction, a plaintiff must show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm without the injunction, that the harm it would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and that the injunction is in the public interest.

Dkt. 172 at 2. *See Judge v. Quinn,* 612 F.3d 537, 546 (7th Cir. 2010). Because many of the arguments in support of this motion received ample treatment in prior submissions on the United States' requests for a preliminary injunction last year (*see* Dkt. 122-126, 147-150, 177-179) and separate submissions on API's non-liability plea (*see* Dkt. 203-208, 301-302, 304), the United States incorporates those arguments by this reference without repeating them in full. The main considerations are summarized below.

   A.  **The United States has shown a high likelihood of success on the merits.**

As the Court has recognized, "the liability of NCR has not been contested." Dkt. 172 at 16. Among other things, NCR is a successor by merger to two predecessor companies that discharged PCBs to the Fox River during their production of PCB-containing carbonless copy paper at facilities in Appleton and Combined Locks. Dkt. 64 at 13; Dkt. 100-5 at 5; Dkt. 100-6 at 4; Dkt. 124-6 at 4-5. The pollution from those facilities undoubtedly "caused a significant part of the environmental damage" in Operable Units 2-5 at the Site. *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2011 WL 806411, at *8 (E.D. Wis. Mar. 1, 2011). API also is highly likely to be held directly liable under CERCLA in light of its agreed assumption of relevant liabilities, as confirmed by this Court's December 19, 2011, decision. Dkt. 279.

4

The Court also has dismissed the main defenses asserted by NCR and API. First, for a variety of reasons detailed in the Court's July 5, 2011, decision, their divisibility arguments carry little weight and NCR and API have nothing more than a low likelihood of success in meeting their burden to show that those arguments excuse them from complying with cleanup requirements imposed by the UAO. Dkt. 172 at 3-13. Second, NCR and API are highly unlikely to prevail in challenging the preference for dredging over capping in the cleanup remedy selected by EPA. In the Court's words, the "capping-versus-dredging debate has been waged for a long time" and NCR and API have "not come close to showing that the EPA's decisions on these matters are arbitrary or capricious." Dkt. 172 at 15. Third, although NCR and API have objected to the procedural mechanism that EPA used to reassess the cost and benefits of the cleanup remedy in 2010, the Court has already concluded that "the government has a strong likelihood of succeeding in showing that it followed proper procedures in making the proposed changes." Dkt. 172 at 15.

### B. The balance of harms tips strongly in favor of entry of an injunction.

After considering arguments made by NCR and API, the Court has found that there is irreparable harm from remediation at a delayed pace and the corresponding continuation of risks to public health and the environment from the PCBs at the Site. Dredging at full pace "means the public will benefit from the full cleanup sooner" and "[d]epriving the public of that benefit is certainly irreparable harm." Dkt. 172 at 16. And the type of relief sought here is tailored to address that harm: "an injunction requiring an increased pace in river cleanup is clearly directed to avoiding the irreparable harm caused by continued exposure to PCBs." *Id.*

A preliminary injunction requiring full scale work by NCR and API also would not cause them undue harm. If those companies truly have paid more than their fair share of the costs, as they have contended, then they should be able to recoup their overpayments through CERCLA

5

contribution claims. That would require reversal of this Court's rulings in the *Whiting* case, but there would be no unfairness under either possible outcome after an appeal. On one hand, if the Seventh Circuit reinstates the contribution claims by NCR and API, then they may pursue reimbursement from other potentially responsible parties. On the other hand, if the Seventh Circuit affirms the dismissal of their contribution claims in *Whiting*, then it is fair for NCR and API to bear all costs of compliance with the proposed preliminary injunction. This Court summarized the circumstances as follows when it ruled that NCR and API – as the Plaintiffs in the *Whiting* case – "are not entitled to recover from the Defendants for their costs incurred in cleaning up damage caused by dangers the Plaintiffs created":

> [W]hen Plaintiffs introduce a toxin into a manufacturing process which they know or should know results in the discharge of that toxin into the environment, and then take a "wait and see" approach and view the danger as a matter of risk management and publicity control, equity will not allow them to later receive contribution from entities who are either completely faultless or nearly so, and who had no role to play in the risk strategy Plaintiffs undertook, a strategy that has now proved quite costly.

*Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL 5064049, at *25 (E.D. Wis. Dec. 16, 2009).

The Court has already found that the United States has established "a sound basis supporting preliminary injunctive relief against NCR." Dkt. 172 at 23. The same is true for API now that the Court has reconsidered its earlier view that API is unlikely to be deemed liable under CERCLA. Dkt. 279 at 11-12.

## II. The Court should give API the option of complying with the injunction by enabling NCR to make use of the LLC's contractors.

In light of the Court's rulings, the United States essentially urged API to lead, follow, or get out of the way of the 2012 remediation effort. Dkt. 313-2. API and its indemnitor seemed content to step aside at first, although they now are erecting impediments through their continued

6

control of the LLC.  Even when the Court viewed API's liability as questionable, it emphasized that API "cannot continue to control the means of cleanup and yet remain outside the injunctive power of this Court."  Dkt. 172 at 24.  A limited exercise of injunctive power over API is all that may be needed to facilitate performance of the remediation work by NCR.

After the Court observed that "NCR may be able to contract directly with Tetra Tech" (Dkt. 172 at 23 n.3), NCR alone took on the task of working directly with Tetra Tech on a draft Remedial Action Work Plan for 2012.  That was done with API's assent and cooperation.  The parties have not disclosed the exact details of the arrangement, but it reportedly involved little more than a set of administrative steps that were taken to allow NCR to make use of the existing contract held by the LLC.  More recently, API has trumpeted the fact that API could use the same process and "take administrative steps within the LLC to free the remediation contractor to perform work in 2012 for any defendant in the enforcement action, on exactly the same terms and at exactly the same rates set forth in the LLC's contracts."  Dkt. 313-1 at 9.  At a minimum, the Court should:  (1) order API to take such steps within the LLC, so that NCR will be empowered to utilize the LLC's contractors for all remediation work this year; and (2) order NCR to take the lead in ensuring performance of that work if API takes such action.  The proposed terms of injunction give API the option of complying with the injunction in that manner.

### III. The specific relief sought by the United States is reasonable and appropriate.

All or nearly all of the anticipated dredging and capping work in OU 2 and OU 3 has been completed.  All involved seem to agree that any remediation work this year should include Production Dredging in some areas and Final Dredging in particular areas between the De Pere

7

Dam and the State Highway 172 Bridge.[3] All involved also agree that any work in 2012 should focus solely on dredging, rather than a combined dredging and capping effort. Dkt. 313-1 at 11; Dkt. 313-4 at 10-11; Dkt. 313-5 at 12-13. Although NCR submitted a draft work plan for 2012 that incorporated those concepts, it had a number of other deficiencies. In January, the Agencies/Oversight Team ("A/OT") assembled by EPA and WDNR provided formal written comments that pointed out the unacceptable aspects of NCR's draft plan and directed NCR to make specific changes. Dkt. 313-3.

When the AO/T's changes to NCR's draft work plan were not incorporated, the government representatives elected to table some disagreements and the parties reached an impasse on other key issues, including the total volume of sediment to be dredged in 2012. The government had indicated that 680,000 cubic yards should be dredged in 2012. Dkt. 313-3 at 1-2. NCR had proposed a plan to dredge 500,000, but API would not back that plan. Dkt. 313-4 at 11; Dkt. 313-1 at 11. API proposed either to suspend dredging operations altogether in 2012 or to dredge no more than 250,000 cubic yards under strict conditions. Dkt. 313-1 at 8, 11. Neither of the companies has made an explicit commitment to perform any amount of dredging this year. To settle the matter before the looming deadline to start work by April 2, EPA revised the draft work plan itself and then approved the plan as modified on March 19, 2012 (the "Modified Work Plan"), exercising its authority under Paragraph 49 of the UAO. Dkt. 313-5; Dkt. 30-1 at 21-22. The Modified Work Plan requires removal of at least 660,000 cubic yards of

---

[3] As explained in prior filings, dredges can be used for at least two different purposes at the Site. First, dredges can perform "Production Dredging," which involves high-rate sediment removal in an area before the more precise work needed to complete the dredging in that area. Second, dredges can do "Final Dredging" which performs the more precise work to finish the dredging in that area. Simultaneous Production Dredging and Final Dredging with different dredges can help ensure the full and efficient utilization of the Sediment Processing Facility at the Site. Final Dredging must ultimately be performed in all designated dredge areas, which have generally been assigned an area number with a "D" prefix, such as area "D24." Dkt. 123 at 4, 11.

8

sediment from specified dredge areas that are listed and depicted in an appendix to the Modified Work Plan. All together, those "Eligible Dredging Areas" contain at least 1.4 million cubic yards of sediment that will need to be dredged at some point, but NCR and API may pick and choose dredge areas as they see fit to satisfy the 660,000 cubic yard minimum volume for 2012. Many of the Eligible Dredging Areas are located between the De Pere Dam and the State Highway 172 Bridge; the most likely Production Dredging areas are located between the State Highway 172 Bridge and the Canadian National Railroad Bridge near the Sediment Processing Facility. Dkt. 313-5 at 13; Dkt. 313-6 at 86-135.

EPA's Modified Work Plan allows the companies to defer removal of more highly contaminated sediment in particular areas that is subject to Toxic Substances Control Act ("TSCA") disposal requirements while EPA considers a pending request for a special in-state disposal approval under TSCA. Dkt. 313-5 at 13. The Modified Work Plan also defers a nascent dispute about whether certain other areas that NCR and API have proposed to cover with engineered caps may need to be re-designated and remediated as dredging areas in future years.[4] All of the 2012 remediation areas have long been designated as dredging areas.

The United States' proposed terms of a preliminary injunction would require completion of the 2012 remediation work in accordance with EPA's Modified Work Plan. That would

---

[4] That deferred dispute concerns a set of refined capping eligibility criteria that EPA and WNDR have developed. As the Court has recognized, "[d]redging has the obvious benefit of getting the PCBs out of the River entirely, whereas capping may be more appropriate when, for example, the PCBs are buried beneath clean sediment." Dkt. 172 at 15. The 2007 Record of Decision Amendment for OUs 2-5 reflects that truism and indicates that that capping may be considered more feasible and more cost effective than dredging where "deeply buried" contamination is covered by several feet of "relatively clean" sediment. Dkt. 276-6 at 7, 19-20, 25-26, 32, 34. To translate those narrative criteria into a set of numerical criteria that can be used in making consistent decisions about whether specific areas should be dredged or capped, EPA and WNDR have indicated that: (1) contamination can be classified as "deeply buried" if it is covered by more than *six feet* of "relatively clean" sediment; and (2) the overlying sediment can qualify as "relatively clean" if its average PCB concentration does not exceed *10 parts per million*. NCR and API have emphasized that they disagree with that "6 feet / 10 ppm rule," but that disagreement is not implicated by this motion or the Modified Work Plan for 2012.

9

ensure that the work will proceed at full pace and avoid any further delay of the overall remediation project, as explained below.

Just like last year, the stalemate this year stems from a fundamental divergence of interests.

NCR and API want to slow the pace of the work to limit their cash flow outlay. To them, there is time value of money and it is better to pay later rather than sooner. The companies spent about $75.2 million on this project in 2010 (Dkt. 137 at 5), and it is better for them if they can spend less than that this year.

In contrast, the United States and the State want this remediation project kept on schedule. To the government, it is important that the public realize the full benefits of the cleanup sooner rather than later. More than 731,000 cubic yards of sediment were dredged from the Site in 2010 and it is best for the government if the companies work at a comparable pace this year.

The dispute over last year's work arose because API and its indemnitor, as the controlling members of the LLC, refused to spend more than $50 million on remediation work in 2011. Dkt. 137 at 7; Dkt. 143 at 5. That cash flow limit severely constrained the amount of dredging compared to prior years, as shown in this table:

| Remedial Action Season | Total Volume Dredged |
|---|---|
| 2009 | 544,535 |
| 2010 | 731,017 |
| 2011 | 235,409 |
| **Total** | **1,510,961** |

Dkt. 313-5 at 15.

The reduced level of dredging in 2011 has already delayed the estimated date for completion of all dredging from 2015 until at least the middle of 2016. Dkt. 124-10 at 3; Dkt. 313-3 at 1. That extended completion schedule will not be met unless the Court grants the

10

motion for a preliminary injunction.  In its latest ultimatum, API has taken the position that the LLC will spend no more than $42 million and dredge no more than 250,000 cubic yards of sediment in 2012.[5]  Moreover, API has implied that will only be done if the government concedes that qualifies as "compliance with the Unilateral Administrative Order . . . for the 2012 Construction season."  Dkt. 313-1 at 11.  That plainly would not qualify as "performance of full scale sediment remediation" this year, as expressly required by the UAO (Dkt. 30-1 at 20), and that proposal to work at far less than half pace would delay completion of the entire dredging effort again until late 2016 or 2017 (Dkt. 123 at 14; Dkt. 313-3 at 1).

To avoid a further delay in dredging completion, EPA's Modified Work Plan for 2012 requires:  (1) active in-River remediation work starting on April 2, 2012, and continuing until at least November 9, 2012; and (2) the removal of a minimum of 660,000 cubic yards of sediment from certain designated dredging areas.  Dkt. 313-5 at 12-13, 81.  Those Eligible Dredging Areas are listed in the proposed terms of preliminary injunction filed with the motion.

For the reasons described above, the proposed terms of injunction give API the option of complying either by joining NCR in the 2012 remediation effort or by enabling NCR to use the LLC's contractor team to complete that effort.

The other provisions of the proposed terms of preliminary injunction account for the back and forth in the preliminary injunction briefing last year.  A *force majeure* provision based on EPA model CERCLA consent decree language has been included, as demanded by NCR.  Another provision that NCR requested to guide the LLC members' actions is included as well.  A sunset provision would terminate the decree later this year if NCR and API comply fully.

---

[5] Based on our knowledge of the actual contract rates, we seriously doubt that dredging 250,000 cubic yards in 2012 would cost anywhere near $42 million.

11

# CONCLUSION

The Court should grant the United States' request for a preliminary injunction for the reasons cited in this brief, especially in light of the Court's prior rulings in this case.

                          Respectfully submitted,

                          For the United States of America

                          IGNACIA S. MORENO
                          Assistant Attorney General
                          Environment and Natural Resources Division

Dated: March 19, 2012         s/ *Randall M. Stone*
                          RANDALL M. STONE
                          JEFFREY A. SPECTOR
                          KRISTIN M. FURRIE
                          Environmental Enforcement Section
                          Environment and Natural Resources Division
                          U.S. Department of Justice
                          P.O. Box 7611
                          Washington, DC 20044-7611
                          Telephone: 202-514-1308
                          Facsimile: 202-616-6584
                          E-Mail: randall.stone@usdoj.gov

                          GREGORY J. HAANSTAD
                          Attorney for the United States, Acting
                          Under Authority Conferred by 28 U.S.C. § 515

                          SUSAN M. KNEPEL
                          Assistant United States Attorney
                          Office of the United States Attorney
                          517 E. Wisconsin Avenue, Room 530
                          Milwaukee, WI 53202

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this day, the foregoing Brief was filed electronically with the Clerk of the Court using the Court's Electronic Court Filing System, which sent notification of such filing to the following counsel:

**Mary Rose Alexander**
Latham & Watkins LLP
mary.rose.alexander@lw.com

**Thomas Armstrong**
von Briesen & Roper SC
tarmstro@vonbriesen.com

**Paul Bargren**
Foley & Lardner LLP
pbargren@foley.com

**Linda E. Benfield**
Foley & Lardner LLP
lbenfield@foley.com

**Dennis P. Birke**
DeWitt Ross & Stevens SC
db@dewittross.com

**Steven P. Bogart**
Reinhart Boerner Van Deuren SC
sbogart@reinhartlaw.com

**Michael P. Carlton**
von Briesen & Roper SC
mcarlton@vonbriesen.com

**Evan R. Chesler**
Cravath Swaine & Moore LLP
echesler@cravath.com

**Marc E. Davies**
Greenberg Traurig LLP
daviesm@gtlaw.com

**Brandon J. Evans**
Hermes Law Ltd.
bje@hermeslawltd.com

**S. Todd Farris**
Friebert Finerty & St. John SC
stf@ffsj.com

**Patrick J. Ferguson**
Latham & Watkins LLP
patrick.ferguson@lw.com

**Sandra C. Goldstein**
Cravath Swaine & Moore LLP
sgoldstein@cravath.com

**Thomas R. Gottshall**
Haynsworth Sinkler Boyd PA
lgantt@hsblawfirm.com

**Eric W. Ha**
Sidley Austin LLP
eha@sidley.com

**Scott W. Hansen**
Reinhart Boerner Van Deuren SC
shansen@reinhartlaw.com

**William H. Harbeck**
Quarles & Brady LLP
william.harbeck@quarles.com

**Michael L. Hermes**
Hermes Law Ltd.
mlh@hermeslawltd.com

**Cynthia R. Hirsch**
Wisconsin Department of Justice
hirschcr@doj.state.wi.us

**Caleb J. Holmes**
Greenberg Traurig LLP
holmesc@gtlaw.com

**Philip C. Hunsucker**
Hunsucker Goodstein & Nelson PC
phunsucker@hgnlaw.com

**Peter C. Karegeannes**
Quarles & Brady LLP
peter.karegeannes@quarles.com

**Gregory A. Krauss**
Gregory Krauss pllc
gkrauss@krausspllc.com

**Paul G. Kent**
Stafford Rosenbaum LLP
pkent@staffordlaw.com

**Ericka L. Krumrie**
Hermes Law Ltd
elk@hermeslawltd.com

**Linda R. Larson**
Marten Law PLLC
llarson@martenlaw.com

**Vanessa A. Lavely**
Cravath Swaine & Moore LLP
vlavely@cravath.com

**Susan E. Lovern**
von Briesen & Roper SC
slovern@vonbriesen.com

**Kevin J. Lyons**
Davis & Kuelthau SC
klyons@dkattorneys.com

**Karl S. Lytz**
Latham & Watkins LLP
karl.lytz@lw.com

**Meline G. MacCurdy**
Marten Law
mmaccurdy@martenlaw.com

**David G. Mandelbaum**
Greenberg Traurig LLP
mandelbaumd@gtlaw.com

**Bradley M. Marten**
Marten Law
bmarten@martenlaw.com

**Tara M. Mathison**
Davis & Kuelthau SC
tmathison@dkattorneys.com

**Darin P. McAtee**
Cravath Swaine & Moore LLP
dmcatee@cravath.com

**Stephen F. McKinney**
Haynsworth Sinkler Boyd PA
smckinney@hsblawfirm.com

**Heidi D. Melzer**
Hermes Law Ltd.
hdm@hermeslawltd.com

**Elizabeth K. Miles**
Davis & Kuelthau SC
emiles@dkattorneys.com

**Sabrina Mizrachi**
Greenberg Traurig LLP
mizrachis@gtlaw.com

**Monique M. Mooney**
Greenberg Traurig LLP
mooneym@gtlaw.com

**William J. Mulligan**
Davis & Kuelthau SC
wmulligan@dkattorneys.com

**Daniel C. Murray**
Johnson & Bell Ltd.
murrayd@jbltd.com

**Omid H. Nasab**
Cravath Swaine & Moore LLP
onasab@cravath.com

**Kelly J. Noyes**
von Briesen & Roper SC
knoyes@vonbriesen.com

**Nancy K. Peterson**
Quarles & Brady LLP
nancy.peterson@quarles.com

**Thomas M. Phillips**
Reinhart Boerner Van Deuren SC
tphillip@reinhartlaw.com

**Ian A.J. Pitz**
Michael Best & Friedrich LLP
iapitz@michaelbest.com

**David A. Rabbino**
Hunsucker Goodstein & Nelson PC
drabbino@hgnlaw.com

**Joan Radovich**
Sidley Austin LLP
jradovich@sidley.com

**Ronald R. Ragatz**
DeWitt Ross & Stevens SC
rrr@dewittross.com

**Alexandra Reeve Givens**
Cravath Swaine & Moore LLP
agivens@cravath.com

**Kathleen L. Roach**
Sidley Austin LLP
kroach@sidley.com

**Megan A. Senatori**
DeWitt Ross & Stevens SC
ms@dewittross.com

**Adam B. Silverman**
Greenberg Traurig LLP
silvermana@gtlaw.com

**Sarah A. Slack**
Foley & Lardner LLP
sslack@foley.com

**Margaret R. Sobota**
Sidley Austin LLP
msobota@sidley.com

**Anthony S. Wachewicz, III**
City of Green Bay
tonywa@ci.green-bay.wi.us

**James P. Walsh**
Appleton City Attorney
jim.walsh@appleton.org

**Ted A. Warpinski**
Friebert Finerty & St John SC
taw@ffsj.com

**Ted Waskowski**
Stafford Rosenbaum LLP
twaskowski@staffordlaw.com

**Evan B. Westerfield**
Sidley Austin LLP
evanwesterfield@sidley.com

**Richard C. Yde**
Stafford Rosenbaum LLP
ryde@staffordlaw.com

Dated: March 19, 2012     s/ *Randall M. Stone*