IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> NCR CORPORATION, APPLETON PAPERS INC., BROWN COUNTY, CITY OF APPLETON, CITY OF GREEN BAY, CBC COATING, INC., GEORGIA-PACIFIC CONSUMER PRODUCTS LP, KIMBERLY-CLARK CORPORATION, MENASHA CORP., NEENAH-MENASHA SEWERAGE COMMISSION, NEWPAGE WISCONSIN SYSTEMS, INC., P.H. GLATFELTER CO., U.S. PAPER MILLS CORP., and WTM I COMPANY, <br><br> Defendants. | Civil Action No. 10-C-910 |

___

**DECLARATION OF BRYAN A. HEATH IN SUPPORT OF
NCR CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO THE
UNITED STATES' MOTION FOR A PRELIMINARY INJUNCTION**
___

I, BRYAN A. HEATH, of sound mind and full age, declare as follows:

1. I am a senior environmental engineer for Defendant NCR Corporation ("NCR"), and I make this declaration on its behalf, being duly authorized to do so. The contents of this declaration are true and correct to the best of my knowledge, information and belief and are based on my first-hand, personal knowledge or, as applicable, on my review of NCR records. If called and sworn as a witness, I can and will testify competently thereto.

2. As part of my regular duties for NCR, I am responsible for the engineering, scientific and contract administration aspects of NCR's participation in the Lower Fox River cleanup, including those aspects of NCR's compliance with the Unilateral Administrative Order that the U.S. Environmental Protection Agency ("EPA") issued in November 2007 (the "UAO"). I have been responsible for these duties since October 2010, and I have first-hand, personal knowledge since that time of NCR's compliance with the UAO, its participation in the Lower Fox River Remediation LLC (the "LLC") and the cleanup work in Operable Units 2-5 ("OU2-5") of the Lower Fox River Site. I have access in the course of my position to many of NCR's records related to these topics, and I have reviewed those records, including but not limited to records from before October 2010.

**NCR's and API's Successful Cleanup Efforts at the Lower Fox River Site**

3. NCR has consistently participated and taken a leading role in efforts to clean up the Lower Fox River Site.

4. Since the UAO was issued in November 2007, NCR has consistently complied with the UAO and has used its best efforts to effectuate any ordered work.

5. To date, NCR and Appleton Papers Inc. ("API"), through the LLC, have dredged more than 1.5 million cubic yards of sediment from the river and have applied engineered caps

or sand covers to approximately 170 acres of river bottom.  NCR and API have paid over $280 million in total for remediation work required by the UAO.

6. Even before EPA issued the UAO, NCR took the lead in identifying remediation contractors to perform the cleanup work.  In early 2008, NCR and API selected Tetra Tech EC, Inc. ("Tetra Tech") as the preferred prime contractor to perform the key construction work (i.e., the work other than post-construction monitoring) required by the UAO.  Tetra Tech, along with the subcontractors on which it relies, began work in April 2008.  Through Tetra Tech, its subcontractors and other vendors, the LLC has retained skilled personnel to perform the remediation work.

7. In 2008, NCR and API directed the land-based work necessary to allow full-scale, in-water remediation to begin in 2009, as the UAO required.  A major portion of this work was the construction of a large sediment processing facility.  The construction of the facility and the equipment needed to "dewater" the sediment cost tens of millions of dollars.

**The Purpose, Structure and Operation of the LLC**

8. In April 2009, just before dredging began in the river, NCR and API jointly formed the LLC as a vehicle for undertaking remediation work required under the UAO, including directing construction projects that EPA requires by entering contracts with contractors, vendors and suppliers of equipment, services and materials. Consistent with that purpose, the LLC entered into a complex, long-term contract with Tetra Tech.  Over time, the LLC has also entered into contracts with other contractors and vendors who provide a variety of goods and services necessary for the cleanup effort.   These goods and services include landfill disposal; supply of sand and gravel for engineered caps and sand covers; transportation of the sediment, sand and gravel; and oversight consultants to supervise Tetra Tech's work.  In light of
2

these arrangements, the LLC has become a unique solution for efficiently performing work at the Site.

9. The LLC contracts with 14 different contractors and vendors (including Tetra Tech, but not its various subcontractors). Each of these contracts is tailored to the particular services that the contractor or vendor provides.

10. Another key purpose of the LLC is to provide a mechanism for NCR and API to pay their respective shares of all Fox River remediation costs, per their mutual contractual obligations, as confirmed by the 2007 Consent Order. NCR holds a 40 percent interest in the LLC, and it has a corresponding 40 percent of the LLC's voting power. The other 60 percent interest and voting power belong to API and an associated company. Specifically, API itself owns a 45 percent interest (and 45 percent voting power), and Arjo Wiggins Appleton (Bermuda) Ltd. ("AWAB"), a company controlled by API's indemnitor Windward Prospects Ltd., owns the remaining 15 percent interest (and voting power). API and AWAB have been jointly represented in all LLC activities. (The references below to API's actions and votes in the LLC should be read to include AWAB, as they have acted together in all LLC decisions.)

11. The LLC Agreement provides that most issues—including entering into contracts, providing instructions to Tetra Tech, and issuing "cash calls" (as they are informally known) to its members—must be decided by majority vote. As a result, API controls these and almost all other LLC actions. Because NCR holds only a minority interest, NCR cannot effect an LLC action unless NCR can persuade API to agree with it on that action. A limited number of actions, including a transfer of shares, must be approved by a supermajority (75 percent) of the votes.

12. The LLC obtains the money needed to pay Tetra Tech and other vendors by issuing funding requests (cash calls) to its members. NCR pays 40 percent of any amount called for, and API pays 60 percent. NCR and API each pay their cash call amounts to a trust, and the LLC has the authority to direct the trustees to pay invoices on the LLC's behalf.

13. NCR has consistently voted its LLC shares in favor of actions to comply with the UAO, including entering into the contracts with Tetra Tech and the other vendors involved in the OU2-5 cleanup, issuing Change Directives as needed to Tetra Tech and approving invoices from Tetra Tech and the other vendors. NCR has also consistently approved monthly cash calls to support the work. In an effort to build and maintain a cooperative working relationship for the remedial action, NCR has also participated directly in meetings between the LLC and EPA and the Wisconsin Department of Natural Resources ("WDNR") (collectively, the "Response Agencies").

14. NCR and API structured the LLC in a way that would allow other potentially responsible parties ("PRPs") to join. Although only NCR and API joined the LLC, the structure will accommodate the addition of other parties.

**API's Disagreements with NCR's Remediation Efforts Since Early 2011**

15. The UAO requires the respondents to submit an annual Remedial Action Work Plan ("Work Plan") that describes the work to be performed during the coming year. Through Tetra Tech, the LLC submitted Work Plans for 2009, 2010 and 2011.

16. Until 2011, the Work Plans that the LLC submitted on NCR's and API's behalf were always approved by the Response Agencies.

17. In February 2011, the LLC submitted a Work Plan for the 2011 Remedial Action in OU2-5. On March 4, 2011, EPA notified Tetra Tech that this Work Plan had been approved,

4

Case 1:10-cv-00910-WCG   Filed 04/06/12   Page 5 of 10   Document 340

but with modifications that increased the volume of sediment to be dredged in 2011. EPA's March 4, 2011 notice also directed the LLC to submit a revised Work Plan by March 25, 2011. For the next three weeks, NCR worked with API and the LLC's consultants in an effort to make changes in response to EPA's modifications.

18. On March 24, 2011, API informed NCR that it intended to exercise its controlling vote in the LLC to cause the LLC to reject many of EPA's modifications. NCR objected in writing. On March 25, 2011, API sent NCR notice of an LLC Action by Consent, in which API exercised its controlling vote pursuant to the LLC Agreement. NCR objected in writing to the Action by Consent. On March 28, 2011, API directed the LLC to submit a final work plan, which limited dredging in 2011 to 250,000 cubic yards. API further capped the 2011 work at $50 million. Ultimately, just over 239,000 cubic yards of sediment were removed in 2011.

19. The Government filed two preliminary injunction motions to compel work by NCR and API in 2011. Although the Court denied the motions, it encouraged NCR and API to comply with the terms of the proposed injunction to the extent possible.

20. Accordingly, on August 24, 2011, NCR made a motion to cause the LLC to conduct an additional 150,000 cubic yards of dredging in 2011. In a telephonic meeting of the LLC conducted on September 12, 2011, NCR voted its 40 percent of shares in favor of this motion. API voted its 60 percent of shares against the motion, thus defeating it.

21. Throughout fall 2011, the Response Agencies demanded the preparation of a draft 2012 Remedial Action Work Plan (the "2012 Work Plan") and the performance of "infill sampling" up to the Canadian National Railroad Bridge. API informed NCR that it was not willing to permit the LLC to pay for preparation of the 2012 Work Plan or for infill sampling. Thus, on September 29, 2011, the LLC issued "Change Directive 12" to Tetra Tech, which

removed preparation of the 2012 Work Plan and the 2012 infill sampling activities from the scope of Tetra Tech's agreement with the LLC. On October 3, 2011, NCR independently authorized Tetra Tech and Foth LLC ("Foth"), another LLC contractor, to begin work on these activities.

22. On November 30, 2011, Tetra Tech, working on behalf of NCR, submitted a draft Work Plan for 2012, which called for 500,000 cubic yards of dredging. On January 23, 2012, and again on February 9, 2012, the Response Agencies issued comments on the draft 2012 Work Plan. Tetra Tech, at NCR's direction, submitted a revised 2012 Work Plan on March 7, 2012 (the "March 7 Work Plan").

23. On March 13, 2012, NCR made a motion to cause the LLC to conduct 500,000 cubic yards of dredging in 2012 in accordance with the March 7 Work Plan, along with a motion to perform the long-term monitoring required by the UAO in 2012. In a telephonic meeting of the LLC conducted on March 14, 2012, NCR voted its shares in favor of both motions. API voted against them. Accordingly, both the motion to perform 500,000 cubic yards of dredging and the motion to perform necessary long-term monitoring were defeated.

24. On March 19, 2012, the Response Agencies approved the March 7 Work Plan with modifications (the "Final 2012 Work Plan"). The work described in the Final 2012 Work Plan is generally consistent with the work that the United States has asked the Court to order in its motion for preliminary injunction.

25. During the telephonic conferences on March 14, 2012, API also asked if NCR would be interested in API transferring all of its shares in the LLC to NCR on a permanent basis. NCR stated that it was disinclined to accept a transfer of shares. API formally moved on March 19, 2012. In an email on March 20, 2012, API voted its 60 percent of shares in favor of the

motion, and NCR voted its 40 percent of shares against it. Because the motion required a supermajority (75 percent) of shares to be approved, the motion was defeated. In its vote against the motion, NCR proposed, as an alternative, that API issue a proxy to NCR for 2012 only to allow NCR to vote API's shares. API declined to do so.

26. On March 19, 2012, API also sent NCR a draft change directive, called "Change Directive 13". The draft Change Directive 13 carved out all 2012 remediation activities from Tetra Tech's contractual scope of work. On March 20, 2012, NCR objected to the issuance of Change Directive 13, and explained to API in writing why it believes that Change Directive 13 is invalid and ineffective. Later that day, API gave NCR notice of an LLC Action by Consent, in which API exercised its controlling vote to direct the LLC to issue Change Directive 13. NCR objected in writing again, but API caused the LLC to issue Change Directive 13 on March 26, 2012.

27. Although prior to issuing Change Directive 13 API obtained a letter from Tetra Tech stating that Tetra Tech would perform work for any third party on the same terms as it had with the LLC, API did not obtain any commitment from any of the other vendors under contract to the LLC. To the best of my knowledge, none of the other vendors has offered any such commitment to NCR.

28. API has also prevented the LLC from paying outstanding amounts on certain invoices issued by WDNR for that agency's oversight costs related to the remedial design for OU2-5. NCR and API had consistently paid WDNR oversight cost invoices in the past through the LLC, given the 40/60 cost sharing arrangement between the two companies. After WDNR demanded payment of outstanding balances on the invoices in January 2012, NCR sought to
7

have the LLC process payment of the outstanding balances. API refused to allow the LLC to pay the balances. As a result, NCR currently is processing the invoices for payment itself.

**Scope of the Work Completed by NCR and API in OU4**

29. As noted above, NCR and API have spent over $280 million thus far on cleanup efforts in OU2-5. Since 2009, the LLC has completed all construction work in OU2 and OU3 of the Site, and has also performed substantial work in OU4, the largest OU and the most expensive to remediate. To date, NCR and API have incurred almost $130 million remediating OU4.

30. NCR and API have directed remediation in both "Upper OU4" and "Lower OU4", as those terms are defined in the Consent Decree between the United States and Georgia-Pacific Consumer Products LP ("GP"), which was approved in April 2011. Lower OU4 is the area where GP has conceded liability.

31. The figures in this declaration are based on the current Tetra Tech projections, as analyzed by Project Control Companies ("PCC"), an LLC contractor.

Upper OU4:

32. The remedial design calls for dredging of approximately 1.52 million cubic yards of sediment in Upper OU4. Of this total, over 810,300 cubic yards have already been dredged by the LLC's contractors. Accordingly, NCR and API have already completed over 53% of the dredging required in Upper OU4.

33. If NCR and API are required to dredge an additional 660,000 cubic yards in 2012, as the Proposed Preliminary Injunction directs, they would be required to complete the substantial majority, approaching 100%, of the dredging in Upper OU4 (save residual dredging).

34. The estimated total cost of remediating Upper OU4 is almost $174.6 million. To date, NCR and API have spent more than $76 million on Upper OU4 cleanup.

8

Lower OU4:

35.     The remedial design calls for dredging of approximately 2.13 million cubic yards of sediment in Lower OU4. Of this total, 428,700 cubic yards have already been dredged. Accordingly, NCR and API have already completed over 20% of the dredging required in Lower OU4.

36.     Under the terms of the Proposed Preliminary Injunction, 100,000 cubic yards of dredging (or more) may have to be performed in Lower OU4, which would increase the total percentage completed by NCR and API in Lower OU4 to about 25%.

37.     The estimated total cost of remediating Lower OU4 is about $277 million, of which about $54 million has already been spent.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 5, 2012

/s/ Bryan A. Heath
Bryan A. Heath