UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                 Case No. 10-C-910

NCR CORP. and APPLETON PAPERS INC.,

    Defendant.

## DECISION GRANTING MOTION FOR RECONSIDERATION

On July 5, 2011, this Court denied the government's motion for a preliminary injunction against Defendants NCR and Appleton Papers Inc. ("API") on the basis that the government was unlikely to prove Appleton Papers was a liable party. In a December 19, 2011 decision, I denied API's motion for summary judgment on that point and instead accepted the government's argument that it appeared API had in fact agreed by contract to assume CERCLA liability when it purchased the Appleton Papers Division from NCR. API soon moved to reconsider, citing several points of error. For the reasons given below, I agree with API to the extent that the purchase agreement in question was not drafted broadly enough to encompass API's direct liability for the CERCLA liability at issue in this case. The motion for reconsideration will therefore be granted in part.

To recall, the result reached in my December 19, 2011 Decision and Order was based on two discrete conclusions. First, I concluded that NCR's continued existence did not *per se* preclude an agreement to create liability to a third party such as the government. Although it was not a traditional "successorship" liability situation (because NCR did not go out of business), I found that

there was nothing within CERCLA that would preclude parties, as a matter of contract, from effectively creating additional liability under CERCLA (although presumably that would be a rare scenario). The second aspect of my decision required interpretation of the purchase agreement, between NCR and API's predecessor, for NCR's Appleton Papers Division. I concluded that the language and matters disclosed in Schedule A to that agreement were broad enough to encompass the CERCLA liability at issue in this case. Because I now conclude otherwise, I do not address the first prong of that decision, which is now moot.

**I. The 1978 Agreement**

In 1978 NCR sold its Appleton Papers Division to API's predecessor, which for ease of understanding will be referred to simply as API. A key clause in that agreement provided that API agreed to "assume, pay, perform, defend and discharge . . . all of Seller's obligations and liabilities of any kind, character or description relating to the period subsequent to the Closing Date which arise out of or in respect of any state of facts, matter, event or disclosure set forth on an attachment to the agreement that was designated as Schedule A." (Section 1.4.4; Dkt. # 139, Ex. 3 at 19.)

Schedule A contains the following clause:

> Seller has reason to believe that the facilities of Appleton Papers Division located in Pennsylvania and Wisconsin may be operating; in violation of applicable federal, state, local and other governmental environmental and pollution control laws, ordinances, regulations, rules and standards.
> APD receives and has received notices from time to time from various federal, state, local and other governmental authorities claiming violation of environmental and pollution control laws, ordinances, regulations, rules and standards (collectively "laws"). These claims may result, and have resulted in fines and corrective action.

(Dkt. # 195, Ex. 3 at 4.)

In my previous decision, I concluded that because NCR had disclosed that the Appleton Papers Division "receives" (present tense) notice of various environmental violations, which "may

result" (in the future) in corrective action, the buyer was accepting liability for the Division's "proclivity" for environmental violations. In other words, the buyer was on the hook not just for specific past violations but for any future environmental issues as well.

**A. The present liability does not arise from any "violation" of law or any "compliance" issue**

I am now convinced that there are at least two problems with the approach taken at the summary judgment stage. First, the clauses that trigger liability require notice of the "violation" of environmental laws and standards, as well as past and potential fines for those violations. API notes that no one has argued that the PCB pollution at issue in this case was the product of any legal or regulatory violations. CERCLA did not yet exist in 1978, of course, and the PCBs were released into the environment primarily in the 1960s before they were regulated. In fact, as noted in the parallel contribution action, No. 08-C-16, in more recent years PCBs were released in smaller quantities at least partly with governmental acquiescence due to the difficulty in separating them from recyclable paper.

In response, the government now attempts to bolster my earlier ruling by citing, for the first time, the federal Refuse Act, as well as Wisconsin law barring the unauthorized disposition of refuse into waterways. 33 U.S.C. § 407. It also cites the Clean Water Act, 33 U.S.C. § 1311(a), which regulates discharge of pollutants. Because the Appleton Papers Division may have been operating in violation of those laws, the government argues, that should trigger the liability clause in Schedule A.

API notes that these are new arguments and, as such, are waived. Even if the argument is not waived, however, the violations of various environmental laws now alleged would not be enough to create CERCLA liability under the terms of the 1978 agreement. To recall, Schedule A discloses that the Division may have been operating in violation of various environmental laws and

regulations, and thus the buyer would be assuming any liability arising out of those violations. Here, the massive CERCLA liability at issue, which is based on the discharge of PCBs, does not "arise out of" any Clean Water Act, Refuse Act or other state or federal statutory or regulatory violations. First, for the period in question the release of PCBs was not known to be environmentally toxic, and so their release would not have given rise to any statutory or regulatory violations.[1] Second, violations of laws like the Clean Water Act are not a precondition to CERCLA liability, which is strict. Put another way, the liability that CERCLA creates does not depend on any "violations" of, or compliance with, then-existing environmental laws. Thus, even if the Division had been operating in violation of, say, the Refuse Act, that does not mean that CERCLA liability "arises out of" those violations. CERCLA liability is its own creature.

Moreover, Schedule A appears to premise liability on receipt of a "notice" of a violation. Schedule A tells the buyer that the Division has received notices of noncompliance with laws and regulations and might receive similar notices in the future. This creates liability for those "claims" and anything "arising" from them. The clause underscores the fact that the liability being assumed is not open-ended environmental liability but is instead linked to specific claims and notices of environmental violations. Needless to say, the Appleton Papers Division had never received a "notice" that it was "violating" CERCLA. Had the parties wanted to draft a broader clause, it would have been much easier to simply say so in the text of the agreement itself. Instead, by drafting a schedule, the parties were clearly limiting liability to the particular circumstances disclosed therein.

The government also cites other sections of the purchase agreement (§§ 1.4.3 and 1.4.9) that create liability arising out of "compliance" with applicable environmental laws. It argues that the

---

[1] With the exception that certain insiders began to appreciate the risks of PCBs in the late 1960s.

present CERCLA enforcement action is itself an action to assure "compliance" with CERCLA's requirement that liable parties clean up pollution sites. That is, the government appears to argue that this lawsuit is *itself* a trigger for liability because it is being brought to ensure compliance with CERCLA.

The claim that the government, simply by bringing a lawsuit, has the power to trigger the very liability it is seeking to enforce is a wholly circular argument. That is, the government's argument begs the question of API's liability: this is only an action to enforce "compliance" with CERCLA to the extent API is actually *liable* under CERCLA, and of course that is one of the centerpiece questions being adjudicated in this lawsuit. It makes little sense to argue that the very act of suing someone *under* CERCLA makes a defendant "non-compliant" with CERCLA. Accordingly, I cannot find that liability exists on the basis of any compliance issues.

In sum, even if the Appleton Papers Division were operating in violation of certain environmental laws, I am unable to conclude that CERCLA liability "arises out of" such laws. The various environmental laws now cited by the government have their own provisions for liability and their own remedies, none of which are integral to a CERCLA action. The government has not explained how, for example, violating the Clean Water Act could make a party liable to pay for the billion-dollar cleanup of a large river. Because liability under CERCLA is distinct from these other provisions, it does not arise out of (or even relate to) those alleged violations. And, as API points out, had the parties wanted to include all environmental liability, it would have been simple enough to do so.

**B. At a Minimum, the Contractual Language is Silent, Which Means No Liability**

Ultimately, perhaps the most important point is that the 1978 agreement is silent about CERCLA liability and lacks a broad "catch-all" environmental liability clause. The question of

API's liability has a long history. In 1995 NCR sued API in the Southern District of New York to resolve liability for the PCB cleanup. In a brief ruling, the district court concluded that it was unable to determine from the 1978 asset purchase agreement whether API had, in fact, assumed liability for PCB cleanup expenses. (Dkt. # 208, Ex. 2 at 8.) It found that the contract was negotiated before CERCLA came into existence and that none of the clauses in the asset purchase agreement was conclusive as to liability. The parties agreed to arbitrate the matter, and an arbitration panel also concluded that the agreement was unclear. The arbitration panel concluded that API pay 60% and NCR 40% of any expenses in excess of $75 million. The panel found, like the district judge, that the contractual language "is not sufficiently clear and unambiguous with respect to the issue of responsibility for the environmental costs at issue to permit an award based solely on the contract language." (Dkt. # 208, Ex. 1 at 4.) Thus, three judicial bodies (including this one) have now concluded that there is no clear language indicating that API's successor agreed to assume liability *to the government* for any CERCLA claims. At most, as the arbitrators found, API agreed to indemnify NCR for a *portion* of such liability.

The contract's silence on the point is enough to support a finding that API did not agree to assume direct CERCLA liability. In *Olin Corp. v. Consolidated Aluminum Corp.*, the Second Circuit noted that indemnification agreements are interpreted strictly under New York law (which applies here at the agreement of the parties). 5 F.3d 10, 15 (2d Cir. 1993). If an arbitration panel and another district court could not even conclude that API had agreed to *indemnify* NCR for its CERCLA liability, it should go without saying that the notion that API had agreed to become liable to a *third* party is even more tenuous. In *Olin*, where the Second Circuit found an assumption of liability, the district court had noted that "One would be hard pressed to draft broader or more inclusive indemnification provisions than those entered into by Conalco and Olin." 807 F.Supp.

1133, 1142 (S.D.N.Y. 1992). Here, the opposite is true. The parties drafted a number of indemnification and liability clauses, but each of those clauses contains limitations linking liability to Schedule A or compliance with applicable regulations and the like. They are not the narrowest of clauses, but neither are they the "extremely broad language" at issue in *Olin.* 5 F.3d at 15. Ultimately, API's overarching point remains salient: if the parties had wanted to make the buyer liable for all future unknown environmental liabilities, it would have been much easier to simply use the kind of broad language used in *Olin* and the other cases. That lawyers and courts have spilled so much ink on the question for more than seventeen years is itself suggestive of an intent *not* to create CERCLA liability.

**C. Given NCR's continued viability, the negating clause precludes the creation of additional CERCLA liability to third parties**

API has also cited what it describes as the purchase agreement's negating clause, which in its view bars the government from seeking to enforce the contract as a third party beneficiary. That clause provides that "Nothing in this Agreement, express or implied, is intended to confer upon any other person not a party to this Agreement any rights and remedies hereunder." (Dkt. # 139, Ex. 4 at § 10.10.) The government asserts that this is not a true negating clause and, in any event, it could not operate to bar the federal government from suing a party under CERCLA.

I agree with the government in part. Specifically, I conclude that a negating clause (or "no third parties" clause) cannot be dispositive of the issue of successor liability in cases in which the seller ceases its existence. Otherwise, a simple negating clause could leave both the seller and the buyer off the hook for CERCLA liability, even if the buyer would otherwise be deemed a successor. Clearly that would not be a satisfactory result, as private parties cannot simply "contract out" of CERCLA liability to the government.

But where, as here, the seller remains in existence, we are not dealing with successorship in an equitable sense, we are dealing with successorship in a contractual sense, which means we must explore the question of the parties' contractual intentions. In that context, a negating clause is dispositive. Ultimately, the clause underscores the point made above: if the parties had intended to create liability to the government, surely they would have done so more clearly. They would not have transferred very specific environmental liabilities referenced in Schedule A and then used a negating clause to make clear that they wanted no third parties to be able to benefit from the contract. Thus, even though a negating clause could not be determinative of the issue in a traditional successorship context, I conclude here that it precludes any reading of the Agreement that would make API directly liable to the government for CERCLA-type liability.

**D. No estoppel applies**

The government and some of the other Defendants in this action argue that the arbitration order, which was confirmed by the New York district court, means that API is estopped from arguing that it is not liable under CERCLA. Yet the arbitration panel, like the district court, was not persuaded that API had actually assumed CERCLA liability through the asset purchase agreement. Instead, the arbitration was the product of a settlement between NCR and API, a settlement made advisable for the principal reason that API's actual liability was *not* crystal clear (as the district court found). In dividing responsibility 60/40 between the parties, the panel was not concluding that API was directly liable under CERCLA or that it had become a successor to NCR's liability. Instead, the 60/40 division appears to have been the result of a number of quasi-equitable factors that pointed to requiring API to bear a larger share of responsibility.

More importantly, the arbitration and the award itself were an assessment of how much each party should *pay*, which is an entirely different question than whether API had assumed direct

CERCLA liability. No one ever posed that question to the arbitrators, and in fact it is doubtful that private arbitration could ever resolve a question involving one party's liability to the federal government. Accordingly, it would be improper to view the arbitration award as having any kind of estoppel effect on API's ability to argue that it never agreed to become directly liable under CERCLA.[2]

**II. Conclusion**

For the reasons given above, I conclude that the terms of the 1978 assumption agreement are not broad enough to encompass the CERCLA liability at issue here. Accordingly, the motion for reconsideration is **GRANTED** in part, and API is entitled to summary judgment that it is not a liable party under CERCLA. All claims against API are **DISMISSED**.

**SO ORDERED** this 10th day of April, 2012.

/s William C. Griesbach
William C. Griesbach
United States District Judge

---

[2]In previous briefing, the other Defendants opposing API's motion argued (the government does not join this argument) that summary judgment would have been improper because there are countless documents and witnesses that have not been produced in discovery. But these Defendants do not explain how additional discovery would shed any light on any terms in the 1978 agreement. Most importantly, they do not even identify any of the terms they believe to be ambiguous. The Rule 56(d) declaration lists numerous categories of information that have not been subject to discovery, but that is irrelevant if the contract not ambiguous.

Here, I am not concluding that any specific term is "ambiguous," I am simply concluding that because the contract is silent as to CERCLA liability, because it lacks a broad enough liability assumption provision, and especially because it contains a negating clause, API did not assume direct liability under CERCLA. Thus, I do not believe additional discovery could shed light on the question of the parties' intent, particularly given that CERCLA had not even been enacted at the time.