# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                Case No. 10-C-910

NCR CORP. and APPLETON PAPERS INC.,

    Defendant.

## DECISION GRANTING PRELIMINARY INJUNCTION

On July 5, 2011, this Court denied the government's motion for a preliminary injunction against Defendants NCR and Appleton Papers Inc. ("API"). In doing so, I found that although the government had met the standard requirements for obtaining preliminary injunctive relief, it appeared to be unlikely to prove API was a liable party. The government filed another motion for a preliminary injunction on March 19, 2012. Subsequently, this Court ruled that API was *not* a liable party under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq*., , and the government tailored the proposed preliminary injunction to NCR alone. These developments have removed the hurdle that prevented the grant of injunctive relief in 2011. A hearing was held on April 12, 2012. Although NCR has made some additional arguments to bolster the divisibility defense it raised in 2011, I conclude that preliminary injunctive relief is warranted here. Accordingly, the government's motion for a preliminary injunction will be granted.

**I. Background**

The present motion is merely the latest iteration of an ongoing dispute between the Environmental Protection Agency and NCR. Pursuant to a Unilateral Administrative Order, the EPA has ordered NCR and API to complete the removal of some 660,000 cubic yards of sediment from the Lower Fox River this year. This work would occur in what is known as OU4, the span of the Fox River between De Pere and Green Bay. In turn, NCR proposed to dredge 500,000 cubic yards, but API refused to support that proposal. The government thus brought this motion seeking to compel NCR and API (and now just NCR) to complete the 660,000 cubic yards the government ordered. NCR opposes the motion, arguing that it is likely to succeed in showing that the harm is divisible, which would mean its share of several liability would be relatively small. It also asserts that there has been no showing of irreparable harm and that the balance of equities favors denial of the motion. Additional background information underlying the present motion may be found in this Court's July 5, 2011 decision.

**II. Analysis**

In order to obtain a preliminary injunction, a plaintiff must show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm without the injunction, that the harm it would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and that the injunction is in the public interest. These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted. *Judge v. Quinn,* 612 F.3d 537, 546 (7th Cir. 2010). I begin by addressing the government's likelihood of success on the merits.

**A. The Government is Likely to Succeed on the Merits**

**1. Divisibility**

The centerpiece of NCR's defense to the injunction now sought is its argument that the PCB pollution in the river, and particularly in OU4, is divisible. CERCLA typically imposes joint and several liability on liable parties, but if a party can prove that the harm is divisible, that party may be held liable only for its contribution to that harm.

> Once a party is found to be liable under CERCLA, the party is jointly and severally liable for all of the EPA's response costs, "regardless of that party's relative fault." *Metropolitan Water Reclamation Dist. of Greater Chicago v. North American Galvanizing & Coatings, Inc.,* 473 F.3d 824, 827 (7th Cir.2007). Courts, however, do recognize one judicially created exception to joint and several liability under § 107(a). If a liable party can establish that the harm is divisible—that is, that there is a reasonable means of apportioning the harm among the responsible parties—then that party is not subject to joint and several liability.

*United States v. Capital Tax Corp.,* 545 F.3d 525, 534 (7th Cir. 2008).

But because a successful divisibility defense would often undermine Congress' determination that CERCLA liability should be joint and several, such a defense "is the exception, however, not the rule." *Id.* The burden of establishing divisibility is on the defendant asserting the defense. The first step in addressing a divisibility defense is to determine whether the harm is "theoretically capable of apportionment." *Burlington Northern and Santa Fe Railway Co. v. United States,* 556 U.S. 599, 615 (2009). Some harms are "a single, indivisible harm," and in such cases "courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm." *Id.* at 615-16 (citing RESTATEMENT (SECOND) OF TORTS § 433A, Comment i, p. 440 (1963–1964)).

3

Although rarely successful in the past, the divisibility defense did receive the support of the Supreme Court in *Burlington Northern,* 556 U.S. at 616. There, the Court upheld a district court's conclusion that a railroad was liable for only nine percent of the harm at the site based on the amount of chemical releases, the site's area, and the amount of time the railroad had leased the site to the polluter. *Id.* Although *Burlington Northern* has been seen as a watershed case by some, including NCR, its holding is actually quite modest. The Court merely found (almost grudgingly, it would seem) that the district court's divisibility determination was not erroneous, largely because the district court had built a large "fudge factor" of 50% into its analysis. Nowhere did the Court suggest that the district court's allocation was *preferable*; nor did it even weigh in on the question of whether the harm in question was even *capable* of division, which is the question before me at present.[1]

**2. NCR's Divisibility Argument**

NCR argues, as it did last year, that the harm is theoretically capable of apportionment because its experts have been able to demonstrate that only 9 percent of the PCBs in OU4 came from the facilities for which NCR is responsible, which are twenty or more miles upstream in OU2 (the stretch of river near Appleton). Dr. Connolly testified that he analyzed sediment data at several points to determine the key question, which is what percentage of OU4's PCBs originated from mills in OU4 itself (such as U.S. Paper or Georgia-Pacific) and what percentage flowed downstream from the OU2 mills for which NCR is responsible (known as the Appleton Coated Paper facility and

---

[1] One commentator (admittedly, a former DOJ attorney) persuasively argues that "the Burlington Northern decision should have relatively limited impact on CERCLA litigation." Steve C. Gold, DIS-JOINTED? SEVERAL APPROACHES TO DIVISIBILITY AFTER BURLINGTON NORTHERN, 11 VT. J. ENVTL. L. 307, 311 (2009).

4

Combined Locks). Dr. Connolly explained that good sediment cores can tell the story of PCB contamination over time. Dr. Connolly also relied on the uncontroversial conclusion that higher PCB concentrations in a given downstream location indicate a new source of PCBs. For example, if sediment cores in OU3 and the upstream end of OU4 indicate 500 parts per million, while core samples taken further downstream in OU4 show 1,000 ppm, the only explanation for the increase is that some new source in OU4 has contributed a large amount in the area near the sample. In other words, PCB contamination from upstream sources diminishes as one moves downstream. Dr. Connolly also used a chemical marker that dilutes in a manner similar to PCBs. By using this marker, he was able to approximate the rate at which PCBs dilute as they move downriver. His calculations produced a conclusion that between 28% and 39% of PCBs in OU4 came from upriver sources.

But NCR's sources in OU2 were not the only upriver sources of PCBs found in OU4. Other mills in OU1 had also released PCBs into the river, and thus Dr. Connolly had to differentiate between OU1 and OU2 sources of PCBs in OU4. To accomplish this, he used a mass balance analysis, which he described as akin to balancing a checkbook. In short, PCBs either deposit in a given spot or they flow downstream. If one can determine how many PCBs were released by mills in a given area (here, OU1), and then subtract from that amount the total PCBs that *remained* in that area, one can reasonably determine that the rest of the PCBs must have flowed downstream. For this calculation Dr. Connolly relied on the work of Philip Simon, API's expert. Based on the estimated volume of PCBs that remained in OU1 (prior to dredging) and how many PCBs were actually released by OU1 sources, Connolly posited that OU1 sources actually contributed more to the PCBs in OU4 than the OU2 sources NCR was responsible for (even though OU1 is even farther

5

upstream). Ultimately, he concluded that OU2 sources were responsible for only 9% of PCBs in upper OU4 and 6% in lower OU4.

### 3. Pollution Mass has Little Relationship with Cleanup Cost

Although NCR has bulked up the science underlying its divisibility argument, I remain unpersuaded that the harm at the site, and particularly OU4, is anything but a single, indivisible harm. My reasons echo those already explained in this Court's July 5, 2011 ruling. There, I found that in this case the real "harm" in question is the cost of remediating the PCB problem. At a minimum, the cost of cleanup must inform a court's assessment of what the harm is and whether it is capable of apportionment. When determining whether a given harm is a single harm or whether it is capable of apportionment, we are not deciding that question in a vacuum. In this and any CERCLA action, the defendants are not objecting to doing cleanup work *per se*, they are objecting to *paying* for the cleanup work. That payment is what the defendants seek to avoid, or at least to minimize, and that money is ultimately what may be "divisible." As such, it makes little sense to focus on the somewhat abstract question of specific and relative amounts of contribution to a pollution problem if those amounts bear little relation to the expense required to clean up that very pollution.

Here, the PCBs found in the riverbed are not fungible. Some of the PCBs are buried deep below the river floor underneath clean sediment, and these deposits can be capped relatively cheaply (or even ignored altogether). Other deposits are closer to the surface and must be dredged. The government's witness, Richard Fox, testified convincingly about the varied expenses involved in the cleanup effort. Regardless of whether a given portion of sediment needs to be capped or dredged, the capping and dredging costs have very little relation to the mass of PCBs that lie

6

thereunder. A cubic yard of sediment costs the same to dredge or cap whether it contains 10 ppm or 100 ppm. And the determination as to whether to cap or dredge in the first place is based primarily *not* on how many kilograms of PCBs are beneath the location but by how *deep* they are and how clean the sediment on top of them is. Moreover, some portions of the river can be cleaned with a "production dredge," which is larger and more cost-effective, while other portions require a smaller, less efficient dredge.

API's expert Philip Simon testified and provided an extensive report detailing his firm's effort to produce a model to measure PCB flow throughout the river.[2] In a nutshell, Simon divided OU4 into "apportionment polygons"—discrete areas with known (or estimated) response costs and estimated contributions of PCBs broken down by PRP. He asserted that the contributions of each PRP could be traced into these polygons (based on markers, core samples and other data points taken over many years of study), and since we know the cost of remediating each polygon we can link the mass of PCBs discharged with the cost of cleanup, and thereby apportion the costs based on relative contributions. This approach was not entirely convincing. First, the link between specific dischargers and PCBs found in individual OU4 polygons was not entirely clear. More importantly, much of the cost data used by Simon appears to underscore the point that there is no reasonable relationship between cost and PCB mass. Appendix E to Simon's report lists all of the various apportionment polygons, their projected costs to remediate, and the mass of PCBs in each polygon. (ECF # 337-7 at 87.) For example, Polygon 1 (with 1,356 kg of PCBs) costs some $24 million to clean up. Polygon 2 has only 97 kg and costs $220,000. Thus, Polygon 1 has roughly

---

[2] Given the very recent dismissal of the claims against API, I allowed API's expert to testify on NCR's behalf under examination by API's counsel. API and its indemnitors remain interested parties given API's indemnification relationship with NCR.

14 times the amount of PCBs but costs more than 100 times as much to remediate. The starkest example involves Polygon 19, which has only 18 kg of PCBs. That polygon costs more than $15 million to remediate, whereas Polygon 41 has nearly 2,500 kg of PCBs and costs four million *less*.

As the government points out, this kind of data is a nearly fatal indictment of the notion that the cleanup costs have any relation whatsoever to the mass of PCBs polluted by each party. Fox's testimony in particular emphasized how fickle the relationship is. Of course it is true that the cleanup cost of OU4 would be lower if PCBs in that section came *only* from OU4 sources, just as it is true that the cost would be *nonexistent* if there were no pollution at all. The fact that there is some small relationship between PCB mass and cleanup expense, however, is simply a truism that does little to advance the discussion. The overwhelming point is that the expense of cleaning up the Lower Fox River is only weakly correlated with the mass of PCBs discharged by the parties. *Pakootas v. Teck Cominco Metals, Ltd.,* 2012 WL 1133656 at *16 (E.D. Wash. 2012) ("Even if it could be determined that Teck contributed only a certain percentage of the total volume of hazardous substances in the UCR Site, there would not necessarily be a basis to conclude it caused the same percentage of 'harm' in the UCR Site . . . .") These factors convince me that the site is not a good candidate for divisibility.

**4. The Harm must be Measured by Danger to the Public**

My conclusion remains the same even if the focus on cleanup costs is placed to one side. Even if the "harm" at issue is not the cost of cleanup *per se*, surely the harm is measurable and best described with an eye towards how toxic the pollution is to the public. That, after all, is the actual harm at issue here. Divisibility allows a party to be liable "for [only] the portion of the total harm that he has himself caused." *Burlington Northern,* 129 S. Ct. at 1881 [ ]. Here, the PCBs

8

themselves are not necessarily "harmful" to the public based solely on the mass that is present in the riverbed. Some of the PCBs are buried safely beneath layers of sediment. It is usually only when they become present in fish, especially bottom-feeders and fish at the top of the food chain, that they become harmful to humans. Because the PCBs that settled in the riverbed are not fungible (some are more harmful than others), it does not make sense to focus so narrowly on the relative masses of PCBs discharged by each party.[3] As noted above, PCBs may be buried deep under several feet of clean sediment and thus present relatively little health risk to the public. PCBs located closer to the surface may be much more dangerous (although cheaper to clean up). Even if we accept API's polygon approach, we still do not know, within a given polygon, which polluter's PCBs are the most harmful and toxic.

**5. OU4 is not Divisible even if the "Harm" is the Polluted Sediment itself**

Finally, even if the "harm" to be divided is simply the polluted sediment itself (without respect to its toxicity or the cost of remediating it), my conclusion remains the same. As noted in my previous decision, the riverbed is a complex organism with numerous factors working independently on it. For example, API and NCR have educated the Court about a phenomenon known as "seiche," caused by wind and other factors, which can cause the river to flow *upstream* for discrete periods of time. A shipping channel and turning basin in OU4 have been dredged for decades by the Army Corps of Engineers, and the Corps uses mechanical dredging (rather than hydraulic), which increases sediment dispersion. Great Lakes vessels (with large displacements and propellers) have been coming in and out of the river since long before PCBs were ever an issue, and

---

[3] I recognize that "PCBs" is the generic term we are applying here. The Lower Fox River contains a number of different manifestations of PCBs, some of which did not come from the carbonless copy paper that is at issue here.

9

recreational boats have stirred up sediments in shallower waters, where PCBs may be at their most dangerous. These natural and anthropogenic forces have been working on the river sediment, moving it around, stirring it up and redistributing it for decades.

These and other factors convince me that the Lower Fox River and OU4 in particular are not reasonably capable of division. In my July 5, 2011 ruling, I cited examples of indivisible harms from the RESTATEMENT (2d) OF TORTS, and these examples bear repeating:

> 14. A Company and B Company each negligently discharge oil into a stream. The oil floats on the surface and is ignited by a spark from an unknown source. The fire spreads to C's barn, and burns it down. C may recover a judgment for the full amount of his damages against A Company, or B Company, or both of them.

> 15. The same facts as Illustration 14, except that C's cattle drink the water of the stream, are poisoned by the oil and die. The same result.

Rest. (2d) Torts, § 433A, cmt. 1, illus. 14, 15.[4]

What these examples demonstrate is that independent factors (such as the spark) worked on the pollution and transformed it into a harm of a different nature and degree. The oily stream was one kind of pollution, but it became transformed into a different, more "toxic" event, by the spark that set fire to a barn. Similarly, an intervening event (cattle drinking the water) caused collateral damages wholly apart from the oily stream itself. The harm is thus not merely the oil in the river but rather the collateral effects of that oil when acted upon by independent sources.

These examples illustrate two related points. The first is that when independent factors transform the nature of a harm, that harm is unlikely to be found divisible. Here we have the independent factors noted above, such as current, wind, gravity, dredged shipping channels, time,

---

[4] Notably, these examples do not concern themselves with dividing up the pollution itself, but the cost of making the injured party whole.

10

Case 1:10-cv-00910-WCG   Filed 04/27/12   Page 10 of 19   Document 370

and the like that continue to transform the physical pollution profile at the bottom of the river. Not only do these factors stir up and move around the PCBs in the river, they also render some of them more toxic by bringing them closer to the surface. *United States v. Monsanto Co.,* 858 F.2d 160, 172 (4th Cir.1988) ("Volumetric contributions provide a reasonable basis for apportioning liability only if it can be reasonably assumed, or it has been demonstrated, that independent factors had no substantial effect on the harm to the environment.")

The second point is that in both Restatement examples the independent factors (the spark and the cattle) act as a transformative medium that creates a different kind of harm altogether, one that is largely (albeit not completely) divorced from the relative contributions of the parties to the original harm. The collateral effect caused by the independent factor turns the focus from the physical pollution itself (the oil spill, for example) to the collateral damage caused *after* the independent factor has interacted with it. In our case, we do not have cattle but we have fish. Fish exposed to PCBs are the principal medium through which the PCBs pose a health risk to humans. Without fish, it is conceivable that the river would not need remediation at all. It goes without saying that these fish travel throughout the many areas of the river and become exposed to PCBs in multiple different locations. No one has even attempted to suggest that we could trace different contributions of PCBs through the fish themselves. Thus, the fish are an additional independent factor that transfer the toxicity of the PCBs to humans, and their toxicity is not strongly correlated with the relative volumes of PCBs that exist in the riverbed.

In fact, when compared to the Restatement examples the divisibility argument here is even weaker. In those examples, the principal harm was the burned barn or the poisoned cattle—the direct collateral effect caused by the pollution's interaction with an independent source. Here, we

11

are even one more step removed. The PCB cleanup is not being undertaken at roughly a billion dollars' expense in order to protect fish from poisoning, it is to protect *humans* who consume the fish. The chain of causation thus extends from the original discharge of PCBs to the river current that carries them down river, where the PCBs continue to be dispersed, dredged and intermingled with other PCBs, to the fish that are exposed to them, and finally to humans who consume them. It is thus not difficult to conclude that the "harm" itself has been commingled into a singular, indivisible injury. In short, because this case is much more about collateral effects and independent factors than it is about the relative mass of PCB discharges, I conclude that the harm is an indivisible one:

> [W]here causation is unclear, divisibility is not an opportunity for courts to "split the difference" in an attempt to achieve equity. Rather, "[i]f they are in doubt, district courts should not settle on a compromise amount that they think best approximates the relative responsibility of the parties." In such circumstances, courts lacking a reasonable basis for dividing causation should avoid apportionment altogether by imposing joint and several liability.

*United States v. Hercules, Inc.,* 247 F.3d 706, 718-19 (8th Cir. 2001) (citations omitted).[5]

### B. Irreparable Harm and Balance of Equities

NCR contends only sparingly that the public would not be harmed if the injunction does not issue. It notes that the PCB problem has been around for decades and that the government has taken years to study the problem. As such, given how long the problem has persisted, NCR does not share the government's sense of urgency to recommence the river cleanup operation.

NCR's argument on this point is understandably limited. I concluded last year that the

---

[5]NCR also challenges the specific remedy required in the injunction, but this Court has already rejected those arguments in its July 5, 2011 order. It appears that the primary new objection, which is based on a non-final proposal by the government to tighten dredging requirements, is not on the table at this point and will not be implemented in 2012.

public would enjoy a substantial benefit from requiring the remediation project to continue at full strength. We are talking about removing some 660,000 cubic yards of sediment from the river this year, which would significantly advance the cleanup project and keep it on schedule for completion in five years. Studies have shown that anglers continue to catch and eat fish from the river in the thousands, and as noted above contaminated fish are the primary cause of danger to humans. Moreover, each year significant quantities of PCBs are washed through the river into Green Bay and Lake Michigan, where it becomes unrecoverable. If the river is dredged and capped sooner rather than later, fewer toxic PCBs will enter another body of water. It is difficult to conclude that any delay does not create irreparable harm.

Instead of focusing on the harm to the public, NCR points the finger at the government, as if to say that if any harm does ensue from a delay in the cleanup, it will be the government's fault rather than NCR's. The essence of NCR's irreparable harm argument is that there are other PRPs who are liable to the government for the cleanup, yet the government has, in effect, let those PRPs off the hook. In API's more pointed words, the government has "engineered" a crisis by focusing solely on NCR and API when it could have been going after the other PRPs. As such, because the potential harm is due to the government's own actions, NCR believes the government cannot show that it will suffer irreparable harm. This is also the substance of NCR's argument that the equities favor denial of injunctive relief.

There are several problems with NCR's argument. First, there is no question that NCR itself is a liable party. For a variety of reasons, the government has discretion to bring enforcement actions against some liable parties (but not others), particularly when, as here, a determination has been made that one or more of the PRPs is overwhelmingly responsible for the PCB problem in the

13

first place. *See Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 8-C-16, 2009 WL 5064049 (E.D. Wis. Dec. 16, 2009). In the parallel contribution action, I have concluded that NCR knew or should have known that its carbonless copy paper would pose a serious risk to the environment and public health, whereas the other PRPs had no idea that PCBs were toxic. This view was shared by the government. It thus makes perfect sense that the government has chosen to focus on NCR. Given the background of this action, it would be unusual if the government had *not* focused on NCR as the primarily responsible party. Simply saying that other PRPs "could" be made to begin cleaning up the river is not enough to avoid a finding of irreparable harm.

Second, although it is true that Georgia-Pacific has signed a consent decree with respect to OU4, its liability does not extend to the upper portions of that section of the river (its plant is downstream). For a variety of practical reasons, dredging normally begins in the upstream portions of a site and then moves downstream, and thus it makes sense to require NCR to begin work on the entire stretch of river. Ultimately, NCR's argument is little more than a preference that the government pursue other parties for the cleanup, but for the reasons noted above and in the contribution action, the government's focus on NCR is entirely reasonable.

Finally, I note that NCR is not without any recourse whatsoever in the event the *Whiting* contribution decision is overturned. Although Georgia-Pacific has signed a consent decree with the government, NCR would be able to pursue contribution from other parties in the event it is later found that NCR has paid more than its fair share. The risk of irreparable harm to NCR is thus quite low. Accordingly, I conclude that there is a substantial risk of irreparable harm to the public if the injunction would not issue. And for the same reasons, the equities favor issuance of an injunction as soon as possible because the harm to the public outweighs any potential harm to NCR.

14

**III. Conclusion**

For the reasons given above, **IT IS HEREBY ORDERED**:

1.      NCR shall comply with the following requirements relating to the performance of remedial action work at the site in 2012:

   a.      If full-scale sediment remediation has not commenced at the site before issuance of this Order, NCR shall ensure the immediate commencement of full-scale sediment remediation as described. NCR shall ensure the continuation of full-scale sediment remediation work as described below through at least November 9, 2012.

   b.      NCR shall ensure that three or more dredges are used simultaneously to perform Production Dredging and/or Final Dredging 24 hours per day, five days per week (except during particular holiday-shortened weeks listed in the Modified Work Plan), throughout the construction season, subject only to bona fide operational limitations, and with the goal of maintaining the efficiency of the Sediment Processing Facility. (During startup of operations, the dredges may be operated 16 hours per day, pending confirmation that all systems and processes are functioning as planned.)

   c.      NCR shall ensure the performance of remediation work at the site as specified by EPA's Modified Work Plan for 2012 (filed with the Court as ECF 313-5 through ECF 313-9, and incorporated herein by this reference), including removing a minimum of 660,000 cubic yards of sediment from the following Eligible Dredging Areas:

| 2012 Eligible Dredging Areas | Estimated Total Volume | Estimated Total TSCA Volume |
|---|---|---|
| D114-TBD | 4,173 cy | |

| | | |
|---|---:|---:|
| D118A-TBD | 1,828 cy | |
| D118B-TBD | 2,890 cy | |
| D23 | 205,861 cy | 19,389 cy |
| D23B | 715 cy | |
| D23C | 84 cy | |
| D24 | 68,013 cy | |
| D25C | 194 cy | |
| D26A | 1,467 cy | 160 cy |
| D26B/D61 | 6,901 cy | |
| D26C | 1,644 cy | |
| D27A | 71,772 cy | 347 cy |
| D28 | 109 cy | |
| D29 | 1,215 cy | |
| DPhase1 | uncertain cy | |
| D27B | 31,040 cy | |
| D27D | 4,022 cy | |
| D27E | 468 cy | |
| D27F | 3,638 cy | |
| D30A North | 7,806 cy | |
| D30A South | 5,362 cy | |
| D91 | 1,169 cy | |
| D119A-TBD | 11,649 cy | |
| D119B-TBD | 3,162 cy | |
| D119C-TBD | 3,126 cy | |
| D27C-TBD | 3,457 cy | |
| D30B South | 136,889 cy | |

16

| | | |
|---|---:|---:|
| D30C-TBD | 7,630 cy | |
| D30D | 1,518 cy | |
| D30E | 2,316 cy | |
| D31 South | 55,487 cy | |
| D32 South | 153,977 cy | |
| D32A | 228 cy | |
| D32B | 167 cy | |
| D141C | 161 cy | |
| D30B North | 72,210 cy | |
| D30B North | 21,549 cy | |
| D31 North | 14,772 cy | |
| D31 North | 8,947 cy | |
| D32 North | 81,288 cy | |
| D32 North | 27,167 cy | |
| D34 | 5,310 cy | 3,643 cy |
| D35A | 310,631 cy | 21,667 cy |
| D35Q | 55,206 cy | 9,263 cy |
| D37 | 17,845 cy | |
| **Total** | **1,415,063 cy** | **54,468 cy** |

      d.     NCR shall ensure the performance of all infill sampling work required by EPA's Modified Work Plan (including the modified 2012 OU 4 Infill Sampling Plan that comprises Appendix E of the Modified Work Plan).

    2.     Upon receipt of actual notice of this injunction, the following persons and entities shall be bound by its terms pursuant to Fed. R. Civ. P. 65(d)(2):

a. the parties;

b. the parties' officers, agents, servants, employees, and attorneys who are involved in decision-making concerning the performance or direction of remediation work at the site or contractual arrangements or funding arrangements for remediation work at the site;

c. other persons who are in active participation or concert with anyone described in Subparagraphs 2.a and 2.b concerning the performance or direction of remediation work at the site or contractual arrangements or funding arrangements for remediation work at the site.

3. All response action work required by this Order shall be subject to oversight by EPA, with supervision by the Court.

4. NCR shall not be held in contempt of this Order or otherwise held responsible for any failure to carry out its obligations under this Order if such failure is attributable to a "*force majeure*." For purposes of this Order, a "*force majeure*" is defined as any event arising from causes beyond the control of NCR or any entity controlled by NCR, or any contractors or subcontractors of NCR, that delays or prevents the performance of any obligation under this Order despite NCR's best efforts to fulfill the obligation.

a. The requirement that NCR exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential *force majeure* and best efforts to address the effects of any potential *force majeure*.

b. If any event occurs or has occurred that may delay the performance of any obligation under this Order for which NCR intends or may intend to assert a claim of *force*

18

*majeure*, NCR shall notify EPA within seven days of learning of such an event and provide sufficient explanation of the reasons for delay and the actions to be taken. If EPA agrees that the delay or anticipated delay is attributable to a *force majeure*, the provisions of this Order shall be adjusted as necessary to enable NCR to fulfill its obligations. If EPA disagrees that the delay or anticipated delay is attributable to a *force majeure*, then the Court shall determine whether the requirement of this Order should be adjusted.

5. The terms of this Order may be modified by a subsequent written agreement signed by appropriate representatives of the United States, the State of Wisconsin, and NCR, although no such modification shall take effect until it is approved by the Court. Nothing in this Order shall be deemed to alter the Court's power to enforce, supervise or approve modifications to this Order.

6. The Court shall terminate this preliminary injunction in response to a motion showing that all requirements of Paragraph 1 have been satisfied.

**SO ORDERED** this ___27th___ day of April, 2012.

                                                      s/ William C. Griesbach
                                                    William C. Griesbach
                                                    United States District Judge