IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

UNITED STATES OF AMERICA and
THE STATE OF WISCONSIN,

        Plaintiffs,

   v.

NCR CORPORATION, *et al.*,

        Defendants.

No. 10-CV-910-WCG

**MEMORANDUM OF DEFENDANT APPLETON PAPERS INC. IN SUPPORT OF MOTION TO STAY OR STRIKE NCR CORPORATION'S MOTION TO ENFORCE THE 40/60 COST-SHARING JUDGMENT AND FOR ENTRY OF AN ORDER COMPELLING ARBITRATION**

       Defendant Appleton Papers Inc. ("API"), by its undersigned counsel, respectfully submits this Memorandum in support of API's motion to stay or strike NCR Corporation's Motion to Enforce the 40/60 Cost-Sharing Judgment and to compel arbitration of the underlying dispute.

**INTRODUCTION**

       In 1998, API, NCR, and British American Tobacco ("BAT") promised one another that any dispute arising under the 1998 Confidential Settlement Agreement ("1998 Agreement") would be resolved outside of court. They agreed to a multi-tiered "Inter-Company Dispute Escalation Process," culminating in binding arbitration.

       A dispute regarding the parties' obligations under the 1998 Agreement has arisen and, last month, API invoked the mandatory dispute resolution process specified in the 1998 Agreement. Now, in a blatant attempt to circumvent that process, NCR has brought a motion asking this Court to resolve the dispute. API has moved to stay consideration of the motion to allow completion of the dispute resolution process required under the 1998 Agreement, including arbitration.

API's motion for stay is a threshold issue and is dispositive. There is no question regarding the validity of the arbitration provision in the 1998 Agreement or the applicability of that provision to the parties' dispute. Therefore, the Federal Arbitration Act and Seventh Circuit precedent compel granting the motion to stay.

NCR argues that the arbitration provision can be ignored because, in its view, there is no "real" dispute. That contention is concocted from arguments that are irrelevant, factually inaccurate and/or misleading. NCR's own submissions present a host of factual and legal issues that this Court would be required to address. Moreover, the United States Supreme Court has directed that where there is a valid arbitration provision, as here, the Court is not to consider the merits of the underlying dispute.

Further, addressing the dispute in this action, rather than in arbitration as the parties agreed, would be highly prejudicial to API. The 1998 Agreement was among three parties – NCR, API and BAT. BAT is not a party to this action. Thus, any relief could only be ordered against API (which has already paid over $200 million) as opposed to BAT (which has paid nothing), requiring further litigation with BAT and raising the risk of potentially inconsistent results. Thus, the requirement for enforcing the Agreement's arbitration clause is particularly compelling in this case. The Court should grant API's motion for stay and need not consider NCR's motion.

Alternatively, the Court should strike NCR's motion. NCR has not pled any claim against API in this action and, thus, has not properly invoked the jurisdiction of the Court. It has not even begun the process necessary for the Court to consider its request for relief.

NCR relies upon the 2011 registration of the Consent Judgment from the Southern District of New York embodying the 2005 arbitration award. However, the statutory

provision for registering a judgment does not allow the relief that NCR seeks because the Southern District of New York judgment is not a money judgment. It has no liquidated amount that can be enforced. Indeed, it is clear from NCR's submittal that the Court would have to resolve factual and legal issues about any amount allegedly owed. The registration provisions are not designed to accomplish that function and they are certainly not designed to allow such issues to be simply dropped into an existing, unrelated litigation without a claim even having been pled. Accordingly, NCR's motion should be stricken.

## STATEMENT OF FACTS

### A. The Arbitration Award and Consent Judgment.

In 1998, NCR and API/BAT entered into a settlement (the "1998 Agreement") in which the parties agreed to, among other things, share certain costs related to the Fox River. For costs up to $75 million, the parties agreed to share them on a 55/45 basis, with API/BAT, jointly and severally, paying the larger share. For costs in excess of $75 million, the parties set a ceiling and a floor and agreed to "compulsory, binding arbitration to allocate as between them all Claims, Damages or Group Defense Costs relating to the Fox River sites…" Dkt. 124-1, ¶ 4(a).

The arbitration proceeding to allocate costs above $75 million occurred in 2005, at which time a panel of three arbitrators entered an Arbitration Award, stating in part:

> Pursuant to this agreement of the parties, the Arbitrators deem appropriate the following allocation:
>
> API/BAT    Sixty (60) percent
> NCR        Forty (40) percent.

Dkt. 144-2 at 3 of 5. The Arbitration Award did not set forth a sum certain for allocation, or provide a money judgment for a sum certain amount. It simply set forth the arbitrators' allocation.

On November 21, 2006, the United States District Court for the Southern District of New York entered a Consent Order entering judgment upon the Arbitration Award.

### B. The Terms Of The 1998 Agreement.

While the 2005 Arbitration Award set forth the future allocation of costs between the parties, it did not in any way address what constitutes "damages" subject to the allocation. That issue is controlled by the 1998 Agreement, in which the parties defined "Damages" in detail and established three different categories of "Damages". Paragraph 1(e) of the 1998 Agreement states as follows:

> e. With the exception of Excepted Matters, "Damages" means:
>
> (1) all out-of-pocket study, restoration, acquisition, cleanup, removal, remedial, investigative, oversight or response costs, or penalties allocated or assessed to, imposed upon, or incurred by NCR, or API/BAT in response to Claims; whether arising from administrative proceedings, litigation, or settlement; and whether asserted directly by the Sovereigns, by way of a private party actions (in the nature of contribution or otherwise), or pursuant to allocation proceedings conducted by and between potentially responsible parties ("PRPs") at the Fox River sites or Future Sites;
>
> (2) all damages, including natural resources damages, allocated or assessed to, imposed upon, or incurred by NCR or API/BAT in response to Claims; whether arising from administrative proceedings, litigation, or settlement; and whether asserted directly by the Sovereigns, by way of a private party actions (in the nature of contribution or otherwise), or pursuant to allocation proceedings conducted by and between PRPs at the Fox River sites or Future Sites;
>
> (3) all costs allocated or assessed to, imposed upon, or incurred by NCR or API/BAT pursuant to the reopener provisions in the settlement agreement with U.S. EPA regarding the Marina Cliffs sites.

Dkt. 124-1 at 6-7.

In Paragraph 5 of the 1998 Agreement, the parties agreed to a detailed process for tendering of "damages" or "group defense costs" to one another for payment. Paragraph 5 states as follows:

> 5. **PAYMENT OF DAMAGES OR GROUP DEFENSE COSTS ALLOCATED OR ASSESSED UPON NCR OR API/BAT**: NCR and API/BAT shall each designate an individual with responsibility for reviewing all Damages or Group Defense Costs allocated to or assessed upon NCR or API/BAT, either singly or collectively, relating to the Fox River sites, the Marina Cliffs sites (to the extent that the reopener provisions are invoked), or the Future sites ("the Authorization Administrator"). The Authorization Administrators shall promptly review all such Damages or Group Defense Costs when tendered for payment and upon approval thereof, shall cause their respective companies to pay their applicable shares in accordance with the Initial and Subsequent Allocations, as defined above and in ¶¶ 3 and 4. If either of the Authorization Administrators believes any Damages or Group Defense Costs are inappropriate or unauthorized, or otherwise has questions or concerns about any portion of such Damages or Group Defense Costs, the Authorization Administrators shall confer with one another in an effort to arrive at a consensus. **If a dispute arises as to the propriety of the payment of any Damages or Group Defense Costs, the provisions of ¶ 10 (relating to dispute resolution) shall apply**.

Dkt. 124-1, ¶ 5 (emphasis added).

Thus, in event of a dispute over amounts due under the 1998 Agreement, the parties first agreed, as set forth above, that their Authorization Administrators would confer. Consistent with Paragraph 5, Bryan Heath currently serves as the Authorization Administrator for NCR. Leila Pittaway currently serves as the Authorization Administrator for API. To date, BAT has not paid any amounts under the 1998 Agreement and has, therefore, not appointed an Authorization Administrator.

If the meet and confer among Authorization Administrators does not resolve a dispute over amounts due under the 1998 Agreement, then, in paragraph 10, the parties agreed to a detailed, multi-tiered dispute resolution process. First, the parties agreed an "Inter-Company Dispute Escalation Procedure":

> 10. DISPUTE RESOLUTION:
>
>     a. <u>Inter-Company Dispute Escalation Procedures</u>: In the event of any disputes under this Agreement, except those relating to the Subsequent Allocation Arbitration which shall be governed by the Subsequent Allocation Arbitration Agreement attached as Exhibit A, the parties shall submit the issue for resolution to their respective General Counsel, who shall attempt in good faith to resolve the dispute. If resolution is not reached, the parties will then submit the issue for resolution to their respective Chief Financial Officers who shall also negotiate in good faith to resolve the matter. If these intercompany

> dispute escalation procedures are not effective, the parties shall participate in non-binding mediation before a mediator jointly agreed upon the parties.

Dkt. 124-1, ¶ 10a.

If the inter-company dispute escalation procedure does not resolve a dispute, then the parties promised to submit "all disputes over payment of any Damages or Group Defense Costs" to non-binding mediation and, if unsuccessful, then to binding arbitration:

> b. <u>Funding Disputes</u>: In the event that the inter-company dispute escalation procedures and the non-binding mediation are not effective, NCR and API/BAT agree that any and all disputes over payment of any Damages or Group Defense costs allocated to or assessed upon NCR or API/BAT shall be submitted to arbitration in New York, New York administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules. Judgment on the award entered by the Arbitrator shall be entered in any court having jurisdiction thereof.

Dkt. 124-1, ¶ 10b.

### C. API's Invocation Of The Inter-Company Dispute Escalation Process.

Consistent with paragraph 5, on May 3, 2012, Bryan Heath, as the Authorization Administrator for NCR, tendered to Leila Pittaway, as the Authorization Administrator for API, amounts that NCR claims are due under the 1998 Agreement. See Dkt. 469-1. Ms. Pittaway then, consistent with paragraph 5, raised to Mr. Heath's attention concerns about the tender, including that NCR had made a demand for $11 million with no supporting documentation of any kind. Dkt. 469-2. Over the next six weeks, NCR and API engaged in discussions about the dispute through a series of communications between the Authorization Administrators. Dkt. 469-3 – 469-9.

Despite API's requests, NCR refused to provide documents and any reasoning behind its decisions. Dkt. 469, Exs. 1-10. When it became clear that the discussions between Mr. Heath and Ms. Pittaway were proving unsuccessful in resolving the dispute, Ms. Pittaway proceeded to the next step in the dispute resolution process. By letter dated

July 23, 2012, Ms. Pittaway provided a Notice of Dispute to Mr. Heath under Section 10, invoking the Inter-Company Dispute Escalation Procedure, stating, in part:

> This letter serves as formal Notice of Dispute under § 10 of the Settlement with respect to NCR's demand for payment of $6,398,891.08 relating to the Lower Fox River Remediation Cash Call No. 34.
>
> * * *
>
> Pursuant to § 10(a) of the Settlement, I have submitted the following issues to Tami Van Staten, General Counsel for API, for intercompany dispute resolution:
>
> • Any request for reimbursement under §5 of the Settlement must include documentation, such as invoices from remediation and other contractors, showing how and when the funds in question were spent.
>
> • The Settlement defines "Damages" as "out-of-pocket" remediation and other costs. NCR may not seek reimbursement for such costs from API unless and until the relevant remediation and other contractors have been paid in full. To be clear, "out-of-pocket" costs do not include amounts transferred by NCR to its Environmental Remediation Trust or to the Lower Fox River Remediation LLC since both are wholly controlled by NCR.
>
> • The term "out-of-pocket," as used in the Settlement, limits the costs NCR may seek from API and/or BAT to costs it has incurred but has not been reimbursed by other sources. Specifically, API is not obligated to indemnify NCR for amounts paid or payable by insurance or indemnities (such as the AT&T and Alcatel Lucent indemnities).

Dkt. 469-10. Rather than participate in the dispute resolution process that it promised to follow in the 1998 Agreement, however, NCR filed an Expedited Motion To Enforce The 40/60 Cost-Sharing Consent Judgment Against Appleton Papers Inc. NCR has not filed any claim or cross-claim against API in this action.

## ARGUMENT

### I. THE FEDERAL ARBITRATION ACT OBLIGATES THE COURT TO STAY THE MOTION IN ORDER TO ALLOW ARBITRATION.

#### A. The Present Dispute Falls Squarely Within The Dispute Resolution Process In The 1998 Agreement.

NCR's motion is premised on the claim that it is currently entitled to payment of approximately $15 million from API. Contrary to its claims, however, NCR's alleged entitlement to that money was not determined in the Consent Judgment entered in the

United States District Court for the Southern District of New York that confirmed the arbitrators' award.  The Consent Judgment does nothing more than establish each side's percentage of costs that are subject to sharing under the 1998 Agreement.  It does not specify, for example, which costs are subject to the cost-sharing agreement or the terms and conditions under which costs are to be shared.  These issues (and others) are governed by express provisions in the 1998 Settlement Agreement.  The Consent Judgment certainly did not award any of the costs currently at issue, since these costs arose long after the docketing of the Judgment.  Thus, NCR is not asking the Court to simply enforce the Consent Judgment.  Rather, it is seeking adjudication of issues necessary to determine a liquidated sum of money NCR claims it is owed.

The parties to the 1998 Agreement contemplated that disputes like the one described in NCR's motion might arise in the future, due to the ongoing nature of the costs.  Consequently, they agreed upon a detailed process — spelled out in the 1998 Agreement and summarized above — for handling and resolving disputes.  This alternative dispute resolution process culminates in mandatory binding arbitration if disputes are not resolved by other means:

> In the event that the inter-company dispute escalation procedures and the non-binding mediation are not effective, **NCR and API/BAT agree that any and all disputes over payment of any Damages or Group Defense costs allocated to or assessed upon NCR or API/BAT shall be submitted to arbitration** in New York, New York administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules.  Judgment on the award entered by the Arbitrator shall be entered in any court having jurisdiction thereof.

Dkt. 124-1, ¶ 10b (emphasis added).

In neither its communications with API nor in its brief (in which it acknowledges the arbitration provision) has NCR either disputed the validity of the parties' arbitration agreement or asserted that the parties' dispute falls outside the scope of that agreement.

Dkt. 468 at 24 of 26. The arbitration agreement is, therefore, undisputedly valid and applicable to the parties' dispute.

### B. The Federal Arbitration Act Requires The Court To Enter A Stay To Allow For Arbitration.

Under the Federal Arbitration Act, arbitration agreements like the one in the 1998 Agreement are "valid, irrevocable, and enforceable." 9 U.S.C. § 2. Congress enacted the Arbitration Act "to ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985). "The Arbitration Act thus establishes a 'federal policy favoring arbitration,' . . . requiring that 'we rigorously enforce agreements to arbitrate.'" *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (internal citations omitted).

To effectuate this policy, the Act *requires* a court to stay an action (or, in this case, consideration of a motion) pending arbitration once it is satisfied that the dispute is arbitrable under an arbitration agreement:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, **the court in which such suit is pending**, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, **shall on application of one of the parties stay the trial of the action until such arbitration has been had** in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added). The Act also provides that a party aggrieved by "the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

The Court's duties when presented with a motion to stay and compel arbitration are both clear and limited:

> When a motion to stay proceedings and compel arbitration under 9 U.S.C. §§ 1-14 is filed, the court "may consider only issues relating to the making and performance of the agreement to arbitrate". *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 404, (1967). **If the agreement to arbitrate is valid the court has no further power or discretion to address the issues raised in the complaint but must order arbitration**, for it was "the unmistakably clear congressional purpose that the arbitration procedure . . . be speedy and not subject to delay and obstruction in the courts." *Id.*

*Merit Ins. Co. v. Leatherby Ins. Co.*, 581 F.2d 137, 142 (7th Cir. 1978). In short, "[f]or arbitrable issues, a § 3 stay is mandatory." *Volkswagen of America, Inc. v. Suds' of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007). *See also McMahon*, 482 U.S. at 226 ("[A] court *must* stay its proceedings if it is satisfied that an issue before it is arbitrable . . .") (emphasis added).

Here, as discussed above, NCR does not dispute the validity of the agreement to arbitrate or that the parties' dispute falls within the scope of that agreement. This, without more, demonstrates that NCR's motion must be stayed to allow for arbitration.

### C. NCR's Attack Upon The Merits Of The Underlying Dispute Provides No Basis For Evading Its Obligation To Arbitrate.

NCR seeks to avoid the 1998 Agreement's dispute resolution process by claiming that the dispute is nothing more than "conjured excuses" and that API has "no good faith basis for not paying." Dkt. 468 at 24 of 26. NCR thus invites the Court to summarily evaluate and dismiss the merits of API's position.

The law is crystal clear, however, that the Court cannot weigh the merits of the underlying dispute when deciding whether to compel arbitration:

> . . . [I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. **Whether "arguable" or not, indeed, even if it appears to the court to be frivolou**s, the union's claim that the employer has violated the collective bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator.

*AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649-50 (1986). *See also BCS Ins. Co. v. Wellmark, Inc.*, 410 F.3d 349, 352 (7th Cir. 2005) (citing quoted language from *AT&T*). "The function of the court is . . . confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. . . . The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious." *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 568 (1960). Thus, NCR's attack upon the merits of API's position, as a matter of law, provides no basis for ignoring the arbitration clause.

Further, NCR's submissions on their face raise factual and legal issues that this Court would have to consider, including:

- The 14-year course of dealings between NCR and API (Dkt. 468 at 8-11);

- Three months' worth of communications between the Authorization Administrators about NCR's demand and API's objections to the demands (Dkt. 468 at 13-15; Dkt. 469, Exhibits 1-10);

- The structure of the Lower Fox River Remediation LLC (Dkt. 468 at 10);

- The detailed process of "cash calls", the Lower Fox River Environmental Remediation Trusts, and the Tetra Tech contract (Dkt. 468 at 10-13);

- Whether the costs for which NCR seeks reimbursement were necessary to comply with the PI Order (Dkt. 468 at 13);

- Whether the costs for which NCR seeks reimbursement were calculated consistent with the Tetra Tech contract (*Id.*);

- The propriety of NCR's demand and whether it is acting in good faith (Dkt. 468 at 11-15);

- The propriety of API's objections to NCR's demand and whether API is acting in good faith (Dkt. 468 at 19-22);

- The meaning of "out-of-pocket" – a term not defined in the 1998 Agreement (Dkt. 468 at 19-22);

- The indemnity arrangements that NCR and API have with their other indemnitors and how these multiple indemnities interrelate (Dkt. 468 at 21-22);

- The motivation of API and its indemnitor (Dkt. 468 at 11).

These issues belie NCR's claim that this is a "simple" matter. Dkt. 468 at 5.

NCR also makes wild claims with no support. It claims that in litigation pending in the U.K., BAT has sued API's indemnitor for reimbursement of allegedly improper dividends. Dkt. 468 at 11, n.5. NCR attaches no support and BAT's U.K. proceedings make no such claim. Moreover, NCR has not explained why such allegations would in any event provide any basis to deprive API of its rights under the 1998 Agreement.

NCR also claims that API is trying to avoid its obligations under the 1998 Agreement when, in fact, API is trying to pursue its contractual rights while NCR seeks to end run them. Thus, the proper process to resolve the dispute, however, is under the express terms of the 1998 Agreement.

Finally, API would be seriously prejudiced by addressing the dispute outside the process the parties agreed upon. The 1998 Agreement has three parties, NCR, API and BAT, but only two of them are parties to this action. Were the Court to entertain NCR's motion, the Court could only award relief against API (which has already paid $200 million) not against BAT (which has paid nothing). Further proceedings would be necessary to properly distribute the responsibility with no assurance against inconsistent results.

For all of the above reasons, the motion to stay and to compel arbitration should be granted.

## II. NCR'S MOTION SHOULD BE STRICKEN.

NCR's Motion should be stricken because NCR has not invoked the jurisdiction of this Court to resolve the dispute. It has not filed any cross-claim against API. It has not even begun the process of raising and joining issues regarding API's obligations

under the 1998 Agreement. As far as API is aware, there is no precedent for simply dropping a claim involving a multi-million dollar dispute into existing litigation by what is essentially a dispositive motion where the claim has not even been pled.

NCR relies upon the registration in the Eastern District of the Consent Judgment from the Southern District of New York (with the 2005 arbitration award attached). However, registration under 28 U.S.C. § 1963 does not solve NCR's jurisdictional problem. That section provides for the registration of judgments as follows:

> A judgment in an action for the recovery of money or property entered in any … district court … may be registered by filing a certified copy of the judgment in any other district … when the judgment has become final by appeal or expiration of the time for appeal or when ordered by the court that entered the judgment for good cause shown.

The registration of a judgment is designed to be an uncomplicated procedure, requiring only the filing of a certified copy of the judgment in a district court. 28 U.S.C. § 1963. *See also Arenas v. Sternecker*, 109 F. Supp. 1, 2 (D. Kan. 1953) ("The term 'registered' is not defined; but, as applicable here, it seems to connote a filing with the clerk and an entering upon the records in that office, in substantially the same manner as a judgment rendered by this court.").

By its very terms, § 1963 applies to judgments "for the recovery of money or property" and, therefore, presupposes that there is a judgment for a sum certain or specific property. The registration of judgment process is intended "to simplify and facilitate the enforcement of federal judgments, at least those for money, to eliminate the necessity and expense of a second lawsuit, and to avoid the impediments, such as diversity of citizenship, which new and district federal litigation might otherwise encounter." *Stanford v. Utley*, 341 F.2d 265, 270 (8th Cir. 1965). Consistent with that purpose, registration of a judgment does not "give a new judgment to the judgment

creditor" and "confers upon [the] court no power to alter the judgment itself." *Juneau Spruce Corp. v. Int'l Longshoremen's & Warehousemen's Union*, 128 F. Supp. 697, 699 (D. Haw. 1955). *See also Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1034, (7th Cir. 2000) (requiring motions to modify a registered judgment to be made to the district court that rendered the judgment rather than to the court that registered the judgment and confirming this is the majority rule).

Thus, for a judgment that does not establish a liquidated amount but, rather, requires further proceedings to resolve disputes or fill in gaps, such further work cannot be done in the district where the judgment was registered. It must be done by the court that made the original decision.

In this case, the arbitration award did not fix any dollar amounts. It merely determined a percentage split of costs that falls within the terms of the 1998 Agreement. The determination of the costs that so qualify must be made by the original forum. In this case, that means arbitration, which is what the parties contractually chose.

NCR suggests that by allowing registration of the Consent Judgment, this Court somehow decided that it could adjudicate any future funding disputes. Dkt. 468 at 24. The Court certainly did not so state when it simply allowed the judgment to be registered. Implying such a conclusion here goes far beyond what this Court has actually said and would be both contrary to Seventh Circuit precedent because it would be tantamount to modifying the Judgment of the Southern District, *Bd. of Trustees*, 212 F.3d at 1034, and conflict with the Court's clear and well-established obligations under the Federal Arbitration Act.

## CONCLUSION

Accordingly, API respectfully requests the Court to enter as follows:

(a)  staying consideration of NCR's motion until the dispute resolution process in the 1998 Agreement is completed;

(b)  compelling NCR to participate in the dispute resolution process, including arbitration;

(c)  in the alternative to (a), striking NCR's motion; and

(d)  awarding API its costs and attorneys' fees.

Dated this 3rd day of August, 2012.

Respectfully submitted,

APPLETON PAPERS INC.


By:   /s/ Ronald R. Ragatz
        One of Its Attorneys

Counsel for Appleton Papers Inc.:

| | |
|---|---|
| Michael L. Hermes (#1019623) | Ronald R. Ragatz (#1017501) |
| Heidi D. Melzer (#1076125) | Dennis P. Birke (#1018345) |
| Hermes Law, Ltd. | Megan A. Senatori (#1037314) |
| 333 Main Street, Suite 601 | DeWitt Ross & Stevens S.C. |
| Green Bay, WI 54301 | Two East Mifflin Street |
| (920) 436-9870 | Madison, WI 53703 |
| Fax: (920)436-9871 | (608) 255-8891 |
| | Fax: (608) 252-9243 |
| | |
| | Gregory A. Krauss |
| | Gregory A. Krauss PLLC |
| | 1629 K St. NW |
| | Suite 300 |
| | Washington, DC 20006 |
| | (202) 355-6430 |