IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

UNITED STATES OF AMERICA and
THE STATE OF WISCONSIN,

        Plaintiffs,

    v.

NCR CORPORATION, *et al*.,

        Defendants.

No. 10-CV-910-WCG

## DEFENDANT APPLETON PAPERS INC.'S MEMORANDUM IN OPPOSITION TO NCR CORPORATION'S EXPEDITED MOTION TO ENFORCE THE 40/60 COST-SHARING CONSENT JUDGMENT

Defendant Appleton Papers Inc. ("API"), by its undersigned counsel, respectfully submits this Memorandum in Opposition to NCR Corporation's Expedited Motion to Enforce the 40/60 Cost-Sharing Consent Judgment.

## INTRODUCTION

API, NCR Corporation ("NCR"), and B.A.T Industries, p.l.c. ("BAT") entered into a settlement agreement ("1998 Agreement") that required any disputes over funding obligations arising under the Agreement to be resolved via a dispute resolution process culminating in binding arbitration. NCR now seeks to avoid this agreed-upon process, to have this Court order API to pay $15 million to NCR, and to deny API its right to arbitrate the parties' funding dispute. API disputes the claim for reasons it has explained to NCR, including NCR's refusal to provide reasonable supporting documentation and its misinterpretation of the 1998 Agreement. NCR refuses to provide the required documentation and its position is that API must simply pay whatever NCR demands – no questions asked. Thus, the parties have a bona fide dispute over payment. NCR has a fully adequate forum and process to resolve this dispute – it just is not in this Court or by

the pending motion. Rather, it is the dispute resolution process that NCR, API and BAT expressly agreed to in their 1998 Agreement.

Before NCR filed its motion, API had formally initiated that dispute resolution process. API is working to abide by the parties' agreement by resolving the dispute in the manner specified in the contract. NCR is attempting to circumvent the parties' agreement by bringing this motion. NCR's motion is fatally defective for four independent reasons.

First, the parties contractually agreed in the 1998 Agreement to an alternative dispute resolution process, including mandatory arbitration, of "any and all disputes over payment" of "Damages" or "Group Defense Costs." NCR's motion and the exchange of correspondence between API and NCR leading to the motion, on their face, demonstrate a dispute over payment under the 1998 Agreement. API seeks resolution of this dispute and formally initiated the alternative dispute resolution process before NCR filed its motion. When parties have agreed to a dispute resolution process ending in binding arbitration, the Seventh Circuit has directed that a district court may not delve into the merits of the dispute but, rather, must stay the litigation and allow the dispute to be arbitrated. This first reason is the only one that the Court should reach based upon decades of precedent enforcing dispute resolution clauses freely entered into by sophisticated parties. API includes the other three reasons only for completeness sake and, by doing so, does not waive the dispute resolution clause in any respect whatsoever.

Second, the Court cannot grant the relief NCR seeks even in the absence of the arbitration provision. NCR purports to seek enforcement of a consent judgment entered in the Southern District of New York and registered in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1963. However, the consent judgment only confirms a 2005

arbitration decision declaring a percentage allocation of costs. It is not a money judgment. Fixing an amount owed, if any, will require interpretation of the 1998 Agreement, consideration of the evidence of amounts spent, and a determination of whether such amounts fall within the definition of "out-of-pocket" costs under the 1998 Agreement. As a matter of black letter law, the resolution of those issues cannot be done by the registering court.

Third, the relief that NCR seeks is inappropriate, given that NCR has not even attempted to join BAT, which is jointly and severally liable for any obligation that API may have and, therefore, is a necessary and/or indispensable party. It is entirely improper for NCR to ask the Court to adjudicate the rights of NCR, API and BAT under the 1998 Agreement in a proceeding in which BAT is not even a party, particularly where API has already paid more than $200 million and BAT has paid nothing.

Fourth, beyond these threshold problems with NCR's motion, the motion is also fatally defective on the merits. NCR has not submitted evidence sufficient to demonstrate entitlement to the $15 million it seeks from API. NCR's motion does not include even basic documentation supporting the amounts NCR claims. Therefore, even adopting NCR's erroneous position that the merits of the funding dispute are properly before the Court, API cannot respond on the record before the Court. There is likewise no way for the Court to resolve the dispute on the merits. NCR is essentially asking this Court to grant it summary judgment to force API to pay $15 million without submitting evidence of undisputed material facts that would entitle NCR to the relief it seeks against API. Thus, NCR's motion cannot be granted on the merits.

NCR's motion is an attempt to circumvent the express dispute resolution process agreed to by the parties by utilizing a procedure (the registration of judgment statute) that

Case 1:10-cv-00910-WCG   Filed 08/22/12   Page 3 of 22   Document 486

has no application to the posture of the dispute and without demonstrating an entitlement to the relief it seeks. For all of the foregoing reasons, the Court should stay or strike NCR's motion.

## BACKGROUND

In its motion, NCR pretends as if the 2005 arbitration between NCR, API and BAT resolved all issues between the parties. It did not. In fact, the 2005 arbitration was the result of one of two separate arbitration clauses in the 1998 Agreement.

Specifically, as a first step, the 1998 Agreement provided for binding arbitration to establish a percentage allocation of all eligible amounts in excess of $75 million:

> 4.    SUBSEQUENT ALLOCATION:
>
> a.    Pursuant to the terms of the Subsequent Allocation Arbitration Agreement attached hereto as Exhibit A, NCR and API/BAT agree to participate in discovery and a compulsory, binding arbitration to allocate as between them all Claims, Damages, or Group Defense Costs relating to the Fox River sites, the Marina Cliffs sites, or Future Sites, in excess of $75,000,000 (the "Subsequent Allocation").
>
> b.    The parties agree that the Subsequent Allocation Arbitration cannot be triggered, nor can a panel of arbitrators be requested and convened unless and until $50 million of the $75 million Initial Allocation has been expended in connection with the Fox River sites, the Marina Cliffs sites, or Future Sites. At that point, either party can initiate the arbitration pursuant to the procedures set forth in the Subsequent Allocation Arbitration Agreement attached as Exhibit A.

Dkt. 124-1, ¶ 4, pp. 14-15. The parties completed that arbitration in 2005.

The parties contemplated the potential for disputes over what costs were subject to that allocation, as well as other funding disputes. Thus, in a separate provision of the 1998 Agreement, the parties specified a process for resolving all other disputes that may arise under the 1998 Agreement:

> 10.    DISPUTE RESOLUTION:
>
> a.    Inter-Company Dispute Escalation Procedures:  **In the event of any disputes under this Agreement**, except those relating to the Subsequent Allocation Arbitration which shall be governed by the Subsequent Allocation

Arbitration Agreement attached as Exhibit A, **the parties shall submit the issue for resolution** to their respective General Counsel, who shall attempt in good faith to resolve the dispute. If resolution is not reached, the parties will then submit the issue for resolution to their respective Chief Financial Officers who shall also negotiate in good faith to resolve the matter. If these intercompany dispute escalation procedures are not effective, the parties shall participate in non-binding mediation before a mediator jointly agreed upon [by] the parties.

        b.    <u>Funding Disputes</u>: In the event that the intercompany dispute escalation procedures and the non-binding mediation are not effective, **NCR and API/BAT agree that any and all disputes over payment of any Damages or Group Defense costs allocated to or assessed upon NCR or API/BAT shall be submitted to arbitration in New York, New York** administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules. Judgment on the award entered by the Arbitrator shall be entered in any court having jurisdiction thereof.

Dkt. 124-1, ¶ 10, pp. 19-20 (emphasis added).

Accordingly, the 2005 arbitration was never intended to resolve, and in fact did not resolve, other disputes between the parties, including funding disputes. Instead, funding disputes are subject to the Inter-Company Dispute Escalation Procedures, including binding arbitration, if necessary.

## LAW AND ARGUMENT

I.    **THE COURT CANNOT ADDRESS THE MERITS OF NCR'S MOTION BECAUSE THE DISPUTE MUST BE ARBITRATED.**

    A.    **Where A Dispute On Its Face Is Subject To Arbitration, A Court Cannot Delve Into The Merits But Must Stay The Litigation To Allow Arbitration.**

In its brief, NCR summarily addresses as the last issue what is actually the threshold issue before the Court: whether the dispute presented by NCR's motion is subject to the alternative dispute resolution process in the 1998 Agreement. Dkt. 468 at 24 of 26.

The law in the Seventh Circuit (and elsewhere) is clear that where the parties have chosen arbitration as a mandatory and binding process for resolving disputes, the Court cannot delve into the merits of the dispute but must stay any litigation to allow arbitration

if the dispute falls within the scope of the agreement to arbitrate. API will not repeat the arguments set forth in its August 3, 2012 brief. Dkt. 472. However, it may be helpful to elaborate on the limited role of the court where, like here, there is an arbitration provision.

The Seventh Circuit has defined the narrow role of the court where the parties have agreed to resolve disputes via arbitration:

> We are responsible *only* for the question of arbitrability. We will not "rule on the potential merits of the underlying case" unless it is absolutely necessary. *AT & T Techs.,* 475 U.S. at 649, 106 S.Ct.1415, 89 L.Ed.2d 648. **If the parties have in fact agreed to arbitrate their dispute, then they have bargained for *the arbitrator's* interpretation of their contract – not ours.** "[P]utting … matters in the hands of specialists rather than judges or jurors is one attraction of arbitration." *Sphere Drake Ins. Ltd. v. All American Ins. Co.*, 256 F.3d 587, 592 (7th Cir. 2001). **If we were to weigh in on the merits of their case, we would be denying them the benefit of that bargain.**
>
> **The question we must answer, then, is narrow. We must determine whether the Union is making a claim that is, "on its face," governed by the TriMas Agreement.**

*United Steel Workers Int'l Union v. TriMas Corp.,* 531 F.3d 531, 535-36 (7th Cir. 2008) (bold emphasis added; italics original); *see also Int'l Bhd. of Elec. Workers, Local 21 v. Ill. Bell Tel. Co.,* 491 F.3d 685, 688 (7th Cir. 2007) ("When determining whether the parties have agreed to arbitration, a court must be careful not to consider the merits of the underlying claim. If the dispute falls within the scope of the parties' arbitration agreement, even a seemingly frivolous claim must be submitted to arbitration.") (citations omitted). Thus, the only question for the Court is whether the dispute on its face falls within the arbitration provision.

## B. The Dispute On Its Face Clearly Falls Within The Alternative Dispute Resolution Provisions In The 1998 Agreement.

There is no question that the current dispute on its face falls within the dispute resolution provisions in the 1998 Agreement. The Agreement specifies that "any and all

disputes over payment of any Damages or Group Defense costs allocated to or assessed upon NCR or API/BAT shall be submitted to arbitration . . ." Dkt. 124-1, ¶ 10(b), p. 20.

The dispute between API and NCR is entirely over payment of alleged "Damages." NCR asks the Court to order API to pay $15,003,126.88. Dkt. 468 at 25 of 26. In support of its request, NCR has submitted the Declaration of Bryan Heath along with a series of ten letters between Heath (on behalf of NCR) and Leila Pittaway (on behalf of API). The letters all concern a dispute over payment of costs pursuant to the 1998 Agreement. In the last letter dated July 23, 2012, with the dispute still not resolved, Ms. Pittaway formally initiated the alternative dispute resolution provisions of the 1998 Agreement with respect to the following issues:

- Any request for reimbursement under § 5 of the Settlement must include documentation, such as invoices from remediation and other contractors, showing how and when the funds in question were spent.

- The Settlement defines "Damages" as "out-of-pocket" remediation and other costs. NCR may not seek reimbursement for such costs from API unless and until the relevant remediation and other contractors have been paid in full. To be clear, "out-of-pocket" costs do not include amounts transferred by NCR to its Environmental Remediation Trust or to the Lower Fox River Remediation LLC since both are wholly controlled by NCR.

- The terms "out-of-pocket," as used in the Settlement, limits the costs NCR may seek from API and/or BAT to costs it has incurred but not been reimbursed by other sources. Specifically, API is not obligated to indemnify NCR for amounts paid or payable by insurance or indemnities (such as the AT&T and Alcatel Lucent indemnities).

Dkt. 470-10, Heath Dec., Ex. 10.

Presented with an issue that, on its face, is entirely a dispute over payment and thus must be arbitrated, NCR argues only that there is no legitimate dispute because it believes API's position on the merits is groundless. Dkt. 468 at 15, 24 of 26. NCR cannot side-step the agreed upon arbitration and ask this Court to delve into the merits of the parties' dispute merely because it contends that it is right and API is wrong. *See, id.*

at 15 of 26. That is exactly what the Seventh Circuit (and the United States Supreme Court) has unequivocally forbidden a court from doing when confronted with a valid arbitration clause. *See* Dkt. 471 at 10-11. The parties to the 1998 Agreement elected to have an arbitration panel decide whose position is right and whose position is wrong in the event of a payment dispute. The Seventh Circuit has expressly warned courts against depriving the parties of their choice in addressing the merits of a dispute.

These fundamental principles are dispositive. The Court need go no further. It must stay any further consideration of NCR's motion to allow the dispute resolution process in the 1998 Agreement, including binding arbitration if necessary, to resolve the dispute.[1] For this reason alone, the Court should deny NCR's motion.

## II.    28 U.S.C. § 1963 DOES NOT ALLOW THE COURT TO GRANT THE RELIEF NCR SEEKS.

Even in the absence of the arbitration provision in the 1998 Agreement, this Court cannot grant the relief NCR seeks pursuant to the registration statute, 28 U.S.C. § 1963. That statute only allows a registering court to enforce an existing money judgment – the registering court cannot adjudicate amounts allegedly owed. The statute provides for registration of a "judgment in an action for the recovery of money or property entered in any . . . district court . . . ." It does not allow enforcement of a declaratory judgment. In *DeLeon v. Marcos,* 742 F. Supp. 2d 1168, 1173 (D. Colo. 2010), *vacated on other grounds,* 659 F.3d 1276 (10th Cir. 2011), the court observed that the statutory language contemplates that the registered judgment was "entered in an action *for the recovery of*

---

[1] API's motion also asked the Court for an order compelling arbitration. Upon further review, it appears that such a motion should be addressed to the United States District Court for the Southern District of New York, since any arbitration will be venued in New York. *See, e.g., UAL Corp. v. Mesa Airlines, Inc.,* 88 F. Supp. 2d 910, 912-13 (N.D. Ill. 2000). However, it is still proper for this Court to stay the NCR motion pending arbitration. *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods.,* 660 F.3d 988, 997 (7th Cir. 2011).

*money or property* (in essence, reflecting the adjudication of a claim for tangible, not simply declaratory, relief)." (emphasis in original). The Second Circuit recognized a similar distinction when it allowed registration of a judgment including both an injunction order and an award of damages, but only allowed the award of damages to be enforced in the registering court. *Stiller v. Hardman,* 324 F.2d 626, 628 (2ⁿᵈ Cir. 1963) (emphasis added):

> Thus, if the Ohio court had only issued an injunction order its judgment order would not have been registrable, but inasmuch as the Ohio judgment contained, together with an injunction order, an **award for damages**, the entire Ohio judgment is nominally registrable but the injunctive portion thereof is not enforceable.
>
> In view of our interpretation of Section 1963 we affirm the decisions below upholding registration of the entire Ohio judgment, **permitting enforcement of the award for damages and denying enforcement of the injunctive portion of the judgment.**

Thus, the registration statute allows the registering court to facilitate collection of a liquidated sum fixed in a money judgment by the entering court, but does not allow the registering court to alter, modify, add to or fill gaps in the original judgment.

Consistent with those principles, the Seventh Circuit has held that a registering court cannot modify the registered judgment. *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.,* 212 F.3d 1031, 1034 (7ᵗʰ Cir. 2000) (emphasis added):

> A judgment may be registered in many districts, see Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *11 Federal Practice and Procedure* § 2787 (2d ed. 1995), and it would not make much sense to allow each of these districts to modify the judgment under Rule 60(b), potentially in different ways. *Rector* and *Covington* state a minority view. Other circuits conclude (with the support of Wright & Miller, *Federal Practice* at § 2865) that **requests for modification under Rule 60(b) must be presented to the rendering court.** E.g., *Indian Head National Bank of Nashua v. Brunelle,* 689 F.2d 245 (1ˢᵗ Cir. 1982); *First Beverages, Inc. v. Royal Crown Cola Co.,* 612 F.2d 1164, 1172 (9ᵗʰ Cir. 1980). **This circuit is among the majority that require Rule 60(b) motions to be presented to the rendering court.** *Fuhrman v. Livaditis,* 611 F.2d 203, 204-05 (7ᵗʰ Cir. 1979). Cf. *Harris Trust & Savings Bank v. Ellis,* 810 F.2d 700, 705-06 (7ᵗʰ Cir. 1987).

*See also Juneau Spruce Corp. v. Int'l Longshoremen's & Warehousemen's Union,* 128 F. Supp. 697, 699 (D. Haw. 1955) (emphasis added):

> 28 U.S.C. § 1963 does not give a new judgment to the judgment creditor. **Registration is purely a ministerial act in the enforcement of a foreign judgment. It confers upon this court no power to alter the judgment itself.** *Gullet v. Gullet*, 5 Cir., 1951, 188 F.2d 719. Registration is different from a suit upon a judgment which is a new and independent action, not ancillary to the original action. *H. C. Cook Co. v. Beecher*, C.C.D.Conn.1909, 172 F. 166, affirmed 1910, 217 U.S. 497, 30 S.Ct. 601, 54 L.Ed. 855. . . . As revealed in the legislative history recorded at the time of an amendment to 28 U.S.C. § 1963, U.S. Code Cong. & Adm. News 1954, p. 3142, **the plain and simple purpose of the statute is enforcement of the original judgment.**

The consent judgment in this case is not a money judgment. It does not fix any dollar amount owed. Rather, it simply attaches an arbitration decision that declares a percentage allocation among the parties pursuant to their contractual agreement. NCR is asking this Court to add what the 2005 arbitration did not address and the arbitration award does not contain – a fixed dollar amount allegedly owed. It asks this Court to interpret the 1998 Agreement and to determine rights not determined in either the arbitration decision or the consent judgment, citing 28 U.S.C. § 1963. However, as a matter of law, that statute does not allow this Court to fill in the consent judgment's gaps by interpreting the 1998 Agreement and adjudicating rights not determined in the consent judgment or the arbitration decision. That can only be done in the original forum.

## III. THE COURT SHOULD NOT RULE ON NCR'S MOTION BECAUSE BAT IS NOT A PARTY.

There is a third reason why the Court must deny NCR's motion regardless of the mandatory arbitration provision in the 1998 Agreement. There are three parties to the 1998 Agreement – NCR, API and BAT. Those three parties participated in the 2005 arbitration and are subject to the arbitration decision. Those three parties all have an interest in how the 1998 Agreement is interpreted and all have an interest in the resolution of this dispute. However, NCR has brought this motion against API only in an

action in which BAT is not a party. NCR's requested relief cannot be granted in BAT's absence.

Rule 19(a) addresses persons required to be joined if feasible:

> **(1) *Required Party*.** A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
> > **(A)** in that person's absence, the court cannot accord complete relief among existing parties; or
> >
> > **(B)** that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
> >
> > > **(i)** as a practical matter impair or impede the person's ability to protect the interest; or
> > >
> > > **(ii)** leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

BAT qualifies as a necessary party under Rule 19(a)(1)(B). NCR is asking the Court to interpret the 1998 Agreement and determine the rights of the parties. If BAT is bound by that adjudication, without having had the opportunity to be heard, then its ability to protect its interests will be impaired or impeded. Rule 19(a)(1)(B)(i). On the other hand, if BAT is not bound by the determination, then API will be subject to a substantial risk that when BAT is called upon to pay its share of the joint and several obligation, the contract will be interpreted differently. API has already paid $200 million towards the Fox River problem, while BAT has paid nothing. It is unfair and prejudicial to expose API to a widening of that disparity and the danger of inconsistent adjudication of the same contract. Thus, if BAT is subject to service in the Eastern District of Wisconsin (NCR has not properly commenced any legal proceeding and has not attempted to serve BAT), then BAT must be joined.

In situations where joinder is not feasible, Rule 19(b) provides factors for determining whether an absent party is indispensible such that the matter cannot proceed in the absence of the missing party:

> **(b) When Joinder Is Not Feasible.** If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
>
> **(1)** the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> \* \* \*
>
> **(4)** whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Rule 19(b)(1) and (4) are pertinent in this case. As explained above, construing the 1998 Agreement and determining the parties' rights under it without BAT will likely prejudice either API or BAT, or both, within the meaning of Rule 19(b)(1). The Rule 19(b)(4) factor, "whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder," strongly indicates that BAT is an indispensable party. NCR not only has an adequate remedy, it has the very remedy that the three parties contractually mandated – arbitration. API has already invoked the dispute resolution provisions that culminate in binding arbitration. Accordingly, BAT is an indispensable party and NCR's motion must not proceed in BAT's absence.

However, a determination that BAT is an indispensable party is not necessary to deny NCR's motion, in view of the nature of declaratory proceedings. The general rule is that "'all interested parties should be joined in a declaratory judgment action whenever possible,' in keeping with the purpose of the Declaratory Judgment Act to fully and finally adjudicate the controversy at issue." *RFF Family P'ship, LP v. Link Dev., LLC*, No. 11-10968, 2012 WL 893737, *5 (D. Mass. Mar. 13, 2012) (citation omitted). *See*

*also* Uniform Declaratory Judgments Act, such as Wisconsin's version, Wis. Stat. § 806.04(11) ("When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration . . ."). All interested parties should be joined to effectuate the fundamental purpose of declaratory proceedings, which is a full, fair and efficient resolution of disputes.

Accordingly, in a declaratory judgment action, a court may properly decline to proceed even where the absent party is not "indispensible" within the meaning of Rule 19(b). *Delpro Co. v. Nat'l Mediation Bd. of U.S.A.,* 509 F. Supp. 468, 476 (D. Del. 1981) ("A court may in its discretion decline to grant declaratory relief because of the non-joinder of an interested party, regardless of whether the absent party is indispensible within the meaning of Rule 19(b) of the Federal Rules of Civil Procedure.") (*citing Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967)).

The lawsuit among NCR, API and BAT that was settled by the 1998 Agreement was an action for a declaratory judgment. The 2005 arbitration decision declared a percentage allocation of costs in excess of $75 million. The 1998 Agreement sets out other rights and obligations of the parties including those related to payment disputes. It would be highly inequitable and prejudicial to API to proceed with a further declaration of rights and obligations under the 1998 Agreement in the absence of BAT. Therefore, NCR's motion should be denied.

## IV.   THE COURT SHOULD DENY NCR'S MOTION AS FATALLY DEFECTIVE.

Although the law is clear that this Court may not reach the merits of this arbitrable dispute, API in fact has raised a bona fide dispute, NCR's assertions to the contrary notwithstanding. Moreover, NCR's motion seeks dispositive relief, but the matter is not in a posture for summary judgment because NCR has filed no pleading

Case 1:10-cv-00910-WCG   Filed 08/22/12   Page 13 of 22   Document 486

asserting a claim against API and API has had no opportunity for discovery. Further, as demonstrated below, NCR's motion does not come close to meeting the summary judgment standard on any of the three issues raised by API in its formal demand for arbitration.

## A. NCR Has Not Made A *Prima Facie* Showing That It Is Entitled To The Relief It Seeks.

NCR has not provided the Court with any documentation of the amounts it claims are owed. NCR merely attached correspondence between Mr. Heath and Ms. Pittaway without even providing the minimal (and inadequate) documentation that accompanied certain of those letters. NCR has failed to submit even a *prima facie* case for the claim asserted in its motion.

API cannot determine the amount of properly reimbursable costs on its own because it does not have access to the documents evidencing NCR's alleged payments. As the letters between Mr. Heath and Ms. Pittaway clearly show, API has repeatedly asked NCR to provide reasonable documentation of the costs for which it seeks reimbursement, such as invoices from contractors who are doing the remediation work, so that API can verify the amounts it is being asked to pay. This is no different than what an insurer would expect to be provided before paying indemnity or reimbursement to an insured. Nonetheless, NCR consistently refused to provide such documentation.

Ms. Pittaway identified the problem of NCR's refusal to document its requests in her May 11, 2012 letter. Dkt. 470-2, Heath Dec., Ex. 2:

> Under Section 5 of the '98 Settlement, I am obligated to review all demands for payment in order to determine if they are appropriate and authorized. In order to do so, I must be provided with some documentary support for such demands. Your demand is supported by nothing more than the statement that: "on April 30, 2012, Lower Fox River Remediation LLC ("the LLC") issued Cash Call No. 34 to NCR, in the amount of $11 million. . ." I anticipated that you would

follow-up with some documentation that might indicate how, when or why the monies are to be spent. That information has not been forthcoming.

She reiterated the issue in her May 21, 2012 letter. Dkt. 470-4, Heath Dec., Ex. 4:

> As I also stated in my 11 May letter, any demand for payment from API should include documentation indicating how, when and why the monies were spent. Your 14 May demand included a Cash Forecast projecting that certain amounts may be due to the contractors performing remediation work at the Fox River during the 2012 season. You did not, however, provide a copy of any referenced invoice or any other description of the work performed. Absent such information, I have no means of ascertaining whether work is within the scope of NCR's 2012 remediation obligations.

Still, the problem persisted when Ms. Pittaway wrote her July 23, 2012 letter. Dkt. 470-10, Heath Dec., Ex. 10:

> Moreover, as stated above, your 13 July demand does not include supporting documentation of the type that I have repeatedly requested. Indeed, this demand takes almost exactly the same form as NCR's initial 3 May demand.

NCR has tried to justify its refusal to provide API the requested documentation by noting that API had historically paid costs without being sent such documentation. *See* Dkt. 470-5, Heath Dec., Ex. 5. Ms. Pittaway addressed that claim in her May 30, 2012 letter explaining that API no longer received the information it received when it was a member of the LLC:

> Your statement that NCR has "provided the exact same documentation to support its payment demand that API routinely found sufficient to pay its own cash calls to the LLC" is both inaccurate and immaterial. **During the time-frame to which you refer, API was a member of the LLC and privy to all of the underlying documents and discussions upon which the LLC founded its cash calls. That is no longer the case, as you well know**.

*Id.*, Ex. 6 (emphasis added).

In its motion, NCR argues that API previously told the Court its obligations under the 1998 Agreement would not change if it was found to be not liable under CERCLA. Dkt. 468 at 18 of 26. NCR's attempt to portray API as changing its position is based upon a sleight of hand. The 1998 Agreement has not changed; however, API's

relationship to the LLC has changed, just as API said it would change in its filings with the Court.

In the past, API was a participating member in the LLC. As such, API was directly involved in making decisions on expenditures to be paid and, therefore, received the necessary documentation through the LLC without having to get it through NCR. However, API told NCR and the Court in briefing last year that its relationship to the LLC would change if API was found not liable under CERCLA:

> The LLC's operating agreement includes an express provision that if a member's obligations under CERCLA for performance of the 106 Order are modified by a court order, the shares of the membership must be reallocated. Declaration of Jeffrey Thomas Lawson, filed April 18, 2011 ("Lawson Dec."), Exhibit 1, ¶ 3.4. Through that provision, NCR would become the LLC's sole and controlling member. Lawson Dec., ¶¶ 6-8.

Dkt. 151 at 9; *see also* Dkt. 156-1 at 12 of 17; Dkt. 187 at 10-11. Thus, API explained that upon a no-liability ruling, it would no longer be a member of the LLC and NCR would be in full control of the LLC. *Id.* The Court acknowledged as much in its July 28, 2011 decision denying the Government's motion for preliminary injunction. Dkt. 193 at 4. Indeed, NCR's pending motion acknowledges that it has sole control of the LLC. Dkt. 468 at 12, n.6 of 26. That is the straightforward reason why API's need for documentation is different this year than in previous years.

Nonetheless, NCR steadfastly refuses to acknowledge the simple fact that API is now in a different position. Instead, NCR insists that API merely take its word for what is owed. NCR approaches its motion as if the 2005 arbitration decision had determined that API must pay whatever NCR asks, with no questions asked. That is not what the arbitration panel held. That is not what the parties agreed to in the 1998 Agreement.

**B.** **There Is A Material Dispute That Cannot Be Resolved On This Record As To Whether NCR Can Require Reimbursement When It Simply Transfers Money From One Account To Another That It Controls.**

NCR's brief and the correspondence attached to it demonstrate that there is a material dispute between NCR and API regarding when any reimbursement obligation is triggered. Is it when NCR transfers funds from one account that it controls to another account that it controls or, rather, only when funds are actually paid to contractors doing remediation work? NCR claims that it is entitled to reimbursement when it transfers money from its own account to its own environmental remediation trust, which NCR fully controls. It argues that that is how LLC cash calls were handled when both NCR and API were members of the LLC. Of course, at that time, both NCR and API were parties to the LLC's Operating Agreement, which specified that cash calls were to be handled in that manner. NCR again ignores the fact that the parties' obligations are now governed solely by the 1998 Agreement – not the LLC operating agreement – and that API is no longer a member of the LLC.

More than a year ago, API told the Court that "NCR has no legal or contractual basis for attempting to intertwine API's indemnification obligations with the procedures for paying LLC cash calls":

> Pursuant to the terms of the LLC Operating Agreement, the LLC periodically issues "cash calls" to its members, requiring payment in advance of the LLC's estimated expenses during the upcoming three months. The duty to pay such cash calls, and the procedures and timing for making of such payments, arise under the LLC Operating Agreement, while the parties' indemnification obligations to each other arise under the separate 1998 Settlement Agreement. The 2009 LLC Operating Agreement makes no reference to the 1998 Settlement Agreement. Nor does the SDNY Judgment (entered in 2007) make any reference to the LLC Operating Agreement. **Therefore, while the amounts NCR pays in response to a cash call may fall within the scope of API's indemnification obligations under the 1998 Settlement Agreement, nothing in that Agreement or the SDNY Judgment requires API to indemnify NCR in accordance with the LLC's timeline for paying cash calls.** (API is obligated to comply with the LLC's timeline for payment of cash calls by virtue of its

membership in the LLC.) Consequently, NCR has no legal or contractual basis for attempting to intertwine API's indemnification obligations with the procedures for paying LLC cash calls. This Court cannon re-write the SDNY Judgment to include obligations under contracts that did not exist when the Judgment was entered.

Dkt. 192 at 6 (emphasis added).

Ms. Pittaway raised this point to NCR when she responded to NCR's claims in her May 21, 2012 letter. Dkt. 470-4, Heath Dec., Ex. 4:

It also appears from the documents provided that NCR has transferred funds to its environmental remediation trust following a cash call from the LLC, but there is no indication that contractors have been paid. As with any indemnity, API's reimbursement obligations do not arise unless and until the underlying obligation is paid. The LLC is currently wholly owned and controlled by NCR. In essence, NCR has transferred monies from one pocket to another. As such, API is not obligated to reimburse for transfers from NCR to NCR's environmental remediation trust following cash calls from the LLC. Future demands for reimbursement should include documents showing that the LLC has in fact paid contractors and vendors in satisfaction of NCR's remediation obligations.

Further, as noted above, API unequivocally told NCR (and the Court) in briefing last year that ownership and control of the LLC would change upon a finding of no liability. It has, in fact, changed. In light of that simple reality, any reimbursement obligation under the 1998 Agreement is not triggered until the funds are paid to contractors and thereby leave NCR's control.

**C.    There Is A Material Dispute That Cannot Be Resolved On This Record As To Whether The Costs NCR Has Paid Qualify As "Out-Of-Pocket" "Costs" Under The 1998 Agreement.**

Under the 1998 Agreement, API is obligated to indemnify NCR for certain of its "Damages." The 1998 Agreement defines "Damages" as various "out-of-pocket" costs. API questions whether the costs for which NCR seeks reimbursement are "out-of-pocket" because NCR's SEC filing discloses that the funds for which NCR seeks reimbursement have not been paid out of NCR's pocket but, rather, by its various insurers and/or indemnitors. If NCR is also allowed to recover these same amounts from API, NCR

would obtain a windfall. Therefore, Ms. Pittaway wrote to NCR on May 30, 2012 stating:

> Indeed, the "out of pocket" language that you quote from the '98 Settlement raises another pertinent point. NCR and API/B.A.T. chose to use this limiting language in defining "Damages" for remediation and other similar costs (*i.e.*, the costs for which NCR seeks reimbursement) <u>after</u> NCR obtained indemnity from AT&T and Alcatel-Lucent. As described in NCR's SEC filings, NCR presently values that indemnity at $79 million, although I note that those companies are required to pay 50% for every dollar spent by NCR in excess of $100 million. In addition, under §5.4 of the AT&T and Alcatel-Lucent indemnity, those obligations arise after NCR has spent the monies recovered from relevant insurance; an[] event that I understand has not occurred. According to its SEC filings, NCR has obtained $162 million in recoveries from its insurers. In this context, I am unable to determine if NCR is 'out of pocket' any sums at all. Any future demands for payment from API should include an accounting of monies received by NCR from its insurers, AT&T and Alcatel-Lucent, and any other sources.

Dkt. 470-6, Heath Dec., Ex. 6 (underline original). This dispute between API and NCR requires interpretation of the phrase "out-of-pocket" as used in the 1998 Agreement, an issue not addressed in the 2005 arbitration decision.

In its brief, NCR relies upon dictionary definitions of "out-of-pocket" as referring to costs that involve an "outlay of cash" or a "cash payment." Dkt. 468 at 20 of 26. However, those definitions beg the question of who must pay the cash. NCR cites no legal authority or provision in the 1998 Agreement supporting its proposition that NCR is "out-of-pocket" even if it has not paid any sums from its own funds. It claims that its position is clearly the right one, but ignores that there is authority to the contrary:

> Contract language is construed to give words their plain and ordinary meaning, as understood by a reasonably intelligent person familiar with the contemporaneous circumstances. *Olympia Props.*, 54 Fed. Cl. at 152. **Here, the relevant contractual provision provides that plaintiff is entitled to "out-of-pocket expenses." The plain meaning of "out-of-pocket expense" is "[a]n expense paid from one's own funds."** BLACK'S LAW DICTIONARY 618 (8th ed. 2004) (expense). **This definition excludes those losses that are not paid out of one's funds.** Moreover, the language in CT 6.01 provides that "[p]urchaser agrees to provide receipts or other documentation [of out-of-pocket expenses] to the Contracting Officer which clearly identify and verify *actual expenditures.*" Taken together, the Court holds that to recover an out-of-pocket

> expense under CT 6.01, plaintiff must demonstrate that it made an actual
> expenditure paid out of its own funds.

*Precision Pine & Timber, Inc. v. United States,* 81 Fed. Cl. 235, 290-91 (Fed. Cl. 2007)

(italics original, bold added), *on recons. in part,* 81 Fed. Cl. 733 (Fed. Cl. 2008), *aff'd in*

*part and rev'd in part on other grounds,* 596 F.3d 817 (Fed. Cir. 2010).

Moreover, even absent an explicit legal definition of "out-of-pocket," API has a

strong argument that the term does not include amounts reimbursed by insurance or other

recoveries. In accordance with "familiar and salutary principles of contract law,"

contract terms should be given their plain meaning and the agreement should be

construed to give effect to all provisions. *Freedom Chem. Co. v. BC Sugar Refinery,*

*Ltd.,* No. 97-Civ-4634, 1998 WL 289736, *2 (S.D.N.Y. June 4, 1998). Further, "the

meaning of a word in a series of words is determined by the company it keeps." *Fresh*

*Del Monte Produce N.V. v. Eastbrook Caribe A.V.V.,* 836 N.Y.S.2d 160, 164 (N.Y. App.

Div. 2007) (citation omitted).

Simply put, the parties selected the term "out-of-pocket" to limit some categories

of "Damages" but not other categories. Logic dictates that, by limiting payments to "out-

of-pocket," the parties meant that NCR and/or API/BAT would only be reimbursed for

costs they actually paid for out of their own accounts. NCR's interpretation reads the

term "out-of-pocket" out of the 1998 Agreement entirely, which flies in the face of well

established principles of contract construction.

Nonetheless, NCR asks the Court to interpret the language differently. Dkt. 468

at 19-22 of 26. It asks the Court to review the course of dealings between NCR and API

over the life of the 1998 Agreement as an aid to interpreting the meaning of the

1998 Agreement. *Id.* at 22 of 26. Analyzing that course of dealing that NCR claims is

crucial to its position would require evidence of whether any of NCR's 40 percent share

has been paid with funds not directly paid or reimbursed by an insurer or indemnitor. NCR has submitted no such evidence and has refused to provide such documentation to API. NCR simply argues that it interpretation of the phrase is right and API's interpretation is wrong, which is an arbitrable dispute. But beyond that threshold problem, the Court cannot resolve the dispute on the inadequate record before it.

Finally, this Court would have to resolve whether the various indemnity agreements allow NCR to prefer one group of indemnitors (AT&T and Lucent) over another (API and BAT). To do so, the Court would need to delve into the specifics of not only the 1998 Agreement, but also the AT&T and Lucent indemnity. In that sense, the situation before the Court is analogous to an insurance dispute where the Court must resolve, based on the various policy language, the order in which the insurers must pay. NCR, however, has failed to provide the Court with the AT&T and Lucent indemnity agreement or any facts or evidence regarding any demands made upon, or payments received from, AT&T or Lucent.[2]

## CONCLUSION

For all of these reasons, the Court should stay consideration of NCR's motion pending completion of the parties' dispute resolution process, including binding arbitration if necessary. Alternatively, the Court should strike NCR's motion.

---

[2] NCR, likewise, failed to provide a copy of the AT&T and Lucent indemnity agreement to API. API only recently obtained a copy of that agreement by other means.

Dated this 22nd day of August, 2012.

Respectfully submitted,

APPLETON PAPERS INC.


By:      /s/ Ronald R. Ragatz
              One of Its Attorneys

Counsel for Appleton Papers Inc.:

| Heidi D. Melzer (#1076125) | Ronald R. Ragatz (#1017501) |
|---|---|
| Hermes Law, Ltd. | Dennis P. Birke (#1018345) |
| 333 Main Street, Suite 601 | Megan A. Senatori (#1037314) |
| Green Bay, WI  54301 | DeWitt Ross & Stevens S.C. |
| (920) 436-9870 | Two East Mifflin Street |
| Fax:  (920)436-9871 | Madison, WI 53703 |
| | (608) 255-8891 |
| | Fax: (608) 252-9243 |
| | |
| | Gregory A. Krauss |
| | Gregory A. Krauss PLLC |
| | 1629 K St. NW |
| | Suite 300 |
| | Washington, DC 20006 |
| | (202) 355-6430 |