# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and<br>THE STATE OF WISCONSIN,<br><br>     Plaintiffs,<br><br>    v.<br><br>NCR CORPORATION,<br>APPLETON PAPERS INC.,<br>BROWN COUNTY,<br>CITY OF APPLETON,<br>CITY OF GREEN BAY,<br>CBC COATING, INC.,<br>GEORGIA-PACIFIC CONSUMER PRODUCTS LP,<br>KIMBERLY-CLARK CORPORATION,<br>MENASHA CORP.,<br>NEENAH-MENASHA SEWERAGE COMMISSION,<br>NEWPAGE WISCONSIN SYSTEMS, INC.,<br>P.H. GLATFELTER CO.,<br>U.S. PAPER MILLS CORP. and<br>WTM I COMPANY,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 10-C-910<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

## NCR CORPORATION'S OPPOSITION TO APPLETON PAPER INC.'S MOTION TO STAY OR STRIKE NCR'S MOTION TO ENFORCE THE 40/60 COST-SHARING JUDGMENT AND FOR ENTRY OF AN ORDER COMPELLING ARBITRATION

---

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ............................................................................................................... 3

I.  API's Cost-Sharing Obligation Is Subject to Enforcement by the Court. ........................ 3

    A.  The Consent Judgment Grants the Court Jurisdiction to Ensure Compliance with the Parties' Obligations to Fund the Ongoing Cleanup ........... 3

    B.  A New Claim or Lawsuit Is Not Needed to Enforce API's 60% Payment Obligation. ........................................................................... 5

    C.  API's 60% Obligation Under the Consent Judgment Is Not Subject to Arbitration ............................................................................. 6

II.  API Has Not Raised an Arbitrable Issue Concerning Its Obligation to Pay 60% of the PI Compliance Costs. ................................................................... 7

    A.  Relevant Standard. ......................................................................... 8

    B.  Over the Past 14 Years, API Has Acted Inconsistently with Its Request to Arbitrate the Alleged Disputes. ....................................................... 9

    C.  NCR Would Be Prejudiced by Having to Arbitrate API's Alleged Disputes. ......................................................................................... 14

    D.  API Has Repeatedly Assured the Court that It Would Honor Its 60% Obligation Under the Consent Judgment. ................................................. 15

III.  In the Alternative, If the Court Determines that There Is an Arbitrable Dispute, the Court Should Order Expedited Arbitration Proceedings. ......................................... 17

CONCLUSION ........................................................................................................... 18

Case 1:10-cv-00910-WCG   Filed 08/22/12   Page 2 of 22   Document 487

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Board of Trustees, Sheet Metal Workers' National Pension Fund v. Elite Erectors, Inc.*,
    212 F.3d 1031 (7th Cir. 2000) ........................................................................6

*Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*,
    50 F.3d 388 (7th Cir. 1995) ........................................................................9, 14

*Conant v. Morgan's Foods, Inc.*, No. 2:10-cv-496, 2011 WL 672584
    (S.D. Ohio Feb. 15, 2011) ........................................................................8

*Grumhaus v. Comerica Sec., Inc.*, 223 F.3d 648 (7th Cir. 2000) ...........................................8, 14

*Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*,
    660 F.3d 988 (7th Cir. 2011) ........................................................................8

*Karmin v. Karmin*,
    796 N.Y.S.2d 703 (App. Div. 2005) ........................................................................12

*Menorah Ins. Co. v. INX Reinsurance Corp.*, 72 F.3d 218 (1st Cir. 1995) ...............................12

*Pac. Reinsurance Mgmt. Corp. v. Fabe*, 929 F.2d 1215 (7th Cir. 1991) ....................................4

*Peacock v. Thomas*, 516 U.S. 349 (1996) ........................................................................4

*St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.*,
    969 F.2d 585 (7th Cir. 1992) ........................................................................8, 9

*Transamerica Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    Nos. 93-55490, 93-55498, 1994 WL 712173 (9th Cir. Dec. 19, 1994) ..........................8, 11

*Zahran v. Frankenmuth Mut. Ins. Co.*, No. 97-1712, 1999 WL 191493
    (7th Cir. Mar. 25, 1999) ........................................................................4

**Statutes & Rules**

28 U.S.C. § 1963 ........................................................................3, 6

Federal Rule of Civil Procedure 14 ........................................................................14

Federal Rule of Civil Procedure 19 ........................................................................14

Federal Rule of Civil Procedure 60 ........................................................................6

NCR Corporation ("NCR") respectfully submits this Opposition to Appleton Paper Inc.'s ("API") Motion to Stay or Strike NCR's Motion to Enforce the 40/60 Cost-Sharing Judgment and for Entry of an Order Compelling Arbitration. For the reasons set forth below, API's Motion should be denied in its entirety, and NCR's pending Motion to Enforce API's obligation to pay its 60% share of the Court-ordered PI Compliance Costs should be granted.

## PRELIMINARY STATEMENT

API owes NCR millions of dollars that it is refusing to pay for no legitimate reason. That refusal undermines orderly progress of the Fox River cleanup. As explained in NCR's pending motion to enforce, API's funding obligation arises from the 1998 Confidential Settlement Agreement ("CSA"). Pursuant to the CSA, NCR and API agreed to arbitrate to determine the allocation of liability for any Fox River costs expended above $75 million. Arbitration proceedings conducted in 2005 resulted in a final, binding allocation of 60% to API and 40% to NCR. API then petitioned the U.S. District Court for the Southern District of New York ("SDNY") for an order confirming the 2005 Arbitration Award. In February 2007, SDNY granted the petition and directed entry of the Consent Judgment, which confirmed the parties' funding obligations.

Until the current remediation season, NCR and API *always* paid Fox River costs consistent with their respective shares. And during that 14-year history, API *never* disputed its 60% obligation. Nor did API ever suggest that indemnity or insurance payments from other sources had any bearing on NCR's 40% obligation. On the contrary, API accepted reimbursements from NCR when API paid Fox River costs alone without regard to or discussion of API's own insurance recoveries or other indemnities (which are substantial). API also repeatedly assured the Court that it was "funding 60% of the cleanup costs on the basis of its indemnity arrangement with NCR" and would continue doing so.

API's position changed abruptly when the Court ruled in April 2012 that API is not directly liable to the Government under CERCLA. In response to NCR's request for API to pay its 60% share of the costs that NCR is incurring—at a rate of over $300,000 per day—in compliance with the Court's mandatory preliminary injunction ("PI") order (costs paid in the same way, for the same work, through the same LLC administrator and to the same contractor as in every prior remediation season), API began making a series of newly minted excuses as to why it is purportedly not obligated to comply with the Consent Judgment. Seeing no end to API's delay tactics, NCR turned to the Court for relief.

It was in case of precisely such a development—which NCR made every effort to avoid—that NCR moved to register its Consent Judgment last year. And notwithstanding API's efforts to complicate the matter, NCR's request remains simple: API should be ordered to promptly fund its 60% share of the costs that NCR has been incurring (and will continue to incur) in compliance with the Court's PI Order. Contrary to what API contends, this request is not subject to arbitration. The parties' respective obligations under the Consent Judgment have already been decided by an arbitration panel and confirmed by two federal courts. In any event, API waived any right it may have had to arbitrate that dispute as a result of engaging in 14 years of conduct wholly inconsistent with an intent to arbitrate. API's efforts to avoid this Court's jurisdiction and its obligations to NCR should be rejected.

\*          \*          \*

2

**ARGUMENT**

**I.**     **API's Cost-Sharing Obligation Is Subject to Enforcement by the Court.**

     **A.**     **The Consent Judgment Grants the Court Jurisdiction to Ensure Compliance with the Parties' Obligations to Fund the Ongoing Cleanup.**

API's contention that the Court lacks jurisdiction—the sole basis for its request to strike NCR's motion to enforce—is incorrect.  API tried to convince this Court last year not to register the Consent Judgment (Dkt. #151), but the Court summarily rejected API's arguments (Dkt. #172 at 24).[1]  Yet API's motion to strike merely echoes its unsuccessful opposition to the motion to register in 2011.  API is not entitled to another bite at the apple.

Most notably, API attempts to revive its theory that the Consent Judgment did not arise from "an action for the recovery of money", which it argued at length last year in its registration opposition brief.  (Dkt. #151 at 3-5.)  For example, API asserted that the Consent Judgment could not be registered because § 1963 requires "a liquidated, fixed amount of money" and cannot be used to determine "whether any monies are in fact owed" by the judgment debtor.  (*Id.* at 5.)  In response, NCR explained that § 1963's "recovery of money" element was clearly met under the circumstances:  the key purpose of the arbitration proceedings that resulted in entry of the Arbitration Award (which was confirmed and entered as the Consent Judgment) was "to determine the specific amount of costs in excess of $75 million related to the Lower Fox River site that API and NCR are each required to pay".  (Dkt. #158 at 2.)  In other words, the Consent Judgment was initially entered so that API and NCR could ultimately *recover money* that the other party may owe in the event of a failure to

---

[1] To register the Consent Judgment pursuant to the 28 U.S.C. § 1963, NCR needed to show only that the Consent Judgment is (1) a final judgment, (2) entered by any district court (3) in an action for the recovery of money or property.  (*See* Dkt. #145 at 2-3; Dkt. #158 at 2.)

3

pay—an event that has now come to pass as a result of API's refusal to comply with its longstanding funding obligation.

Unable to "un-register" the Consent Judgment, API now seeks to render the Court's decision an empty gesture. API theorizes, without support, that a judgment that "does not establish a liquidated amount" (as API classifies the Consent Judgment) cannot be enforced by a registering court. (Dkt. #472 at 14.) Accordingly, in API's view, registration served no purpose here.

API's interpretation would completely undermine § 1963's goal of "protect[ing] both judgment creditors and judgment debtors from the burden of further litigation in attempting to satisfy a judgment". *Zahran v. Frankenmuth Mut. Ins. Co.*, No. 97-1712, 1999 WL 191493, at *2 (7th Cir. Mar. 25, 1999). Moreover, contrary to what API suggests (Dkt. #472 at 14), the Court was not required to state expressly that it could "adjudicate any future funding disputes" when it directed the clerk to register the Consent Judgment. *See Pac. Reinsurance Mgmt. Corp. v. Fabe*, 929 F.2d 1215, 1219 (7th Cir. 1991) ("Section 1963 does not call for magic words or require district judges to write opinions."). Even if API could point to a legitimate "funding dispute" here—and it cannot—having registered the Consent Judgment, the Court acquired jurisdiction to ensure that the Judgment "is complied with in all respects" (Dkt. #341-2 at 2), which necessarily includes the inherent power to enforce it. *See Peacock v. Thomas*, 516 U.S. 349, 356 (1996). This power is hollow if the Court cannot order API to undertake the precise action required by the Consent Judgment: fund its 60% share of the ongoing Fox River remediation costs.

**B.    A New Claim or Lawsuit Is Not Needed to Enforce API's 60% Payment Obligation.**

In asserting that NCR should have filed its motion to enforce as a cross-claim or in a new action, API fundamentally misunderstands the nature of NCR's requested relief. (Dkt. #472 at 12-13.)  NCR is trying to enforce an existing right, not assert or create a new one.  It was for this precise reason that NCR registered the Consent Judgment in this Court. At the time, there were already signs of discord between NCR and API, following API's unilateral decision to limit the amount of work that the Lower Fox River Remediation LLC (the "LLC") could perform in 2011.  (*See* Dkt. #140 at 7-8.)  NCR thus sought to register the Consent Judgment in this action in conjunction with its opposition to the Government's first PI motion.  (Dkt. #145.)  NCR was concerned—appropriately, as it turns out—that a PI could be entered against NCR alone and API would subsequently refuse to pay its 60% share of the PI costs for no legitimate reason.  NCR therefore wanted a means of ensuring that API would fund its 60% share of the cleanup work "in the event that enforcement of the Consent Order becomes necessary in this Court".  (Dkt. #158 at 6.)

NCR is now seeking to enforce its judgment against API in the very action in which the Court granted the motion to register.[2]  API had notice over a year ago of NCR's intended course of action:  "If this Court grants the Motion [to Register], NCR will seek relief only as needed to collect API's 60% share of costs".  (Dkt. #158 at 3.)  NCR is thus not "dropping a claim" into an unrelated lawsuit, as API suggests.  (Dkt. #472 at 13.)  Nor has

---

[2] The Court granted NCR's motion to register in the same order in which it denied the Government's initial PI motion (and in which it initially concluded that API was likely not directly liable to the Government under CERCLA).  (Dkt. #172 at 24.)  To avoid any confusion, NCR clarified in its motion to enforce that it filed under the Enforcement Action case caption for the sake of continuity with the motion to register, but that it "is not seeking the relief requested herein from any party in the Enforcement Action other than API".  (Dkt. #468 at 1 n.2.)

5

NCR requested a modification of any kind to the Consent Judgment.[3]  NCR is simply trying to

enforce the exact terms that were entered by SDNY in 2007—at *API's* request and with NCR's

consent.  *See B.A.T. Indus. p.l.c. & Appleton Papers Inc. v. NCR Corp.*, No. 06-cv-13430

(S.D.N.Y. filed Nov. 21, 2006).  The registering court (here, this Court) has plenary power to

enforce the Consent Judgment in the same manner that the rendering court (SDNY) could

enforce it.  *See* 28 U.S.C. § 1963.

> API's contention that NCR is seeking to modify the Consent Judgment is

particularly misplaced in light of the events giving rise to NCR's motion to enforce.

API's repeated refusal to comply with its obligation to pay 60% of the PI costs is what

necessitated NCR's motion.  It is thus *API* that is seeking to modify the Consent Judgment—

in effect, demanding a reduction in its allocation of costs under the Consent Judgment

from 60% to 0%.  But API's precise numerical obligation was determined by a final, binding

arbitration (Dkt. #124-1 at 14; Dkt. #144-2); it cannot be altered simply because API (or its

behind-the-scenes indemnitor, Windward) now wishes to stop paying.

### C.  API's 60% Obligation Under the Consent Judgment Is Not Subject to Arbitration.

> API has already argued to the Court—unsuccessfully—that enforcement of

the parties' Consent Judgment obligations is subject to alternative dispute resolution.  In its

opposition to NCR's motion to register, API referenced the policy favoring arbitration and

recited verbatim the language from Section 10 of the CSA, implying that it necessarily follows

---

[3] The modification cases that API cites have no bearing here.  (*See* Dkt. #472 at 14.)  For example, *Board of Trustees, Sheet Metal Workers' National Pension Fund v. Elite Erectors, Inc.*, concerned a motion under Federal Rule of Civil Procedure 60(b)(4) to declare a registered judgment void.  212 F.3d 1031, 1033 (7th Cir. 2000).  The Seventh Circuit held that the request should have been presented to the court that rendered the judgment, not the registering court.  *Id.* at 1034.  Unlike the moving party in *Board of Trustees*, NCR is not seeking relief under Rule 60 or asking to void any judgment.

that the Court could not assume jurisdiction over the Consent Judgment. (Dkt. #151 at 5-7.) The Court declined to adopt API's interpretation of the CSA, and granted NCR's motion to register. (Dkt. #172 at 24.)

API's motion to stay merely repeats these rejected arguments from its 2011 registration opposition. API again quotes various provisions from the CSA and then parrots its argument on the presumption in favor of arbitration. (Dkt. #472 at 4-6, 9-10.) API does not even attempt to explain why enforcement of the Consent Judgment—which arose from a contested arbitration—must be submitted to yet another arbitration when registration of the Consent Judgment for the purpose of enforcing it did not. To be clear, NCR does not dispute that federal policy generally favors arbitration or that a valid arbitration agreement should be enforced *if* the issue before the Court falls within the scope of the agreement and is otherwise arbitrable. Indeed, NCR fully agrees that the arbitration process—*and binding decisions resulting from it*—must be respected. That is precisely what NCR is seeking to ensure through its motion to enforce. API does not cite a single case where the judicial enforcement of a valid judgment was itself subjected to arbitration.

## II.  API Has Not Raised an Arbitrable Issue Concerning Its Obligation to Pay 60% of the PI Compliance Costs.

Unable to demonstrate that the Court lacks jurisdiction to grant NCR's motion to enforce, API resorts to manufacturing alleged "disputes" about its funding obligations that purportedly must be resolved through time-consuming alternative dispute resolution procedures. But API has waived any right to invoke arbitration in connection with its newly developed arguments. API's conduct over the past 14 years (including its recent statements to the Court) is entirely inconsistent with an intent to arbitrate the purported disputes that API has invented in a transparent attempt to delay payment.

7

**A.    Relevant Standard.**

A stay of litigation proceedings should not be granted unless a court is satisfied that the issue before it is arbitrable. *See Grumhaus v. Comerica Sec., Inc.*, 223 F.3d 648, 650-51 (7th Cir. 2000). It is well-settled that courts should not enforce an arbitration provision if the moving party has waived its right to arbitrate the disputes in question through conduct inconsistent with an intent to arbitrate. *See St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 587-88 (7th Cir. 1992). Whether a party waived its right to arbitrate is a threshold question for the court to decide. *See Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 994 (7th Cir. 2011). This rule helps promote a fair and efficient resolution of the underlying controversy. *See Conant v. Morgan's Foods, Inc.*, No. 2:10-cv-496, 2011 WL 672584, at *3-4 (S.D. Ohio Feb. 15, 2011) (discussing the "traditional rule that the courts presumptively resolve waiver-through-inconsistent-conduct claims" (internal quotation marks omitted)).

Courts consider the totality of the circumstances to determine whether a party impliedly waived its right to arbitrate. *Kawasaki*, 660 F.3d at 994. Although "[n]o rigid rule exists as to what constitutes a waiver of the right to arbitrate", *St. Mary's*, 969 F.2d at 587-88, several factors in particular weigh heavily in favor of a finding of waiver:

- The moving party's (here, API's) lack of diligence in pursuing its right to arbitrate. *See Kawasaki*, 660 F.3d at 994.

- The moving party's delay in initiating arbitration proceedings. *See Grumhaus*, 223 F.3d at 651.

- Bad faith or willful misconduct on the part of the moving party. *See Transamerica Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, Nos. 93-55490, 93-55498, 1994 WL 712173, at *1 (9th Cir. Dec. 19, 1994).

8

- Prejudice that the non-moving party (here, NCR) has or will suffer as a result of the moving party's conduct. *See Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995).

If the relevant factors, taken together, demonstrate that a party has acted inconsistently with its right to arbitrate, then a court can and should deny a motion to stay litigation proceedings or to compel arbitration. *See St. Mary's*, 969 F.2d at 587-88. They undeniably do so here.

**B.    Over the Past 14 Years, API Has Acted Inconsistently with Its Request to Arbitrate the Alleged Disputes.**

API contends that it is necessary to engage in a lengthy dispute resolution process to address three issues: (1) whether API's obligation to pay its 60% share of the PI Compliance Costs is net of NCR's insurance and indemnity payments; (2) whether NCR's requests for reimbursement must include documentation to show specifically how and when the funds in question were spent; and (3) whether API must pay its 60% share of the PI Compliance Costs when NCR wires those costs to an irrevocable trust (that can only be used for Fox River remediation). (Dkt. #470-10; Dkt. #472 at 7.) API's conduct over the past 14 years is entirely inconsistent with an intent to arbitrate these purported disputes.

1.    The "Last in Line" Argument.

API's theory that it is suddenly "last in line" to reimburse NCR—following all other indemnitors and insurers—is belied by over a decade of payments (including payments by NCR to API of sums for which API was fully indemnified by its indemnitor) pursuant to the parties' cost-sharing agreement.

NCR detailed its cost-sharing history with API in its motion to enforce and supporting declaration. (Dkt. #468 at 6; Dkt. #470.) During this 14-year period, API never *once* asserted that its payment obligation is "net of" NCR's indemnities and insurance. API does not even attempt to reconcile its prior payment conduct with its current

9

argument—nor can it. The waiver-through-inconsistent-conduct doctrine exists to prevent precisely this type of gamesmanship.

Particularly fatal to API's new theory is the fact that NCR has *reimbursed API* for NCR's 40% share of any Fox River costs that API incurred alone. On a number of occasions, API directly paid the remediation contractor to perform remediation and fund the purchase of necessary equipment, as detailed in the motion to enforce and supporting declaration. (Dkt. #468 at 6; Dkt. #470 ¶¶ 10-11.) When NCR reimbursed API for NCR's 40% share, API did *not* tell NCR to stop its payments because API's indemnitor, Windward, had covered API's Fox River costs since 2001 (Dkt. #468 at 6, 18-19; *Whiting*, No. 08-cv-16, Dkt. #993-5). Nor did API offer to credit NCR for any of its payments on account of API's substantial Fox River related insurance recoveries. (*See, e.g.*, Dkt. #341-6 at 16.) In other words, even though API has been fully reimbursed for its Fox River costs by other sources, it repeatedly accepted payments from NCR. API's conduct for over a decade is wholly inconsistent with its new "last in line" argument.

Similarly, prior to the current dispute, API not only contemporaneously paid its share of the Fox River costs but also affirmatively reimbursed NCR for remediation expenses that NCR paid alone in the first instance. (Dkt. #468 at 18.) At the time, NCR had already obtained a number of Fox River related insurance recoveries, a fact that was known to API through its frequent interactions with NCR and through NCR's public disclosures. API nevertheless paid its 60% share of NCR's costs, as required by the Consent Judgment. (*Id.*) These past practices cannot be reconciled with API's new argument that the parties' cost-sharing obligations do not take effect until all other sources of recovery have been exhausted. After more than a decade of conduct inconsistent with the "last in line" argument, API has

waived any right it may have had to arbitrate the purported dispute (even if it were subject to arbitration, which it is not).

The plain language of the CSA further demonstrates that API has manufactured this argument in less than good faith, which counsels heavily in favor of waiver. *Transamerica*, 1994 WL 712173, at *1. The CSA defines "Damages" in two categories of relevance here:

> "(1) all *out-of-pocket* study, restoration, acquisition, cleanup, removal, remedial, investigative, oversight or response costs, or penalties allocated or assessed to, imposed upon, or incurred by NCR or API/BAT in response to Claims, whether arising from administrative proceedings, litigation, or settlement; and whether asserted directly by the Sovereigns, by way of a private party actions [sic] (in the nature of contribution or otherwise), or pursuant to allocation proceedings conducted by and between potentially responsible parties ("PRPs") at the Fox River sites or Future Sites; [and]

> (2) all damages, including natural resource damages, allocated or assessed to, imposed upon, or incurred by NCR or API/BAT in response to Claims, whether arising from administrative proceedings, litigation, or settlement; and whether asserted directly by the Sovereigns, by way of private party actions (in the nature of contribution or otherwise), or pursuant to allocation proceedings conducted by and between PRPs at the Fox River sites or Future Sites."

(Dkt. #124-1 at 7-8 (emphasis added).) The term "out-of-pocket" qualifies only the first category of costs. Because these costs relate to actual remediation, the term "out-of-pocket" is included there to clarify that an actual outlay of cash is required and that projected or contingent costs, or internal overhead costs and employee time, do not qualify as "Damages". This clarification is unnecessary in the second category, as the damages there

11

are necessarily identifiable (such as the amount of a judgment in a cost recovery CERCLA enforcement action).[4]

Under API's interpretation, cleanup costs (subject to category #1) should be "net of" insurance and other indemnities, but damages (subject to category #2) are immediately owed, a distinction for which there is no logical explanation. While it is not surprising that API never once mentioned this argument in prior years, API's failure to do so precludes it from now trying to use this argument as means of delaying its obligation to pay 60% of the PI Compliance Costs. *See Menorah Ins. Co. v. INX Reinsurance Corp.*, 72 F.3d 218, 222 (1st Cir. 1995) (holding that the defendant had waived its right to arbitrate and reasoning that "[a]rbitration clauses were not meant to be another weapon in the arsenal for imposing delay and costs in the dispute resolution process").

2.      The "Ripeness" Arguments.

API's other two arguments—the documentation and cash call issues, both of which relate to the question of whether API's obligation is ripe—are easily resolved against API. API has refused to pay (in whole or in part) even *after* NCR cured the alleged problems. These arguments are thus moot. To the extent API is still seeking to arbitrate these "disputes", they have also been waived by API's conduct in past years.

_____

[4] If the parties to the CSA had intended to include a "net of" indemnity/insurance provision or any other payment priority scheme, which would have significantly affected the parties' rights and obligations, they would have done so explicitly and using unequivocal language. API's suggestion that the term "out-of-pocket" effectively functions as a "net of" provision is entirely implausible. Omitted terms cannot be implied when the language in a contract is unambiguous. *See Karmin v. Karmin*, 796 N.Y.S.2d 703, 705 (App. Div. 2005). In any event, even if API's interpretation were correct, the costs incurred by NCR in compliance with the PI Order also fall within the second category of "Damages", which is *not* qualified by "out-of-pocket".

*First*, API contends that it is not obligated to pay its 60% share of the

PI Compliance Costs without further information about how the work is conducted.  But NCR

*did* submit full documentation of certain payments to API in conjunction with NCR's recent

demands—a fact that is notably absent from API's brief for obvious reasons.  API nevertheless

still refused to pay.  (Dkt. #468 at 20-21; Dkt. #470 ¶¶ 28, 29; Dkt. #470-7.)  Moreover, as a

long-time member of the LLC, the vehicle through which the 2012 remediation is being

performed, API is fully aware of the way in which NCR's payments are being spent.  The

invoices of which API feigns a lack of knowledge are precisely the same types of invoices that

have been generated in each prior work season.  The money is being paid to the same vendors

for the same type of work that API previously directed and knows well.  API's demand for

information has thus been mooted by NCR's responses or waived by API's prior conduct.

Either way, API is not entitled to arbitrate this "dispute".

*Second*, API tries to avoid its obligations under the Consent Judgment by

claiming that NCR's payments to the LLC trust do not constitute a remediation expense.[5] This

argument is also waived by API's conduct in the LLC.  Prior to the 2012 season, API paid

*almost 30 cash calls* with NCR—with the funds directed in each instance to their respective

LLC trusts.  (Dkt. #468 at 7-9.)  During the three years in which it was paying funds into its

LLC trust, API *never* took issue with the 40/60 allocation being implemented at the cash call

stage, rather than when vendors were subsequently paid.  (*Id.* at 20.)  API does not contend that

the LLC procedures have changed or that NCR's trust is somehow different than the trust that

API funded.  API is thus well aware that each cash call is calculated based on current invoices

---

[5] As noted above, even if API were correct (which it is not), NCR's payments also constitute
"damages" under the second category of the CSA's definition.  (Dkt. #124-1 at 7-8.)

13

and projected future costs. (*Id.* at 7; Dkt. #470 ¶ 16.) API is also well aware that the funds in the trusts may be disbursed only after the LLC certifies that a certain payment is required by the Government's remediation or design orders. (Dkt. #468 at 8; Dkt. #470 ¶ 18.) API's supposed concerns about these procedures were waived long ago. *See Grumhaus*, 223 F.3d at 651, 653 (explaining that lengthy delay in raising a dispute weighs heavily in favor of a finding of waiver).

## C. NCR Would Be Prejudiced by Having to Arbitrate API's Alleged Disputes.

A showing of prejudice, while not required to establish waiver of a right to arbitrate in the Seventh Circuit, weighs heavily in favor of waiver. *Cabinetree*, 50 F.3d at 390. Such is the case here, where NCR would be greatly prejudiced by having to arbitrate API's purported disputes.[6]

The cost-sharing arrangement between NCR and API has been in place for over 14 years. NCR has relied on that arrangement in its business planning—including its planning for the 2012 season. As noted above, NCR is currently incurring remediation costs at a rate of over $300,000 *per day*. The 2012 work is estimated to cost approximately $70 million in total. (Dkt. #470 ¶ 19; *see* Dkt. #333 ¶ 13.) To date, NCR has sought reimbursement from API in the

---

[6] API's contention that it is prejudiced by BAT's absence in this proceeding is entirely unfounded. API admits, as it must, that it is jointly *and severally* liable to NCR under the Consent Judgment. (Dkt. #472 at 3.) NCR is thus free to pursue relief against API alone. API's theory that BAT is a necessary party is incorrect. (*Id.* at 9.) Third-party claims are by definition permissive, not compulsory. Fed. R. Civ. P. 14. And Federal Rule of Civil Procedure 19 is clearly inapplicable. To require joinder under the circumstances would strip NCR of a key aspect of what it bargained for—API and BAT's *several* liability. Moreover, contrary to what API suggests (Dkt. #472 at 2, 12), there is no risk of inconsistent results, as any future claim API may have against BAT is entirely distinct from NCR's enforcement of a preexisting judgment against API. API's argument is yet another delay tactic that should be rejected.

14

amount of about $15 million, but API has not paid a penny.[7]  There can be no question that NCR's costs are subject to allocation by the Consent Judgment, as they were compelled by an order of this Court and following a hearing at which API's counsel requested to be heard in light of API's "substantial common interest with NCR in the outcome of . . . the enforcement proceedings through private cost-sharing arrangements".  (April 12, 2012 Hearing Tr. at 7:2-5.)

NCR is fulfilling its obligation to perform full-scale remediation as ordered by the Court, while API is engaging in delay tactics to avoid making any payments.[8]  NCR should not be required to fund this year's substantial remediation efforts alone when API is bound by a court judgment—to which it consented—to pay 60% of the costs.  Nor should API be permitted to keep the millions of dollars in reimbursements it has received from NCR over the years (at times when it enjoyed abundant third-party indemnities), while suddenly now refusing to honor its corresponding obligations under the Consent Judgment.  API cannot have it both ways.

**D.    API Has Repeatedly Assured the Court that It Would Honor Its 60% Obligation Under the Consent Judgment.**

API's current request to arbitrate also conflicts with its statements to the Court that it is not trying to avoid its 60% obligation to NCR.  API repeatedly assured the Court that it would honor its cost-sharing arrangement with NCR—all part of API's effort to convince the Court that summary judgment as to CERCLA liability should be granted in API's favor.

---

[7] On August 1, 2012, NCR funded another cash call for $11 million, bringing NCR's total payments thus far toward funding the work required by the PI Order to over $36 million.  API's share of this amount is about $22 million.  NCR has or will seek reimbursement from API for all payments required for compliance with the PI Order.  (See Dkt. #468 at 10 n.7.)

[8]  With each passing day, NCR has decreasing assurance of what will happen to the money that API (or its indemnitors) should be using to fund its obligations under the Consent Judgment.  NCR's reference to Windward's $810 million dividend payment to Sequana (Windward's former parent in France) is not "wild", as API suggests.  (Dkt. #472 at 12.)  BAT has suggested that these dividends were improperly paid in light of API's ongoing Fox River indemnity obligations.  (Dkt. #341-9.)  NCR thus has legitimate grounds for concern about the consequences of further delay in payment by API.

15

(Dkt. #468 at 15-16.)  For example, only a few months before the PI Order for the 2012 season was issued, API told the Court that "equity need not intervene to create successor liability since NCR is both viable and before the Court *and API is funding 60% of the cleanup costs on the basis of its indemnity arrangement with NCR*".  (Dkt. #287 at 2 (emphasis added).)  API also emphasized that it has been "fully" performing its indemnity obligation to NCR.  (*Id.* at 6.)  API's message was the same in its correspondence to NCR.  Mostly notably, less than one week before API's summary judgment motion was granted, API unequivocally confirmed to NCR that there is no dispute that API's obligation remains the same *regardless* of whether API is directly liable to the Government.  (Dkt. #468 at 15-16.)

NCR relied on API's repeated assurances—taking no position on API's motion for summary judgment and arranging financing for the 2012 season consistent with the parties' 40/60 cost-sharing arrangement.  The Court similarly took API at its word.  In the April 2012 order granting summary judgment for API, the Court noted that "the 60/40 division . . . requir[es] API to bear a larger share of responsibility . . . which is an entirely different question than whether API had assumed direct CERCLA liability".  (Dkt. #349 at 8-9.)  Almost immediately after the Court issued the April 2012 order, API began doing precisely what it promised the Court it would *not* do:  shirking its 60% obligation to NCR.  (Dkt. #287 at 15.)  Indeed, in a recent petition to EPA,[9] API suggested that it perhaps should have "paid nothing" to NCR all along.[10]  API's response to NCR's motion to enforce—in

---

[9] In June 2012, API filed a Petition for Reimbursement of Costs before the EPA Environmental Appeals Board on the grounds that it has no liability under CERCLA.  *See* EPA, Environmental Appeals Board, Appleton Papers Inc., Lower Fox River and Green Bay Site, http://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/Dockets/CERCLA+106(b)+12-04.

[10] Memorandum of API in Opposition to EPA's Motion to Dismiss Petition for Reimbursement, at 4 (filed Aug. 1, 2012), *available at* EPA, Environmental Appeals Board, Active Dockets, http://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/Dockets/CERCLA+106(b)+12-04.

which it once again tries to walk back its promises—is nothing more than a transparent effort to delay or avoid the payments that are due to NCR under the Consent Judgment.

### III.    In the Alternative, If the Court Determines that There Is an Arbitrable Dispute, the Court Should Order Expedited Arbitration Proceedings.

If, notwithstanding the overwhelming evidence of API's gamesmanship and delay tactics, the Court is inclined to stay NCR's motion to enforce, then NCR respectfully requests that the Court direct that any arbitration be completed as expeditiously as possible. Specifically, NCR requests that the Court direct the parties to complete arbitration within 60 days from the issuance of the Court's order, and in any event no later than the conclusion of the 2012 remediation season (November 9, 2012).  (*See* Dkt. #370 at 15.)

NCR has good cause for this alternative relief.  As discussed above, NCR is incurring substantial costs on a daily basis.  Pursuant to the Court's PI Order, NCR must continue performing full-scale remediation at the Site through November 9, 2012.  (*Id.*)  Unless arbitration is expedited, NCR will continue to bear alone the massive cost of these cleanup efforts—estimated at approximately $70 million.  (Dkt. #470 ¶ 19; *see* Dkt. #333 ¶ 13.)

Whereas NCR will be substantially prejudiced by further delay, API will suffer no harm from an expedited arbitration.  And as described above and in NCR's motion to enforce, the allegations here arise from straightforward, undisputed facts.  The Commercial Arbitration Rules, pursuant to which any arbitration under the CSA must be conducted (Dkt. #124-1 at 20), provide for expedited procedures for cases that lack a substantial evidentiary record or where there is no need for prolonged discovery.  To streamline any further proceedings and minimize prejudice to NCR as a result of API's delay tactics, NCR respectfully requests that if the Court stays NCR's motion to enforce, it also direct

that any arbitration proceedings conclude within 60 days, and in any event no later than November 9, 2012.

\*          \*          \*

**CONCLUSION**

For the foregoing reasons and those stated in NCR's Motion to Enforce (Dkt. #467) and supporting documents, NCR respectfully requests that the Court rule as follows:

1.     Deny API's motion to strike or stay NCR's Motion to Enforce;

2.     Deny API's motion for an order compelling arbitration;

3.     Grant NCR's Motion to Enforce and order API to promptly pay to NCR its allocable share of the initial installments of Court-ordered PI Compliance Costs ($15,003,126.88) and any future costs that NCR incurs complying with the PI Order;

4.     Alternatively, if the Court determines that there is an arbitrable dispute, direct that arbitration must be completed within 60 days from the date of the Court's order, but by no later than November 9, 2012;

5.     Award NCR its costs and attorneys' fees; and

6.     Grant any other relief as the Court deems just and proper.

18

Dated:  August 22, 2012                        Respectfully submitted,

/s/ Darin P. McAtee

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
Darin P. McAtee
Yonatan Even
Worldwide Plaza, 825 Eighth Avenue
New York, New York 10019
Phone:  (212) 474-1000
Fax:  (212) 474-3700
dmcatee@cravath.com

SIDLEY AUSTIN LLP
Evan B. Westerfield
One South Dearborn Street
Chicago, Illinois 60603
Phone:  (312) 853-7000
Fax:  (312) 853-7036

MARTEN LAW PLLC
Linda R. Larson
Bradley M. Marten
1191 Second Avenue
Suite 2200
Seattle, Washington 98101
Phone:  (206) 292-2600
Fax:  (206) 292-2601

*Attorneys for NCR Corporation*