IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF WISCONSIN, )<br><br>Plaintiffs, )<br><br>v. )<br><br>NCR CORPORATION, *et al*., )<br><br>Defendants. ) | Civil Action No. 10-C-910<br><br>Hon. William C. Griesbach |

**STATEMENT OF MATERIAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE PROPRIETY OF THE
REMEDY SOUGHT TO BE ENFORCED IN THE FIFTH CLAIM FOR RELIEF**

Pursuant to Civil L.R. 56(b)(1)(C) of the United States District Court for the Eastern District of Wisconsin, the United States of America and State of Wisconsin ("Plaintiffs") respectfully submit the following Statement of Material Undisputed Facts in support of Plaintiffs' Motion for Partial Summary Judgment on the Propriety of the Remedy Sought to be Enforced in the Fifth Claim for Relief.

**I.     The Response Agencies Conducted a Remedial Investigation of the Site.**

1.     The Wisconsin Department of Natural Resources ("WDNR") began its Remedial Investigation of the Lower Fox River and Green Bay Site ("Site") in 1998, with funding assistance from the United States Environmental Protection Agency ("EPA").  Dkt. 125 at 1. WDNR performed a Remedial Investigation to collect the data needed to characterize the Site for purposes of developing and evaluating effective remedial alternatives.  *Id.* at 2.

2.     The studies conducted during the Remedial Investigation evaluated physical, biological, and chemical characteristics of the Site based on more than 500,000 analytical results for over 200 chemical parameters collected during numerous investigations between 1971 and 2000.  *Id.* WDNR considered factors such as PCB distribution and sediment volumes, contaminant fate and transport, changes in sediment bed elevation, and the potential for natural biodegradation of PCBs in the Remedial Investigation.  *Id.*

3.     WDNR performed a formal Risk Assessment as part of its Remedial Investigation, to identify the current and potential risks to human health and the environment at the Site, and to identify acceptable exposure levels for use in developing remedial alternatives.  Dkt. 125 at 2. The Risk Assessment included both a screening level risk assessment, identifying chemicals at the Site that posed the greatest risk to people and animals, and a baseline risk assessment, which

1

focused on the most significant human exposure routes and most sensitive ecological receptors. *Id.*

4.      The Final Baseline Human Health and Ecological Risk Assessment for the Site in part evaluated the impacts of PCB exposure at the Site to various human and ecological receptors. Dkt. 507-1 at 5-8.  Multiple groups of human receptors were evaluated in the Human Health Risk Assessment, including: recreational anglers, high-intake fish consumers, hunters, drinking water users, local residents, recreational water users (swimmers and waders), and marine construction workers.  Dkt. 507-2 at 7-10.

5.      The Human Health Risk Assessment found that that the fish consumption pathway presented the highest cancer and non-cancer hazard indices – cancer risks from fish consumption are 1,000 times greater than the one-in-a-million cancer risk benchmark that is often used in making Superfund risk management decisions, and non-cancer hazard indices from fish consumption are as much as 50 times greater than acceptable levels for seven-year to lifetime exposures.  Dkt. 507-1 at 5-6.  Non-cancer health effects of PCBs in humans include "developmental effects (e.g. neurological impairment in infants and children due to maternal exposure), reproductive effects (e.g. conceptive failure), and immune system suppression (e.g., increased incidence of infectious disease in infants)."  Dkt. 507-1 at 6.  At the time of the Human Health Risk Assessment 136,000 people had been issued fishing licenses in the area, approximately 14,000 of which are considered "high-intake anglers."  Dkt. 507-3 at 5.

6.      The Ecological Risk Assessment identified and evaluated multiple assessment endpoints (from which receptor species were selected), including: aquatic invertebrates, benthic invertebrates, benthic fish, pelagic fish, insectivorous birds, piscivorous birds, carnivorous birds, and piscivorous mammals.  Dkt. 507-4 at 3-6, 12-20.  The Ecological Risk Assessment found

2

that PCBs cause, or potentially cause, risk to all identified ecological receptors (except insectivorous birds), although not all are at risk or potentially at risk in all geographic locations at the Site. Dkt. 507-1 at 8-9.

7.  Sediment quality thresholds ("SQTs") were developed based on the Human Health and Ecological Risk Assessments for each pathway and receptor to assist with the evaluation of PCB levels in the Final Feasibility Study. Dkt. 507-1 at 10-13.

8.  The Draft and Final versions of the Baseline Human Health and Ecological Risk Assessment are included in the Administrative Record for the Site. Dkt. 474-2 at 1, 20.

**II.   The Response Agencies Conducted a Feasibility Study for the Site.**

9.  WDNR performed a Feasibility Study at the Site to develop and evaluate a range of remedial alternatives that could be considered in the process of selecting the appropriate remedial action for the Site. Dkt. 125 at 2. Seven remedial alternatives were subjected to a detailed analysis in the Feasibility Study: (1) no action; (2) monitored natural recovery; (3) dredging with off-site disposal; (4) dredging with sediment placement in an on-site confined disposal facility; (5) dredging with thermal treatment; (6) *in-situ* capping; and (7) dredging with sediment placement in a confined aquatic disposal facility. *Id.*; Dkt. 507-5 at 5.

10.  Each of the seven alternatives was then evaluated in light of the nine remedy evaluation criteria specified in the NCP at 40 C.F.R. § 300.430(e)(9)(iii): (1) overall protection of human health and the environment, (2) compliance with the applicable or relevant and appropriate requirements, (3) long-term effectiveness and permanence, (4) reduction of toxicity, mobility, or volume through treatment, (5) short-term effectiveness, (6) implementability, (7) cost, (8) state acceptance, and (9) community acceptance. Dkt. 125 at 2-3; Dkt. 507-6. In addition to the

individual assessment of each individual alternative against the nine evaluation criteria, the seven remedial alternatives were also subjected to a detailed comparative analysis. Dkt. 507-7.

11. As part of the Feasibility Study, a Sediment Technologies Memorandum was prepared that examined 20 different environmental dredging case studies, reviewing each for effectiveness in achieving both short-term goals and long-term remedial objectives. Dkt. 439-1, Dkt. 439-2, Dkt. 439-3.

### III. Two Sediment Remediation Demonstration Projects Were Conducted at the Site and Provided Further Information on Dredging.

12. Two sediment remediation demonstration projects, the Deposit N Removal Project and the Sediment Management Unit 56/57 ("SMU 56/57") Project, were also conducted at the Site to evaluate sediment removal and disposal from the Lower Fox River. Dkt. 507-9; Dkt. 507-10.

13. The primary objective of the Deposit N Project, conducted in 1998-1999 as a jointly sponsored EPA-WDNR project, was to demonstrate that environmental dredging of PCB-contaminated sediment could be conducted in an environmentally safe manner at the Site. Dkt. 507-9 at 3. The Project used hydraulic dredging to remove approximately 8,200 cubic yards of highly-contaminated sediment (containing approximately 112 lbs of PCBs), from an area near Little Chute and Kimberly. Dkt. 404-2 at 26-27; Dkt. 507-9 at 14, 17.

14. The Fox River Deposit N Project Pre-Design Phase Quality Assurance Project Plan, the Interim Project Report for Fox River Deposit N, and the Summary Report for Fox River Deposit N are all included in the Administrative Record for the Site. Dkt. 474-2 at 25, 39.

15. The SMU 56/57 Project, funded initially by the Fox River Group[1], was designed

---

[1] Around that time, the Fox River Group consisted of Appleton Papers Inc., Fort James Corporation (now Georgia-Pacific), P.H. Glatfelter Company, NCR Corporation, Riverside Paper Corporation (now CBC Coating), U.S. Paper Mills Corporation, and Wisconsin Tissue Mills Inc. (now WTM I).

to assess the "implementability, environmental effectiveness, and expense of large-scale sediment dredging and disposal," while also removing PCB-contaminated sediment from the River. Dkt. 507-10 at 3. Hydraulic dredging was used to remove PCB-contaminated sediment from an area near the Fort Howard Turning Basin. *Id.* at 3, 9.

16.    After weather and other problems stopped dredging work at SMU 56/57 in December 1999, EPA and WDNR entered into an Administrative Order on Consent with the Fort James Corporation in May 2000 to complete the dredging work. Dkt. 507-10 at 3; s*ee* Dkt. 76-8. Over the two years, more than 80,000 cubic yards of contaminated sediment (containing about 2,070 pounds of PCBs) was removed. Dkt. 404-2 at 27.

17.    Both the SMU 56/57 and Deposit N Projects yielded information regarding the viability of dredging of PCBs as a remediation technique, information which was then incorporated into the Feasibility Study for the Site. Dkt. 507-8; Dkt. 474-2 at 1.

**IV.    The Response Agencies Developed Scientific Models as One Tool to Assist in the Remedy Selection Process.**

18.    The Response Agencies developed and used several interrelated scientific models to simulate the fate and transport of PCBs at the Site, as one tool "to evaluate the degree and extent of contamination, risks to human health and the environment, and long-term benefits of implementing remedial approaches." Dkt. 439-14 at 8. These models included sediment bed mapping, the Whole Lower Fox River Model ("wLFRM"), the Fox River food chain model ("FRFood"), the Enhanced Green Bay PCB transport model ("GBTOXe"), and the Green Bay food chain model ("GBFood"). *Id.* at 8-9.

19.    In 2001, WDNR prepared a more than 100 page report entitled "Development and Application of a PCB Transport Model for the Lower Fox River Report," summarizing the development and use of the wLFRM model at the Site. Dkt. 439-15. A nearly 2,500 page Final

5

Model Documentation Report was then issued by WDNR in 2002. Dkt. 439-14 (excerpts). These documents are contained within the Administrative Record for the Site. Dkt. 474-2 at 1).

20.     In February 1999, WDNR released draft versions of the Remedial Investigation and Feasibility Study for public review and comment. Dkt. 125 at 3. The Administrative Record includes the draft documents, along with twelve volumes of public comments submitted by the Fox River Group, and comments from EPA, Native American Tribes, as well as other groups and individuals. Dkt. 125 at 3; Dkt. 474-2 at 7-19.

21.     Taking the comments received into consideration, WDNR refined and revised the draft reports and, in accordance with 40 C.F.R. § 300.430(d) and (e), issued final reports on its Remedial Investigation, Risk Assessment, and Feasibility Study in December 2002. Dkt. 125 at 2-3. The final reports are also in the Administrative Record. Dkt. 125 at 3; *see* Dkt. 474-2 at 1.

**V.      The Response Agencies Issued a Proposed Remedial Action Plan for the Site.**

22.     In October 2001, the WDNR and EPA (the "Response Agencies") issued a joint Proposed Remedial Action Plan ("PRAP") for the Site, and both publicized and solicited public comments on the PRAP. Dkt. 125 at 3; Dkt. 474-2 at 5. Public meetings on the PRAP were held in the affected community on October 29 and 30, 2001, during the public comment period. *See* Dkt. 507-11; Dkt. 507-12.

23.     The PRAP divided the Site into five geographically-defined Operable Units ("OUs") from Little Lake Butte des Morts (OU 1) at the southern part of the Lower Fox River, to the Bay of Green Bay (OU 5). Dkt. 125 at 3; Dkt. 507-13 at 7-8. The Proposed Plan also identified and described the seven remedial alternatives evaluated for each of the OUs during the Feasibility Study. Dkt. 125 at 3; Dkt. 507-13 at 20-22.

24.     The PRAP identified the "Proposed Alternative" selected based on a multi-factor

6

analysis: extensive dredging in OUs 1, 3, and 4, and long-term monitoring during natural recovery in most of OUs 2 and 5.  Dkt. 125 at 3; Dkt. 507-13 at 24-32.

25.     The PRAP, the public comments received on the PRAP and the transcripts of the public meetings are part of the Administrative Record for the Site.  Dkt. 507-11; Dkt. 507-12; Dkt. 474-2 at 1, 3-4, 5; *see* 40 C.F.R. § 300.430(f)(3).

**VI.     The Response Agencies Issued the Original RODs.**

26.     In December 2002, the Response Agencies issued a Record of Decision selecting a remedy for OUs 1 and 2 ("2002 ROD").  Dkt. 125 at 3-4; Dkt. 439-12.  The 2002 ROD called for sediment removal by hydraulic dredging in OU 1 and "monitoring only" in most of OU 2, but it also included a "contingent remedy" feature that could allow possible installation of engineered caps to contain contaminated sediment in certain areas.  Dkt. 125 at 4; Dkt. 439-12 at 93-95.

27.     The 2002 ROD set a "Remedial Action Level" ("RAL") of 1 part per million (ppm) and the remedy selected for OU 1 required dredging to remove sediments contamination with PCBs in concentrations greater than the RAL.  Dkt. 439-12 at 96-101.

28.      Multiple potential RALs had been evaluated during the remedy selection process, including: 0.125 ppm, 0.25 ppm, 0.5 ppm, 1 ppm, 5 ppm, and "no action."  Dkt. 439-12 at 97. Among other efforts, WDNR ran the wLFRM using the different RAL options as inputs, to try to predict in a relative sense how the varying PCB cleanup action levels would impact sediment and water concentrations over time.  *Id.* at 31.  The outputs from the wLFRM were then used as inputs into the bioaccumulation model (FRFood) to achieve projections of fish tissue concentrations of PCBs based on the different RALs.  *Id.*

29.     The 1 ppm PCB RAL was ultimately selected because it was projected to achieve

dramatically greater reductions in PCB concentrations in sediments, water, and fish tissue than either the "no action" alternative or the 5 ppm RAL, while lower RALs achieved only marginal further reductions in PCB concentrations and were significantly more costly. Dkt. 439-12 at 96-101.

30. Using the 1 ppm RAL for sediments in OU 1, the Response Agencies estimated that after the dredging was complete, the surface weighted average concentration ("SWAC") of PCBs in sediments (the average PCB concentration over a given area in the OU), would be reduced to 0.185 ppm. Dkt. 439-12 at 97. Based on this SWAC, the Response Agencies then projected that concentrations of PCBs in fish tissues would reach safe levels within a reasonable period of time -- for example, PCB levels in walleye would be reduced so as to make them safe for consumption by recreational anglers within one year. *Id.* at 98-100. Using the next-highest RAL considered by the Response Agencies (5 ppm), walleye were not projected to be safe for consumption by anglers for 29 years. *Id.*

31. Using similar reasoning, the Response Agencies selected a different remedy for most of OU 2, where the Response Agencies found that monitored natural recovery would achieve comparable PCB levels in sediments, water, and fish for that area of the river without dredging. Dkt. 439-12 at 101-102.

32. The 2002 ROD documents the Response Agencies' evaluation of the multiple remedial alternatives under the NCP's nine remedy selection criteria, and the analysis conducted to select the remedy for OUs 1 and 2. Dkt. 439-12 at 66-110.

33. In June 2003, the Response Agencies issued a separate Record of Decision selecting a remedy for OUs 3-5 at the Site ("2003 ROD"). Dkt. 125 at 4; *see* Dkt. 404-2. The 2003 ROD called for extensive sediment removal by dredging in OUs 3 and 4, removal of sediment from an

8

area known as "Deposit DD" in OU 2 as part of the OU 3 remedy, removal of contaminated sediment from the River mouth area of OU 5, and monitoring only in other portions of OU 5. Dkt. 125 at 4; Dkt. 404-2 at 147-151. The 2003 ROD also allowed for possible installation of engineered caps to contain contaminated sediment in certain areas, as a contingent remedy. Dkt. 125 at 4; Dkt. 404-2 at 159-161.

34. The 2003 ROD called for removal of an estimated 6.5 million cubic yards of sediment from OUs 2-5, transportation of the sediment slurry by pipeline to specially constructed "passive dewatering" cells, disposal of the removed sediment in a new sediment-only landfill, and piping the treated separated water back to the River. Dkt. 404-2 at 147-49.

35. Like the 2002 ROD, the 2003 ROD also used a RAL of 1 ppm PCBs because that level of PCB removal achieved the most dramatic and cost-effective reductions in PCB concentrations in sediments, water, and fish tissues. Dkt. 404-2 at 147-63.

36. As in the 2002 ROD, the following Remedial Action Objectives were adopted in the 2003 ROD: (1) achieve, to the extent practicable, surface water quality criteria throughout the Lower Fox River and Green Bay; (2) protect humans who consume fish from exposure to Contaminants of Concern that exceed protective levels; (3) protect ecological receptors from exposure to Contaminants of Concern above protective levels; (4) reduce transport of PCBs from the Lower Fox River into Green Bay and Lake Michigan; and (5) minimize downstream movement of PCBs during implementation of the remedy. Dkt. 404-2 at 90.

37. The 2003 ROD estimated that the remediation in the Lower Fox River would yield at least a 93% to 97% reduction in the amount of PCBs transported from the River to Green Bay and Lake Michigan each year as contaminated sediment from the River is re-suspended and carried downstream. Dkt. 125-5; Dkt. 404-2 at 104-105.

38.     The 2003 ROD estimated the cost of the all-dredging remedy for OUs 2-5 at approximately $325 million (in 2001 dollars), as explained in both the 2003 ROD and a "White Paper" the Response Agencies prepared to address remedy cost issues raised by certain Defendants and others during the public comment period.  Dkt. 404-2 at 151; Dkt. 439-5 at 22-37; Dkt. 507-20.

39.     The 2003 ROD specifically explained: "[the $325 million is an] engineering cost estimate that is expected to be within -30 and +50 percent of the actual project cost (based on year 2001 dollars).  Changes in the cost elements are likely to occur as a result of new information and data collected during the remedial design.  Major changes may be documented in a memorandum in the Administrative Record, and ESD, or a ROD amendment."  Dkt. 404-2 at 151.

40.     Detailed cost estimates for the elements of the all-dredging remedy were developed and presented in the December 2002 Final Feasibility Study and the remedy cost White Paper.  Dkt. 439-4; Dkt. 507-20.

41.     The Feasibility Study also compared the 2003 ROD remedy cost estimate to the actual costs of 20 other environmental dredging projects, all smaller in scale, where the "unit cost" of dredging, transportation, and disposal ranged from approximately $6 to $1,842 per cubic yard dredged.  Dkt. 439-1; Dkt. 439-2; Dkt. 439-3.

42.     As explained in the 2003 ROD and its Responsiveness Summary, the $44 per cubic yard estimated unit cost for the all-dredging remedy at the Site was expected to fall toward the lower end of that unit cost range for two reasons: (1) economies of scale at this larger project and (2) use of a dedicated sediment processing and disposal facility would avoid the costs of mechanical dewatering with presses and disposal at a commercial landfill.  Dkt. 404-2 at 98-133; Dkt. 439-5 at 22-37.

43.    Before issuing the original RODs, the Response Agencies reevaluated multiple remedial alternatives under the NCP's nine remedy selection criteria. Dkt. 125 at 4; *see* Dkt. 439-12 at 66-92; Dkt. 404-2 at 92-146. This process was informed by the Response Agencies' review and analysis of voluminous comments that certain Defendants and others submitted during a formal public comment period on the PRAP. Dkt. 125 at 4.

44.    The RODs included lengthy Responsiveness Summaries as appendices in which the Response Agencies documented their assessment of the previously submitted comments. Dkt. 125 at 4; Dkt. 507-14; Dkt. 507-15; Dkt. 507-16; *see* Dkt. 474-2 at 1, 78. The Response Agencies further addressed certain issues raised in the comments in "White Papers" which are also appended to the RODs. *See e.g.* Dkt. 507-17; Dkt. 507-18.

45.    The 2002 and 2003 RODs, including the Responsiveness Summaries and White Papers, are part of the Administrative Record. Dkt. 474-2 at 1, 24.

**VII.    The Response Agencies Considered Continued Input from Defendants and Revised the Selected Remedy in the 2007 ROD Amendment in Accordance with the NCP.**

46.    In 2004, NCR and Georgia-Pacific entered into an Administrative Order on Consent with EPA and WDNR ("2004 AOC") that allowed them to "make a submittal proposing alternate remedial measures" that the Response Agencies committed to consider as part of the remedial design process. Dkt. 439-6 at 42.

47.    In 2004-2005, NCR and Georgia-Pacific went forward with pre-design sampling work and collected 10,000 sediment samples at more than 1,400 locations in the River, yielding new PCB data for the Site. Dkt. 404-3 at 12. The sampling data collected by NCR and Georgia-Pacific led to three general findings: (1) the discovery of high levels of PCB contamination in a particular area below the De Pere dam; (2) the conclusion that a much larger volume of sediment would need to be dredged than originally anticipated to comply with the remedy set forth in the

2003 ROD; and (3) the 2003 ROD SWAC goals might not be met even if that larger volume of sediment were dredged.  *Id.* at 13-16.

48.    Based on these findings, NCR and Georgia-Pacific formally proposed a hybrid "Optimized Remedy" that incorporated a combination of dredging, capping, and sand covering in a 2006 Basis of Design Report ("BODR").  Dkt. 439-7 at 2-9.

49.    The BODR proposed dredging an estimated 3.7 million cubic yards of sediment with PCB concentrations greater than 1 ppm, containing additional PCB-contaminated sediment through capping and sand coverage, and completing all active remediation within nine years. Dkt. 439-7 at 5-7.

50.    The reduced dredging volume under the Optimized Remedy eliminated the economies of scale that favored pipeline transport to a passive dewatering and sediment-only disposal facility as selected in the 2003 ROD, so the BODR instead proposed construction of a stand-alone mechanical dewatering and water treatment facility just north of the Georgia-Pacific's Green Bay West Mill, and truck transport of the dewatered sediment to one or more landfills.  Dkt. 439-7 at 6.

51.    The 2006 BODR submitted by NCR and Georgia-Pacific increased the cost estimate for the original 2003 ROD remedy to nearly $580 million and it estimated the cost of their proposed Optimized Remedy at about $390 million (in 2005 dollars).  Dkt. 439-7 at 8, 26-35.  An Optimized Remedy Design Memorandum prepared by NCR's and Georgia-Pacific's consultants presented detailed cost worksheets used for these estimates.  Dkt. 439-8 at 4-96.

52.    As the Response Agencies were considering the BODR, Glatfelter and WTM were advocating corresponding changes to the OU 1 remedy based on experience gained under their 2004 Consent Decree for the remediation of OU 1.  *See* Dkt. 507-21.  By the end of 2006,

Glatfelter and WTM had dredged about 210,000 cubic yards of sediment from OU 1, but they also prompted the formation of a work group composed of government and company representatives that would try to reach a technical consensus on potential cap designs for an OU 1 hybrid remedy proposal that Glatfelter and WTM were developing. Dkt. 507-21 at 15.

53.     The Response Agencies determined that a change from the OU 2-5 all-dredging remedy in the 2003 ROD to something like the hybrid remedy proposed by NCR and Georgia-Pacific in the BODR was fundamental and required a ROD amendment. Dkt. 404-3 at 18. In November 2006, the Response Agencies issued a Proposed Plan inviting public comment on the proposed changes to the remedy. *Id.*; Dkt. 474-2 at 51.

54.     In June 2007, following consideration of the public comments received, the Response Agencies issued a ROD Amendment ("2007 ROD Amendment") designed to accommodate the design concept outlined in the BODR, with the caveat that it would "be adjusted and revised as the remedial design process progresses." Dkt. 404-3 at 30.

55.     The 2007 ROD Amendment made fundamental changes to the remedy for OUs 2 (Deposit DD), 3, 4, and 5, including the adoption of a revised hybrid remedy that provided for a combination of dredging, capping, and sand covering, rather than dredging alone. Dkt. 404-3 at 29-47; Dkt. 125 at 4.

56.     The Response Agencies' decision to require dredging in some areas while allowing capping and sand covering in others is explained in the 2007 ROD Amendment. Dkt. 404-3 at 29-39. Though sediment removal remained the "primary remedial approach for sediment exceeding the 1.0 ppm PCB RAL," the 2007 ROD Amendment also set forth alternate remedial approaches, including engineered caps, the combination of dredging and capping, sand cover in

undredged areas, and specific handling of "exceptional areas," along with detailed criteria for when such approaches are appropriate in a given area of the River. Dkt. 404-3 at 33-39.

57.   The 2007 ROD Amendment did not alter the 1 ppm PCB RAL that would mandate sediment remediation in an area, and did not alter the overall Remedial Action Objectives, which have always included reducing fish tissue PCB concentrations and reducing the continued re-suspension and loss of PCB-contamination sediment to Green Bay and Lake Michigan. Dkt. 404-3 at 12-13.

58.   The public comments received when the Response Agencies released the ROD Amendment Proposed Plan for public comment are addressed in the Responsiveness Summary appended to the 2007 ROD Amendment. Dkt. 125 at 5; *see* Dkt. 507-19.

59.   The 2007 ROD Amendment Proposed Plan, the public comments, and the final 2007 ROD Amendment are included in the Administrative Record for the Site. Dkt. 474-2 at 51, 65, 75, 78.

60.   The 2007 ROD Amendment for OUs 2-5 adopted the $390 million hybrid cost estimate "as presented in the BODR" that NCR and Georgia-Pacific had submitted. Dkt. 404-3 at 26.

61.   As sought by Glatfelter and WTM, a corresponding ROD Amendment adopting a hybrid remedy for OU 1 was issued in June 2008 ("2008 ROD Amendment"). Dkt. 125 at 5; Dkt. 439-18. The 2008 ROD Amendment adopted an amended remedy that called for dredging as the primary remedial approach, but allowed for a combination of dredging and capping, capping alone, and sand covering as alternate remedial approaches in certain instances. Dkt. 125 at 5; Dkt. 439-18 at 17, 27-28.

62.   The Response Agencies released for public comment a ROD Amendment Proposed Plan,

consisting of a concept paper and design supplement. Dkt. 439-18 at 6, 12, 17; Dkt. 474-2 at 52. The 2008 ROD Amendment Proposed Plan, public comments, and the 2008 ROD Amendment with appended Responsiveness Summary addressing the public comments received, are included in the Administrative Record. Dkt. 474-2 at 52, 74, 76.

## VIII.    The Response Agencies Published an ESD to Account for Updated Cost Estimates for the OU 2-5 Remedy.

63.    The Response Agencies published an Explanation of Significant Differences for OUs 2-5 ("2010 ESD"), updating and re-evaluating the cost estimates of the OU 2-5 remedy set forth in the 2007 ROD Amendment. Dkt. 147-1.

64.    The Response Agencies published a corresponding Criteria Analysis Memorandum that supported the 2010 ESD and detailed the criteria considered in concluding that, despite the increased cost estimate, the 2007 ROD Amendment remedy remained the preferred remedy for OUs 2-5 and that an ESD was appropriate to document the changes under the circumstances. Dkt. 147-2.

65.    The 2010 ESD and its associated Criteria Analysis Memorandum are included in the Administrative Record. Dkt. 474-2 at 52.

66.    NCR and API had formed the Lower Fox River Remediation LLC ("the LLC"), which had entered into long term contracts for the OU 2-5 remediation work (now required to be performed pursuant to EPA's 2007 Unilateral Administrative Order). *See* Dkt. 507-22.

67.    At the Response Agencies' request, the LLC's contractor, Tetra Tech EC, Inc., prepared and submitted a detailed cost projection for the hybrid remedy selected by the 2007 ROD Amendment using actual contract rates. Dkt. 439-9; Dkt. 507-22. This yielded a revised cost estimate of $700.5 million (in 2009 dollars). Dkt. 507-22; Dkt. 507-23.

68.    The 2010 ESD compared the revised cost estimate produced by the Defendants'

contractors in 2009 (*i.e.*, $700.5 million (in 2009 dollars)) to the cost estimate presented by the Defendants in the 2006 BODR (*i.e.*, less than $400 million (in 2005 dollars)) and identified the cost categories that NCR and Georgia-Pacific had underestimated in the BODR.  Dkt. 404-4 at 13-15.

69.    The Criteria Analysis Memorandum for the 2010 ESD explained that the increase in the overall cost estimate for the OU 2-5 remedy did not fundamentally alter the elements of the remedy or the fact that 2007 ROD Amendment remedy remained the preferred remedy based on the balancing criteria identified in the NCP.  Dkt. 147-2 at 2.

70.    The re-evaluation of the long-term effectiveness, permanence, and cost criteria in the Criteria Analysis Memorandum for the 2010 ESD supported the Response Agencies' determination that the 2007 ROD Amendment remedy remained more beneficial and cost-effective than other potential alternatives, including widespread capping.  Dkt. 147-2 at 7.

71.    The 2010 ESD and Criteria Analysis Memorandum also addressed a reduction in monitoring in OU 2, and a reduction in cap thickness in OUs 2-5, which were expected to yield cost savings without reducing the effectiveness of the selected remedy.  Dkt. 147-1 at 10-11, 14-15; Dkt. 147-2.

72.    In June 2012, EPA issued a Memorandum on the Response Agencies' recent revisions to the final remedial design for OUs 2-5 that projects the total cost of the hybrid remedy at approximately $647 million (in 2012 dollars), $54 million less than the estimate presented in the 2010 ESD.  Dkt. 439-10 at 12.

73.    The expected reduction in the remedy cost is the result of design guidance, provided by

the Response Agencies, to optimize the cost-effective use of dredging, capping, and sand

covering in the remaining remediation areas in OU 4, consistent with the requirements of the

2007 ROD Amendment.  Dkt. 439-10.

74.    The Memorandum, and the associated Technical Memorandum, are included in the

Administrative Record.  *See* Dkt. 474-2 at 77.

**IX.    The Response Agencies Engaged in Community Relations.**

75.    The complete Administrative Record is available to the public at: 1) WDNR Northeast

Region office, 2984 Shawano Avenue, Green Bay, Wisconsin; 2) WDNR Bureau of Watershed

Management, 2nd Floor, 101 South Webster Street, Madison, Wisconsin; and 3) EPA Superfund

Records Center, 7th Floor, 77 West Jackson Boulevard, Chicago, Illinois.  *See e.g.* Dkt. 404-2 at

31.

76.    Notices of availability of documents, as well as notices of public meetings on the Site

were published in major local newspapers.  *See e.g* Dkt. 474-2 at 5 (notice of public meeting to

discuss 2002 ROD), 47 (notice of public meeting on Oneida Reservation), 71 (notice of additions

to Administrative Record Index, public meeting for 2003 ROD), 73 (notice of public meeting to

discuss current status of OU 2-5 cleanup).


                                        Respectfully submitted,


                                        For Plaintiff United States of America

                                        IGNACIA S. MORENO
                                        Assistant Attorney General
                                        Environment and Natural Resources Division

Dated:   September 12, 2012                    s/   *Maya S. Abela*_____
                                               RANDALL M. STONE
                                               JEFFREY A. SPECTOR
                                               KRISTIN M. FURRIE
                                               SUMONA N. MAJUMDAR
                                               SEAN CARMAN
                                               MAYA S. ABELA
                                               Environmental Enforcement Section
                                               Environment and Natural Resources Division
                                               U.S. Department of Justice
                                               P.O. Box 7611
                                               Washington, DC  20044-7611
                                               Telephone:     202-514-2717
                                               Facsimile:     202-616-6583
                                               E-Mail:        maya.abela@usdoj.gov


                                               GREGORY J. HAANSTAD
                                               Attorney for the United States, Acting
                                               Under Authority Conferred by 28 U.S.C. § 515

                                               SUSAN M. KNEPEL
                                               Assistant United States Attorney
                                               Office of the United States Attorney
                                               517 E. Wisconsin Avenue, Room 530
                                               Milwaukee, WI  53202



                                               For the State of Wisconsin:



Dated:  _____                       s/   *Cynthia R. Hirsch*_____
                                               CYNTHIA R. HIRSCH
                                               Assistant Attorney General
                                               Wisconsin Department of Justice
                                               17 West Main Street
                                               P.O. Box 7857
                                               Madison, Wisconsin  53707-785
                                               hirschcr@doj.state.wi.us

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this day, the foregoing Statement of Material Undisputed Facts in Support of Plaintiffs' Motion for Partial Summary Judgment on the Propriety of the Remedy Sought to be Enforced in the Fifth Claim for Relief was filed electronically with the Clerk of the Court using the Court's Electronic Court Filing System, which sent notification of such filing to the following counsel:

**Mary Rose Alexander**
Latham & Watkins LLP
mary.rose.alexander@lw.com

**Thomas Armstrong**
von Briesen & Roper SC
tarmstro@vonbriesen.com

**Paul Bargren**
Foley & Lardner LLP
pbargren@foley.com

**Linda E. Benfield**
Foley & Lardner LLP
lbenfield@foley.com

**Dennis P. Birke**
DeWitt Ross & Stevens SC
db@dewittross.com

**Steven P. Bogart**
Reinhart Boerner Van Deuren SC
sbogart@reinhartlaw.com

**Michael P. Carlton**
von Briesen & Roper SC
mcarlton@vonbriesen.com

**Evan R. Chesler**
Cravath Swaine & Moore LLP
echesler@cravath.com

**Marc E. Davies**
Greenberg Traurig LLP
daviesm@gtlaw.com

**Brandon J. Evans**
Hermes Law Ltd.
bje@hermeslawltd.com

**S. Todd Farris**
Friebert Finerty & St. John SC
stf@ffsj.com

**Patrick J. Ferguson**
Latham & Watkins LLP
patrick.ferguson@lw.com

**Sandra C. Goldstein**
Cravath Swaine & Moore LLP
sgoldstein@cravath.com

**Thomas R. Gottshall**
Haynsworth Sinkler Boyd PA
lgantt@hsblawfirm.com

**Eric W. Ha**
Sidley Austin LLP
eha@sidley.com

**Scott W. Hansen**
Reinhart Boerner Van Deuren SC
shansen@reinhartlaw.com

**William H. Harbeck**
Quarles & Brady LLP
william.harbeck@quarles.com

**Michael L. Hermes**
Hermes Law Ltd.
mlh@hermeslawltd.com

**Cynthia R. Hirsch**
Wisconsin Department of Justice
hirschcr@doj.state.wi.us

**Caleb J. Holmes**
Greenberg Traurig LLP
holmesc@gtlaw.com

**Philip C. Hunsucker**
Hunsucker Goodstein & Nelson PC
phunsucker@hgnlaw.com

**Peter C. Karegeannes**
Quarles & Brady LLP
peter.karegeannes@quarles.com

**Gregory A. Krauss**
Gregory Krauss PllC
gkrauss@krausspllc.com

**Paul G. Kent**
Stafford Rosenbaum LLP
pkent@staffordlaw.com

**Ericka L. Krumrie**
Hermes Law Ltd
elk@hermeslawltd.com

**Linda R. Larson**
Marten Law PLLC
llarson@martenlaw.com

**Vanessa A. Lavely**
Cravath Swaine & Moore LLP
vlavely@cravath.com

**Susan E. Lovern**
von Briesen & Roper SC
slovern@vonbriesen.com

**Kevin J. Lyons**
Davis & Kuelthau SC
klyons@dkattorneys.com

**Karl S. Lytz**
Latham & Watkins LLP
karl.lytz@lw.com

**Meline G. MacCurdy**
Marten Law
mmaccurdy@martenlaw.com

**David G. Mandelbaum**
Greenberg Traurig LLP
mandelbaumd@gtlaw.com

**Bradley M. Marten**
Marten Law
bmarten@martenlaw.com

**Tara M. Mathison**
Davis & Kuelthau SC
tmathison@dkattorneys.com

**Darin P. McAtee**
Cravath Swaine & Moore LLP
dmcatee@cravath.com

**Stephen F. McKinney**
Haynsworth Sinkler Boyd PA
smckinney@hsblawfirm.com

**Heidi D. Melzer**
Hermes Law Ltd.
hdm@hermeslawltd.com

**Elizabeth K. Miles**
Davis & Kuelthau SC
emiles@dkattorneys.com

**Sabrina Mizrachi**
Greenberg Traurig LLP
mizrachis@gtlaw.com

**Monique M. Mooney**
Greenberg Traurig LLP
mooneym@gtlaw.com

**William J. Mulligan**
Davis & Kuelthau SC
wmulligan@dkattorneys.com

**Daniel C. Murray**
Johnson & Bell Ltd.
murrayd@jbltd.com

**Omid H. Nasab**
Cravath Swaine & Moore LLP
onasab@cravath.com

**Kelly J. Noyes**
von Briesen & Roper SC
knoyes@vonbriesen.com

**Nancy K. Peterson**
Quarles & Brady LLP
nancy.peterson@quarles.com

**Thomas M. Phillips**
Reinhart Boerner Van Deuren SC
tphillip@reinhartlaw.com

**Ian A.J. Pitz**
Michael Best & Friedrich LLP
iapitz@michaelbest.com

**David A. Rabbino**
Hunsucker Goodstein & Nelson PC
drabbino@hgnlaw.com

**Joan Radovich**
Sidley Austin LLP
jradovich@sidley.com

**Ronald R. Ragatz**
DeWitt Ross & Stevens SC
rrr@dewittross.com

**Alexandra Reeve Givens**
Cravath Swaine & Moore LLP
agivens@cravath.com

**Kathleen L. Roach**
Sidley Austin LLP
kroach@sidley.com

**Megan A. Senatori**
DeWitt Ross & Stevens SC
ms@dewittross.com

**Adam B. Silverman**
Greenberg Traurig LLP
silvermana@gtlaw.com

**Sarah A. Slack**
Foley & Lardner LLP
sslack@foley.com

**Margaret R. Sobota**
Sidley Austin LLP
msobota@sidley.com

**Anthony S. Wachewicz, III**
City of Green Bay
tonywa@ci.green-bay.wi.us

**James P. Walsh**
Appleton City Attorney
jim.walsh@appleton.org

**Ted A. Warpinski**
Friebert Finerty & St John SC
taw@ffsj.com

**Ted Waskowski**
Stafford Rosenbaum LLP
twaskowski@staffordlaw.com

**Evan B. Westerfield**
Sidley Austin LLP
evanwesterfield@sidley.com

**Richard C. Yde**
Stafford Rosenbaum LLP
ryde@staffordlaw.com

Dated:  September 12, 2012                    s/   *Maya S. Abela*_____