In the

# United States Court of Appeals

## For the Seventh Circuit

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

No. 12-2069

UNITED STATES OF AMERICA and
THE STATE OF WISCONSIN,

*Plaintiffs-Appellees,*

*v.*

NCR CORPORATION,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 10-C-910—**William C. Griesbach**, *Judge.*

ARGUED JUNE 4, 2012—DECIDED AUGUST 3, 2012

Before KANNE, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* This case involves just one chapter in a long-running set of efforts to clean up the Fox River in Wisconsin, after years during which various companies dumped PCBs (more formally, polychlorinated biphenyls) into its waters. Since at least the late 1990s, the United States Environmental Protection Agency (EPA) and the Wisconsin Department of Natural

Resources (WDNR) have been working to devise and implement an effective remedial plan for the River. One of companies that was designated as a "potentially responsible party (PRP)," and thus responsible for undertaking remedial work, was NCR Corporation. Acting pursuant to administrative orders, NCR has performed a significant amount of cleanup. It decided, however, in 2011 that it had done enough and announced that it was no longer going to comply with the relevant order. That is what prompted the present action by the United States and Wisconsin seeking a preliminary injunction compelling NCR to complete the remediation work scheduled for this year. The governing statute is the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9606(a). NCR opposed the injunction, arguing that the cleanup costs were capable of apportionment, and that when so apportioned, it was clear that NCR had already performed more than its share of the work. The district court evaluated the facts otherwise and issued the preliminary injunction.

NCR is presently complying with the injunction. We expedited this appeal, however, understanding that NCR is seeking to challenge its interim obligations, which have been imposed without a full trial on the merits. For the reasons that follow, we agree with the district court that NCR has not met its burden of showing that the harm caused by pollution in the Lower Fox River is capable of apportionment. We further find no abuse of discretion in the court's decision to issue the preliminary injunction, and so we affirm its order.

# I

Wisconsin is the country's leading producer of paper products, thanks to its abundance of forests and fresh water. As early as the 1890s, paper mills began operating on Wisconsin's many rivers. The densest concentration of those mills in Wisconsin—indeed, in the world—is found on the Lower Fox River, which begins at Lake Winnebago and runs for about 40 miles northeast until it discharges into Green Bay.

Paper manufacturing, unfortunately, has traditionally come at a high environmental price, in the form of serious water pollution. Wisconsin's vast industry has left the Lower Fox River heavily contaminated with PCBs. PCBs are toxic chemicals that remain highly stable in the environment for a long time and are known to cause a host of health problems, including birth defects and cancer, in both animals and humans. Many of the PCBs present in the Lower Fox River are attributable to the production of "carbonless" copy paper, which was developed by NCR in 1954. Between 1954 and 1971, NCR and other paper manufacturers produced and recycled this PCB-tainted paper, ultimately discharging an estimated 230,000 kilograms of PCBs into the Lower Fox River.

Starting in 1998, EPA and WDNR began investigating the contamination in order to develop a cleanup plan, in accordance with the EPA's power under CERCLA. See 42 U.S.C. § 9605; 40 C.F.R. § 300.430(f). After ample opportunity for public comment, EPA issued a final cleanup plan for the River in 2002. The plan proposed that cleanup of the River would proceed in several

phases, beginning with the portions of the River located upstream and ending with the portions that flow into Green Bay. The plan thus divided the River into five sections, which in bureaucratese were called operable units. Anywhere that the average concentration of PCB in the River exceeds 1.0 ppm (*i.e.*, parts per million) requires remediation, because EPA has determined that concentrations of PCB above this amount are hazardous to human health. Depending on the particular concentration of PCBs and river dynamics, the plan called for a combination of dredging (gathering and disposing of sediments) and capping (covering contaminated sediments) at various sites in each of the River's operable units.

Remediation is largely complete in the first three operable units. At issue in this appeal is the last section of the River, the fourth operable unit, which runs from the De Pere Dam to the mouth of Green Bay. (The fifth operable unit consists of portions of Green Bay contaminated with PCBs.) The parties further divide this fourth section into an upper and lower half, as shown in the Appendix to this opinion.

NCR admits that it is a liable party under CERCLA, because of PCB discharges from two plants located alongside the River's second operable unit. In November 2007, EPA issued a Unilateral Administrative Order pursuant to CERCLA § 106(a), 42 U.S.C. § 9606(a), directing NCR and other potentially responsible parties (a term of art under CERCLA, see 42 U.S.C. § 9607(a)) to implement the remedial plan in operable units two through five.

After EPA issued this order, NCR participated in—and even led—remediation efforts in operable units two and three, at a cost of approximately $50 million. It also performed some of the work required in the fourth unit: As of the end of 2011, NCR had completed about half of the dredging required in the upper half of unit four and twenty percent of that required in its lower half.

Throughout this time, however, NCR has maintained that it should not be responsible for 100% of the remediation work and has tried to recoup some of the cleanup costs from the other potentially responsible parties. In January 2008, NCR filed a suit for contribution in equity from the other paper plants. At the end of 2009, the district court denied NCR's claim for contribution. It did so because it found as a fact that NCR, and not the companies operating the other plants, had been aware of the significant risks of PCBs at an early date but had decided "to accept the risk of potential environmental harm in exchange for the financial benefits of continued (and increasing) sales of carbonless paper." *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL 5064049, at *14 (E.D. Wis. Dec. 16, 2009). In fact, the court's finding of NCR's culpability also led it to hold that NCR owed the other plants contribution for their expenses in cleaning the river. *Appleton Papers Inc. v. George A. Whiting Paper Co.*, 776 F. Supp. 2d 857, 867-70 (E.D. Wis. 2011). These decisions have not yet been appealed because the district court held a trial on the issue of arranger liability and a decision is still pending.

A few weeks after the district court's second adverse ruling in the contribution case, NCR notified EPA it would no longer comply with EPA's order because it had already done more than its share of the work. NCR cut its work in half during 2011, and then it refused to commit to perform any remediation work in 2012. In response, the United States filed a motion for a preliminary injunction to require NCR to complete the scheduled work. (In fact, the United States had also filed a motion for a preliminary injunction against NCR and another company, Appleton Paper Inc. (API), in 2011, but the district court denied that motion on the ground that the government was not likely to show that API was liable. API was then dismissed as a party from the current motion for a preliminary injunction. The scope of API's liability is thus not at issue in this appeal.) Although it would also be theoretically possible for the United States to complete the work itself, using money from the Superfund account, nothing compels it to use that option rather than seeking to compel responsible parties to do the work. Should NCR be found not to be responsible for the contested work after the trial on the merits, the district court will need to consider how to make it whole. We reserve that question for another day.

NCR's principal ground for contesting the propriety of the injunction was that its liability was less than the costs it had already incurred. Citing *Burlington Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 599 (2009), it argued that the harm to the Fox River is divisible and thus that the remediation costs should be apportioned

among all of the potentially responsible parties. The district court rejected this defense, holding that the harm to the site was not reasonably capable of apportionment, and in an order dated April 27, 2012, it issued the injunction. NCR immediately filed a notice of appeal, requesting expedited treatment and a stay of the injunction during the pendency of the appeal. This court granted expedited treatment but denied the motion for a stay. Remediation efforts are thus ongoing, in compliance with the district court's order.

## II

It is important to recall, for purposes of this interlocutory appeal under 28 U.S.C. § 1292(a)(1), that our role is only to review the district court's decision for abuse of discretion. To the extent that the district court based its decision on a question of law, our review is *de novo*; but we give deferential review to the district court's findings of fact. *Michigan v. U.S. Army Corps of Engrs.*, 667 F.3d 765, 769 (7th Cir. 2011). Plaintiffs seeking a preliminary injunction must establish that they are likely to succeed on the merits, they are likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in their favor, and issuing an injunction is in the public interest. *Id.* (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## A

We begin with the plaintiffs' likelihood of success, which turns on NCR's assertion that the harm to the Fox River

caused by the PCBs dumped into it over the years by a number of companies is divisible. If that is correct, then the follow-on question is how to apportion the costs of remediation among all responsible parties.

1

The "'universal starting point for divisibility of harm analysis in CERCLA cases' is § 433A of the Restatement (Second) of Torts." *Burlington Northern*, 556 U.S. at 614 (quoting *United States v. Hercules, Inc.*, 247 F.3d 706, 717 (8th Cir. 2001)). Under CERCLA, although Congress "imposed a 'strict liability standard,' it did not mandate 'joint and several' liability in every case." *Id.* (quoting *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 805 & 807 (S.D. Ohio 1983)). Thus, in general we must look to the common law to determine whether the harm in this case is divisible. And in particular, we are instructed by *Burlington Northern* to use the Restatement standard, which the Court adopted in that case, quoting the following language:

> [W]hen two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused. Restatement (Second) of Torts, §§ 443A, 881 (1976); Prosser, Law of Torts, pp. 313-14 (4th ed. 1971) . . . . But where two or more persons cause a single and indivisible harm, each is subject to liability

> for the entire harm. Restatement (Second) of Torts,
> § 875; Prosser, at 315-17.

*Id.* (ellipses in original).

This analysis proceeds in two steps. First, we must determine whether the harm at issue is theoretically "capable of apportionment." *Id.* The Restatement instructs that this is "a question of law, and is for the decision of the court in all cases." Restatement (Second) of Torts § 434, cmt. d. By that, we understand that the ultimate question is one that is allocated to the court for decision, but that as is often the case, there will be underlying findings of fact on which the court's decision will rest. For example, the district court will need to decide what type of pollution is at issue, who contributed to that pollution, how the pollutant presents itself in the environment after discharge, and similar questions. In reviewing the district court's findings of the facts that underlie the ultimate decision, our review, as noted previously, proceeds under the clear error standard. Second, if the harm is capable of apportionment, the fact-finder must determine how actually to apportion the damages, which is "a question of fact." *Id.* At all times, the burden remains on the party seeking apportionment—here NCR—to "prove[] that a reasonable basis for apportionment exists." *Burlington Northern*, 556 U.S. at 614.[1]

---

[1] The American Tort Reform Association as *amicus curiae* argues that we should follow the modern trend away from joint and several liability and reject joint and several liability across

(continued...)

2

We agree with the district court that NCR has not met its burden of showing that the harm in this case is capable of apportionment, although we reach this conclusion by taking a slightly different approach. We are guided by the commentary to Restatement § 433A(2) on the topic of the possibility (or impossibility) of apportionment. Apportionment is improper "where either cause would have been sufficient in itself to bring about the result, as in the case of merging fires which burn a building." *Id.* at cmt. i; see also Steve C. Gold, *Dis-Jointed? Several Approaches to Divisibility After* Burlington Northern, 11 VT. J. ENVT'L L. 307, 351 (2009) (examining cases and concluding that "at common law and under the Second Restatement, parties responsible for multiple sufficient causes of harm faced joint and several liability for the entire resulting harm"). We are convinced that the facts in this case are an example of

---

[1] (...continued)
the board. That, however, is a policy argument best directed to Congress. The Supreme Court has told us in *Burlington Northern* to adopt the apportionment principles of the Restatement (Second) of Torts, and that is the end of it for a lower court. Even if we were to look more closely at modern state trends, it is notable that some of the states that have moved away from joint and several liability for general torts specifically retain it in the context of pollution. See Restatement (Third) of Torts §17, at 154 (1999) (citing Alaska, Idaho, and Nevada rules retaining joint and several liability for claims involving hazardous or toxic substances).

just this kind of multiple sufficient causes of an environmental harm.

NCR's expert, Dr. Connolly, testified that NCR's discharge of PCBs into the Lower Fox River in the second operable unit (that is, upstream) contributed about 9% of the PCBs in the fourth operable unit's upper half (further from Green Bay), and 6% of the PCBs in the lower half (closer to Green Bay). We will assume for the sake of this analysis that those figures are correct. But it does not necessarily follow that NCR is responsible for only 9% or 6% of the cleanup costs. Even if all that were present in the river were NCR's contributions, the Lower Fox River would still need to be dredged and capped, because EPA has set a maximum safety threshold of 1.0 ppm of PCB. Anything above that amount is dangerous to human life and requires remediation. The government offered unrefuted expert testimony from Richard Fox that "[e]ven in the absence of inputs of PCBs from [other] Operable Unit 4 sources, remediation would likely still be required in certain areas of Operable Unit 4 at the 1.0 ppm" level. App. 460 (Fox Declaration at 4). The district court credited Fox's testimony, noting that Fox's analysis showed that "[a] cubic yard of sediment costs the same to dredge or cap whether it contains 10 ppm or 100 ppm." Although the district court was focused on the cost of dredging (and NCR argues passionately that cost of remediation is a bad surrogate for harm inflicted), the court's analysis necessarily recognizes that a cubic yard of sediment would need to be dredged whether it contained 10 ppm or 100 ppm, because that cubic yard of sediment contains PCBs above the maximum threshold.

NCR did not put forth any evidence to refute the government's contention that NCR's contributions of PCB would, alone, require approximately the same remedial measures. In fact, the models used by NCR's own expert failed to take into account the threshold-triggering aspect of PCB remediation. When asked by the government how NCR's model would assign liability between polluter A, who deposited 3 ppm, and polluter B, who deposited 30 ppm, NCR's expert testified that the model would assign 10% liability to polluter A and 90% liability to polluter B. App. 46-47 (Simon testimony). But under the Restatement, both polluters are liable because either discharge of PCB was sufficient to create a condition that is hazardous to human health under EPA guidelines.

There was some evidence presented to the court that the dredging costs would be lower if less PCBs were present, because disposal procedures for sediment that is extremely contaminated are more costly. But this point was not developed adequately; indeed, to the extent that it was, it tends to favor the government. As the district court explained, "[t]he overwhelming point is that the expense of cleaning up the Lower Fox River is only weakly correlated with the mass of PCBs discharged by the parties." Put another way, the need for cleanup triggered by the presence of a harmful level of PCBs in the River is not linearly correlated to the amount of PCBs that each paper mill discharged. Instead, once the PCBs rise above a threshold level, their presence is harmful and the River must be cleaned. The details of that cleanup may vary depending on exactly how

much PCB is present, but not in any way that suggests that the underlying harm caused—the creation of a hazardous, polluted condition—is divisible.

### 3

The district court reached the same conclusion taking a slightly different approach. It began by trying to determine how to define the "harm" caused by PCB pollution in this case. It considered three different definitions of "harm": harm as measured by remediation costs imposed by the pollution, harm as measured by danger to the public, and harm as measured by the amount of pollution in the sediment. The court concluded that the harm was not divisible because the amount of PCBs deposited by NCR was not well correlated with the amount of harm under any of these approaches.

On appeal, NCR largely attacks the district court's reliance on remediation cost as a measure of harm, even though that was not the district court's only holding. NCR argues that remediation cost is an inappropriate way to measure the harm caused by PCBs, because other courts and the Restatement examples focus on the level of pollution and contamination as a measure of the harm.

We agree with NCR that cleanup costs, on their own, are not exactly equal to harm. Cleanup costs reflect the damage caused by the pollution. But we are not persuaded that taking into account remediation costs to *approximate* harm caused by pollution is so far off the mark. If EPA has determined that the harm from

leaving a certain pollutant in the environment exceeds the costs required to clean up that pollutant, then under standard cost-benefit analysis we might think of cleanup costs as setting a lower bound for an approximation of the amount of harm. If other assessments of injury show that the costs of cleanup significantly exceed the expected benefits, that would require further investigation. Here, however, the district court did look beyond costs, indicating that it did not rely on an untested assumption that the government would never miss the mark with its cost-benefit assessments.

NCR argues that the Ninth Circuit has flatly rejected using cost as a measure of harm, but we read its decision differently. *Burlington Northern*, 520 F.3d 918, 939 (9th Cir. 2008). (This is the case that the Supreme Court later took; it reversed the Ninth Circuit's conclusion that the district court's allocation calculation was not accurate enough, but it did not comment on the Ninth Circuit's assessments of how "harm" should be measured.) In fact, that court recognized that costs can be used as evidence of harm in certain cases, holding that the harm in CERCLA cases should be defined as "the contamination traceable to each defendant." *Burlington Northern*, 520 F.3d at 939. It then explained that the

> cost of cleanup of different toxic substances or in different areas of the facility will often be a useful measure of the proportion of the pertinent contamination allocable to each defendant. . . . [T]he 'harm' allocation analysis may in some instances usefully focus initially on the proportion of costs associ-

ated with remedying various aspects of the contam-
ination.

*Id.* at 939 n.25. We agree with the Ninth Circuit that
"contamination traceable to each defendant" is a proper
measure of the harm, and our analysis above is con-
sistent with that definition. But how to define "contamina-
tion" will not always be such a simple question, because
in many cases the level of contamination will depend
on a variety of facts about the type of contaminant and
site at issue. Here, for instance, contamination occurs
whenever PCBs pass a threshold level (thereby trig-
gering remedial requirements).

   In other cases in which the facts are simple, and "it is
reasonable to assume that the respective harm done by
each of the defendants is proportionate to the volume
of [contaminant] each discharged into the environment,"
*Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 903 (5th
Cir. 1993), then a court might be able to measure harm
based simply on the volume of contaminant. But for
more complicated situations like this one, in which a
chemical is harmful when it surpasses a certain amount,
or instances in which a chemical may not be very
harmful but becomes so when mixed with other
chemicals, it will not suffice to look solely at the amount
of contamination present in order to estimate the harm.
See also *United States v. Monsanto Co.*, 858 F.2d 160, 173
n. 27 (4th Cir. 1988) ("Volumetric contributions provide
a reasonable basis for apportioning liability only if it
can be reasonably assumed, or it has been demonstrated,
that independent factors had no substantial effect on the
harm to the environment."). Like the Ninth Circuit,

we believe that cleanup costs may sometimes be a relevant factor for courts to use to determine the level of contamination, and thus the level of harm, caused by each polluter.

The Restatement's various examples of pollution-related torts do not undermine this analysis. NCR points to a Restatement example that says harms are divisible when two people put oil in a stream and the oil prevents a downstream factory from using the water:

> 5. Oil is negligently discharged from two factories, owned by A and B, onto the surface of a stream. As a result C, a lower riparian owner, is deprived of the use of the water for his own industrial purposes. There is evidence that 70 per cent of the oil has come from A's factory, and 30 per cent from B's. On the basis of this evidence, A may be held liable for 70 per cent of C's damages, and B liable for 30 per cent. Contrast Illustrations 14 and 15.

Restatement (Second) of Torts § 433A, illustration 5. But the Restatement also gives examples of two companies that put oil in a stream, after which a fire breaks out or cows drink the water and die, as examples of indivisible harms:

> 14. A Company and B Company each negligently discharge oil into a stream. The oil floats on the surface and is ignited by a spark from an unknown source. The fire spreads to C's barn, and burns it down. C may recover a judgment for the full amount of his damages against A Company, or B Company, or both of them.

15. The same facts as in Illustration 14, except that C's cattle drink the water of the stream, are poisoned by the oil and die. The same result.

*Id.*, illustrations 14 and 15.

These examples show that there is not necessarily one universal way that we should approach apportionment in pollution cases. Instead, apportionment will vary depending on how the harm that flows from pollution is characterized. In Illustration 5, there is a single harm to the downstream user—the need to find an alternative source of water—while in Illustrations 14 and 15 the ultimate harms are more difficult to trace to the original polluters. In the latter Illustrations, just as in the present case, it is impossible to draw a logical connection between the amount of oil each company discharged into the stream and the ultimate injury. Or at least the district court could reasonably find, based on the expert evidence that was in the record. Our own conclusion is the same as the district court's: were we choosing among Restatement examples, we find this case to be closer to Illustrations 14 and 15 than to 5. The problem here is not that downstream factories were prevented from using the Fox River for some period, but that wholly apart from water usage, a toxic chemical in the water causes significant and widespread health problems in both animals and in humans.

4

NCR's final point is that the district court's approach is inconsistent with the Supreme Court's decision in

*Burlington Northern*. In *Burlington Northern*, however, the parties agreed that apportionment was theoretically possible, and thus the Court never addressed the question at issue in this case. See 556 U.S. at 615. The Court instead addressed only the second question, regarding the evidence necessary to make an apportionment calculation. We agree with NCR that this aspect of *Burlington Northern* demonstrates that apportionment calculations need not be precise. To the contrary, the Court upheld a district court's rather rough, *sua sponte* calculation of apportionment. 556 U.S. at 617-18.

But we do not agree with NCR that lower courts must always take such an approach. Such a rule would in essence replace an evidence-based apportionment calculation with a rougher appeal to equity. *Burlington Northern* was very careful to distinguish apportionment from contribution: "[A]pportionment . . . looks to whether defendants may avoid joint and several liability by establishing a fixed amount of damage for which they are liable, while contribution actions allow jointly and severally liable PRPs to recover from each other on the basis of equitable considerations." *Id.* at 615 n.9. The Court emphasized that "[e]quitable considerations play no role in the apportionment analysis; rather, apportionment is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs." *Id.*

*Burlington Northern* said nothing at all about fact patterns like the one presented by this case, in which multiple entities independently contribute amounts of pollutants sufficient to require remediation. In *Burlington Northern*,

one party had "contributed to no more than 10% of the
total site contamination, some of which did not require
remediation." *Id.* at 617. The Court noted that "[w]ith
these background facts in mind" the district court's
apportionment calculation was appropriate. *Id.* Here,
in contrast, even if NCR contributed no more than 10%
of the PCBs, that 10% would require remediation. It was
NCR's burden to show otherwise, and it failed to do so.

### B

As for the remaining three preliminary injunction
factors, we agree with the district court's analysis. The
district court held that a delay in the Fox River cleanup
would inflict irreparable harm in the form of permitting
pollution to continue unabated, which would cause
the further spread of PCBs into fish, and thence into
humans who eat fish. Studies show that people continue
to eat some fish from the River despite government
warnings about the presence of PCBs. Successful
remediation in previous sections of the River has
resulted in a reduction in the concentration of PCBs in
fish by 73%. In addition, permitting PCBs to remain in
the water allows them to continue to flow into Green
Bay and ultimately Lake Michigan. Once in the bay and
the Lake, the problem becomes irreparable, as there are
not any effective methods of cleaning PCBs from such
deep bodies of water. Preventing these injuries is in the
public interest, and thus the district court concluded
that issuing an injunction was in the public interest.

Finally, the district court concluded that "the equities
favor issuance of an injunction as soon as possible

because the harm to the public outweighs any potential harm to NCR." A district court's "balancing of harms is a highly discretionary matter and therefore one to which this court must give substantial deference." *Washington v. Indiana High Sch. Ath. Ass'n, Inc.*, 181 F.3d 840, 845 (7th Cir. 1999). We agree with the district court that the balance of the equities favors issuing an injunction.

NCR's primary appeal to equity rests on its assertion that it should not have to bear the costs of the cleanup before it is determined to be liable on the merits. It argues that its ability to recoup costs from other potentially responsible parties will be slim given the fact that others have settled with the government, and given the district court's existing (but as of yet, unreviewed) rulings that NCR is not entitled to contribution. But we believe none of these contentions counsels against issuing an injunction at this stage; there will be time enough later to sort out the various parties' liabilities. At this stage, anything we might say about how that liability might be apportioned (or equitably redistributed) would be entirely speculative. For example, while section 113(f) of CERCLA, 42 U.S.C. § 9613(f), provides for a contribution action in order for potentially responsible parties to sort out among one another after remediation costs are incurred who should pay, see *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 657 (6th Cir. 2000), the same statute provides that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." § 113(f)(2); 42 U.S.C.

§ 9613(f)(2). NCR is thus correct that it cannot seek contribution from parties that have settled. But settlements do reduce the potential liability of *non*settling parties by the amount of the settlement. *Id.*

NCR has not taken into account another part of the statute, section 107(a), 42 U.S.C. § 9607(a), which provides a claim for cost recovery under certain circumstances. In *United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007), the Supreme Court held that "§§ 107(a) and 113(f) provide two 'clearly distinct' remedies." *Id.* at 138. Section 113 actions for contribution are available only to parties that have been the subject of government enforcement action under CERCLA. *Id.* & n.5; see also *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 160-61 (2004). Section 107 cost recovery, in contrast, may be sought by a potentially responsible party that has not yet been the subject of any government enforcement action or admitted liability. *Atlantic Research*, 551 U.S. at 139.

*Atlantic Research* commented on the overlap between the two sections and held that a party is limited to § 113 if it wishes to obtain money it paid "to satisfy a settlement agreement or a court judgment," because "by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a)." *Id.* The Court went on to note, however, that there may not be a stark division between § 113 and § 107 in all cases, such as when a responsible party sues to recover expenses sustained "pursuant to a consent decree following a suit under § 106

or § 107(a)." *Id.* at 139 n.6. As noted earlier, NCR has been incurring cleanup costs pursuant to such a consent decree. "In such a case, the PRP does not incur costs voluntarily but does not reimburse the costs of another party. We do not decide whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both. For our purposes, it suffices to demonstrate that costs incurred voluntarily are recoverable only by way of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f)." *Id.*

The Supreme Court has thus left some aspects of this issue up in the air. We recognize that in the course of NCR's contribution actions, the district court here has concluded that section 107(a) is unavailable to NCR, for the simple reason that section 113(f) appears to be available: it thought that these were mutually exclusive remedies. But the Supreme Court, in the passage just quoted, intimated that the two statutes may not always be mutually exclusive. The Second Circuit has concluded that parties that incurred costs following a consent order may seek cost recovery under section 107(a). *W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.,* 559 F.3d 85, 89 (2d Cir. 2009). The Eleventh and Eighth Circuits appear to have come out the other way. *Solutia, Inc. v. McWane, Inc.,* 672 F.3d 1230 (11th Cir. 2012); *Morrison Enters., LLC v. Dravo Corp.,* 638 F.3d 594, 603 (8th Cir. 2011).

All of this is too uncertain to drive the result in the present case. If and when the time comes, NCR will be

free to explore whatever possibilities may still be available to it for either contribution or cost recovery. What is available will of course depend in part on any appeal that it might take from the district court's order on this subject—a topic that is not before us at this time. For now, we conclude that it is an open question whether, and if at all to what extent, NCR might be able in future legal proceedings to recoup any costs it should not have paid. Thus, the district court's weighing of the equities did not amount to an abuse of discretion. Its preliminary injunction requiring NCR to complete the specified 2012 remediation work is therefore AFFIRMED.

## Appendix



8-3-12