IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF WISCONSIN, | ) ) ) |
| Plaintiffs, | ) ) Civil Action No. 10-C-910 |
| v. | ) ) Hon. William C. Griesbach |
| NCR CORPORATION, *et al.*, | ) ) |
| Defendants. | ) ) |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE
PROPRIETY OF THE REMEDY SOUGHT TO BE ENFORCED
IN THE FIFTH CLAIM FOR RELIEF**

# INTRODUCTION

Plaintiffs moved the Court for summary judgment on the propriety of the remedy selected by EPA and WDNR (the "Agencies"), which Plaintiffs seek to enforce in the Fifth Claim for Relief. Defendants have combined their oppositions with several cross-motions for summary judgment. The Court has expressed particular interest in reviewing "the *process* EPA used in issuing its 2010 Explanation of Significant Differences" (Dkt. 522 at 2 (emphasis in original)), so this brief focuses on NCR's challenge to the Agencies' decision to document the increase in estimated remedy costs through that Explanation of Significant Differences ("ESD") rather than a Record of Decision ("ROD") amendment. The other defendants, by and large, challenge the selected remedy on minor technical issues lying at the heart of the Agencies' informed discretion. With good reason, the Court has disclaimed any interest in "second-guessing the science underlying the governments' decisions." Dkt. 522 at 2. The Plaintiffs will therefore respond to the other Defendants' remedy challenges primarily in their forthcoming brief in opposition to the Defendants' cross-motions. The Plaintiffs will file and serve their responses to Defendants' statements of additional facts at the same time.[1]

NCR's opposition and cross-motion argue that EPA and WDNR violated the NCP by addressing the 2010 increase in estimated remedy costs through an ESD rather than a ROD amendment. Dkt. 535. NCR's arguments have no merit. Its argument that the amount of the cost increase alone compelled the Agencies to issue a ROD amendment is contrary to the plain language of the NCP, and finds no support in EPA guidance or case law. NCR sought and was granted the ability to offer evidence on this issue from a particular expert, Jeffrey Zelikson, but

---

[1] In addition to challenging matters that lie at the heart of the Agencies' sound and informed discretion, and are thus entitled to substantial deference by this Court, Certain Defendants' arguments also fail to meet the governing legal standard. Instead of identifying alleged inconsistencies between the Agencies' actions and specific provisions of the National Contingency Plan ("NCP"), they argue that certain judgments by the Agencies were generally "arbitrary and capricious" or generally "fail the test of Section 113(j)(2)." Even setting aside questions of judicial deference and the governing law, these challenges have no merit – on their technical basis alone they are simply incorrect.

Mr. Zelikson could not defend his opinions in his recent deposition. Further, there is no merit to NCR's argument that the 2010 ESD and its associated Criteria Analysis Memorandum ("CAM") did not provide adequate analysis to substantively support the Agencies' decision that the 2007 ROD Amendment remedy remained cost-effective and the preferred remedy for the Site. The 2010 ESD and CAM plainly provide ample explanation and analysis for the Agencies' determination. Finally, NCR's argument that the Agencies' would have selected a different remedy had they issued a ROD amendment instead of an ESD is supported only by Mr. Zelikson's half-baked speculation. This argument also fails. The Plaintiffs' motion for summary judgment on the propriety of the remedy should be granted.

## LEGAL STANDARD

NCR contends that there are two standards of judicial review of agency action – a deferential standard of review for agency technical decisions, and a "searching and careful" standard of review for alleged agency failures to follow procedure. Dkt. 535 at 11-14. NCR's argument, however, completely glosses over the well-established and guiding principle that an agency is entitled to deference in its reasonable interpretations of its own regulations. It is this principle that guides the Court's review of EPA and WDNR's decision to address the 2010 increase in estimated remedy costs through an ESD.

The NCP provides two distinct procedures for addressing post-ROD remedy changes, one for changes that are "significant," and another for changes that are "fundamental" –

> if the remedial action . . . differs significantly from the remedy selected in the ROD with respect to scope, performance, or cost, the lead agency . . . shall either: (i) Publish an explanation of significant differences when the differences in the remedial or enforcement action . . . *significantly change but do not fundamentally alter* the remedy selected in the ROD with respect to scope, performance, or cost . . . ; *or* (ii) Propose an amendment to the ROD if the differences in the remedial or enforcement action . . . *fundamentally alter the basic features* of the selected remedy with respect to scope, performance, or cost . . . .

40 C.F.R. § 300.435(c)(2)(i)-(ii) (emphasis added).

2

The NCP does not attempt to define the difference between "significant" or "fundamental," nor is it clear it would be possible to do so, as the determination whether a remedy change is "significant" or "fundamental" will depend on the particular facts in each case. Thus, in determining which procedure is appropriate, the agency must necessarily interpret its own regulations to reach a conclusion whether the proposed change in the remedy is significant or fundamental. Because the Agencies' decision to address the 2010 increase in estimated remedy costs through an ESD represented an exercise of agency discretion based on EPA's interpretation of its own regulation, that decision is entitled to deference from this Court.

Indeed, the Court has recognized this standard previously in this litigation, holding that "EPA is afforded substantial deference in construing its own regulations." *United States v. NCR Corp.*, No. 10-C-910, 2011 WL 2634262, at *8 (E.D. Wis. July 5, 2011) (Dkt. 172 at 13). Other courts are in agreement on this well-established point. *Abraham Lincoln Mem'l Hosp. v. Sibelius*, No. 11-2809, 2012 WL 4875355, at *15 (7th Cir. Oct. 16, 2012) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000).

Further, CERCLA Section 113(j)(4) provides that "in reviewing alleged *procedural errors*, the court may disallow costs or damages *only* if the errors were *so serious* and *related to matters of such central relevance* to the action that the *action would have been significantly changed* had such errors not been made." 42 U.S.C. § 9613(j)(4) (emphasis added). The relevance of this standard is discussed below. *See* Section C.

## ARGUMENT

### A. The 2010 ESD Was Procedurally Appropriate to Document the 2010 Estimated Cost Increase.

NCR argues that the Agencies violated the procedural requirements of 40 C.F.R. § 300.435(c)(2) when they issued an ESD to address the 2010 increase in estimated remedy

3

costs.[2] Dkt. 535 at 14-22. This argument is without merit and the Court's initial sense of the situation here was indeed accurate – "[g]iven the deference owed to such determinations, I conclude that the government has a strong likelihood of succeeding in showing that it *followed proper procedures in making the proposed changes*." Dkt. 172 at 14-15 (emphasis added).

### 1. Cost increase alone does not compel a ROD amendment.

NCR argues that the size of the 2010 increase in estimated remedy costs required the Agencies to go through the ROD amendment process.[3] Dkt. 535 at 14-17. This argument is incorrect. First, a cost increase alone does not necessarily compel EPA to issue a ROD amendment – the NCP expressly provides that the agency may issue an ESD where the differences significantly change the remedy "with respect to . . . costs." 40 C.F.R. § 300.435(c)(2)(i).

Second, EPA's preamble to the NCP provides that an ESD is appropriate where the post-ROD changes "would affect a basic feature of the remedy, such as timing or cost, but not fundamentally alter the remedy specified in the ROD *(i.e., change the selected technology)*." 55 Fed. Reg. 8666, 8772 (March 8, 1990) (emphasis added).[4] An additional example in the NCP preamble provides: "when sampling during the remedial design phase indicates the need to *increase the volume of waste material to be removed and incinerated by 50 percent, requiring an increase in cost, in order to meet remediation goals. This increase in the scope of the action represents a significant change and requires an ESD.*" *Id.* Thus, 40 C.F.R. § 300.435(c)(2) and

---

[2] NCR's repeated insistence on the importance of added public and PRP participation, which is not required by the NCP for an ESD, is frankly suspect considering the remedy it would seek to crack open with a ROD amendment is the remedy NCR and Georgia-Pacific themselves proposed to the Agencies in the 2006 Basis of Design Report.

[3] The most current cost estimates for the hybrid Optimized Remedy being implemented at the Site total approximately $647 million (in 2012 dollars), so the absolute amount of cost estimate increase at the heart of this dispute is now in fact $54 million *less* than as presented in the 2010 ESD. Dkt. 439-10 at 12.

[4] The case law recognizes that the preamble to a regulation is instructive about its meaning. *Seneca Oil Co. v. Dep't of Energy*, 712 F.2d 1384, 1397 (Em. App. 1983); *see also Martin v. Am. Cyanamid Co.*, 5 F.3d 140, 144 (6th Cir. 1993).

4

the preamble to the NCP expressly authorize the agency to address major cost increases through an ESD.

NCR's argument boils down to the claim that, although 40 C.F.R. § 300.435(c)(2) and the NCP preamble *expressly authorize* an ESD for cost increases, when an estimated cost increase reaches 62%, the NCP requires a ROD amendment be issued. There is no support for this claim, and a ruling to this effect here would represent an unwarranted intrusion into agency discretion. Put another way, while EPA can elect to document a cost change in a ROD amendment, there is no rule that it must do so in every case, and no reason to think it must do so here.

Finally, the sole case upon which NCR relies for the proposition that a major cost increase "requires" EPA to issue a ROD amendment does not so hold. In *United States v. Burlington Northern Railroad Co.*, the ROD remedy required impoundment sludge from the site to be shipped to a permitted recycler and treated, and the ROD had "specifically rejected the idea of off-site incineration of the impoundment sludge." 200 F.3d 679, 693 (10th Cir. 1999). When problems with the recycling approach cropped up, EPA instead decided to incinerate over half the impoundment sludge, at a significant additional cost, without taking *any* action to document the change in accordance with the NCP. Under those circumstances, the Tenth Circuit affirmed the district court's finding that that EPA had erred in changing the remedy without a ROD amendment because "the remedy was altered fundamentally with respect to *scope and cost*." *Id.* at 694 (emphasis added). Unlike in *Burlington Northern*, EPA documented the change here using the process prescribed by the NCP. But there was no change to the remedy's scope or technological approach, so the change in cost alone was appropriately documented in an ESD.

## 2. The Agencies' actions in publishing the 2010 ESD were not inconsistent with actions taken in the 2007 ROD Amendment.

NCR argues that the Agencies' actions in 2007 demonstrated that the 2010 increase in estimated remedy costs represented a fundamental alteration of the remedy. In fact, the 2007 changes to the remedy were dramatically more extensive than the increased cost estimate the Agencies reported in 2010. In 2007, following additional pre-design sampling work, Defendants NCR and Georgia-Pacific formally proposed in their 2006 Basis of Design Report ("BODR") a hybrid "Optimized Remedy" that incorporated a combination of dredging, capping, and sand covering. *See* Dkt. 509 at 25; Dkt. 439-7 at 2-9. These proposed changes to the remedy envisioned by the 2006 BODR were to overhaul the all-dredging remedy selected by the 2003 ROD and implement a hybrid remedy that required fundamentally different remedial work at the Site, including capping and sand covering – technologies that were *not part* of the remedy previously selected in 2003 ROD. Dkt. 439-7 at 2-9; *see* Dkt. 404-3 at 11. The 2006 BODR also increased the cost estimate for the original 2003 ROD remedy to nearly $580 million and estimated the cost of the Optimized Remedy at about $390 million (in 2005 dollars). Dkt. 439-7 at 8, 26-35.

The Agencies properly determined that changing the 2003 ROD remedy as proposed by NCR and Georgia-Pacific in the 2006 BODR would require fundamental changes to the *basic features* of that remedy, and thus undertook a ROD amendment in 2007. Dkt. 404-3 at 18-19. It is particularly telling that in explaining their decision to amend the 2003 ROD in the 2007 ROD Amendment, the Agencies identified six points of "new data and analyses in the BODR" on which they based their determination that a ROD amendment was appropriate under the circumstances. Dkt. 404-3 at 7-8. None pertained to costs of the remedy. *Id.* Thus, the multiple changes to the nature of the remedial work proposed in the 2006 BODR that led to the Agencies undertaking a ROD amendment in 2007 were completely different from the cost estimate change

6

that led to the Agencies publishing the ESD in 2010. The Agencies' evaluation of these proposed changes and their relative magnitude, and the decisions made as to the appropriate procedure to follow under the circumstances, are entitled to deference.

### 3. Mr. Zelikson's conclusory opinion that the cost increase was a "fundamental change" is neither credible nor helpful.

NCR relies heavily on the written opinions of Mr. Zelikson to support its argument that the Agencies should have issued a ROD amendment rather than an ESD in 2010. To prop up its tautology that the cost increase was "fundamental" because it was "gigantic," NCR cites to Mr. Zelikson's evaluation of cost increases at several Superfund "mega-sites" and his conclusion that the cost increase documented in the 2010 ESD was "five times the total cleanup cost of the 'average' Superfund 'mega-site.'" Dkt. 535 at 11, 15. Not only is this is an empty comparison, as cost increases at one Superfund site are simply not relevant to those at another, but Mr. Zelikson also admitted in his deposition that he was wrong on this conclusion.[5] Dkt. 563-1 at 52:11-13, 53:15-19; Dkt. 501-1 at 12.

Mr. Zelikson's conclusory opinion that the cost increase could only be interpreted as a "fundamental change" utterly lacks authority because he admitted he couldn't recall even deciding whether to issue an ESD as opposed to a ROD amendment during his tenure at EPA.[6] Dkt. 501-1 at 13; Dkt. 563-1 at 66:19-25, 67:1-2. Moreover, his view is inconsistent with EPA guidance that he claims to have considered in forming his opinions; the guidance identifies particular factors the agency should consider in deciding whether to issue an ESD or ROD

---

[5] The other comparison-based justifications provided by Mr. Zelikson in his report are similarly empty, as they arbitrarily compare cost increases at Superfund sites during the FY 1996 -1999 period. *See* Dkt. 501-1 at 10.

[6] "Q: When you were at EPA, did you ever make a decision to issue an ESD as opposed to an amended ROD?
A: I don't remember actually.
Q: Do you remember ever issuing an ESD?
A: I don't recall. I don't. I just don't.
Q: Do you remember ever issuing an amended ROD?
A: I think so, yes. I couldn't tell you on what site but that sounds more familiar to me but I'm not sure."

7

amendment, such as whether the change – in this case, the change in cost – alters the type of waste being remediated or the remediation goals. Dkt. 563-2 at 4. In his deposition, Mr. Zelikson conceded that the cost increase either did not affect these factors or he did not know whether the change affected the factors. Dkt. 563-1 at 134:10-135:8. Notwithstanding his admission, Mr. Zelikson maintains that EPA should have performed a ROD amendment, although the relevant factors clearly tip in the opposite direction.

### 4. The Agencies' decision to publish an ESD was consistent with EPA policy.

NCR argues that EPA's issuance of an ESD to document the 2010 increase in estimated remedy costs was a departure from EPA policy. Dkt. 535 at 19. This is not the case. The 2010 ESD notes that EPA cost estimate guidance provides an expected accuracy range of the cost estimate for the "Detailed Analysis of Alternatives / Conceptual Design" stage of -30% to +50%. Dkt. 147-1 at 15. As the Court understands, this was cited to explain that the 62% increase was nearly within the expected "uncertainty factor" range for cost estimates at similar design stages, and thus was not as drastic as it might otherwise sound. *See* Dkt. 172 at 14.

NCR claims that EPA picked the wrong percentage range and that the relevant range instead was -10% to +15%, which applies to expected cost estimate accuracy at the "Final Design" stage. Dkt. 535 at 17-20. This claim is simply wrong and Mr. Zelikson has now admitted that it is wrong.[7] The 62% increase assessed in the ESD is based on a comparison of cost estimates by NCR's contractors in the 2006 BODR to revised cost estimates by NCR's contractors in 2009. At the time of the 2007 ROD Amendment, when EPA adopted the "Optimized Remedy" for OUs 2-5 proposed in the 2006 BODR, EPA also adopted the cost

---

[7] Mr. Zelikson tendered this erroneous opinion in his expert report but recanted it in his deposition, admitting that EPA was in fact *not* at the final design stage, and that therefore the -10% to +15% range was not the correct range to use. Dkt. 501-1 at 12-13; Dkt. 563-1 at 73:19-24 ("I did not account for these other subsequent design reports which would have if we had the final design would have made it absolutely clear that it was plus 15 minus 10 and that we're not at that point. You win that point.")

8

estimate of $390 million exactly "as presented in the BODR." Dkt. 404-3 at 26; *see* Dkt. 509 at 27. As stated in its opening sentence, the BODR's main purpose was to summarize "the results of the *pre-design investigatio*n of . . . Operable Units 2 through 5." Dkt. 439-7 at 2. After the BODR and the 2007 ROD Amendment were issued, 30%, 60%, and 90% Design Reports were *subsequently* developed that further advanced the remedy design for the Site. *See* Dkt. 439-6 at 33-40; Dkt. 563-1 at 74:5-13. NCR is simply wrong to claim that the design work was "advanced" in 2007. Dkt. 535 at 19. Because the 2006 BODR and 2007 ROD Amendment were prepared at a very early stage of the remedial design process, the expected uncertainty range for the 2007 cost estimate was roughly -30% to +50% (as explained in ESD (Dkt. 147-1 at 15)), not -10% to +15% (as argued by NCR (Dkt. 535 at 18-20)).

This Court has already discussed this precise issue regarding the relative scope of the 62% cost increase documented in the 2010 ESD:

> In the outside world, a 62% increase in cost projections is exceptionally large, but that is not necessarily true here. In its ESD, the EPA explained…that cost estimates have an expected accuracy range of -30% to +50% – in other words, a large built-in uncertainty factor. Because the +62% increase was close to the actual expected range, the additional 12% above the uncertainty factor was relatively minor.

Dkt. 172 at 14. As shown above, the -30% to +50% uncertainty range was the appropriate range to use for comparison of the prior cost estimates in the 2010 ESD, and thus an estimate 12% above that expected uncertainty range was indeed relatively minor.

### B. The 2010 ESD and CAM Are Substantively Sufficient to Support the Agencies' Determination that the 2007 ROD Amendment Remedy Was Cost-Effective and Remained the Preferred Remedy for the Site.

Not only was an ESD the appropriate procedure under the NCP for addressing the increase in estimated remedy costs, the analysis documented in the 2010 ESD and accompanying CAM is sufficient to support the Agencies' determination that the 2007 ROD Amendment remedy remained cost-effective and the preferred remedy despite the cost increase. NCR's

9

criticism of the Agencies' substantive analysis in the 2010 ESD and CAM centers on attacking the cost effectiveness analysis (mainly arguing that capping was not adequately re-considered as an alternative) and claiming that the Agencies provided inconsistent statements about capping to skew the analysis in favor of the 2007 ROD Amendment remedy. Both of these allegations are false.

### 1. The Agencies' analysis of remedy cost-effectiveness comported with the requirements of the NCP.

NCR claims that the NCP requires a remedy to be "cost-effective" and that the 2010 ESD and CAM "failed to include any meaningful analysis of the cost effectiveness of the selected remedy." Dkt. 535 at 22. NCR supports this claim by advancing Mr. Zelikson's opinion that the Agencies "did not adequately consider all the relevant factors,[8] particularly the cost-effectiveness factor." *See* Dkt. 535 at 24. The NCP states that cost-effectiveness is to be determined by comparing "overall effectiveness" of the remedy to its cost. 40 C.F.R. § 300.430(f)(1)(ii)(D). A cost-effective remedy is also defined: a "remedy shall be cost-effective if its costs are proportional to its overall effectiveness." *Id.* Thus, the cost-effectiveness of a remedy is a balance between the remedy's overall effectiveness and its cost.

The CAM specifically stated that the "long-term effectiveness and permanence" and "cost" remedy selection criteria would be important to re-evaluate given the cost estimate increase described in the 2010 ESD, and specifically examined these criteria in light of the increase. Dkt. 147-2 at 4-6. Following this evaluation and comparison of the various degrees of overall effectiveness of three remedies (dredging, hybrid, capping) against their costs, the Agencies concluded that the 2007 ROD Amendment hybrid remedy remained the "most cost-effective alternative because it balances and combines the long-term effectiveness and

---

[8] It is important to point out that the other "relevant factors" refer to the nine remedy selection criteria Mr. Zelikson believed the Agencies' should have re-considered in a ROD amendment, but that are in fact not required to be re-evaluated in an ESD. *See* Dkt. 563-2 at 5 ("Generally, a new nine criteria analysis is not required" in an ESD).

10

permanence advantages of dredging and the potential cost saving advantages of capping and sand covering in particular areas." Dkt. 147-2 at 7. This is precisely the analysis required in the NCP for determining the cost-effectiveness of a remedy. NCR's dislike of the outcome does not defeat the fact that the analysis was sufficient to meet the NCP's requirements. It is clear that the Agencies appropriately evaluated the cost-effectiveness of the remedy and that the evaluation supported their decision that the 2007 ROD Amendment hybrid remedy remained a cost-effective remedy for the Site.

### 2. The Agencies' analysis in the 2010 ESD and CAM did not provide contradictory information about capping as a remedial alternative.

NCR's argument also cherry-picks portions of the Agencies' analysis, selectively describing uncertainties associated with estimating the long-term capping costs to erroneously suggest that the Agencies' cost-effectiveness analysis was flawed. Dkt. 535 at 22-24. In fact, the Agencies' cost-effectiveness analysis of the capping alternative was sound.

First, the CAM explicitly states: "[t]his re-evaluation draws upon the Response Agencies' findings and conclusions from prior remedy development and refinement efforts and prior experience with dredging, capping, and sand placement at the Site." Dkt. 147-2 at 3. Those prior efforts are defined to include: "(1) preparation of remedial investigation and feasibility study reports for the Site; (2) remedy evaluation work associated with the 2002 ROD, 2003 ROD, BODR, 2007 ROD Amendment, and 2008 ROD Amendment; and (3) oversight of potentially responsible parties' remedial design efforts." *Id.* Thus, NCR's limited description of the analysis in the 2010 ESD and CAM is incomplete. In fact, the Agencies drew upon their past detailed analyses and experience at the Site in making their re-evaluation in 2010.

Second, the cherry-picked portions of the analysis that supposedly are "baseless justifications" without "*any* type of investigation or analysis" to support them (Dkt. 535 at 23) are not, in fact, post-hoc justifications to support the decision in the 2010 ESD, but rather sound
11

conclusions based on earlier decision documents, including the 2003 ROD, which extensively considered the remedial alternatives.[9] Thus, NCR's argument that the Agencies presented contradictory statements about capping in the 2010 ESD as compared with the 2007 ROD Amendment is baseless.

### C. The 2007 ROD Amendment Remedy Remains Enforceable Even if EPA's Judgment to Issue an ESD was a Procedural Error.

Finally, even if this Court concludes that the Agencies unreasonably departed from prescribed NCP procedures in preparing an ESD rather than a ROD amendment, those alleged procedural errors only render the remedy selected in the 2007 ROD Amendment unenforceable if NCR has proven – as required by CERCLA Section 113(j) – that the procedural errors "were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not been made." 42 U.S.C. § 9613(j)(4).[10] NCR has not come close to making that demonstration.

By its terms, Section 113(j)(4) only empowers court to "disallow costs or damages . . . if the errors were so serious . . . that the action would have been significantly changed had such errors not been made." 42 U.S.C. § 9613(j)(4). Thus, in cost recovery actions, courts regularly hold that governments are not necessarily precluded from recovering costs merely because the

---

[9] For example, the 2003 ROD graded the capping alternative as less likely to be effective and less reliable than the dredging alternative over the long term "because of the unknown potential for damage to the cap, potentially exposing PCBs" and because it depends upon "maintenance of the cap in perpetuity for its effectiveness." Dkt. 404-2 at 124.

[10] CERCLA Section 113(j) governs judicial review EPA remedy selection decisions and orders to implement remedies selected by EPA. *United States v. E.I. Du Pont de Nemours & Co., Inc.*, 341 F. Supp. 2d 215, 248 (W.D.N.Y. 2004); *United States v. Seymour Recycling Corp.*, 679 F. Supp. 859, 862-863 (S.D. Ind. 1987). Section 113(j)(1) expressly provides that, "in *any* judicial action under this chapter, judicial review of any issues concerning the adequacy of any response action taken *or ordered* by the President shall be limited to the administrative record" (emphasis added). Section 121(a) of CERCLA, 42 U.S.C. § 9621(a), empowers federal agencies to select remedies to be "secured under Section 106" of CERCLA, and orders those agencies to make remedy selections based on strict technical standards after consideration of alternative remedies, and to ensure public participation in the remedy selection. As the *Seymour Recycling* court noted, agency technical decisions are commonly and properly entrusted to agencies with expertise to make such judgments, and the public comment provisions of CERCLA and the NCP could not be given meaningful effect if review of the agency's remedy selection were by trial *de novo*. *Seymour Recycling*, 679 F. Supp. at 862-863.

agency's action is found to be inconsistent with the NCP. Rather, to preclude recovery of costs, the defendant must further demonstrate that the alleged inconsistency with the NCP resulted in the excess incurrence of costs, and even then only the excess costs are barred from recovery. *Burlington N.*, 200 F.3d at 694-695; *Minnesota v. Kalman W. Abrams Metals, Inc.*, 153 F.3d 1019, 1025 (8th Cir. 1998). As the *Burlington Northern* court explained, the concept is similar to the difference between breach and damage in tort law – having established a breach of duty to follow proper procedures, a defendant must prove the breach resulted in damages. 200 F.3d at 695.

There is no reason why the same standard should not be applied where, as here, a court is judging a UAO that mandates performance of the remedy under the arbitrary and capricious standard specified by CERCLA Section 113(j). Even if NCR can establish that the Agencies' decision to address the 2010 increased cost estimate in an ESD violated NCP procedural requirements, the remedy remains enforceable unless NCR can prove that, had the Agencies issued a ROD amendment instead, they would have chosen a remedy other than the remedy they now seek to enforce.[11] NCR cannot make this showing. Its only support comes from Mr. Zelikson, who offers a purely speculative opinion that the Agencies would have selected a different remedy under a ROD amendment instead of an ESD. *See* Dkt. 535 at 21-22.

While in his report Mr. Zelikson stated that the Agencies "would have selected 'the capping' remedy alternative" (Dkt. 501-1 at 17), he changed his mind in his deposition. Dkt. 563-1 at 131:11-15. Instead, he opined that EPA would have selected a mixed capping and dredging remedy that contained more capping than was permitted under the remedy selected by the 2007 ROD Amendment. *Id.* at 114:1-14. However, his opinion is purely speculative because he: (1) could not identify any added areas that would be eligible for capping under his proposal;

---

[11] It bears reiterating that the remedy the Agencies now seek to enforce is the Optimized Remedy *proposed by NCR* and Georgia-Pacific in the 2006 BODR and adopted by the 2007 ROD Amendment.

13

(2) could not identify criteria that the agency would use to select new areas to be capped; (3) had not analyzed whether new areas that could be capped would be protected over the long-term; and (4) had not analyzed the cost-effectiveness of a remedy that had more capping than the 2007 ROD Amendment remedy. Dkt. 563-1 at 115-116, 142-143.

In fact, Mr. Zelikson did not analyze the cost estimate increases that were described in the ESD, revealing the fatal problems with his opinion. Dkt. 563-1 at 92:18-22. Ironically, the single largest cost increase across the categories was for "*Engineered Caps*," which increased nearly $83 million from the 2007 ROD Amendment cost estimates. Dkt. 147-1 at 13. As Mr. Zelikson clearly opines that any newly selected remedy "would have" included more capping, the record shows that the remedy that NCR seems to prefer also would have had at least an $83 million increase in the estimated cost of capping alone. The second largest increase, over $71 million, was attributable to "Design and Infrastructure," mainly for the "dewatering facility," as explained in the 2012 ESD. Dkt. 147-1 at 12-13. But by the time NCR's contractor gave the Agencies their revised cost estimates in late 2009, that massive facility just to the north of Georgia-Pacific's Green Bay West Mill had *already been built*. Dkt. 137 at 2-4; Dkt. 141 at 3; Dkt. 563-3. Thus, the "increased" costs to construct that six-acre facility, containing eight of the world's largest membrane filter presses, were sunk costs that could not be "saved" even if some other remedy might have seemed more "cost-effective" on paper. Even if Mr. Zelikson's speculative opinion is correct, the new remedy NCR wanted the Agencies to adopt would itself have added $154 million to the bottom line.

Taken together, these two categories of costs – which would either have been spent before any ROD amendment ("Design and Infrastructure") or included as an integral part of the remedy NCR seems to advocate ("Engineered Caps") – collectively accounted for *over half* of

14

the total cost increase identified in the 2010 ESD.[12] Mr. Zelikson admitted in his deposition that he did not understand this from the 2010 ESD and he did not consider it in rendering the opinions in his expert report. Dkt. 563-1 at 93:8-14, 95:5-18. He further indicated that the "implications of the fact that the project is underway" was a concern he understood, but had thought about only "very, very briefly." Dkt. 563-1 at 93:19-25, 94:1. NCR clearly has not shown that the Agencies would have selected a more cost-effective remedy had they analyzed the cost increase in a ROD amendment rather than an ESD. Thus, the 2007 ROD Amendment remedy, re-evaluated and re-affirmed in the 2010 ESD, and being implemented at the Site today is properly enforceable and should be upheld regardless of any alleged procedural error.

## CONCLUSION

The punch-line of NCR's entire remedy challenge is its opinion that the Agencies should have allowed more capping and less dredging in the remedy. *See* Dkt. 535 at 25-26. This Court has previously noted:

> [t]he capping versus dredging debate has been waged for a long time, and the EPA has explained at length why it has chosen to require dredging in some areas and allow the less expensive capping in others . . . *NCR and AP's preferences for the less expensive option are clear, but these are merely preferences. They do not come close to showing that the EPA's decisions on these matters are arbitrary or capricious.*

*US v. NCR*, 2011 WL 2634262, at *9 (emphasis added) (Dkt. 172 at 15). The time has come to put this debate to rest. The Court should grant the Plaintiffs' Motion for Partial Summary Judgment on the Propriety of the Remedy Sought to be Enforced in the Fifth Claim for Relief. Resolution of this issue at the summary judgment stage will eliminate the need for extensive remedy expert testimony proposed by the Defendants and significantly streamline the December trial.

---

[12] The total cost estimate increase was $268,946,755 and the collective total of the cost estimate increases associated with the "Design and Infrastructure" and "Engineered Caps" categories was $154,292,624.

Respectfully submitted,

For Plaintiff United States of America

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

Dated: October 18, 2012    s/ *Maya S. Abela*
SUMONA N. MAJUMDAR
MAYA S. ABELA
RANDALL M. STONE
JEFFREY A. SPECTOR
KRISTIN M. FURRIE
SEAN CARMAN
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone:    (202) 514-2717
Facsimile:    (202) 616-6583
E-Mail:    maya.abela@usdoj.gov


GREGORY J. HAANSTAD
Attorney for the United States, Acting
Under Authority Conferred by 28 U.S.C. § 515

SUSAN M. KNEPEL
Assistant United States Attorney
Office of the United States Attorney
517 E. Wisconsin Avenue, Room 530
Milwaukee, WI 53202


For the State of Wisconsin:

Dated: October 18, 2012    *s/ Cynthia R. Hirsch*
CYNTHIA R. HIRSCH
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
P.O. Box 7857
Madison, Wisconsin 53707-785
hirschcr@doj.state.wi.us

16

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this day, the foregoing Reply Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment on the Propriety of the Remedy Sought to Be Enforced in the Fifth Claim for Relief was filed electronically with the Clerk of the Court using the Court's Electronic Court Filing System, which sent notification of such filing to the following counsel:

**Mary Rose Alexander**
Latham & Watkins LLP
mary.rose.alexander@lw.com

**Thomas Armstrong**
von Briesen & Roper SC
tarmstro@vonbriesen.com

**Paul Bargren**
Foley & Lardner LLP
pbargren@foley.com

**Linda E. Benfield**
Foley & Lardner LLP
lbenfield@foley.com

**Dennis P. Birke**
DeWitt Ross & Stevens SC
db@dewittross.com

**Steven P. Bogart**
Reinhart Boerner Van Deuren SC
sbogart@reinhartlaw.com

**Michael P. Carlton**
von Briesen & Roper SC
mcarlton@vonbriesen.com

**Evan R. Chesler**
Cravath Swaine & Moore LLP
echesler@cravath.com

**Marc E. Davies**
Greenberg Traurig LLP
daviesm@gtlaw.com

**Brandon J. Evans**
Hermes Law Ltd.
bje@hermeslawltd.com

**S. Todd Farris**
Friebert Finerty & St. John SC
stf@ffsj.com

**Patrick J. Ferguson**
Latham & Watkins LLP
patrick.ferguson@lw.com

**Sandra C. Goldstein**
Cravath Swaine & Moore LLP
sgoldstein@cravath.com

**Thomas R. Gottshall**
Haynsworth Sinkler Boyd PA
lgantt@hsblawfirm.com

**Eric W. Ha**
Sidley Austin LLP
eha@sidley.com

**Scott W. Hansen**
Reinhart Boerner Van Deuren SC
shansen@reinhartlaw.com

**William H. Harbeck**
Quarles & Brady LLP
william.harbeck@quarles.com

**Michael L. Hermes**
Hermes Law Ltd.
mlh@hermeslawltd.com

**Cynthia R. Hirsch**
Wisconsin Department of Justice
hirschcr@doj.state.wi.us

**Caleb J. Holmes**
Greenberg Traurig LLP
holmesc@gtlaw.com

**Philip C. Hunsucker**
Hunsucker Goodstein & Nelson PC
phunsucker@hgnlaw.com

**Peter C. Karegeannes**
Quarles & Brady LLP
peter.karegeannes@quarles.com

**Gregory A. Krauss**
Gregory Krauss PllC
gkrauss@krausspllc.com

**Paul G. Kent**
Stafford Rosenbaum LLP
pkent@staffordlaw.com

**Ericka L. Krumrie**
Hermes Law Ltd
elk@hermeslawltd.com

**Linda R. Larson**
Marten Law PLLC
llarson@martenlaw.com

**Vanessa A. Lavely**
Cravath Swaine & Moore LLP
vlavely@cravath.com

**Susan E. Lovern**
von Briesen & Roper SC
slovern@vonbriesen.com

**Kevin J. Lyons**
Davis & Kuelthau SC
klyons@dkattorneys.com

**Karl S. Lytz**
Latham & Watkins LLP
karl.lytz@lw.com

**Meline G. MacCurdy**
Marten Law
mmaccurdy@martenlaw.com

**David G. Mandelbaum**
Greenberg Traurig LLP
mandelbaumd@gtlaw.com

**Bradley M. Marten**
Marten Law
bmarten@martenlaw.com

**Tara M. Mathison**
Davis & Kuelthau SC
tmathison@dkattorneys.com

**Darin P. McAtee**
Cravath Swaine & Moore LLP
dmcatee@cravath.com

**Stephen F. McKinney**
Haynsworth Sinkler Boyd PA
smckinney@hsblawfirm.com

**Heidi D. Melzer**
Hermes Law Ltd.
hdm@hermeslawltd.com

**Elizabeth K. Miles**
Davis & Kuelthau SC
emiles@dkattorneys.com

**Sabrina Mizrachi**
Greenberg Traurig LLP
mizrachis@gtlaw.com

**Monique M. Mooney**
Greenberg Traurig LLP
mooneym@gtlaw.com

**William J. Mulligan**
Davis & Kuelthau SC
wmulligan@dkattorneys.com

**Daniel C. Murray**
Johnson & Bell Ltd.
murrayd@jbltd.com

**Omid H. Nasab**
Cravath Swaine & Moore LLP
onasab@cravath.com

**Kelly J. Noyes**
von Briesen & Roper SC
knoyes@vonbriesen.com

**Nancy K. Peterson**
Quarles & Brady LLP
nancy.peterson@quarles.com

**Thomas M. Phillips**
Reinhart Boerner Van Deuren SC
tphillip@reinhartlaw.com

**Ian A.J. Pitz**
Michael Best & Friedrich LLP
iapitz@michaelbest.com

**David A. Rabbino**
Hunsucker Goodstein & Nelson PC
drabbino@hgnlaw.com

**Joan Radovich**
Sidley Austin LLP
jradovich@sidley.com

**Ronald R. Ragatz**
DeWitt Ross & Stevens SC
rrr@dewittross.com

**Alexandra Reeve Givens**
Cravath Swaine & Moore LLP
agivens@cravath.com

**Kathleen L. Roach**
Sidley Austin LLP
kroach@sidley.com

**Megan A. Senatori**
DeWitt Ross & Stevens SC
ms@dewittross.com

**Adam B. Silverman**
Greenberg Traurig LLP
silvermana@gtlaw.com

**Sarah A. Slack**
Foley & Lardner LLP
sslack@foley.com

**Margaret R. Sobota**
Sidley Austin LLP
msobota@sidley.com

**Anthony S. Wachewicz, III**
City of Green Bay
tonywa@ci.green-bay.wi.us

**James P. Walsh**
Appleton City Attorney
jim.walsh@appleton.org

**Ted A. Warpinski**
Friebert Finerty & St John SC
taw@ffsj.com

**Ted Waskowski**
Stafford Rosenbaum LLP
twaskowski@staffordlaw.com

**Evan B. Westerfield**
Sidley Austin LLP
evanwesterfield@sidley.com

**Richard C. Yde**
Stafford Rosenbaum LLP
ryde@staffordlaw.com

Dated: October 18, 2012  s/ *Maya S. Abela*