IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF WISCONSIN, ) ) ) | |
| Plaintiffs, ) | Civil Action No. 10-C-910 |
| v. ) | Hon. William C. Griesbach |
| NCR CORPORATION, *et al*., ) | |
| Defendants. ) | |

**PLAINTIFFS' RESPONSE TO NCR'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT AND ADDITIONAL STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO NCR'S CROSS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Civil L.R. 56.2(b)(2)(i) of the United States District Court for the Eastern District of Wisconsin, the United States and the State of Wisconsin ("Plaintiffs") respectfully submit the following Response to NCR's Statement of Undisputed Material Facts in Support of its Cross Motion for Summary Judgment.

**I.      THE 2003 RECORD OF DECISION**

1.      In 2003, the United States Environmental Protection Agency ("U.S. EPA") and the State of Wisconsin (collectively, the "Agencies") issued a Record of Decision ("2003 ROD") setting forth a plan for remediating Operable Units 2-5 of the Lower Fox River and Green Bay [*sic*] (the "Site"). 2003 ROD, Dkt. 404-2 at pp. i-54, WDNR124002131-299.

**Response:**  Undisputed.

2.      The 2003 ROD evaluated several different cleanup alternatives, including an all-dredging

remedy (the "Dredging Remedy") and an all-capping remedy (the "Capping Remedy) [*sic*]. 2003 ROD, Dkt. 404-2 at pp. 77-80, WDNR124002222-225.

> **Response:** Disputed. The 2003 ROD evaluated several alternatives that included dredging, capping, no action, and monitored natural attenuation. Dkt. 404-2 at 95-98. The 2003 ROD also evaluated several different dredging remedies. *Id.* Further, the 2003 ROD evaluated a capping remedy that in fact included some dredging, including for areas in the federally-authorized navigation channel, areas where frazil ice forms during cold weather, and areas where minimum water depth requirements for capping could not be met. *See* Dkt. 147-2 at 2-3.

3. Each remedial alternative was evaluated against the nine criteria set forth in the National Contingency Plan ("NCP"). 2003 ROD, Dkt. 404-2 at pp. 82-128, WDNR124002227-273.

> **Response:** Undisputed.

4. Cost is one of the nine criteria that must be evaluated under the NCP. *See* 40 C.F.R. § 300.430(e)(9)(iii).

> **Response:** Undisputed.

5. The estimated cost of the Capping Remedy in the 2003 ROD was $455 million. 2003 ROD, Dkt. 404-2 at Tables 11-8, 11-16 and 11-25, WDNR124002243, WDNR124002259, WDNR124002272; Expert Report of Jeffrey Zelikson ("Zelikson Report"), Dkt. 501-1 at p. 18, Table 1.

> **Response:** Undisputed.

6. The estimated cost of the Dredging Remedy in the 2003 ROD was approximately $324 million. 2003 ROD, Dkt. 404-2 at p. 133, WDNR124002278.

**Response:** Undisputed, with the clarification that the selected dredging remedy was approximately $324 million. Not all the dredging remedies that were evaluated cost $325 million.

7. The Agencies ultimately selected the Dredging Remedy as the remedy in the 2003 ROD, in part because the Agencies determined that the Dredging Remedy was more cost-effective than the Capping Remedy. 2003 ROD, Dkt. 404-2 at p. 151, WDNR124002296.

**Response:** Undisputed, with the clarification that the selected Dredging Remedy was determined to be most cost-effective of all of the remedial alternatives, including other remedies involving dredging not just the Capping Remedy.

## II. THE 2007 ROD AMENDMENT PROCESS

8. In 2004-2005, NCR and Georgia-Pacific began performing the pre-design and design work for implementing the Dredging Remedy at the Site, pursuant to an Administrative Order on Consent ("2004 AOC"). 2004 AOC, Dkt. 439-6 at p. 1, EPAAR295170.

**Response:** Undisputed.

9. In 2006, NCR and Georgia-Pacific submitted the final Basis of Design Report to the Agencies. ("2006 BODR"). The 2006 BODR provided the agencies with a summary of new information regarding the conditions and remedial approaches available for the Site that was gathered during the design work. 2006 BODR, Declaration of Evan Westerfield ("Westerfield Decl.) [*sic*], Ex. A at pp. 1-6, EPAAR176733-738.

**Response:** Undisputed.

10. In the 2006 BODR, NCR and Georgia-Pacific formally proposed that the Agencies select

a new remedy for the Site which involved a combination of dredging, capping and sand covering technologies (the "Optimized Remedy"). 2006 BODR, Westerfield Decl., Ex. A at p. 3, EPAAR176735.

**Response:** Undisputed.

11. The 2006 BODR included a substantially revised estimate of the cost to implement the Dredging Remedy at the Site. This revised estimate was prepared by NCR's and Georgia-Pacific's engineering consultants, and increased the cost estimate for the Dredging Remedy to approximately $579 million.[1] 2006 BODR, Westerfield Decl., Ex. A at p. 6, EPAAR176738.

**Response:** Undisputed.

12. At the time of the 2006 BODR, the cost estimate of the original 2003 Dredging Remedy, adjusted for inflation to 2005 dollars, was $358 million. Zelikson Report, Dkt. 501-1 at p. 18, Table 1.

**Response:** Disputed. The original cost estimate for the 2003 ROD Remedy was $325 million. Dkt. 404-3 at 26. The most recent cost estimate for the 2003ROD Remedy at the time of the 2007 ROD was $579 million. *Id.*

13. The revised cost estimate for the Dredging Remedy contained in the 2006 BODR had increased by approximately $221 million, or 62%, over the inflation-adjusted cost of the original Dredging Remedy estimate contained in the 2003 ROD. Zelikson Report, Dkt. 501-1 at p. 4, n. 7.

**Response:** Undisputed.

14. In 2007, in response to the new information presented in the 2006 BODR, the Agencies

---

[1] The 2006 BODR rounded the revised cost estimate of the Dredging Remedy to $580 million. The actual revised cost of the Dredging Remedy, as reported in the 2007 Record of Decision Amendment ("2007 AROD") was $579,304,000. 2007 AROD, Dkt. 404-3 at p. 26, Table 4, EPAAR180130.

initiated a process to amend the 2003 ROD. 2007 Record of Decision Amendment ("2007 AROD"), Dkt. 404-3 at pp. 6-7, EPAAR180110-111.

**Response:** Undisputed.

15. During the ROD Amendment process, the Agencies reevaluated the original Dredging Remedy and the Optimized Remedy against the nine NCP criteria. 2007 AROD, Dkt. 404-3 at pp. 19-28, EPAAR180123-132.

**Response:** Undisputed.

16. The Agencies ultimately selected an amended remedy (the "2007 Amended Remedy") for the Site, which adopted most of the features of the Optimized Remedy proposed by NCR and Georgia-Pacific. 2007 AROD, Dkt. 404-3 at pp. 19-20, 28-29, EPAAR180123-124, EPAAR180132-133.

**Response:** Undisputed.

17. The Agencies prepared a formal amendment to the 2003 ROD adopting the 2007 Amended Remedy, and released the proposed amendment for public comment on November 13, 2006. 2007 AROD, Dkt. 404-3 at pp. 19-20, 50, EPAAR180123-124, EPAAR180154.

**Response:** Undisputed.

18. Several public comments were submitted in opposition to the Agencies' decision to permit capping as one of the acceptable remedial technologies at the Site. 2007 Responsiveness Summary, Dkt. 507-19 at pp. 18-19, 128-130, 176, EPAAR180174-175, EPAAR180284-286, EPAAR180332.

**Response:** Undisputed.

19. The Agencies responded to public comments they received regarding the proposed

amendment to the 2003 ROD in a Responsiveness Summary, issued in June 2007 ("2007 Responsiveness Summary"). 2007 Responsiveness Summary, Dkt. 507-19 at EPAAR180157-372.

> **Response:** Undisputed.

20. The 2007 Responsiveness Summary states: "The Agency believes that capping will effectively contain the contaminants and should improve the water quality significantly." 2007 Responsiveness Summary, Dkt. 507-19 at p. 177, EPAAR180333.

> **Response:** Undisputed that the above-quoted sentence is one of the Agencies' responses in the 2007 Responsiveness Summary.

21. The 2007 Responsiveness Summary also states: "Capping has been used successfully in river systems for years and the advantages are clearly understood….Attachment 1 provides a summary of thirty four contaminated sediment capping projects in the United States and the world. Experience on these projects has demonstrated the viability and effectiveness of capping as a method to contain contamination and reduce risks to human health and the environment." 2007 Responsiveness Summary, Dkt. 507-19 at p. 19, EPAAR180175.

> **Response:** Undisputed that the above-quoted sentence is in the 2007 Responsiveness Summary.

22. The 2007 Responsiveness Summary also states: "[C]apping has been successfully performed in a variety of freshwater and marine environments in the United States and around the world. Attachment 1 provides a listing of capping projects that have been implemented. Attachment 1, compiled by WDNR and USEPA, indicates caps have been successfully constructed and are effectively containing contamination in sediments in a variety of water bodies." 2007 Responsiveness Summary, Dkt. 507-19 at pp. 131-32, EPAAR180287-288.

**Response:** Undisputed that the above-quoted sentence is in the 2007 Responsiveness Summary.

23. The 2007 Responsiveness Summary also states: "Evaluations by experts in the fields of sediment transport, ice flows and propeller wash have provided input into the design of the caps to ensure that caps would maintain long term stability and would effectively contain PCB contamination." 2007 Responsiveness Summary, Dkt. 507-19 at pp. 131-32, EPAAR180287-288.

**Response:** Undisputed that the above-quoted sentence is in the 2007 Responsiveness Summary.

24. The 2007 Responsiveness Summary also states: "At the Fox River Side, leading experts in the fields of sediment transport, ice flow and propeller wash have been closely involved in evaluating and providing input into cap design. This will ensure that the caps remain stable in the long term, and effectively contain PCB contamination. The Final Design will have a built-in margin of safety to ensure long-term stability and effectiveness of the caps." 2007 Responsiveness Summary, Dkt. 507-19 at p. 8, EPAAR180164.

**Response:** Undisputed that the above-quoted sentence is in the 2007 Responsiveness Summary.

25. After considering and responding to public comments on the proposed amendment to the 2003 ROD, the Agencies released the 2007 AROD in June 2007. 2007 AROD, Dkt. 4043 at p. 1, EPAAR180105.

**Response:** Undisputed.

26. The 2007 AROD adopted the 2007 Amended Remedy for the Site. 2007 AROD, Dkt. 404-3 at pp. 47-50, EPAAR180151-154.

**Response:** Undisputed.

27.    In the 2007 AROD, the estimated cost to implement the 2007 Amended Remedy was $390 million.  2007 AROD Amendment, Dkt. 404-3 at p. 26, EPAAR180130.

    **Response:** Undisputed.

28.    The 2007 Amended Remedy was estimated to be $189 million less expensive than the $579 million, revised cost of the Dredging Remedy in the 2007 AROD and 2006 BODR.  2007 AROD, Dkt. 404-3 at pp. 26, 49, EPAAR180130, EPAAR180153.

    **Response:** Undisputed.

29.    In the 2007 AROD, the Agencies characterized the $189 million change in costs resulting from the selection of the 2007 Amended Remedy over the Dredging Remedy as a "fundamental change" to the remedy.  2007 AROD, Dkt. 404-3 at p. 45, Table 6, EPAAR180149.

    **Response:**  Undisputed that cited Table 6 depicts the "Cost" category as a "fundamental change."

30.    The Agencies selected the 2007 Amended Remedy because, among other considerations, the Agencies determined that it would be more cost effective than the Dredging Remedy.  2007 AROD, Dkt. 4043 at p. 49, EPAAR180153.

    **Response:** Undisputed.

31.    The Agencies further determined in the 2007 AROD that the 2007 Amended Remedy, which combined dredging, capping and sand covering, would be "more protective of human health and the environment in the short term and just as protective as the 2003 ROD Remedy in the long term."  2007 AROD, Dkt. 404-3 at p. 21, EPAAR180125.

    **Response:** Undisputed.

**III.    The 2010 ESD PROCESS**

32.     In November 2009, NCR, Georgia-Pacific and Appleton Papers Inc. submitted a draft 100% Design Report to the Agencies ("100% Design Report"). 100% Design Report Volume II (November 2009), Westerfield Decl., Ex. B. The draft 100% Design Reports provide an updated summary of the design work and remedial activities at the Site.

     **Response:** Undisputed.

33.     Draft Volume II of the 100% Design Report contained new information regarding the cost estimates for implementing the 2007 Amended Remedy. This new information included actual contractor bids for performing the work required under the 2007 Amended Remedy. 100% Design Report, Westerfield Decl., Ex. B at pp. 150-151, EPAAR183754-755.

     **Response:** Undisputed.

34.     Based on this information, the revised estimate for implementing the 2007 Amended Remedy was approximately $701 million. 100% Design Report, Westerfield Decl., Ex. B at p. 151, EPAAR183755.

     **Response:** Undisputed.

35.     At the time of the 100% Design Report, the cost estimate for the 2007 Amended Remedy contained in the 2007 AROD, adjusted for inflation to 2009 dollars, was $432 million. Zelikson Report, Dkt. 501-1 at p. 18, Table 1; 2010 ESD, Dkt. 404-4 at p. 13, Table 5, EPAAR185223.

     **Response:** Undisputed, with the clarification that the cost estimate for the 2007 Amended Remedy contained in the 2007 AROD, adjusted for inflation to 2009 dollars, was approximately $432 million. Dkt. 404-4 at 14.

36.     The revised estimate for implementing the 2007 Amended Remedy in the 100% Design

Report was $269 million, or 62%, more than the $432 million inflation-adjusted cost of the 2007 Amended Remedy estimate contained in the 2007 AROD. Zelikson Report, Dkt. 501-1 at p. 18, Table 1.

> **Response:** Undisputed with the clarification that the revised estimate for implementing the 2007 Amended Remedy in the 100% Design Report was approximately $269 million. Dkt. 404-4 at 14.

37. When confronted with this new information and the revised estimate for implementing the 2007 Amended Remedy in the 100% Design Report, the Agencies issued and Explanation of Significant Differences (the "2010 ESD"). 2010 ESD, Dkt. 404-4.

> **Response:** Undisputed.

38. The Agencies did not conduct a full re-evaluation of the Optimized Remedy, or alternative remedial actions, against the NCP's nine balancing criteria in the 2010 ESD.

> **Response:** Undisputed, but irrelevant. The Agencies did not conduct a "full re-evaluation" of the Optimized Remedy, or alternative remedial actions, against all of the NCP's nine balancing criteria in the 2010 ESD because a re-evaluation of all nine criteria is not required for an ESD, as established by the criteria in the NCP, 40 C.F.R. § 300.435(c)(2)(i). Further, the 2010 Criteria Analysis Memorandum that accompanied the 2010 ESD states: "A new evaluation of most of those [nine evaluation] criteria would not change the prior evaluations [conducted in 2003 ROD and 2007 ROD Amendment], so this re-evaluation focuses on two of the NCP's 'primary balancing criteria' that are most important for the current comparison, given the increased cost estimate for the selected remedy as described in the 2010 ESD." Dkt. 147-2 at 4. The Agencies conducted a re-evaluation of the Long Term Effectiveness and Permanence and the Cost criteria for the

Dredging Remedy, 2007 ROD Amendment Remedy, and Capping Remedy alternatives. Dkt. 147-2 at 4-6.

39.     The Agencies did not solicit or respond to public comment regarding the 2010 ESD.

**Response:**  Undisputed, but irrelevant. The Agencies did not solicit or respond to public comment regarding the 2010 ESD because such public participation procedures are not required for an ESD, as established by the criteria in the NCP, 40 C.F.R. § 300.435(c)(2)(i).

40.     The Agencies determined that a ROD amendment was not necessary because the $269 million, or 62%, increase in the cost estimate for implementing the 2007 Amended Remedy constituted only a "significant," but not "fundamental," change to the remedy.  2010 ESD, Dkt. 404-4 at p. 15, EPAAR185225.

**Response:**  Undisputed.

41.     The Agencies' only explanation for their decision to issue an ESD rather than a ROD amendment on account of the increased cost estimate for implementing the 2007 Amended ROD is contained in the 2010 ESD:

> As set forth in the EPA guidance document entitled, "*A Guide to Developing and Documenting Cost Estimates During the Feasibility Study*," EPA 540-R-00-002, OSWER 9355.0-75 (July 2000), the expected accuracy range of a cost estimate for a detailed analysis of remedial action alternatives is -30% to +50%.  As the current estimated cost of the OU 2 – 5 remedial action is 62% greater than the original estimate, it is nearly within EPA's expected accuracy range for the cost of a remedial action and represents a "significant" but not "fundamental" change from the 2007 AROD.

2010 ESD, Dkt. 404-4 at p. 15, EPAAR185225.

42.     **Response:**  Disputed.  The 2010 ESD and its accompanying 2010 Criteria Analysis Memorandum constitute a comprehensive explanation for the Agencies' decision to issue an ESD rather than a ROD amendment in 2010.  *See* Dkt. 147-1; Dkt. 147-2.

43.     There is no further analysis, calculation, or explanation in the Administrative Record as to why the $269 million/62% cost increase was determined to be a "significant" but not "fundamental" alteration to the remedy.

>    **Response:**  Disputed.  The 2010 ESD and its accompanying 2010 Criteria Analysis Memorandum constitute a comprehensive explanation for the Agencies' determination that the increase in estimated remedy costs in 2010 was a significant but not fundamental alteration to the remedy.  *See* Dkt. 147-1; Dkt. 147-2.

44.     In 2010, the 2007 Amended Remedy was approximately $259 million less expensive than the inflation-adjusted cost of the Dredging Remedy ($957 million in 2009 dollars).  Zelikson Report, Dkt. 501-1 at p. 18, Table 1.

>    **Response:**  Disputed.  The 2007 Amended remedy cost approximately $701 million in 2010.  Dkt. 404-4 at 14.  The difference between $957 million and $701 million is $256 million.

45.     However, for the first time ever at the Site, the Capping Remedy, at an inflation-adjusted $484 million, was less expensive than the revised cost estimate for the 2007 Amended Remedy ($701 million) and the inflation-adjusted cost of the Dredging Remedy ($957 million).  Zelikson Report, Dkt. 501-1 at p. 18, Table 1.

>    **Response:**  Undisputed.

46.     Despite the fact that the 2007 Amended Remedy was estimated to cost $217 million more than the Capping Remedy, the Agencies determined that the 2007 Amended Remedy remained the preferred remedial option for the Site.  2010 ESD, Dkt. 404-4 at p. 16, EPAAR185226.

>    **Response:**  Undisputed, with the clarification that the Agencies re-evaluated the cost-effectiveness of the Dredging Remedy, Capping Remedy, and 2007 Amended Remedy in

the 2010 CAM and ESD and determined that the 2007 Amended Remedy remained cost-effective.  *See* Dkt. 147-2 at 2-7.

47.    The Agencies published a Criteria Analysis Memorandum that accompanied the 2010 ESD ("2010 CAM").  The 2010 CAM contains the Agencies' analysis supporting the decision in the 2010 ESD to continue with the 2007 Amended Remedy over the less expensive Capping Remedy.  2010 CAM, Dkt. 147-2 at p. 2, EPAAR185228.

> **Response:**  Undisputed.

48.    The 2010 CAM states that "the long-term costs and benefits of capping are less certain than the long-term costs and benefits of dredging."  2010 CAM, Dkt. 147-2 at p. 3, EPAAR185229.

> **Response:**  Disputed to the extent the quote represents a sentence fragment.  Undisputed that the 2010 CAM states: "[e]ngineered caps are meant to contain PCB-contaminated sediment in place on a permanent basis, but ensuring permanent protection may require cap maintenance, cap enhancement, or cap removal over the long term.  Although some predictions can be made from modeling and recent cap placement efforts at the Site, the long-term costs and benefits of capping are less certain than the long-term costs of dredging."  Dkt. 147-2 at 3.

49.    The 2010 also states that "[e]ngineered caps also may limit River use."  2010 CAM, Dkt. 147-2 at p. 3, EPAAR185229.

> **Response:**  Disputed to the extent the quote represents a sentence fragment.  Undisputed that the 2010 CAM states: "[e]ngineered caps may also limit River use and navigability particularly if placed in a navigational channel, in shallow areas, or in other areas if water levels decline in the future."  Dkt. 147-2 at 3.

50.    The 2010 CAM also states that "the long-term needs for cap maintenance, cap enhancement, and potential cap removal cannot be predicted with certainty at this time."  2010 CAM, Dkt. 147-2 at p. 6, EPAAR185232.

> **Response:**  Disputed to the extent the quote represents a sentence fragment.  Undisputed that the 2010 CAM states: "[t]he long-term risk of leaving PCBs at the Site also depends on the durability of any systems used to contain residual PCBs, such as engineered caps. Although the cap designs for this Site are based on extensive modeling efforts and added safety factors, the long-term needs for cap maintenance, cap enhancement, and potential cap removal cannot be predicted with certainty at this time.  Some cap maintenance is expected.  Any cap failure could re-expose contaminated sediment left in place at the Site and reduce the remedy's long-term effectiveness and permanence."

51.    The Agencies did not identify any new data, analysis, calculations, or facts to support the statements made in the 2010 CAM and referenced in SUFs 47-49.

> **Response:**  Undisputed, with the clarification that the 2010 CAM explicitly states: "[t]his re-evaluation draws upon the findings and conclusions from prior remedy development and refinement efforts and prior experience with dredging, capping, and sand placement at the Site."  Dkt. 147-2 at 3.  The 2010 CAM defines those efforts to include: "(1) preparation of remedial investigation and feasibility study reports for the Site; (2) remedy evaluation work associated with the 2002 ROD, 2003 ROD, BODR, 2007 ROD Amendment, and 2008 ROD Amendment; and (3) oversight of potentially responsible parties' remedial design efforts."  *Id.*

52.    The only documents in the Administrative Record that support the Agencies' decision to

continue with implementation of the 2007 Amended Remedy at the Site in 2010, even after receiving new information that the cost of the 2007 Amended Remedy was $269 million/62% higher than the estimate in the 2007 AROD, are the 2010 ESD and 2010 CAM. 2010 ESD, Dkt. 404-4 at EPAAR185211; 2010 CAM, Dkt. 147-2 at EPAAR185228.

> **Response:** Disputed. The 2010 CAM explicitly states: "[t]his re-evaluation draws upon the findings and conclusions from prior remedy development and refinement efforts and prior experience with dredging, capping, and sand placement at the Site." Dkt. 147-2 at 3. The 2010 CAM defines those efforts to include: "(1) preparation of remedial investigation and feasibility study reports for the Site; (2) remedy evaluation work associated with the 2002 ROD, 2003 ROD, BODR, 2007 ROD Amendment, and 2008 ROD Amendment; and (3) oversight of potentially responsible parties' remedial design efforts." *Id.* These prior remedy development and refinement efforts and prior experiences at the Site support the Agencies' decision to continue with implementation of the 2007 Amended Remedy at the Site in 2010.

## United States and the State of Wisconsin's Additional Statements of Undisputed Facts in Opposition to NCR's Motion for Summary Judgment

Pursuant to Civil L.R. 56.2(b)(2)(ii) of the United States District Court for the Eastern District of Wisconsin, the United States and the State of Wisconsin respectfully submit the following statement of additional undisputed facts ("SUF") in opposition to NCR's motion for summary judgment in the above-captioned action.

1.      The 2010 ESD did not change the remedial action level for the Site.  Dkt. 404-4.

2.      The 2010 ESD did not change the remedial technology that was going to be used at the Site compared from the remedy that was selected in the 2007 ROD.  Dkt. 404-4.

3.      The 2010 ESD did not change the physical area that was to be remediated at the Site.  Dkt. 404-4.

4.      The 2010 ESD did not change the remediation goals at the Site.  Dkt. 404-4.

5.      The 2010 ESD did not change the type of contamination that was being remediated at the Site.  Dkt. 404-4.

6.      The 2010 ESD did not change the volume of waste being remediated.  Dkt. 404-4.

7.      At the time of the 2007 Amended ROD the Agencies were not at the "Final Design" stage.  Dkt. 501-1 at 12-13; Dkt. 563-1 at 73:19-24 .

Respectfully submitted,

For Plaintiff United States of America

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

Dated: November 5, 2012

_s/ Sean Carman_
RANDALL M. STONE
JEFFREY A. SPECTOR
KRISTIN M. FURRIE
SUMONA N. MAJUMDAR
SEAN CARMAN
MAYA S. ABELA
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: 202-514-2746
Facsimile: 202-616-6584
E-Mail: randall.stone@usdoj.gov
sean.carman@usdoj.gov

GREGORY J. HAANSTAD
Attorney for the United States, Acting
Under Authority Conferred by 28 U.S.C. § 515

SUSAN M. KNEPEL
Assistant United States Attorney
Office of the United States Attorney
517 E. Wisconsin Avenue, Room 530
Milwaukee, WI 53202

For the State of Wisconsin


Dated:  November 5, 2012          *s/ Cynthia R. Hirsch*
                                   CYNTHIA R. HIRSCH
                                   Assistant Attorney General
                                   Wisconsin Department of Justice
                                   17 West Main Street
                                   P.O. Box 7857
                                   Madison, Wisconsin  53707-785
                                   hirschcr@doj.state.wi.us

## CERTIFICATE OF SERVICE

I, Sean Carman, an attorney, certify that on November 5, 2012, the foregoing Plaintiffs Response to NCR's Statement of Undisputed Facts was filed electronically using the Court's ECF system and automatically served through the Court's ECF system on the following:

Mary Rose Alexander
Latham & Watkins LLP
Mary.rose.alexander@lw.com

Thomas Armstrong
von Briesen & Roper SC
tarmstro@vonbriesen.com

Paul Bargren
Foley & Lardner LLP
pbargren@foley.com

Linda E. Benfield
Foley & Lardner LLP
lbenfield@foley.com

Dennis P. Birke
DeWitt Ross & Stevens SC
db@dewittross.com

Steven P. Bogart
Reinhart Boerner Van Deuren SC
sbogart@reinhartlaw.com

Michael P. Carlton
Von Briesen & Roper SC
mcarlton@vonbriesen.com

Evan R. Chesler
Cravath Swaine & Moore LLP
echesler@cravath.com

Marc E. Davies
Greenberg Traurig LLP
daviesm@gtlaw.com

Brandon J. Evans
Hermes Law Ltd.
bje@hermeslawltd.com

S. Todd Farris
Friebert Finerty & St. John SC
stf@ffsj.com

Patrick J. Ferguson
Latham & Watkins LLP
patrick.ferguson@lw.com

Sandra C. Goldstein
Cravath Swaine & Moore LLP
sgoldstein@cravath.com

Thomas R. Gottshall
Haynsworth Sinkler Boyd PA
lgantt@hsblawfirm.com

Eric W. Ha
Sidley Austin LLP
eha@sidley.com

Scott W. Hansen
Reinhart Boerner Van Deuren SC
shansen@reinhartlaw.com

William H. Harbeck
Quarles & Brady LLP
william.harbeck@quarles.com

Michael L. Hermes
Hermes Law Ltd.
mlh@hermeslawltd.com

Cynthia R. Hirsch
Wisconsin Department of Justice
hirschcr@doj.state.wi.us

Caleb J. Holmes
Greenberg Traurig LLP
holmesc@gtlaw.com

Philip C. Hunsucker
Hunsucker Goodstein & Nelson PC
phunsucker@hgnlaw.com

Peter C. Karegeannes
Quarles & Brady LLP
peter.karegeannes@quarles.com

Gregory A. Krauss
Gregory Krauss pllc
gkrauss@krausspllc.com

Paul G. Kent
Stafford Rosenbaum LLP
pkent@staffordlaw.com

Ericka L. Krumrie
Hermes Law Ltd
elk@hermeslawltd.com

Linda R. Larson
Marten Law PLLC
llarson@martenlaw.com

Vanessa A. Lavely
Cravath Swaine & Moore LLP
vlavely@cravath.com

Susan E. Lovern
Von Briesen & Roper SC
slovern@vonbriesen.com

Kevin J. Lyons
Davis & Kuelthau SC
klyons@dkattorneys.com

Karl S. Lytz
Latham & Watkins LLP
karl.lytz@lw.com

Meline G. MacCurdy
Marten Law
mmaccurdy@martenlaw.com

David G. Mandelbaum
Greenberg Traurig LLP
mandelbaumd@gtlaw.com

Bradley M. Marten
Marten Law
bmarten@martenlaw.com

Tara M. Mathison
Davis & Kuelthau SC
tmathison@dkattorneys.com

Darin P. McAtee
Cravath Swaine & Moore LLP
dmcatee@cravath.com

Stephen F. McKinney
Haynsworth Sinkler Boyd PA
smckinney@hsblawfirm.com

Heidi D. Melzer
Hermes Law Ltd.
hdm@hermeslawltd.com

Elizabeth K. Miles
Davis & Kuelthau SC
emiles@dkattorneys.com

Sabrina Mizrachi
Greenberg Traurig LLP
mizrachis@gtlaw.com

Monique M. Mooney
Greenberg Traurig LLP
mooneym@gtlaw.com

William J. Mulligan
Davis & Kuelthau SC
wmulligan@dkattorneys.com

Daniel C. Murray
Johnson & Bell Ltd.
murrayd@jbltd.com

Omid H. Nasab
Cravath Swaine & Moore LLP
onasab@cravath.com

Kelly J. Noyes
von Briesen & Roper SC
knoyes@vonbriesen.com

Nancy K. Peterson
Quarles & Brady LLP
nancy.peterson@quarles.com

Thomas M. Phillips
Reinhart Boerner Van Deuren SC
tphillip@reinhartlaw.com

Ian A.J. Pitz
Michael Best & Friedrich LLP
iapitz@michaelbest.com

David A. Rabbino
Hunsucker Goodstein & Nelson PC
drabbino@hgnlaw.com

Joan Radovich
Sidley Austin LLP
jradovich@sidley.com

Ronald R. Ragatz
DeWitt Ross & Stevens SC
rrr@dewittross.com

Alexandra Reeve Givens
Cravath Swaine & Moore LLP
agivens@cravath.com

Kathleen L. Roach
Sidley Austin LLP
kroach@sidley.com

Megan A. Senatori
DeWitt Ross & Stevens SC
ms@dewittross.com

Adam Silverman
Greenberg Traurig LLP
silvermana@gtlaw.com

Sarah A. Slack
Foley & Lardner LLP
sslack@foley.com

Margaret R. Sobota
Sidley Austin LLP
msobota@sidley.com

Anthony S. Wachewicz, III
City of Green Bay
tonywa@ci.green-bay.wi.us

James P. Walsh
Appleton City Attorney
jim.walsh@appleton.org

Ted A. Warpinski
Friebert Finerty & St John SC
taw@ffsj.com

Ted Waskowski
Stafford Rosenbaum LLP
twaskowski@staffordlaw.com

Evan B. Westerfield
Sidley Austin LLP
evanwesterfield@sidley.com

Richard C. Yde
Stafford Rosenbaum LLP
ryde@staffordlaw.com

*s/ Sean Carman*
Sean Carman
Counsel for the United States