IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF WISCONSIN, | Case Action No. 1:10-CV-00910 |
| Plaintiffs, | Hon. William C. Griesbach |
| v. | |
| NCR CORPORATION, et al., | |
| Defendants. | |

**MENASHA CORPORATION'S (JOINED BY CERTAIN DEFENDANTS[1]) REPLY MEMORANDUM IN SUPPORT OF CERTAIN DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ON THE REMEDY SELECTED BY THE PLAINTIFFS**

---

[1] As indicated in the Motion, this Reply is filed by Menasha Corporation, but is joined by each of the "Certain Defendants." Certain Defendants are CBC Coating, Inc., Menasha Corporation, Neenah Menasha Sewerage Commission, P.H. Glatfelter Company, and WTM I Company. Counsel for Certain Defendants are listed in the signature page of the Motion.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................ 1

II. THIS MOTION PLAYS BY THE RULES PLAINTIFFS THEMSELVES WANTED – REVIEW ON THE ADMINISTRATIVE RECORD – SO THE COURT SHOULD REFUSE TO REVIEW PLAINTIFFS' *NEW* EVIDENCE ................ 3

III. THE AGENCIES' PREPARATION OF THE COST ESTIMATE WAS ARBITRARY AND CAPRICIOUS ....................................................................................... 4

    A. Subsequent Cost Estimates Depend on Assumptions in the 2003 Cost Estimate ............................................................................................................... 4

    B. The Agencies Unreasonably Failed to Include Overdredge Costs ......................... 6

    C. The Agencies Used an Unreasonable Unit Cost of Dredging ................................ 6

    D. The Agencies Unreasonably Failed to Reconsider Dredging and Capping in their 2007 ROD Amendment and 2010 ESD ....................................................... 8

    E. The Agencies Unreasonably Uniformly Applied a 1 ppm RAL to Define Remedial Alternatives .......................................................................................... 10

IV. THE AGENCIES' DEVELOPMENT OF THE MODELS USED TO SELECT THE REMEDY WAS ARBRITRARY AND CAPRICIOUS .......................................... 11

    A. The Agencies Unreasonably Used a Constant Water Temperature Parameter of 20 Degrees Celsius in the FRFood Web Model .............................. 11

    B. The Agencies Used Unreasonable PCB Partitioning Coefficients in the FRFood and GBFood Models ................................................................................ 12

    C. The Agencies Unreasonably Failed to Calibrate the wLFRM Model, Even though it was Required by Tech Memo 1 ............................................................ 14

V. EVEN IF CERTAIN DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT, THERE ARE ISSUES OF FACT AS TO THE PROPRIETY OF THE REMEDY THAT PRECLUDE SUMMARY JUDGMENT FOR PLAINTIFFS ............................................................................................................... 15

VI. CONCLUSION ................................................................................................................. 15

**I.     INTRODUCTION**

After fighting stubbornly to limit the Court's review of the remedy to the Administrative Record ("AR"), the State of Wisconsin and the United States (collectively, "Plaintiffs") rely on evidence beyond the AR to make their case that the remedy selected was not arbitrary and capricious. For example, when record review cannot explain why they used a constant temperature of 20 degrees Celsius (68 degrees Fahrenheit) for the Lower Fox River ("LFR") in the FRFood model,[2] Plaintiffs turn to extra-record evidence and claim victory. The submission of extra-record evidence here prejudices Certain Defendants because, under the Court's prior ruling denying record supplementation,[3] they cannot submit expert evidence to rebut it. The Court already has rejected the receipt of expert evidence on this very topic.[4] The Plaintiffs should not be allowed to have it both ways. By contrast, this motion was made on AR evidence *only* and should be decided on AR evidence *only*.[5]

It is undisputed that the Wisconsin Department of Natural Resources ("WDNR") used a constant temperature of 20 degrees Celsius for the LFR. Dkt. 580 at 40. Plaintiffs admit *why* this error *matters*: "the [FRFood] model *may* overestimate the effects of water temperature on fish feeding during the winter months." Dkt. 579 at 30 (emphasis added). Given the *normal* weather along the LFR and Green Bay, using a 20 degrees Celsius (68 degrees Fahrenheit)

---

[2] Plaintiffs make much of an erroneous statement in the opening brief that another model (the GBFood model) also used a constant temperature of 20 degrees Celsius. This mistake does not matter. *See infra* 12-13.

[3] Certain Defendants' Motion for Reconsideration is based solely on the incorrect determination that the wLFRM Model was calibrated. Dkt. 528; Dkt. 608 at 4. That Motion was necessitated by the Court's reliance on misrepresentations in other extra-record evidence submitted by the Plaintiffs. Dkt. 608 at 9.

[4] In their motion seeking to supplement the AR, Certain Defendants filed a declaration from Keith Tolson, Ph.D., on this topic. Dkt. 394.

[5] On October 17, 2012 – after the filing of the Cross-Motion – the Court granted Certain Defendants' request to offer expert testimony from Paul Fuglevand on the limited issue of the cost-effectiveness of the remedy. Dkt. 560.

1

constant temperature makes no sense. As indicated in the opening brief, there is a good reason Lambeau Field is nicknamed "the Frozen Tundra." The Plaintiffs' defense relies solely on the newest declaration of Dr. Zhang. Dkt. 579 at 29-31. They cite no evidence in the AR to support a finding that the fixed temperature used in the FRFood model was reasonable in light of actual temperatures experienced in the LFR. They cannot have it both ways. If the Court's review is limited to the AR, then Plaintiffs' defenses must be limited to the AR as well.

In the end, a variety of facts admitted by the Plaintiffs demonstrate that the remedy selected by the U.S. Environmental Protection Agency ("EPA") and WDNR (collectively, the "Agencies") was arbitrary and capricious. For example, Plaintiffs admit:

1. WDNR failed to use site-specific and species-specific data when it was available for the OU 2-4 remedy ("the GBFood model used site-specific and species-specific log Kow values," whereas "the FRFood model used a constant log Kow value"). Dkt. 579 at 31-32;

2. WDNR failed to calibrate the wLFRM Model to the adopted quantitative standards ("the Agencies could not demonstrate that the [M]odel's results met the designated ± 30% standard"). Dkt. 579 at 39; and,

3. The inaccuracy in the cost estimate of the remedial alternative alleged could *alone* render the cost-effectiveness analysis arbitrary and capricious:

   - "the lack of a cost estimate associated with over-dredging in the 2003 ROD *may* have contributed, to some extent, to the Agencies' underestimation of the cost of the dredging components of that remedy," Dkt. 579 at 17 (emphasis added);

   - "the cost estimates at the initial remedy selection and early design stage . . . carry significant uncertainty," *id.* at 16; and,

   - The "alleged inaccuracy in the cost estimate of the remedial alternative" could render "the Agencies cost-effectiveness analysis arbitrary and capricious," *id.* at 14.

In short, Certain Defendants are entitled to summary judgment that the remedy was not selected in accordance with the National Contingency Plan ("NCP"), and instead, is arbitrary and

capricious as a matter of law. In the alternative, there are at least issues of fact as to the propriety of the remedy on the AR that preclude summary judgment for Plaintiffs.

## II. THIS MOTION PLAYS BY THE RULES PLAINTIFFS THEMSELVES WANTED – REVIEW ON THE ADMINISTRATIVE RECORD – SO THE COURT SHOULD REFUSE TO REVIEW PLAINTIFFS' *NEW* EVIDENCE

Plaintiffs opposed Certain Defendants' efforts to supplement the AR. *See* Dkt. 441. On August 30, 2012, the Court declined to allow supplementation of the AR. Dkt. 498 at 10. Nonetheless, Plaintiffs have submitted yet ***another*** extra-record declaration of Dr. Zhang in support of their Opposition. Dkt. 578-11; *see also* Dkt. 437. As explained in Certain Defendants' Reply in Support of Motion for Reconsideration, Plaintiffs have sought repeatedly to use extra-record evidence on key modeling issues, while denying Certain Defendants the right to do the same. Dkt. 608. This is not a fair application of the Court's August 30, 2012 Order. Plaintiffs should be willing to stand on the AR they created.

Furthermore, as the Court recognized in its August 30 Order, "the party asking for supplementation [typically] seeks to add missing documents into the administrative record." Dkt. 498 at 8. The Plaintiffs sought record review, and the Court gave them what they wanted, holding that the AR "is ample enough to allow a reviewing court to determine if the remedy selected fails the arbitrary and capricious standard." Dkt. 498 at 10 (emphasis added). This Motion makes clear that it is based on the AR ***alone***. Dkt. 555 at 5 n.4.

Plaintiffs offer ***new*** evidence not included in the AR to explain how using a constant temperature of 20 degrees Celsius (68 degrees Fahrenheit) for the LFR can possibly make sense. The improper use of the 20 degrees Celsius constant temperature is not a new issue. It was discussed in Certain Defendants' motion for summary judgment or in the alternative for record supplementation as a reason the remedy selection was arbitrary and capricious. Dkt. 388 at 31. There are no expert disclosures on this topic because the Court precluded it. The time for expert

3

disclosures have passed. The parties have been double and triple-tracking expert depositions for the last several weeks in order to be ready for the December 3, 2012 trial date. This *new* extra-record evidence comes as an unwelcome surprise, especially from the parties who have consistently claimed that extra-record evidence must not be considered.

## III. THE AGENCIES' PREPARATION OF THE COST ESTIMATE WAS ARBITRARY AND CAPRICIOUS

### A. Subsequent Cost Estimates Depend on Assumptions in the 2003 Cost Estimate

Plaintiffs wrongly argue that the Cross-Motion fails from the outset because it is focused on the original cost estimate for the all-dredging remedy which has since been replaced by the "hybrid Optimized remedy," and, therefore, Certain Defendants' "attacks . . . are irrelevant." Dkt. 579 at 13. This incorrect argument permeates throughout Plaintiffs' response on the cost estimate. *See* Dkt. 579 at 17 ("this is a misguided challenge leveled at the original all-dredging remedy that has since been replaced"), 18 & 19. What the Plaintiffs do *not* say is that they never revisited the assumptions in the 2003 ROD. Neither the 2007 ROD Amendment nor the 2010 ESD was a *new* cost estimate as Plaintiffs disingenuously imply. Instead, Plaintiffs continued to use the improper cost estimate from 2003 for baseline comparative purposes in 2007, and again in their alleged "cost analysis" in the ESD in 2010.

The 2003 ROD analyzed *six different* remedial alternatives. Declaration of Philip C. Hunsucker ("Hunsucker Decl.") ¶ 4. The evaluation of the remedial alternatives covers over 70 pages. The costs of each of the six remedial alternatives were analyzed in detail in this analysis. Hunsucker Decl. ¶ 5. For example, each of the six remedial alternatives considered costs for OU3, and were summarized in Table 11-8 in the 2003 ROD. Hunsucker Decl. ¶ 6. Similarly, each of the six remedial alternatives considered costs for OU4 and were summarized in Table 11-16 in the 2003 ROD. Hunsucker Decl. ¶ 7.

The 2007 ROD Amendment compares only the amended remedy to the 2003 remedy. As to costs, Table 4 of the 2007 ROD Amendment makes it very clear that the six remedial alternatives in the 2003 ROD were never revisited. Hunsucker Decl. ¶ 8. Similarly, the 2010 ESD never claims that EPA performed a new cost effectiveness analysis. The 2010 ESD merely compared the cost of the 2010 changes to the remedy to the costs of the 2003 ROD and the 2007 ROD Amendment. Hunsucker Decl. ¶ 9. The 2010 CAM plainly states that the Agencies "have re-evaluated the costs of various remedial alternatives based on information received since issuance of earlier decision documents." *Id.* Accordingly, a new cost-effectiveness analysis was never performed and the Agencies continued to rely on the cost-effectiveness analysis in the 2003 ROD. They simply carried the erroneous 2003 ROD cost-effectiveness analysis forward. Bringing the cost estimates forward to 2009 dollars, the Plaintiffs compared the revised cost estimate for the remedy, and stated that the 62% cost increase "was only slightly higher than the expected cost uncertainty range." Dkt. 579 at 16.

Plaintiffs also argue that they did not include a cost contingency for any of the proposed remedies, so that (a) the failure to include one for the selected remedy should not matter, and (b) that the inclusion of a cost contingency would not actually have made the cost estimate any more reliable. Dkt. 579 at 14. This is wrong. The dredging remedy is more complicated than the capping remedy, and contains more elements, each of which has its own uncertainties and cost contingency. Hunsucker Decl. ¶ 11 & Att. 1 [Fuglevand Depo.] at 66:24-70:7. While we agree that a cost contingency can be a percentage of the total estimated costs, there is nothing that mandates that the ***same*** percentage be applied to ***each*** remedial alternative. In fact, there is a very good reason not to apply a single cost contingency. The more complicated the remedial alternative, the larger the overall contingency associated with it should be. Dredging is more

5

complicated and has significantly more uncertainty in cost than does capping.  As a result, the omission of the contingency "across the board" left more dollars out of the dredging cost estimate than from the other remedial alternatives, skewing any cost-effectiveness analysis that could have been attempted.  Hunsucker Decl. ¶ 12 & Att. 1 [Fuglevand Depo.] at 33:20-34:13.

### B. The Agencies Unreasonably Failed to Include Overdredge Costs

Plaintiffs *admit* the lack of a cost estimate associated with over-dredging in the 2003 ROD "may have contributed, to some extent, to the Agencies' underestimation of the cost of the dredging components of that remedy."  Dkt. 579 at 17.  Nonetheless, Plaintiffs claim that was not the only reason for the cost increase because information gathered after the 2003 ROD revealed that the volume of necessary dredging would increase significantly under the all-dredging remedy.  *Id.*  Plaintiffs further claim that any issue created by the exclusion of over-dredging cost estimates in the 2003 ROD is rendered moot by the fact that a new cost-effectiveness evaluation for an amended remedy was provided in the 2007 ROD Amendment.  *Id.* at 18.  Given the fact that no new cost-effectiveness was performed in the 2007 ROD Amendment, that argument is absurd.

### C. The Agencies Used an Unreasonable Unit Cost of Dredging

Plaintiffs respond to evidence that the Agencies used a historically unsupported and unreasonable dredging unit cost as "pointless" because of subsequent analysis in the 2010 ESD and the 2010 CAM which reevaluated the remedy "based on the actual contract costs of dredging."  Dkt. 579 at 19.  Nonetheless, they claim "the early estimates were still reasonable," because the Agencies performed "a detailed cost estimate."  *Id.*  This is patently untrue.

The Agencies never performed a detailed analysis to show why the $44/cubic yard unit cost selected was "reasonable" in 2003, or why any of the revised unit cost estimates in the 2007 ROD Amendment or 2010 ESD were either.  The chart in the Sediment Technologies

6

Memorandum that set forth the projects to which the dredging remedy was compared is the most comprehensive source of information on the unit costs. There were only two projects that had unit costs near the unit cost of $44/ cubic yard, both of which were far simpler than the proposed project for the LFR. Hunsucker Decl., ¶ 13; Dkt. 439-1 at 95. Given the uncertainties associated with a project of that scale, there is no rationale that would support the $44/cubic yard estimate carried forward. Importantly, Plaintiffs disregard the fact that the unit costs for Fox River Deposit N and Fox River SMU 56/57 – projects on *this* river – were much, much greater than the estimate in the 2003 ROD. Dkt. 579 at 20.

Plaintiffs discount the testimony of Paul Fuglevand, claiming he did not know details about the selected remedy. Dkt. 579 at 20. This is incorrect. Mr. Fuglevand's report and deposition make clear he is well-versed on the unit costs proposed by the Plaintiffs, as well as the lack of supporting data proffered to support them. Dkt. 519-2 [Fuglevand Report] at 24-31; Hunsucker Decl. ¶ 3 & Att. 1 [Fuglevand Depo.] at 19:15-20:6, 102:5-103:12, 106:13-110:16, 113:1-13, 120:22-121:15.

Finally, Plaintiffs claim the fact that NCR's expert has reported the actual unit cost of OU 4 non-TSCA dredging at roughly $70-75/cy "reveals that Defendants' arguments about cost per unit estimates are much ado about nothing." Dkt. 579 at 21. Omitted from Plaintiffs' analysis is the fact that the same "NCR expert" (John Butler) listed the TSCA dredging unit costs at $197/cubic yard, or weighted unit costs for OU4 of $134. Dkt 578-8 at 5. Also omitted is how "NCR's expert" arrived at the non-TSCA dredging unit costs, thereby precluding any form of meaningful analysis as to the accuracy of the alleged costs.

7

### D. The Agencies Unreasonably Failed to Reconsider Dredging and Capping in their 2007 ROD Amendment and 2010 ESD

Plaintiffs claim the hybrid dredging-capping Optimized Remedy is "in fact remarkably close to the 'in situ capping' option" evaluated in the 2003 ROD. Dkt 579 at 22. Plaintiffs also argue that capping-only options were considered early on, but ruled out because they "could not meet NCP's 'threshold' criterion for adequate protection of human health and the environment," in part because Plaintiffs believed that "certain areas of the Site are not suited for capping," "that there were inherent challenges in monitoring and maintaining a cap in a river environment," and "the potential unknown for damage to the cap." *Id.* at 22 & 23. Finally, Plaintiffs argue that "the Defendant-recommended Optimized Remedy being implemented at the Site today" contains "an equal or greater degree of capping" as was evaluated in the RODs. *Id.* at 24.

Omitted from the Plaintiffs' analysis is the fact that the 2010 ESD found that capping was equally protective, and $217 million less expensive, than the Optimized Remedy allegedly reevaluated in the 2007 ROD Amendment. The 2010 ESD also found the capping remedy "clearly would be less costly than the [Optimized Remedy] in the short-term." The capping remedy was set aside because "the long-term needs for cap maintenance, cap enhancement, and potential cap removal cannot be predicted with certainty at this time." Hunsucker Decl. ¶ 10.

Plaintiffs' assertion that the long-term operation and maintenance ("O&M") costs for the OUs 2-5 capping remedy "cannot be predicted with any certainty" is at odds with the O&M analysis performed for the OU 1 remedy in 2007. The O&M for the OU 1 Optimized Remedy was estimated with some precision to cost between $3.4 to $5.9 million.[6] If the capping

---

[6] In the OU1 Design Supplement of November 2007 submitted to Plaintiffs by GW Partners LLC, the following assumptions were made when estimating the O&M capping costs for the OU1 Optimized Remedy: (1) that cap monitoring would occur in years 2, 7, 12, 17, and 25 and then every 10 years ending at year 95; and, (2) that 10% (20% for a high cost-estimate), 5% (10% for a high cost-estimate), 5%, and 2.5% cap replacement would be required in years 3, 8,

8

maintenance for the OU 1 Optimized Remedy could be so well "predicted," it strains credibility that the same could not be done for the Optimized Remedy for OUs 2-5. The Plaintiffs paid only lip-service to the capping alternative for the OU 2-5 remedy in 2003, in 2007, and again in 2010. Hunsucker Decl. ¶ 14 & Att. 2.

Finally, Plaintiffs claim that WDNR did not "gloss over" – and instead made proper assumptions regarding – the timing of dredging. Dkt. 579 at 24-25. Yet, Plaintiffs admit that their initial evaluation of the time it would take to implement the dredging remedy was almost 30% longer, 11 years versus only 8, than it would have taken to implement that more capping-oriented remedy. There is nothing in the AR to demonstrate that this timing difference was thoughtfully considered and compared against other criteria in any meaningful way by the Agencies during the remedy selection process. Plaintiffs did no more than simply list the time in which the remedial alternatives would be implemented, and then chose the one that it would take longer to implement.

With regard to the effectiveness of dredging, Plaintiffs do not even respond to Certain Defendants' arguments. Certain Defendants' arguments are based on the results of ***actual*** dredging demonstration projects in the LFR, done prior to the selection of the OU 3-5 remedy, which clearly showed that dredging had resulted in "unacceptably high concentrations of PCBs in surface sediment" in areas where the dredging had taken place. Dkt. 542 at 7. Plaintiffs cite to "residual sediment contamination" discussed in the 2003 ROD. Dkt. 579 at 25. Missing from this, however, is evidence of any analysis engaged in by the Agencies to address this issue, or of whether a remedial alternative such as capping that would have avoided this issue entirely, was more appropriate. As with the timing of the dredging, the Plaintiffs have presented no evidence

---

13, and 18 respectively. Applying a three percent (3%) discount rate to arrive at a present net worth, leads to an estimate of cost between $3.4 and $5.9 million.

that they did any more than "gloss over" the issue of the effectiveness of dredging during the remedy selection process.

### E. The Agencies Unreasonably Uniformly Applied a 1 ppm RAL to Define Remedial Alternatives

Plaintiffs argue there is no evidence that the selection of a single Remedial Action Level ("RAL") was arbitrary on its face. Dkt. 579 at 26. They acknowledge that the NCP provides that "the purpose of the remedy selection purpose is to implement remedies that eliminate, reduce, or control risks to human health and environment," but claim the "Agencies fully complied with this requirement of the NCP in their careful development and evaluation of an appropriate RAL." *Id.* Specifically, the Agencies considered a range of RALs to balance the feasibility of removing PCB-containing sediment down to each action level with the residual risk to human and ecological receptors after remediation. *Id.*

The Agencies' decision to impose a uniform 1 ppm RAL river-wide was arbitrary and capricious because it failed to account for the risk reduction objectives of the RI/FS guidance and the NCP. As comments on the RI/FS explained, a "single-river-wide sediment criterion does not reflect actual risk [and] provides no contribution to risk reduction." Dkt. 580 at 98. Because "exposure risk is not constant in space or time," the river-wide cleanup objective arbitrarily assigned an objective without fulfilling the objective of an RI/FS, that is, to "eliminate, reduce or control risks to human health and the environment." 40 C.F.R. 300.430(a).[7] At a minimum, there is an issue of fact as to whether the application of a uniform 1 ppm RAL was reasonable.

---

[7] *See also* Glatfelter's Opposition to the United States' Motion for Partial Summary Judgment and in Support of Certain Defendants' Cross-Motion for Summary Judgment on the Propriety of the Remedy, Dkt. 542 at 23-34.

## IV. THE AGENCIES' DEVELOPMENT OF THE MODELS USED TO SELECT THE REMEDY WAS ARBITRARY AND CAPRICIOUS

Development and documentation of the models used by the Agencies to select the remedy has been the subject of much dispute in this lawsuit and is the subject of Certain Defendants' pending Motion for Reconsideration, which is now fully briefed. *See* Dkt. 528; Dkt. 608. Even without supplementation, however, it is clear based on the AR alone that the models were unreasonably developed and used and cannot support the injunction sought by Plaintiffs.

### A. The Agencies Unreasonably Used a Constant Water Temperature Parameter of 20 Degrees Celsius in the FRFood Web Model

First, Plaintiffs correct Defendants' "misrepresentation" of the record regarding whether a constant water temperature was also used for the GBFood model. *See* Dkt. 579 at 27. Certain Defendants acknowledge their brief inadvertently included the GBFood model in this portion of the discussion, but as indicated in Menasha's ASUFs, only the FRFood model used a constant water temperature, as Plaintiffs recognize. *Id.* at 28 ("The FRFood model used a constant water temperature parameter of 20 degrees Celsius, but the GBFood model used a variable input parameter"). However, Plaintiffs' clarification raises a good question: If WDNR could use a variable temperature input parameter for the GBFood model, why not for the FRFood model?

Plaintiffs claim the AR "amply explains and supports the Agencies' water temperature parameter choice for the FRFood Model." *Id.* at 27. If the record were indeed "ample," there would be no need for Plaintiffs to submit the Second Declaration of Dr. Zhang on this very issue. *See* Dkt. 578-11. Yet, that is precisely what Plaintiffs have done – they spend almost an entire page discussing Dr. Zhang's "explanation" for why "there are good reasons to conclude that the FRFood model accurately represented the range of annual water temperatures in the Lower Fox River." Dkt. 579 at 30. Plaintiffs cite to no support in the AR for these "good reasons," relying instead on Dr. Zhang's newest extra-record declaration. *See id.* at 29-31.

11

Indeed, Plaintiffs talk about the development, application and calibration of the FRFood model, its prior use at other sites, and the "excellent performance of the model during its calibration phase," but none of this discussion addresses Certain Defendants' concerns about the constant temperature used in the model for *this Site*. Dkt. 579 at 28-29. Plaintiffs provide *no evidence in the AR* to support a finding that the fixed temperature used in the FRFood model was reasonable in light of the actual temperatures observed in the LFR. Rather, Plaintiffs' response acknowledges the unknown (and unreasonable) assumptions they incorporated into the model: "while the model *may* overestimate the effects of water temperature on fish feeding during the winter months, the model *may* also underestimate this effect in summer months, when water temperatures exceed the 20 degree Celsius parameter." *Id.* at 30 (emphasis added). These uncertainties were incorporated into the FRFood model, rightfully causing Certain Defendants to question its reliability, and demonstrating an issue of fact on this point.

### B. The Agencies Used Unreasonable PCB Partitioning Coefficients in the FRFood and GBFood Models

Plaintiffs provide no explanation for why it was reasonable to use a higher Log Kow value for FRFood (which failed to use Site-specific congeners) than for GBFood (which used Site-specific congeners), resulting in vastly different remedies for OU 4 and OU 5. *See* Dkt. 579 at 31-34. They merely acknowledge that WDNR used species-specific Log Kow values for the GBFood model, whereas it used a constant Log Kow value for FRFood. *Id.* at 31-32.

Plaintiffs do not address the inconsistency (and resulting unreasonableness) with using a specific Log Kow for GBFood versus a set 6.6 value for the FRFood model. Nor do they address the fact that the two models overlap in OU 4. The fact that the Agencies used two different Log Kow values to assess risk at two, adjoining, portions of the LFR at the same Site, raises enough of an issue of fact as to the reasonableness of the modeling used by the Agencies. If they could

12

use specific Log Kows for GBFood, they should have to reasonably explain why the same could not have been done for FRFood. They claim the "record establishes that the log Kow values used in each case were reasonable," Dkt. 579 at 33, but they present nothing to suggest it was reasonable to use two different values at the Site.

Plaintiffs argue the evidence in the record establishes the Log Kow value of 6.6 assigned to the FRFood model did not cause the model to exaggerate the propensity of PCBs in the LFR to bioaccumulate in fish tissue. Dkt. 579 at 32. Plaintiffs rely on Table 5-7 from the Final Human Health and Ecological Risk Assessment, which they purport shows observed Log Kow values for PCBs in the LFR ranged from 4.4 to 8.2, to support that the 6.6 value used for some model runs fell within the range of observed Log Kow values in the River. *Id.* However, this does not address Certain Defendants' point that it was unreasonable to use different values for the two different models.

Moreover, Plaintiffs' argument that the 6.6 Log Kow from the screenshot for FRFood is an issue only for model runs is nonsensical because the screenshot was generated from modeling files provided by Plaintiffs. They cannot prove, therefore, that it was only for model runs because they admit they cannot identify which model runs were used for the remedy selection.

Finally, Plaintiffs argue "Defendants have failed to offer any evidence that the log Kow values used in the GBFood and FRFood models in any way affected the remedy selected by the Agencies for the Site." Dkt. 579 at 34. To the contrary, Certain Defendants have discussed why the distinction between the two Log Kow values was important: the FRFood model used a higher Log Kow value that WNDR knew would result in modeled predictions of more PCBs in fish tissue because it supported the dredging-only remedy that was selected for OU 4.

13

### C. The Agencies Unreasonably Failed to Calibrate the wLFRM Model, Even though it was Required by Tech Memo 1

Yet again, Plaintiffs argue that because WDNR declared the Model calibrated, it actually was calibrated. Dkt. 579 at 34 ("the Agencies reasonably determined that the wLFRM had been adequately calibrated and was reliable"). They assert the dispute about the calibration of the Model is "a misunderstanding of the process by which the Agencies calibrated the [M]odel." *Id.* There is no misunderstanding. Certain Defendants understand full well the extent of the misrepresentations of WDNR and its employees regarding the failure to calibrate the Model.

First, Plaintiffs attempt to educate the Court on "what it means to calibrate a model." *Id.* at 35. Citing Tech Memo 1, Plaintiffs claim the Model was only "required" to be calibrated according to certain metrics and "no single metric was to determinative of the model's usefulness," therefore, it did not matter that the Model did not meet the standards. *Id.* at 35-36. Not surprisingly, Plaintiffs ignore the language in Tech Memo 1 establishing that: "The process of model development and validation requires *quantitative* as well as some qualitative analysis" and "*quantitative* model quality criteria must be established." Dkt. 568-1 at 6 & 9.

Plaintiffs misconstrue Certain Defendants' position as asserting that the quantitative standard was the only one the Model was required to meet. Certain Defendants acknowledge there were other standards – however, the Model *failed* to meet the quantitative standard; therefore, Dr. Velleux and WDNR could not properly have declared it calibrated. Plaintiffs focus on the fact that Tech Memo 1 *also* had a qualitative standard to distract from the fact the Model did not meet the quantitative standard. *See* Dkt. 579 at 37. They likewise point out that it met the quantitative standards for water. *Id.* at 38. The existence (and fulfillment) of these other standards does not change the fact the Model failed to meet the standard for sediment.

14

Next, Plaintiffs claim the Model actually met the quantitative model quality criteria. Dkt. 579 at 39. Acknowledging that "[c]omparisons for sediment data were harder to draw," Plaintiffs claim "***despite these less than perfect results on this quantitative measure***," " the model had been properly calibrated for its application." *Id.* Plaintiffs recognized "the Agencies' inability to demonstrate observed versus modeled PCB concentrations in sediment within ±30%," but claimed that failure to meet the Tech Memo 1 quantitative standard "did ***not necessarily*** mean the [M]odel was generating inaccurate predictions." *Id.* Thus, Plaintiffs ***admit*** "the Agencies could not demonstrate that the model's results met the designated ± 30% standard" that was adopted by WDNR. *Id.* at 40. Accordingly, Certain Defendants are entitled to summary judgment that the Model was not calibrated. At a minimum, the evidence in the AR alone supports a finding that there is an issue of fact as to whether the Model actually was calibrated to the quantitative standards detailed in Tech Memo 1.

## V. EVEN IF CERTAIN DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT, THERE ARE ISSUES OF FACT AS TO THE PROPRIETY OF THE REMEDY THAT PRECLUDE SUMMARY JUDGMENT FOR PLAINTIFFS

Even if the Cross-Motion of Certain Defendants is denied, for the reasons stated above and in Menasha's Memorandum (joined by Certain Defendants), significant issues of fact exist such that the Court should at a minimum deny Plaintiffs' motion and hold that the Court will not issue a mandatory injunction at this time.

## VI. CONCLUSION

For all of the foregoing reasons, the remedy was selected in an arbitrary and capricious manner and cannot be enforced. Accordingly, Plaintiffs' motion for summary judgment as to the propriety of the remedy selection should be denied, and the Cross-Motion of Certain Defendants should be granted.

Dated: November 14, 2012                          Respectfully submitted,

/s/ Philip C. Hunsucker                            s/ David G. Mandelbaum

Philip C. Hunsucker                               David G. Mandelbaum
David A. Rabbino                                  Francis A. Citera
Hunsucker Goodstein PC                            Marc E. Davies
3717 Mt. Diablo Blvd., Suite 200                  Caleb J. Holmes
Lafayette, CA 94549                               Adam B. Silverman
Telephone: (925) 284-0840                         GREENBERG TRAURIG, LLP
Fax: (925) 284-0870                               Two Commerce Square, Suite 2700
phunsucker@hgnlaw.com                             2001 Market Street
drabbino@hgnlaw.com                               Philadelphia, PA 19103
                                                  215.988.7800
Anne E. Lynch                                     mandelbaumd@gtlaw.com
Hunsucker Goodstein PC
5335 Wisconsin Avenue NW, Suite 360               **Counsel for Defendant P.H. Glatfelter Co.**
Washington, DC 20015
Telephone: (202) 895-5380                         s/ Nancy K. Peterson
Fax: (202) 895-5390                               Nancy K. Peterson (Wis. Bar No. 1000197)
alynch@hgnlaw.com                                 Peter C. Karegeannes (Wis. Bar No. 1015025)
                                                  Arthur A. Vogel, Jr. (Wis. Bar No. 1010425)
                                                  William H. Harbeck (Wis. Bar No. 1007004)
**Counsel for Menasha Corporation**               QUARLES & BRADY LLP
                                                  411 East Wisconsin A venue
 s/ Susan E. Lovern                               Milwaukee, WI 53202
Susan E. Lovern (#1025632)                        Telephone: 414-277-5000
Michael P. Carlton (#1016037)                     E-mail: nancy.peterson@quarles.com
Thomas Armstrong (#1016529)
Kelly J. Noyes (#1064809)                         **Counsel for Defendant WTM I Company**
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 700              s/ William J. Mulligan
Milwaukee, WI 53202                               William J. Mulligan (WI Bar No. 1008465)
Telephone: (414) 276-1122                         Kevin J. Lyons (WI Bar No. 1013826)
Fax: (414) 276-6281                               Elizabeth K. Miles (WI Bar No. 1064284)
slovern@vonbriesen.com                            Davis & Kuelthau, s.c.
mcarlton@vonbriesen.com                           111 E. Kilbourn Avenue, Suite 1400
tarmstro@vonbriesen.com                           Milwaukee, WI 53202
knoyes@vonbriesen.com                             Telephone: (414) 276-0200
                                                  Fax: (414) 276-9369
**Attorneys for Defendant CBC Coating, Inc.**     wmulligan@dkattorneys.com
                                                  klyons@dkattorneys.com
                                                  emiles@dkattorneys.com

                                                  **Attorneys for Defendant**
                                                  **Neenah-Menasha Sewerage Commission**

16