# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and ) <br> THE STATE OF WISCONSIN, ) <br>                        Plaintiffs, ) <br>     ) <br> v. ) <br>     ) <br> NCR CORPORATION, ) <br> APPLETON PAPERS INC., ) <br> BROWN COUNTY, ) <br> CITY OF APPLETON, ) <br> CITY OF GREEN BAY, ) <br> CBC COATING, INC., ) <br> GEORGIA-PACIFIC CONSUMER PRODUCTS LP, ) <br> KIMBERLY-CLARK CORPORATION, ) <br> MENASHA CORP., ) <br> NEENAH-MENASHA SEWERAGE COMMISSION, ) <br> NEWPAGE WISCONSIN SYSTEMS, INC., ) <br> P.H. GLATFELTER CO., ) <br> U.S. PAPER MILLS CORP., and ) <br> WTM I COMPANY, ) <br>                        Defendants. ) | Civil Action No. 10-C-910 |

---

**DEFENDANT NCR CORPORATION'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

Page

**INTRODUCTION**......................................................................................................................1

**ARGUMENT**...........................................................................................................................3

      I.     THE AGENCIES' PRIOR ACTIONS AT THE SITE DEMONSTRATE THAT THE DECISION TO ISSUE AN ESD IN 2010 WAS CONTRARY TO THE NCP....................................................................................................................3

      II.    CASE LAW CONFIRMS THAT THE AGENCIES' DECISION TO ISSUE AN ESD IN 2010 WAS CONTRARY TO THE NCP. ...................................................5

      III.   EPA GUIDANCE DOES NOT SUPPORT THE AGENCIES' DECISION TO ISSUE AN ESD IN 2010. ......................................................................................6

      IV.   PLAINTIFFS' CRITICISMS OF MR. ZELIKSON ARE UNFOUNDED.............9

      V.    THIS COURT SHOULD NOT DISREGARD THE AGENCIES' NONCOMPLIANCE WITH THE NCP, AS PLAINTIFFS PLEAD....................11

**CONCLUSION** ....................................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Cape Cod Hosp. v. Sebelius*,
 630 F.3d 203 (D.C. Cir. 2010) ..................................................................................................3

*Employers Ins. of Wausau v. Browner*,
 52 F.3d 656 (7th Cir. 1995) ....................................................................................................11

*Meister v. Dep't of Agriculture*,
 623 F.3d 363 (6th Cir. 2010) ....................................................................................................2

*United States v. Burlington N. R.R. Co.*,
 200 F.3d 679 (10th Cir. 1999) ("*Burlington Northern*") .......................................................5, 6

**STATUTES**

42 U.S.C. § 9606 ...........................................................................................................................11

42 U.S.C. § 9613(j) .......................................................................................................................11

**OTHER AUTHORITIES**

40 C.F.R. § 300.435(c)(2)(ii) ....................................................................................................7, 10

# INTRODUCTION

The decision by the Agencies in 2010 to continue with the remedy set forth in the Amended Record of Decision for Operable Units 2-5 of the Site ("2007 AROD"), notwithstanding new information showing that the cost to implement that remedy would be *one-quarter of a billion dollars more than previously estimated*, was arbitrary and capricious and "not in accordance with law". The massive cost increase was a fundamental alteration to the remedy that required the Agencies, under the National Contingency Plan ("NCP"), to re-evaluate the remedy, and seek public comment, to ensure that the NCP's nine criteria were satisfied. By failing to engage in this process, the agencies did not comply with the statutory and regulatory requirements and the resulting remedy is not enforceable as a matter of law.

Jeffrey Zelikson, a 25-year EPA veteran who began working at EPA when it was first formed, and eventually ran the Superfund program in EPA's Region IX, agrees the Agencies failed to follow the required process. Mr. Zelikson was the final decisionmaker for remedies at over one hundred Superfund sites, including a number of contaminated sediment cases like this one. So he speaks with great experience when he says that the Agencies' decision not to re-evaluate the selected remedy, but instead to issue the 2010 Explanation of Significant Differences ("2010 ESD"), was contrary to the NCP as well as the very "pillars" of what EPA stands for:

> "[C]ost effectiveness and meaningful public involvement. Those are two of the most important pillars on which agency decisions should be made, have been made, and are required to be made under the National Contingency Plan, and unfortunately, in this case were not followed."

Deposition Transcript of Jeffrey Zelikson ("Zelikson Tr."), Declaration of Evan Westerfield, Ex. A at 36:11-16. Moreover, this procedural error was significant in Mr. Zelikson's view:

> "I don't know what it is, but [the Agencies] didn't follow the logic that they had established. They didn't follow the NCP. ***And bigger than that, they didn't do***

1

> *the right thing*. They didn't pick a cost-effective remedy, and they didn't involve the stakeholders in the process. If you don't pick a cost-effective remedy and you don't involve the stakeholders in the process, *there aren't two things that you could have done worse in selecting a remedy*."

Deposition Transcript of Jeffrey Zelikson ("Zelikson Tr.") 42:16-25. (emphasis added). And although he devoted virtually his entire career to working at EPA, Mr. Zelikson cannot divine a defensible explanation for the Agencies' action in 2010, stating "I don't know why they did this, but it's so inconsistent with agency policy, agency sentiment, regulations and site history. It's not consistent with anything." Zelikson Tr. at 46:1-8, 50:16-19.

In their response to NCR's motion, Plaintiffs are equally unable to justify the Agencies' decision. They nit-pick NCR's arguments and Mr. Zelikson's deposition testimony, but in the end they offer no affirmative support for what the Agencies did. They have not cited any regulatory language, case law, or guidance stating that a $269 million, or 62%, increase in costs falls below the NCP's "fundamental alteration" threshold for when a ROD amendment is required. They have not identified a single other Superfund case in which EPA responded to such a fundamental change in costs with an ESD rather than a ROD amendment. And they have not offered any expert testimony that the Agencies properly considered all relevant factors when electing to issue the 2010 ESD. There is no one to rebut Mr. Zelikson's opinions.

Rather than defending the Agencies' actions, Plaintiffs instead suggest that this Court should simply defer to the Agencies, regardless of whether any valid support for the Agencies' action exists. Plaintiffs are wrong. Deference must be earned. *Meister v. Dep't of Agriculture*, 623 F.3d 363, 367 (6th Cir. 2010) ("An agency is not entitled to deference simply because it is an agency"). Moreover, the case law is clear, and Plaintiffs themselves even agree, that this Court must conduct a "searching and careful" analysis of whether the Agencies' remedy selection process in 2010 was appropriate. Plaintiffs' Memorandum in Support of Plaintiffs'

Motion for Partial Summary Judgment, Dkt. 509 at 7 ("the Court's examination of the facts surrounding the Response Agencies' remedy selection process should be 'searching and careful'"); *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 216 (D.C. Cir. 2010) (quoting *Citizens to Preserve Overton Park. Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).  When this Court does so, we respectfully submit it should find that the Agencies' actions were contrary to the requirements of the NCP, the case law interpreting the NCP, the Agencies' past actions at this Site, and CERCLA policy and agency practice.  In sum, the Agencies acted arbitrarily and capriciously in 2010, and the remedy is therefore unenforceable as a matter of law.

## ARGUMENT

### I. THE AGENCIES' PRIOR ACTIONS AT THE SITE DEMONSTRATE THAT THE DECISION TO ISSUE AN ESD IN 2010 WAS CONTRARY TO THE NCP.

The Agencies' actions in 2010 were a sharp departure from their past actions at the Site.  In 2006, the Agencies received new information indicating that the cost to implement its selected remedy had increased $221 million, or 62%.  NCR's Statement of Undisputed Material Facts ("SUF"), Dkt. 539, ¶¶ 11-13.  This change in the cost estimate, in part, drove the Agencies' decision to undertake a ROD amendment process.  SUF ¶ 14.  In fact, at the conclusion of the ROD amendment process, the Agencies specifically identified a cost change of $190 million as a "fundamental change", using the precise language from the NCP.  SUF ¶ 29.

In 2009, EPA again received new information indicating that the cost to implement its selected remedy would be 62% more than previously estimated.  SUF ¶¶ 34-36.  The actual amount of the increase was $269 million, far more than both the $220 million increase that triggered the 2007 AROD and the $190 million change that the Agencies themselves had previously determined was a "fundamental change" at the Site.  SUF ¶ 36.

Nevertheless, the Agencies did not undertake a ROD amendment process as they had before. Instead, they simply issued the 2010 ESD. SUF ¶ 37. To Mr. Zelikson, this was inexplicable:

> "In 2007 you know when the site costs changed by approximately 200 million, the agency said we should do a ROD amendment. In 2010 with a similar cost difference, they decided not to. I don't get that."

Zelikson Tr. at 86:16-20. Because the Agencies thus ignored their own precedent, and issued an ESD notwithstanding changed circumstances that they themselves had previously considered "fundamental," their actions constitute arbitrary and capricious conduct that renders the remedy itself unenforceable.

Plaintiffs try to distinguish the situation in 2009-2010 from that in 2006-2007, insisting that the decision to issue the 2007 AROD was prompted not by a cost increase alone, but by "new data and analyses." Reply Memorandum in Support of Plaintiffs' Motion for Summary Judgment Regarding the Propriety of the Remedy ("Pls' Brief"), Dkt. 564 at 6. While Plaintiffs are correct that the 2007 AROD does refer to certain changed circumstances, Plaintiffs fail to acknowledge that these changed circumstances mattered solely because they had significant cost implications. As Mr. Zelikson explained at his deposition, the "new data and analyses" did not, in and of themselves, prompt the Agencies to re-evaluate the remedy. Rather it was because those newly-discovered circumstances resulted in a fundamentally more expensive cleanup that the Agencies decided to pursue a ROD amendment:

> [W]hat [the Agencies] received was the Basis of Design Report which had a number of elements to it that was derived from the fieldwork that was ongoing. My take on it is that each and every one of those items had a cost implication to it which added up to the $221 million revised estimate, and that ***but for those items not having a cost implication, it wouldn't have raised the need to do a complete reanalysis, but that it was the cost implications of all of those changes that was the driving force*** towards the need to do a reanalysis through a ROD amendment.

4

Zelikson Tr. at 152:3-14 (emphasis added). Since this is precisely what happened in the 2009-2010 timeframe as well, the Agencies should have proceeded with a ROD amendment in 2010, just as they had done in 2007.

## II. CASE LAW CONFIRMS THAT THE AGENCIES' DECISION TO ISSUE AN ESD IN 2010 WAS CONTRARY TO THE NCP.

The only case that has ever addressed this issue supports the conclusion that the Agencies should have undertaken a ROD amendment in the 2009-2010 timeframe. In *United States v. Burlington N. R.R. Co.*, 200 F.3d 679, 689 (10th Cir. 1999) ("*Burlington Northern*"), EPA discovered during the course of cleanup work at a site that the cost of the selected remedy would in fact be 61% higher than originally estimated. Nevertheless, EPA did not re-evaluate the remedy. Both the district court and the Tenth Circuit Court of Appeals held that this was error. According to these courts, the 61% cost increase "fundamentally altered" the remedy such that a ROD amendment was required. *Id.* Given this authority, it follows that the nearly identical 62% cost increase at this Site also "fundamentally altered" the remedy and so should *not* have been addressed through an ESD.

Plaintiffs try to distinguish *Burlington Northern* by arguing that the issue in that case was not the cost increase, but instead that EPA acted "without taking *any* action to document the change in accordance with the NCP." Pls' Brief at 5 (emphasis in original). In other words, Plaintiffs suggest that *Burlington Northern* would have been decided the other way if EPA had merely documented its actions in some way, such as by issuing an ESD. This characterization of *Burlington Northern* cannot be reconciled with the language of the decision. Both the district court and the Tenth Circuit repeatedly and specifically state that a ROD amendment was required; at no point do they suggest that some other action, such as an ESD, would have sufficed. Both the district court and the Tenth Circuit also cite to the "fundamentally

5

altered" language, which is the trigger for a ROD amendment under the NCP. Thus, contrary to Plaintiffs' claim, *Burlington Northern* stands firmly for the proposition that a 61% cost increase necessitates a ROD amendment. The Agencies' failure to undertake such a process here therefore constitutes arbitrary and capricious conduct.

## III.  EPA GUIDANCE DOES NOT SUPPORT THE AGENCIES' DECISION TO ISSUE AN ESD IN 2010.

Plaintiffs do not cite any cases to support the Agencies' decision to issue an ESD in 2010, rather than undertake a ROD amendment. Plaintiffs also do not identify any precedent, either at this Site or anywhere else, that validates this decision. Instead, the sole support offered by Plaintiffs for the Agencies' actions are certain of EPA's own guidance documents. However, none of these documents in fact justify what happened in 2010.

For example, Plaintiffs refer to the Preamble to the NCP and insist that it "expressly authorize[s] the agency to address major cost increases through an ESD." Pls' Brief at 5. But this argument is beside the point. It is well-established that the Agencies can address some types of cost increases through an ESD, including "major" cost increases as Plaintiffs suggest. But it is equally well-established that the Agencies must address "fundamental" cost increases through a ROD amendment; that is expressly required by the plain language of the NCP. To justify the Agencies' decision to issue an ESD in 2010, then, Plaintiffs must show that the massive cost increases discovered in 2009-2010 were not "fundamental." Citing to the preamble's general language that ESDs can be used in some cost-increase situations does not accomplish that.

As a fall-back, Plaintiffs point to the EPA document, "*A Guide to Developing and Documenting Cost Estimates During the Feasibility Study*", EPA 540-R-00-002, OSWER 9355.0-75 (July 2000) (the "Cost Estimate Guidance"). This guidance states that, at the earliest

6

stages of a CERCLA cleanup, costs may exceed estimates by 50%. Based on this document, Plaintiffs insist that the quarter-billion-dollar increase in the 2009-2010 timeframe was not "fundamental" but instead "relatively minor." Pls' Brief at 9. This argument fails for three reasons.

*First*, the Cost Estimate Guidance does not apply to this situation. This guidance document was prepared by EPA to inform EPA's cost estimating activities during remedial design work. It was not prepared to address whether a cost change qualifies as "fundamental" under 40 C.F.R. § 300.435(c)(2)(ii). Accordingly, the Cost Estimate Guidance has no relevance to the issue currently before the Court. As Mr. Zelikson explained at his deposition:

> "[The Cost Estimate Guidance] doesn't say anything about what the agency's obligation should be regarding whether to do a ROD amendment or ESD given those changes. . . . [The Cost Estimate Guidance] has **absolutely no bearing on whether you should issue an amended ROD or an ESD**…. [If you've] got PRPs and community and everybody else involved and you say, we've selected this remedy, and this is what we're going to do, and then down the road you find out the remedy is 50 percent more, and that means you should have selected maybe another remedy which would have been more cost-effective, … and you say, well, it's in the cost guidelines, I don't have to tell anybody about it. No. That's not it. If that remedy – if those costs change and it affects the dynamics around the site, you have to go back and have a conversation with the stakeholders again . . . and maybe do a reanalysis of the remedy."

Zelikson Tr. at 87:14-88:18.

*Second*, even if the Court were to consider the Cost Estimate Guidance, the 50% uncertainty allowance only applies when the site is at the remedial investigation and feasibility study stage. That was not the situation in 2007 at the Site. The remedial investigation and feasibility study was completed in 2002, and between 2002 and 2007, an extensive amount of additional work had been performed at the Site. For example, over 10,000 sediment samples were collected and analyzed from over 1,400 locations in the Site. *See* Plaintiffs' Statement of Undisputed Facts, Dkt. 510 at ¶ 47. Moreover, there was sufficient information available for the

7

Agencies to conclude that they had selected the wrong remedy in the first place. In light of the this work that took place between 2002 and 2007, Plaintiffs cannot seriously contend that the expected accuracy range of cost estimates in 2002 was still the appropriate range in 2007. The Site simply was not "at a very early stage of the remedial design process" in 2007. Pls' Brief at 9. As a result, the 62% cost increase identified in 2009 represented a fundamental departure from the original estimate and triggered the need for a ROD amendment.

*Third*, even if Plaintiffs were correct that the remedial design work remained at a preliminary stage in 2007, and that therefore a 50% cost increase was acceptable according to the Cost Estimate Guidance, Plaintiffs must still explain why a **62%** cost increase – 24% more than 50%[1] – was not "fundamental." They fail to do so. A 62% cost increase is by its very terms *outside* the acceptable bounds established by the Cost Estimate Guidance; by definition, such a cost increase is "fundamental" in nature. As Mr. Zelikson explained at his deposition:

> "Either way it's significantly outside the range that would be expected on this generalized guidance, which has nothing to do with the fact that it was a huge number, and it should have been subject to a ROD amendment…. [E]ven at the plus 50 minus 30, the cost exceedances that were shown in the ESD were at 62 percent. So there's no way to make this work for EPA on this."

Zelikson Tr. at 78:19-23, 85:18-21. Moreover, the difference between a 50% increase over the 2007 estimate, and a 62% increase over the 2007 estimate, is nearly $50 million. That amount, as Mr. Zelikson noted in his report, is enough, by itself, to have a site classified as a "mega-site." Expert Report of Jeffrey Zelikson ("Zelikson Report"), Dkt. 501-1 at 9. To merely assert that 62% is "close" to 50%, as Plaintiffs do, is not a valid justification for the Agencies' conclusion that the 62% cost increase was not "fundamental" under the NCP.

---

[1] Plaintiffs contend that the 62 percent cost increase was only 12 percent higher than the upper bound of the -30 to +50 percent range. However, a 62 percent cost increase is actually 24 percent higher than the upper bound ((12 percent ÷ 50 percent) x 100 = 24 percent).

## IV. PLAINTIFFS' CRITICISMS OF MR. ZELIKSON ARE UNFOUNDED.

Unable to present affirmative support for the Agencies' actions, Plaintiffs instead try to undermine Mr. Zelikson's credibility. But their claims are based on inaccurate characterizations of Mr. Zelikson's testimony that are not in fact supported by the testimony itself.

*First*, Plaintiffs make the incorrect claim that Mr. Zelikson "utterly lacks authority". Pls' Brief at 7. As noted above, Mr. Zelikson began working at EPA when it was formed in 1971. Zelikson Report at 1-2. He served in numerous positions at the agency, eventually becoming Director of the Hazardous Waste Management Division for EPA's Region IX. *Id*. at 1-2. In that role, which he held from 1987 to 1995, Mr. Zelikson was responsible for all Superfund remedy decisions made by EPA for sites within the states of California, Arizona, Nevada and Hawaii. *Id*. at 2. Over his 25-year career at EPA, Mr. Zelikson was involved in making "hundreds" of remedy selection decisions governed by the NCP, including many contaminated sediment sites just like the Fox River. *Id*. at 2. As Mr. Zelikson described it, he "lived and breathed the NCP" for more than two decades. Zelikson Tr. at 45:1-2. Given this vast experience, Plaintiffs' claim that Mr. Zelikson "utterly lacks authority" is untenable.

*Second*, Plaintiffs claim that Mr. Zelikson was never involved in any situation involving ESDs and amended RODs. This is also incorrect. As Mr. Zelikson testified, he was the ultimate decision-maker for all Superfund cases being handled within Region IX between 1987 and 1995. Zelikson Report at 1-2. While Mr. Zelikson did concede that he could not recall the names of specific sites where he worked on ESDs or amended RODs, that is understandable given the passage of time and the number of sites he supervised.

*Third*, Plaintiffs assert that Mr. Zelikson's opinions are "conclusory." Pls' Brief at 7. The record shows otherwise. In his report, Mr. Zelikson articulates three bases for why he

9

concluded that the 2010 cost increase qualified as a "fundamental alteration" of the remedy under 40 C.F.R. § 300.435(c)(2)(ii):

- The cost increase exceeded by many times the cost of entire Superfund "mega-sites";

- The cost increase was larger than any other cost increase at a Superfund site during various intervals in EPA history – and larger than all the increases *combined* between 2004 and 2005; and

- The cost increase was equivalent to cost increases at the Fox River and Hudson River which EPA had itself characterized as "fundamental alterations."

Zelikson Report at 9-10. Grounded in this way with specific examples from EPA's past practice, Mr. Zelikson's opinions are not merely conclusory.

*Fourth*, Plaintiffs claim that Mr. Zelikson "admitted in his deposition that he was wrong" about his opinion that the 2010 cost increase was many times the cost of the average mega-site. Pls' Brief at 7. This is not accurate. Mr. Zelikson simply clarified that the 2010 cost increase was five times the *threshold* cost for a mega-site, rather than five times the *average* cost. This clarification does not alter Mr. Zelikson's fundamental point: the 2010 cost increase was, by itself, more than the cost of other entire Superfund sites.

*Fifth,* Plaintiffs claim that Mr. Zelikson "admitted that it is wrong" to say that 2007 cost estimate should have been accurate to within -10% to +15%. Pls' Brief at 8. This is misleading. Mr. Zelikson admitted only that the 2007 cost estimate did not need to have been *precisely* within the -10% to +15% range. He insisted, however, that something *very close* to that was the appropriate range. Zelikson Tr. at 70:4-6. And he reiterated several times, as noted above, that what *is unquestionably wrong* is Plaintiffs' claim that -30% to +50% was an acceptable uncertainty range. *Supra* at 8.

10
Case 1:10-cv-00910-WCG   Filed 11/14/12   Page 13 of 18   Document 614

## V. THIS COURT SHOULD NOT DISREGARD THE AGENCIES' NONCOMPLIANCE WITH THE NCP, AS PLAINTIFFS PLEAD.

Essentially conceding that the requirements of the NCP were not followed, Plaintiffs resort to asking the Court to excuse the Agencies' noncompliance. They suggest that NCR should still be required to implement a remedy costing several hundred million dollars, even though that remedy was not selected in accordance with law, unless *NCR* can demonstrate that some other alternative would have been less expensive. This argument turns CERCLA on its head. It is well-established that a court cannot enforce a CERCLA remedy that is arbitrary, capricious or not in accordance with law. 42 U.S.C. § 9606; 42 U.S.C. § 9613(j). Any such remedy is, in the words of the 7th Circuit, "*ultra vires*." *Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 665 (7th Cir. 1995). Once NCR has established that the Agencies' selection process violated the NCP, as NCR has done, this Court has no authority under the statute to compel implementation of the *ultra vires* remedy.

Plaintiffs attempt to salvage this argument in five ways, but none has any merit. *First*, Plaintiffs claim that Section 113(j)(4) places the burden on NCR to show that if the Agencies had complied with the NCP, a "significantly changed" remedy would have been chosen. Pls.' Brief at 12. But this Section imposes no such requirement. Section 113(j)(4) concerns the situation in which an agency incurs costs at a site, but fails to properly document those costs or otherwise cannot demonstrate that each individual expense was proper under the NCP. Section 113(j)(4) makes clear that the agency can still recover those particular costs that can be shown to have been proper. This provision has nothing to do with the situation here. On its face, the plain language of Section 113(j)(4) refers only to "costs and damages." There is no mention of remedies, or of ordering parties to implement remedies.

Nor should Section 113(j)(4) be read to extend to this situation, as Plaintiffs urge. Whereas it may be possible in a cost-recovery action to identify individual *expenses* that are NCP-compliant or non-compliant, it is not similarly possible to identify in an injunction proceeding individual remedial actions that would have been chosen, or not chosen, if the Agencies had performed what they were required to do. As Mr. Zelikson states in his report, it is clear that the Agencies would not have re-selected the current remedy. Zelikson Report at 7, 17. However, it is beyond anyone's ken what mix of dredging and capping the Agencies would have ultimately settled on, or whether the Agencies even would have stuck with their goal of addressing all sediment with PCB concentration above 1 ppm, especially after they sought and considered input from the public and stakeholders. The administrative record is devoid of any information on what these other possible options might have been. Under these circumstances, it would be pure speculation for NCR or the Court to try to identify the alternative remedies and whether their costs would be "significantly changed," and Section 113(j)(4) should not be interpreted as requiring that.

*Second*, Plaintiffs postulate that a full re-evaluation of the remedy would not have resulted in a less-costly remedy because many of the costs were in some sense "sunk," either because they had already been spent or would necessarily be part of any revised remedy. Pls' Brief at 14. But there is no way to know precisely what would have come out of a new ROD amendment process, as discussed above. Moreover, Plaintiffs only identify $154 in costs that they claim to be "sunk." So even if Plaintiffs were correct that these costs would not have changed as a result of a full re-evaluation of the remedy, which NCR does not concede, a revised remedy could still have saved at least $100 million. This is twice the threshold amount for an

12

entire Superfund "mega-site" and unquestionably sufficient to qualify as a "significant change[]."

*Third*, Plaintiffs claim that Zelikson offers a "speculative" opinion in his report about what would have happened if the Agencies had complied with the NCP. Pls' Brief at 14. To the contrary, Mr. Zelikson states in his report that if the Agencies had re-evaluated the remedy using the nine criteria under the NCP, and sought and considered public comment, the Agencies would not have re-selected the current remedy. Zelikson Report at 7, 17. He bases this opinion on the Agencies' own statements about the efficacy of capping. *Id.* at 16-17. Thus, Mr. Zelikson's opinion is firmly grounded in fact and there is nothing speculative as Plaintiffs insist.

*Fourth*, Plaintiffs claim that Mr. Zelikson "changed his mind" about what would have happened if the Agencies had complied with the NCP. Pls' Brief at 13. He did not; Mr. Zelikson's statements are consistent. Mr. Zelikson's position in his report, just like that stated at his deposition, is that (i) the Agencies would not have re-selected the current remedy and (ii) there is no way to know precisely what mix of dredging and capping the Agencies would have selected. *Compare* Zelikson Report at 17 *with* Zelikson Tr. at 133:10-14. Again, the record does not support Plaintiffs' assertion.

*Fifth*, Plaintiffs unfairly argue that Mr. Zelikson's opinion should be disregarded because it did not take into account certain analyses, such as which new areas would be capped rather than dredged. Pls' Brief at 14. Mr. Zelikson's opinion does not need those analyses. His opinion is based on the Agencies' own statements, which provide more than adequate support for the final conclusion, as discussed above. Moreover, Mr. Zelikson could not have considered these analyses even if it had wanted to. As Plaintiffs well know, such analyses were never performed by the Agencies and are not in the administrative record. Therefore, they have no

13

place in this proceeding. Indeed, it is ironic that Plaintiffs would attempt to challenge Mr. Zelikson for failing to consider certain evidence when it was the Agencies themselves who failed to generate that evidence in the first place, thus keeping it out of the record.

## **CONCLUSION**

For the foregoing reasons, NCR is entitled to a summary judgment ruling in its favor on Plaintiffs' Fifth Claim for Relief. Accordingly, NCR respectfully requests that the Court grant NCR's Cross-Motion for Summary Judgment.

Dated:  November 14, 2012　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　NCR CORPORATION
　　　　　　　　　　　　　　　　　　　　/s/ Evan B. Westerfield

　　　　　　　　　　　　　　　　　　　　*Counsel for NCR Corporation*
　　　　　　　　　　　　　　　　　　　　CRAVATH, SWAINE & MOORE LLP
　　　　　　　　　　　　　　　　　　　　Evan R. Chesler
　　　　　　　　　　　　　　　　　　　　Darin P. McAtee
　　　　　　　　　　　　　　　　　　　　Worldwide Plaza, 825 Eighth Avenue
　　　　　　　　　　　　　　　　　　　　New York, New York 10019
　　　　　　　　　　　　　　　　　　　　Phone: (212) 474-1000
　　　　　　　　　　　　　　　　　　　　Fax: (212) 474-3700

　　　　　　　　　　　　　　　　　　　　SIDLEY AUSTIN LLP
　　　　　　　　　　　　　　　　　　　　Evan B. Westerfield
　　　　　　　　　　　　　　　　　　　　Eric W. Ha
　　　　　　　　　　　　　　　　　　　　One South Dearborn Street
　　　　　　　　　　　　　　　　　　　　Chicago, Illinois 60603
　　　　　　　　　　　　　　　　　　　　Phone: (312) 853-7000
　　　　　　　　　　　　　　　　　　　　Fax: (312) 853-7036
　　　　　　　　　　　　　　　　　　　　evanwesterfield@sidley.com

　　　　　　　　　　　　　　　　　　　　MARTEN LAW PLLC
　　　　　　　　　　　　　　　　　　　　Linda R. Larson
　　　　　　　　　　　　　　　　　　　　Bradley M. Marten
　　　　　　　　　　　　　　　　　　　　1191 Second Avenue, Suite 2200
　　　　　　　　　　　　　　　　　　　　Seattle, Washington 98101
　　　　　　　　　　　　　　　　　　　　Phone: (206) 292-2600
　　　　　　　　　　　　　　　　　　　　Fax: (206) 292-2601

15