IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA AND
THE STATE OF WISCONSIN

   Plaintiffs,

  v.

NCR CORPORATION, *et al.*,

   Defendants.

No. 10-CV-00910-WCG

REPLY MEMORANDUM OF P.H. GLATFELTER COMPANY IN
SUPPORT OF CERTAIN DEFENDANTS'[1] CROSS-MOTION FOR
SUMMARY JUDGMENT ON THE PROPRIETY OF THE
REMEDY

---

[1] CBC Coating, Inc., Menasha Corporation, and WTM I Company join in this memorandum.

# TABLE OF CONTENTS

I. Introduction. ...................................................................................................................1

II. EPA Did Not Properly Delegate the "Lead" to WDNR. ....................................................3

    A. Dkt. 578-1 is not in the Administrative Record, so it is irrelevant on this motion. .......................................................................................................4
    B. Even if Dkt. 578-1 were in the Administrative Record, Dkt. 578-1 is not a "cooperative agreement," and Dkt. 578-1 does not say what the United States represents it to say................................................................6
    C. WDNR's consideration of non-NCP criteria appears on the face of Dkt. 578-1. .....................................................................................................8

III. EPA's Consideration of Comments Must Not Be Arbitrary or Contrary to Law. ...............................................................................................................................10

IV. Certain Defendants Have Not Endorsed the "Optimized Remedy." ................................11

V. EPA's and WDNR's 2007 Amended ROD and 2010 ESD Did Not Cure the Impropriety of the Remedy Selection. .........................................................................12

VI. Even if the Court Declines to Grant Judgment to Certain Defendants Invalidating the Governments' Remedy Selection for OU2-5, the Court Should Grant Summary Judgment to Certain Defendants Denying the United States' Requested Mandatory Injunction. ............................................................13

I.   **Introduction.**

This is a claim for a mandatory injunction under section 106(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9606(a). The United States seeks to have this Court exercise its equitable powers to order the Certain Defendants to implement a mostly-dredging remedy for Operable Unit 4 ("OU4") of this Site – a project that will cost hundreds of millions of dollars – and all the United States can manage to do in its brief is to invoke judicial deference to administrative action. However, CERCLA section 106(a) nowhere mentions agency deference as a basis for granting an injunction. Instead, section 106(a) limits the exercise of judicial power "to grant[ing] such relief as the public interest and the equities of the case may require" when the United States seeks "such relief as is necessary to abate [a] danger or threat." 42 U.S.C. § 9606(a). Section 106(a) requires the government to offer *de novo* proof of these elements. The United States believes the Administrative Record is enough. Yet, their brief is oddly silent on the elements of section 106(a).

The Consolidated Reply Memorandum of the United States and the State of Wisconsin in Support of Motion for Summary Judgment on the Selected Remedy and in Opposition to Certain Defendants' Cross-Motions for Summary Judgment on the Selected Remedy ("Plffs' Brief"), Dkt. 579, fails anywhere to say that the injunction being sought against the Certain Defendants would abate the danger or threat from the presence of polychlorinated biphenyls ("PCBs") in OU4, or is what the public interest or the equities of the case require. In fact, Plffs Brief fails even to state that the remedy being implemented on the Fox River would do any good at all. Those omissions alone

should persuade the Court to deny the injunction that Plaintiffs request against Certain Defendants.

On the issue of abatement of the danger or threat, Certain Defendants have been clear. The dredging component of the remedy selected by the Wisconsin Department of Natural Resources ("WDNR") and the Environmental Protection Agency ("EPA") by itself does not abate risk. By itself, dredging does not achieve a low concentration of PCBs at the surface of the sediment bed; sand cover or capping after dredging does that. Dredging does not reduce risk posed by buried sediments. Dredging will not accelerate the recovery of fish tissue. Capping and covering do those. The United States *admits* that capping and covering are equally protective of human health and the environment as dredging. Dkt. 147-2 [Criteria Analysis Memorandum for the 2010 Explanation of Significant Differences ("CAM")] at EPAAR185229 ("Dredging, capping, and sand covering are all feasible and the all can be effective in reducing the risks posed by PCB-contaminated sediments at the Site.").

Nowhere in its brief does the United States say that dredging has accelerated reductions in the concentration of PCBs in fish, which is the pathway by which PCBs get from sediment into people. Nowhere does the United States say that completing the work in OU4 would further accelerate the recovery of fish tissue PCB concentrations. Nowhere does the United States say that the expenditure of hundreds of millions of dollars that it seeks is a good thing to do, let alone a better thing to do than alternatives like capping or covering. The United States admits that a capping remedy would cost

2

***$217 million less*** than the mostly-dredging remedy selected and would be equally protective. CAM at EPAAR185232. The Court should not grant a mandatory injunction for hundreds of millions of dollars of work – and should not impose an existential threat on several of the defendants – when the plaintiff does not even argue that dredging actually would reduce risk. If the United States cannot say anywhere in a 45-page brief that ordering ***Certain Defendants*** to do this work would be the right thing to do, then the Court should cancel the December trial and deny the United States' Fifth Claim for Relief.[2] Certain Defendants' motion for summary judgment should be granted.

## II. EPA Did Not Properly Delegate the "Lead" to WDNR.

Glatfelter's principal brief pointed out that the United States improperly delegated the lead role in preparing the remedial investigation and feasibility study ("RI/FS"), preparing the proposed remedial action plan ("PRAP"), and developing the records of decision ("RODs") for this site to the Wisconsin Department of Natural Resources ("WDNR"). The United States argues that WDNR's selection of the remedy for this site – in which the Environmental Protection Agency ("EPA") acquiesced – may be wrong, but not arbitrarily so; it may be less than optimal, but not a caprice.

The United States wants to make the review of the remedy selection here about the process used to make that remedy selection. However, perhaps the most important

---

[2] Instead, if any defendant later willfully violates the 2007 Unilateral Administrative Order ("UAO") without sufficient cause, the United States should seek to enforce the UAO via a conventional enforcement claim for penalties under CERCLA section 106(b)(1), 42 U.S.C. § 9606(b)(1).

3

part of reviewing a decision-making process is understanding whether the right decision-maker made the decision. Here, everyone agrees that WDNR, not EPA, had the "lead" and made the decisions, which EPA then ratified. There is nothing in the record to suggest that EPA ever delegated the responsibility for this remedy selection to WDNR.

The United States claims that WDNR received a proper delegation of authority to have that "lead" under a "cooperative agreement" that the United States has filed with its response as Docket Document 578-1 ("Dkt. 578-1"). Dkt. 578-1 does not establish a proper delegation of authority from EPA to WDNR for this site. ***First***, Dkt. 578-1 is not in the Administrative Record, so the Court cannot even take it into account. ***Second***, even if the Court could consider it, Dkt. 578-1 is not a cooperative agreement as required by section 104(d)(1) of CERCLA, 42 U.S.C. § 9604(d)(1), subpart F of the National Contingency Plan ("NCP"), 40 C.F.R. §§ 300.500 to .525, or subpart O of EPA's grant making regulations, 40 C.F.R. §§ 35.6000 to .6820. ***Third***, Dkt. 578-1 on its face reflects exactly the non-NCP criteria that WDNR intended to apply – and did apply – to its decision-making in this case.

### A. Dkt. 578-1 is not in the Administrative Record, so it is irrelevant on this motion.

The Court has denied Certain Defendants' motion to supplement the Administrative Record. Dkt. 498. The Court reasoned that its primary role in a review of ***EPA's*** selection of the remedy was to assure that the process EPA used was appropriate. However, as it turns out, the "lead" role in preparing all of the documents leading up to selection of the remedy in this case – the RI/FS, the RODs, and so forth – was WDNR's.

4

Dkt. 30 [Complaint] at ¶¶ 7-10. *See also* Dkt. 439-12 [Record Of Decision, Operable Units 1 and 2] at WDNR124002708; Dkt. 404-2 [Record Of Decision, Operable Units 3, 4 and 5 at WDNR124002142.

A state may end up with the "lead" role in a response action, provided that EPA delegates that role to the state under section 104(d)(1) of CERCLA. The process involves entering into an agreement that satisfies section 515 of the NCP. That agreement can make the state into a "lead" agency or a "support" agency. 40 C.F.R. § 300.515(a). In order to receive federal funding for its role, a state must enter into an agreement that complies with 40 C.F.R. pt. 35, subpt. O. *Id.* § 300.515(a).

The United States contends that there is no need for the delegation from EPA to a state of the lead for this site to be in the Administrative Record. However, there are very detailed *procedural* requirements for EPA to delegate authority to a state. Those requirements are set forth in the NCP and in Part 35 of EPA's regulations. Failure to comply with those requirements fails to protect the integrity of the decision-making process. The Court must be able to review that delegation, in order to review the procedural integrity of the remedy selection.

The Administrative Record must include "the documents that form the basis for the selection of the response action." 40 C.F.R. § 300.800(a). The document that authorizes the decision-maker to make a decision forms the basis for that decision. If the Court does not have that authorization in the record before it, how can the Court evaluate whether that decision was procedurally appropriate?

5

Dkt. 578-1 is not in the Administrative Record. No agreement is in the Administrative Record. The Court cannot find that based on the Administrative Record the State of Wisconsin had any authority for conducting the RI/FS, preparing the proposed remedial action plan, or issuing the RODs in this case.

**B.  Even if Dkt. 578-1 were in the Administrative Record, Dkt. 578-1 is not a "cooperative agreement," and Dkt. 578-1 does not say what the United States represents it to say.**

The Court should look carefully at Dkt. 578-1, because it is not what the government says it is. It is not a "cooperative agreement" that explains how WDNR made the decisions it made in this case.

Dkt. 578-1 is a request by WDNR for funding from the United States. It is not signed anywhere by any official of the United States, let alone anyone in a position to enter into a cooperative agreement under CERCLA. It cannot be an agreement with or a delegation from the United States.

Dkt. 578-1 nowhere commits the State of Wisconsin to do its work in conformity with CERCLA, the NCP, or CERCLA guidance. The governments write the following in their brief:

> The cooperative agreement explicitly states: "[a]ll activities conducted under this Agreement shall not be inconsistent with the revised National Contingency Plan ("NCP"), 40 CFR 300, dated March 8, 1990 (Vol. 55 No. 46 Federal Register 8666)" and contains the assurance that the applicant "[w]ill comply with all applicable requirements of all other Federal laws, executive orders, regulations and policies governing this program." Dkt. 578-1 at WDNR-040001198.

Plffs' Brief at 11. Plaintiffs are mistaken.

6

PHI 316,987,392v5 11-14-12
Case 1:10-cv-00910-WCG   Filed 11/14/12   Page 8 of 17   Document 617

The first quotation *simply does not appear in the document anywhere*. The document does not mention the NCP at all.

The second quotation is part of the boilerplate on a pre-printed form. Notice that the pre-printed form mentions *other* legal standards quite specifically, but not CERCLA or the NCP. Dkt. 578-1 at WDNR-040001197-98, ¶¶ 5-17.

Dkt. 578-1 seeks funding for the WDNR Bureau of Remediation and Redevelopment, headed at the time by Mark Giesfeldt. *Id.* at WDNR-04001191, Item 5. The work done on this site was done by WDNR's Bureau of Watershed Management, headed at the time by Bruce Baker. *See, e.g.,* Dkt. 439-12 [Record Of Decision, Operable Units 1 and 2] at WDNR124002710; Dkt. 404-2 [Record Of Decision, Operable Units 3, 4 and 5] at WDNR124002144. This is no mere formal difference. The substitution of the Bureau of Watershed Management for the Bureau of Remediation and Redevelopment substituted for the group at WDNR experienced at Superfund remedy selection a group less receptive to risk-based remedial decisions. Dkt. 578-1 offers no explanation for how Mr. Baker and his group ended up leading the effort on this site, and therefore it is just irrelevant.

Dkt. 578-1 also addresses only part of the relevant time period. The fate and transport models were finalized, the RI/FS was drafted, the proposed remedial action plan was prepared, and the RODs were all issued after January 31, 1999, the end date of the agreement proposed by WDNR in Dkt. 578-1. Dkt. 578-1 at WDNR-040001190.

It is impossible to tell from the face of Dkt. 578-1 what it is, but it is not whatever the agreement was under which WDNR's Bureau of Watershed Management took the lead in selecting the remedy for this site. Dkt. 578-1 is not what the plaintiffs have represented it to be. If extra-record evidence is to be considered on the issue of whether EPA properly involved WDNR as the lead agency, then discovery ought to be permitted and a full record developed.

### C. WDNR's consideration of non-NCP criteria appears on the face of Dkt. 578-1.

WDNR prepared Dkt. 578-1 in 1997, long before the formal selection of a remedy for this site. WDNR noted the concurrent remedy selection and federal natural resource damages assessment, as well as a competing state natural resource damages assessment. WDNR wrote: "Governor Tommy G. Thompson has directed DNR Secretary George Meyer to make this cleanup and restoration project a high priority." Dkt. 578-1 at WDNR-040001205. WDNR was told by the Governor to obtain control over evaluation of "the legal, political, socioeconomic and environmental issues associated with this remediation project . . . ." *Id.* "Public interest in restoring the Lower Fox River remains high, as does citizens' demand for information and direct involvement in shaping a cleanup and restoration plan for the river." *Id.*

These understandable, and perhaps even laudable, objectives are not the same as application of CERCLA's nine remedy selection criteria as dictated by the NCP. Dkt. 578-1 shows exactly what was true. WDNR obtained control over the remedy selection

here in order to assure achievement of the Governor's purpose that the river be "restored" in a manner shaped by local public opinion – not necessarily application of the NCP.

Dkt. 578-1 shows that WDNR had already decided in 1997 that that "restoration" would involve dredging. WDNR requested funding for an environmental engineer "to provide engineering support on activities related to dewatering of sediment and other disposal related issues that will come up in the review of the RI/FS." *Id.* at WDNR-040001210. WDNR requested no similar engineering support for consideration of any other remedial technology. In 1997, WDNR had already committed to a sediment removal remedy. The remedy selection was pre-judged by WDNR before the RI/FS was under way.

The Administrative Record does not tell us what agreement, if any, EPA and WDNR in fact had. The Court should not consider Dkt. 578-1 at all. However, if the Court does consider that document for whatever it is worth, it surely reflects WDNR's thinking as of its date. The governments' lawyers deride Certain Defendants for claiming

> that EPA's "improper" delegation turned WDNR into a zombie agency answering only "to the Governor, not the President" in mindless pursuit of its own dredging-centric agenda and without obligations to abide by the requirements of CERCLA.

Plffs' Brief at 10-11. They have it 180 degrees backward. WDNR was no zombie, and EPA's delegation certainly did not make it a zombie. WDNR pursued nothing mindlessly. WDNR had an objective and a charge from the Governor. WDNR adroitly pursued that objective, in part by positioning itself as the lead agency. It was EPA that

9

acted improperly by failing to protect the integrity of the CERCLA decision-making process.

Nothing in the Administrative Record shows that WDNR was properly placed in the lead role for all of the complicated decision-making that went into selection of the remedy at this site. What the governments have offered from outside the record, Dkt. 578-1, does not even contain the language the governments say it contains. That document in fact shows exactly what Certain Defendants have contended. This remedy was pre-judged by WDNR for reasons outside the nine CERCLA remedy selection criteria, and EPA improperly acquiesced. The remedy selection was arbitrary and not in accordance with the NCP or CERCLA.

### III. EPA's Consideration of Comments Must Not Be Arbitrary or Contrary to Law.

The Plaintiffs' brief suggests that on any issue as to which any party submitted comments that EPA and WDNR considered, EPA's and WDNR's decision cannot be arbitrary, capricious, or contrary to law. Plaintiffs seem to reason from the Court's observation that the Court's review focuses primarily on whether the governments used the appropriate process to reach their decisions. Dkt. 498.

Plaintiffs too blindly exalt form over substance. An agency must not only consider comments, it must consider them in a non-arbitrary, not capricious way. The Fox River Group submitted six volumes of comments on the proposed remedial action plan. Had they taken those comments seriously, the governments would have known in

10

PHI 316,987,392v5 11-14-12

2003 that dredging would cost much more and be less effective than the governments assumed. Yet, the governments arbitrarily rejected those comments, and never revisited the issue fully in 2007 or 2010 when the FRG's criticisms were borne out. That arbitrary rejection of well-taken comments does not insulate the governments' remedy selection. To the contrary, it shows that it was arbitrary, as described in Glatfelter's principal brief.

IV. **Certain Defendants Have Not Endorsed the "Optimized Remedy."**

Plaintiffs argue that because NCR and Georgia-Pacific advocated for an amendment to the 2003 ROD for OU3-5, and because EPA and WDNR ultimately adopted some of those suggestions in the 2007 Amended ROD for OU2-5, the other defendants ought to be treated as having endorsed the 2007 Amended ROD's "optimized remedy." That does not follow. NCR and Georgia-Pacific are not Glatfelter, WTM I, Menasha, CBC, USPM, NMSC, or the City of Appleton. Indeed, the Certain Defendants did not participate in preparation of the Basis of Design Report on which the "optimized remedy" was based.

Plaintiffs point out that Glatfelter and WTM I agreed to implement an Amended ROD for OU1 in 2008 that included some of the same features as the remedy for OU2-5. However, that agreement is taken out of context. In 2003, Glatfelter and WTM I agreed to implement the original remedy for OU1 as an alternative to litigating with the United States. *United States v. P.H. Glatfelter Co.*, No. 2:03-cv-949-LA (E.D. Wis. consent decree entered April 12, 2004)("OU1 CD"). The OU1 CD included a waiver of Glatfelter's and WTM I's rights to challenge the OU1 remedy. *Id.*, Dkt. 4. EPA agreed

11

PHI 316,987,392v5 11-14-12
Case 1:10-cv-00910-WCG   Filed 11/14/12   Page 13 of 17   Document 617

to amend that OU1 remedy in 2008, improving the remedy in the view of Glatfelter and WTM I, but only if Glatfelter and WTM I agreed to a modification of the OU1 CD. *See id.*, Dkt. 37. Neither Glatfelter nor WTM I nor anyone else agreed that the OU2-5 Amended ROD selected a proper remedy for OU2-5. Glatfelter and WTM I merely agreed to modify the OU1 project to meet the parties' needs, given the parties' positions in 2008.

### V. EPA's and WDNR's 2007 Amended ROD and 2010 ESD Did Not Cure the Impropriety of the Remedy Selection.

The plaintiffs offer no good response to Glatfelter's principal argument. In 2003, WDNR selected a dredging remedy. It did so by failing fairly to consider the comments that Glatfelter and others submitted which comments made clear that dredging would cost much more than WDNR anticipated and it would be less effective at achieving any environmental benefit. Indeed, dredging might retard the natural recovery of fish tissue PCB concentrations. WDNR's failure to consider those comments fairly made its decision arbitrary. WDNR's substitution of non-NCP criteria (such as those described in Dkt. 578-1) made the remedy selection contrary to law. EPA's delegation of the "lead" role in developing that remedy selection to WDNR was itself contrary to section 104(d)(1) of CERCLA and section 515 of the NCP.

In 2007, WDNR's assumptions that dredging would be inexpensive yet environmentally effective had proven inaccurate. Rather than revisiting the initial premise of the remedy selection, EPA merely compared the "optimized remedy" to the

12

dredging remedy, and decided that the "optimized remedy" was better. Dkt. 276-6 [Record of Decision Amendment, OU2-OU5] at EPAAR180148-50.  That does not mean that it was better than remedies that focused on capping or covering.  The same failure of reasoned analysis occurred in 2010.  Dkt. 147-1 [Explanation of Significant Differences, OU2-OU5 ("ESD")].

In no case did WDNR or EPA consider the difference in the time it would take to complete an all-dredging 2003 remedy, or a mostly-dredging "optimized remedy," as compared with a mostly-covering and -capping remedy.  They cannot rationally say that fish tissue PCB concentrations will recover faster than they would have had the remedy not relied on dredging.

**VI. Even if the Court Declines to Grant Judgment to Certain Defendants Invalidating the Governments' Remedy Selection for OU2-5, the Court Should Grant Summary Judgment to Certain Defendants Denying the United States' Requested Mandatory Injunction.**

All the governments can say is that these decisions were not arbitrary.  The governments cannot, or do not, say that the remedy they selected will in fact do any good.  This is a claim for a mandatory injunction.  "Not arbitrary" should not be enough for this Court to grant a mandatory injunction under section 106(a) of CERCLA.

The Court may, if it so chooses, grant judgment to Certain Defendants denying the United States' requested mandatory injunction.  That ruling would not at this time invalidate the selection of the remedy nor would it necessarily make the 2007 UAO unenforceable.  The statute provides for enforcement of UAOs in the ordinary course

13

through the imposition of civil penalties under section 106(b)(1) of CERCLA, 42 U.S.C. § 9606(b)(1). Courts have very rarely considered requests for mandatory injunctions under section 106(a), such as what the United States seeks here. Perhaps the UAO is enforceable, but not by injunction. The government should be denied relief under Count V, and the Court should relegate it to conventional enforcement under section 106(b)(1) of CERCLA should any person, without sufficient cause, violate the UAO.

For the foregoing reasons, and for the reasons stated in Glatfelter's principal brief and the briefs filed by Menasha Corporation, the motion for summary judgment as to the propriety of the remedy selection of Plaintiffs should be denied, and the cross-motion of Certain Defendants should be granted. Moreover, for the reasons stated here, the Court should at a minimum deny the Plaintiffs' motion and hold that the Court will not issue a mandatory injunction against Certain Defendants at this time.

Dated: November 14, 2012					Respectfully submitted,


					*/s/ David G. Mandelbaum*
					David G. Mandelbaum
					Francis A. Citera
					Marc E. Davies
					Caleb J. Holmes
					Adam B. Silverman
					GREENBERG TRAURIG, LLP
					Two Commerce Square, Suite 2700
					2001 Market Street
					Philadelphia, PA 19103
					215.988.7800
					mandelbaumd@gtlaw.com

					**Attorneys for Defendant P.H. Glatfelter Company**

*PHI 316,987,392v5 11-14-12*