UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA and
STATE OF WISCONSIN,

        Plaintiffs,

v.                                                          Case No. 10-C-910

NCR CORP. et al.,

        Defendant.

**DECISION AND ORDER ON DEFENDANTS' LIABILITY**

The United States has moved for partial summary judgment on the question of some of the Defendants' liability under CERCLA. (ECF No 549.) NCR has conceded liability under § 107(a), 42 U.S.C. § 9607(a), but other Defendants to whom the motion is addressed, P.H. Glatfelter, Inc. ("Glatfelter"); CBC Coating, Inc. ("CBC"); Menasha Corporation ("Menasha"); and WTM I Company ("WTM"), oppose. Although the liability of these Defendants (hereinafter collectively "the Defendants") has essentially been taken for granted throughout these proceedings, the Defendants at issue, all of whom had facilities in the upriver portion of the Site, have suggested that they might not be liable if their discharges did not give rise to response costs downstream of their facilities. It has been assumed throughout this action that although toxic PCBs did not flow *up*stream (at least very far), PCBs that were released in OU1 and OU2 were naturally carried *down*stream into OU4 and into Green Bay. Even if the amounts were small, it has been assumed that these releases rendered the upriver Defendants liable under CERCLA. The Defendants now

1

argue that only a minimal amount of PCBs were carried downstream, and these releases were not sufficient to cause the incurring of any response action in the lower portions of the Site. In other words, the amounts released from their facilities would not have been sufficient *on their own* to require a response. As such, they believe they cannot be liable under CERCLA for these downriver response costs.

As relevant here, liability under CERCLA § 107(a) requires (1) "release" of a "hazardous substance" from (2) a "facility," which (3) caused the incurrence of costs of response, and (4) the defendant owned, operated or arranged for disposal at that facility. 42 U.S.C. § 9607(a). Defendants argue that, read together, these elements require the government to prove that the release from a given defendant's facility specifically caused the incurrence of response costs. This "nexus" between the release from one location and the incurrence of response costs from another site is, the Defendants argue, part of the government's *prima facie* case. "In a 'two-site' case such as this, where hazardous substances are released at one site and allegedly travel to a second site, in order to make out a prima facie case, the plaintiff must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up." *Kalamazoo River Study Group v. Rockwell Intern. Corp.,* 171 F.3d 1065, 1068 (6th Cir. 1999).

The Defendants argue that their OU1 releases are neither necessary nor sufficient causes of the costs incurred in OU2 through OU5. Little Lake Butte des Morts (OU1) is a 1,200 acre reservoir of water that connects Lake Winnebago to the Lower Fox River. Water moves slowly within the Lake, and even within the Lake itself the portion that is downriver of the Defendants' paper mills did not need to be remediated. Thus, it should go without saying that a portion of the River that is

2

downstream by some 30 miles would not result in remediation costs that are attributable to the OU1 Defendants.

In a previous decision, I rejected the idea that PCBs released at Portage, Wisconsin into the *Upper* Fox River could give rise to liability in the *Lower* Fox River given the fact that the Lower Fox (the Site at issue here) is so far downstream and the fact that toxins released in Portage would have needed to travel a labyrinth of locks and dams, not to mention a large lake. Portage was simply not part of "the Site" as the government has defined it, just as Lake Huron is not part of the Site, even though technically the waters from the Fox flow into Green Bay and into the connected Great Lakes system. The OU1 Defendants note that PCBs can evaporate in the air and be carried by the jet stream to waterways all around the country, and yet no one would have the temerity to suggest that a polluter in California would be liable for the cleanup of the Hudson River in New York. So, too, they suggest, OU1 dischargers cannot be held liable for OU4 cleanup costs merely because some trace amounts of PCBs might have leaked into that section of the River. The government will not be able to show the required "nexus" between the OU1 PCB releases and the response costs incurred in OU4. For present purposes, Defendants argue that it is enough that there is a genuine issue of material fact as to whether their releases into OU1 resulted in the incurring of cleanup costs in OU4. As such, they believe the government's motion for summary judgment must be denied.

Indeed, Menasha even suggests that there is no evidence that it ever discharged PCBs at all. Menasha notes that the John Strange Paper Mill, which Menasha owned prior to 1983, never used NCR broke in its manufacturing process. In fact, NCR broke would have been a poor product to use to make the paperboard products the John Strange Paper Mill produced. But buy emphasizing

3

that it did not buy NCR broke, Menasha seems to concede, as Plaintiffs allege, that it would have released some amount of PCBs either to the lower Fox River or the Neenah-Menasha Sewerage Commission publicly owned treatment works ("NMSC POTW") as a result of recycling post-consumer mixed paper that would have contained some portion of NCR carbonless copy paper ("CCP"). (ECF No. 589, at 16-18.) More importantly, as Plaintiffs point out, Menasha has already admitted in its answer that it discharged PCBs and that it is liable under CERCLA sections 107(a)(2) and (a)(3). "Menasha admits that Menasha or its predecessor, the John Strange Paper Company, owned and operated JSPM which, in the manner discussed in its response to paragraph 82 above, inadvertently, unintentionally and/or unknowingly: (a) discharged waste water with very low levels of PCBs to the upper portion of OU-1 at the Menasha Channel; and, (b) arranged for treatment or disposal with the NMSC POTW waste water with very low levels of PCBs." (ECF No. 48, ¶ 84.) Given these admissions, Menasha's eleventh hour denial is insufficient to raise a factual issue as to whether it discharged PCBs directly or indirectly into the lower Fox River site.

Ultimately the Defendants' overall argument is unpersuasive. Holding an OU1 paper company liable for cleanup of the River is not the same as trying to hold it liable for cleanup of a distant waterway merely because some infinitesimal amount of PCBs evaporated into the air and was transported to, say, the Hudson River. Nor is it the same as a distant release in Portage, which no one has plausibly suggested was a source of the pollution at the Lower Fox River Site and is, in fact, *not* part of this Site. Here, the Defendants have admitted that some of their PCB-containing discharges made their way into OU4, but argue that the amounts were so small that they did not result in response costs. (*E.g.,* "WTM's direct discharges to OU1 are not enough to impose liability . . . for OU4." (ECF No. 596 at 7.); "A very great deal of solid material washes into the Fox River,

4

and those particles tend to contain very little PCB." (ECF No. 589 at 13.); "CBC will establish at trial that it did not independently contribute PCBs to the Fox River at anywhere near the level that would warrant remediation."))

The Defendants are essentially attempting to argue for a *de minimis* defense, which they concede does not exist in CERCLA. As the Eighth Circuit pointed out:

> at least at the liability stage, the language of the statute does not require the government to prove as part of its prima facie case that the defendant caused any harm to the environment. Rather, once the requisite connection between the defendant and a hazardous waste site has been established (because the defendant fits into one of the four categories of responsible parties), it is enough that response costs resulted from "a" release or threatened release-not necessarily the defendant's release or threatened release.

*United States v. Hercules, Inc.,* 247 F.3d 706, 716 (8th Cir. 2001) (citation omitted).

In other words, there need be no "nexus" between a given defendant's release and a specific response cost incurred—it is enough that (a) the defendant released a pollutant and (b) response costs were incurred to clean up "a" release. If the defendant truly released a minimal amount, that speaks not to its own liability (for which there is no *de minimis* defense) but to whether that liability is divisible. It also plays a role in equitable contribution. In short, I agree with the United States that the arguments the Defendants now present are more of a "preview" of their divisibility arguments than an independent basis to conclude they are not liable.

CBC Coating is in a somewhat different situation. It argues that the governments did not plead a violation of CERCLA § 107(a)(2) (discharger liability) in their complaint and thus they cannot now obtain summary judgment on § 107(a)(2) liability. And even if they did plead it, CBC argues that there are outstanding issues of fact that would preclude summary judgment.

The governments referred to § 107(a)(2) in their amended complaint and specifically alleged

5

that CBC "owned an operated a facility at the time of disposal of hazardous substances at that facility, and there were releases from that facility to the Site." (ECF No. 30 at ¶¶ 58, 59.) Further, the governments inquired through the discovery process about direct discharges from CBC's facility (then known as Riverside Paper). Although the amended complaint also alleges discharges CBC made to the Appleton Publicly Owned Treatment Works ("POTW") (ECF No. 30, ¶ 57), the allegation of direct discharge is in the amended complaint. Even if it were not, I would allow an amendment to conform the amended complaint to the evidence.

The real question is whether summary judgment on liability may be granted to the governments even assuming it did plead § 107(a)(2) liability in its amended complaint. The Plaintiffs argue that the evidence is indisputable that CBC's wastewater contained PCBs and that it was discharged to the River, which seems quite plausible since CBC used recycled paper in its production process and did not connect to the Appleton POTW until 1972. Before then, and even after, CBC discharged into the Lower Fox River, consistent with its WDNR-issued discharge permit. (ECF No. 605, ¶ 6.) CBC focuses on the fact that only trace amounts of PCBs have been found in the wastewater it discharged to the POTW since it began testing for them in 1974. (*Id.* ¶¶ 7-9.) But this is hardly surprising since NCR stopped using PCBs in its CCP emulsion in April 1971. (*Id.* ¶ 3.) CBC also asserts that it did not start buying broke from NCR until about six months after NCR stopped using PCBs, but again, as with Menasha, a recycler did not need to buy NCR broke in order to discharge PCBs into the River. By the height of the NCR CCP production period, it presumably would have been difficult to avoid NCR paper if a company was recycling post-consumer mixed paper as CBC apparently was. Summary judgment cannot be based on presumptions and appearances, however, and the cited support for Plaintiffs' proposed findings of

6

fact leave me unconvinced that, as to CBC's liability, they are undisputed on the issue of whether CBC discharged PCBs either directly or indirectly through the Appleton POTW into the River. Nor has CBC conceded the point, unlike other Defendants. I am thus satisfied that CBC has shown the existence of material facts that preclude entry of judgment at this time on both the § 107(a)(2) and (a)(3) claims.

Finally, both WTM and CBC, somewhat inconsistently in light of the previous discussion, raise arranger liability issues. They argue that they cannot be held arrangers because they did not know their discharges to the POTWs were hazardous and thus they did not "arrange" for the disposal of hazardous materials. It is undisputed that WTM's discharges contained PCBs, and for purposes of addressing the argument, I will assume that CBC's did as well.

WTM analogizes this case to the companion *Whiting* action, where I concluded that the Appleton Coated Paper Company did not arrange to dispose of hazardous substances when it sold bales of seemingly harmless paper scraps for profit. But a key verb at issue in that case was the word "dispose." 42 U.S.C. § 9607(a)(3). Selling a valuable product (paper scraps, or "broke") is not readily described as a "disposal," particularly if the seller did not realize the product was hazardous in the first place. That is, if the product is worth something and is not considered dangerous, there is no reason for someone to "dispose" of it—they *sell* it. But here, there is no question that the matter "disposed" of was wastewater, which is, by definition, something that someone intends to "dispose" of. Accordingly, knowledge about the specific nature of the matter disposed of is far less relevant. I am satisfied that discharging wastewater qualifies as "arranging for disposal" under § 107(a)(3). *Burlington N. and Santa Fe Ry. Co. v. United States,* 556 U.S. 599, 610-11 (2009). Accordingly, the governments' motion for summary judgment on arranger liability

7

will be granted as to all Defendants except CBC.

In sum, the Plaintiffs' motion for partial summary judgment [549] is **GRANTED** in all respects, except that it is **DENIED** as to the issue of Defendant CBC Coating's liability under CERCLA § 107(a).

**SO ORDERED** this  23rd  day of November, 2012.

                                                  /s William C. Griesbach
                                                 William C. Griesbach
                                                 United States District Judge

8

Case 1:10-cv-00910-WCG   Filed 11/23/12   Page 8 of 8   Document 668