# EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF WISCONSIN

 3                      GREEN BAY DIVISION
     -----------------------------------------------------
 4
     UNITED STATES OF AMERICA, et al.
 5
                     Plaintiffs,
 6
                  vs.              Case No. 1:10-CV-00910-WCG
 7
     NCR CORPORATION, et al.,
 8
                     Defendants.
 9
     -----------------------------------------------------
10

11          Videotape Deposition of GARY KLEINRICHERT

12              Wednesday, November 7, 2012

13
                         9:33 a.m.
14
                           at
15
                  Greenberg Traurig, LLP
16                 77 West Wacker Drive
                     Chicago, Illinois
17

18

19

20

21

22

23

24          Reported by Dawn M. Lahti, RPR/CRR

25
```


Case 1:10-cv-00910-WCG   Filed 11/27/12   Page 2 of 21   Document 687-3

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

```
 1              Videotape deposition of GARY
 2        KLEINRICHERT, a witness in the above-entitled
 3        action, taken at the instance of the Defendants,
 4        pursuant to the Federal Rules of Civil Procedure,
 5        before Dawn M. Lahti, RPR, Certified Realtime
 6        Reporter, and Notary Public, State of Wisconsin, at
 7        77 West Wacker Drive, Chicago, Illinois, on the 7th
 8        day of November, 2012, commencing at 9:33 a.m. and
 9        concluding at 10:58 a.m.
10  A P P E A R A N C E S :
11
12                U.S. DEPARTMENT OF JUSTICE, by
                  Ms. Sumona Majumdar
13                P.O. Box 7611
                  Washington, DC 20044-7611
14                Appeared on behalf of Plaintiffs.
15                CRAVATH, SWAINE & MOORE LLP, by
                  Ms. Jennifer A. Jude
16                825 Eighth Avenue
                  New York, New York 10019
17                Appeared on behalf of NCR Corporation.
18                GREENBERG TRAURIG, LLP, by
                  Mr. Frank A. Citera
19                77 West Wacker Drive, Suite 3100
                  Chicago, Illinois 60601
20                Appeared on behalf of P.H. Glatfelter
                  Company.
21                HUNSUCKER GOODSTEIN & NELSON, PC, by
                  Mr. Marc Shapp
22                3717 Mt. Diablo Boulevard, Suite 200
                  Lafayette, California 94549
23                Appeared by phone on behalf of Menasha
                  Corporation.
24
25
```

```
 1  APPEARANCES CONTINUED:
 2  QUARLES & BRADY LLP, by
    Ms. Nancy Peterson
 3  Mr. James E. Goldschmidt
    411 East Wisconsin Avenue
 4  Milwaukee, Wisconsin 53202
    Appeared on behalf of WTM-1 Company.
 5
    DAVIS & KUELTHAU, S.C., by
 6  Mr. William J. Mulligan
    111 East Kilbourn Avenue, Suite 1400
 7  Milwaukee, Wisconsin 53202
    Appeared on behalf of Neenah-Menasha
 8  Sewerage Commission.
 9  von BRIESEN & ROPER, s.c., by
    Mr. Michael Carlson
10  411 East Wisconsin Avenue, Suite 700
    Milwaukee, Wisconsin 53202
11  Appeared by phone on behalf of CBC
    Coating, Inc.
12
13  ALSO PRESENT: Robert Zellner, Videographer.
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              E X A M I N A T I O N
 2
    BY MS. JUDE                                           6
 3  BY MS. MAJUMDAR                                      45
 4
 5
 6
 7
 8
 9
10              E X H I B I T S
11  EXHIBIT NO.                              PAGE MARKED
12  4310   Expert Report                         18
    4311   Supplemental Expert Report            19
13  4312   EPA Memorandum                        30
14
    (Original exhibits attached to original transcript.
15  Copies of exhibits attached to copies of transcript.)
16
17
18
19
20
21
22
23
24
25
```

```
 1   TRANSCRIPT OF PROCEEDINGS
 2      VIDEO OPERATOR: Good morning.  We are on
 3  the video record.  My name is Robert Zellner, and
 4  I'm a video technician for Depovision located at 77
 5  West Washington Street in Chicago, Illinois in
 6  association with Gramann Reporting.
 7      The date is November 7th, 2012, and
 8  the time is approximately 9:33 a.m.  We are present
 9  here today at 77 West Wacker Drive on the 31st
10  floor in Chicago, Illinois with reference to the
11  case entitled United States of America vs. NCR
12  Corporation, et al., pending in the United States
13  District Court for the Eastern District of
14  Wisconsin, Green Bay division, Case No.
15      1:10-CV-00910-WCG.
16      The witness is Gary G. Kleinrichert.
17  An audiovisual recording of this deposition is at
18  the request of the defendants.  And will the
19  attorneys please identify themselves for the
20  record?
21      MS. JUDE: Jennifer Jude for NCR
22  Corporation.
23      MS. PETERSON: Nancy Peterson, Quarles &
24  Brady for WTM-1 Company.
25      MR. GOLDSCHMIDT: James Goldschmidt,
```

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

1 Quarles & Brady, for WTM-1.
2     MR. MULLIGAN: William Mulligan, Davis &
3 Kuelthau, for Neenah-Menasha Sewerage Commission.
4     MS. MAJUMDAR: Sumona Majumdar with the
5 United States Department of Justice.
6     MR. CITERA: Frank Citera for the
7 Glatfelter Company.
8     VIDEO OPERATOR: On the telephone,
9 please.
10     MR. CITERA: Can you guys on the
11 telephone re-identify yourselves for the purposes
12 of the video?
13     MR. SHAPP: This is Marc Shapp for
14 Menasha Corporation.
15     MR. CARLSON: Mike Carlson for CBC
16 Coating.
17     VIDEO OPERATOR: Thank you. And will the
18 court reporter please identify herself for the
19 record and swear in the witness?
20     GARY KLEINRICHERT, called as a witness
21 herein, having been first duly sworn on oath, was
22 examined and testified as follows:
23     EXAMINATION
24     BY MS. JUDE:
25 Q. All right. Good morning.

1 A. Good morning.
2 Q. Could you please state your full name for the
3 record?
4 A. Sure. Gary Kleinrichert.
5 Q. And what's your address?
6 A. My address is 520 North Kingsbury, Chicago,
7 Illinois. I also have a residence in Indianapolis,
8 Indiana, 5697 North Pennsylvania Street,
9 Indianapolis, Indiana.
10 Q. And who do you work for?
11 A. I'm employed by FTI Consulting.
12 Q. Okay. So if you don't understand any of my
13 questions, please just ask for clarification. Also
14 I know you've done this before, but try to give,
15 you know, verbal answers rather than nodding or
16 saying uh-huh.
17 A. Okay, I'll try.
18 Q. And let me know if you need a break.
19 A. Okay.
20 Q. So could you -- could you describe the types of
21 cases that you've been involved in in the past?
22 A. I've been involved in a variety of civil litigation
23 matters in the past. I've been involved in -- when
24 you say cases, I assume you mean disputes?
25 Q. Um-hum, yes.

1 A. I've been involved in a variety of investigations
2 in the past dealing with financial -- alleged
3 financial misrepresentations and fraud and
4 implementation proprieties.
5 Q. Okay. Have you --
6 A. And I'm just -- I answered your question relative
7 to the types of disputes as opposed to other types
8 of just general projects in cases I've done where
9 there's not a dispute --
10 Q. Okay.
11 A. -- or a potential dispute.
12 Q. For disputes, have you been involved in anything
13 related to CERCLA in the past?
14 A. I've been involved in some matters where there are
15 CERCLA claims, yes.
16 Q. Okay. Could you describe your role in those
17 disputes?
18 A. My role in those disputes has been to look at
19 underlying costs which had been incurred to
20 determine and to review the adequacy of the support
21 for those costs. I've also looked at the financial
22 resources and capabilities of some of the parties
23 involved in the -- in the matters.
24 Q. Okay. So have you made a determination of
25 financial ability to pay similar to your opinion

1 here in the past?
2 A. In CERCLA matters?
3 Q. Um-hum.
4 A. I don't believe I've rendered any opinions with
5 respect to ability to pay in a CERCLA matter.
6 Q. Okay.
7 A. I've done some analysis and some consulting in
8 environmental matters with respect to a party's
9 ability to pay, but I don't believe I've rendered
10 any opinions or testified on such analysis.
11 Q. And have you rendered opinions about financial
12 ability to pay in non-CERCLA matters in disputes?
13 A. Yes.
14 Q. Could you describe --
15 A. Let me go back. Can you read back that question?
16     (Record read.)
17     THE WITNESS: Yes, I believe so.
18     BY MS. JUDE:
19 Q. Could you describe those disputes in your opinion?
20 A. The disputes that I've rendered such opinions
21 relate to some EEOC claims against parties related
22 to where there are claims related to the actions of
23 employees of corporations and fines that the EEOC
24 was looking to impose and their ability to pay such
25 fines.

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

1  Q.  Okay.  Any other context type of dispute?
2  A.  I've performed solvency analysis, which one of the
3  two tests under a solvency analysis relates to
4  ability to pay your bills, so certainly I've done a
5  number of those types of calculations as well.
6  Q.  What is the other aspect of the solvency analysis?
7  A.  The other general test of a solvency analysis is
8  whether the company is solvent, whether the assets
9  of the -- the fair value of the assets are greater
10  than the fair value of the liabilities.
11  Q.  And that's different than ability to pay?
12  A.  Well, there's two tests to determine solvency.
13  Q.  Those are alternatives, okay.
14  A.  It's whether or not the fair -- the fair value of
15  your assets are in excess of the fair value of your
16  liabilities or does the company have the ability to
17  pay its bills as they come due.
18      And as you're looking at the ability
19  of a company to pay its bills as they come due,
20  you're looking at what those bills are and the
21  company's ability -- projected ability to meet
22  those obligations.
23  Q.  What did you do to prepare for this deposition?
24  A.  Reread my report, reviewed some of the documents
25  that were produced in the case, met with counsel

1  and perhaps other things but generally just
2  attempted to make sure I was familiar with the
3  document or re-familiar -- re-familiarize myself
4  with the documents so that I was conversant with
5  respect to them.
6  Q.  When and for how long did you meet with counsel?
7  A.  I met with counsel yesterday for approximately
8  three hours.  I met with counsel this morning for
9  30 minutes or so.
10  Q.  Any other times?
11  A.  Not in preparation for this deposition.
12  Q.  When you met with counsel to prepare for this
13  deposition, did you review documents?
14  A.  There were documents in the room.  I think we did
15  look at some documents.
16  Q.  Okay.  About how many?
17  A.  Oh, boy, I don't know.  That's hard to -- we looked
18  at certain documents that are referenced in the
19  reports that I've issued.  I think we looked at the
20  recent 10Q that was filed by NCR, and we may have
21  looked at some others.
22  Q.  Did you review any documents not in Appendix B of
23  your more recent supplemental report?
24  A.  Not that I can recall.
25  Q.  Then did you speak to anyone besides counsel to

1  prepare for this deposition?
2  A.  I spoke to my colleague who I worked -- who worked
3  for me on this engagement.
4  Q.  And who is that?
5  A.  Brent Miller.
6  Q.  And what is Brent's job on this engagement?
7  A.  Brent's job was to assist me in reviewing the
8  documentation and performing analysis with respect
9  to this matter under my supervision.
10  Q.  And Brent works for FTI?
11  A.  Brent works -- yes.
12  Q.  Did anyone else at FTI assist you in preparing for
13  the deposition?
14  A.  No.
15  Q.  And did anyone else at FTI assist you in preparing
16  your report or your reports?
17  A.  Can you read back the question?
18      (Record read.)
19      THE WITNESS: No.
20      BY MS. JUDE:
21  Q.  What is your general understanding of what's at
22  issue in this case?
23  A.  My general understanding of what's at issue in this
24  particular case is the government seeking
25  reimbursement for certain costs they've incurred

1  from the defendants, and I believe the government
2  seeking to enforce orders with respect to the
3  remediation of the Fox River against those
4  defendants, and it's my understanding that the
5  trial relates to the second of those two items.
6  That's my understanding.
7  Q.  Could you describe your expertise?
8  A.  Well, I understand that -- I'm not a lawyer, but I
9  do understand that in providing expert testimony,
10  that expertise is based upon a person's knowledge,
11  experience, education and training.
12      I have -- I'm a CPA, and therefore,
13  I am -- I think I'm certainly an expert in
14  accounting and financial matters.  I also have
15  other designations in valuations.  I also have
16  expertise and designations related to forensic
17  investigations.
18      So in financial/accounting/
19  valuation's investigative matters, that's where I
20  spend a significant amount of my professional time,
21  but I also certainly have worked in a number of
22  industries and worked in a number of other more --
23  more -- more narrow topics as well in addition to
24  those general topics.
25  Q.  Do you consider yourself an expert in environmental

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

1 remediation?
2 A. Can you clarify?
3 Q. Do you consider yourself an expert in the science
4 of environmental remediation?
5 A. No.
6 Q. Do you consider yourself an expert in the cost of
7 environmental remediation?
8 A. I -- I have experience with reviewing support for
9 costs which are incurred in a variety of contexts
10 and I have experience with analyzing trends and
11 other projections of cost. I don't have experience
12 with respect to the original estimation of cost to
13 do a particular cleanup or remediation.
14 Q. Do you have any legal training?
15 A. No.
16 Q. Are you offering a legal opinion?
17 A. No.
18 Q. And you are being compensated for your involvement
19 in this matter?
20 A. Yes.
21 Q. How are you --
22 A. Well, FTI is being compensated for my involvement
23 in this matter.
24 Q. How is FTI being compensated?
25 A. They're being compensated based on the time I spend

1 on this matter on a time and materials basis.
2 Q. Time and materials?
3 A. Sure.
4 Q. What's the materials aspect?
5 A. Well, to the extent there's any out-of-pocket costs
6 for travel or other types of cost of that type,
7 those -- those costs would also be -- FTI would be
8 compensated or reimbursed then for those costs.
9 Q. Is there any other aspect of your compensation in
10 this matter besides a time rate and out-of-pocket
11 costs?
12 A. When you say "your," are you referencing FTI?
13 Q. Yes.
14 A. No.
15 Q. Do you know how much FTI has been compensated so
16 far for its role in this case?
17 A. No.
18 Q. Do you know what your budget for this case is?
19 A. No, I don't think I have a budget.
20 Q. And do you know approximately how many hours you've
21 worked on this case so far?
22 A. I don't have the time estimates in front of you --
23 in front of me. I've -- I've spent a significant
24 amount of time on this project.
25 Q. Any ballpark, more than 100 hours?

1 A. Probably more than 100 hours.
2 Q. More than 300 hours?
3 A. Probably not more than 300 hours. But I'd have to
4 look at the time records and let them stand for
5 themselves.
6 Q. And how much do you anticipate being paid by the
7 end of the trial for your -- for -- and I mean --
8 by "you," I mean FTI?
9 A. I don't know.
10 Q. Approximately how many times have you been retained
11 as an expert prior to this matter?
12 A. I've -- I don't know. I mean that's a little
13 bit -- can you clarify your question? Because
14 often I'm engaged not as an expert. I'm engaged to
15 perform an analysis with respect to some financial
16 or accounting or investigative topic and then later
17 I'm asked to testify about it.
18     I don't -- I don't know that I'm --
19 I'm not typically engaged to be the expert. I'm
20 engaged to do an analysis, and then counsel will
21 determine whether they would designate me later as
22 an expert based upon what I find in -- in that
23 phase.
24 Q. How many times have you prepared an expert report
25 that has been in the context of a dispute that has

1 been served on other parties?
2 A. I don't know. I'd have to estimate.
3 Q. Could you?
4 A. I'd estimate 150 times.
5 Q. How many times have you been deposed in a dispute?
6 A. Well, that we could figure out by looking at my CV
7 which -- which lists my testimony experience. I
8 think it's approximately 30 times but that's --
9 that's included in the documents I think we have.
10 Q. Have you ever been criticized for any expert
11 testimony you've been -- you have provided?
12     MR. CITERA: I'll object to the form of
13 the question.
14     THE WITNESS: Can you be more specific?
15     BY MS. JUDE:
16 Q. Have you ever failed to qualify as an expert on a
17 subject --
18 A. No.
19 Q. Have you ever --
20 A. Not as I understand that question. I mean, I think
21 that's somewhat of a legal question, but as I
22 understand that question, I've never been -- when
23 asked to testify or put forth in a proceeding to
24 testify, I've never not -- not testified with
25 respect to my opinions or been excluded.

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

1 Q. Have you ever submitted an expert report to a court
2 that has found it to be inaccurate?
3 A. Not to my knowledge.
4 Q. Are there any other --
5 A. Can you clarify what you mean by inaccurate? I
6 still think not to my knowledge, but that's an
7 interesting way to ask that question.
8 Q. Has a court in an opinion ever pointed out
9 inaccuracies in a report that you submitted?
10 A. Not to my knowledge.
11 Q. I'm going to hand you a copy of your initial expert
12 report which is dated September 7, 2012. And could
13 we mark this?
14     (Exhibit 4310 was marked for
15 identification.)
16     BY MS. JUDE:
17 Q. It is marked as Exhibit 4310.
18 A. You want me to take that one?
19 Q. Yeah.
20 A. This is -- this appears to be a copy of the report
21 that I authored September 7, 2012 --
22 Q. Okay.
23 A. -- based upon flipping through it.
24 Q. Right. Let's do the same thing again. I'm going
25 to hand you a copy of your supplemental expert

1 report dated November 5, 2012 and let's also mark
2 this.
3     (Exhibit 4311 was marked for
4 identification.)
5     THE WITNESS: Similar to the prior
6 exhibit, this appears, based on flipping through
7 it, to be a copy of the report that I prepared and
8 authored dated November 5, 2012. I can't check all
9 the numbers exactly to the original, but it appears
10 to be a copy.
11     BY MS. JUDE:
12 Q. Okay. Unless I say otherwise, when I refer to
13 report, I'm going to be referring to both of these
14 combined.
15 A. Okay.
16 Q. And if I'm referring specifically to one or the
17 other, I'll specify either initial report or
18 supplemental report, but ask me to clarify if
19 something's unclear.
20 A. Okay.
21 Q. Who wrote your expert report?
22 A. I did.
23 Q. Did you draft every section of it?
24 A. Yes.
25 Q. Did anyone else prepare a draft of any part of it?

1 A. Yes.
2 Q. Who?
3 A. Brent Miller assisted me with the initial drafting
4 of certain aspects of the report, but I -- I
5 drafted the report. He worked under my
6 supervision.
7 Q. Approximately when did you begin preparing the
8 report?
9 A. Well, you're referencing two different reports, so
10 I think you have to ask me specifically with
11 respect to each report because that's two different
12 times.
13 Q. Approximately when did you begin preparing the
14 initial report?
15 A. Sometime in late August.
16 Q. Approximately when did you begin preparing the
17 supplemental report?
18 A. Last Thursday or Friday.
19 Q. Did counsel give you feedback on any drafts of
20 either report?
21 A. Yes.
22 Q. How substantial were the edits?
23     MR. CITERA: I'm going to object to the
24 characterization of them as edits.
25     THE WITNESS: I don't remember any edits

1 as a result of counsel's feedback. So I would say
2 not substantial because I don't recall the edits.
3     BY MS. JUDE:
4 Q. So do you mean that you did not receive edits from
5 counsel, or you did not make edits as a result of
6 the feedback that you received from counsel?
7 A. Can you read that question back, please?
8     (Record read.)
9     THE WITNESS: With -- I'm not sure I mean
10 either. With respect to the first report, which
11 was months ago, I recall that there was discussion
12 with counsel related to a draft. I don't recall
13 whether there were edits made or not, and if so, I
14 know they weren't substantial.
15     BY MS. JUDE:
16 Q. So what did you mean earlier when you said you
17 didn't receive any edits from counsel?
18 A. I said I don't recall any edits. I don't -- I
19 don't recall any edits -- any particular edits with
20 respect to, for example, the initial report. I
21 don't recall if I made any edits at all or if we --
22 or if I received some feedback which caused me to
23 make any edits that were unsubstantial because I
24 just don't recall any edits.
25 Q. Okay. Did counsel ask you to make any assumptions

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

1   about any issues in preparing your report?
2   A.   I don't know that I would characterize -- counsel
3   asked me to -- based upon estimated costs for the
4   remediation cleanup to do an analysis of NCR's
5   ability to pay those.
6     With respect to the amount of those
7   costs, and I'm sure you'll ask me some questions
8   about that, we looked -- I looked at certain costs
9   which -- estimates which have been provided, and I
10   discussed the basis of coming to those estimates
11   with counsel.
12     I don't know that I would
13   characterize that as an assumption, but it is a set
14   of estimates that are used as the basis for the
15   estimated future remediation cleanup costs.
16   Q.   So you were told to use those estimates, not review
17   the estimates and then perform your analysis on top
18   of those estimates, is that accurate?
19   A.   Can you break that up?
20   Q.   You were asked to not review the estimates
21   themselves but just use them as a basis for your
22   further analysis?
23   A.   No, I don't think so. I was asked to look at the
24   different estimates that were being made with
25   respect to the future costs including the estimates

1   that were provided to me by counsel from the
2   government, from an NCR witness and from SEC
3   disclosures made by NCR and to -- based upon those
4   to -- to derive a conservative estimate of what
5   those costs may be for purposes of my analysis, and
6   I discussed that with counsel.
7   Q.   Okay. Did you review each of the final reports
8   before they were submitted?
9   A.   Did I review --
10   Q.   Did you see the final version?
11   A.   Of my expert report dated September 7th and of my
12   supplemental report November 5th?
13   Q.   Yes.
14   A.   Yes, I authored the reports.
15   Q.   Do you agree with everything said in each report?
16   A.   I stand by my reports, yes.
17   Q.   Is there anything in either report that you would
18   like to change or amend now?
19   A.   No, I don't believe so.
20   Q.   Did you have all the information you needed to
21   complete each report?
22   A.   I believe so.
23   Q.   And was there any information that you asked for
24   from -- of counsel that was not provided to you?
25   A.   I asked counsel whether NCR had produced forecasts

1   and budgets for future years beyond what is
2   included in their SEC disclosures, and I asked them
3   if that had been produced, and it had not been.
4   It's my understanding it had not been.
5   Q.   You're saying not produced by NCR or not produced
6   by counsel to you?
7   A.   It's my understanding that that -- those documents
8   had not been produced by NCR.
9   Q.   Do you plan to supplement this report before trial?
10   A.   I don't know. It depends whether there's more --
11   more developments between now and trial that are
12   announced.
13   Q.   If there are developments announced, will you
14   supplement your report?
15   A.   If they're material to my report, I would
16   supplement my report so that my report is -- is
17   up-to-date as of trial. If there -- if they aren't
18   material, either positive or negative, with respect
19   to NCR's results and future results and their
20   borrowing capacity, then I likely would not.
21     But I -- I don't know what NCR could
22   announce between now and trial, so to the extent
23   NCR makes a meaningful announcement or material
24   announcement, I will consider that prior to trial.
25   Q.   Does that mean that you consider the events between

1   September 7th and November 5th that you cover in
2   your supplemental report to be material?
3   A.   Sure. I think they were meaningful, and they had a
4   meaningful impact on the analysis, so I believed it
5   was appropriate to be familiar with them. And
6   given the nature of the items, I thought it was
7   appropriate to supplement my report so that,
8   frankly, you would understand what I would likely
9   say at trial given my consideration of new
10   developments.
11   Q.   Can you tell me who selected the material for you
12   to review?
13   A.   Is this a general question, or are we talking about
14   my supplement, or can you be more specific?
15   Q.   For both of the reports.
16   A.   I guess it would be a combination of me and
17   counsel. With respect to estimated costs, I asked
18   counsel to provide me any information they had with
19   respect to witnesses or documents that had been
20   produced in the case so that I could understand
21   what future estimated costs had been put forth.
22     I -- with respect to public filings
23   made by NCR and analyst reports, those were
24   available to me in -- counsel may have provided
25   some of those, but I had access to those in any

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

1  event because they're publicly available for both
2  NCR and other entities as well.
3  Q.  For the purpose of preparing these reports, did you
4  review -- Strike that.  For the purpose of
5  reviewing these reports, besides NCR, which other
6  companies' public filings did you review?
7  A.  I think I referenced that in Appendix B.  We could
8  look at that, but if you want me to --
9  Q.  If you'd like to, you're welcome to.
10 A.  The section in Appendix B under -- which is I think
11 the second page of Appendix B, company filings, I
12 reviewed those company filings which are listed
13 there in Appendix B.  And certainly there's
14 companies listed here that are not NCR.
15 Q.  You did not review filings of any other parties in
16 this action besides NCR, is that correct?
17 A.  I don't -- I don't believe, but I don't know that
18 Appleton Papers is a party to this dispute, so I
19 don't -- I don't want to speak for that.  I don't
20 believe they are, but I don't -- I don't -- but I
21 did review -- I did not review -- other than
22 potentially Appleton Papers, I did not review the
23 other parties in this dispute.
24 Q.  So you did not review any of the filings of any of
25 the members of the joint defense group?

1  A.  No, sir -- or no, ma'am.  Sorry.
2  Q.  Did you personally review all the documents cited
3  in Appendix B?
4  A.  Yes.
5  Q.  Did anyone prepare summaries of any documents that
6  you considered?
7  A.  There were analyses prepared from certain
8  documents.  I don't recall any team member, if
9  that's what you're asking, preparing a summary of
10 what was in a document.
11 Q.  Or a summary by counsel?
12 A.  Not that I recall.
13 Q.  Do you consider all the materials that you reviewed
14 for purposes of preparing your report to be
15 accurate?
16 A.  I don't have an opinion on whether they're accurate
17 or not.  I have no reason to believe they're
18 inaccurate.
19 Q.  Okay.  In Appendix B, this first subheading, Legal
20 Documents, do you see that?
21 A.  I'm sorry, I lost the page.  Yes.
22 Q.  Are you looking at the supplemental report or the
23 initial report just to make sure we're using the --
24 A.  I'm looking at the supplemental report.
25 Q.  Me as well.  Did you get financial data that you

1  use in your analysis from any of the documents
2  listed under the heading Legal Documents?
3  A.  I think we can look at my footnotes, but I do
4  reference, I think, some filings that are legal
5  filings for some of the amounts.
6  Q.  Do you know which ones on this list?
7  A.  I believe one of the documents that I reference in
8  my report which relates to just one of the data
9  points with respect to costs which had been
10 incurred with respect to the mediation and cleanup,
11 some of those numbers are included and perhaps
12 in -- they're also in other documents as well, but
13 I think they are -- I reference their inclusion in
14 the document entitled NCR Corporation's Memorandum
15 of Law in support of its expedited motion to
16 enforce the 40/60 cost sharing consent judgment
17 against Appleton Papers, Inc. dated August 2, 2012,
18 Docket 468.
19    And we can look at the footnotes,
20 but I believe that filing is referenced to support
21 one of the data points that I reference.
22 Q.  Putting those aside, did you glean from any of the
23 documents under the heading Legal Documents data
24 about NCR's financial condition?
25 A.  Let me look at them.  Financial condition is such a

1  broad term that it's kind of hard to answer that
2  question no because these documents, for example,
3  reference some of them tens, if not hundreds of
4  millions of dollars which have been paid.  Some of
5  them reference insurance recoveries.
6  Q.  Um-hum.
7  A.  So I think I'd need a more specific question
8  related to what you mean by financial condition in
9  your question to know whether -- I certainly
10 learned an understanding of the case from these
11 legal documents, and I learned some of the history
12 in the case and some of the costs which have been
13 paid in terms of the relationships between the
14 parties which of course have an impact on
15 financial -- historical financial condition as well
16 as insurance recoveries.
17 Q.  Your opinion of NCR's ability to pay, did that draw
18 from any information that you found in the
19 documents listed under legal documents that you did
20 not find in public filings?
21 A.  Not that I can recall, but I'd have to go back and
22 read these.
23 Q.  Okay.
24 A.  Certainly I looked mostly to public filings of
25 their financial condition and future results, but

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

1  there's a lot of information in these historical
2  legal filings too.
3  Q.  I'd like to talk about what you've listed under
4  other documents in Appendix B, specifically I'm
5  reading this EPA memorandum on general policy on
6  Superfund ability to pay determinations.  Do you
7  remember reviewing that document?
8  A.  I do.
9      (Exhibit 4312 was marked for
10  identification.)
11     BY MS. JUDE:
12  Q.  I'm going to hand you what I think is the same
13  document that you've reviewed.  I'd like to mark
14  it.  Could you read what number we've marked that?
15  A.  It's a big number, Exhibit 4312.
16  Q.  Could you describe that document to me?
17     MR. CITERA: By describe, you want him to
18  just read the subject matter or --
19     MS. JUDE: Or I guess -- I don't want
20  him -- I don't want him to read it.
21     BY MS. JUDE:
22  Q.  What is it -- what is your understanding of what
23  this document is?
24  A.  What the subject -- what the subject matter says
25  and what the first paragraph says.

1  Q.  All right.  Would you read that into the record?
2  A.  This memorandum transmits a policy document
3  developed by the Office of Site Remediation
4  Enforcement, OSRE.  That explains what is necessary
5  for an acceptable ability to pay, ATP, settlement
6  in Superfund cases.
7      The main text of the policy document
8  addresses general -- general is bolded -- issues
9  that apply to the ATT -- ATP process and ATP
10  settlements.  The policy document also contains two
11  appendices that address issues specific to making
12  ATP determinations for individuals and businesses.
13     And the subject matter is general
14  policy on Superfund ability to pay determinations.
15  It's on United States EPA letterhead.
16  Q.  For what purpose did you review this document?
17  A.  To understand whether there was anything -- any
18  guidance in any context from the EPA on doing
19  ability to pay assessments.
20  Q.  And did this document influence your methodology in
21  performing your analysis?
22  A.  I would say it corroborated what I -- my
23  methodology.
24  Q.  Could you explain further?
25  A.  It corroborated that in making an ability to pay

1  assessment, that you look at the assets available
2  to the company based on looking at its balance
3  sheet.  And based upon the time period with respect
4  to determining the company's ability to pay, their
5  expected cash flows during that period of time,
6  which would be consistent with the methodology I
7  described in my report.
8  Q.  So you would have used the same methodology to
9  perform your analysis even had you not reviewed
10  this document?
11  A.  Well, I didn't have that circumstance, but
12  probably, yes.
13  Q.  Let me put it this way.  Would you have conducted
14  the same analysis regardless of this document?
15  A.  I don't know what you mean.  I looked at various
16  sources of guidance on how to -- how -- what method
17  to use.  The methodology is very straightforward.
18     It's consistent with what I would do
19  in a solvency or valuation or other ability to pay
20  assessments.  As part of that assessment, I looked
21  at the -- whether there was anything from the EPA
22  on their guidance which was consistent with that,
23  so I'm not sure what you mean.  I didn't -- I did
24  all that assessment all as part of one process all
25  of which was consistent with one another.

1  Q.  So the method by which you analyze an entity's
2  ability to pay does not change whether you're
3  operating in a CERCLA context or a non-CERCLA
4  context?
5  A.  Well, I looked at in this context whether there was
6  anything in particular, and I also understood that
7  this particular ability to pay determination, as I
8  read it, doesn't necessarily apply directly to the
9  circumstances here but relates to the, as I
10  understand it, the EPA reaching settlements based
11  upon an entity's ability to pay, and this is the
12  assessment they go through to determine whether to
13  make a settlement or to make a reduction.  That's
14  what I understand.  So I guess I'm --
15  Q.  Are you offering an opinion of what the EPA should
16  do from a stand -- from a policy standpoint in this
17  case?
18  A.  No.
19  Q.  And what is your understanding of what an EPA
20  Superfund ability to pay determination is?
21  A.  My understanding is it's an assessment of the --
22  what do you mean by what it is?  Its purpose, how
23  it's performed?
24  Q.  Its purpose.
25  A.  I understand its purpose is, as explained in this

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

1  memo, when there's some question about the
2  enterprise's ability to pay and their reaching a
3  settlement and their ability to pay determination
4  is to determine -- give an assessment for that
5  purpose.
6  Q.  Could you describe the differences between the --
7  between your methodology and your ability to pay
8  determination and the methodology described in this
9  document?
10  A.  I think the general approach is the same.
11  Q.  You say general.  Is there something specific
12  that's different?
13  A.  Well, the general approach in that looking at the
14  balance sheet, the company's ability to use its
15  assets to borrow additional -- its borrowing
16  capabilities as well as its expected cash flows
17  over a period of three to five years, I think the
18  approach is the same.
19  Q.  You are not offering a legal opinion related to
20  NCR's ability to pay?
21  A.  I'm offering a financial -- an opinion based on a
22  financial analysis.
23  Q.  Okay.
24  A.  Can we take a break?
25  Q.  Yeah.

1  A.  Going about an hour.
2  VIDEO OPERATOR: Going off the record at
3  10:27 a.m.
4  (Discussion off the record.)
5  VIDEO OPERATOR: And we are back on the
6  record at 10:36 a.m.
7  BY MS. JUDE:
8  Q.  Could you list the categories of documents from
9  which you got the information about NCR's finances
10  that you analyzed?
11  A.  Well, I do list them in Appendix B, so I think that
12  I do actually -- and I even put them in categories,
13  but I will -- I looked at the public filings, their
14  SEC disclosures, both 10Ks and 8Ks.
15  I reviewed any financial information
16  that had been in various documents that you've
17  previously asked me about.  I looked at -- I
18  obtained and reviewed analyst reports.  I read
19  transcripts of earnings calls of NCR.
20  I also believe I looked at earnings
21  releases of NCR, and I think I looked at their
22  website and other websites that referenced NCR in
23  their financial -- financial information --
24  Q.  Did you --
25  A.  -- and maybe others, but that's what I would -- I

1  would say without looking through this detailed
2  list.
3  Q.  Did you review any non-public information about
4  NCR?
5  A.  Well, I don't believe that the -- the document
6  pertaining to the cleanup costs from the 30(b)(6)
7  witness would be public.
8  Q.  Is that the -- besides that document, did you
9  review any non-public information about NCR?
10  A.  No, with the caveat that a lot of these legal
11  documents have details related to costs which were
12  paid, and those costs aren't described in the
13  detail that the legal documents provide in a public
14  forum, so there are some disclosures related to
15  historical costs and the estimate of the future
16  costs that I think are more specific and not
17  exactly the same as what's in the public filings.
18  Q.  Did you review any non-public information about NCR
19  that did not relate to Fox River costs?
20  A.  And when you say non-public, you're also -- you
21  would include, as I have, I assume, that analyst
22  reports and other reports of that type are public
23  as long as you buy them.
24  Q.  Yes.
25  A.  Not that I recall.

1  Q.  And you didn't have access to any non-public
2  information about NCR as a result of your previous
3  work for FTI, correct?
4  A.  I don't understand.
5  Q.  As a result of other engagements, did you have
6  access to non-public information about NCR
7  Corporation?
8  A.  No.  Your question seems to assume that FTI would
9  have non-public information on NCR.  I don't know
10  if that's true or not.
11  Q.  Okay.  Could you describe the categories of
12  documents from which you got information about the
13  Fox River costs?
14  A.  The public filings of NCR, the cost estimates put
15  forth by the government, the NCR estimate of future
16  costs, the testimony of the 30(b)(6) witness of
17  NCR, the -- I think those would be the categories.
18  Can you read back my answer?
19  (Record read.)
20  THE WITNESS: And any other reference to
21  historical costs that are included in the various
22  documents produced.
23  BY MS. JUDE:
24  Q.  Are you familiar with the litigation between NCR
25  and other parties concerning the Kalamazoo River

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

1  cleanup?
2  A.  I'm familiar with what NCR discloses in its public
3  filings with respect to the Kalamazoo River
4  cleanup.
5  Q.  Does your analysis of NCR's ability to pay account
6  for NCR's potential liability in that matter?
7  A.  It considers NCR's liability in that matter, sure.
8  Q.  And does it consider NCR's liability in other
9  litigations?
10  A.  Sure.  It considers what if -- what NCR has
11  disclosed with respect to material contingencies or
12  commitments and their assessment of the estimated
13  losses with respect to those to the extent there's
14  any estimated loss.
15  Q.  When you were initially engaged on this matter,
16  what issues were you asked to address by the people
17  that hired you?
18  A.  I was asked to assess NCR's ability to pay
19  estimated remediation costs associated with the Fox
20  River.
21  Q.  Could you summarize your opinions in this case?
22  A.  I think I have summarized them in my report, but if
23  you want me to be more succinct than what I've
24  already said in my report -- I mean, my report
25  stands for itself.  I mean, the broad -- and again,

1  my reports -- my report in my opinion stands for
2  itself, but the broad-based opinion is that
3  NCR's -- based upon the estimated Fox River site
4  remediation costs estimated on a very conservative
5  basis based upon the various data points available
6  to estimate what those future costs might be --
7  anyway, looking at those costs and coming to a very
8  conservative estimate as to what they may be
9  between now and 2017, that even without considering
10  any obligations of what NCR refers to as co -- a
11  co-obligor or indemnification indemnitors, NCR
12  clearly has the ability to pay based upon their
13  current financial position, their borrowing
14  capacity and their estimated future results to pay
15  all of those costs.
16      Additionally, if you consider the
17  indemnification amounts from AT&T and
18  Alcatel-Lucent, that even further enhances that
19  ability to pay.  And furthermore, if you consider
20  obligations of API and/or BAT, it even -- and the
21  indemnification payment from AT&T and
22  Alcatel-Lucent, it even further enhances their
23  ability to pay and that the financial condition or
24  financial wherewithal of the various co-obligors
25  and/or indemnity parties, such payments wouldn't be

1  material to their financial condition other than
2  perhaps for API who has significant financial
3  resources, but a payment would be material to them.
4  Q.  Besides --
5  A.  That's the summary of my opinion, but I would let
6  my opinion speak for itself as I've summarized in
7  these various reports.
8  Q.  Besides what you just described, are you offering
9  any other opinions in this case?
10  A.  I have not been asked to review any other issues.
11  Q.  Are you offering any opinion about the financial
12  condition or ability to pay of any of the other
13  parties in this case?
14      MR. CITERA: Other than API?
15      MS. JUDE: Other than -- let's just say
16  other than NCR.
17      THE WITNESS: Well, yes.  I have looked
18  at the other -- what NCR refers to co-obligors as
19  well as indemnitors, and the amount of their
20  potential liability's clearly immaterial to their
21  financial condition.
22      The -- with respect to API, I'm
23  rendering the opinion that it may be material to
24  them, but they do have significant financial
25  resources.  Beyond that, I'm rendering no further

1  opinion with respect to their ability to pay.
2  BY MS. JUDE:
3  Q.  Are you offering any opinion about the financial
4  condition or ability to pay the Fox River costs of
5  any of the members of the joint defense group?
6  A.  No.
7  Q.  So you're not offering an opinion about Glatfelter,
8  for example?
9  A.  No.
10  Q.  And you're not offering an opinion about the
11  ability to pay of any of the other non-JDG parties
12  such as the City of Appleton?
13  A.  No, I'm not offering any such opinion.  I haven't
14  been asked to perform any such analysis.
15  Q.  You've only been asked to perform an analysis of
16  the financial condition and ability to pay of NCR
17  and its co-obligors, is that correct?
18  A.  That's correct.
19  Q.  Are you offering an opinion about NCR's ability to
20  pay relative to any other parties in this matter?
21  A.  I don't know what you mean.
22  Q.  Are you offering an opinion about whether NCR is
23  more or less able to pay the Fox River costs as
24  compared with any other party to this litigation?
25  A.  No.

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

1  Q.  Are you offering an opinion concerning NCR's
2  liability?
3  A.  Can you clarify what you mean, their legal
4  liability?
5  Q.  Yes.
6  A.  I'm rendering no legal opinion on their liability.
7  Q.  Did you perform an independent estimate of the
8  costs of the Fox River remediation?
9  A.  I relied on NCR's estimates of the costs associated
10  with the Fox River.  I also looked at other data
11  points such as the government's, and I chose
12  amounts from the various NCR estimates that end up
13  likely overstating the estimated cost because I
14  chose amounts that were -- for 2012, I considered
15  their 2012 estimate since the estimate they
16  provided from the 30(b)(6) witness was in mid-2012.
17  Q.  Um-hum.
18  A.  For periods beyond that, I relied upon information
19  in their public disclosures which likely included
20  more than just the remediation costs and which is a
21  much higher number than NCR testified to with
22  respect to their estimated cost in 30(b)(6) witness
23  testimony to be conservative.
24  Q.  But you relied on estimates provided by others in
25  the first instance, is that correct?

1  A.  Yes.
2  Q.  Do your reports contain all of the opinions that
3  you expect to give at trial?
4  A.  My reports contain all the opinions that I've been
5  asked -- asked to render based on the analysis I've
6  been asked to do to this point.  If counsel were to
7  ask me to do some other analysis or look at some
8  other issues between now and trial, that's -- I
9  don't know if they will or won't.
10  Q.  Right now assuming counsel doesn't ask you to
11  perform additional work, do your reports contain
12  all of the opinions that you would offer at trial?
13  A.  Yes, subject to your question earlier with respect
14  to any material developments from NCR in the
15  interim.
16  Q.  I want to circle back to one thing we were
17  discussing earlier, the Kalamazoo litigation.  Do
18  you recall that?
19  A.  Yes.
20  Q.  Do you remember how much you assumed NCR's
21  potential liability in that case would be when you
22  performed your ability to pay analysis?
23  A.  Well, NCR discloses in their financial results that
24  the appropriate reserve for Kalamazoo is for the
25  legal costs, the litigation -- estimated litigation

1  costs.
2  Q.  Um-hum.
3  A.  I also -- so I haven't -- in my analysis, I haven't
4  put forth any additional costs above what they
5  under generally accepted accounting principles
6  would have disclosed as their liability.
7       I also note the magnitude of the
8  potential exposure, I think, is disclosed as
9  76 million or something of that and claims with
10  respect to some share of that.
11       So given the results of the rest of
12  my analysis, that should NCR be liable ultimately
13  for some amount greater than what they under
14  generally accepted accounting principles believe is
15  their best estimate currently, I don't believe that
16  that would change my opinion because of the
17  magnitude of what we're discussing.
18  Q.  So in your analysis, you considered NCR's exposure
19  in the Kalamazoo matter to be its legal costs as it
20  disclosed?
21  A.  My analysis only accounts for litigation costs as
22  they have.  I considered the ultimate exposure and
23  whether it on a sensitivity analysis would impact
24  my opinions, and I don't believe it would.
25       MS. JUDE:  Okay.  That's all I've got.

1       MS. MAJUMDAR:  I have just a few
2  questions.
3       THE WITNESS:  Sure.
4       EXAMINATION
5       BY MS. MAJUMDAR:
6  Q.  It's still morning.  Good morning.
7  A.  Good morning.
8  Q.  As you heard earlier, my name is Sumona Majumdar.
9  I'm with the United States Department of Justice.
10  I do have just a couple questions.
11  A.  Okay.
12  Q.  In your analysis, did you consider whether it's
13  possible that NCR could go bankrupt in the -- in
14  the years that it's expected to pay remediation
15  costs?
16  A.  My analysis does -- my analysis would indicate that
17  the likelihood of them going bankrupt would be very
18  remote.  There's no information that would lead you
19  to conclude that the company's in danger of a
20  bankruptcy.
21  Q.  But it is possible that NCR could go bankrupt
22  between now and 2017?
23  A.  I can't testify as to what is -- I can't opine to
24  what is possible.  Based upon their current
25  financial condition and based upon the results that

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

1 they have achieved and their executive's comments
2 with respect to their forward-looking information,
3 they have a very remote likelihood of going
4 bankrupt, but to the extent some event might occur,
5 I don't -- I don't know. I don't have an opinion
6 that they couldn't go bankrupt.
7 Q. So it is possible, although in your opinion, remote
8 chance?
9 A. Sure. Anything -- I mean, it's possible.
10 Q. Would your analysis change if the costs of
11 remediation significantly increase over what's
12 anticipated?
13 A. My analysis would -- if -- would change. It would
14 depend how much those costs would increase to
15 determine whether or not the opinion would change.
16 I believe that the costs I've used based upon the
17 estimates that I've been provided in my
18 understanding of them is very, very conservative.
19     For example, my estimate of the
20 costs that I've used -- the estimate of the costs
21 used for my analysis is meaningfully greater than
22 the amount that NCR estimated it would be just a
23 few months ago.
24 Q. But it is possible that the costs could increase,
25 say, 50 percent over what's anticipated?

1 A. You're asking -- you're asking me if it's possible
2 or you're asking me if my analysis has considered
3 that?
4 Q. If the costs were to increase 50 percent more,
5 would that change your analysis?
6 A. If the costs were increased 50 percent more, my
7 analysis would be impacted by that 50 percent, but
8 under that -- under that scenario, I think it's
9 pretty clear my conclusions would not change.
10 Q. And just to clarify. You did not -- you are not
11 offering an opinion on any of the parties -- sorry,
12 any of the ability to pay of any of the joint
13 defendants?
14 A. I am not.
15 Q. And you did not review their ability to pay?
16 A. I did not.
17    MS. MAJUMDAR: That's all I have.
18    MR. CITERA: Anyone on the phone?
19    MR. CARLSON: No, thank you.
20    MR. SHAPP: No, thanks.
21    MR. CITERA: Nothing from my end.
22    VIDEO OPERATOR: Anything further?
23    MS. PETERSON: Nothing here.
24    VIDEO OPERATOR: This concludes the
25 deposition of Gary G. Kleinrichert. We're off the

1 record at 10:58 a.m. Thank you.
2    (Deposition concluded at 10:58 a.m.)

1 STATE OF WISCONSIN )
                  ) SS:
2 MILWAUKEE COUNTY )
3
4      I, Dawn M. Lahti, RPR, Certified
5 Realtime Reporter, and Notary Public in and for the
6 State of Wisconsin, do hereby certify that the
7 preceding deposition was recorded by me and reduced
8 to writing under my personal direction.
9      I further certify that said
10 deposition was taken at 77 West Wacker Drive,
11 Chicago, Illinois, on the 7th day of November,
12 2012, commencing at 9:33 a.m.
13      I further certify that I am not a
14 relative or employee or attorney or counsel of any
15 of the parties, or a relative or employee of such
16 attorney or counsel, or financially interested,
17 directly or indirectly, in this action.
18      In witness whereof, I have hereunto
19 set my hand and affixed my seal of office on this
20 9th day of November, 2012.
21
22            _____
23            DAWN M. LAHTI, RPR
           Certified Realtime Reporter
           Notary Public
24
25 My commission expires April 17, 2016.

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

## A

ability (43)
8:25;9:5,9,12,24;
10:4,11,16,18,21,21;
22:5;29:17;30:6;31:5,
14,19,25;32:4,19;
33:2,7,11,20;34:2,3,7,
14,20;38:5,18;39:12,
19,23;40:12;41:1,4,
11,16,19;43:22;47:12,
15
able (1)
41:23
above (1)
44:4
acceptable (1)
31:5
accepted (2)
44:5,14
access (3)
25:25;37:1,6
account (1)
38:5
accounting (4)
13:14;16:16;44:5,
14
accounts (1)
44:21
accurate (3)
22:18;27:15,16
achieved (1)
46:1
action (1)
26:16
actions (1)
9:22
actually (1)
35:12
addition (1)
13:23
additional (3)
34:15;43:11;44:4
Additionally (1)
39:16
address (4)
7:5,6;31:11;38:16
addresses (1)
31:8
adequacy (1)
8:20
again (2)
18:24;38:25
against (3)
9:21;13:3;28:17
ago (2)
21:11;46:23
agree (1)
23:15
al (1)
5:12
Alcatel-Lucent (2)
39:18,22
alleged (1)
8:2
alternatives (1)
10:13
although (1)
46:7
amend (1)
23:18
America (1)
5:11
amount (6)
13:20;15:24;22:6;
40:19;44:13;46:22
amounts (4)
28:5;39:17;42:12,
14
analyses (1)
27:7
analysis (39)
9:7,10;10:2,3,6,7;
12:8;16:15,20;22:4,
17,22;23:5;25:4;28:1;
31:21;32:9,14;34:22;
38:5;41:14,15;43:5,7,
22;44:3,12,18,21,23;
45:12,16,16;46:10,13,
21;47:2,5,7
analyst (3)
25:23;35:18;36:21
analyze (1)
33:1
analyzed (1)
35:10
analyzing (1)
14:10
and/or (2)
39:20,25
announce (1)
24:22
announced (2)
24:12,13
announcement (2)
24:23,24
answered (1)
8:6
anticipate (1)
16:6
anticipated (2)
46:12,25
API (4)
39:20;40:2,14,22
APPEARANCES (1)
3:1
Appeared (1)
3:11
appears (1)
18:20;19:6,9
appendices (1)
31:11
Appendix (9)
11:22;26:7,10,11,
13;27:3,19;30:4;35:11
Appleton (3)
26:18,22;28:17;
41:12
apply (2)
31:9;33:8
approach (3)
34:10,13,18
appropriate (3)
25:5,7;43:24
approximately (8)
5:8;11:7;15:20;
16:10;17:8;20:7,13,16
aside (1)
28:22
aspect (3)
10:6;15:4,9
aspects (1)
20:4
assess (1)
38:18
assessment (7)
32:1,20,24;33:12,
21;34:4;38:12
assessments (2)
31:19;32:20
assets (5)
10:8,9,15;32:1;
34:15
assist (3)
12:7,12,15
assisted (1)
20:3
associated (2)
38:19;42:9
association (1)
5:6
assume (3)
7:24;36:21;37:8
assumed (1)
43:20
assuming (1)
43:10
assumption (1)
22:13
assumptions (1)
21:25
AT&T (2)
39:17,21
ATP (4)
31:5,9,9,12
ATT (1)
31:9
attempted (1)
11:2
attorneys (1)
5:19
audiovisual (1)
5:17
August (2)
20:15;28:17
authored (3)
18:21;19:8;23:14
available (4)
25:24;26:1;32:1;
39:5
Avenue (1)
3:10

## B

back (8)
9:15,15;12:17;21:7;
29:21;35:5;37:18;
43:16
balance (2)
32:2;34:14
ballpark (1)
15:25
bankrupt (5)
45:13,17,21;46:4,6
bankruptcy (1)
45:20
based (18)
13:10;14:25;16:22;
18:23;19:6;22:3;23:3;
32:2,3;33:10;34:21;
39:3,5,12;43:5;45:24,
25;46:16
basis (5)
15:1;22:10,14,21;
39:5
BAT (1)
39:20
Bay (1)
5:14
begin (3)
20:7,13,16
behalf (1)
3:11
besides (7)
11:25;15:10;26:5,
16;36:8;40:4,8
best (1)
44:15
beyond (3)
24:1;40:25;42:18
big (1)
30:15
bills (6)
10:4,17,19,20
bit (1)
16:13
bolded (1)
31:8
borrow (1)
34:15
borrowing (3)
24:20;34:15;39:13
both (4)
19:13;25:15;26:1;
35:14
boy (1)
11:17
BRADY (3)
3:2;5:24;6:1
break (3)
7:18;22:19;34:24
Brent (4)
12:5,10,11;20:3
Brent's (2)
12:6,7
BRIESEN (1)

3:9
broad (2)
29:1;38:25
broad-based (1)
39:2
budget (2)
15:18,19
budgets (1)
24:1
businesses (1)
31:12
buy (1)
36:23

## C

calculations (1)
10:5
called (1)
6:20
calls (1)
35:19
Can (18)
6:10;9:15;11:24;
12:17;14:2;16:13;
17:14;18:5;21:7;
22:19;25:11,14;28:3,
19;29:21;34:24;
37:18;42:3
capabilities (2)
8:22;34:16
capacity (2)
24:20;39:14
CARLSON (3)
6:15,15;47:19
case (16)
5:11,14;10:25;
12:22,24;15:16,18,21;
25:20;29:10,12;33:17;
38:21;40:9,13;43:21
cases (4)
7:21,24;8:8;31:6
cash (2)
32:5;34:16
categories (4)
35:8,12;37:11,17
caused (1)
21:22
caveat (1)
36:10
CBC (2)
3:11;6:15
CERCLA (5)
8:13,15;9:2,5;33:3
certain (5)
11:18;12:25;20:4;
22:8;27:7
certainly (6)
10:4;13:13,21;
26:13;29:9,24
chance (1)
46:8
change (8)
23:18;33:2;44:16;
46:10,13,15;47:5,9

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

characterization (1)
20:24
characterize (2)
22:2,13
check (1)
19:8
Chicago (3)
5:5,10;7:6
chose (2)
42:11,14
circle (1)
43:16
circumstance (1)
32:11
circumstances (1)
33:9
cited (1)
27:2
CITERA (9)
6:6,6,10;17:12;
20:23;30:17;40:14;
47:18,21
City (1)
41:12
civil (1)
7:22
claims (4)
8:15;9:21,22;44:9
clarification (1)
7:13
clarify (6)
14:2;16:13;18:5;
19:18;42:3;47:10
cleanup (7)
14:13;22:4,15;
28:10;36:6;38:1,4
clear (1)
47:9
clearly (2)
39:12;40:20
co (1)
39:10
Coating (1)
6:16
colleague (1)
12:2
combination (1)
25:16
combined (1)
19:14
coming (2)
22:10;39:7
comments (1)
46:1
Commission (2)
3:8;6:3
commitments (1)
38:12
companies (1)
26:14
companies' (1)
26:6
Company (8)
5:24;6:7;10:8,16,
19;26:11,12;32:2

company's (4)
10:21;32:4;34:14;
45:19
compared (1)
41:24
compensated (6)
14:18,22,24,25;
15:8,15
compensation (1)
15:9
complete (1)
23:21
concerning (2)
37:25;42:1
conclude (1)
45:19
concluded (1)
48:2
concludes (1)
47:24
conclusions (1)
47:9
condition (12)
28:24,25;29:8,15,
25;39:23;40:1,12,21;
41:4,16;45:25
conducted (1)
32:13
consent (1)
28:16
conservative (5)
23:4;39:4,8;42:23;
46:18
consider (10)
13:25;14:3,6;24:24,
25;27:13;38:8;39:16,
19;45:12
consideration (1)
25:9
considered (5)
27:6;42:14;44:18,
22;47:2
considering (1)
39:9
considers (2)
38:7,10
consistent (4)
32:6,18,22,25
Consulting (2)
7:11;9:7
contain (3)
43:2,4,11
contains (1)
31:10
context (6)
10:1;16:25;31:18;
33:3,4,5
contexts (1)
14:9
contingencies (1)
38:11
CONTINUED (1)
3:1
conversant (1)
11:4

co-obligor (1)
39:11
co-obligors (3)
39:24;40:18;41:17
copy (5)
18:11,20,25;19:7,10
Corporation (4)
5:12,22;6:14;37:7
corporations (1)
9:23
Corporation's (1)
28:14
corroborated (2)
31:22,25
cost (8)
14:6,11,12;15:6;
28:16;37:14;42:13,22
costs (52)
8:19,21;12:25;14:9;
15:5,7,8,11;22:3,7,8,
15,25;23:5;25:17,21;
28:9,22;29:12;36:6,
11,12,15,16,19;37:13,
16,21;38:19;39:4,6,7,
15;41:4,23;42:8,9,20;
43:25;44:1,4,19,21;
45:15;46:10,14,16,20,
20,24;47:4,6
counsel (26)
10:25;11:6,7,8,12,
25;16:20;20:19;21:5,
6,12,17,25;22:2,11;
23:1,6,24,25;24:6;
25:17,18,24;27:11;
43:6,10
counsel's (1)
21:1
couple (1)
45:10
course (1)
29:14
Court (4)
5:13;6:18;18:1,8
cover (1)
25:1
CPA (1)
13:12
criticized (1)
17:10
current (2)
39:13;45:24
currently (1)
44:15
CV (1)
17:6

D

danger (1)
45:19
data (6)
27:25;28:8,21,23;
39:5;42:10
date (1)
5:7
disclosed (4)

dated (5)
18:12;19:1,8;23:11;
28:17
Davis (1)
6:2
dealing (1)
8:2
defendants (4)
5:18;13:1,4;47:13
defense (2)
26:25;41:5
Department (2)
6:5;45:9
depend (1)
46:14
depends (1)
24:10
deposed (1)
17:5
deposition (8)
5:17;10:23;11:11,
13;12:1,13;47:25;48:2
Depovision (1)
5:4
derive (1)
23:4
describe (9)
7:20;8:16;9:14,19;
13:7;30:16,17;34:6;
37:11
described (4)
32:7;34:8;36:12;
40:8
designate (1)
16:21
designations (2)
13:15,16
detail (1)
36:13
detailed (1)
36:1
details (1)
36:11
determination (5)
8:24;33:7,20;34:3,8
determinations (3)
30:6;31:12,14
determine (6)
8:20;10:12;16:21;
33:12;34:4;46:15
determining (1)
32:4
developed (1)
31:3
developments (4)
24:11,13;25:10;
43:14
differences (1)
34:6
different (5)
10:11;20:9,11;
22:24;34:12
directly (1)
33:8
disclosed (4)

38:11;44:6,8,20
discloses (2)
38:2;43:23
disclosures (5)
23:3;24:2;35:14;
36:14;42:19
discussed (2)
22:10;23:6
discussing (2)
43:17;44:17
discussion (2)
21:11;35:4
dispute (7)
8:9,11;10:1;16:25;
17:5;26:18,23
disputes (8)
7:24;8:7,12,17,18;
9:12,19,20
District (2)
5:13,13
division (1)
5:14
Docket (1)
28:18
document (17)
11:3;27:10;28:14;
30:7,13,16,23;31:2,7,
10,16,20;32:10,14;
34:9;36:5,8
documentation (1)
12:8
documents (31)
10:24;11:4,13,14,
15,18,22;17:9;24:7;
25:19;27:2,5,8,20;
28:1,2,7,12,23,23;
29:2,11,19,19;30:4;
35:8,16;36:11,13;
37:12,22
dollars (1)
29:4
done (5)
7:14;8:8;9:7;10:4
draft (3)
19:23,25;21:12
drafted (1)
20:5
drafting (1)
20:3
drafts (1)
20:19
draw (1)
29:17
Drive (1)
5:9
due (2)
10:17,19
duly (1)
6:21
during (1)
32:5

E

earlier (4)

Case 1:10-cv-00910-WCG   Filed 11/27/12   Page 16 of 21   Document 687-3

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

21:16;43:13,17;
45:8
**earnings (2)**
35:19,20
**East (1)**
3:10
**Eastern (1)**
5:13
**edits (14)**
20:22,24,25;21:2,4,
5,13,17,18,19,19,21,
23,24
**education (1)**
13:11
**EEOC (2)**
9:21,23
**either (5)**
19:17;20:20;21:10;
23:17;24:18
**else (3)**
12:12,15;19:25
**employed (1)**
7:11
**employees (1)**
9:23
**end (3)**
16:7;42:12;47:21
**enforce (2)**
13:2;28:16
**Enforcement (1)**
31:4
**engaged (5)**
16:14,14,19,20;
38:15
**engagement (2)**
12:3,6
**engagements (1)**
37:5
**enhances (2)**
39:18,22
**enterprise's (1)**
34:2
**entities (1)**
26:2
**entitled (2)**
5:11;28:14
**entity's (2)**
33:1,11
**environmental (4)**
9:8;13:25;14:4,7
**EPA (7)**
30:5;31:15,18;
32:21;33:10,15,19
**estimate (13)**
17:2,4;23:4;36:15;
37:15;39:6,8;42:7,15,
15;44:15;46:19,20
**estimated (14)**
22:3,15;25:17,21;
38:12,14,19;39:3,4,
14;42:13,22;43:25;
46:22
**estimates (15)**
15:22;22:9,10,14,
16,17,18,20,24,25;

37:14;42:9,12,24;
46:17
**estimation (1)**
14:12
**et (1)**
5:12
**even (6)**
32:9;35:12;39:9,18,
20,22
**event (2)**
26:1;46:4
**events (1)**
24:25
**exactly (2)**
19:9;36:17
**EXAMINATION (2)**
6:23;45:4
**examined (1)**
6:22
**example (4)**
21:20;29:2;41:8;
46:19
**excess (1)**
10:15
**excluded (1)**
17:25
**executive's (1)**
46:1
**Exhibit (6)**
18:14,17;19:3,6;
30:9,15
**expect (1)**
43:3
**expected (3)**
32:5;34:16;45:14
**expedited (1)**
28:15
**experience (5)**
13:11;14:8,10,11;
17:7
**expert (17)**
13:9,13,25;14:3,6;
16:11,14,19,22,24;
17:10,16;18:1,11,25;
19:21;23:11
**expertise (3)**
13:7,10,16
**explain (1)**
31:24
**explained (1)**
33:25
**explains (1)**
31:4
**exposure (3)**
44:8,18,22
**extent (4)**
15:5;24:22;38:13;
46:4

**F**

**failed (1)**
17:16
**fair (5)**
10:9,10,14,14,15

**familiar (4)**
11:2;25:5;37:24;
38:2
**far (2)**
15:16,21
**feedback (4)**
20:19;21:1,6,22
**few (2)**
45:1;46:23
**figure (1)**
17:6
**filed (1)**
11:20
**filing (1)**
28:20
**filings (15)**
25:22;26:6,11,12,
15,24;28:4,5;29:20,
24;30:2;35:13;36:17;
37:14;38:3
**final (2)**
23:7,10
**finances (1)**
35:9
**financial (31)**
8:2,3,21,25;9:11;
13:14;16:15;27:25;
28:24,25;29:8,15,15,
25;34:21,22;35:15,23,
23;39:13,23,24;40:1,
2,11,21,24;41:3,16;
43:23;45:25
**financial/accounting/ (1)**
13:18
**find (2)**
16:22;29:20
**fines (2)**
9:23,25
**first (5)**
6:21;21:10;27:19;
30:25;42:25
**five (1)**
34:17
**flipping (2)**
18:23;19:6
**floor (1)**
5:10
**flows (2)**
32:5;34:16
**follows (1)**
6:22
**footnotes (2)**
28:3,19
**forecasts (1)**
23:25
**forensic (1)**
13:16
**form (1)**
17:12
**forth (4)**
17:23;25:21;37:15;
44:4
**forum (1)**
36:14
**forward-looking (1)**

46:2
**found (2)**
18:2;29:18
**Fox (9)**
13:3;36:19;37:13;
38:19;39:3;41:4,23;
42:8,10
**Frank (1)**
6:6
**frankly (1)**
25:8
**fraud (1)**
8:3
**Friday (1)**
20:18
**front (3)**
15:22,23
**FTI (12)**
7:11;12:10,12,15;
14:22,24;15:7,12,15;
16:8;37:3,8
**full (1)**
7:2
**further (6)**
22:22;31:24;39:18,
22;40:25;47:22
**furthermore (1)**
39:19
**future (10)**
22:15,25;24:1,19;
25:21;29:25;36:15;
37:15;39:6,14

**G**

**Gary (4)**
5:16;6:20;7:4;47:25
**general (3)**
8:8;10:7;12:21,23;
13:24;25:13;30:5;
31:8,8,13;34:10,11,13
**generally (3)**
11:1;44:5,14
**given (3)**
25:6,9;44:11
**Glatfelter (2)**
6:7;41:7
**glean (1)**
28:22
**Goldschmidt (3)**
3:3;5:25,25
**Good (5)**
5:2;6:25;7:1;45:6,7
**government (4)**
12:24;13:1;23:2;
37:15
**government's (1)**
42:11
**Gramann (1)**
5:6
**greater (3)**
10:9;44:13;46:21
**Green (1)**
5:14
**group (3)**

26:25;41:5
**guess (3)**
25:16;30:19;33:14
**guidance (3)**
31:18;32:16,22
**guys (1)**
6:10

**H**

**hand (3)**
18:11,25;30:12
**hard (2)**
11:17;29:1
**heading (2)**
28:2,23
**heard (1)**
45:8
**herein (1)**
6:21
**herself (1)**
6:18
**higher (1)**
42:21
**hired (1)**
38:17
**historical (4)**
29:15;30:1;36:15;
37:21
**history (1)**
29:11
**hour (1)**
35:1
**hours (6)**
11:8;15:20,25;16:1,
2,3
**hundreds (1)**
29:3

**I**

**identification (3)**
18:15;19:4;30:10
**identify (2)**
5:19;6:18
**Illinois (3)**
5:5,10;7:7
**immaterial (1)**
40:20
**impact (3)**
25:4;29:14;44:23
**impacted (1)**
47:7
**implementation (1)**
8:4
**impose (1)**
9:24
**inaccuracies (1)**
18:9
**inaccurate (3)**
18:2,5;27:18
**Inc (1)**
28:17
**include (1)**
36:21

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

included (5)
17:9;24:2;28:11;
37:21;42:19
including (1)
22:25
inclusion (1)
28:13
increase (4)
46:11,14,24;47:4
increased (1)
47:6
incurred (4)
8:19;12:25;14:9;
28:10
indemnification (3)
39:11,17,21
indemnitors (2)
39:11;40:19
indemnity (1)
39:25
independent (1)
42:7
Indiana (2)
7:8,9
Indianapolis (2)
7:7,9
indicate (1)
45:16
individuals (1)
31:12
industries (1)
13:22
influence (1)
31:20
information (18)
23:20,23;25:18;
29:18;30:1;35:9,15,
23;36:3,9,18;37:2,6,9,
12;42:18;45:18;46:2
initial (6)
18:11;19:17;20:3,
14;21:20;27:23
initially (1)
38:15
instance (1)
42:25
insurance (2)
29:5,16
interesting (1)
18:7
interim (1)
43:15
into (1)
31:1
investigations (2)
8:1;13:17
investigative (2)
13:19;16:16
involved (7)
7:21,22,23;8:1,12,
14,23
involvement (2)
14:18,22
issue (2)
12:22,23

issued (1)
11:19
issues (6)
22:1;31:8,11;38:16;
40:10;43:8
items (2)
13:5;25:6

**J**

James (2)
3:3;5:25
Jennifer (1)
5:21
job (2)
12:6,7
joint (1)
26:25;41:5;47:12
JUDE (18)
5:21,21;6:24;9:18;
12:20;17:15;18:16;
19:11;21:3,15;30:11,
19,21;35:7;37:23;
40:15;41:2;44:25
judgment (1)
28:16
Justice (2)
6:5;45:9

**K**

Kalamazoo (5)
37:25;38:3;43:17,
24;44:19
kind (1)
29:1
Kingsbury (1)
7:6
Kleinrichert (4)
5:16;6:20;7:4;47:25
knowledge (4)
13:10;18:3,6,10
Kuelthau (1)
6:3

**L**

Last (1)
20:18
late (1)
20:15
later (2)
16:16,21
Law (1)
28:15
lawyer (1)
13:8
lead (1)
45:18
learned (2)
29:10,11
legal (17)
14:14,16;17:21;
27:19;28:2,4,23;
29:11,19;30:2;34:19;

36:10,13;42:3,6;
43:25;44:19
less (1)
41:23
letterhead (1)
31:15
liabilities (2)
10:10,16
liability (8)
38:6,7,8;42:2,4,6;
43:21;44:6
liability's (1)
40:20
liable (1)
44:12
likelihood (2)
45:17;46:3
likely (4)
24:20;25:8;42:13,
19
list (8)
28:6;35:8,11;36:2
listed (5)
26:12,14;28:2;
29:19;30:3
lists (1)
17:7
litigation (7)
7:22;37:24;41:24;
43:17,25,25;44:21
litigations (1)
38:9
little (1)
16:12
LLP (1)
3:2
located (1)
5:4
long (2)
11:6;36:23
look (10)
8:18;11:15;16:4;
22:23;26:8;28:3,19,
25;32:1;43:7
looked (16)
8:21;11:17,19,21;
22:8,8;29:24;32:15,
20;33:5;35:13,17,20,
21;40:17;42:10
looking (10)
9:24;10:18,20;17:6;
27:22,24;32:2;34:13;
36:1;39:7
loss (1)
38:14
losses (1)
38:13
lost (1)
27:21
lot (2)
30:1;36:10

**M**

ma'am (1)

27:1
magnitude (2)
44:7,17
main (1)
31:7
MAJUMDAR (6)
6:4,4;45:1,5,8;47:17
makes (1)
24:23
making (2)
31:11,25
many (5)
11:16;15:20;16:10,
24;17:5
Marc (1)
6:13
mark (3)
18:13;19:1;30:13
marked (5)
18:14,17;19:3;30:9,
14
material (10)
24:15,18,23;25:2,
11;38:11;40:1,3,23;
43:14
materials (4)
15:1,2,4;27:13
matter (15)
9:5;12:9;14:19,23;
15:1,10;16:11;30:18,
24;31:13;38:6,7,15;
41:20;44:19
matters (8)
7:23;8:14,23;9:2,8,
12;13:14,19
may (5)
11:20;23:5;25:24;
39:8;40:23
maybe (1)
35:25
mean (19)
7:24;16:7,8,12;
17:20;18:5;21:4,9,16;
24:25;29:8;32:15,23;
33:22;38:24,25;41:21;
42:3;46:9
meaningful (3)
24:23;25:3,4
meaningfully (1)
46:21
mediation (1)
28:10
meet (2)
10:21;11:6
member (1)
27:8
members (2)
26:25;41:5
memo (1)
34:1
Memorandum (3)
28:14;30:5;31:2
Menasha (1)
6:14
met (4)

10:25;11:7,8,12
method (2)
32:16;33:1
methodology (7)
31:20,23;32:6,8,17;
34:7,8
mid-2012 (1)
42:16
might (2)
39:6;46:4
Mike (1)
6:15
Miller (2)
12:5;20:3
million (1)
44:9
millions (1)
29:4
Milwaukee (2)
3:4,7
minutes (1)
11:9
misrepresentations (1)
8:3
months (2)
21:11;46:23
more (19)
11:23;13:22,23,23;
15:25;16:1,2,3;17:14;
24:10,11;25:14;29:7;
36:16;38:23;41:23;
42:20;47:4,6
morning (7)
5:2;6:25;7:1;11:8;
45:6,6,7
mostly (1)
29:24
motion (1)
28:15
much (5)
15:15;16:6;42:21;
43:20;46:14
Mulligan (3)
3:6;6:2,2
myself (1)
11:3

**N**

name (3)
5:3;7:2;45:8
Nancy (1)
5:23
narrow (1)
13:23
nature (1)
25:6
NCR (45)
5:11,21;11:20;23:2,
3,25;24:5,8,21,23;
25:23;26:2,5,14,16;
28:14;35:19,22;
36:4,9,18;37:2,6,9,14,
15,17,24;38:2,10;
39:10,11;40:16,18;

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

41:16,22;42:12,21;
43:14,23;44:12;45:13,
21;46:22
**NCR's (17)**
22:4;24:19;28:24;
29:17;34:20;35:9;
38:5,6,7,8,18;39:3;
41:19;42:1,9;43:20;
44:18
**necessarily (1)**
33:8
**necessary (1)**
31:4
**need (2)**
7:18;29:7
**needed (1)**
23:20
**Neenah-Menasha (1)**
6:3
**negative (1)**
24:18
**new (1)**
25:9
**nodding (1)**
7:15
**non-CERCLA (2)**
9:12;33:3
**non-JDG (1)**
41:11
**non-public (7)**
36:3,9,18,20;37:1,6,
9
**North (2)**
7:6,8
**note (1)**
44:7
**November (5)**
5:7;19:1,8;23:12;
25:1
**number (6)**
10:5;13:21,22;
30:14,15;42:21
**numbers (2)**
19:9;28:11

## O

**oath (1)**
6:21
**object (2)**
17:12;20:23
**obligations (3)**
10:22;39:10,20
**obtained (1)**
35:18
**occur (1)**
46:4
**off (3)**
35:2,4;47:25
**offer (1)**
43:12
**offering (14)**
14:16;33:15;34:19,
21;40:8,11;41:3,7,10,
13,19,22;42:1;47:11

**Office (1)**
31:3
**often (1)**
16:14
**one (9)**
10:2;18:18;19:16;
28:7,8,21;32:24,25;
43:16
**ones (1)**
28:6
**only (2)**
41:15;44:21
**operating (1)**
33:3
**OPERATOR (7)**
5:2;6:8,17;35:2,5;
47:22,24
**opine (1)**
45:23
**opinion (29)**
8:25;9:19;14:16;
18:8;27:16;29:17;
33:15;34:19,21;39:1,
2;40:5,6,11,23;41:1,3,
7,10,13,19,22;42:1,6;
44:16;46:5,7,15;47:11
**opinions (11)**
9:4,10,11,20;17:25;
38:21;40:9;43:2,4,12;
44:24
**opposed (1)**
8:7
**orders (1)**
13:2
**original (2)**
14:12;19:9
**OSRE (1)**
31:4
**others (3)**
11:21;35:25;42:24
**otherwise (1)**
19:12
**out (2)**
17:6;18:8
**out-of-pocket (2)**
15:5,10
**over (3)**
34:17;46:11,25
**overstating (1)**
42:13

## P

**page (2)**
26:11;27:21
**paid (4)**
16:6;29:4,13;36:12
**Papers (3)**
26:18,22;28:17
**paragraph (1)**
30:25
**part (3)**
19:25;32:20,24
**particular (5)**
12:24;14:13;21:19;

33:6,7
**parties (12)**
8:22;9:21;17:1;
26:15,23;29:14;37:25;
39:25;40:13;41:11,20;
47:11
**party (2)**
26:18;41:24
**party's (1)**
9:8
**past (5)**
7:21,23;8:2,13;9:1
**pay (43)**
8:25;9:5,9,12,24;
10:4,11,17,19;22:5;
29:17;30:6;31:5,14,
19,25;32:4,19;33:2,7,
11,20;34:2,3,7,20;
38:5,18;39:12,14,19,
23;40:12;41:1,4,11,
16,20,23;43:22;45:14;
47:12,15
**payment (2)**
39:21;40:3
**payments (1)**
39:25
**pending (1)**
5:12
**Pennsylvania (1)**
7:8
**people (1)**
38:16
**percent (4)**
46:25;47:4,6,7
**perform (7)**
16:15;22:17;32:9;
41:14,15;42:7;43:11
**performed (3)**
10:2;33:23;43:22
**performing (2)**
12:8;31:21
**perhaps (3)**
11:1;28:11;40:2
**period (3)**
32:3,5;34:17
**periods (1)**
42:18
**personally (1)**
27:2
**person's (1)**
13:10
**pertaining (1)**
36:6
**PETERSON (3)**
5:23,23;47:23
**phase (1)**
16:23
**phone (2)**
3:11;47:18
**plan (1)**
24:9
**please (6)**
5:19;6:9,18;7:2,13;
21:7
**point (1)**

43:6
**pointed (1)**
18:8
**points (4)**
28:9,21;39:5;42:11
**policy (6)**
30:5;31:2,7,10,14;
33:16
**position (1)**
39:13
**positive (1)**
24:18
**possible (7)**
45:13,21,24;46:7,9,
24;47:1
**potential (5)**
8:11;38:6;40:20;
43:21;44:8
**potentially (1)**
26:22
**preparation (1)**
11:11
**prepare (5)**
10:23;11:12;12:1;
19:25;27:5
**prepared (3)**
16:24;19:7;27:7
**preparing (9)**
12:12,15;20:7,13,
16;22:1;26:3;27:9,14
**PRESENT (2)**
3:13;5:8
**pretty (1)**
47:9
**previous (1)**
37:2
**previously (1)**
35:17
**principles (2)**
44:5,14
**prior (3)**
16:11;19:5;24:24
**Probably (3)**
16:1,3;32:12
**proceeding (1)**
17:23
**PROCEEDINGS (1)**
5:1
**process (2)**
31:9;32:24
**produced (8)**
10:25;23:25;24:3,5,
5,8;25:20;37:22
**professional (1)**
13:20
**project (1)**
15:24
**projected (1)**
10:21
**projections (1)**
14:11
**projects (1)**
8:8
**proprieties (1)**
8:4

**provide (2)**
25:18;36:13
**provided (8)**
17:11;22:9;23:1,24;
25:24;42:16,24;46:17
**providing (1)**
13:9
**public (12)**
25:22;26:6;29:20,
24;35:13;36:7,13,17,
22;37:14;38:2;42:19
**publicly (1)**
26:1
**purpose (7)**
26:3,4;31:16;33:22,
24,25;34:5
**purposes (2)**
6:11;23:5;27:14
**put (6)**
17:23;25:21;32:13;
35:12;37:14;44:4
**Putting (1)**
28:22

## Q

**qualify (1)**
17:16
**QUARLES (3)**
3:2;5:23;6:1

## R

**rate (1)**
15:10
**rather (1)**
7:15
**reaching (2)**
33:10;34:2
**read (13)**
9:15,16;12:17,18;
21:7,8;29:22;30:14,
18,20;31:1;33:8;
35:18;37:18,19
**reading (1)**
30:5
**reason (1)**
27:17
**recall (13)**
11:24;21:2,11,12,
18,19,21,24;27:8,12;
29:21;36:25;43:18
**receive (2)**
21:4,17
**received (2)**
21:6,22
**recent (2)**
11:20,23
**record (13)**
5:3,20;6:19;7:3;
9:16;12:18;21:8;31:1;
35:2,4,6;37:19;48:1
**recording (1)**
5:17
**records (1)**

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

16:4
recoveries (2)
29:5,16
reduction (1)
33:13
re-familiar (1)
11:3
re-familiarize (1)
11:3
refer (1)
19:12
reference (8)
5:10;28:4,7,13,21;
29:3,5;37:20
referenced (4)
11:18;26:7;28:20;
35:22
referencing (2)
15:12;20:9
referring (2)
19:13,16
refers (2)
39:10;40:18
regardless (1)
32:14
re-identify (1)
6:11
reimbursed (1)
15:8
reimbursement (1)
12:25
relate (2)
9:21;36:19
related (9)
8:13;9:21,22;13:16;
21:12;29:8;34:19;
36:11,14
relates (4)
10:3;13:5;28:8;33:9
relationships (1)
29:13
relative (2)
8:6;41:20
releases (1)
35:21
relied (3)
42:9,18,24
remediation (14)
13:3;14:1,4,7,13;
22:4,15;31:3;38:19;
39:4;42:8,20;45:14;
46:11
remember (1)
20:25;30:7;43:20
remote (3)
45:18;46:3,7
render (1)
43:5
rendered (4)
9:4,9,11,20
rendering (3)
40:23,25;42:6
report (46)
10:24;11:23;12:16;
16:24;18:1,9,12,20;

19:1,7,13,17,18,21;
20:4,5,8,11,14,17,20;
21:10,20;22:1;23:11,
12,15,17,21;24:9,14,
15,16,16;25:2,7;
27:14,22,23,24;28:8;
32:7;38:22,24,24;39:1
reporter (1)
6:18
Reporting (1)
5:6
reports (18)
11:19;12:16;20:9;
23:7,14,16;25:15,23;
26:3,5;35:18;36:22,
22;39:1;40:7;43:2,4,
11
request (1)
5:18
Reread (1)
10:24
reserve (1)
43:24
residence (1)
7:7
resources (3)
8:22;40:3,25
respect (29)
9:5,8;11:5;12:8;
13:2;14:12;16:15;
17:25;20:11;21:10,20;
22:6,25;24:18;25:17,
19,22;28:9,10;32:3;
38:3,11,13;40:22;
41:1;42:22;43:13;
44:10;46:2
rest (1)
44:11
result (4)
21:1,5;37:2,5
results (7)
24:19,19;29:25;
39:14;43:23;44:11;
45:25
retained (1)
16:10
review (22)
8:20;11:13,22;
22:16,20;23:7,9;
25:12;26:4,6,15,21,21,
22,24;27:2;31:16;
36:3,9,18;40:10;47:15
reviewed (7)
10:24;26:12;27:13;
30:13;32:9;35:15,18
reviewing (4)
12:7;14:8;26:5;30:7
right (4)
6:25;18:24;31:1;
43:10
River (11)
13:3;36:19;37:13,
25;38:3,20;39:3;41:4,
23;42:8,10
Robert (2)

3:13;5:3
role (3)
8:16,18;15:16
room (1)
11:14
ROPER (1)
3:9

## S

same (7)
18:24;30:12;32:8,
14;34:10,18;36:17
saying (2)
7:16;24:5
sc (1)
3:9
scenario (1)
47:8
science (1)
14:3
SEC (3)
23:2;24:2;35:14
second (2)
13:5;26:11
section (2)
19:23;26:10
seeking (2)
12:24;13:2
seems (1)
37:8
selected (1)
25:11
sensitivity (1)
44:23
September (4)
18:12,21;23:11;
25:1
served (1)
17:1
set (1)
22:13
settlement (3)
31:5;33:13;34:3
settlements (2)
31:10;33:10
Sewerage (2)
3:8;6:3
SHAPP (2)
6:13,13;47:20
share (1)
44:10
sharing (1)
28:16
sheet (2)
32:3;34:14
significant (4)
13:20;15:23;40:2,
24
significantly (1)
46:11
similar (2)
8:25;19:5
Site (2)
31:3;39:3

solvency (6)
10:2,3,6,7,12;32:19
solvent (1)
10:8
something's (1)
19:19
Sometime (1)
20:15
somewhat (1)
17:21
Sorry (3)
27:1,21;47:11
sources (1)
32:16
speak (3)
11:25;26:19;40:6
specific (6)
17:14;25:14;29:7;
31:11;34:11;36:16
specifically (3)
19:16;20:10;30:4
specify (1)
19:17
spend (2)
13:20;14:25
spent (1)
15:23
spoke (1)
12:2
stand (3)
16:4;23:16;33:16
standpoint (1)
33:16
stands (2)
38:25;39:1
state (1)
7:2
States (5)
5:11,12;6:5;31:15;
45:9
still (2)
18:6;45:6
straightforward (1)
32:17
Street (2)
5:5;7:8
Strike (1)
26:4
subheading (1)
27:19
subject (6)
17:17;30:18,24,24;
31:13;43:13
submitted (3)
18:1,9;23:8
substantial (3)
20:22;21:2,14
succinct (1)
38:23
Suite (1)
3:10
summaries (1)
27:5
summarize (1)
38:21

summarized (2)
38:22;40:6
summary (3)
27:9,11;40:5
Sumona (2)
6:4;45:8
Superfund (4)
30:6;31:6,14;33:20
supervision (2)
12:9;20:6
supplement (5)
24:9,14,16;25:7,14
supplemental (8)
11:23;18:25;19:18;
20:17;23:12;25:2;
27:22,24
support (4)
8:20;14:8;28:15,20
Sure (12)
7:4;11:2;15:3;21:9;
22:7;25:3;27:23;
32:23;38:7,10;45:3;
46:9
swear (1)
6:19
sworn (1)
6:21

## T

talk (1)
30:3
talking (1)
25:13
team (1)
27:8
technician (1)
5:4
telephone (2)
6:8,11
tens (1)
29:3
term (1)
29:1
terms (1)
29:13
test (1)
10:7
testified (4)
6:22;9:10;17:24;
42:21
testify (4)
16:17;17:23,24;
45:23
testimony (5)
13:9;17:7,11;37:16;
42:23
tests (2)
10:3,12
thanks (1)
47:20
therefore (1)
13:12
thought (1)
25:6

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Video Deposition of Gary Kleinrichert
November 07, 2012

three (2)
11:8;34:17
Thursday (1)
20:18
times (7)
11:10;16:10,24;
17:4,5,8;20:12
today (1)
5:9
told (1)
22:16
top (1)
22:17
topic (1)
16:16
topics (2)
13:23,24
training (2)
13:11;14:14
TRANSCRIPT (1)
5:1
transcripts (1)
35:19
transmits (1)
31:2
travel (1)
15:6
trends (1)
14:10
trial (11)
13:5;16:7;24:9,11,
17,22,24;25:9;43:3,8,
12
true (1)
37:10
try (2)
7:14,17
two (6)
10:3,12;13:5;20:9,
11;31:10
type (3)
10:1;15:6;36:22
types (5)
7:20;8:7,7;10:5;
15:6
typically (1)
16:19

**U**

ultimate (1)
44:22
ultimately (1)
44:12
Um-hum (5)
7:25;9:3;29:6;
42:17;44:2
unclear (1)
19:19
under (12)
10:3;12:9;20:5;
26:10;28:2,23;29:19;
30:3;44:5,13;47:8,8
underlying (1)
8:19

understood (1)
33:6
United (5)
5:11,12;6:5;31:15;
45:9
Unless (1)
19:12
unsubstantial (1)
21:23
up (2)
22:19;42:12
upon (14)
13:10;16:22;18:23;
22:3;23:3;32:3;33:11;
39:3,5,12;42:18;
45:24,25;46:16
up-to-date (1)
24:17
use (5)
22:16,21;28:1;
32:17;34:14
used (5)
22:14;32:8;46:16,
20,21
using (1)
27:23

**V**

valuation (1)
32:19
valuations (1)
13:15
valuation's (1)
13:19
value (4)
10:9,10,14,15
variety (3)
7:22;8:1;14:9
various (7)
32:15;35:16;37:21;
39:5,24;40:7;42:12
verbal (1)
7:15
version (1)
23:10
VIDEO (10)
5:2,3,4;6:8,12,17;
35:2,5;47:22,24
Videographer (1)
3:13
von (1)
3:9
vs (1)
5:11

**W**

Wacker (1)
5:9
Washington (1)
5:5
way (2)
18:7;32:13
website (1)

35:22
websites (1)
35:22
welcome (1)
26:9
weren't (1)
21:14
West (2)
5:5,9
what's (7)
7:5;12:21,23;15:4;
36:17;46:11,25
wherewithal (1)
39:24
William (1)
3:6;6:2
Wisconsin (4)
3:4,7,10;5:14
without (2)
36:1;39:9
witness (17)
5:16;6:19,20;9:17;
12:19;17:14;19:5;
20:25;21:9;23:2;36:7;
37:16,20;40:17;42:16,
22;45:3
witnesses (1)
25:19
work (3)
7:10;37:3;43:11
worked (6)
12:2,2;13:21,22;
15:21;20:5
works (2)
12:10,11
wrote (1)
19:21
WTM-1 (2)
5:24;6:1

**Y**

years (3)
24:1;34:17;45:14
yesterday (1)
11:7

**Z**

Zellner (2)
3:13;5:3

**1**

1:10-CV-00910-WCG (1)
5:15
10:27 (1)
35:3
10:36 (1)
35:6
10:58 (2)
48:1,2
100 (2)
15:25;16:1
10Ks (1)

35:14
10Q (1)
11:20
150 (1)
17:4

**2**

2 (1)
28:17
2012 (8)
5:7;18:12,21;19:1,
8;28:17;42:14,15
2017 (2)
39:9;45:22

**3**

30 (2)
11:9;17:8
300 (2)
16:2,3
30b6 (4)
36:6;37:16;42:16,
22
31st (1)
5:9

**4**

40/60 (1)
28:16
411 (1)
3:10
4310 (2)
18:14,17
4311 (1)
19:3
4312 (2)
30:9,15
468 (1)
28:18

**5**

5 (2)
19:1,8
50 (4)
46:25;47:4,6,7
520 (1)
7:6
53202 (2)
3:4,7
5697 (1)
7:8
5th (2)
23:12;25:1

**7**

7 (2)
18:12,21
700 (1)
3:10
76 (1)

44:9
77 (2)
5:4,9
7th (3)
5:7;23:11;25:1

**8**

8Ks (1)
35:14

**9**

9:33 (1)
5:8

Case 1:10-cv-00910-WCG    Filed 11/27/12    Page 21 of 21    Document 687-3