```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF WISCONSIN

 3                       GREEN BAY DIVISION
    -----------------------------------------------------------
 4
    UNITED STATES OF AMERICA and
 5  THE STATE OF WISCONSIN,

 6                 Plaintiffs,

 7              v.                 Case No. 10-C-910

 8  NCR CORPORATION, et al.,

 9                 Defendants.
    -----------------------------------------------------------
10

11

12               Deposition of EDWARD LYNCH

13             Wednesday, August 22nd, 2012

14
                          9:04 a.m.
15
                             at
16
                Wisconsin Department of Justice
17                    17 West Main Street
                       Madison, Wisconsin
18

19

20

21

22

23         Reported by Sarah A. Hart, RPR/RMR/CRR

24

25
```



USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of Edward Lynch
August 22, 2012

## Page 2

```
 1         Deposition of EDWARD LYNCH, a witness in the
 2     above-entitled action, taken at the instance of the
 3     Defendants, pursuant to the Federal Rules of Civil
 4     Procedure, pursuant to notice, before Sarah A. Hart,
 5     RPR/RMR/CRR and Notary Public, State of Wisconsin, at
 6     17 West Main Street, Madison, Wisconsin, on the 22nd
 7     day of August, 2012, commencing at 9:04 a.m. and
 8     concluding at 4:16 p.m.
 9  A P P E A R A N C E S:
10            U.S. DEPARTMENT OF JUSTICE
              ENVIRONMENTAL & NATURAL RESOURCES
11            DIVISION, by
                Mr. Randall M. Stone
12              P.O. Box 7611
                Washington, DC  20044
13            Appeared by phone on behalf of the
              United States of America.
14
              WISCONSIN DEPARTMENT OF JUSTICE
15            OFFICE OF THE ATTORNEY GENERAL, by
                Ms. Cynthia R. Hirsch
16              17 West Main Street
                P.O. Box 7857
17              Madison, Wisconsin  53707-7857
              Appeared on behalf of the State of
18            Wisconsin.

              SIDLEY AUSTIN, LLP, by
19              Ms. Katharine B. Falahee
                One South Dearborn Street
20              Chicago, Illinois  60603
              Appeared on behalf of NCR
21            Corporation.
```

## Page 3

```
 1  A P P E A R A N C E S:
 2            GREENBERG TRAURIG LLP, by
                Mr. David Mandelbaum
 3              2700 Two Commerce Square
                2001 Market Street
 4              Philadelphia, Pennsylvania  19103
              Appeared on behalf of
 5            P.H. Glatfelter Company.

 6            HUNSUCKER GOODSTEIN & NELSON, PC, by
                Mr. David A. Rabbino
 7              3717 Mt. Diablo Boulevard, Suite 200
                Lafayette, California  94549
 8            Appeared on behalf of
              Menasha Corporation.
 9
              STAFFORD ROSENBAUM, LLP, by
10              Mr. Richard C. Yde
                222 West Washington Avenue, Suite 900
11              P.O. Box 1784
                Madison, Wisconsin  53701-1784
12            Appeared on behalf of
              City of Appleton.
13
              DAVIS & KUELTHAU, S.C., by
14              Mr. Kevin J. Lyons
                111 East Kilbourn Avenue, Suite 1400
15              Milwaukee, Wisconsin  53202
              Appeared on behalf of
16            Neenah-Menasha Sewerage Commission.

17            von BRIESEN & ROPER, S.C., by
                Mr. Terry E. Nilles
18              411 East Wisconsin Avenue, Suite 700
                P.O. Box 3262
19              Milwaukee, Wisconsin  53201
              Appeared on behalf of CBC
20            Coating, Inc.
```

## Page 4

```
                       I N D E X

                    E X A M I N A T I O N
 5  BY MR. MANDELBAUM:                                    6
    BY MR. NILLES:                                      112
 6  BY MR. RABBINO:                                     133
    BY MS. FALAHEE:                                     175
 7  BY MR. LYONS:                                       177
    BY MR. MANDELBAUM:                                  186
 8  BY MR. RABBINO:                                     188

                       E X H I B I T S

11  EXHIBIT NO.                              PAGE IDENTIFIED

12  Exhibit 4211A  9/14/99 E-mail from Greg Hill,         45
                   re: "Lake Michigan Mass Balance"
13  Exhibit 4211B  9/99 E-mail chain re: "Eco             50
                   Meeting w/ FRG"
14  Exhibit 4211C  9/23/99 E-mail from Brenda Jones       65
                   re: "Ludwig Meeting"
15  Exhibit 4211D  3/7/01 E-mail from Anne                91
                   Fitzpatrick responding to E-mail
16                 string re: "Kidney Island Study"
    Exhibit 4211E  Responses to E-mail string in          93
17                 4211-D
    Exhibit 4211F  5/2/00 Memorandum to Ed Lynch          97
18                 from ThermoRetec
                   re: "Action Levels"
19  Exhibit 4211G  May/June/July 2000 E-mail string      102
                   re: "Design model forecasts"
20  Exhibit 4211H  White Paper No. 22, June 2003         111
    Exhibit 4211I  2/6/03 E-mail to William Merte         120
21                 from Edward Lynch re:
                   "Environmental dredging, draft
22                 synopsis for A/E services"
    Exhibit 4211J  3/14/03 E-mail to Edward Lynch        124
23                 from William Merte re: "Fox FS
                   for Environmental Dredging -
24                 Additional Funding Request"
```

## Page 5

```
              E X H I B T S (cont'd)

 2  Exhibit 4211K  February 2003 E-mail string re:      125
                   "Fox River Meeting"

 4     (Original exhibits attached to original transcript.)

 5     (Copies of exhibits attached to copies of transcript.)


 7     P R E V I O U S L Y   M A R K E D   E X H I B I T S

 8    EXHIBIT NO.                           PAGE IDENTIFIED

 9  No. 4154                                            127
    No. 4165                                            129
```

USA & WI v.  
NCR Corporation, et al. (Appleton Papers)

Deposition of Edward Lynch  
August 22, 2012

Deposition of EDWARD LYNCH, 8/22/12                              Page 14

1   believe that our notice of designating Mr. Lynch for
2   this particular issue went out exactly a week ago.
3   So it was not -- it was seven days' notice, not two
4   to three days' notice.
5       MR. RABBINO: Be that as it may, the
6   objection stands. I understand you disagree. We'll
7   have a meet and confer about this. In all
8   likelihood, we'll probably be discussing this with
9   the court at some time as well.
10      MS. HIRSCH: I understand.
11      BY MR. MANDELBAUM:
12  Q.   Allow me to ask one more question or one more set of
13  questions on this point. You've been -- the state of
14  Wisconsin would like to put you forward, Mr. Lynch,
15  as a person to testify on behalf of the state; not on
16  behalf what you know, but on behalf of what the state
17  of Wisconsin knows about the development of cost
18  estimates for the 2002 RODs.
19      I understand what you've described
20  that you've reviewed. You have reviewed documents
21  which reflect the cost estimates; is that correct?
22  A.   Yes.
23  Q.   Have you reviewed any documents about development of
24  those cost estimates?
25  A.   Not recently.

Deposition of EDWARD LYNCH, 8/22/12                              Page 15

1   Q.   Have you spoken to anyone recently about development
2   of those cost estimates?
3   A.   No.
4   Q.   Okay. Have you -- so you would be -- if you were to
5   testify today, is it fair to say you would be
6   testifying on behalf of the state of Wisconsin about
7   the development of those cost estimates solely on the
8   basis of your recollection of events from the time?
9   A.   I don't know if that's a fair characterization or
10  not.
11  Q.   You haven't prepared yourself to know what the state
12  of Wisconsin knows about the development of those
13  cost estimates, have you?
14  A.   Well, what do you mean by "what the state of
15  Wisconsin knows"?
16  Q.   What anyone at the state of Wisconsin knows. You're
17  testifying on behalf of the entity, the state of
18  Wisconsin.
19  A.   Um-hmm.
20  Q.   That's what Ms. Hirsch would like you to do once
21  we're through asking what you, Ed Lynch, knows, okay?
22  And you have an obligation -- or the state has an
23  obligation to prepare you on what the state knows, to
24  review its files, to talk to other people with
25  knowledge, and to be prepared. You have to make a

Deposition of EDWARD LYNCH, 8/22/12                              Page 16

1   reasonable effort.
2       Have you done any of that other than
3   to recall what you yourself know?
4   A.   I did review Appendix H of the feasibility study.
5   Q.   Okay. But no drafts, no correspondence, no work
6   papers, none of that?
7   A.   I did not review that in detail. I didn't think I
8   needed to.
9   Q.   Okay. I'm not criticizing you; I'm just asking what
10  you did.
11      All right. Let's take your deposition
12  in your individual capacity and see where we get to.
13      You're currently employed at the
14  Department of Natural Resources, correct?
15  A.   Correct.
16  Q.   In what capacity?
17  A.   I am the chief of the hazardous waste and mining
18  section.
19  Q.   And how long have you held that position?
20  A.   For about three years.
21  Q.   So you took that position in 2009?
22  A.   Approximately.
23  Q.   And what was your position immediately before that?
24  A.   Before that, I was working as a engineering
25  supervisor in the remediation and redevelopment

Deposition of EDWARD LYNCH, 8/22/12                              Page 17

1   program, as well as working as a supervisor in our
2   Waukesha service center for both remediation and
3   waste and materials management issues.
4   Q.   And for how long had you had those roles?
5   A.   I had that job for about a year or so.
6   Q.   So you began that job in about 2008?
7   A.   Approximately.
8   Q.   And before that, what did you do?
9   A.   Before that, I was -- let's see. From -- I was a --
10  what they called a career executive temporary
11  assignment where I worked in the remediation program
12  on issues related to our relationship -- the DNR's
13  relationship with the Department of Agriculture, you
14  know, determining, you know, residual remediation
15  activities from cleanup of agricultural pesticides; I
16  worked on certain information technology issues; and
17  then I had a few other roles as well.
18  Q.   And for how long did you have that role?
19  A.   I had that job roughly from 2004 to 2008.
20  Q.   Okay. And before 2004, what did you do?
21  A.   Before 2004, I was working on the Fox River.
22  Q.   And what was your job title?
23  A.   I was a project manager.
24  Q.   In which bureau?
25  A.   I worked in the bureau for remediation and

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of Edward Lynch
August 22, 2012

Deposition of EDWARD LYNCH, 8/22/12                    Page 18

1  redevelopment.
2  Q.  Now, we talked to Mr. Baker yesterday, Bruce Baker,
3    and he was in the bureau of watershed management,
4    correct -- or water waste management.  Excuse me.
5  A.  I think Bruce was actually the deputy administrator
6    for the water division.
7  Q.  Okay.
8  A.  Okay.
9  Q.  And that's a different division than you were in; is
10   that correct?
11 A.  Correct.
12 Q.  And so you worked with him but in a different unit of
13   DNR?
14 A.  Different division, yes.
15 Q.  Okay.  And what was your role with respect to the Fox
16   River?
17 A.  As project manager, what I did was I worked on
18   completing the various documents related to the
19   Superfund process to get the project from the initial
20   RI/FS to the record of decision being made.
21 Q.  So when did you come into the project?
22 A.  I believe it was in 1998 or so.
23 Q.  And the RI/FS was not yet complete at that point; is
24   that right?
25 A.  Correct.

Deposition of EDWARD LYNCH, 8/22/12                    Page 19

1  Q.  So were you involved in completing the RI/FS?
2  A.  Yes.
3  Q.  And you were involved in preparing the Proposed
4    Remedial Action Plan?
5  A.  My initial actions related to hiring -- putting
6    together a grant application and working to hire the
7    consultant we used to prepare the RI/FS and risk
8    assessment.
9  Q.  And then did you remain -- withdrawn.  Is that
10   consultant RETEC?
11 A.  Correct -- well --
12 Q.  Excuse me?
13 A.  Yes, it was RETEC.
14 Q.  Was there anyone else?
15 A.  RETEC had some subcontractors who worked for them,
16   different ones throughout the course of the project.
17 Q.  Okay.  And did you remain involved with their work
18   once RETEC had been hired?
19 A.  Yes.
20 Q.  And what did you do in connection with RETEC's work
21   after RETEC was hired?
22 A.  I worked with RETEC to coordinate the various tasks
23   that were associated with completing the RI/FS, and
24   to a certain degree, the risk assessment.
25 Q.  Did you have substantive input into the content of

Deposition of EDWARD LYNCH, 8/22/12                    Page 20

1    the RI/FS and the risk assessment?
2  A.  I believe so.
3  Q.  In what areas?
4  A.  The content in terms of what needed to be in the RI,
5    the remedial investigation.  That would include
6    determining the, you know, degree and extent of
7    contamination; the feasibility study as it related to
8    looking at alternatives, you know, the feasibility of
9    various alternatives and the costs associated with
10   those alternatives.
11 Q.  After the feasibility study and risk -- remedial
12   investigation and feasibility study and risk
13   assessment were completed, a Proposed Remedial Action
14   Plan was prepared, correct?
15 A.  Um-hmm.  Yes.
16 Q.  Were you involved in preparation of the PRAP?
17 A.  Yes.
18 Q.  What was your role in connection with the preparation
19   of the PRAP?
20 A.  You're working with other people within the agency to
21   write the document and evaluate the alternatives and
22   come up with a proposed remedy.
23 Q.  Who were the other people in the agency you were
24   working with that you can recall?
25 A.  It would have been -- Bruce Baker and Bob Paulson

Deposition of EDWARD LYNCH, 8/22/12                    Page 21

1    would have been two of the main people within DNR.
2  Q.  Okay.  Were you working with anyone else?
3  A.  EPA was involved.
4  Q.  Who at EPA was involved?
5  A.  The primary contact that I was working with was Jim
6    Hahnenberg.
7  Q.  Who was the person who had the lead role in
8    identifying the preferred remedial alternative?
9  A.  I think that was somewhat of a collective decision.
10 Q.  Okay.  Were you involved in that collective decision?
11 A.  I believe so.
12 Q.  The remedy that was proposed in the PRAP was
13   primarily dredging; is that correct?
14 A.  Yes, for areas where we were doing -- where we
15   proposed active remediation.
16 Q.  When did you become, yourself, convinced that
17   dredging was the appropriate remedial action for
18   those areas where there was active remediation that
19   was going to be proposed?
20 A.  I'm not sure if there was a single moment.  You know,
21   it was an evaluation of information learned in the
22   entire process.
23 Q.  Had you ever worked on a contaminated sediment site
24   before your involvement with the Fox River matter?
25 A.  I would have to think about that a little bit.  I

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of Edward Lynch
August 22, 2012

Deposition of EDWARD LYNCH, 8/22/12                                  Page 46

1  Q.  Okay.  Who is Greg Hill?
2  A.  Greg Hill was a -- he's now retired.  He formerly
3  worked for DNR.
4  Q.  In what role?
5  A.  Greg was a chief in the -- a section chief in the
6  Bureau of Watershed Management or Bureau -- Bureau of
7  Watershed Management, Water Resources Management, you
8  know, what they called themselves at that time.
9  Q.  And did he have any involvement with the Fox River
10  cleanup?
11  A.  Yes.
12  Q.  What was his involvement?
13  A.  Greg was the supervisor for various modeling-type
14  activities.
15  Q.  Okay.  Anything else that you recall?
16  A.  He worked on NRDA issues.
17  Q.  Okay.  Now, you're not shown as a recipient of this
18  e-mail.  Do you recognize the document by any chance?
19  A.  It doesn't -- it looks like an e-mail, you know.  I
20  mean, I don't recognize it as having seen it before.
21  Q.  Okay.  Do you recall the incident described in it?
22  I'll give you an opportunity to review it.
23  A.  No, I'm not really familiar with it.
24  Q.  You don't remember anything about a presentation by
25  Messrs. Horvatin, Warren, and Kreis on the Lake

Deposition of EDWARD LYNCH, 8/22/12                                  Page 47

1  Michigan mass balance?  You don't remember anything
2  about that?
3  A.  It's not ringing a bell.  Sorry.
4  Q.  Okay.  Now, you see that Mr. Hill says in the fifth
5  paragraph, the one that begins: "Bottom line for
6  PCBs" --
7  A.  Um-hmm.  Yes.
8  Q.  -- "is that" -- I think what it says is, "it is" --
9  that is, the effect of mass entering Lake Michigan
10  from tributaries -- "is masked by the atmospheric
11  contribution.  The conclusion drawn is that from a
12  lake-wide point of view, sediment remediation will
13  have no impact."  Okay?
14      Then in the next paragraph -- did I
15  read that correctly?
16  A.  I believe you read it correctly, yeah.
17  Q.  Okay.  In the next paragraph he says, "We suggested
18  that there may be some serious programmatic
19  implications to this kind of statement which they
20  should past a few folks" -- I think that's a typo --
21  "including the EPA Superfund program, FWS, tribes and
22  other states; and that this probably is not ready for
23  primetime presentation at the IJC meeting next week."
24      IJC is International Joint Commission,
25  correct?

Deposition of EDWARD LYNCH, 8/22/12                                  Page 48

1  A.  I believe so.
2  Q.  All right.  Were you part of the "we"?
3  A.  I don't believe so.  I don't believe so.
4  Q.  Okay.  Do you recall at about that time in 1999 there
5  being a practice among these various agencies to vet
6  scientific analysis for programmatic implications
7  before it was discussed?
8  A.  I don't remember that being any kind of common
9  occurrence.
10  Q.  Okay.  You would have -- you yourself didn't have any
11  instinct that communications -- or you would not have
12  had yourself a practice of limiting your own
13  communications with outside persons about science; is
14  that right?
15  A.  I don't -- I --
16  Q.  In other words, you would not -- would you have --
17  would you yourself in 1999 have taken the position
18  that a scientific study should be vetted by the EPA
19  Superfund program, FWS, tribes, and other states
20  because it might have programmatic implications
21  before it was presented to the IJC had you been in
22  Mr. Hill's position?  That would not have been your
23  practice, right?
24  A.  I can't -- I wasn't part of this.  I can't say what I
25  would have done in that regard.

Deposition of EDWARD LYNCH, 8/22/12                                  Page 49

1  Q.  All right.  Would you have objected to some of those
2  agencies but not others meeting with these people if
3  you were excluded from the meeting?
4  A.  I never have problems with meeting people.
5  Q.  Okay.  And that would be true no matter who -- do you
6  know who Mr. Horvatin and Mr. Warren and Mr. Kreis
7  are?
8  A.  Not really.
9  Q.  It wouldn't matter if they were university scientists
10  or industry scientists or agency scientists, correct?
11  A.  Yeah.
12  Q.  No problem?
13  A.  I guess --
14      MS. HIRSCH: Finish.  Go ahead.
15      THE WITNESS: I don't know them.  The names
16  aren't ringing a bell.  You know, I don't know the
17  context with which the work was done.  You know, I
18  don't know if there was some agreement between these
19  agencies and these people that they would -- that
20  they would provide input.  I don't know if there
21  was -- if this was part of some kind of agreement
22  that their -- I don't know if there was some
23  agreement as to, you know, "Talk to us before we go
24  external."
25

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of Edward Lynch
August 22, 2012

Deposition of EDWARD LYNCH, 8/22/12                                     Page 126

1  and we need more precision if we want to have an
2  effective meeting."
3      What did you understand the purpose of
4  setting up another meeting was?
5  A.  I believe what we were trying to do was to -- as I
6  recall, for the corps of engineers to become
7  involved, they had to do their own feasibility study.
8  And we needed to work with the corps of engineers,
9  participate, I guess -- I don't know the exact
10 terminology right now -- toward that feasibility
11 study, toward getting it done.
12     This -- by the corps identifying and
13 conducting their own feasibility study, it would
14 allow for additional federal funds to become
15 available, not just for an investigation, but also
16 actual remediation.
17     So what we were trying to do was more
18 clearly identify what needed to be done for the corps
19 to complete its own feasibility study using their
20 consultant, Barr Engineering out of the Twin Cities,
21 Minnesota.  And that's what the purpose of the
22 meeting was going to be.
23 Q.  You state on your long e-mail -- it's actually on the
24 back of the exhibit I gave you, the third-last
25 paragraph, second-last sentence says, "Other

Deposition of EDWARD LYNCH, 8/22/12                                     Page 127

1  questions would be how are we going to use the RETEC
2  RI/FS (to what extent can we build off of it) versus
3  what areas do we need to add to this effort?  I would
4  also like to look to ways where we could expedite the
5  process so that we could move ahead more quickly."
6      And that's consistent with your view
7  that there shouldn't be any more data collection
8  because that had already gone into the RI/FS; is that
9  right?
10 A.  I believe so.  We believed that we had information
11 that was adequate to make decision.  That doesn't
12 mean additional data wouldn't be useful or couldn't
13 be used in the future, but at this particular point
14 in time, since we were in the process of making
15 decisions, it appeared that we didn't need to collect
16 any more data as it related to make -- as it related
17 to completing a feasibility study.
18 Q.  I'm going to hand what you I'll represent to you was
19 previously marked as Exhibit 4154 in this litigation
20 being E-WDNR-700807 through 700808 and ask you if you
21 can identify this as a couple of e-mails that you
22 would have sent, the first being to Mr. Merte with
23 copies to Wanielista and Weigum, and the second being
24 to David Hildreth essentially forwarding your
25 previous message dated September 19, 2003.

Deposition of EDWARD LYNCH, 8/22/12                                     Page 128

1  A.  Yes.
2  Q.  And this was, I believe, information that you were
3  passing on to the Army Corps of Engineers concerning
4  questions that they might have for consultants; is
5  that right?
6  A.  I believe so.  Yes.
7  Q.  I think you indicated they were consulting with Barr
8  Engineering up in the Twin Cities.  Were they
9  selecting a different consultant?
10 A.  You know, I would have to go back and look at the
11 file.  I believe that that would have been the step
12 in the process because, as I recall, Barr was already
13 involved.
14     Barr had an existing contract with the
15 corps of engineers, as I recall, to provide technical
16 assistance to them of some sort.
17     I don't know if that included or
18 expanded the -- would have included work on a
19 feasibility study of this type.
20     That being said, based on the e-mail,
21 I'm guessing that we were going to be doing
22 interviews.
23 Q.  Well, that would certainly be how I would interpret
24 it, and that's why I was just wondering what the
25 problem was with Barr Engineering doing the corps of

Deposition of EDWARD LYNCH, 8/22/12                                     Page 129

1  engineers feasibility study, if any.
2  A.  Yeah, and I -- you know, the -- I don't recall
3  specifically, but Barr very well could have been a
4  oversight contractor for the corps of engineers.
5  Don't recall.  So this --
6  Q.  Go ahead.  I'm sorry.
7  A.  Nothing.
8  Q.  No, I was doing some paper shuffling; I wasn't trying
9  to cut you off.
10 A.  I don't have anything.
11 Q.  I'm next going to hand you a document that I will
12 represent to you has previously been marked in this
13 litigation as Exhibit 4165, and it's E-WDNR-702115
14 and E-WDNR-702116.
15     And I want to start on E-WDNR-702116,
16 if I can, and ask you if you can identify that as an
17 e-mail from Mr. Velleux to yourself dated December 9,
18 2002.
19 A.  Yes.
20 Q.  And what he says to you is, the first sentence:  "Now
21 that I've been through all this stuff again, I
22 strongly urge you to consider your need to have a
23 complete counter-analysis of Fox sim, look deeper
24 into additional years of bad elevation data, and
25 complete a PCB hindcast for the river using the Whole

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of Edward Lynch
August 22, 2012

Deposition of EDWARD LYNCH, 8/22/12                                Page 130

Fox River Model. To get through the ROD process for OU 4, I am virtually certain that you will need this information."
    Did you agree with Mr. Velleux's observations?
A. I passed Mark's observation on. Some of this information may have been useful; some of it may have been academic.
    Mark was working on his Ph.D. at that time. I don't know if he had a specific project for his dissertation. This may have been an idea that would have provided some dissertation-type work for him to do.
    That being said, you know, I -- I passed the information on.
Q. Well, in fact, it's not a may. He's pitching it here.
A. Yeah.
Q. He's saying, you know, "I can do a Ph.D. dissertation to do this and give you a bullet-proof" -- not bullet-proof; he doesn't use that word. But he can get a peer-review journal for the Whole Lower Fox River Model calibration forecasts, a peer-review journal publication for the Whole Lower Fox River Model hindcast, a peer-review journal publication for

Deposition of EDWARD LYNCH, 8/22/12                                Page 131

lower Fox River and Sheboygan bed elevation changes over time, analysis of Fox sim, and says, "With such information, you would be able to survive legal challenges to the ROD. You could win on purely technical grounds." He says, "You've heard my pitch."
    So he was trying to get money is what he was trying to get, right?
A. Sure. And I passed it on, and Mark did his dissertation on something else. So it was not a successful pitch.
Q. What you did is you passed it on to Mr. Hahnenberg of EPA, and you passed it on to Terry Long at the U.S. Army Corps of Engineers and asked them to follow up if they had some funding available, didn't you?
A. Yeah. "Please review the following e-mail and let me know if you are aware of resources that could fund this request or have any other ideas or get back to Mark directly."
Q. And you say, "While the OU 3-5 ROD may benefit from this work, I do not believe that this would be eligible to be done as part of the DNR Superfund cooperative agreement on the Fox."
    So you didn't think you could use existing grant funds to do it; you were asking them

Deposition of EDWARD LYNCH, 8/22/12                                Page 132

whether there might be other funds to assist the OU 3-5 ROD.
A. Yeah, I didn't think this would be something that would be eligible for us to do.
    MS. HIRSCH: Could you repeat what the number was on this document?
    MR. NILLES: 4165.
    MS. HIRSCH: Thank you.
    MR. NILLES: It may actually have another exhibit number as well, but that's the one that I marked it as.
    BY MR. NILLES:
Q. Do you know when you left in 2004 -- you left the Fox River for other bigger and better things in 2004?
A. Approximately.
Q. Yeah. Do you know with the Army Corps of Engineers whether there was a plan instead of dredge -- doing environmental dredging of PCBs there would be environmental dredging of mercury?
A. I don't recall.
Q. In your work with the Army Corps of Engineers, was Mr. Greg Hill involved as well?
A. I believe Greg was aware of what was going on, yes.
Q. You didn't attend a November 2005 meeting with the Army Corps of Engineers concerning environmental

Deposition of EDWARD LYNCH, 8/22/12                                Page 133

dredging of the Fox River, did you?
A. I don't believe so.
Q. I think that's all the questions I have. Thank you very much.
A. You're welcome.
    MR. RABBINO: About 2:30. Want to take a short break for a little bit?
    MS. HIRSCH: Yeah, let's take a short break.
    (A break was taken at 2:30 p.m.)
    (Back on the record at 2:52 p.m.)
    EXAMINATION
    BY MR. RABBINO:
Q. Mr. Lynch, my name is David Rabbino, and our firm represents the Menasha Corporation. Have you ever dealt with anybody from the Menasha Corporation?
A. No, not that I'm aware of.
Q. Obviously, people have asked you a lot of questions today. I will try not to repeat them. I will do my best to get into new territory. And I do have some follow-ups to some of the stuff that was going on earlier, so this is my chance to ask them.
    Earlier in the day Mr. Mandelbaum was talking to you about Exhibit 4211-B. This is where I think your e-mail was expressing some displeasure

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of Edward Lynch
August 22, 2012

Deposition of EDWARD LYNCH, 8/22/12                                   Page 178

1  Q. Okay. For any conversations that you may recall with
2  either commission members or employees at the POTW,
3  did anyone there ever indicate some refusal to
4  cooperate with DNR in the cleanup of the Fox River?
5  A. Not that I'm aware of.
6  Q. I bet you have some e-mail, or maybe you can even
7  identify it by name, that you may recall where
8  someone said something to you that sounded like it
9  wasn't -- this person wasn't going to be cooperative
10 no matter what.
11 A. Uh-huh.
12 Q. Do you have something like that in mind?
13 A. No, I don't. I don't have anything in mind.
14 Q. Okay. You never got anything like that from anyone
15 from the Neenah-Menasha Sewerage Commission, did you?
16 A. Not that I recall.
17 Q. Okay. Much earlier in the day today you were asked a
18 series of questions by Mr. Mandelbaum about source
19 removal. Do you remember that?
20 A. Um-hmm. Yes.
21 Q. Who ultimately decided at the department as to what
22 method of source removal would be done?
23 A. The person who signed the ROD is Bruce Baker. He was
24 the ultimate decision maker as it related to this. I
25 mean, he relied on input from others, I'm assuming.

Deposition of EDWARD LYNCH, 8/22/12                                   Page 179

1  Well, I know.
2  Q. During the time that you worked on the Fox River at
3  DNR, did you and the other folks with whom you worked
4  attempt to engage in consensus decision making with
5  respect to how the river would be remediated?
6  A. Internally and with EPA and the Fox -- the tribes,
7  the Fish and Wildlife Service I think were all, you
8  know, part and parcel to what we were -- what we were
9  doing. The level of involvement and input would
10 vary.
11 Q. But ultimately, as far as DNR was concerned,
12 Mr. Baker was the guy who finally signed off on what
13 was going to happen; is that right?
14 A. Correct. And I'm sure that Bruce, you know, informed
15 and discussed with the secretary's office, you know,
16 the decisions that were being made. I'm confident to
17 that.
18 Q. Do you know who on the federal side of all of this
19 was the person who signed off the way Mr. Baker
20 signed off on what exactly was going to be done to
21 clean up the river?
22 A. I believe it was -- the person who signed would have
23 been either Bill Muno or Rick Carle. I don't
24 remember. It seemed that Bill was leaving the
25 agency, and Rick was, I think, acting. I don't

Deposition of EDWARD LYNCH, 8/22/12                                   Page 180

1  recall specifically.
2  Q. Earlier today I think Mr. Mandelbaum asked you some
3  questions about dredging also. And if I recall your
4  testimony correctly or if I heard it correctly, I
5  think you said that at the time that you started
6  considering dredging for the Fox River, you knew of
7  other projects to clean up other waters that had
8  involved dredging.
9     Do I recall your testimony correctly?
10 A. There are other -- there are other dredging projects,
11 yes.
12 Q. Is it fair to say that at the start of your work on
13 the Fox River, dredging was an idea you had from your
14 knowledge of other projects as to what might be done
15 on the Fox?
16 A. I think that's accurate. That was an identified
17 alternative, yes.
18 Q. And if you can remember, at the time you started work
19 on the Fox, did you think that ultimately dredging
20 was what the department would want to do to clean up
21 the river?
22 A. I wouldn't go that far. You know, I think that there
23 were other options that needed to be considered, you
24 know. And that included things such as monitor
25 natural attenuation for certain areas, monitor

Deposition of EDWARD LYNCH, 8/22/12                                   Page 181

1  natural recovery, capping in certain areas. Source
2  control is what I'm getting at; not just source
3  removal, I guess.
4  Q. At the time you started your work and you had
5  dredging in mind, did you have these other
6  alternatives in mind as well?
7  A. Yeah, I think early in the process we looked at
8  identifying what alternatives there were.
9  Q. At the very beginning of the process did you have in
10 mind any other projects like the Fox River where
11 natural attenuation had been the selected remedy?
12 A. You mean formally selected through a --
13 Q. Yes.
14 A. -- EPA record of decision?
15 Q. Yes.
16 A. I'm not aware of any right offhand. That doesn't
17 mean none existed, but...
18 Q. At the time that -- take you to the time when you
19 first start work on the Fox River and you're
20 thinking -- or at least you know that dredging is a
21 possibility and you knew that there were other
22 projects where dredging had been done.
23    Did you know of any projects where
24 natural attenuation had been the selected remedy? I
25 think you said you did not; is that correct?