```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF WISCONSIN

 3                   GREEN BAY DIVISION
   -----------------------------------------------------------
 4
   UNITED STATES OF AMERICA, et al.,
 5
                   Plaintiffs,
 6
                vs.           Case No. 1:10-CV-00910-WCG
 7
   NCR CORPORATION, et al.,
 8
                   Defendants.
 9
   -----------------------------------------------------------
10

11            Deposition of JAMES HAHNENBERG

12            Tuesday, August 28, 2012

13

14                   9:03 a.m.

15                      at

16        Gramann Reporting, Ltd.
          710 North Plankinton Avenue
17          Milwaukee, Wisconsin

18

19

20

21

22

23

24        Reported by Dawn M. Lahti, RPR/CRR

25
```


Case 1:10-cv-00910-WCG   Filed 02/20/13   Page 1 of 10   Document 753-6

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of James Hahnenberg
August 28, 2012

```
 1              Deposition of JAMES HAHNENBERG, a witness
 2      in the above-entitled action, taken at the instance
 3      of the Defendants, pursuant to the Federal Rules of
 4      Civil Procedure, before Dawn M. Lahti, RPR,
 5      Certified Realtime Reporter, and Notary Public,
 6      State of Wisconsin, at 710 North Plankinton Avenue,
 7      Milwaukee, Wisconsin, on the 28th day of August,
 8      2012, commencing at 9:03 a.m. and concluding at
 9      5:45 p.m.
10  A P P E A R A N C E S:
11              U.S. DEPARTMENT OF JUSTICE, by
12              Mr. Randall M. Stone
                P.O. Box 7611
13              Washington, D.C. 20044-7611
                Appeared on behalf of the Plaintiffs.
14
                GREENBERG TRAURIG LLP, by
15              Mr. David G. Mandelbaum
                2700 Two Commerce Square
16              2001 Market Street
                Philadelphia, Pennsylvania 19103
17              Appeared on behalf of P.H.
                Glatfelter Company.
18
                HUNSUCKER GOODSTEIN & NELSON, PC, by
19              Mr. David A. Rabbino
                3717 Mt. Diablo Boulevard, Suite 200
20              Lafayette, California 94549
                Appeared on behalf of Menasha
21              Corporation.

22              STAFFORD ROSENBAUM, LLP, by
                Ms. Marney I. Hoefer
23              222 West Washington Avenue, Suite 900
                P.O. Box 1784
24              Madison, Wisconsin 53701-1784
                Appeared by phone on behalf of City of
25              Appleton.
```

```
 1  APPEARANCES CONTINUED:
 2
 3              DAVIS & KUELTHAU, S.C., by
                Mr. Mark F. Yokom
 4              111 East Kilbourn Avenue, Suite 1400
                Milwaukee, Wisconsin 53202
 5              Appeared by phone on behalf of
                Neenah-Menasha Sewerage Commission.
 6
                CRAVATH, SWAINE & MOORE LLP, by
 7              Mr. Omid H. Nasab
                Mr. Benjamin F. Heidlage
 8              Worldwide Plaza
                825 Eighth Avenue
 9              New York, New York 10019
                Appeared on behalf of NCR Corporation.
10
                QUARLES & BRADY LLP, by
11              Mr. Nancy K. Peterson
                411 East Wisconsin Avenue, Suite 2040
12              Milwaukee, Wisconsin 53202
                Appeared on behalf of WTM I Company.
13
                HERMES LAW, LTD., by
14              Ms. Heidi D. Melzer
                2360A Dousman Street, Suite 2
15              Green Bay, Wisconsin 54303
                Appeared on behalf of Appleton Papers,
16              Inc.

17              von BRIESEN & ROPER, s.c., by
                Mr. Michael P. Carlton
18              411 East Wisconsin Avenue, Suite 700
                Milwaukee, Wisconsin 53202
19              Appeared on behalf of CBC Coating, Inc.
20
21
22
23
24
25
```

```
 1              E X A M I N A T I O N
 2
 3  BY MR. MANDELBAUM                                   5
    BY MR. RABBINO                                    181
 4  BY MR. NASAB                                      287
    BY MR. MANDELBAUM                                 333
 5  BY MR. STONE                                      334
 6
 7
 8
 9
10              E X H I B I T S
11  EXHIBIT NO.                              PAGE MARKED
12  Exhibit 4219A  Answers and Objections              7
    Exhibit 4219B  E-mail of 10/5/00                   14
13  Exhibit 4219C  NRRB Briefing Package               19
    Exhibit 4219D  PRAP, October 2001                  33
14  Exhibit 4219E  Letter of 7/16/99                   51
    Exhibit 4219F  E-mail of 9/22/99                  119
15  Exhibit 4219G  Article, 10/25/97                  145
    Exhibit 4219H  E-mail of 6/4/98                   152
16  Exhibit 4219I  E-mails of 2/19/99                 153
    Exhibit 4219J  Article, 12/10/97                  156
17  Exhibit 4219K  Record of Decision, OU3, OU4, OU5  167
    Exhibit 4219L  E-mail of 7/6/00                   209
18  Exhibit 4219M  Excerpts from LFR, 12/'02          216
    Exhibit 4219N  Excerpts from EPA Cost Estimates   232
19
    (Original exhibits attached to original transcript.
20  Copies of exhibits attached to copies of transcript.)
21
22
23
24
25
```

```
 1  TRANSCRIPT OF PROCEEDINGS
 2      JAMES HAHNENBERG, called as a witness
 3  herein, having been first duly sworn on oath, was
 4  examined and testified as follows:
 5      EXAMINATION
 6      BY MR. MANDELBAUM:
 7  Q.  Good morning, Mr. Hahnenberg.  We've known each
 8  other a long time.
 9  A.  Um-hum.
10  Q.  I'm David Mandelbaum.  I'm still representing the
11  P.H. Glatfelter Company.  And I want to go over a
12  few ground rules for this deposition before we get
13  started so I'm sure we're on the same page.
14  A.  Okay.
15  Q.  Have you been deposed before?
16  A.  No.
17  Q.  Okay.  First time for everything, and I'm sorry for
18  this -- more fun things coming.  Can we take a
19  two-second break?
20      (Discussion off the record.)
21      BY MR. MANDELBAUM:
22  Q.  So I will be asking you some questions.  When I'm
23  through, other people will be asking you some
24  questions.  When you respond to questions, I'm
25  going to ask that you respond verbally.  You've
```

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of James Hahnenberg
August 28, 2012

1  Department of Justice?
2  A.  I believe he has.
3  Q.  Are those notes in the administrative record?
4  A.  I don't know.
5  Q.  Are your e-mails in the administrative record?
6  A.  I'm not sure.
7  Q.  I have to pull clean copies of a document out of
8  this box.  So if you don't mind, I'd like to take a
9  two-minute break.
10      MR. STONE: Okay.
11      (Discussion off the record.)
12      (Exhibit 4219B was marked for
13  identification.)
14      BY MR. MANDELBAUM:
15  Q.  I'm showing you a document that the reporter has
16  marked 4219B.
17  A.  Um-hum.
18  Q.  This is a printout of an e-mail.  Do you see the
19  number in the lower right-hand corner?
20  A.  Yes.
21  Q.  EWDNR?
22  A.  Yes.
23  Q.  That indicates, I understand from Mr. Stone, that
24  this came from a collection of e-mails and other
25  materials that Mr. Lynch had.

1  A.  Okay.
2  Q.  Now, if you look at this e-mail, it's an e-mail
3  trail, correct?
4  A.  Yes.
5  Q.  I'd like you to look at the -- at the original
6  e-mail, the bottom e-mail.
7  A.  Okay.
8  Q.  It appears to be from a person named Todd -- does
9  he pronounce his name Goeks?
10  A.  Yes.
11  Q.  Who is Mr. Goeks or Dr. Goeks?
12  A.  He works for NOAA, and I think he was a liaison to
13  the EPA to provide support on this project on
14  behalf of NOAA.
15  Q.  So he works for the United States?
16  A.  Yes.
17  Q.  Now he's looking to get a PowerPoint presentation
18  that Mark prepared.  Is that Mark Velleux?
19  A.  I don't know, probably.  But that's the only Mark I
20  know of who's been involved in the project early
21  on.
22  Q.  If you look at the latest e-mail, the one from
23  Mr. Lynch to among other people you.
24  A.  Right.
25  Q.  I think it refers to a PowerPoint presentation by

1  Mark Velleux.
2  A.  Okay.
3  Q.  And Mark Velleux was the modeler for DNR, correct?
4  A.  Correct.
5  Q.  I'm curious about this document.  If you look at --
6  on the second sheet in the next-to-the-last
7  paragraph, you see in the last sentence of that
8  paragraph reads I believe, I understand the
9  concerns with releasing the material and can
10  provide you with NOAA's assurance that the
11  electronic file would be treated as FOIA exempt,
12  litigation sensitive --
13  A.  Where is that?
14  Q.  This is the next-to-the-last paragraph in this
15  document.
16  A.  Okay.  I see the second sentence, okay.
17  Q.  -- would be treated as FOIA exempt, litigation
18  sensitive and under no circumstances released or
19  printed out.
20      And then the last sentence is, I
21  could provide further assurance that after viewing
22  the presentation and potentially discussing with
23  Mark, we would erase/delete the file such that no
24  permanent record would remain.  Right?
25  A.  Right.

1  Q.  Do you recall seeing this --
2  A.  No, I don't.
3  Q.  -- set of e-mails?
4  A.  No, I don't.
5  Q.  Is the term litigation sensitive a term that was
6  used either regularly or from time to time within
7  the United States government?
8  A.  I would guess it is but not a term that I use much.
9  Q.  What do you understand Dr. Goeks to mean by that
10  term?
11  A.  Well, the way I would interpret it is litigation
12  sensitive means it would be something that would
13  probably be kept confidential.
14  Q.  Does it mean that he thought there might be
15  litigation involving this material?
16  A.  Reading the e-mail, it would appear so, yes.
17  Q.  And this e-mail is dated September of 2000.  Do you
18  see that?
19  A.  Yes.
20  Q.  And at about that time, were you involved in the
21  Fox River matter?
22  A.  Oh, well, it was actually dated October 2000.
23  Q.  That's the -- that's the latest e-mail in this
24  trail.  The original one from Dr. Goeks, which I
25  think you're also copied on --

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of James Hahnenberg
August 28, 2012

1  A.  Oh, yes, I see.
2  Q.  -- dated September --
3  A.  Um-hum.
4  Q.  -- you were involved in the Fox River matter at the
5  time?
6  A.  Yes.
7  Q.  And did you believe that litigation was reasonably
8  likely at that time?
9  A.  I didn't know.
10  Q.  You didn't know?
11  A.  No.
12  Q.  So if -- do you recall submitting a package to the
13  National Remedy Review Board?
14  A.  Yes.
15  Q.  Did you prepare it?
16  A.  Yes.
17  Q.  And that was in July of 1999, correct?
18  A.  It sounds right.
19  Q.  And that package is marked Enforcement
20  Confidential.  Do you recall that?
21  A.  I don't remember.
22  Q.  We can look at it if you want.
23  A.  Sure.
24      (Exhibit 4219C was marked for
25  identification.)

1      BY MR. MANDELBAUM:
2  Q.  I'm giving you a document which the reporter has
3  marked 4219C.
4  A.  Okay.
5  Q.  Do you recognize it?
6  A.  Let me look at it.  I don't remember it in detail,
7  but it looks like something I would have prepared,
8  and it has my handwritten notes on it.
9  Q.  So these are your handwritten notes on it?
10  A.  It appears like my writing, yes.
11  Q.  And there was a volume two, right?
12  A.  Yes.
13  Q.  And your name is on the front of this?
14  A.  Yes.
15  Q.  Does that indicate that you prepared it?
16  A.  Yes.
17  Q.  Now, if you look at the top of the cover page and
18  then on every page in the text it says enforcement
19  confidential?
20  A.  Right.
21  Q.  What does that mean?
22  A.  Well, it would mean that it would be kept with the
23  EPA only.
24  Q.  And why is it enforcement confidential?
25  A.  I don't know.

1  Q.  Does it mean that litigation was anticipated at
2  that point?
3  A.  It means it may have been possible.
4  Q.  Okay.
5  A.  Sure.
6  Q.  At any time has anyone provided any direction to
7  you or to other employees at EPA working on the Fox
8  River matter concerning how documents are to be
9  managed because the matter might end up in
10  litigation?
11  A.  Yes.
12  Q.  What was the direction?
13  A.  I don't remember exactly.
14  Q.  Can you recall when you received that direction?
15  A.  Not exactly.  Over the years most likely, but I
16  don't really remember it specifically.
17  Q.  So if you look back at Exhibit 4219B -- let me back
18  up.  Is this -- this direction that you received,
19  was it direction from counsel?
20  A.  In which case?
21  Q.  For any lawyer --
22  A.  I don't remember.
23  Q.  You don't remember who told you about documents,
24  and you don't remember what they said?
25  A.  I remember the documents.  I don't remember people

1  telling me about their enforcement confidential
2  aspect to them.
3  Q.  Do you remember anyone telling you either keep
4  documents or don't keep documents --
5  A.  No.
6  Q.  -- because litigation --
7  A.  I was never told that.
8  Q.  You were never told that?
9  A.  No.
10  Q.  Even up to today?
11  A.  Correct.  I was told to always keep all documents.
12  Q.  Okay.  So I'm looking at --
13  A.  To an extreme in fact because I have a million
14  e-mails.
15  Q.  So I'm looking then at Dr. Goeks' e-mail, and he's
16  offering to delete a document when he's done with
17  it, right?
18  A.  He may have, yes.  That's what it says in the
19  e-mail, correct.
20  Q.  And he's offering to delete it specifically because
21  it could end up in litigation, right?
22  A.  That seems to be what he's saying.
23  Q.  Is that something that was a common practice within
24  the United States?
25  A.  Not at all.  Not that I know of.

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of James Hahnenberg
August 28, 2012

1  Q.  Do you know whether anyone else has either kept
2  everything or deleted some things?
3  A.  The general direction is to keep everything, like I
4  say, to an extreme because now I have like 60,000
5  e-mails or something like that that we've been
6  compiling in the database.
7      I mean I've had training in the past
8  regarding administrative records and that kind of
9  stuff.  And my understanding from that training was
10  you keep everything no matter how trivial -- you
11  don't make the judgment.  You just keep it.  It's a
12  government record.  That's my understanding.
13  Q.  And you've looked at the administrative record,
14  right?
15  A.  Um-hum, yes.
16  Q.  Are those e-mails in the administrative record?
17  A.  These?  I don't know.
18  Q.  No, the e-mails that you've collected, 60,000
19  e-mails.
20  A.  Oh, I don't know how those have been handled.  I
21  put them on this database which we have in our
22  Lotus notes, and the counsel has handled it from
23  there.
24  Q.  And when you've examined the administrative record,
25  you can't tell me one way or the other whether

1  they're in there?
2  A.  I don't know.
3  Q.  Now, if you look at the October 5 e-mail from
4  Mr. Lynch to Dr. Goeks which copies you, if you
5  look to the -- in the next-to-the-last paragraph,
6  the next to the -- the third-to-the-last sentence.
7      It says, Please note that we expect
8  you to follow this assurance, meaning the assurance
9  that there would be a deletion --
10  A.  Right.
11  Q.  -- and will not forward this to anyone else,
12  emphasis, without the expected -- expressed
13  permission of either Greg Hill or myself.
14      Do you see that sentence?
15  A.  Yes, I do.
16  Q.  Now you also say -- he also says that the -- at the
17  bottom, By copy of this e-mail, I'm also sending a
18  copy of this presentation to Jim Hahnenberg of EPA.
19  A.  Right.  Yes.
20  Q.  Did you have any reaction that you can recall to
21  this e-mail?
22  A.  I don't remember, but I can tell you that kind of
23  direction, I would not follow.
24  Q.  You would not follow?
25  A.  I would not follow.

1  Q.  You expected Dr. Goeks to follow it?
2  A.  I had no understanding one way or the other of how
3  he would react.  I didn't talk to Todd about this.
4  I don't remember this e-mail, and I don't remember
5  this as an issue.
6      I can tell you my practice is to
7  keep everything, and I would expect others to do
8  the same.  Obviously this is saying something
9  different, but that's not my practice.
10  Q.  Why would DNR to your knowledge have wanted this
11  document destroyed?
12  A.  I don't know.  It would only be my speculation as
13  to why.  And that really would be pure speculation
14  as to why they would.
15  Q.  Let's shift gears a little bit.  You say you've
16  been involved with the Fox River matter?
17  A.  Um-hum, yes.
18  Q.  In what capacity?
19  A.  Project manager for U.S. EPA.
20  Q.  And you're employed by U.S. EPA?
21  A.  Correct.
22  Q.  What's your job title?
23  A.  Remedial project manager.
24  Q.  And that's at EPA Region 5 in Chicago?
25  A.  Correct.

1  Q.  When did you first become involved in that capacity
2  with the Fox River matter?
3  A.  1996 was the first meeting that we had relative to
4  the Fox River that I was involved in.
5  Q.  And when did you join EPA Region 5?
6  A.  1989 -- June 1989.
7  Q.  And before that, where were you employed?
8  A.  I was in the oil exploration business in Texas.
9  Q.  Who were you employed by?
10  A.  Marathon Oil Company.
11  Q.  And when did you join Marathon?
12  A.  I believe it was 1980.
13  Q.  What was your job at Marathon?
14  A.  I was an exploration geologist.
15  Q.  And before Marathon, what did you do?
16  A.  I was a student.  I had other various small summer
17  jobs.
18  Q.  Describe your education for me after high school.
19  A.  I went to Central Michigan, got my bachelor's of
20  science, graduated in 1975.  I went to Michigan
21  State University for about a year.
22      Then I took some time off, and then
23  I ended up going back to -- well, going to grad
24  school at Western Michigan University, and I think
25  that was probably about -- I went to geology field

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of James Hahnenberg
August 28, 2012

1    camp in the summer of 1976.
2         Then from '76 to '77 I think I went
3    to Michigan State.  Then I believe it was 1978
4    roughly I started at Western Michigan in their
5    Master of Science program in geology.
6    Q.   Did you complete that program?
7    A.   Yes.
8    Q.   When did you get a Master of Science?
9    A.   I think it was 1980 when I officially got my
10   degree.
11   Q.   So you have a Master of Science in geology, and
12   what was your undergraduate degree in?
13   A.   Geology.
14   Q.   All right.  So you consider yourself a geologist?
15   A.   Correct.
16   Q.   Do you have any experience at EPA working on
17   contaminated sediment sites other than the Fox
18   River?
19   A.   Yes.
20   Q.   Which sites?
21   A.   Manistique River Harbor, area of concern; Kalamazoo
22   River, Pine River and Siawassee River.
23   Q.   Can you describe for me your role with respect to
24   the Manistique?
25   A.   I was both the remedial project manager, and I

1    operated in some capacity as an on-scene
2    coordinator.  I was really officially designated as
3    the remedial project manager.
4    Q.   And when did that occur -- withdrawn.  When did you
5    have that role?
6    A.   I'm not certain, but I'm going to say it was
7    probably 1993 to 1994.  It was quite a few years
8    ago, so I'm not exactly sure on the dates.
9    Q.   But it's before your involvement with the Fox?
10   A.   Correct.
11   Q.   And what was going on at Manistique during the time
12   that you were working on it?
13   A.   We were proposing that some dredging should be done
14   there, and I can go on about that, but that's our
15   initial involvement.
16   Q.   That's what EPA proposed?
17   A.   Correct.
18   Q.   Was dredging actually performed?
19   A.   Yes.
20   Q.   Was that dredging performed during your time on the
21   project?
22   A.   Yes.
23   Q.   Did you supervise the dredging?
24   A.   Some of the time I did.
25   Q.   Were you there when dredging was completed?

1    A.   No.
2    Q.   Has dredging been completed?
3    A.   Yes.
4    Q.   When was dredging completed?
5    A.   Well, it was after I left the project, so I'm not
6    sure exactly, late '90s.  '97 to '98, something
7    like that, but I don't know exactly.
8    Q.   Are you familiar with the outcome of that project?
9    A.   I'm not entirely informed.  I know there was lots
10   of monitoring done by EPA.  The details of it, I
11   just know a few bits and pieces, so I don't know
12   the specifics of the outcome.
13   Q.   Are you familiar with the costs experienced there?
14   A.   Vaguely.
15   Q.   Who did the work at Manistique?
16   A.   EPA did.  I mean, EPA contractors did.
17   Q.   Now you say you were involved with Kalamazoo?
18   A.   Yes.
19   Q.   What was your role at Kalamazoo?
20   A.   I was remedial project manager there.  It was a
21   state-lead site, so my role was really secondary.
22   Q.   And when were you involved with Kalamazoo?
23   A.   I don't remember the years.  It was quite a few
24   years ago.
25   Q.   Are you still involved with Kalamazoo?

1    A.   No, no.
2    Q.   Were you involved with Kalamazoo during a time when
3    there was any response action being taken?
4    A.   You know, I'm not sure.  We did do a small removal
5    there.  It was a dry excavation-type project, and
6    I'm not sure if I was on the project then or not to
7    be honest with you.  I might have been.  It was a
8    dry excavation, but it was in a small tributary to
9    the Kalamazoo.
10   Q.   You also were involved with the Pine River I think
11   you said?
12   A.   Correct.
13   Q.   What was your role with the Pine River?
14   A.   For a short time I was remedial project manager
15   while the other project manager was ill at the
16   time, so I took over for a few months.
17   Q.   And when was that?
18   A.   I don't remember the dates.  It's quite a few years
19   ago.
20   Q.   Decade?
21   A.   Yeah, probably 10, 12 years ago.
22   Q.   So it was concurrent with your involvement with the
23   Fox River?
24   A.   I believe so.
25   Q.   Was any response action underway at the time?

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of James Hahnenberg
August 28, 2012

1 A. No.
2 Q. And the last river you mentioned, I believe, was --
3 A. Siawassee River.
4 Q. Yes, which I can never say. Could you spell that
5 for the court reporter?
6 A. S-I-A-W-A-S-S-E-E.
7 Q. And what was your role with respect to --
8 A. Remedial project manager -- still my assignment.
9 Q. And you're still working on that matter you say?
10 A. Correct.
11 Q. Is there a response action underway there?
12 A. Yes, it's monitoring natural recovery.
13 Q. What's the contaminant at the Siawassee?
14 A. PCBs.
15 Q. Were you the remedial project manager at the time
16 of the selection of the remedy for the Siawassee?
17 A. No, I was not.
18 Q. Now, who had the lead for the Fox River?
19 A. At that time?
20 Q. At any time.
21 A. Oh, the State, the Wisconsin DNR. They always
22 have, and they still do.
23 Q. Is there a memorandum of agreement with the State
24 where there's a formal designation of the State as
25 the lead agency?

1 A. Well, there's a memorandum of understanding between
2 the State and the EPA and the trustees, basically
3 an agreement to work together on the project.
4 Q. That's an intergovernmental partners agreement?
5 A. Right, correct.
6 Q. But there's no -- in a --
7 A. There's no -- like we call them SMOAs or something
8 like that. As far as I know, there's not a formal
9 agreement between the EPA and the State
10 specifically for just the Fox River other than this
11 memorandum of understanding.
12 Q. And is that a permissible way to proceed because
13 the site is not included on the national priorities
14 list?
15 A. I'm assuming it is. I would say it is, yes.
16 Q. What is -- that it's permissible?
17 A. Sure, yes.
18 Q. Because it's a Superfund alternative site?
19 A. Right, yes. Well, I don't know if that's what we
20 call it, but it's certainly acceptable and
21 permissible and allowed.
22    MR. STONE: Be sure to let him finish his
23 question before you answer.
24    THE WITNESS: Sorry.
25

1    BY MR. MANDELBAUM:
2 Q. That's okay. Finish your answer.
3 A. That was it.
4 Q. Now, you were the remedial project manager for the
5 Fox River at the time that the remedy was selected,
6 correct?
7 A. Correct.
8 Q. Now, let's get the timeline in mind. Am I correct
9 that the Remedial Investigation and Feasibility
10 Study for this site was completed in 2001?
11 A. Officially it was completed in 2002 because that's
12 when we finished the first record of decision.
13 That's when you officially complete an RI/FS.
14 Q. But you issued a Proposed Remedial Action Plan or
15 PRAP in 2001, correct?
16 A. I think it was before -- well, I'm not sure of the
17 year, but we did issue what we call a proposed
18 plan. PRAP is kind of an outmoded term. We don't
19 really use that. It's a proposed plan. I'm not
20 sure of the exact date it was issued, but that was
21 issued by EPA and Wisconsin DNR.
22 Q. Let me just make sure we're on the same page. Let
23 me find the document. Here we go.
24    (Exhibit 4219D was marked for
25    identification.)

1    BY MR. MANDELBAUM:
2 Q. I'm showing you a document which is marked Exhibit
3 4219D, and I realize I have not been good about
4 identifying these documents for people on the
5 phone. This is the Proposed Remedial Action Plan
6 for the lower Fox River in Green Bay dated
7 October 2001.
8    Do you recognize that document?
9 A. Yes, I do.
10 Q. And this is the proposal that's put out for public
11 comment of how EPA proposed to address this site,
12 correct?
13 A. Correct. Well, EPA and DNR really jointly,
14 although it has -- we jointly issued it, but EPA is
15 administratively the lead.
16 Q. Administratively the lead. Explain that for me.
17 A. Well, I take that back. It was a state --
18 considered a state lead. We call it technical lead
19 because enforcement matters are mostly left to the
20 federal government. We don't for the most part
21 rely on state authority in that regard.
22 Q. So in 2001 the PRAP was issued -- is PRAP a term
23 that --
24 A. It's not a term we use, but it would -- proposed
25 plan.

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of James Hahnenberg
August 28, 2012

1    I mean, sure, if there's no mass
2  there, then there's no chance for any -- there's no
3  PCBs there, there's zero concentrations, and of
4  course the risk is nonexistent.
5      So it is a factor, but is it the
6  most important factor?  No.  And the way -- it's
7  just a matter of expressing what PCBs are there.
8  You can express it in concentration.  You can
9  express it in mass.  It's just a different way of
10  expressing -- different ways of expressing the same
11  thing.
12      MR. STONE:  Dave, let me just make one
13  mention for the record, and that is Mr. Hahnenberg
14  was noticed for the deposition in both his
15  individual capacity, and he was also designated as
16  a 30(b)(6) witness.
17      On this topic of the importance of
18  mass, et cetera, our position is this is outside
19  the scope of any of the 30(b)(6) designations.  So
20  I'm not saying you can't ask him about it.  I'm
21  just saying in many instances you've said on this
22  topic what's the answer for United States, et
23  cetera, et cetera.
24      Our position, and you don't have to
25  agree to it, is that this is outside the scope of

1  the 30(b)(6) topics.
2      MR. MANDELBAUM:  I understand -- I
3  understand your position, and I will call your
4  attention to -- I'll call your attention to the --
5  I think 1C has to do with movement, which is what
6  he's been telling us about, and 1C3 talks about the
7  use of the models, which is what he's been talking
8  about.
9      MR. STONE:  Okay.  I understand your
10  position.  I don't agree with you, but proceed.
11      MR. MANDELBAUM:  That's fine.
12      BY MR. MANDELBAUM:
13  Q.  If someone was in the room who in his or her heart
14  of hearts wanted mass removed for whatever reason,
15  would that person -- would that desire to remove
16  mass tend to influence the decision towards removal
17  by dredging or towards dilution or encapsulation by
18  capping recovery?
19  A.  I'd say it's very hypothetical and speculative as
20  to what that hypothetical person might think.  I
21  mean, I don't know.  It depends on the person.
22  Q.  Is this even a controversial question?  If you want
23  to remove mass, don't you want to remove mass?
24  A.  If you already know the answer, then why are you
25  asking the question?

1  Q.  So you don't want to agree with me?
2  A.  Yeah.
3  Q.  Okay.  Because I'm wondering when there were other
4  people in the room talking about mass removal,
5  Mr. Hahnenberg, were they talking about things
6  which fit neatly in your vocabulary, or were they
7  advocating for dredging in a way that didn't neatly
8  fit into the NCP consideration?
9  A.  Again, you'd have to ask them.
10  Q.  I'm asking you if they were there --
11  A.  I can't tell you what was in their mind.
12  Q.  I'm asking you what was in your mind.
13  A.  I wasn't there.  What was in my mind when we did
14  these decisions I can tell you was concentration
15  was the factor that I considered and looked at and
16  proposed to our management in terms of remedy.  It
17  was concentration-based.
18  Q.  Did you or anyone in your hearing ever say in words
19  or substance, the State of Wisconsin would like a
20  remedy that removes more mass?
21  A.  I don't know.
22  Q.  You don't know whether anyone said that in your
23  hearing?
24  A.  No, I don't remember.  It's a long time ago.  I
25  doubt I did.

1  Q.  What was the relationship between the United
2  States -- between EPA, DNR and the trustees in
3  terms of developing the remedy?
4  A.  It was good.
5  Q.  I don't mean it that way.  Did one agency make all
6  the decisions, or was it a collective decision?
7  A.  I would say it was a collective -- joint decision,
8  I would put it, between DNR and EPA.  Fish &
9  Wildlife, which is the main trustee I'm thinking
10  of, had little to do with selection of the remedy.
11      We did coordinate with the trustees.
12  In some cases we could share data.  That was mostly
13  what it was for.  That coordination was data
14  sharing.  And as you read in the one letter, they
15  may have had opinions, and they could express those
16  opinions.
17      In some cases as you pointed out
18  yourself, they expressed an opinion, and we didn't
19  do what they asked.  So I mean if we felt it was
20  inappropriate or the opinion was not something that
21  we wanted to go with, we didn't.  We had no
22  obligation to go with those kinds of
23  recommendations.
24  Q.  Turn to page 3 of Exhibit 4219E.
25  A.  Okay.

Case 1:10-cv-00910-WCG   Filed 02/20/13   Page 8 of 10   Document 753-6

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of James Hahnenberg
August 28, 2012

1      It will still be well within, say,
2  the NCP or legal parameters or whatever.  But
3  generally I think what David is saying here is that
4  we should try and get along better.  That's what
5  he's saying.
6  Q.  The restoration decision-making by the trustees was
7  not -- was not driven by the same selection
8  criteria as the remedy selection by EPA, right?
9  A.  Correct.
10     MR. MANDELBAUM: Now is a good time for a
11  break.
12     (Discussion off the record.)
13     BY MR. MANDELBAUM:
14  Q.  Mr. Hahnenberg, I'm actually looking at a document,
15  but I'm not going to give it to you because it's
16  privileged.  Who's David Ullrich?
17  A.  He is retired.  Years ago when EPA was first
18  involved in the Fox River project, he was acting
19  regional administrator.
20  Q.  And was that true in November 1999?
21  A.  I believe so.
22  Q.  So if he said something about the Fox River remedy
23  selection, what influence would that have on the
24  people working on that project?
25  A.  It probably would have some influence, but he was

1  not the decision maker.
2  Q.  Who was the decision maker?
3  A.  Bill Muno.  It was delegated to him.
4  Q.  Would Mr. Muno tend to listen to what Mr. Ullrich
5  wanted?
6  A.  I imagine.  Being acting regional administrator, of
7  course.
8  Q.  So do you recall a meeting in Chicago on or about
9  November 18, 1999 attended by Mr. Ullrich,
10  Mr. Ullrich's executive assistant Roger Grimes,
11  you, Cheri Eggleson, Peggy Schneider, Paul Karch,
12  Andy Schlickman, me and David Ludwig?
13  A.  No.
14  Q.  Do you recall attending a meeting to discuss
15  focusing sediment remediation on areas where the
16  pathway to fish might be concentrated?
17  A.  No.
18  Q.  Do you recall any conversation at any time, or did
19  you review anything in the administrative record
20  about the pathway from sediments to foraging carp
21  who would stir up soft sediment which would then be
22  taken into the gullets of the digestive systems of
23  gizzard shad?
24  A.  No.
25  Q.  You don't recall that at all?

1  A.  Nope.
2     MR. STONE: David, you said it's
3  privileged.  Privileged for you or privileged for
4  me?
5     MR. MANDELBAUM: Privileged for me.
6     MR. STONE: Okay.  Thank you.
7     BY MR. MANDELBAUM:
8  Q.  Do you recall Mr. Ullrich saying at any time in
9  your presence in words or substance in the hearing
10  of other people that from his point of view, there
11  were only two issues, first, how much to dredge,
12  and second, where to put the dredged spoils?
13  A.  I don't remember that.
14  Q.  If he had said that, that would have had an
15  influence on the remedy selection, would it not?
16  A.  I don't know.  I can't put myself in Bill Muno's
17  head.
18  Q.  You have no recollection, you say, of this gizzard
19  shad question?
20  A.  No, I don't.
21  Q.  Would you look at Exhibit 4219F?
22  A.  Yeah.  It was in 1999?
23  Q.  Yep.
24  A.  Well --
25     MR. STONE: No question pending.  Wait

1  for a question.
2     THE WITNESS: Sorry.  Sorry, David.
3     MR. MANDELBAUM: No problem.  I seem to
4  only have one copy of this one.
5     BY MR. MANDELBAUM:
6  Q.  Was any consideration given by EPA at any time
7  about or trying to identify the pathway by which
8  fish took up PCBs and breaking that pathway?
9  A.  Well, probably because we'd be part of --
10  potentially part of some remedial actions.
11  Q.  Was there any effort made to narrow the remedial
12  action to focus specifically on a pathway or
13  pathways?
14  A.  I don't recall us ever narrowing it like that.
15  Q.  Why?
16  A.  Because we usually look at a broader array of
17  considerations.  I mean that's why it would seem
18  unlikely that we would ever take that approach.
19  That would be very much against a lot of guidance
20  and other things that we have in terms of how we
21  approach things, that we would not focus it to that
22  degree.
23     MR. STONE: I'll mention for the record
24  again that our view is that this topic area is
25  outside the scope of the 30(b)(6) designation, but

USA & WI v.
NCR Corporation, et al. (Appleton Papers)

Deposition of James Hahnenberg
August 28, 2012

1  and 2007, did the cost variance expectation of the
2  government change?
3      MR. STONE: Objection, vague. Go ahead
4  and answer him if you can.
5      THE WITNESS: I'm not sure.
6      BY MR. NASAB:
7  Q.  Who within the government would you say was the
8  primary decision maker about whether -- how to
9  memorialize and give notice of the change in the
10 cost estimate for the remediation?
11 A.  Rick Karl. He's the decision maker. It's been
12 delegated to him by the regional administrator in
13 Region 5 to the Superfund division director which
14 is Rick Karl. Well, in earlier documents it was
15 Bill Muno who has since retired. More recently
16 it's Rick Karl.
17 Q.  Who did the drafting of this document?
18 A.  It was --
19 Q.  By this document --
20 A.  It was a combination of people, DNR and EPA, and I
21 was the person for EPA who did the drafting. Other
22 people were involved with reviewing and commenting
23 on it. Quite a variety of people. So I don't
24 know.
25     I really couldn't recall all the

1  individuals who -- I mean, like I mentioned before,
2  the way this works at the end of the process is the
3  final draft, which I would have done a large
4  portion of it and others would have commented on
5  and made some revisions, it goes through a sign-off
6  chain where it goes up through our management to my
7  boss, to her boss and then to Rick Karl, and the
8  office of region of counsel firm signs off on
9  it. A lot of people sign off on it in the final
10 sign-off process.
11 Q.  And as part of your preparation for today, do you
12 feel prepared to speak on behalf of the government
13 while -- with respect to this document and the
14 process behind it?
15 A.  Yes.
16 Q.  Are there any reasons why the government decided --
17 withdrawn.
18 A.  Let me back up too. Your question about who
19 reviewed this. Also my counsel has reviewed it
20 mainly for the legal kind of -- to make sure legal
21 is addressed properly in the.
22 Q.  Thank you. And why was the ESD issued? What's the
23 role of an ESD generally?
24 A.  Generally it's to document what we call significant
25 differences, and those would be differences that

1  are things like changes to components of remedies.
2  It could be some cost increases as opposed to a
3  fundamental change which you actually change which
4  is the ROD amendment. In that case you actually
5  change what you're doing, the actual remedy.
6      So in other words, if we went from,
7  say, an all-dredging remedy to an all-capping
8  remedy, that would be a fundamental change. And
9  going from the earlier ROD to the ROD amendment
10 that we did do prior to this, we went from a
11 dredging remedy with some capping contingency to a
12 combination remedy of dredging, capping and sand
13 covers. So that was a fundamental change.
14     This was not a significant change --
15 excuse me, it was a significant change I meant to
16 say. It was not a fundamental change.
17 Q.  So is it your view that a change in the cost
18 estimate from each project can't constitute a
19 fundamental change?
20 A.  Not at this level.
21 Q.  Fair enough, but that's, I think, a different
22 question. My question is, can a difference in cost
23 estimate in your opinion constitute a fundamental
24 change?
25 A.  I'm not sure that would be a policy question which

1  is beyond my role. That's like a policy question.
2  In other words, would a particular specific action
3  basically require a ROD amendment? Like say
4  200 percent, would that require a ROD amendment to
5  make that kind of decision? It would really be a
6  policy determination which is not something I would
7  be involved in.
8  Q.  How about for the Fox River remediation project?
9  Would a 100 percent increase in the cost estimate
10 have constituted a fundamental change?
11 A.  I'm not sure.
12 Q.  Is there --
13 A.  There's no bright line that tells you, 72 percent,
14 now you're in ROD amendment territory. There's
15 nothing that exists that tells you hard and fast a
16 certain number.
17     I can say in this case, yes, we are
18 62 percent more than the original cost, and
19 obviously we don't think that that is great enough
20 to fall within what we call a fundamental change
21 because the actual remedy is not changing, and
22 there are other things in this too which are other
23 significant differences which we haven't talked
24 about, but they're also lesser changes.
25 Q.  And as the government 30(b)(6) representative, you