**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF WISCONSIN<br><br>Plaintiffs,<br><br>v.<br><br>NCR CORPORATION, *et al.*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 10-C-910

The Honorable William C. Griesbach

**PLAINTIFFS' BRIEF IN OPPOSITION TO P.H. GLATFELTER COMPANY'S**
**MOTION FOR RECONSIDERATION OF THE COURT'S**
**DECISION AND ORDER ON THE PROPRIETY OF THE REMEDY**

# TABLE OF CONTENTS

Introduction...................................................................................................................1

Discussion.....................................................................................................................2

    **1. Superfund Cooperative Agreements are State Financial Assistance
Agreements, Not Delegation Documents**..............................................................3

    **2. EPA and WDNR Entered Into a Cooperative Agreement for Remedy
Development Work at this Site**..........................................................................4

    **3. EPA Adopted and Approved the Remedy Set Forth in the RODs**............................10

    **4. EPA's Cooperative Agreement was with WDNR, not a Particular WDNR
Bureau or Component**......................................................................................13

    **5. Additional Discovery Is Unnecessary and Unwarranted**.............................................15

**Conclusion** ..........................................................................................................19

**Introduction**

Glatfelter claims that its reconsideration motion focuses on "issues presented by the documents that the plaintiffs contend constitute a 'cooperative agreement' *delegating to WDNR the authority to select the remedy for this Site*." Dkt. 736 at 8 (emphasis added).[1] That is a red herring. The Plaintiffs do not contend that EPA somehow delegated ultimate remedy selection approval authority to WDNR through an EPA-WDNR cooperative agreement or otherwise.

First, there was no need for any sort of remedy selection decision-making delegation to WDNR because EPA approved and signed every remedy selection decision document that has been issued for the Lower Fox River and Green Bay Superfund Site, including the original Records of Decision, the ROD Amendments, and the Explanation of Significant Differences that the Court considered in its *Decision and Order on the Propriety of the Remedy*. Dkt. 666. That indisputable fact makes all the issues raised by Glatfelter immaterial and irrelevant to the propriety of the remedy.

Second, contrary to Glatfelter's suggestions, state cooperative agreements under CERCLA Section 104(d) *never* purport to delegate ultimate remedy selection decision-making authority under CERCLA. As the name suggests, a state cooperative agreement is put in place to formalize a cooperation and funding arrangement between EPA and a state agency like WDNR, so that particular work by the state agency can be financed with money disbursed from EPA's Hazardous Substance Superfund. EPA and WDNR established that type of funding arrangement for this Site but the details of that funding arrangement once again are immaterial and irrelevant to the propriety of the remedy.

---

[1] Docketed filings with the Court's Electronic Case Filing system are cited herein by the ECF docket number and ECF system page number applied to the bottom of the page as "Dkt. __ at __." Trial exhibits are cited by the exhibit number and PDF page number as provided to the Court as "Ex. __ at __." Trial transcript references are cited by the page number as "Tr. _____."

1

During the December trial, the Plaintiffs did their best to put this nonissue to rest with additional Court filings, a voluntary document production, and a specific inquiry on the record. Dkt. 711; Dkt. 712; Dkt. 753 at 3-4; Dkt. 753-7; Tr. 2105-06.  Glatfelter waffled at the time and then waited seven weeks to renew its protest and make a demand for unspecified discovery and another "trial that would take two or three days."  Tr. 2106; Dkt. 736 at 21; Dkt. 753 at 3-4. But Glatfelter cites no legal requirement that was violated and points to no new basis for finding that "the President's decision in selecting the response action . . . was arbitrary and capricious or otherwise not in accordance with law" under CERCLA Section 113(j)(2), 42 U.S.C. § 9613(j)(2). There is no need for additional discovery or a trial on the misguided inquiry that Glatfelter wants to pursue:  "whether the United States Environmental Protection Agency and the Wisconsin Department of Environmental Resources . . . entered into a cooperative agreement properly designating WDNR as the lead agency for the Lower Fox River and Green Bay Superfund Site." Dkt. 734-1 at 1.  Glatfelter's motion for reconsideration should be denied.

## Discussion

CERCLA Section 121(a) specifies that "[t]he President shall select appropriate remedial actions determined to be necessary to be carried out under section 9604 of this title or secured under section 9606 of this title which are in accordance with this section and, to the extent practicable, the national contingency plan."  42 U.S.C. § 9621(a).  By Executive Order, CERCLA remedy selection decision-making authority has been delegated to particular federal agencies, and primarily to EPA.  *See* Exec. Order 12,580 (Jan. 23, 1987) (published at 52 Fed. Reg. 2923 (Jan. 29, 1987)).

A different provision of CERCLA allows and encourages Superfund-financed state involvement in response actions that are being performed under CERCLA – including investigation, planning, and remediation activities – through entry into cooperative agreements

with EPA. More specifically, CERCLA Section 104(d)(1) provides as follows: "If the President determines that the State . . . has the capability to carry out [response actions authorized by CERCLA], . . . the President may enter into a contract or cooperative agreement with the State . . . to carry out such actions." 42 U.S.C. § 9604(d)(1).

The National Contingency Plan ("NCP") regulations and EPA's state financial assistance regulations amplify the purposes and limitations of cooperative agreements.[2] Most notably, the regulations reserve EPA's statutory authority to make final remedy selection decisions under CERCLA, as EPA did for this Site. As shown below, the governing regulations dispose of all of Glatfelter's argument for reconsideration as a legal matter, and they render immaterial the factual disputes that Glatfelter has tried to manufacture.

        **1.**       **Superfund Cooperative Agreements are State Financial Assistance Agreements, Not Delegation Documents.**

The EPA regulations concerning cooperative agreements make clear that those agreements serve as Superfund financing mechanisms for CERCLA response activities to be performed by state agencies. EPA's state financial assistance regulations and the NCP both define a "cooperative agreement" for a Superfund response action as a "legal instrument EPA uses to transfer money, property, services, or anything of value to a recipient to accomplish a public purpose in which substantial EPA involvement is anticipated during the performance of the project." 40 C.F.R. §§ 35.6015, 300.5. The NCP regulations also explain that "EPA will use a cooperative agreement to transfer funds to [a state agency] to undertake Fund-financed response activities" under CERCLA. *Id.* at § 300.515(a).

---

[2]     *See generally* 40 C.F.R. §§ 300.500-300.525 (NCP provisions entitled "State Involvement in Hazardous Substance Response"); 40 C.F.R. §§ 35.6000-35.6820 (EPA State and local assistance grant regulations entitled "Cooperative Agreements and Superfund State Contracts for Superfund Response Actions"). The statute and the regulations also authorize cooperative agreements with political subdivisions of States and federally recognized Native America Tribes, but the discussion here focuses on cooperative agreements with State agencies.

3

Glatfelter concedes that the Plaintiffs have produced and submitted to the Court "records of a grant" arrangement that financed WDNR's work on the remedial investigation and feasibility study ("RI/FS") for this Site with money from the EPA Hazardous Substance Superfund. *See* Dkt. 736 at 8 n.3; *see also* Dkts. 620-1 to 620-3; Dkts. 711-1 to 711-7; Dkts. 712-1 to 712-4; Exs. 2113, 2313, 2314, 2316. But Glatfelter questions "whether the grant documents constitute a cooperative agreement." Dkt. 736 at 15. That is a distinction without a difference. Under the governing law and regulations, CERCLA cooperative agreements are Superfund financing agreements.

A cooperative agreement under CERCLA Section 104(d)(1) can be used to finance a state agency's efforts as either the "lead agency" or the "support agency" on the activity or activities it covers.[3] The "lead agency" is defined as merely "the agency that provides [a Remedial Project Manager] to plan and implement response actions under the NCP." 40 C.F.R. § 300.5 (definition of "lead agency"). No special form of lead agency "designation" is required or specified by the NCP. If a state agency serves as the "lead agency," then EPA serves as the "support agency" and the state agency must still "consult with [EPA] throughout the response process." *Id.* By agreeing to serve as the lead agency, the state agency accepts workload and funding, but it does not acquire ultimate authority to select the remedy under CERCLA. EPA always reserves final remedy selection approval authority, as shown below.

### 2. EPA and WDNR Entered Into a Cooperative Agreement for Remedy Development Work at this Site.

In early 1998, EPA and WDNR entered into what the documents described as "Cooperative Agreement V985769-01" to provide money from the Superfund "for WDNR to

---

[3]     *See* 40 C.F.R. §§ 35.6055 (dealing with State-lead pre-remedial cooperative agreements), 35.6240-35.6255 (dealing with support agency cooperative agreements), 300.5 (NCP definitions of "lead agency" and "support agency"). Cooperative agreements can cover a single activity or multiple activities. *See id.* at § 35.6260; *see also id.* at § 35.6015 (defining preparation of remedial investigation/feasibility studies as an "activity" that may be eligible for cooperative agreement funding).

conduct a risk assessment and to conduct a remedial investigation/feasibility study . . . for the Fox River site." Dkt. 620-2 at 1. As shown by this excerpt from the first page of the form agreement, the agreement itself specified that it was a "Cooperative Agreement" making an initial award of $1,651,623 from EPA's "Hazardous Substances Response Trust Fund" to "Wisconsin DNR" under "CERCLA Sec. 104" for a "Fox River Remedial Investigation/Feasibility Study."[4]

| U.S. ENVIRONMENTAL PROTECTION AGENCY<br>EPA ASSISTANCE AGREEMENT / AMENDMENT<br>PART I - ASSISTANCE NOTIFICATION INFORMATION | | | 1. ASSISTANCE ID NO.<br>V 985769-01-0 | 2. LOG NUMBER<br>05-V -000 | Page 1 of 5 |
|---|---|---|---|---|---|
| | | | 3. DATE OF AWARD<br>FEB 0 6 1998 | 4. MAILING DATE<br>FEB 1 3 1998 | |
| **5. AGREEMENT TYPE** | | | **6. PAYMENT METHOD** | | |
| Cooperative Agreement | | X | ☐ Advance ☐ Reimbursement ☒ ACH Number ACH-0536 | | |
| Grant Agreement | | | Send Payment Request to | **7. TYPE OF ACTION** | |
| Assistance Amendment | | | COMPTROLLER BRANCH, MF-10J | NEW PROJECT | |

| R E C I P I E N T | 8. RECIPIENT<br>WISCONSIN DNR<br>P. O. BOX 7921<br>MADISON, WI 53707 | 9. PAYEE<br>WISCONSIN DNR<br>P.O. BOX 7921<br>MADISON, WI 53707 |
|---|---|---|
| | EIN NO<br>39-6006436 | CONGRESSIONAL DISTRICT<br>02 | 10. RECIPIENT TYPE<br>STATE, COMMONWEALTH, TERR GOVT |

| O R G | 11. PROJECT MANAGER AND TELEPHONE NO.<br>MARK F. GIESFELDT<br><br>(608) 267-7562 | 12. CONSULTANT (WWT Construction Grants only)<br><br>N/A |
|---|---|---|

| E P A C O N T A C T | 13. ISSUING OFFICE (CITY / STATE)<br>US ENVIRONMENTAL PROTECTION AGENCY<br>ACQUISITION-ASSISTANCE BRANCH<br>US EPA , REGION 5, MC-10J<br>77 W JACKSON BLVD<br>CHICAGO, IL 60604-3590 | 14. EPA PROJECT / STATE OFFICER AND TELEPHONE NO.<br>COLL<br>SUPERFUND DIVISION<br>SR-5J,        (312) 886-6044 |
|---|---|---|
| | 15. EPA CONGRESSIONAL LIAISON & PHONE<br>BARBARA BROOKS, (202) 260-5660 | 16. STATE APPL ID (Clearinghouse) | 17. SCIENCE FIELD | 18. PROJECT STEP (WWT Construction Grants Only)<br>N/A |

| 19. STATUTORY AUTHORITY<br>CERCLA: SEC. 104 | 20. REGULATORY AUTHORITY<br>40 CFR PTS 31, 35 SUBPT O | 21. STEP 2 + 3 & STEP 3 (WWT Construction Grants Only) | |
|---|---|---|---|
| | | a. Treatment Level | N/A |
| | | b. Project Type | |
| | | c. Treatment Process | |
| | | d. Sludge  Design | |

| 22 PROJECT TITLE AND DESCRIPTION          FOX RIVER REMEDIAL INVESTIGATION/FEASIBILITY STUDY |
|---|

| 23. PROJECT LOCATION (Areas Impacted by Project) | | | |
|---|---|---|---|
| City / Place<br>STATEWIDE | County<br>STATEWIDE | State<br>WI | Congressional District<br>ST AT EW ID E |
| 24. ASSISTANCE PROGRAM (CFDA Program No. & Title) 66.802<br>Hazardous Substances Response Trust Fund | 25. PROJECT PERIOD<br>02/08/98 - 01/31/99 | 26. BUDGET PERIOD<br>02/08/98 - 01/31/99 | |
| 27. COMMUNITY POPULATION<br>(WWT Construction Grants Only)        N/A | 28. TOTAL BUDGET PERIOD COST<br>$1,651,623 | 29. TOTAL PROJECT PERIOD COST<br>$1,651,623 | |

---

[4]        The "Hazardous Substance Response Trust Fund" was the original name of the statutorily-established EPA fund that was renamed the "Hazardous Substance Superfund." *See* Pub. L. 99-499 § 517(e) (1986).

Case 1:10-cv-00910-WCG   Filed 02/20/13   Page 7 of 24   Document 754

Dkt. 620-2 at 2 (highlighting added); Ex. 2316 at 2. The final page of the form agreement documenting "Offer and Acceptance" was signed by WDNR Secretary George E. Meyer and EPA Region 5 Superfund Division Director William E. Muno, as shown by this excerpt:



| OFFER AND ACCEPTANCE | |
| --- | --- |
| The United States of America, acting by and through the U.S. Environmental Protection Agency (EPA), hereby offers assistance/amendment to the ___WISCONSIN DNR___ for _100.00_% of all approved costs incurred up to and not exceeding $ ___1,651,623___ for the support of approved budget period effort described in application (including all application modifications) cited in Item 22 of this Agreement | |
| ASSISTANCE AMOUNT | |
| SUPERFUND PROGRAM , included herein by reference. | |
| DATE AND TITLE | |
| **ISSUING OFFICE** (Grants Administration Office) | **AWARD APPROVAL OFFICE** |
| ORGANIZATION / ADDRESS<br>ACQUISITION-ASSISTANCE BRANCH<br>US EPA, REGION 5, MC-10J<br>77 W JACKSON BLVD<br>CHICAGO, IL 60604-3590 | ORGANIZATION / ADDRESS<br>SUPERFUND DIVISION<br>US EPA, REGION 5, S-6J<br>77 W JACKSON BLVD<br>CHICAGO, IL 60604-3590 |
| THE UNITED STATES OF AMERICA BY THE U.S ENVIRONMENTAL PROTECTION AGENCY | |
| SIGNATURE OF AWARD OFFICIAL *Wm. E. Muno* | TYPED NAME AND TITLE WILLIAM E. MUNO, DIRECTOR SUPERFUND DIVISION, REGION 5 | DATE 2/6/98 |
| This agreement is subject to applicable U.S. Environmental Protection Agency statutory provisions and assistance regulations. In accepting this award or amendment and any payments made pursuant thereto, (1) the undersigned represents that he is duly authorized to act on behalf of the recipient organization, and (2) the recipient agrees (a) that the award is subject to the applicable provisions of 40 CFR Chapter I, Subchapter B and of the provisions of this agreement (Parts I thru IV), and (b) that acceptance of any payments constitutes an agreement by the payee that the amounts, if any found by EPA to have been overpaid will be refunded or credited in full to EPA. | |
| BY AND ON BEHALF OF THE DESIGNATED RECIPIENT ORGANIZATION | |
| SIGNATURE *George E. Meyer* | TYPED NAME AND TITLE | DATE 3/6/98 |
| EPA Form 5700-20A (Rev. 5-82) | |

Dkt. 620-2 at 6 (highlighting added); Dkt. 711-1 at 6; Dkt. 712-3 at 5; Ex. 2316 at 6.[5]

Glatfelter was well aware of the EPA-WNDR cooperative agreement when it was put in place in 1998. Counsel for NCR requested and received a set of EPA documents concerning the cooperative agreement in response to a February 1998 Freedom of Information Act request submitted to the Agency. Dkt. 753-1. NCR's counsel then distributed those documents to counsel for Glatfelter and the other Fox River Group members with a March 10, 1998,

---

[5] "Signed instruments such as wills, contracts, and promissory notes are writings that have independent legal significance, and are nonhearsay." *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 540 (5th Cir. 1994) (internal citations and quotation omitted). The Federal Rules of Evidence "exclude from hearsay the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights." Fed. R. Evid. 801(c) advisory committee's note. That exclusion applies to contractual agreements because a contract "is a form of verbal act to which the law attaches duties and liabilities." *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992) (citing 2 McCormick On Evid., § 249 at 101 (6th ed.)).

transmittal memo entitled "Fox River/USEPA –WDNR Grant Documents and Cooperative Agreement," as shown here:

SIDLEY & AUSTIN                                              CHICAGO

## MEMORANDUM

**BY FEDERAL EXPRESS**

| | |
|---|---|
| **TO:** | David Mandelbaum |
| | John Hanson |
| | Nancy Peterson |
| | Robert Bourque |
| | Mark Thimke |
| | John Van Lieshout |
| | Joe Heimbuch |
| | Mark Travers |
| **FROM:** | J. Andrew Schlickman |
| **RE:** | Fox River/USEPA - WDNR Grant Documents and Cooperative Agreement |
| **DATE:** | March 10, 1998 |

Attached are the documents we received from Roger Grimes concerning USEPA's grant to WDNR to perform the RI/FS for the Fox River. I suggest we set aside 10 to 15 minutes of our weekly Lawyers Committee call to discuss these materials and how to best follow up and track the progress of the RI/FS work. De maximis should make sure that copies of these materials are distributed to the appropriate consultants and members of the Technical Committee.

J.A.S.

/pk
Attachments

Dkt. 753-2 at 1 (highlighting added). Additional copies of the cooperative agreement documentation were passed on to the Fox River Group members by their technical consulting firm, *de maximis, inc.* Dkt. 753 at 1-2; Dkt. 620-1; Dkt. 620-3; Ex. 2313; Ex. 2314. Many of the same documents were reproduced in response to a Wisconsin Public Records Act request to WDNR in 2008. Dkt. 753 at 2; Dkt. 620-2; Ex. 2316.

7

The cooperative agreement for the RI/FS work was extended several times and in each case EPA provided WDNR additional Superfund money for each added budget period as the RI/FS process progressed. *See, e.g.*, Ex. 2113 at 94-99, 133-48, 186-90.[6] An RI/FS is a pre-decisional assessment of site conditions and remediation options. RI/FS reports do not select a remedy; that is done at a later stage of the process by issuance of a Record of Decision. As explained in the NCP regulations:

> The purpose of the remedial investigation (RI) is to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives. To characterize the site, the lead agency shall, as appropriate, conduct field investigations, including treatability studies, and conduct a baseline risk assessment. The RI provides information to assess the risks to human health and the environment and to support the development, evaluation, and selection of appropriate response alternatives.
>
>                       *     *     *
>
> The primary objective of the feasibility study (FS) is to ensure that appropriate remedial alternatives are developed and evaluated such that relevant information concerning the remedial action options can be presented to a decision-maker and an appropriate remedy selected.

40 C.F.R. § 300.430(d)(1), (e)(1). The 2002 RI/FS reports for this Site collected and presented such Site-specific technical information, and both reports stated that the work was undertaken by WDNR "in accordance with the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the National Contingency Plan (NCP)" and "with funding and

---

[6]     Each agreement extension referenced the fact that the additional funds were being provided through a Cooperative Agreement under CERCLA Section 104, as typified by this excerpt from the fifth extension to the agreement in 2000:

| Assistance Program (CFDA) | Statutory Authority |
|---|---|
| 66.802 - Superfund State Site Specific Cooperative Agreements | Cercla: Sec. 104 |
| | |

Ex. 2113 at 188.

technical assistance from the United States Environmental Protection Agency." Ex. 1 at 48; Ex. 3 at 27.[7]

The documents that Glatfelter and the other Fox River Group members received from EPA in 1998 included a five-page set of "assurances" that accompanied the cooperative agreement. Dkt. 620-1 at 10-14; Ex. 2314 at 10-14. Exact duplicates of those assurances have been maintained in both the EPA and WDNR files to this day. Dkt. 711-6; Ex. 2113 at 10-14.[8] Those assurances addressed fairly mundane topics such as cost accounting requirements, restrictions on the use of the funds for lobbying, and progress reporting. They also contain the following general proviso, which set off all the recent back-and-forth about the cooperative agreement when the Plaintiffs quoted it in a brief:

> 13. All activities conducted under this Agreement shall not be inconsistent with the revised National Contingency Plan (NCP), 40 CFR 300, dated March 8, 1990 (Vol. 55 No. 46 Federal Register 8666).

Dkt. 620-1 at 12; Dkt. 711-6 at 3; Ex. 2113 at 12; Ex. 2314 at 12. *See, e.g.*, Dkt. 579 at 11 (Plaintiffs' brief quoting this provision); Dkt. 617 at 8-9 (Glatfelter's response); Dkt. 620, 621 (United States' clarifying letter and Supplemental Declaration); Dkt. 622, 623 (Glatfelter's Supplemental Reply and Supplemental Declaration).

---

[7]     Whether EPA or a State agency assumes the lead role, outside engineering contractors routinely pull the laboring oar in performing much of the RI/FS work and preparing the RI/FS technical reports. *Compare* Fox River RI and FS Reports Prepared for WDNR by RETEC, Inc. (Exs. 1, 3) *with* Upper Hudson River FS Prepared for EPA by TAMS Consultants, Inc. (posted at www.epa.gov/hudson/fs000001.pdf).

[8]     Glatfelter is wrong in saying that WDNR's files do "not contain a set of Superfund 'Assurances' that matches the 'Assurances' in EPA's file." Dkt. 736 at 4. That assertion is based on Glatfelter's comparison of the final version from WDNR's files (Dkt. 711-6) to a *draft* version from EPA's files (712-2). EPA's files also contain a final version of the assurances (Ex. 2113 at 10-14; Dkt. 753 at 2) and Glatfelter and the other Fox River Group members received that final version of the assurances from EPA in response to their FOIA request in 1998, as noted above (Dkt. 753 at 1-2; Dkt. 620-1 at 10-14; Ex. 2314 at 10-14). In any event, the differences between the draft and final versions are immaterial. *Compare* Ex. 2113 at 10-14 (final version from EPA files) *with* Dkt. 712-2 (draft version from EPA files with slight differences on the last page). For example, the paragraph that seems to have been "missing" from the draft version of the assurances was redundant because it was duplicated elsewhere in the documentation. Dkt. 620-1 at 14; Dkt. 620-2 at 2; Dkt. 712-2 at 5.

There is no basis for Glatfelter's vague suggestion that WDNR failed to give other "statutorily- and regulatorily-mandated assurances" here. Dkt. 736 at 11-12. A cooperative agreement for state performance of a Superfund-financed remedial action – *i.e.*, an agreement that EPA will pay the state to do the remedy – requires special statutory "assurances" by the state, including a commitment in the agreement that the State will assure the long-term maintenance of the remedy. 42 U.S.C. § 9604(c)(3); 40 C.F.R. §§ 35.6105(b), 300.510(a). Those special state assurances and designations are not required for Superfund-financed *remedial planning activities*, such as preparation of an RI/FS under a cooperative agreement. 40 C.F.R. § 300.510(b)(1).[9] The EPA-WDNR cooperative agreement here focused on the preparation of the RI/FS. Dkt. 620-2 at 2; Ex. 2316 at 2. It was not "a Cooperative Agreement for remedial action" within the meaning of the regulations cited by Glatfelter. 40 C.F.R. § 35.6105(b). *See* Dkt. 736 at 12 (citing 40 C.F.R. §§ 35.6105(b), 300.510). The cooperative agreement for this Site never granted Superfund money for state performance of the remedy itself, so special assurances under CERCLA were not legally required. Because those special assurances were not required, there is no material issue of fact and no legal issue regarding the assurances given by WDNR.

### 3. EPA Adopted and Approved the Remedy Set Forth in the RODs.

Even if a state agency has taken the lead in preparing the RI/FS, the roles and responsibilities of EPA and the state agency at the final remedy selection stage are governed by specific NCP provisions codified at 40 C.F.R. § 300.515(e), which are entitled "*State involvement in selection of remedy*." First, the state agency may prepare and publish a Proposed Plan for remedial action that will be put out for public comment so long as the state agency does

---

[9]  RI/FS work and other remedial planning activities are classified as "removal" activities under CERCLA, not "remedial" activities. *Id.*; *Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836, 843 (6th Cir. 1994); *SCA Servs. of Ind., Inc. v. Thomas*, 634 F. Supp. 1355, 1381 (N.D. Ind. 1986).

so "consistent with § 300.515(e)."  40 C.F.R. §§ 300.430(f)(2), 300.515(e).  Among other things, Section 300.515(e) specifies that "the state may not publish a proposed plan that EPA has not approved."  *Id.* at § 300.515(e)(1).  Second, after the receipt and consideration of public comments, the state agency may prepare and publish a Record of Decision documenting a final remedy selection so long and the state agency does so "as specified in § 300.515(e)."  *Id.* at §§ 300.430(f)(4)(i), 300.515(e).  When a state agency has taken the lead role in performing the RI/FS for the site with money from the Superfund – what the NCP terms a "Fund-financed state-lead site" – the state agency may only prepare and publish a ROD selecting a final remedy with "EPA's concurrence and adoption of the remedy specified therein."  *Id*. at § 300.515(e).[10]

EPA's preamble to the NCP regulations emphasized that "EPA can accept, reject, or modify any state recommendation for Fund-financed actions" and that "EPA's concurrence is required in the issuance of a ROD for state-lead Fund-financed actions."  55 Fed. Reg. at 8776, 8782-83.[11]  By law, EPA never delegates final CERCLA remedy selection approval authority to state agencies.

---

[10]     A site is classified as a "Fund-financed state-lead site" whenever EPA has provided a State agency cooperative agreement money to take the lead on site-specific response action work.  As EPA explained in its regulatory preamble that accompanied the relevant NCP provisions, "cooperative agreements are intended to implement CERCLA-funded response and should not be used to aid cleanup at non-Fund-financed sites."  55 Fed. Reg. 8666, 8780 (Mar. 8, 1990).  "Non-Fund-financed state-lead" sites are sites where "a state is responding to a release pursuant to state law, not CERCLA."  *Id.* at 8782 n.24.  *Accord* EPA, *Question and Answers About the State Role in Remedy Selection at Non-Fund Financed Enforcement Sites*, OSWER Directive 9831.9 (Apr. 18, 1991) (posted at www.epa.gov/superfund/policy/remedy/pdfs/98-319-s.pdf).

[11]     EPA's preamble to the NCP regulations addressed a public comment suggesting that "the agency making a remedy recommendation or actually selecting the remedy should be a function of which agency conducted the RI/FS at the site."  *Id*. at 8783.  In response, EPA made clear that the regulations always reserve EPA's final approval authority for any remedy selected under CERCLA, as follows:

> EPA acknowledges that several states have their own "superfund" programs and is encouraged by their willingness to take on an even greater role in cleaning up sites. EPA believes, however, that it is not appropriate at this time to turn over the final decision-making authority on remedy selection to states. While Congress appeared to contemplate an increased role for states in the remedial process through enactment of CERCLA section 121(f), EPA believes that it should retain primary responsibility for the federal Superfund program. EPA intends, however, that the concurrence process provide a significant and meaningful role for state involvement in the cleanup process. EPA believes that if the state is the lead agency for the RI/FS, it generally should recommend a remedy for EPA's adoption. Further, keeping the final responsibility for remedy selection within EPA (rather than dividing it among the 50 states and EPA) furthers the goal of ensuring consistency among remedies implemented at sites.

Case 1:10-cv-00910-WCG   Filed 02/20/13   Page 13 of 24   Document 754

EPA exercised its own authority in approving the RODs for this Site, although there is no question that WDNR did much of the legwork with funding provided under further extensions to the EPA-WDNR cooperative agreement for this Site. Ex. 2113 at 214-21, 253-60, 282-89. As prescribed by the NCP, that final remedy selection process began with the issuance of a Proposed Plan. *See* 40 C.F.R. § 300.515(e)(1). Here, EPA and WDNR issued the Proposed Plan jointly in 2001. Dkt. 404-1; Ex. 46. After the receipt and consideration of public comments, EPA and WDNR jointly selected the original remedy for this Site in two RODs that were issued in December 2002 and June 2003. Dkt. 404-2; Dkt. 439-12; Ex. 9; Ex. 322. Both of those original RODs evidenced and documented "EPA's concurrence and adoption of the remedy specified therein" consistent with 40 C.F.R. § 300.515(e)(2), as shown by these excerpts from the 2003 ROD's cover page and signature page:



---

*Id.* at 8783. A regulatory preamble provides authoritative guidance on the intended meaning of a rule promulgated by a federal agency. *See Nat'l Min. Ass'n v. EPA*, 59 F.3d 1351, 1355 n.7 (D.C. Cir. 1995) ("It is well settled by decisions of this Court that the preamble to a regulation of [a federal agency] . . . should be considered in construing the regulation and determining the meaning of the regulation.") (internal citations and quotations omitted).

```
Declaration for the Record of Decision
Fox River and Green Bay OUs 3, 4, and 5
```

By signing this ROD, U.S. EPA Region 5 concurs with the selected remedy

6/30/03

Date

*Wm. E. Muno*

William E. Muno, Director
Superfund Division
U.S. EPA – Region 5

Dkt. 404-2 at 3, 18; Ex. 322 at 2, 17.  The 2007 ROD Amendment for OUs 2-5 and the 2010

Explanation of Significant Differences also were jointly issued and co-signed by EPA and

WDNR.  Dkt. 404-3 at 2, 53; Dkt. 404-4 at 2, 17; Ex. 758 at 1, 52; Ex. 772 at 1, 16.  In

depositions already taken by Glatfelter, EPA's Remedial Project Manager confirmed that the

remedy selection for this Site reflected a "collective – joint decision . . . between DNR and EPA"

(Dkt. 753-6 at 8) and his WDNR counterpart agreed that the two agencies "engage[d] in

consensus decision making with respect to how the river would be remediated" (Dkt. 753-3 at 8).

The undisputed evidence shows that that the agencies worked together and that EPA

concurred with and adopted all aspects of remedy as an exercise of its own approval authority

under the NCP, so phantom issues concerning the cooperative agreement funding documentation

are immaterial to the propriety of the remedy.

### 4.     EPA's Cooperative Agreement was with WDNR, Not a Particular WNDR Bureau or Component.

EPA exercised its own legal authority in approving the remedy here, so there is little

reason to dwell on Glatfelter's argument about which WDNR component "had the authority to

act for EPA at this Site."  Dkt. 736 at 5.  Neither the governing law nor the cooperative

agreement required that WDNR confine its work on the project to its Bureau for Remediation

and Redevelopment, as argued by Glatfelter.

13

Wisconsin Code Chapter 292 grants the WDNR authority to "enter into agreements with the federal environmental protection agency" to implement CERCLA. Wis. Stat. § 292.31(7). Invoking that statutory authority, WDNR has promulgated its own regulations stating that "[t]he department may enter into cooperative agreements or Superfund state contracts with the U.S. EPA for the purpose of taking a response action under CERCLA." Wis. Admin. Code NR § 730.05. The statute and the regulations both indicate that the authority to enter into such agreements is exercised by the "department," which is defined as the "department of natural resources," and not any particular bureau or component of WDNR. Wis. Stat. § 292.01(2); Wis. Admin. Code NR §§ 700.03(11), 730.03, 730.05. As shown in the cooperative agreement excerpts depicted above, the agreement here listed "Wisconsin DNR" as both the funding "Recipient" and the "Payee," and the agreement was signed on the agency's behalf by the WDNR Secretary. Dkt. 620-2 at 6; Dkt. 711-1 at 6; Dkt. 712-3 at 5.

The original form agreement listed Mark Giesfeldt – the Director of the Bureau for Remediation and Redevelopment – as WDNR's "Project Manager" for the cooperative agreement, although the quarterly progress reports on the activities actually funded under the cooperative agreement were prepared and signed by one of Mr. Giesfeldt's subordinates, Edward Lynch, who was identified therein as WDNR's actual day-to-day "Project Manager." Dkt. 620-2 at 2; Dkt. 711-1 at 2; Dkt. 712-3 at 1; Ex. 2113 at 105-06, 318-19. The applicable EPA regulations define the "project manager" as merely "the recipient official designated in the Cooperative Agreement . . . as the program contact with EPA." 40 C.F.R. § 35.6015. Other regulations use the term "lead site project manager" to describe the "lead State agency" employee designated as responsible for "coordinated planning of response activities with other state agencies." *Id.* at § 35.6105(a)(2)(iii). None of those designations confer any special power or authority under CERCLA or the relevant regulations.

14

With EPA's full knowledge and assent, WDNR staffed this project with personnel from both its Bureau for Remediation and Redevelopment (often abbreviated in documents as "RR") and its Division of Water (often abbreviated as "WT"). *See*, *e.g.*, Dkt. 404-1 at 6; Dkt. 404-2 at 17; Ex. 322 at 16; Dkt. 753-3 at 3-5, 8; Ex. 2113 at 100, 106. WDNR's day-to-day Project Manager, Mr. Lynch, actually worked in the Bureau for Remediation and Redevelopment. Dkt. 753-3 at 3-4; Ex. 2113 at 100. Finally, it is undisputed that major decisions about matters such as entry into the cooperative agreement and WDNR's assent to the remedy were made or approved by the WDNR Secretary, who oversaw the entire agency. Dkt. 620-2 at 6; Dkt. 711-1 at 6; Dkt. 712-3 at 5; Dkt. 753-3 at 8; Ex. 2316 at 6.

The undisputed facts and the legal authorities cited above show that WDNR – not a particular bureau or component within WDNR – served as both the funding recipient and the lead agency for preparation of the RI/FS under the cooperative agreement. There is no authority for Glatfelter's position that identifying a "project manager" from one bureau of WDNR precluded another bureau of WDNR from having "any role" at the Site. Dkt. 736 at 20. The facts on that point are not in dispute and nothing in CERCLA, the NCP, or EPA's state financial assistance regulations imposed that restriction. In the final analysis, WDNR's staffing arrangements and organizational structure have no bearing on whether "the President's decision in selecting the response action . . . was arbitrary and capricious or otherwise not in accordance with law" under CERCLA Section 113(j)(2), 42 U.S.C. § 9613(j)(2).

**5.  Additional Discovery Is Unnecessary and Unwarranted.**

Glatfelter and the other defendants deposed 13 current and former EPA and WDNR employees during the fact discovery period last summer. Although Glatfelter obtained a copy of the cooperative agreement in 1998 and additional copies and related documents concerning the Agreement were produced in discovery last summer, the cooperative agreement was not among

15

the nearly 500 deposition exhibits shown to any of the deponents during the discovery in this case taken in 2012. Based on an electronic word search of those 13 depositions, we find only one occasion when a question was asked using the words "cooperative agreement." Dkt. 753 at 2-3. Counsel for CBC Coating asked Edward Lynch, the WDNR project manager for the RI/FS work, about a 2002 e-mail that he sent to his EPA counterpart and others discussing whether "additional research into the models used on the Fox" proposed by a former WDNR employee "would be eligible to be done as part of the DNR Superfund cooperative agreement on the Fox." Mr. Lynch answered that question by CBC's Counsel – and at an earlier point he had mentioned that he personally prepared the initial EPA funding application – but Glatfelter and the other defendants asked no follow-up questions about the "cooperative agreement" referenced in the e-mail. Dkt. 753-3 at 7; Dkt. 753-4.

Instead of asking direct questions about the cooperative agreement, Glatfelter beat around the bush with opaque inquiries about whether the EPA and WDNR roles for this Site were spelled out in a "formal memorandum of understanding" or "memorandum of agreement," as typified by this exchange with former WDNR employee Robert Paulson:

> Q. All right. Maybe I asked the question inartfully. This is – there's no –
> were you aware of any formal memorandum of understanding which gave the
> lead on this site to the State of Wisconsin, that is an agreement between the State
> of Wisconsin and the United States?
>
> A. Not to my recollection.
>
> Q. So there was a -- an arrangement under which DNR did certain work and EPA
> did certain work, correct?
>
> A. That's fair.
>
> Q. And which was the lead agency?
>
> A. In developing the RI/FS?
>
> Q. Yes, please.

A. It was DNR as we held the contract with the consultant.

Q. So DNR had a contract with the consultant, and DNR had an agreement with the United States that it would oversee that contract, right?

A. Yes, as we got funds from EPA to do the work.

Dkt. 753-5 at 5. Glatfelter's latest brief cites this testimony as evidence that "no special

agreement existed between WDNR and EPA." Dkt. 736 at 15.

Glatfelter led the EPA Remedial Project Manager, James Hahnenberg, down a similar

winding path in this colloquy:

Q. Is there a memorandum of agreement with the State where there's a formal designation of the State as the lead agency?

A. Well, there's a memorandum of understanding between the State and the EPA and the trustees, basically an agreement to work together on the project.

Q. That's an intergovernmental partners agreement?

A. Right, correct.

Q. But there's no -- in a --

A. There's no -- like we call them SMOAs or something like that. As far as I know, there's not a formal agreement between the EPA and the State specifically for just the Fox River other than this memorandum of understanding.

Dkt. 753-6 at 7.[12] Glatfelter has now quoted that testimony in two briefs as some sort of

admission that a cooperative agreement never existed between EPA and WNDR (Dkt. 623 at 3;

Dkt. 736 at 15), but a Superfund Memorandum of Agreement, or "SMOA," is a *different* type of

agreement that can be formalized by EPA and a state. A SMOA serves a special purpose and the

NCP makes clear that a "SMOA shall not supersede" a Site-specific cooperative agreement

---

[12]     The intergovernmental partners' agreement referenced in the questioning is a Site-specific Memorandum of Agreement that was put in place in 1997 to promote coordination, cooperation, and consensus decision-making by EPA, WDNR, and other federal and tribal trustees for natural resources at and near the Site. A copy of that Agreement was been authenticated and filed with the Court's ECF as Dkt. 353 at 1-2, 6-23.

between EPA and the state. 40 C.F.R. § 300.505(c). In a declaration filed with this Court, Mr. Hahnenberg clarified that he was personally involved helping to put the EPA-WDNR cooperative agreement in place for this Site, and he authenticated the internal approval documentation that Glatfelter and the Fox River Group members obtained from EPA in 1998. Dkt. 626 at 6-7; Dkt. 626-1.

Despite the assertions made in Glatfelter's brief, neither the United States nor Wisconsin was asked to designate any 30(b)(6) deposition witnesses on topics relating to the cooperative agreement. Dkt. 479-4; Dkt. 747-7. For that reason, many of the witnesses deposed by the defendants made special efforts to prepare on particular subjects, but not on the cooperative agreement put in place in 1998. Mr. Lynch was the State's 30(b)(6) designee on "the development of the cost estimates for the remedial alternatives evaluated at the Site." Dkt. 479-4 at 8. Mr. Hahnenberg was the United States' 30(b)(6) designee on "efforts to sample PCBs at the Site," "efforts to model the movement of PCBs at the Site," "dredging performed at the Site," "the impacts of dredging on the location of PCBs at the Site," and "the development of the cost estimates for the remedial alternatives evaluated at the Site." Dkt. 479-4 at 4, 5, 6, 8. Retired WDNR employee Bruce Baker was not a 30(b)(6) designee on *any* issues (Dkt. 479-4; Dkt. 749-7), so Glatfelter's brief is flat wrong when it says that the "State designated Bruce Baker under Rule 30(b)(6) to testify about remedy selection issues" (Dkt. 736 at 12).

Glatfelter has known of and possessed a copy of the EPA-WDNR cooperative agreement for many years. The Plaintiffs ended up providing Glatfelter and the other defendants more than 150 documents concerning the cooperative agreement last summer due to the sheer breadth of their document production requests. Dkt. 753 at 2. But Glatfelter made no meaningful effort to inquire about the cooperative agreement specifically during the intensive fact discovery phase last year. Glatfelter's Court filings never raised any question about the cooperative agreement

until after fact discovery had closed on September 30, 2012. Dkt. 542 at 6-7. For example, Glatfelter posed no issues concerning the cooperative agreement or the roles assumed by EPA and WDNR in its filings last summer seeking administrative record supplementation. Dkt. 388; Dkt. 447. Finally, and most importantly, Glatfelter's latest filing gives no indication how or why added discovery would have any bearing on the propriety of the remedy, especially where the salient question is whether Glatfelter "can demonstrate, on the administrative record, that [EPA's remedy selection] decision was arbitrary and capricious or otherwise not in accordance with law." 42 U.S.C. § 9613(j)(1).

## Conclusion

For the foregoing reasons, Glatfelter's motion for reconsideration of the Court's *Decision and Order on the Propriety of the Remedy* should be denied.

Plaintiffs' Brief in Opposition to P.H. Glatfelter Company's Motion for Reconsideration of the Court's Decision and Order on the Propriety of the Remedy in *United States and the State of Wisconsin v. NCR Corp., et al.*, No. 10-C-910 (E.D. Wis.)

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

Dated:   February 20, 2013          s/ *Randall M. Stone*
                                    RANDALL M. STONE
                                    JEFFREY A. SPECTOR
                                    KRISTIN FURRIE
                                    MAYA ABELA
                                    SEAN CARMAN
                                    SUMONA MAJUMDAR
                                    Environmental Enforcement Section
                                    Environment and Natural Resources Division
                                    U.S. Department of Justice
                                    P.O. Box 7611
                                    Washington, DC 20044-7611
                                    Telephone:     202-514-1308
                                    Facsimile:     202-616-6584
                                    E-Mail:        randall.stone@usdoj.gov

                                    GREGORY J. HAANSTAD
                                    Attorney for the United States, Acting
                                    Under Authority Conferred by 28 U.S.C. § 515

                                    SUSAN M. KNEPEL
                                    Assistant United States Attorney
                                    Office of the United States Attorney
                                    517 E. Wisconsin Avenue, Room 530
                                    Milwaukee, WI  53202

                                    FOR THE STATE OF WISCONSIN

Dated:   February 20, 2013          s/ *Cynthia R. Hirsch*
                                    CYNTHIA R. HIRSCH
                                    Assistant Attorney General
                                    Wisconsin Department of Justice
                                    17 West Main Street
                                    P.O. Box 7857
                                    Madison, WI  53707-785
                                    E-Mail:        hirschcr@doj.state.wi.us

20

## CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of the foregoing Brief to be served on the following counsel of record by the Court's Electronic Case Filing system:

**Mary Rose Alexander**
Latham & Watkins LLP
mary.rose.alexander@lw.com

**Thomas Armstrong**
von Briesen & Roper SC
tarmstro@vonbriesen.com

**Paul Bargren**
Foley & Lardner LLP
pbargren@foley.com

**Linda E. Benfield**
Foley & Lardner LLP
lbenfield@foley.com

**Dennis P. Birke**
DeWitt Ross & Stevens SC
db@dewittross.com

**Steven P. Bogart**
Reinhart Boerner Van Deuren SC
sbogart@reinhartlaw.com

**Michael P. Carlton**
von Briesen & Roper SC
mcarlton@vonbriesen.com

**Evan R. Chesler**
Cravath Swaine & Moore LLP
echesler@cravath.com

**Francis A. Citera**
Greenberg Traurig LLP
citeraf@gtlaw.com

**Marc E. Davies**
Greenberg Traurig LLP
daviesm@gtlaw.com

**David R. Erickson**
Shook Hardy & Bacon LLP
derickson@shb.com

**S. Todd Farris**
Friebert Finerty & St. John SC
stf@ffsj.com

**Patrick J. Ferguson**
Latham & Watkins LLP
patrick.ferguson@lw.com

**Charles Fried**
fried@law.harvard.edu

**Sandra C. Goldstein**
Cravath Swaine & Moore LLP
sgoldstein@cravath.com

**Thomas R. Gottshall**
Haynsworth Sinkler Boyd PA
lgantt@hsblawfirm.com

**Eric W. Ha**
Sidley Austin LLP
eha@sidley.com

**Scott W. Hansen**
Reinhart Boerner Van Deuren SC
shansen@reinhartlaw.com

**William H. Harbeck**
Quarles & Brady LLP
william.harbeck@quarles.com

**Cynthia R. Hirsch**
Wisconsin Department of Justice
hirschcr@doj.state.wi.us

**Margaret I. Hoefer**
Stafford Rosenbaum LLP
mhoefer@staffordlaw.com

**Caleb J. Holmes**
Greenberg Traurig LLP
holmesc@gtlaw.com

**Philip C. Hunsucker**
Hunsucker Goodstein PC
phunsucker@hgnlaw.com

**Peter C. Karegeannes**
Quarles & Brady LLP
peter.karegeannes@quarles.com

**Paul G. Kent**
Stafford Rosenbaum LLP
pkent@staffordlaw.com

**Gregory A. Krauss**
Gregory Krauss pllc
gkrauss@krausspllc.com

**Linda R. Larson**
Marten Law PLLC
llarson@martenlaw.com

**Vanessa A. Lavely**
Cravath Swaine & Moore LLP
vlavely@cravath.com

**Susan E. Lovern**
von Briesen & Roper SC
slovern@vonbriesen.com

**Anne E. Lynch**
Hunsucker Goodstein PC
alynch@hgnlaw.com

**Kevin J. Lyons**
Davis & Kuelthau SC
klyons@dkattorneys.com

**Karl S. Lytz**
Latham & Watkins LLP
karl.lytz@lw.com

**Meline G. MacCurdy**
Marten Law
mmaccurdy@martenlaw.com

**David G. Mandelbaum**
Greenberg Traurig LLP
mandelbaumd@gtlaw.com

**Bradley M. Marten**
Marten Law
bmarten@martenlaw.com

**Tara M. Mathison**
Davis & Kuelthau SC
tmathison@dkattorneys.com

i

**Allison E. McAdam**
Hunsucker Goodstein PC
amcadam@hgnlaw.com

**Darin P. McAtee**
Cravath Swaine & Moore LLP
dmcatee@cravath.com

**Stephen F. McKinney**
Haynsworth Sinkler Boyd PA
smckinney@hsblawfirm.com

**Heidi D. Melzer**
Melzer Law, LLC
hmelzer@melzerlaw.com

**Elizabeth K. Miles**
Davis & Kuelthau SC
emiles@dkattorneys.com

**William J. Mulligan**
Davis & Kuelthau SC
wmulligan@dkattorneys.com

**Daniel C. Murray**
Johnson & Bell Ltd.
murrayd@jbltd.com

**Omid H. Nasab**
Cravath Swaine & Moore LLP
onasab@cravath.com

**Kelly J. Noyes**
von Briesen & Roper SC
knoyes@vonbriesen.com

**Nancy K. Peterson**
Quarles & Brady LLP
nancy.peterson@quarles.com

**Thomas M. Phillips**
Reinhart Boerner Van Deuren
SC
tphillip@reinhartlaw.com

**Ian A.J. Pitz**
Michael Best & Friedrich LLP
iapitz@michaelbest.com

**David A. Rabbino**
Hunsucker Goodstein PC
drabbino@hgnlaw.com

**Ronald R. Ragatz**
DeWitt Ross & Stevens SC
rrr@dewittross.com

**Kathleen L. Roach**
Sidley Austin LLP
kroach@sidley.com

**Megan A. Senatori**
DeWitt Ross & Stevens SC
ms@dewittross.com

**Adam B. Silverman**
Greenberg Traurig LLP
silvermana@gtlaw.com

**M. Andrew Skierawski**
Friebert Finerty & St. John SC
mas@ffsj.com

**Sarah A. Slack**
Foley & Lardner LLP
sslack@foley.com

**Margaret R. Sobota**
Sidley Austin LLP
msobota@sidley.com

**Arthur A. Vogel, Jr.**
Quarles & Brady LLP
arthur.vogel@quarles.com

**Anthony S. Wachewicz, III**
City of Green Bay
tonywa@ci.green-bay.wi.us

**James P. Walsh**
Appleton City Attorney
jim.walsh@appleton.org

**Ted A. Warpinski**
Friebert Finerty & St John SC
taw@ffsj.com

**Ted Waskowski**
Stafford Rosenbaum LLP
twaskowski@staffordlaw.com

**Evan B. Westerfield**
Sidley Austin LLP
evanwesterfield@sidley.com

**Richard C. Yde**
Stafford Rosenbaum LLP
ryde@staffordlaw.com

Dated: February 20, 2013                    *s/ Randall M. Stone*