**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA AND THE STATE OF WISCONSIN** | : | |
| **Plaintiffs,** | : | |
| | : | **No. 10-CV-00910-WCG** |
| **v.** | : | |
| **NCR CORPORATION, *et al.,*** | : | |
| **Defendants.** | : | |

**REPLY MEMORANDUM OF P.H. GLATFELTER COMPANY IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF SUMMARY JUDGMENT AS TO THE PROPRIETY OF THE REMEDY**

Plaintiffs respond to the motion of the P.H. Glatfelter Company ("Glatfelter") for reconsideration of the grant of partial summary judgment on the propriety of the remedy by raising a welter of facts, and then arguing that they do not matter. This is a motion to reconsider the grant of summary judgment. If a genuine factual dispute exists and that dispute is material, then summary judgment is not appropriate and this motion should be granted.

The factual dispute here centers on whether the Environmental Protection Agency ("EPA") properly delegated to the Wisconsin Department of Natural Resources ("WDNR") "lead agency" status to prepare the remedial investigation and feasibility study ("RI/FS"), baseline risk assessment, proposed remedial action plan ("PRAP"), responses to comments on the PRAP, and the records of decision ("RODs") for this Site, and specifically for OU2-5. WDNR received a grant from EPA that supported that work, but neither the paperwork nor the deposition testimony of WDNR officials who were active at the time suggests that WDNR understood and agreed that it was performing tasks to support a remedy selection under the National Contingency Plan's ("NCP's") risk-based criteria rather than the different approach that WDNR had been pursuing for more than a decade under state law. The paper record reflects the creation of an "Assurances" document that contained an undertaking to do the work under the NCP, but that document was created after the grant application was signed and submitted to EPA. The commitment to comply with the NCP never appears in text signed or acknowledged by WDNR at any later time.

Moreover, neither the paperwork nor the deposition testimony of any of the witnesses is consistent with the retention of control by the Bureau of Waterways

Management of the work on this site, even though the grant application specifically proposed a shift from Mr. Baker's group to the Bureau of Remediation and Redevelopment that never occurred.

These facts matter. The public, including Glatfelter, was entitled to have properly authorized regulators, who had agreed to perform the work under the NCP, actually involved in the technical work underlying the remedy selection. A mere signature by EPA does not regularize work done by unauthorized people. The public, including Glatfelter, was entitled to have had the *manner* of selecting the remedy not be inconsistent with the NCP and to have this Court review that procedure. A later signature does not retroactively authorize WDNR to have done the technical analysis and to have considered Glatfelter's comments on the proposed plan.

**1. A genuine factual dispute exists.**

A reasonable factfinder could find, indeed would be compelled to find, the following facts:

- As of January 26, 1998, a half-dozen people working for Bruce Baker in WDNR were addressing all of the contaminated sediment sites in Wisconsin, including the Fox River. In Mr. Baker's view, they were the principal regulators, and the federal EPA was just an "observer." March 11, 2012 Declaration of David G. Mandelbaum ("3/11/12 DGM Decl."), Ex. A [8/21/2012 Deposition of Bruce Baker ("Baker Dep.")] at 50.
- On January 26, 1998, WDNR Secretary George Meyer signed an application for a grant to perform a remedial investigation and feasibility

study ("RI/FS") for this Site. Dkt. 620-1 / Ex. 2314 at NCR-FOX435161 (cover letter), NCR-FOX435162 (signed first page), NCR-FOX435169 (signed final page); Dkt. 753-2 at API-GE020455, API-GE020456, API-GE020463.[1]

- EPA has treated a 27-page document as if it is that application. Dkt. 620-1 / Ex. 2314; Dkt. 753-2 at API-GE020455 to API-GE020463. However, that 27-page document is three separate packages that were assembled after Secretary Meyer signed the cover letter and the second and ninth pages.
    - On January 28, 1998, at what appears to be 8:14, someone at WDNR sent a 10-page document by facsimile from a facsimile machine at the WDNR Bureau of Remediation and Redevelopment to EPA Region 5. Dkt. 620-1 / Ex. 2314 at NCR-FOX435161 to NCR-FOX435169; Dkt. 753-2 at API-GE020455 to API-GE020463 (fax line across top showing sender, time, and numbering from 2/10 to 10/10). The first of those ten pages is not part of the exhibit and was probably the fax cover sheet. The nine pages that form the first nine sheets of the exhibit include Secretary Meyer's cover letter and both of his signatures. No document reflects Secretary Meyer's review of any other of the January 26 papers.

[1] The United States seems variously to rely on three copies of the same set of pages. Dkt. 620-1 and Ex. 2314 bear the same Bates range. Dkt. 753-2 is a copy provided in 1998 to the Fox River Group and produced with a different Bates range from de maximis' files.

- The next five sheets of the exhibit that the government claims to be the application, are an "Assurances" document that was prepared after January 29, 1998, and after Secretary Meyer signed the application. These pages were not sent by facsimile from WDNR to EPA. Dkt. 620-1 / Ex. 2314 at NCR-FOX435170 to NCR-FOX435174; Dkt. 753-2 at API-GE020464 to API-GE020468.
- The remaining thirteen sheets of the exhibit that the government claims to be the application are back-up for the application signed by Secretary Meyer. They were sent by facsimile from WDNR's Bureau of Remediation and Redevelopment to EPA as pages 11-23 of a 23-page document at 7:59 on January 28, 1998. Dkt. 620-1 / Ex. 2314 at NCR-FOX435175 to NCR-FOX435187; Dkt. 753-2 at API-GE020469 to API-GE020481.

- It is likely that the first and third of these components were a single set of papers sent by WDNR, although the first nine were sent twice and the copy sent second was retained. The five-page "Assurances" document was prepared separately because it was not sent by facsimile at all.
- The application dated January 26 and sent on January 28 by facsimile identified Mark Giesfeldt, Director of the Bureau of Remediation as the Project Manager. Dkt. 620-1 / Ex. 2334 at NCR-FOX435162; Dkt. 753-2 at APIGE020456.

- As of January 29, 1998, the packet received by EPA did not include the assurances: "[t]he final application [was] not perfect – some required CERCLA assurances are missing . . . ." Dkt. 737-2.
- At some time after Ms. Yeates' January 29 email, someone prepared the five-page set of "Assurances," the final version of which contains an undertaking that "[a]ll activities conducted under this Agreement shall not be inconsistent with the revised National Contingency Plan (NCP) . . . ." Dkt. 620-1 / Ex. 2314 at NCR-FOX435172; Dkt. 753-2 at API-GE020466.
- Secretary Meyer never saw this five-page "Assurances" document in 1998. He never signed or initialed it, nor is there any record of a copy ever being sent from his office to EPA or from EPA to his office. Secretary of Administration Mark Bugher, who reviewed the application on January 15, 1998, never saw this document. Dkt. 620-1 / Ex. 2314 at NCR-FOX435187; Dkt. 753-2 at API-GE020481.
- On February 6, 1998, William Muno of EPA approved the grant application and sent a grant agreement to Secretary Meyer. This document refers to the application, but does not attach it, and nowhere includes the "Assurances" document. Ex. 2313 at 1.
- On March 9, 1998, Secretary Meyer accepted the grant agreement – a document that did not include the "Assurances" document. Dkt. 620-2 at 6; Dkt. 711-1 at 6; Dkt. 712-3 at 5; Ex. 2316 at 6. At that point, Secretary Meyer had seen and signed the application providing that Mr. Giesfeldt

would manage this project, but he had not seen any contract provision that the project would be conducted under the NCP.

- At some later time, Mr. Baker obtained control over this grant funding and retained control over the project. Baker Dep. at 52.
- Mr. Baker characterized the result of this agreement as bringing EPA into ***WDNR's*** project "as a full partner," not as WDNR entering into EPA's project under the NCP. 3/11/12 DGM Decl., Ex. A [Baker Dep.] at 51.
- Mr. Baker and his team prepared the RI/FS, the baseline risk assessment, all of the underlying fate and transport modeling, the proposed remedial action plan ("PRAP"), and each of the records of decision ("RODs") that underpin the selection of the remedy at this Site. *Id.* at 13-14.

Based on these facts, the Court should conclude that EPA thought that it had delegated the "lead agency" status to WDNR for this site under the NCP, but WDNR had not agreed in a "cooperative agreement" to perform this task not inconsistently with the NCP. Instead, the leader of the team implementing this project – Mr. Baker – thought that EPA was participating in ***his*** ongoing management of contaminated sediment sites in Wisconsin under Wisconsin authorities, not that he was converting his Fox River remedy selection into an NCP-consistent, risk-based, process. EPA and WDNR did not document a meeting of the minds, nor did they have a meeting of the minds in fact. Therefore, the "manner" of selecting the remedy here was flawed.

The United States and the State of Wisconsin surely dispute these facts. If the only evidence to be offered is the evidence offered on this motion, the Court must find the facts as we have outlined them. But the Court does not have to do so now. All that

has to happen now is that the Court recognize that a reasonable factfinder could find the facts above. That implies that summary judgment should not be granted in favor of the governments on the propriety of the remedy. If the touchstone is the process, the process here was flawed.

**2. The factual dispute is material.**

Plaintiffs' principal response is that none of the paperwork matters and none of the delegation matters. EPA, they say, signed the RODs and the Explanation of Significant Differences ("ESD"), so those federal signatures erase all underlying procedural flaws. Dkt. 754 [Plaintiffs' Brief in Opposition to P.H. Glatfelter Company's Motion for Reconsideration of the Court's Decision and Order on the Propriety of the Remedy ("Plffs' Brief")] at 1.

Plaintiffs' position runs afoul of the statutory assurance of *some* judicial review of remedy selections, 42 U.S.C. § 9613(j)(3), as well as the Due Process Clause. *See General Elec. Co. v. Jackson*; 610 F.3d 110 (D.C. Cir. 2010); *United States v. Akzo Coatings of Am., Inc.*, 719 F. Supp. 571, 579 (E.D. Mich. 1989) (requiring heightened review where EPA actions were procedurally deficient) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)) *aff'd*, 949 F.2d 1409, 1425 (6th Cir. 1991) ("Ours is the task of searching for errors of procedure, and serious omissions of substantive evidence"); *United States v. Allied-Signal Corp.*, 736 F. Supp. 1553, 1558 (N.D. Cal. 1990); *United States v. Rohm & Haas Co., Inc.*, 669 F. Supp. 672, 683 (D.N.J. 1987) (requiring heightened review where EPA actions were procedurally deficient; remanding to agency for further development of record); *Indus. Park Dev. Co. v. E.P.A.*, 604 F. Supp. 1136, 1142 (E.D. Pa. 1985) (finding

procedural errors by E.P.A. likely violated due process); *Wagner Electric v. Thomas*, 612 F.Supp. 736, 745-48 (D. Kan. 1985); s*ee also Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). Plaintiffs have persuaded this Court that the Court should not test EPA's decisionmaking substantively by weighing the technical merits of the six volumes of comments submitted by the Fox River Group on the PRAP and the responses to those comments prepared by WDNR. Dkt. 666 [Decision and Order on the Propriety of the Remedy]. Instead, plaintiffs have successfully argued that the fact that comments were received and responses were prepared is enough, provided that the *process* was proper under the NCP. It is the *manner* – the procedure – of decisionmaking that matters.

EPA's signature alone cannot suffice to regularize any procedural lapse. If that were true, judicial review would be no review at all. To repeat the example from our principal brief, if New York regulators or California regulators had prepared the underlying studies, prepared the PRAP, read and responded to the comments, and drafted the ROD, but EPA had signed, that would not have been proper. Those other agencies have no business doing the technical thinking on this Wisconsin site. EPA's signature would not undo the procedural lapse caused by the primary remedy selection process having been conducted by individuals and agencies without authority.

And if the Court has any question, consider a more extreme hypothetical. What if the work had been done by the students in a graduate seminar on sediment management at the University of Wisconsin, or a class of bright high school students? The public and the defendants were entitled to have the "lead" agency be an agency experienced and comfortable with the risk-based standards under the NCP. That EPA signed someone else's work, alone, would not regularize the procedure.

EPA's signature does not regularize the procedure because the process leading up to the signature matters. There has to be an RI and an FS that satisfy the NCP. 42 U.S.C. § 9604(a); 40 C.F.R. § 300.430; *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 790-91 (7th Cir. 2000); *County Line Inv. Co. v. Tinney*, 933 F. 2d 1508, 1513-15 (10th Cir. 1991); *Raytheon Constructors, Inc. v. ASARCO Inc.*, No. CIV. A. 96 N 2072, 2000 WL 1635482, *24-*27 (D. Colo. Mar. 31, 2000). Failure to perform those studies properly cannot be rectified by a signature on the ROD. There has to be a PRAP and an opportunity for public participation in the decision. 42 U.S.C. § 9617; 40 C.F.R. § 300.700; *Union Pac. R. Co. v. Reilly Indus., Inc.*, 215 F.3d 830, 835 (8th Cir. 2000); *Rohm & Haas Co.*, 669 F. Supp. at 682-83. A signature on the ROD cannot substitute for that. Those steps have to be taken in a proper way by a proper person. The New York regulators, or the graduate students, or the high schoolers do not substitute for EPA as the person doing that work unless there is a proper delegation. There was no such proper delegation here.

Moreover, this is not a case where EPA reviewed, understood, and in effect replicated the results produced by WDNR. James Hahnenberg, the EPA Remedial Project Manager and the United States' Rule 30(b)(6) on the use of fate and transport modeling in the remedy selection testified repeatedly that "I'm not a modeler" and that he relied on WDNR. 3/11/12 DGM Decl., Ex. B [8/28/12 Deposition of James Hahnenberg ("Hahnenberg Dep.")] at 37, 39, 89, 130, 133, 230. For example, he could not testify to the implications for the precision of model runs if the input estimates of PCB discharges from various sources were "rough." *Id.* at 37. There was no other federal modeler supervising WDNR. The United States relied on WDNR. As Mr. Hahnenberg testified,

"when I say I'm not a modeler, the people we did rely on for modeling were Wisconsin DNR people." *Id.* 39:16-17; *see also id.* 89:9; 133:22-23; 230:22. The Fox River Group's comments on WDNR's modeling work were responded to by WDNR modelers, not EPA. EPA's signature on the ROD does not substitute for having a proper delegation to the people with day-to-day control over the process.

As the result of internal WDNR politics that we do not presently understand fully, a group under Mr. Baker at WDNR that was not practiced or comfortable with risk-based decisionmaking retained control of the remedy selection process here without proper delegation. Secretary Meyer applied for a grant to Mr. Giesfeldt's group, but Mr. Baker's group got the money and the work. Secretary Meyer never saw the Superfund Assurances, and Mr. Baker did not testify to having internalized any of them. EPA's signature does not undo those procedural lapses.

**3. This motion is entirely straightforward.**

Glatfelter recognizes that the Department of Justice finds this motion awfully inconvenient. However, this issue was not raised late. It was raised at the first time that a motion was in order. Depositions were not taken by sneaky or misleading questions. Recall that there was no agreement in the Administrative Record delegating "lead agency" status to WDNR. When witnesses testified that there was no agreement delegating to WDNR, questioning moved on.

If EPA had taken over this site and done all of the technical work, none of this would have been an issue. If EPA had insisted that the grant application be signed by Secretary Meyer ***after*** it was put in proper form and if the papers had not designated Mr. Giesfeldt, none of this would be an issue. But those steps were not taken. Surely there

were reasons for haste. There were reasons for not putting the Superfund Assurances before Secretary Meyer after January 29, 1998. There were reasons why the Bureau of Remediation was even mentioned on these papers. There were reasons why the Bureau of Remediation ended up being displaced. All of those may have been good reasons at the time. But the cost of serving those reasons – whatever they were – is that WDNR was not properly delegated "lead agency" status for this site, but nevertheless did all of the technical work and prepared all of the decision documents.

**4. Conclusion**

This is a motion to reconsider the grant of partial summary judgment. Genuine issues of material fact exist. Summary judgment was not appropriate. The disputed issues must be tried.

For the foregoing reasons and for the reasons stated in the principal memorandum, Glatfelter's motion for reconsideration of partial summary judgment as to the propriety of the remedy should be granted. Summary judgment should be vacated. The remaining issues should be set for trial.

Dated: March 11, 2013

Respectfully submitted,

*/s/ David G. Mandelbaum*
David G. Mandelbaum
Francis A. Citera
Marc E. Davies
Caleb J. Holmes
Adam B. Silverman
GREENBERG TRAURIG, LLP
Two Commerce Square, Suite 2700
2001 Market Street
Philadelphia, PA 19103
215.988.7800
mandelbaumd@gtlaw.com

**Attorneys for Defendant P.H. Glatfelter Company**