# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN
# GREEN BAY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> NCR CORPORATION, *et al.*, <br><br> Defendants. | Civil Action No. 10-C-910 <br><br> The Honorable William C. Griesbach |

**PLAINTIFFS' BRIEF IN RESPONSE TO CERTAIN DEFENDANTS' SUPPLEMENTAL OPPOSITION TO MOTION TO ENTER PROPOSED CONSENT DECREE WITH BROWN COUNTY, THE CITY OF GREEN BAY, AND THE SETTLING FEDERAL AGENCIES**

## Introduction

Two dozen depositions of Army Corps witnesses and exhaustive, burdensome written discovery demanded by Menasha Corporation turned up nothing contradicting the information and premises that form the basis of the settlement embodied in the proposed Consent Decree with Brown County, the City of Green Bay, and the Settling Federal Agencies. For that reason, the latest brief filed by Menasha and two of its co-Defendants does little more than re-argue points that have already been addressed in the Plaintiffs' principal brief (Dkt. 175) and reply brief (Dkt. 278) in support of their motion to enter the Consent Decree. The facts concerning the establishment and maintenance of the dams, the navigational channel, and the two confined disposal facilities are uncontested. The only question is what equitable share of the estimated total cleanup costs and natural resource damages the settlers should bear for their involvement at the Lower Fox River and Green Bay Superfund Site. The objectors have raised no legitimate issues concerning the estimates and calculations used to compute a fair share for the settlers, as set forth in detailed settlement share calculation worksheets and the narrative settlement justification submitted in support of the Plaintiffs' motion to enter the Consent Decree. *See* Dkt. 173-1; Dkt. 175; Dkt. 278. The proposed Consent Decree should now be entered.

The Plaintiffs' prior filings concerning the Consent Decree explained the separate settlement shares calculated for: (1) the United States Government's potential generation of PCB-containing wastepaper recycled in the Fox River Valley (computed as a $100,000 equitable share); and (2) the activities of the Army Corps, Brown County, and the City of Green Bay relating to navigational dredging in the Lower Fox River and Green Bay, the Confined Disposal Facilities ("CDFs") used to contain much of the dredged sediment, and the ownership and operation of the dams on the River (computed as a collective $5.1 million equitable share).

*See* Dkt. 173-1 at 1, 10; Dkt. 175 at 31-38.  The objectors' latest brief focuses solely on the second settlement share calculation; it does not question the settlement share for paper recycling. For that reason, this brief addresses only considerations relevant to the proposed settlement share for dam-related and dredging-related activities.

Section 1 of this brief summarizes the key facts supporting the proposed settlement, to clear up any confusion created by the objectors' latest filings.  Section 2 shows that the objectors' newly-filed expert declarations offer no compelling reasons to question the settlement. Finally, Section 3 demonstrates that the Court can largely disregard the objectors' extended discussion of the potential legal bases for classifying the United States as a liable party under CERCLA Section 107(a)(1)-(4), because the settlement *assumes* that the United States has potential liability and it incorporates no discount for any possibility that the United States might not be a potentially responsible party.

**1. The Facts Supporting the Settlement**

Despite their complaints about the proposed settlement, the objectors have not challenged and cannot contradict the following facts that form the foundation for the proposed settlement.

- By the time the Defendants began contaminating sediment in the Fox River and Green Bay with PCBs from NCR Paper manufacturing and recycling in the mid-1950s, a series of dams and a navigational channel maintained by the Army Corps had already been in place for many years.  *See* Dkt. 175 at 6-7 (citing references); Dkt. 698 at 16.

- Since the 1870s, the Army Corps has used the dams on the Lower Fox River to regulate water flow "for public purposes like navigation and flood control."  *City of Kaukauna v. FERC*, 214 F.3d 888, 891 n.5 (7th Cir. 2000).  Under a water regulation plan that has remained largely unchanged since 1886, the Army Corps has controlled water flow to

keep water levels within a prescribed range (and below flood stage) in the Lake Winnebago Pool (which includes Lake Winnebago, Lake Butte des Morts, Lake Winneconne, and Lake Poygan). *See* Dkt. 175 at 6-8 (citing references). The water levels are adjusted by manipulating water control structures installed in each dam – including Tainter gates – that regulate the passage of water (and entrained sediments) at each dam. *See* Dkt. 698 at 19.

- The Army Corps began dredging to promote access to Green Bay Harbor in the 1860s, as authorized by the River and Harbor Act of 1866 and subsequent enactments. *See* Dkt. 175 at 6-7 (citing references); Dkt. 819 at 2; Dkt. 819-1 at 19.

- Until 1966, sediment that the Army Corps dredged and removed from the Fox River navigational channel below the De Pere Dam often was re-deposited in open water, sometimes in off-channel areas within the River itself and sometimes in designed open water disposal areas in Green Bay. *See* Dkt. 175 at 9-11 (citing references); *see also* Dkt. 819-1 at 13-14.

- In 1966, the Army Corps began placing sediment dredged from the Fox River navigation channel into CDFs established under local sponsorship agreements with the City of Green Bay and Brown County. The Bayport CDF – used between 1966 and 1979 and then again from 1985 until now – has been owned and operated by the City and the County at different times. The County also owned and operated the Renard Island CDF when it was used from 1979 to 1996, and it continues to own the portion of the lakebed on which

that CDF is situated. *See* Dkt. 175 at 11-18 (citing references); *see also* Dkt. 819-1 at 13-15, 20-21.[1]

- The Army Corps also used the CDFs to dispose of large amounts of sediment dredged from the Green Bay portion of the navigation channel, starting in the late 1960s, when the Corps began a major project to deepen and widen the channel. Some sediment dredged from the Bay during that channel enlargement project was deposited in designated open water disposal areas elsewhere in the Bay between 1969 and 1973.[2] In addition, at the start of the 1975 dredging season, a very small amount of Green Bay sediment – reported as only 9,198 cubic yards – was removed and re-deposited elsewhere in Green Bay to allow hopper dredge access to the mooring basin and pumpout trestle serving the Bayport CDF. *See* Dkt. 175 at 11-18 (citing references); *see also* Dkt. 76-15 at 14-21; Dkt. 512-3 at 3; Dkt. 808-6 at 2; Dkt. 819-1 at 14-16.

- Between 1957 and 2009, the Army Corps dredged about 17 million cubic yards of sediment from the Fox River/Green Bay navigation channel. *See* Dkt. 819-1 at 14-16. The vast majority of that 17 million cubic yards of sediment – from 10 to 12.6 million

---

[1] In addition to the Fox River sediment placed in the Bayport and Renard Island CDFs, in 1973, a relatively small amount of sediment was removed from the Fort Howard Turning Basin and used as fill on a portion of the National Railroad Museum's land at the confluence of Dutchman's Creek and the Fox River. An Army Corps contractor, Capital Dredge & Dock Corp., did that work using its own hydraulic cutterhead dredge. *See* Dkt. 76-15 at 22; Dkt. 512-3 at 2. Our principal brief supporting entry of the proposed Consent Decree suggested that the material dredged in 1973 might have been deposited at Bayport (Dkt. 175 at 14), but additional documents that were identified and produced in discovery confirmed that Capital Dredge & Dock ultimately received special permission to place the dredged material on the National Railroad Museum's property rather than at Bayport (Dkt. 532-8 at 37-39; Dkt. 820-1; Dkt. 820-2; Dkt. 820-3).

[2] For example, in July and August 1973, roughly 57,000 cubic yards of sediment from the Green Bay navigation channel beyond Long Tail Point was removed during channel deepening work by the Army Corps dredge *Kewaunee* and then placed in an open water disposal location in Green Bay. Because the Army Corps' fiscal year ended on June 30, some information sources refer to that dredging as work done in calendar year 1973 and other sources list it as work done in fiscal year 1974. *See, e.g.,* Dkt. 76-15 at 21; Dkt. 819-1 at 14.

4

cubic yards – was deposited in the Bayport CDF and the Renard Island CDF. More than 3.2 million cubic yards of dredged sediment from the Fox River/Green Bay navigation channel (and perhaps up to 5.65 million cubic yards) was deposited in open water locations in the Fox River (between 1957 and 1966) and Green Bay (between 1957 and early 1975). Most of the sediment that was placed in open water was dredged from the navigation channel in Green Bay and deposited elsewhere in Green Bay. In addition, of that more than 3.2 million cubic yards, more than 2 million cubic yards originated from the enlargement of the Green Bay navigation channel in the late 1960s and early 1970s. *See* Dkt. 76-15 at 14-21; Dkt. 698 at 17; Dkt. 807 at 6-7; *see also* Dkt. 175 at 18-19; Dkt. 173-1 at 7.

- After 1966, there was no open water disposal of sediment dredged from the Fox River by the Army Corps or its contractors. *See* Dkt. 175 at 9-19 (citing references); Dkt. 278 at 7-8 (citing references); Dkt. 512-3 at 3; Dkt. 698 at 17.

- After early 1975, there was no open water disposal of sediment dredged from Green Bay by the Army Corps or its contractors. *See* Dkt. 175 at 9-19 (citing references); Dkt. 278 at 7-8 (citing references); Dkt. 512-3 at 3; Dkt. 698 at 17; Dkt. 808-3; Dkt. 808-6 at 2; Dkt. 819 at 3.

- By 1975, there had only been limited PCB sampling near the Fox River/Green Bay navigation channel. A December 1975 Army Corps report that is cited and relied upon by Menasha found very low levels of PCB contamination – ranging from about 0.02 parts per million to about 0.5 parts per million – in five sediment samples collected near where the Renard Island CDF is now located. *See* Dkt. 808-2 at 4; Dkt. 820-4 at 25, 29. All open water disposal in the Fox River and Green Bay had ceased by the time EPA did

5

more extensive sampling in 1977 and found PCB levels ranging from about 0.5 parts per million to 12 parts per million. *See* Dkt. 276-1 at 25-26.

- Some sediment loss and resuspension is inevitable when dredging is being performed. Dkt. 512-2 at 146-47; Dkt. 698 at 18.[3]

- The net effects of the dredging by the Army Corps and its contractors were: (1) an estimated net removal of about 3 million cubic yards of sediment containing about 16,500 kilograms of PCBs from the Fox River; (2) an estimated net transfer of about 3,600 kilograms of PCBs from the Fox River to Green Bay through the open water disposal of PCB-containing Fox River sediments in Green Bay until 1966; and (3) the containment in the CDFs of at least 10 million cubic yards of PCB-contaminated sediment from both the Fox River and Green Bay.[4]

- According to a 2010 report, the Army Corps spent nearly $112 million (in 2010 dollars) in dredging the more than 17 million cubic yards of sediment from the Fox River/Green

---

[3] The calculus that was used to compute a settlement share for the dredging parties included a conservative adjustment for dredging-related sediment losses, as explained in the Plaintiffs' principal brief. *See* Dkt. 175 at 32 & n.20.

[4] Our terminology here deserves some explanation. First, the "estimated net removal of about 3 million cubic yards of sediment containing about 16,500 kilograms of PCBs from the Fox River" does not include any sediment that was dredged from the River channel and then re-deposited elsewhere in the River; it does include River sediment that was placed in CDFs and dredged River sediment that was moved and re-deposited in Green Bay. Second, the "estimated net transfer of about 3,600 kilograms of PCBs from the Fox River to Green Bay" includes all PCB mass from dredged River sediment that was moved and re-deposited in Green Bay, but it subtracts the estimated total mass of PCBs that was dredged from the Green Bay channel and contained in the CDFs. Third, the indication that the CDFs contain "at least 10 million cubic yards of PCB-contaminated sediment from both the Fox River and Green Bay" comes from a conservative, low-end estimate used for this settlement. *See* Dkt. 175 at 18. One of the most recent tallies actually puts the CDF volume total at about 12.6 million cubic yards. *See* Dkt. 819 at 14-16. The 10 million cubic yard estimate is low because the settlement calculus used a worst case assumption that up to 20% of the material placed in the CDFs in the 1960 and 1970s might have been re-released to Green Bay and thus not fully "contained" within the CDFs. The calculations that yielded all of these figures are explained and shown in our initial filings supporting the motion to enter the Consent Decree. *See* Dkt. 173-1 at 2-4, 7-8; Dkt. 175 at 18-19, 31-34.

6

Bay navigation channel between 1957 and 2009. Another 536,119 cubic yards have been and will be dredged between 2010 and 2013, at a cost of more than $8 million. That includes work under a recently awarded $1,741,000 contract for Green Bay Harbor maintenance dredging that will be performed for the Army Corps between May and August 2013. Dkt. 819 at 2-3; Dkt. 819-1 at 14-16; Dkt. 819-2. The United States is not seeking reimbursement of those expenditures in this case.

- Under the local cooperation agreements between the Army Corps and Brown County, the Army Corps is responsible for operating and maintaining the Renard Island CDF and Bayport CDF until filled, performing final site preparation, and then turning over the maintenance responsibilities to Brown County. Brown County is responsible for the post-closure long-term care and maintenance of those facilities. Dkt. 819 at 3-4.

- WDNR has already approved a formal Closure Plan for the Renard Island CDF under WDNR's solid waste management regulations codified at Wis. Admin. Code ch. 500-538. Dkt. 820-5.

- Site preparation at the Renard Island CDF has required extensive coordination between the Army Corps, Brown County, and WDNR. The Army Corps has already incurred design and construction costs totaling approximately $2.9 million. In addition, the Army Corps recently commenced a procurement process for certain Renard Island CDF closure work, estimating the construction cost at between $1 million and $5 million. Dkt. 819 at 4; Dkt. 819-3. Once again, the United States is not seeking reimbursement of those expenditures in this case.

Of course, no one contends that the Army Corps, Brown County, and the City of Green Bay were the original source of any of the PCBs in the sediment that was moved and/or removed

by navigational dredging or the flow of water through the dams. The objectors and their co-Defendants in this case originally discharged the vast majority of the PCB mass that settled in the sediment of the Lower Fox River and Green Bay. Even so, based on their partial role in arguably contributing to the net PCB mass in Green Bay from relocated Fox River sediments contaminated by others, the dredging parties would pay a nearly 2% share of EPA's past response costs for the Site as whole, the estimated future response costs for long-term monitoring in Green Bay, and the natural resource damages.[5]

When coupled with the $100,000 settlement payment for U.S. Government paper recycling, the $5.1 million payment by the dredging parties would be allocated with one portion of the total settlement amount defraying response costs ($850,000) and a second portion reducing the claim for natural resource damages ($4,350,000), as explained in Plaintiffs' principal brief. *See* Dkt. 175 at 31-37. Most of the payment for response costs would be made to WDNR to help offset its costs of the day-to-day oversight of the ongoing remediation work, because the objectors and the other Defendants have refused to reimburse those costs as they have come due.[6] As provided by CERCLA Section 113(f)(2), the payments by the settlers would have the effect of "reduc[ing] the liability of the others by the amount of the settlement." 42 U.S.C. § 9613(f)(2).

---

[5] The settlement share percentage calculation for the dredging parties' involvement in moving PCBs to Green Bay from the Fox River is explained in detail in the Plaintiffs' principal brief. *See* Dkt. 175 at 31-34, 46-48.

[6] We simply do not understand the objectors' contention that a payment to WDNR is unwarranted because WDNR "is not overseeing the cleanup of OUs 2-5." Dkt. 804 at 11. That is just wrong, as shown by testimony from several witnesses at the December trial and other evidence of record in this case. Since 2004, the governments' main oversight contractors have been engaged and paid under contracts with WDNR. *See* Trial Transcript at 61 (Carney testimony), 245-46, 366-67, 370-71 (Fox testimony), 402 (Grosskopf testimony); *see also* Dkt. 356 at 2.

## 2. The Objectors' New Expert Declarations Provide No Basis for Rejecting the Proposed Settlement

The objectors rely heavily on declarations from two experts, Dr. James Evans and Paul F. Fuglevand, in opposing entry of the proposed Consent Decree. For the most part, those declarations merely rehash points that were made and answered in prior submissions to this Court, including earlier declarations by both experts that Menasha submitted during the public comment period on the proposed settlement. *See* Dkt. 173-12 at 80-145. In short, the assertions by Dr. Evans and Mr. Fuglevand are flawed, and neither expert accounts in any way for the benefit accrued by the Army Corps through its removal of millions of cubic yards of PCB-contaminated material from the Fox River and Green Bay.

Dr. Evans' opinion stands primarily for the uncontroversial propositions that: (1) the Fox River flows downstream; (2) river currents can transport sediment; and, (3) the series of dams that have been in place along the Fox River since the mid-1800s have an impact on both the flow of water and the accompanying flow of sediment. *See* Dkt. 806 at 7-9; *see also* Dkt. 612-1 at 44-45 (Mr. Fuglevand expressing his belief that "the predominant pathway [of sediment transport] would be with the currents which would be moving downriver."). Dr. Evans, however, does not opine that the cost of the cleanup would have been reduced in a hypothetical world where the Fox River's network of locks and dams did not exist, and he does not attempt to quantify any impact in any meaningful manner. Furthermore, though his opinion highlights the fact that PCB contaminated sediment moved through the Fox River system, it does not account for the Army Corps' environmentally beneficial removal, and segregation, of immense quantities of contaminated sediment over the course of decades. For this reason, Dr. Evans' conclusions – *i.e.*, his "professional opinion that the proposed settlement amount of $4.5 million for the Settling Federal Agencies is too low," based upon the "trapping efficiencies," "sediment

9

homogenization," and sediment "remobilization" caused by the nine federally owned and operated dams – should be wholly discounted. *See* Dkt. 806 at 10.

The objectors place great weight on Mr. Fuglevand's sketchy suggestion that the Army Corps' movement of dredge spoils from the OU 4 navigation channel to an open water disposal area within OU 4 increased the response costs in OU 4 by approximately $19 million. Dkt. 804 at 16. However, as Mr. Fuglevand explained in his deposition in this case, that figure was never meant to be portrayed as "a fully developed cost estimate." Dkt. 612-1 at 49. When pressed on whether the remediation costs *actually* increased due to the Army Corps' movement of sediment from the navigation channel to other areas in OU 4, Mr. Fuglevand rushed to note that "I am not explicitly saying it did or it didn't." Dkt. 612-1 at 61. His $19 million guesstimate was nothing more than a back-of-the envelope calculation of "a possible cost" that Mr. Fuglevand made by multiplying an assumed remediation cost of $200 per cubic yard of sediment by a 95,000 cubic yard estimate of the amount of sediment the Army Corps dredged, moved, and redeposited in OU 4 (*i.e.*, $200 per cubic yard x 95,000 cubic yards = $19 million). Dkt. 612-1 at 48-49. In other words, his estimate essentially treated the relocated OU 4 sediment as if it was imported contamination brought in from elsewhere and dumped at this Site, instead of treating it as contaminated sediment that was already present in OU 4 and moved to another part of OU 4. His accounting also ignored the fact that the Army Corps was not the original source of the PCB contamination. He assigned the Army Corps 100% of his estimated cost of remediating the sediment that the Army Corps moved, although it was plainly contaminated by others and it was moved in the 1950s and early 1960s, years before the Army Corps had any reason to know of the potential dangers posed by PCBs in the sediment. Finally, in addition to its other flaws, Mr. Fuglevand's assumptions would tend to overestimate the "possible cost" because his $200 per

cubic yard remediation cost assumption ignored the lower actual unit cost of dredging at this Site.[7]

The Court also should discount Mr. Fuglevand's related speculation that the Army Corps' dredging activities increased "the areal extent of PCBs" within OU 4. Dkt. 807 at 17. In his deposition in this case, Mr. Fuglevand acknowledged that he had no opinion regarding the areal extent of sediment transport at the Site ("how much gets transported downriver versus how much settles out in the immediate area"), *see* Dkt. 612-1 at 42, 45, 68-69, and he agreed that he had "no basis" to contradict the findings of one of NCR's experts, Dr. Donald F. Hayes, on this subject, *see* Dkt. 612-1 at 68-69. In fact, Mr. Fuglevand has always cited and deferred to Dr. Hayes on how much sediment settles in the immediate area of dredging, versus how much sediment is transported downriver.[8] But Dr. Hayes clarified his own opinion concerning dredging-related sediment transport in 2012, concluding that Army Corps dredging did "not significantly change the areas in which sediments were initially deposited." Dkt. 820-6 at 5. Dr. Hayes noted that he reached that conclusion because: (1) the Army Corps did not add PCBs to the system; (2) dredging upstream from the Fort Howard Turning Basin stopped prior to the period of maximum PCB releases; (3) most dredged sediment was disposed of outside of OU 4; and (4) the amount of sediment re-suspension and re-release caused by Army Corps dredging

---

[7] *See* Dkt. 612-1 at 49 ("Those original estimates were, again, a – just a preliminary assessment that were based on, again, just using my estimate of – of a – of a likely number. But they weren't based on, you know, the – the actual cost of the remedy that, you know, currently exists for the site."). NCR's witnesses have indicated that the actual unit cost of dredging in OU 4 has been and will be much less than $200 per cubic yard. *See* Dkt. 333 at 3 (noting that "[w]hen complete, dredging of 3,653,717 cubic yards in OU 4 is estimated to cost a total of $457.7 million," or roughly $125 per cubic yard).

[8] *See* Dkt. 612-1 at 41-42 (pointing to a paper by Hayes as the source for raw data related to resuspension of sediments), 42 ("Q. Do you have an opinion about how much gets transported downriver versus how much settles out in the immediate area? A. No."), 69 ("Q. Now, I believe you testified earlier that you have no opinion on how much sediment settles out in the immediate area of the dredging versus how much sediment is transported downriver? A. That's correct. Q. And so if Dr. Hayes were to have opined in – in his report that most sediment lost resulting from dredging resettles within 100 meters of the dredging operation, you have no basis with which to contradict him? A. That's correct.").

11

was "relatively low" and those sediments "would not have traveled far." Dkt. 820-6 at 4. At the time, Dr. Hayes added that his 2011 declaration in this case was intended to highlight the fact that Army Corps dredging did not result in complete removal of PCBs (something the Army Corps has never contended). Dkt. 820-6 at 8. The objectors ignore all of this when they cite and rely on that prior declaration by Dr. Hayes. *See* Dkt. 804 at 18; Dkt. 805 at 10-12. In sum, Dr. Hayes' opinion does not support an argument that Army Corps dredging materially increased remedial costs at the Site. Key assertions by Mr. Fuglevand and the objectors appear to be based on their misunderstanding of preliminary views expressed by Dr. Hayes, and Dr. Hayes' more recent clarifications expressly refute Mr. Fuglevand's conclusions.

Similar errors infect Mr. Fuglevand's expressed views about the natural resource damages share that the Army Corps should bear for its dredging-related activities in Green Bay. For example, Mr. Fuglevand notes that, in preparing his report for the objectors, he was "asked to assume that approximately 6,647.56 kg of PCB were deposited by the USACE in OU5"and he computed a natural resource damages share using that unexplained assumption. Dkt. 807 at 15-16. But even with worst-case assumptions for the dredging parties, the net estimated PCB addition to Green Bay from dredging-related operations is only about 3,600 kilograms, not 6,600 kilograms or more. *See* Dkt. 173-1 at 4; Dkt. 175 at 32-33. Moreover, the Plaintiffs have never added a 50% uncertainty premium to compute the total natural resource damages figure used for settlement purposes at this Site, as claimed by Mr. Fuglevand, so for that added reason he dramatically overestimates the amount that the dredging parties should pay for natural resource damages. *See, e.g., United States v. Fort James Operating Co.*, 313 F. Supp. 2d. 902 (E.D. Wis. 2004); Dkt. 276-9 at 25.

Most important, however, is that none of the opposing experts addresses the fact that the Army Corps, through dredging, removed millions of cubic yards of PCB contaminated sediment.

12

This undisputed fact is central to the settlement analysis, and it overcomes the vague and unsupported claims by the objectors and their experts that the Army Corps played a major role in causing the environmental harm at this Site. There is no reason to accept Mr. Fuglevand's unvarnished opinion that "it is not reasonable for the United States to claim credit for the placement of PCB-contaminated sediments in CDFs." Dkt. 807 at 16. As shown above, the United States has already spent more than $100 million over the years in dredging and containing sediment contaminated with PCBs discharged by the objectors and their co-Defendants, and the United States and Brown County will continue to incur dredging costs and CDF closure and long-term care costs for years to come. That can and should be considered in judging the proposed settlement.

### 3. The Court Need Not Concern Itself with Trying to Judge the Army Corps' Activities Against the Liability Categories Established by CERCLA

More than a quarter of the objectors' supplemental brief is devoted to a discussion of their various theories supporting a liability finding against the United States. Dkt. 804 at 18-28. Implicit in their analysis is the suggestion that "with this many bases for government liability, the United States' proposed share is *obviously* too low." Any such suggestion is wrong. For the purpose of this settlement, the United States essentially has assumed that it is liable, and the parties to the Consent Decree have proposed a multi-million dollar settlement amount based on the role at this Site played by several U.S. Government agencies and two associated units of local government. This approach is reasonable, fair, and consistent with CERCLA's purposes. *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 85 (1st Cir. 1990) ("Reasonableness, fairness, and fidelity to the statute are, therefore, the horses which the district judges must ride."); *United States v. George A., Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011) (citing *Cannons Engineering*). Once CERCLA liability is established, or assumed, focusing on the

13

various categories of CERCLA liability typically is nothing more than wasted effort. Instead, this Court must examine the evidence and independently determine whether entry of the proposed Consent Decree is proper. *See Gautreaux v. Pierce*, 690 F.2d 616, 630-31 (7th Cir. 1982).

CERCLA imposes strict liability on all responsible parties, regardless of the statutory basis of liability. *See United States v. Capital Tax Corp.*, 545 F.3d 525, 530 (7th Cir. 2008). Once liability is established, the "focus shifts to allocation," *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 934–35 (8th Cir. 1995), regardless of whether a party is only a transporter of another party's waste, or a party is a past or present owner, a past or present operator, and/or a generator of waste at a site. Thus, the issue presented to the Court through this motion to enter is not one of liability – it is a question of equitable allocation, a question raised in a setting where public policy strongly favors settlement. *See Pennwalt Corp. v. Plough, Inc.*, 676 F.2d 77, 80 (3d Cir. 1982) (public policies strongly favor settlements); *Fort James*, 313 F. Supp. 2d at 907 (in considering a proposed settlement's fairness and reasonableness in a CERCLA case, the court must "keep in mind the strong policy favoring voluntary settlement of litigation."). Here, the allocation analysis is explained at length in the Plaintiffs' voluminous filings supporting the motion to enter the proposed Consent Decree, and the explanation offered is more than sufficient to justify entry of this Consent Decree. Dkt. 173-1; Dkt. 175 at 30-39.

## Conclusion

For the foregoing reasons and the reasons set forth in the Plaintiffs' prior submissions, the Court should approve and enter the proposed Consent Decree with Brown County, the City of Green Bay, and the Settling Federal Agencies.

14

Plaintiffs' Response to Certain Defendants' Supplemental Opposition to Motion to Enter Consent Decree
in *United States and the State of Wisconsin v. NCR Corp., et al.*, No. 10-C-910 (E.D. Wis.)

                              Respectfully submitted,

                              FOR THE UNITED STATES OF AMERICA

                              IGNACIA S. MORENO
                              Assistant Attorney General
                              Environment and Natural Resources Division

Dated: May 31, 2013          s/ *Randall M. Stone*
                              RANDALL M. STONE
                              JEFFREY A. SPECTOR
                              KRISTIN FURRIE
                              MAYA ABELA
                              SEAN CARMAN
                              SUMONA MAJUMDAR
                              Environmental Enforcement Section
                              Environment and Natural Resources Division
                              U.S. Department of Justice
                              P.O. Box 7611
                              Washington, DC 20044-7611
                              Telephone: 202-514-1308
                              Facsimile: 202-616-6584
                              E-Mail: randall.stone@usdoj.gov

Dated: May 31, 2013          s/ *Matthew R. Oakes*
                              JOSHUA M. LEVIN
                              MATTHEW R. OAKES
                              Environmental Defense Section
                              Environment and Natural Resources Division
                              U.S. Department of Justice
                              P.O. Box 7611
                              Washington, DC 20044-7611
                              E-Mail: matthew.oakes@usdoj.gov


                              GREGORY J. HAANSTAD
                              Attorney for the United States, Acting
                              Under Authority Conferred by 28 U.S.C. § 515

                              SUSAN M. KNEPEL
                              Assistant United States Attorney
                              Office of the United States Attorney
                              517 E. Wisconsin Avenue, Room 530
                              Milwaukee, WI 53202

FOR THE STATE OF WISCONSIN

Dated:   May 31, 2013           s/ *Cynthia R. Hirsch*
                                CYNTHIA R. HIRSCH
                                Assistant Attorney General
                                Wisconsin Department of Justice
                                17 West Main Street
                                P.O. Box 7857
                                Madison, WI  53707-785
                                E-Mail:         hirschcr@doj.state.wi.us

CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of the foregoing Brief to be served on the following counsel of record by the Court's Electronic Case Filing system:

**Mary Rose Alexander**
Latham & Watkins LLP
mary.rose.alexander@lw.com

**Thomas Armstrong**
von Briesen & Roper SC
tarmstro@vonbriesen.com

**Paul Bargren**
Foley & Lardner LLP
pbargren@foley.com

**Linda E. Benfield**
Foley & Lardner LLP
lbenfield@foley.com

**Dennis P. Birke**
DeWitt Ross & Stevens SC
db@dewittross.com

**Garrett L. Boehm, Jr.**
Johnson & Bell, Ltd.
boehmg@jbltd.com

**Steven P. Bogart**
Reinhart Boerner Van Deuren SC
sbogart@reinhartlaw.com

**Michael P. Carlton**
von Briesen & Roper SC
mcarlton@vonbriesen.com

**Evan R. Chesler**
Cravath Swaine & Moore LLP
echesler@cravath.com

**Francis A. Citera**
Greenberg Traurig LLP
citeraf@gtlaw.com

**Marc E. Davies**
Greenberg Traurig LLP
daviesm@gtlaw.com

**David R. Erickson**
Shook Hardy & Bacon LLP
derickson@shb.com

**S. Todd Farris**
Friebert Finerty & St. John SC
stf@ffsj.com

**Patrick J. Ferguson**
Latham & Watkins LLP
patrick.ferguson@lw.com

**Charles Fried**
fried@law.harvard.edu

**Sandra C. Goldstein**
Cravath Swaine & Moore LLP
sgoldstein@cravath.com

**Thomas R. Gottshall**
Haynsworth Sinkler Boyd PA
lgantt@hsblawfirm.com

**Eric W. Ha**
Sidley Austin LLP
eha@sidley.com

**Scott W. Hansen**
Reinhart Boerner Van Deuren SC
shansen@reinhartlaw.com

**William H. Harbeck**
Quarles & Brady LLP
william.harbeck@quarles.com

**Cynthia R. Hirsch**
Wisconsin Department of Justice
hirschcr@doj.state.wi.us

**Margaret I. Hoefer**
Stafford Rosenbaum LLP
mhoefer@staffordlaw.com

**Caleb J. Holmes**
Greenberg Traurig LLP
holmesc@gtlaw.com

**Philip C. Hunsucker**
Hunsucker Goodstein PC
phunsucker@hgnlaw.com

**Peter C. Karegeannes**
Quarles & Brady LLP
peter.karegeannes@quarles.com

**Paul G. Kent**
Stafford Rosenbaum LLP
pkent@staffordlaw.com

**Gregory A. Krauss**
Gregory Krauss pllc
gkrauss@krausspllc.com

**Linda R. Larson**
Marten Law PLLC
llarson@martenlaw.com

**Vanessa A. Lavely**
Cravath Swaine & Moore LLP
vlavely@cravath.com

**Susan E. Lovern**
von Briesen & Roper SC
slovern@vonbriesen.com

**Anne E. Lynch**
Hunsucker Goodstein PC
alynch@hgnlaw.com

**Kevin J. Lyons**
Davis & Kuelthau SC
klyons@dkattorneys.com

**Meline G. MacCurdy**
Marten Law
mmaccurdy@martenlaw.com

**David G. Mandelbaum**
Greenberg Traurig LLP
mandelbaumd@gtlaw.com

**Bradley M. Marten**
Marten Law
bmarten@martenlaw.com

**Allison E. McAdam**
Hunsucker Goodstein PC
amcadam@hgnlaw.com

| | | |
|---|---|---|
| **Darin P. McAtee**<br>Cravath Swaine & Moore LLP<br>dmcatee@cravath.com | **Thomas M. Phillips**<br>Reinhart Boerner Van Deuren SC<br>tphillip@reinhartlaw.com | **Margaret R. Sobota**<br>Sidley Austin LLP<br>msobota@sidley.com |
| **Stephen F. McKinney**<br>Haynsworth Sinkler Boyd PA<br>smckinney@hsblawfirm.com | **Ian A.J. Pitz**<br>Michael Best & Friedrich LLP<br>iapitz@michaelbest.com | **Arthur A. Vogel, Jr.**<br>Quarles & Brady LLP<br>arthur.vogel@quarles.com |
| **Heidi D. Melzer**<br>Melzer Law, LLC<br>hmelzer@melzerlaw.com | **David A. Rabbino**<br>Hunsucker Goodstein PC<br>drabbino@hgnlaw.com | **Anthony S. Wachewicz, III**<br>City of Green Bay<br>tonywa@ci.green-bay.wi.us |
| **Elizabeth K. Miles**<br>Davis & Kuelthau SC<br>emiles@dkattorneys.com | **Ronald R. Ragatz**<br>DeWitt Ross & Stevens SC<br>rrr@dewittross.com | **James P. Walsh**<br>Appleton City Attorney<br>jim.walsh@appleton.org |
| **William J. Mulligan**<br>Davis & Kuelthau SC<br>wmulligan@dkattorneys.com | **Kathleen L. Roach**<br>Sidley Austin LLP<br>kroach@sidley.com | **Ted A. Warpinski**<br>Friebert Finerty & St John SC<br>taw@ffsj.com |
| **Omid H. Nasab**<br>Cravath Swaine & Moore LLP<br>onasab@cravath.com | **Megan A. Senatori**<br>DeWitt Ross & Stevens SC<br>ms@dewittross.com | **Ted Waskowski**<br>Stafford Rosenbaum LLP<br>twaskowski@staffordlaw.com |
| **Kelly J. Noyes**<br>von Briesen & Roper SC<br>knoyes@vonbriesen.com | **Adam B. Silverman**<br>Greenberg Traurig LLP<br>silvermana@gtlaw.com | **Evan B. Westerfield**<br>Sidley Austin LLP<br>evanwesterfield@sidley.com |
| **Nancy K. Peterson**<br>Quarles & Brady LLP<br>nancy.peterson@quarles.com | **M. Andrew Skierawski**<br>Friebert Finerty & St. John SC<br>mas@ffsj.com | **Richard C. Yde**<br>Stafford Rosenbaum LLP<br>ryde@staffordlaw.com |
| | **Sarah A. Slack**<br>Foley & Lardner LLP<br>sslack@foley.com | |

Dated: May 31, 2013                                   s/ *Randall M. Stone*