UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA and
THE STATE OF WISCONSIN,

    Plaintiffs,

  v.                                                              Case No. 10-C-910

NCR CORP., et al.,

    Defendants.

**DECISION AND ORDER APPROVING CONSENT DECREE WITH
THE CITY OF GREEN BAY, BROWN COUNTY, AND ARMY CORP OF ENGINEERS**

In December 2010 the Plaintiffs lodged a proposed consent decree with the court. The Plaintiffs subsequently moved for court approval of the decree, but the matter was stayed pending the outcome of other proceedings, including an action under the Freedom of Information Act, 5 U.S.C. § 522, in which several interested parties sought additional records relating to the agreement. *See Menasha Corp. v. U.S. Dept. of Justice*, 707 F.3d 846 (7th Cir. 2013). The question is now ripe for decision, however, and for the reasons set forth below the consent decree will be approved.

In reviewing a proposed consent decree, the trial court must defer to the expertise of the agency and to the federal policy encouraging settlement. *United States v. George A. Whiting Paper Co.,* 644 F.3d 368, 372 (7th Cir. 2011). The district court "must approve a consent decree if it is reasonable, consistent with CERCLA's goals, and substantively and procedurally fair." *Id.* At the outset, I note that the settlement between the Army Corps of Engineers and the United States Department of Justice is not a typical arms' length transaction, given that both are arms of the

executive branch. This, however, is unavoidable, given the nature of environmental enforcement. Any time the enforcement branch seeks to impose liability on another agency, there will be some element of conflict. The relationship does not, on its own, give rise to any kind of procedural unfairness. Some of the objectors note that government counsel has been representing both the Army Corps and the EPA in this action. In other words, the government's enforcement lawyers have been working closely with its defense lawyers, and in some cases they have been indistinguishable. Even so, as discussed further below, the result reached is a reasonable one, and the procedure is in many ways unavoidable. In theory both departments could have retained outside counsel, of course, but that was not required here. The fact is that the government's counsel, throughout a half-decade of this action, have proven themselves to be zealous and vigorous enforcers of the environmental laws. The notion that they would somehow give a "sweetheart deal" to a party merely because the party happens to be in the executive branch is nothing more than unsupported speculation. Moreover, given that courts owe deference to the agency, it would make little sense to treat that same agency with the kind of skepticism the objectors now demand. In other words, if an agency is expert in crafting settlements with other PRPs, there is no reason to believe it would not bring a similar level expertise to bear on a settlement with another government agency.

The proposed consent decree addresses the liability of Brown County, the City of Green Bay, and the United States for navigational dredging-related activities in the Lower Fox River and Green Bay. It also addresses the liability of agencies of the United States for their recycling of PCB-containing paper. These parties would pay a total of $5.2 million under the proposed settlement: the United States would pay $4.5 million and Green Bay and Brown County would each pay $350,000.

As discussed at more length elsewhere, the Army Corps of Engineers, under the direction of Congress, engaged in navigational dredging activities for at least the last century. During much of the PCB period (1954-71), the Corps engaged in maintenance dredging and deposited the dredged material in various parts of the river and in Green Bay. The majority of the dredged material, however, went into confined disposal facilities built adjacent to the river. Moreover, the in-river disposal occurred before NCR paper was at its peak production levels. Thus, although the Corps did redistribute some PCBs, and some PCBs inevitably leaked out of the disposal facilities, it was not a major contributor to the PCB problem. The United States recognizes, however, that roughly a half-million cubic yards of contaminated sediment may have been dumped in Green Bay, which contributed to natural resource damages there. For that reason, the bulk of the settlement amount is based on that activity. On balance, however, the government argues that dredging the navigation channel and placing the sediment in disposal facilities markedly *reduced* the mass of PCBs in the Lower Fox River. Thus, on a net basis, the government's activities actually lessened, rather than exacerbated, the problem. As such, the United States argues that the consent decree is a fair settlement even though $5 million constitutes less than one percent of the estimated $700 million cleanup cost.

The government also argues that its recycling activities contributed only minimally to the problem. Recycling in the 1970s was only in its infancy, and the EPA itself was apparently the only governmental agency to recycle its paper in any way relevant to the Lower Fox River. As it turned out, the EPA sent a small number of truckloads to the Bergstrom mill during the 1970s, but that program eventually petered out. The government also did recycle other things, such as maps and waste from the Government Printing Office. The United States argues that GPO waste would not

have contained carbonless copy paper and thus would not be contaminated with significant amounts of PCBs. The recycling aspect of the government's liability here appears to be at truly *de minimis* levels.

In addition, the government encouraged the practice of recycling, even after it was learned that PCBs were dangerous and found within the used office paper that would be subject to recycling. During the 1970s, both the EPA and the FDA recognized that it would not be practical to remove carbonless copy paper from the recyclable inventories because CCP was not easy to identify. Ultimately, however, the government argues that its own recycling and the positions it took on paper recycling added very little to the PCB problem, whose damage had already been done by the 1970s.

Finally, the participation of Green Bay and Brown County in the settlement stems from their involvement in the confined disposal facilities where contaminated sediment was deposited and the fact that the city and county were proponents and beneficiaries of the Corps' dredging program. The Defendants do not meaningfully challenge their settlement terms, except to suggest in conclusory fashion that their mismanagement of the disposal facilities led to additional PCBs being deposited in the river.

The Defendants raise a number of objections to the Army Corps' settlement, but these objections do not carry the day. At the outset, I must note that the notion that the Army Corps of Engineers is a significant disposer or discharger of PCBs simply because it operated dams and moved some sediment around in the river is a premise that has not been explored at any length. The government appears willing to concede its liability under the CERCLA, at least as to its dredging activities, and so the question remains unanswered. *See United States v. Washington State Dept. of Transp.*, 665 F. Supp. 2d 1233 (W.D. Wash. 2009) (appearing to accept premise that Army Corps

4

Case 1:10-cv-00910-WCG   Filed 06/26/13   Page 4 of 8   Document 846

dredging could trigger CERCLA liability). But it is at least arguable that parties who did not themselves discharge PCBs into the waterway, but at most moved around the sediment containing the PCBs discharged by the objecting parties, have no liability under CERCLA at all. The argument is even stronger when one considers that the movement of the sediment occurred during the course of efforts by the Corps and local governments to perform work on behalf of the public that was necessary in order to permit the continued commercial use of the waterway and that they may even have lessened the overall cost of the clean-up necessitated by the initial discharges by the objecting Defendants.

The essence of the Defendants' argument is that the Corps' operation of nine dams and its dredging and redispersement of PCBs made the remedy much more expensive than it would have been otherwise. They argue that the Corps never took into account the PCB issue when operating its dams, which had Tainter gates that allowed the sediment to move through from the bottom and encouraged spreading of PCBs. They also suggest that dredging had significant negative effects. Dredging the navigation channel produced a sediment trap and caused the accumulation of PCBs in certain parts of the river. And moving the dredged material around through open-water disposal resuspended PCBs that might otherwise have been more safely buried deep in the sediment. The dredging also expanded the surface area in which PCBs were spread in the river.

These issues have been noted elsewhere, as the Corps' activities rendered the attempt to divide the harm in the river much more difficult. I am not satisfied, however, that the Corps' activities give rise to a significant amount of liability. The point remains that the open-water disposal of sediment ended in 1966, just as NCR's production of carbonless copy paper was dramatically increasing. Most of the sediment was deposited in confined disposal facilities. The

5

Corps' removal of millions of cubic yards of contaminated sediment from the river at least partially counteracted any exacerbation of the problem due to dredging, and in fact it is not difficult to imagine that the Corps' activities actually had a net ameliorating effect due to the removal of so much contaminated sediment. As the government points out, it removed roughly 16,500 kg of PCBs from the river, which is on par with what the remedial dredging now being undertaken will accomplish. In other words, the Corps' activities already did roughly half of the work, at least as far as mass is concerned. Regardless, it makes sense to view the Corps' activities on a net basis rather than focusing merely on the gross amount of PCBs it might have added or moved through dredging.[1]

In addition, the Defendants' apparent belief that the Corps should bear significant liability merely because the federal dams existed does not bear closer scrutiny. The dams have been operational since the 1800's and thus predated all of the PCB pollution by nearly a century. From a causation perspective, it is difficult to conclude that the Corps "caused" any part of the PCB problem merely by operating pre-existing dams in the fashion they were designed to be operated. Few large rivers exist in their "natural" state, and the objectors have not cited any plausible reason to impose significant liability on the Corps merely for doing the job it is tasked by Congress with doing.

The most recent trial on divisibility established that the relationship between PCB masses and the remedy is a complex one, and the Defendants are not able to explain how the Corps'

---

[1] As discussed at great length elsewhere, mass is a poor lens for viewing impact on remediation efforts and expenses. I am not suggesting that the Corps' dredging made the actual remediation project substantially easier, but simply noting that the Corps' overall effect on the contamination in the river may have been positive.

6

activities would actually have made the problem demonstrably worse. They rely on experts such as Mr. Fuglevand, who opined that the Corps' dredging activity might have increased the cleanup cost in OU4 by some $19 million. But the experts' opinions do not take into account the complex relationship between PCB mass and the remedy, and neither do they incorporate the fact that the Corps actually removed massive quantities of PCBs from the river. Moreover, the analysis of NCR's Dr. Hayes, who is relied on elsewhere by Fuglevand, concludes that dredging "did not significantly affect the deposition patterns of PCBs in OU4." (ECF No. 820-6 at 4.) In short, there is no comprehensive and compelling analysis that suggests the Corps' activities played the major role that the objectors now claim. Moreover, the objectors' arguments overlook the deference that is owed under these circumstances. "As long as the measure of comparative fault on which the settlement terms are based is not arbitrary, capricious, and devoid of a rational basis, the district court should uphold it." *United States v. SEPTA,* 235 F.3d 817, 824 (3d Cir. 2000). Here, there is a non-arbitrary and rational basis for concluding that the government's activities contributed only minimally to the PCB problem and its remediation.

The government has set forth a reasonable basis for a settlement that consists of only a small fraction of the total cost of remediating the river. Its method of calculating that cost is thorough and is based, to the extent possible, on data, including known dredge volumes, PCB concentrations, and the likely impact on Green Bay. The objections now raised are based largely on incompletely developed arguments and attribute far too much liability to the Army Corps. Settlements are owed deference, and without a strong reason to conclude otherwise, I find that the proposed consent decree is a fair and reasonable settlement.

7

Case 1:10-cv-00910-WCG   Filed 06/26/13   Page 7 of 8   Document 846

The motion to approve the settlement [173] is **GRANTED**. The consent decree [31-1] is approved.

**SO ORDERED** this  26th  day of June, 2013.

s/ William C. Griesbach  
William C. Griesbach, Chief Judge  
United States District Court

8

Case 1:10-cv-00910-WCG   Filed 06/26/13   Page 8 of 8   Document 846