# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA and
STATE OF WISCONSIN,

                Plaintiffs,

      v.                                    Case No. 10-C-910

NCR CORP., et al.,

                Defendants.

## ORDER GRANTING RECONSIDERATION

Following this Court's May 15, 2015 Decision and Order finding that NCR had established its divisibility defense, most of the other parties filed motions seeking reconsideration. These parties argue that NCR failed to establish its divisibility defense because the evidence and testimony that are the subject of the limited remand were unreliable. For the reasons given below, I agree, and will therefore grant the motions.

**I. Motions for Reconsideration**

**1. The Harm is not Theoretically Capable of Apportionment**

As the Seventh Circuit explained, the harm is "theoretically capable of apportionment if NCR could show the extent to which it contributed to PCB concentrations in OU4." *United States v. P.H. Glatfelter Co.,* 768 F.3d 662, 678 (7th Cir. 2014). As noted in my previous decision (ECF No. 1000), the government appeared to have all-but conceded this point, but in its subsequent motion practice it has launched a vigorous assault on Dr. Wolfe's estimates, which the Seventh Circuit has asked this Court to consider on remand.

It is true, as NCR notes, that some of the issues now raised could have been argued at some earlier time. In some circumstances, many of the arguments would not properly be the subject of a motion for reconsideration. Here, however, the circumstances are highly unusual. Following the remand, the government filed a motion, accompanied by a short brief, asking the court to conclude, based on the trial record, that NCR had failed to meet its burden. (ECF No. 935.) NCR responded, and the government filed a reply brief. NCR filed a surreply brief. During the limited briefing on that motion, the numerous other interested parties were not heard in any meaningful capacity. Neither were the other parties (nor the government) able to meaningfully respond to NCR's approach during trial, because Butler's use of Wolfe's evidence came only in NCR's surrebuttal. Given the import of the matters under consideration, the motions for reconsideration allowed these parties to be heard and to provide further context, a context that makes it clear that NCR's late-inning use of Dr. Wolfe's evidence was not sufficient to meet its burden.

The most salient problem with Wolfe's estimates is that they contradict facts already found by the court. For example, several of the parties note that Wolfe's estimates overstate—probably dramatically—the PCBs attributed to U.S. Paper, one of the four key sources of PCB contamination, which is located in the upper half of OU4, known as OU4A. As a point of reference, following the trial this Court found that NCR's expert, James Braithwaite, had relied on an excessive estimate of some 9,189 kg attributable to U.S. Paper. In rejecting that conclusion, I noted that U.S. Paper had not used NCR broke during much of the PCB era, and when it *did* use NCR broke, it used only small amounts. (ECF No. 794 at 38-39.) Specifically, this court concluded, as a finding of fact, that U.S. Paper "did not recycle NCR paper, which was white, as a significant part of its business. In about 1966, however, it began manufacturing white paper rolls using white NCR broke, but even

2

then it used only a small portion of NCR broke in the process, as white rolls themselves constituted only a limited portion of its recycled product business." (*Id.* at 15.) Another expert, David Merrill, had more credibly estimated that U.S. Paper had discharged no more than 1,166 kg of PCB, which would be somewhere in the neighborhood of one-half of one-percent of the total PCBs released to the river. (Tr. 2320-31.) In sum, NCR's expert had attributed 9,189 kg to U.S. Paper, while a more credible expert had found no more than 1,166 kg.

In contrast, Georgia-Pacific's expert, Dr. Wolfe, estimated that U.S. Paper had released some 21,500 kg of PCBs, a figure that could easily be too high by a factor of nearly twenty. That explains why he believed U.S. Paper (the only significant OU4A-based source of PCBs) would have been responsible for some 21% of the PCBs in OU4B, and an even higher percentage in OU4A itself, even though U.S. Paper likely contributed only a tiny fraction of the total PCBs to the river—at most, in the low single digit percentages. Obviously, Wolfe's estimate is sharply at odds with that reality. (Notably, NCR does not deny the essence of that fact.) Because there are only a few sources of contamination into OU4, a large error with respect to a single source will skew the numbers dramatically in favor of the other sources, including NCR.

This calls into doubt both the general framework used by Dr. Wolfe as well as his specific conclusions. Most problematic is the fact that his estimates for NCR were not unfavorable or conservative, as I had previously concluded, but instead were based on the flawed premise that U.S. Paper was a substantial polluter of PCBs into the river. As discussed below, Wolfe did not explain exactly what percentage he attributed to U.S. Paper for OU4A (his expert report was limited to conclusions about OU4B), but it would have been much higher than the 21% he ascribed to U.S. Paper for OU4B. That means Wolfe's conclusion attributing some 43% of the PCBs in OU4A to

3

NCR was actually *low*, not high. If much lower assumptions are made with respect to U.S. Paper, then it follows that NCR could easily have been responsible for 50% or more of the harm in OU4A and some 35% or more in OU4B. We do not know. The point is, this substantial divergence from facts I have found, and which are not presently contested, calls Wolfe's conclusions into serious doubt, so much so that NCR has not met its burden to "show the extent to which it contributed to PCB concentrations in OU4." *Id. at* 678. In short, Butler's use of Wolfe's flawed estimates cannot be expected to produce a reliable answer to the question of how much NCR contributed to PCB concentrations in OU4.

**2. Remediation Costs Necessitated by Each Party**

The parties spend the bulk of their efforts addressing the second divisibility question, which is whether there is a reasonable basis for apportionment. Once again, the further context provided in subsequent briefing has shed light on some glaring flaws in NCR's approach.

**A. Missing Estimates**

In its motion for reconsideration, the moving parties argue that the trial record does not provide complete estimates for all of the dischargers, and so Butler's use of those estimates must be based on mere guesswork rather than supportable science. The moving parties focus on OU4A, the artificial designation for the upstream half of OU4. Wolfe's expert report provided PCB concentration estimates for OU4*B* (the location of Georgia-Pacific, his client), but not for OU4*A*. During the trial, however, it came out that Wolfe had produced an estimate of NCR's contribution to OU4A (43%), and that is how Butler learned that figure, which he subsequently used in his own model and testified about on surrebuttal. In sum, Wolfe provided his estimates for four of the key sources of pollution: the OU1, OU2 and OU4 contributions to pollution in OU4B, as well as the

4

43% estimate for OU2 (NCR) contribution to pollution in OU4A.

But, the moving parties note, there was no evidence as to Wolfe's estimates about two of the other key sources of pollution into OU4A, namely those in OU1 (like Glatfelter) and OU4A itself (U.S. Paper). Accordingly, because Wolfe's estimates were incomplete, Butler could not have arrived at a meaningful stand-alone estimate because he did not have estimates for all of the key PRPs. He must simply have guessed at them.

NCR protests that there is no mystery as to where Butler's data came from because it is readily discernable from Wolfe's expert report. The parties debate whether the expert report was itself admitted into evidence, but that is irrelevant. An expert is not bound to rely only on "evidence" admitted at trial. Whether Wolfe's report was admitted as evidence or not, NCR argues, Butler read it and relied on it. (Tr. 1514, ECF No. 726.) Even if true, the report still limits itself to estimates for OU4B rather than OU4A. (ECF No. 628-9 at 63-64.) That is, there is no table or other graphic demonstrating Wolfe's conclusions about OU4A. Thus, contrary to this court's earlier belief, it was not simply a matter of Butler using another expert's mass estimates and running them through his apportionment model. Instead, two of the key estimates are missing from the data set that Butler relied upon in reaching his conclusions.

NCR argues that the estimates are "readily obtained" from Wolfe's expert report, (ECF No. 1025-1 at 3.), but its choice of the passive voice verb is telling. It is conceivable that Wolfe's estimates for the other operable units from data contained within the report are obtain*able*, or that they are "obtained" now, but Butler did not testify that he ever actually obtained them, nor did he explain how he would have done it. The fact that a report might allow an expert to divine another expert's estimates does not mean that the expert actually did so.

5

In fact, the trial testimony suggests that Butler did *not* have complete data from Wolfe, contrary to this court's earlier assumptions. Recall that Butler did not have any of Wolfe's OU4A estimates until he was cross-examined by Georgia-Pacific's counsel, who informed him that Wolfe indeed had an estimate for OU2 (NCR) contributions to OU4A. That was the only OU4A estimate Butler had. As NCR's counsel explained during the trial, Butler "has since [i.e., since the cross-examination] been able to use his model and use that input, which he had not had an opportunity to do until our rebuttal evidence." (ECF No. 731 at 141, Tr. 2782.) And Butler himself testified that Wolfe' report "did not provide an estimate for OU4A." (*Id.* at 139, Tr. 2780.) If Butler had actually found and used all of Wolfe's key estimates in the expert report, he would not have needed to wait until trial to use Wolfe's OU2 estimate for OU4A—he would already have known it. As NCR's counsel explained at trial in response to an objection, "all he's done [Butler] is redo exactly the same model that counsel have had for weeks or months, simply changing one variable, which is the 43 percent estimate, in place of the 37 percent Simon estimate that he used the last time." (*Id.* at 2784.) Thus, it seems abundantly clear that Wolfe used the 43 percent estimate for NCR, but did *not* use Wolfe's other estimates for OU1 and OU4. He only changed "one variable"—Wolfe's estimate of 43 percent for OU2 contributions into OU4A.

In short, if Butler had actually obtained the estimates for OU4A in the report, he would have said so. Instead, it is clear that NCR is now attempting to reconstruct what *could* have been done rather than explaining what Butler actually did. In short, it is largely a mystery as to how Butler was able to arrive at a 28% figure for NCR's contribution to the harm in OU4 because Butler was missing two of Wolfe's key estimates for OU4A. Instead, it appears that Butler's model incorporated and relied upon incomplete estimates, and, as I found above, the estimates from Wolfe

6

that Butler did have were themselves deeply flawed. Accordingly, I now conclude that Butler's use of Wolfe's estimates did not provide a reasonable basis for apportioning the costs.

**B. Changed Paradigm**

A second reason for rejecting Butler's apportionment approach is that he was operating under a paradigm (what we have been calling the "binary" approach) that is no longer operative. Butler's approach to apportioning costs produced results that changed NCR's share very little, even if the PCB mass assumptions varied widely. For example, when Butler used Wolfe's 43% figure instead of the 37% figure he had adopted from the Simon team, the share he now attributed to NCR rose from 23.5% to 23.7%, a measly two-tenths of one-percent, even though Wolfe's 43% figure was some 16 percent higher (6 / 37ths) than 37 percent. Under Butler's method, one could ascribe to NCR *very* large mass estimates without moving the needle very much. Butler explained this apparent anomaly by citing the now-abandoned binary model. The reason there was such a small change in NCR's share, he explained, "has to do with the relationship between PCB mass and cost, which is nonlinear. And that flows from the Remedial Action Decision Rules and the very low 1 part per million PCB threshold here. So that when we're in a situation like we are in Scenario 4 with 37 percent, we're already a fair amount above the 1 part per million threshold. So by adding additional mass and increasing the concentration, what you see is a very small change in the footprint of the remedy, very small change in the remedial quantities, and a very small change in the cost." (*Id.* at 2785-86.) Almost every assumption Butler relied on was overruled by the Seventh Circuit, which held:

> [T]he harm resulting from PCB contamination in the Lower Fox River cannot be characterized as binary. PCB concentrations below the 1.0 ppm remedial action level and even the 0.25 ppm target SWAC still pose a threat to human health and the

7

environment. Even in areas where no remediation is required, higher PCB concentrations contribute more to the risk of harm and require a longer period of natural recovery to achieve an acceptable risk. Moreover, not all concentrations above EPA's remedial thresholds are equally harmful; the risk of harm increases with concentration even at high levels.

The continuous (as opposed to binary) nature of PCB contamination in the Lower Fox River leads us to reexamine EPA's remediation rules to determine whether remediation costs are still a useful approximation of the contamination caused by each party. As with the contamination, the district court thought that remediation costs resembled an on/off switch: sediment with PCB concentrations below 1.0 ppm would impose no remediation costs, while sediment with PCB concentrations above 1.0 ppm would always impose about the same remediation costs. We think the district court got this wrong as well. In fact, remediation costs increase with the degree of contamination above 1.0 ppm. As a result, remediation costs are still a useful approximation of the degree of contamination caused by each party.

*United States v. P.H. Glatfelter Co.,* 768 F.3d 662, 677 (7th Cir. 2014).

In short, key assumptions in Butler's apportionment model caused it to be insensitive to additional PCB mass estimates, in contradiction of the Seventh Circuit's view that both the harm and the cleanup costs are relatively linear, i.e., non-binary. These assumptions were fundamental to Butler's approach, and as such they infect his entire model. Because the fundamental premise of his model has been overturned on appeal, the entire model cannot be used as a sound basis for apportioning costs.

### 3. Causation and Equity

Glatfelter and others argue that since NCR caused the *entirety* of the harm by producing carbonless copy paper in the first place, the harm must not be divisible. But this effort ignores that equity has no role in divisibility, and accepting it would create a kind of product liability framework for CERCLA rather than one based on actual pollution, which is a strict liability tort. In every pollution case, the pollution would not have occurred *but for* the creator of the toxin—the chemical,

8

oil, or whatever. Here, that company is Monsanto, which is not even a party. CERCLA, however, operates on a pollution model, not a products liability model, and so to the extent any of the motions rely on that argument, they are denied.

## II. Motion to Withdraw Sixth Claim for Relief

The Plaintiffs also filed a motion seeking leave to withdraw the sixth claim for relief in their first amended complaint. They note that the claim, which seeks natural resource damages, is being withdrawn in connection with the receipt of some $45.9 million in settlements. Glatfelter has responded to the motion by asking that any dismissal of the claim be *with* prejudice rather than without.

A court may, in its discretion, allow a litigant to withdraw a claim so long as the motivation is not based on procedural gamesmanship. *Solaia Tech. LLC v. Arvinmeritor, Inc.,* No. 02-C-4704, 2004 WL 2203437, at *6 (N.D. Ill. Sept. 29, 2004). Here, the government has offered ample explanation for no longer wishing to pursue the claim in the context of this litigation. Functionally, the "withdrawal" of a claim is not a dismissal but an allowance of an amended complaint. Glatfelter has not presented any sound basis to conclude that the government's withdrawal of the complaint should be treated as a dismissal with prejudice. Accordingly, the claim will be considered withdrawn.

## III. Conclusion

For these reasons, the motions for reconsideration are **GRANTED**. I conclude that NCR has failed to meet its burden to demonstrate both that the harm is theoretically capable of divisibility and that there is a reasonable basis for apportionment. The United States is directed to submit a proposed judgment within seven days.

9

The motion to intervene [1007] is **GRANTED**. The motions to file a sur-reply [1025, 1027] are **GRANTED**.

The motion for leave to withdraw [999] is **GRANTED**. The Plaintiffs' Sixth Claim for Relief (seeking natural resource damages) in their First Amended Complaint shall hereby be deemed withdrawn at Plaintiffs' request.

**SO ORDERED** this  19th  day of October, 2015.

  /s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court