# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA and
THE STATE OF WISCONSIN,

      Plaintiffs,

v.                                           Case No. 10-C-910

NCR CORPORATION, et al.,

      Defendants.

---

**DECISION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
ON RECOVERY OF RESPONSE COSTS FROM P. H. GLATFELTER CO.**

---

In what remains of this enforcement action under Section 107(a)(4) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607(a)(4), the Plaintiffs seek recovery from defendant P. H. Glatfelter Company of more than $33 million in unreimbursed costs (including statutory prejudgment interest) incurred by the Environmental Protection Agency (EPA) in remediating the PCB contamination of the lower Fox River (the Site) through June 30, 2015. Glatfelter, together with other defendants, including NCR Corporation and Georgia Pacific, were previously found jointly and severally liable for the $1.3 billion clean-up that has continued for close to twenty years. *See United States v. P. H. Glatfelter Co.*, 768 F.3d 662 (7th Cir. 2014), and ECF No. 1033. A trial in this action on the amounts that remained owing for the clean-up and on the apportionment of liability among the remaining, non-settling defendants, Appvion, and Georgia Pacific in the related contribution action, *NCR v. Whiting et al*, No. 08-C-0016, was scheduled to commence on May 8, 2017. ECF No. 1152. The trial was removed from

the calendar and all proceedings stayed on January 20, 2017, however, after the Plaintiffs filed a notice of settlement and a proposed consent decree they had entered into with NCR and Appvion, the successor company to Appleton Papers, Inc., which was seeking reimbursement from the other defendants for clean-up costs it had allegedly paid as a volunteer. ECF Nos. 1169, 1183.

Following the required public comment period and further consultation with the parties, the Plaintiffs filed their joint motion for court approval of a revised consent decree on March 29, 2017. Over Glatfelter's objection, the court approved the revised consent decree, which resolved most of the issues that remained for trial, in a decision and order entered on August 23, 2017. That decision is currently on appeal. What remains before the court are the cross motions for summary judgment of the United States and Glatfelter on the United States' claim for unreimbursed past response costs (through September 30, 2015) associated with the Site as a whole or response work in Operable Units 2 through 5 at the Site. Both the United States and the State of Wisconsin also seek a declaration that Glatfelter is liable for any future related response costs. This decision will address those motions. It will also address Glatfelter's motion for reconsideration of the court's January 3, 2017 order granting the government's motion in limine precluding Glatfelter from offering evidence at trial intended to show that the amount of money that was received by the Plaintiffs in previous settlements and allocated to the Natural Resource Damage Assessment and Restoration (NRDAR) fund substantially exceeds the actual damages to natural resources caused by the PCB contamination and the costs of its assessment. ECF No. 1171.

**A. Statutory Framework**

Under Section 107(a)(4)(A) of CERCLA, responsible parties must pay "all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national

contingency plan. 42 U.S.C. § 9607(a)(4)(A). The National Contingency Plan (NCP), promulgated as a regulation pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, prescribes requirements for removal and remedial actions. Consistent with the broad language of the statute and its remedial purpose, "all costs" has been held to include the direct costs of actual clean-up, as well as a broad range of costs, such as investigative costs and enforcement costs. The term has also been held to include as indirect costs administrative and overhead costs incurred in managing the greater Superfund program. *United States v. W. R. Grace & Co.*, 429 F.3d 1224, 1250 (9th Cir. 2005); *United States v. E. I. DuPont De Nemours and Co., Inc.*, 432 F.3d 161, 178 (3d Cir. 2005); *United States v. R. W. Meyer, Inc.*, 889 F.2d 1497, 1499–1508 (6th Cir. 1989). In addition, the statute expressly allows for the recovery of interest. 42 U.S.C. § 9607(a)(4). Once recovered, such funds are deposited with the United States Treasury to replenish the Hazardous Substance Superfund, which is used to finance CERCLA cleanup efforts across the nation. *See* 42 U.S.C. §§ 9601(11), 9604; 26 U.S.C. § 9507; *see also United States v. Bestfoods*, 524 U.S. 51, 55 (1998).

Under Section 107(a)(4)(C), "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release" of hazardous substances are also recoverable from responsible parties. 42 U.S.C. § 9607(a)(4)(C). Liability for natural resource damage (NRD) goes to the United States Government and the State in which the damage occurs. Liability for NRD also extends to any Indian tribe where the damage is to natural resources "belonging to, managed by, controlled by, or appertaining to such tribe, or held in trust for the benefit of such tribe, or belonging to a member of such tribe, if such resources are subject to a trust restriction on alienation." 42 U.S.C. § 9607(f)(1). Funds recovered for NRD are held in trust by the United States Department of the Interior (DOI)

3

"for use only to restore, replace, or acquire the equivalent of such natural resources." *Id.* Any determination or assessment of damages to natural resources made in accordance with the applicable regulations has "the force and effect of a rebuttable presumption on behalf of the trustee in any administrative or judicial proceeding under this chapter or section 1321 of Title 33." 42 U.S.C. § 9607(f)(2)(C).

In cases such as this where multiple parties are responsible for the discharge of hazardous substances and the resultant pollution, the general rule is that each party responsible for the discharge is jointly and severally liable for the entirety of the clean-up and damages resulting therefrom, unless that party can establish a reasonable basis for apportionment. *See Burlington Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614 (2009) ("Not all harms are capable of apportionment, however, and CERCLA defendants seeking to avoid joint and several liability bear the burden of proving that a reasonable basis for apportionment exists."). Even where joint and several liability obtains, a party that pays more than its fair share can seek contribution from any other party that is liable or might be liable. Finally, and key to the dispute between the parties here, is Section 113(f)(2), which governs settlement. That Section states:

> A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. *Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.*

42 U.S.C. § 9613(f)(2) (italics added).

**B. Previous Settlements, Allocation of Payments and Remaining Amounts Due**

Over the past two decades, the Plaintiffs have resolved the liability of dozens of parties alleged to have contributed to the PCB contamination of the Site through a number of judicial

4

consent decrees and administrative orders. Of the hundreds of millions of dollars expended in the cleanup or recovered by the Plaintiffs, the United States claims that roughly $33 million remains of its own costs incurred for the cleanup of the non-OU1 portion of the Site that has not been reimbursed. This amount represents direct and indirect costs incurred by the EPA, together with pre-judgment interest through September 30, 2015. The specific amounts are set forth in an Itemized Cost Summary, which contains a tabular breakdown of the various costs under the headings EPA Payroll and Travel Costs, Contractor Costs, Miscellaneous Costs, Inter-Agency Agreement Costs, Superfund Cooperative Agreement Costs, EPA Indirect Costs, and Prejudgment Interest. ECF Nos. 1132 ¶¶ 5, 7; 1133 at 10. It is this amount that the United States seeks to recover from Glatfelter, the last non-settling defendant.

Glatfelter does not dispute that the EPA incurred the vast majority of these costs in its response to the PCB contamination of the Site. In fact, it appears Glatfelter has no objection to well over $30 million of the total unreimbursed response costs the government claims EPA incurred. The government contends that NCR's objection to an additional $2 million, which Glatfelter has joined, can be readily resolved in favor of the government, leaving the government's right to recover roughly $32 million in unreimbursed response cost clear as a matter of law. With Glatfelter's joint and several liability already established, the government contends that it is entitled to summary judgment for at least this amount, with the remaining portion of its claim to be determined at trial unless the parties are able to reach agreement on the relatively small amount still in dispute.

If that was the end of the matter, the resolution would be clear. Unfortunately, it is not. Glatfelter points out that the Plaintiffs have allocated more than $100 million dollars of the settlement proceeds to the NRDAR Fund maintained by the United States Department of the Interior

5

for NRD caused by the release of PCBs to the Site. Glatfelter contends that this amount vastly exceeds the actual NRD. In support of this contention, Glatfelter notes that over $60 million of the funds transferred to the NRDAR Fund have not yet been applied to any response costs or NRD. Those funds, Glatfelter contends, "remain unspent in the NRDAR Fund for various as-yet-undetermined future NRD projects at the Fox River site." ECF No. 1157 at 2. Glatfelter has proffered evidence in the form of the opinion of its experts that the NRD injury suffered at the Fox River site already has been more than adequately compensated by the over $40 million spent to date. ECF No. 1106-2. Thus, Glatfelter contends, the more than $60 million remaining in the NRDAR Fund constitutes a windfall. More importantly, Glatfelter contends that by allocating such a large portion of the settlement proceeds to the NRDAR Fund, the Plaintiffs have deprived the non-settling defendants of the benefit of the reduction in liability to which they are statutorily entitled under Section 113(f)(2). Once the full amount of the money already paid in settlement of the claims is properly allocated, Glatfelter contends, the remaining unreimbursed costs the United States is seeking is reduced to zero.

The Plaintiffs dispute Glatfelter's claim that the amount of the settlements allocated to the NRDAR Fund for the Site exceed the actual NRDs. In fact, the Plaintiffs argue that notwithstanding their decision to withdraw their NRD claim after the last series of settlements before the most recent consent decree with NCR and Appvion, the NRDAR Fund trustees' formal damage assessment is for far more than the amount of the settlements allocated to the Fund. Plaintiffs note that the DOI-commissioned study of past and future recreational fishing damages alone were estimated in 1998 dollars at $123 million. ECF No. 1155 at 8. Thus, the Plaintiffs contend, a factual dispute precludes

6

entry of summary judgment in Glatfelter's favor even if its statement of the law is correct. The Plaintiffs' primary argument, however, is that Glatfelter's statement of the law is wrong.

The difficulty with Glatfelter's position, at least from the perspective of the government, is that the additional $60 million that Glatfelter claims should be used to reduce its liability for the government's remaining unreimbursed response costs is not available for that purpose. Pursuant to a series of consent decrees, that money has been allocated to NRD and transferred to the NRDAR Fund and cannot be used to pay for response costs. As Glatfelter well knows, the money so allocated is held in a separate account under the control of the federal, state and tribal co-trustees and cannot be used to pay for EPA cleanup expenses. Sums recovered by the federal or state government for NRD, pursuant to 42 U.S.C. § 9607(a)(4)(C), are held by the Department of the Interior and can be used only "to restore, replace, or acquire the equivalent of such natural resources." 42 U.S.C. § 9607(f)(1). Thus, the government argues, these funds cannot be used to reimburse the EPA and replenish the Superfund for the response costs it has incurred that remain outstanding.

In addition to the overpayment to the NRDAR Fund, Glatfelter also notes that the State of Wisconsin holds a surplus of approximately $4 million over the amount of the costs it incurred as of September 30, 2015. This amount, Glatfelter contends, also represents settlement recoveries that have not been applied to reduce the potential liability it faces. Thus, Glatfelter argues, the United States' cost recovery claim must also be reduced by this amount as required by Section 113(f)(2).

**C. NRD Allocation**

   **1. Statutory right to reduction**

The United States contends that Glatfelter's argument that amounts allocated to the NRDAR Fund can be used to reduce its liability for the unreimbursed response costs the EPA incurred in

7

connection with the cleanup has no basis in the law. Indeed, the United States contends that Glatfelter's argument flies in the face of Section 113(f)(2), the very provision upon which Glatfelter's argument is based. In the view of the United States, "§ 113(f)(2) only allows a reduction of EPA's response cost claim for the 'amount of the settlement' actually earmarked and paid to settle that EPA response cost claim." ECF No. 179 at 2–3. The government notes that "Congress created separate statutory claims for response costs and NRD, to be brought by different claimants, with different statutes of limitations, and with recoveries directed to different funds dedicated to different purposes." *Id.* at 3. The differences between response cost and NRD claims, the government contends, are not merely technical distinctions. *Id.* It argues that neither the statute nor the case law lend any support for Glatfelter's argument that settlement payments on separate claims involving different claimants and separate types of losses can offset each other. *Id.*

I disagree with the government's contention that Glatfelter's argument has no support in the law. To the contrary, Glatfelter's argument is based on a plain reading of Section 113(f)(2). To repeat, that section states that while the government's settlement with one responsible party does not discharge the liability of any other responsible party, it does "reduce[] the potential liability of the others by the amount of the settlement." The government reads this provision as limiting the amount of the reduction in the potential liability of non-settling parties to only that portion of the settlement paid for response costs. But that is not what the statute says. It provides for a dollar for dollar reduction of the liability of the remaining parties by the "amount of the settlement," not that portion of the settlement allocated to response costs.

While it is true that Section 113(f)(1) specifically references "response costs," the same is not true of Section 113(f)(2). The government has offered no reason why the settlement provision

8

should be construed so as to limit its effect in such a manner. The fact that money received in settlement may be for different claims and is to be allocated to separate funds for different purposes is not a reason to ignore the plain meaning of the statute. More importantly, to adopt the government's construction of the statute would insulate the government's allocation and use of settlement proceeds from any form of judicial review. The government would be able to minimize or even eliminate Section 113(f)(2) reductions by simply allocating all or most of the proceeds to NRDAR funds. For as Glatfelter points out, when the government settles with a responsible party, it in effect controls the terms of the agreement that govern how the payment received in settlement will be allocated between the response cost and NRD claims under the settlement agreement. The settling defendants have no incentive to negotiate the allocation terms as long as both claims are being dismissed. ECF No. 1157 at 17. What the government chooses to do with settlement proceeds should not diminish non-settlors' right to full credit for the settlement. The Plaintiffs should not be able to divert settlement funds to overpay NRD, as Glatfelter claims they have done, and still claim reimbursement for costs covered by the settlement.

### 2. Motion for reconsideration

This does not end the matter, however. Prior to the scheduled trial in the case, the court granted the Plaintiffs' motion in limine which sought to preclude Glatfelter from introducing evidence at trial to show that the actual NRD were significantly less than the portion of the settlements that had been allocated to the NRDAR Fund. In so ruling, I had accepted the Plaintiffs' argument that such evidence was barred by "*res judicata* principles." ECF No. 1167 at 3. In particular, I noted that Glatfelter had elected not to object to previous consent decrees that expressly provided for the allocations it now claims were improper. Indeed, I noted that Glatfelter had shown by its comments

9

on the then most recent consent decrees, which allocated an additional $45 million to the NRDAR Fund, that it fully realized the effect this allocation would have. Glatfelter had stated in its response to the Plaintiffs' motion for approval that it "maintains its belief that the payments of NRDs under the consent decrees may very well result in overpayment of NRD recoveries" and that such "overpayment will effectively be lost to the remaining defendants; it will not offset any costs or damages for which those remaining defendants might be liable." ECF No. 938 at 4. Nevertheless, Glatfelter elected not to oppose entry of the consent decree because it expected its fair share of the remaining costs and damages to be "relatively low" and thus its share of the likely overpayment "likely small relative to the likely higher cost of litigating the NRD claim." *Id.* at 4. Given its statements at the time, and in the absence of precedent for Glatfelter's position, I concluded the Plaintiffs' motion should be granted. I now conclude that this was error.

At the outset, I note that principles of res judicata are not applicable because there is no previous action. "[P]rinciples of preclusion are not pertinent until the first lawsuit has been concluded and a second, separate proceeding is underway." *Mizuho Corp. Bank (USA) v. Cory & Assocs., Inc.*, 341 F.3d 644, 653 (7th Cir. 2003). Under the circumstances here, the correct doctrine to consider is law of the case. *Id.* Even under this doctrine, however, Glatfelter is not bound by the previous allocations because there was no judicial determination of the actual NRD.

The allocation of settlement proceeds that Glatfelter now seeks to challenge resulted from consent decrees entered by the court. Although Glatfelter was a party to the case, it was not a party to the settlements reflected in the consent decrees. While Glatfelter could have objected to the motions seeking approval of the consent decrees, its failure to do so does not constitute a waiver of its right to challenge the allocation later. This is because even if Glatfelter had objected, it would not

10

have been entitled to a final determination of the issue. A district court's review of a proposed consent decree in a CERCLA action is deferential. The court "must approve a consent decree if it is reasonable, consistent with CERCLA's goals, and substantively and procedurally fair." *United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011) (citing *In re Tutu Water Wells CERCLA Litigation*, 326 F.3d 201, 207 (3d Cir. 2003)). In reviewing a request for approval, "the trial court must defer to the expertise of the agency and to the federal policy encouraging settlement." *Id.* The general rule is that in cases involving judicial approval of consent decrees, "[a]ny findings made as part of the approval process go to the reasonableness of the settlement, not the merits of the dispute." Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 18A FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2d § 4443 at 257 (West 2002); *see also* Restatement (Second) of Judgments § 27, cmt. e ("In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated.").

It thus follows that Glatfelter is not bound by the allocation of payment for NRD to the NRDAR Fund previously approved by the court. If at trial Glatfelter is able to establish that the amount of the previous settlements allocated to the Fund exceeds the actual NRD, Glatfelter is entitled to a reduction in its own liability to the extent of such excess. Of course, if the Plaintiffs seek to and are allowed to reassert their NRD claim against Glatfelter and prove the NRD exceeds what has been collected, Glatfelter may be liable for even more than the government now seeks in response costs. This is the risk it takes. I also realize that my ruling may mean that the government cannot collect all of its remaining unreimbursed response costs from Glatfelter. Whether the government could collect its shortfall from any overpayment it made to the NRDAR Fund is a question that is not before the court, but it does not alter the effect of section 113(f)(2). In any event, for the reasons

11

set forth above, I conclude that Glatfelter's motion for reconsideration should be granted. Neither party is entitled to summary judgment on this issue.

**D. State Surplus**

Glatfelter also seeks to reduce its liability for the EPA's unreimbursed response costs by the roughly $4 million that the State of Wisconsin currently holds and has not expended either for cleanup of the Site or for NRD. There is no dispute that the State holds such a surplus. The $4 million represents part of the settlement proceeds that have been paid by other responsible parties. Based again on the language of § 113(f)(2), Glatfelter contends it is entitled to have its liability reduced by this amount.

The government in response again argues that the EPA's response costs cannot be reduced by money held by a separate government department or agency. But again, that is not what the statute says. Section 113(f)(2) states that the liability of the remaining parties is to be reduced by the amount of the settlement, not by the amount of the settlement allocated to the EPA's costs. If the settlement proceeds exceed that amount that the State incurred as of September 30, 2015, which is how the government has defined its claim, then Glatfelter is entitled to a dollar for dollar reduction in its liability as of that date.

The Plaintiffs note that they are continuing to incur ongoing costs for oversight, monitoring, legal expenses, and expert fees, and thus any surplus is likely to be exhausted in relatively short order. Indeed, it may have been already. For this reason, the amount of the reduction may be significantly lessened, if not eliminated with an amendment of the claim. But based on the record as it now stands, Glatfelter is entitled to a reduction in the government's cost recovery claim by the amount of the surplus on settlement funds held by the State of Wisconsin.

**E. Indirect Costs of WDNR Agreement**

Glatfelter joined in NCR's objection to $2,254,697 in indirect costs the EPA was seeking for its 2013 Cooperative Superfund Agreement with the Wisconsin Department of Natural Resources (WDNR). The EPA incurs both direct and indirect costs attributable to the Superfund program. The EPA's direct costs are accounted for on a site-specific basis. Indirect costs consist of the administrative and other overhead costs necessary to manage the greater Superfund program and support the functioning of relevant EPA employees and DOJ attorneys. "The process to allocate, or distribute, those indirect costs to Superfund is accomplished through an indirect cost methodology" developed by EPA accountants and financial experts in accordance with the Federal Accounting Standards Advisory Board #4 on cost accounting for the Federal government. ECF No. 1128 at 2–4. Neither NCR, nor Glatfelter challenge the EPA's indirect cost methodology. ECF No. 1133. Indeed, neither challenged the EPA's right to recover the indirect costs attributable to the EPA's 2013 Cooperative Agreement with WDNR. Rather, NCR's expert simply felt it was unfair to apply the indirect rate to EPA's direct costs incurred under the Agreement. ECF No. 1126 ¶¶ 45–47. As NCR views it, the indirect costs arising out of this agreement result from the EPA routing payments received from responsible parties in settlement through the Superfund before transferring them to WDNR for work it preformed at the Site. Given the key admissions by NCR's own expert, however, its objection to the indirect costs arising out of the 2013 Cooperative Agreement with WDNR fails. As the government points out without dispute, the EPA helped fund WDNR's oversight efforts through the Cooperative Agreement because NCR and Glatfelter refused to reimburse WDNR directly. Because the direct costs were paid out of the Superfund, the EPA was entitled to recover

the indirect costs attributable to those payments as well. Accordingly, the government is entitled to summary judgment on this amount.

**F. Declaratory Relief**

Lastly, the United States and State of Wisconsin claim they are entitled to declaratory relief against Glatfelter for future response costs. As noted, the governments' current cost claims in the case were tallied up through September 30, 2015, for the United States. For the State, the cost claims are for the period ending June 30, 2015. Because both governments have incurred and will continue to incur costs in connection with the cleanup of the site beyond those dates, they seek a declaration that Glatfelter is jointly and severally liable for future costs as well. The governments base their request on Section 113(g) which states: "In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2).

Glatfelter opposes the governments' request for declaratory relief on the ground that the statute limits the requirement for declaratory relief to an "initial action." Glatfelter contends that this is not an initial action since the government filed a previous action against it in 2003, *United States v. P.H. Glatfelter Company, et al.*, No. 2:03-cv-949-LA. (E.D. Wis.), which was ultimately resolved with a consent decree. For these reasons, Glatfelter contends declaratory relief is neither required nor called for.

I do not read Section 113(g)(2) as narrowly as Glatfelter does. In my view, the phrase "any such action" is not limited to initial actions, but applies to any CERCLA action for recovery of costs. Even if Glatfelter's reading of the statute were correct, this would simply mean that declaratory relief

was not mandatory, not that it was prohibited. Here, I conclude that declaratory relief is appropriate. "The structure of the subsection [113(g)(2)] indicates that the intent of Congress in including the sentence was to avoid the necessity of relitigating liability questions. It provides for the declaratory judgment as a way to manage the litigation in an efficient manner." *United States v. Navistar Intern. Transp. Corp.*, 152 F.3d 702, 709 (7th Cir. 1998). Here, there is no doubt that the Plaintiffs will continue to incur response costs in the future. Glatfelter's liability has already been determined by the court, and the Plaintiffs should not be forced to incur further costs and delay in attempting to collect future costs. Unlike the other defendants, Glatfelter has not entered into a settlement agreement with the Plaintiffs for the current Site. Under these circumstances, I conclude that the Plaintiffs' request for declaratory relief should be granted.

**G. Conclusion**

For the reasons set forth above, the United States' motion for partial summary judgment (ECF No. 1125) is granted in part and denied in part. The State of Wisconsin's motion for summary judgment on its claim for declaratory relief (ECF No. 1134) is granted. Glatfelter's motion for partial summary judgment (ECF No. 1141) is granted in part and denied in part, and Glatfelter's motion for reconsideration (ECF No. 1171) is granted. The clerk is directed to set the matter on the court's calendar for a telephone conference with the United States and Glatfelter to address further scheduling.

**SO ORDERED** at Green Bay, Wisconsin this 5th day of February, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court