# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA and
THE STATE OF WISCONSIN,

        Plaintiffs,

v.                                           Case No. 10-C-910

NCR CORPORATION, et al.,

        Defendants.

### DECISION AND ORDER DENYING MOTION FOR RECONSIDERATION AND GRANTING MOTION FOR RULE 56(g) FINDINGS

**I. Motion for Reconsideration**

Plaintiffs United States and the State of Wisconsin have moved for reconsideration of my decision denying their motion for partial summary judgment on their cost recovery claim against Defendant P. H. Glatfelter under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 et seq. Glatfelter, together with other defendants, including NCR Corporation and Georgia Pacific, were previously found jointly and severally liable for the $1.3 billion clean-up of the PCB contamination of the lower Fox River that has continued for close to twenty years. *See United States v. P. H. Glatfelter Co.*, 768 F.3d 662 (7th Cir. 2014); ECF No. 1033. In what remained of this enforcement action, Plaintiffs sought recovery from defendant P. H. Glatfelter Company, the last non-settling defendant, of more than $33 million in unreimbursed costs (including statutory prejudgment interest) incurred by the Environmental Protection Agency (EPA) in remediating the PCB contamination of the lower Fox River (the Site) through September 30, 2015.

Glatfelter did not dispute that the EPA incurred well over $30 million of these unreimbursed costs in its response to the PCB contamination of the Site. Glatfelter nevertheless opposed Plaintiffs' motion on the ground that Plaintiffs had already recovered far in excess of the additional $33 million they were seeking from Glatfelter from the other responsible parties with whom Plaintiffs had settled. Since CERCLA prohibits double recovery by government entities, Glatfelter argued in its cross motion for summary judgment that Plaintiffs' claims against it should be denied. I found that a material factual dispute precluded summary judgment in favor of either side and denied their respective motions. It is that decision that Plaintiffs ask me to reconsider.

As relevant here, CERCLA requires responsible parties to pay, and authorizes the federal and state governments to recover, two different categories of injury or harm flowing from the release of hazardous substances into the environment: (1) response or cleanup costs; and (2) natural resource damages (NRD). As to the first category, under Section 107(a)(4(A), responsible parties are required to pay "all costs of removal or remedial action incurred by the United States Government or a State or an Indian Tribe not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). The costs of removal or remediation are either paid directly by the responsible parties or incurred by the federal and state governments, which then seek reimbursement from the responsible parties. As to the second category, under Section 107(a)(4)(C), "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release" of hazardous substances are also recoverable from responsible parties. 42 U.S.C. § 9607(a)(4)(C). Amounts collected for NRD go to the United States Government and the State in which the damage occurs. Liability for NRD also extends to any Indian tribe where the damage is to natural resources "belonging to, managed by, controlled by, or

2

appertaining to such tribe, or held in trust for the benefit of such tribe, or belonging to a member of such tribe, if such resources are subject to a trust restriction on alienation." 42 U.S.C. § 9607(f)(1). Funds recovered for NRD are held in trust by the United States Department of the Interior (DOI) "for use only to restore, replace, or acquire the equivalent of such natural resources." *Id.*

"Importantly, CERCLA articulates a policy against double recovery." *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1017 (8th Cir. 2007) (citing 42 U.S.C. § 9614(b) (prohibiting duplicate recovery for the same removal costs)). In other words, the government is not allowed to collect more than it costs to remediate the contaminated site and compensate the interested parties for damages to natural resources. Glatfelter argues that Plaintiffs are trying to accomplish just such a double recovery here. Glatfelter's argument rests on Section 113(f)(2) of CERCLA which states:

> A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. *Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.*

42 U.S.C. § 9613(f)(2) (emphasis added).

Over the past two decades, Plaintiffs have resolved the liability of dozens of parties alleged to have contributed to the PCB contamination of the Site through a number of judicial consent decrees and administrative orders. Of the millions of dollars collected by Plaintiffs, more than $100 million of the settlement proceeds has been allocated to the Natural Resource Damage Assessment and Restoration (NRDAR) Fund maintained by the United States Department of the Interior. Glatfelter contends that this amount vastly exceeds the actual damages to natural resources caused by the PCB contamination. In support of this contention, Glatfelter notes that over $60 million of the funds transferred to the NRDAR Fund have not yet been applied to any response

3

costs or NRD. Those funds, Glatfelter contends, "remain unspent in the NRDAR Fund for various as-yet-undetermined future NRD projects at the Fox River site." ECF No. 1157 at 2. Glatfelter has proffered evidence in the form of the opinion of its expert that the NRD injury suffered at the Fox River site already has been more than adequately compensated by the over $40 million spent to date. ECF No. 1106-2. Thus, Glatfelter contends, the more than $60 million remaining in the NRDAR Fund constitutes a windfall. More importantly, Glatfelter contends that by allocating such a large portion of the settlement proceeds to the NRDAR Fund, Plaintiffs have deprived the non-settling defendants of the benefit of the reduction in liability to which they are statutorily entitled under Section 113(f)(2). Once the full amount of the money already paid in settlement of the claims is properly allocated, Glatfelter contends, the remaining unreimbursed costs the United States is seeking is reduced to zero.

As I noted in my decision denying the parties' cross motions for partial summary judgment, Plaintiffs dispute Glatfelter's contention that the amount of the settlements allocated to the NRDAR Fund for the Site exceed the actual NRD. In fact, Plaintiffs argue that notwithstanding their decision to withdraw their NRD claim after the last series of settlements, the NRDAR Fund trustees' formal damage assessment is for far more than the amount of the settlements allocated to the Fund. Plaintiffs note that the DOI-commissioned study of past and future recreational fishing damages alone were estimated in 1998 dollars at $123 million. ECF No. 1155 at 8. It was this dispute over these facts that led me to conclude that neither party was entitled to judgment as a matter of law and that a trial would be needed.

Plaintiffs argue, however, that the factual dispute over whether the amounts already collected for NRD exceed the damage to the natural resources actually caused by the contamination does not

4

preclude judgment in their favor. In essence, Plaintiffs argue that the factual dispute between the parties over whether the NRDAR was over-funded is not material to their cost recovery claim. This is because, in Plaintiffs' view, Section 113(f)(2) does not require a reduction in a non-settling party's liability for recovery costs by amounts paid by other potentially liable parties for natural resource damages. Because a claim for NRD is different than a claim for recovery of cleanup costs, Plaintiffs contend that payment by a settling party for NRD does not reduce the liability of a non-settling party for recovery of cleanup costs. Since Glatfelter concedes that Plaintiffs have unreimbursed cleanup costs in excess of $30 million, Plaintiffs argue that the fact that they may have collected $60 million more than the actual damage to natural resources is irrelevant.

I rejected this argument in denying Plaintiffs' motion for summary judgment, noting that the language of Section 113(f)(2) calling for a reduction of the liability of non-settling parties by amounts received from other potentially liable persons in settlement does not distinguish between cleanup costs and NRD. By its plain terms, the statute calls for a reduction of the liability of non-settling parties "*by the amount of the settlement*." This language provides no basis for reducing a responsible party's liability for only response costs and ignoring liability for NRD; it applies to the liability of the non-settling parties in general. And since Glatfelter has been found jointly and severally liable with the other responsible parties, it is entitled to the reduction in liability provided by the statute.

In addition to my reliance on the plain language of the statute, I explained why Plaintiffs' interpretation of the law was unreasonable in my original decision. In essence, I explained that the fact that CERCLA plaintiffs allocate certain portions of settlement proceeds to the NRDAR Fund is not a blank check by which the governments can siphon settlement funds away and make them unavailable for reducing the liability of the non-settling parties for cleanup costs:

5

> [T]o adopt the government's construction of the statute would insulate the government's allocation and use of settlement proceeds from any form of judicial review. The government would be able to minimize or even eliminate Section 113(f)(2) reductions by simply allocating all or most of the proceeds to NRDAR funds. For as Glatfelter points out, when the government settles with a responsible party, it in effect controls the terms of the agreement that govern how the payment received in settlement will be allocated between the response cost and NRD claims under the settlement agreement. The settling defendants have no incentive to negotiate the allocation terms as long as both claims are being dismissed. ECF No. 1157 at 17. What the government chooses to do with settlement proceeds should not diminish non-settlors' right to full credit for the settlement. The Plaintiffs should not be able to divert settlement funds to overpay NRD, as Glatfelter claims they have done, and still claim reimbursement for costs covered by the settlement.

ECF No. 1217 at 9. True, consent decrees are subject to public comment and judicial approval. But the public is concerned if at all with the amount of money the settlement provides, not its allocation, and as explained in my previous decision, a district court's review of a proposed consent decree in a CERCLA action is highly deferential and goes to the reasonableness of the settlement, not the merits of the dispute. ECF No. 1217 at 11. As a result, I concluded that Glatfelter was not bound by allocations approved in a consent decree to which it was not a party.

The risk of over-allocating settlement proceeds to NRD is real in light of the nebulous character of NRD and its assessment. As noted above NRD includes "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release" of hazardous substances. 42 U.S.C. § 9607(a)(4)(C). Under Section 107 of CERCLA, sums collected by the United States or state governments as trustees shall be retained by the trustee "for use only to restore, replace, or acquire the equivalent of such natural resources." 42 U.S.C. § 9607(f). But how does one put a dollar amount on the loss of nature's resources, whether temporary or permanent, or replace natural resources that have been destroyed? As one commentator has observed, "Calculating appropriate

6

natural resource damages involves not just legal, but economic and philosophical questions." Marissa L. Curran, THE WILDLIFE CARD: NATURAL RESOURCE DAMAGES AND PUTTING A PRICE ON NATURE, 30 NAT. RESOURCES & ENV'T 10 (2015).

Plaintiffs contend that I made a "critical error in finding that 'a plain reading of Section 113(f)(2)' provides all necessary 'support for Glatfelter's argument that settlement payments on separate claims involving different claimants and separate types of losses can offset each other.'" ECF No. 1220 at 3 (quoting ECF No. 1217 at 8). They argue that my construction of the statute violates traditional common law principles of tort law. In fact, however, it is Plaintiffs' construction that violates common law principles of tort law governing the apportionment of liability.

"When persons are liable because they acted in concert, all persons are jointly and severally liable for the share of comparative responsibility assigned to each person engaged in concerted activity." Restatement (Third) of Torts, § 15 (2000). Note that the rule is that persons acting in concert are liable for their assigned share of comparative responsibility in general, not for select items of harm. Plaintiffs' argument is premised on the assumption that the claim for response costs and the claim for NRD are separate and distinct claims that do not involve a common liability for common damages. Under the common law, however, response costs and NRD would be considered simply two separate and distinct kinds of injury or harm for which CERCLA authorizes plaintiffs to seek remedial relief and compensation. In effect, Plaintiffs have sued to recover damages arising from the same concerted activity, namely the PCB contamination of the lower Fox River. "Damages" under the Restatement, means "a sum of money awarded to a person injured by the tort of another," and "'compensatory damages' are the damages awarded to a person as compensation, indemnity or restitution for harm sustained by him." Restatement (Second) of Torts, §§ 901, 902.

7

In this action, Plaintiffs seek to recover money both for the cost of remediation of the PCB contamination and for the damage to the natural resources caused by the contamination. Glatfelter, together with a number of co-defendants, have been found jointly and severally liable for the resulting injury and harm caused by the contamination. Glatfelter is therefore entitled to a reduction of its liability in its entirety by the amounts paid in settlement by the other responsible parties. Nothing in either the language of the statute or the cases cited by Plaintiffs support their argument that Glatfelter is bound by Plaintiffs' own assessment of NRD. To the contrary, CERCLA explicitly envisions a judicial determination of NRD when the parties do not agree. 42 U.S.C. § 9607(f)(2)(C).

The Department of the Interior has promulgated regulations setting forth the procedure for determining compensation for injuries to natural resources that are not expected to be addressed by response actions. *See* 43 C.F.R. Part 11. Any determination or assessment of damages to natural resources made in accordance with the applicable regulations has "the force and effect of a rebuttable presumption on behalf of the trustee in any administrative or judicial proceeding under this chapter or section 1321 of Title 33." 42 U.S.C. § 9607(f)(2)(C). Glatfelter contends that the determination of NRD in this case was not made in accordance with the applicable regulations and thus no presumption applies. Regardless, a factual dispute remains as to the NRD caused by the PCB contamination. And for the reasons set forth in my original decision denying the cross motions for summary judgment, Glatfelter is not bound by the allocation set forth in the prior consent decrees to which it was not a party.

Plaintiffs argue that if Glatfelter is allowed to challenge their allocation of settlement proceeds between response costs and NRD at this point long after consent decrees have been entered and approved, it would "inject uncertainties and frustrate Congressional intent by reducing a

8

governmental plaintiff's incentive to negotiate partial settlements when multiple CERCLA claims are at stake." ECF No. 1236 at 13. To be sure, the court's ruling, if it stands, may encourage CERCLA plaintiffs to modify their approach to interim allocation of settlement proceeds, but the incentive to settle CERCLA cases will likely remain strong. While Plaintiffs contend that allowing Glatfelter's challenge to the NRD allocation to go forward in this case may place full recovery of the EPA's response costs in jeopardy, the difficulty seems more an accounting problem than one of substance.

In any event, the ability to challenge the allocation does not mean that the allocation will be upset. As I noted in my original decision denying the parties cross motions for summary judgment, Glatfelter is incurring risk in challenging the NRD allocation:

> If at trial Glatfelter is able to establish that the amount of the previous settlements allocated to the Fund exceeds the actual NRD, Glatfelter is entitled to a reduction in its own liability to the extent of such excess. Of course, if the Plaintiffs seek to and are allowed to reassert their NRD claim against Glatfelter and prove the NRD exceeds what has been collected, Glatfelter may be liable for even more than the government now seeks in response costs. This is the risk it takes.

ECF No. 1217 at 11. Given the presumption an NRD assessment made by a Federal or State trustee in accordance with the DOI regulations enjoys in any administrative or judicial proceeding, the risk will in most cases be substantial enough to deter all but the strongest challenges. In this case, Glatfelter has offered evidence that the NRD assessment by the trustees was not in accordance with the applicable regulations and exceeds the actual damages to natural resources by more than $60 million. The trustees' NRD assessment has not been tested in an adversary process or subjected to meaningful judicial review. It was arrived at by Plaintiffs or their designees. To hold that a defendant is bound by a damage determination made by the plaintiff is contrary to the very notion of due process.

9

In sum, when tortfeasors act in concert, they are jointly and severally liable to the plaintiff for all of the damages caused by their conduct. But the plaintiff is only entitled to a single recovery. A plaintiff has no right to recover more than what is reasonably necessary to compensate him for the actual loss or injury. He cannot allocate a settling defendant's payments to over-compensate one category of damages in order to preserve a claim for another category of damages flowing from the same conduct and thereby obtain a windfall. That is what Glatfelter contends Plaintiffs have done here.

Finally, Glatfelter also noted that the State of Wisconsin was holding a surplus of roughly $4 million in settlement funds that it had not expended as of June 30, 2015. Thus, even aside from the excess payment for NRD, Glatfelter argued that Plaintiffs' claim for unreimbursed cleanup costs incurred as of that date must be reduced by at least the amount of the State's surplus. Though the State argued that the surplus was likely to disappear as the State continued to incur ongoing costs for oversight, monitoring, legal expenses, and expert fees, I concluded that based on the record as it then stood, Glatfelter was entitled to the reduction in Plaintiffs' cost recovery claim. Plaintiffs contend this was error and seek reconsideration of this finding as well. Plaintiffs argue that Wisconsin's response cost recovery cannot offset or reduce the United States' claim for EPA's unreimbursed response costs since they are separate and distinct claims held by separate and distinct entities.

Plaintiffs' argument ignores the fact that they brought this action jointly seeking recovery of the costs of cleaning up the same contamination. They decided how they would divide the work required to oversee and monitor the cleanup of the site and how the funds received in settlement from other responsible parties would be allocated between them. If, as all parties appear to concede,

10

the State of Wisconsin was holding a $4 million surplus on funds intended for payment of response cost incurred as of June 30, 2015, then Glatfelter was entitled to a reduction in its liability for that claim in the amount of the surplus. As I stated in my original decision, however, the surplus as of June 30, 2015, may become partly or fully offset from the State's ongoing oversight and monitoring responsibilities, in which case we are presented with little more than an accounting problem that should be easily resolved by the time of trial. To the extent the State's surplus is used to pay ongoing oversight and monitoring responsibilities, it will not be available to reduce the EPA's unreimbursed response costs. Glatfelter disputes whether the entire amount of the surplus will be needed for such purposes. I concluded that on the record as it then stood, Glatfelter was entitled to the reduction on Plaintiffs' claim for unreimbursed cleanup costs. On reconsideration, I conclude that a factual dispute precludes a finding that Glatfelter is entitled to a reduction at this point based on the surplus the State was holding as of June 30, 2015. With this qualification, Plaintiffs' motion for reconsideration is denied.

## II. Motion for Rule 56(g) Findings

Plaintiffs have also moved for an order identifying facts not genuinely in dispute pursuant to Rule 56(g) of the Federal Rules of Civil Procedure. Rule 56(g) states that if the court does not grant all the relief requested by a motion for summary judgment, "it may enter an order stating any material fact--including an item of damages or other relief--that is not genuinely in dispute and treating the fact as established in the case." Plaintiffs request that the court make the following findings of undisputed material facts:

- Through September 30, 2015, EPA had incurred at least $32,748,629.76 in unreimbursed non-OU1 response costs, including prejudgment interest, as shown in Alternative Calculation C in the declaration of Wiley Wright (Dkt.

11

> No. 1127-5). Those EPA costs incurred through September 30, 2015, are not inconsistent with the National Contingency Plan.
>
> • As of June 30, 2015, the State of Wisconsin had a positive balance of no more than $4,631,817 from State response cost settlement recoveries and reimbursements, computed as the difference between such recoveries and reimbursements through that date ($43,336,579) and the uncontested response costs that the State had incurred through that date ($38,704,762). The uncontested response costs that the State of Wisconsin had incurred through June 30, 2015, are not inconsistent with the National Contingency Plan.

ECF No. 1235 at 2. Plaintiffs' motion to identify these undisputed facts will be granted. Glatfelter does not contest the amount of EPA's unreimbursed response costs or that they were not inconsistent with the National Contingency Plan. Glatfelter has objected to the second finding concerning the State's balance from settlement response cost recoveries, but its objection is waived and without merit in any event.

Glatfelter contends that the costs incurred by the State for oversight of work done to implement the remedy in Operable Units 2-5 (OU 2-5) is inconsistent with the National Contingency Plan because as the lead agency on the site, EPA was required to perform the oversight. Glatfelter's objection, which is based on the opinion of its expert, is not timely. The time for expert disclosure is long past, and it is too late to offer revisions of expert reports to support new opinions. Glatfelter also failed to offer this argument in response to Plaintiffs' motion for partial summary judgment. The objection is therefore waived. More importantly, the objection is without merit since there is nothing in the National Contingency Plan that suggests that EPA cannot use a state agency to meet its oversight responsibilities. Accordingly, both of the proposed findings requested by Plaintiffs are adopted in full.

In conclusion and for the reasons set forth above, Plaintiffs' motion for reconsideration (ECF No. 1219) is **DENIED** and their motion for an order identifying material facts not in dispute (ECF No. 1221) is **GRANTED**. Glatfelter is directed to file a response to Plaintiffs' motion for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) on or before August 15, 2018, with Plaintiffs' reply due fifteen days thereafter.

**SO ORDERED** at Green Bay, Wisconsin this 12th day of July, 2018.

                                        s/ William C. Griesbach
                                        William C. Griesbach, Chief Judge
                                        United States District Court